NO. 25-1372

# United States Court of Appeals

## *for the*

# Fourth Circuit

---

CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC.

*Plaintiff-Appellant,*

– v. –

ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES,
d/b/a Accrediting Commission of Career Schools and Colleges

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

## APPELLANT'S OPENING BRIEF

DAVID OBUCHOWICZ
GOMBOS LEYTON, PC
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
(703) 934-2660

*Counsel for Plaintiff-Appellant*

CP COUNSEL PRESS      (800) 4-APPEAL • (812711)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1372          Caption: Center for Excellence in Higher Education, Inc. v. ACCSC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Center for Excellence in Higher Education, Inc.
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David A. Obuchowicz                    Date:       April 24, 2025

Counsel for: Appellant CEHE

Print to PDF for Filing

# Table of Contents

**Page**

Table of Authorities .......................................................................... iii

Jurisdictional Statement .....................................................................1

Introduction ........................................................................................2

Statement of the Issues ......................................................................4

Statement of the Case ........................................................................5

    A.   Center for Excellence in Higher Education and Independence
University ............................................................................5

    B.   Accrediting Commission of Career Schools and Colleges .................6

    C.   ACCSC's Student Achievement Standards ...........................................9

    D.   ACCSC monitored CEHE's efforts to improve student
retention and concluded that CEHE demonstrated good cause ..........11

    E.   ACCSC withdrew IU's accreditation despite its recognizing
CEHE's success in resolving student achievement concerns .............15

    F.   ACCSC blocked CEHE's due process right to challenge the
legitimacy of the withdrawal decision .................................................19

    G.   The district court's decisions also barred CEHE from raising
its due process and bad faith claims ....................................................22

Summary of Argument ....................................................................24

Argument...........................................................................................27

    I.    Standard of Review .........................................................................27

    II.   The District Court erred in denying CEHE's Motion to
Vacate because CEHE was denied a full and fair hearing.................28

    III.  The District Court erred in dismissing CEHE's well-pled
common-law due process and tort claims as "collateral
attacks" on an arbitration award.........................................................33

i

IV.    CEHE's Complaint raises factual allegations that plausibly establish its common law due process and tortious interference claims ...............................................................39

      a.    CEHE plausibly alleged that ACCSC withdrew IU's accreditation in bad faith...........................................40

      b.    CEHE alleged that ACCSC's internal appeals and arbitration procedures failed to provide due process...............45

Conclusion ...............................................................................47

Request for Oral Argument........................................................47

Certificate of Compliance

Addendum of Statutory and Regulatory Authorities

# Table of Authorities

**Page(s)**

**Cases:**

*Accrediting Council for Indep. Colls. & Sch. v. Devos*,
  303 F. Supp. 3d 77 (D.D.C. 2018) ............................................................. 18, 44

*ATX, Inc. v. United States Dep't of Transp.*,
  41 F.3d 1522 (D.C. Cir. 1994) .......................................................................45

*Benitez v. Charlotte-Mecklenburg Hosp. Auth.*,
  992 F.3d 229 (4th Cir. 2021) ..........................................................................27

*Beta Analytics Int'l v. United States*,
  61 Fed. Cl. 223 (2004) ........................................................................30-31, 46

*Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs.*,
  691 F. App'x 737 (4th Cir. 2017) ....................................................................7

*Butler v. United States*,
  702 F.3d 749 (4th Cir. 2012) ................................................................... 27, 39

*Chao v. Rivendell Woods, Inc.*,
  415 F.3d 342 (4th Cir. 2005) ..........................................................................28

*Chi. Sch. of Auto. Transmissions, Inc.
  v. Accred. All. Of Career Schs. & Colls.*,
  44 F.3d 447 (7th Cir. 1994) ............................................................................38

*Corey v. N.Y. Stock Exch.*,
  691 F.2d 1205 (6th Cir. 1982) ........................................................................34

*D.C. Federation of Civic Ass'ns v. Volpe*,
  459 F.2d 1231 (D.C. Cir. 1971) ......................................................... 34, 40, 45

*D.H. Overmyer Co. v. Frick Co.*,
  405 U.S. 174 (1972) ........................................................................................37

*Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  205 F.3d 906 (6th Cir. 2000) ..........................................................................34

*Edwards v. City of Goldsboro*,
  178 F.3d 231 (4th Cir. 1999) ..........................................................................27

*Fine Mortuary College, LLC v. Am. Bd. of Funeral Serv. Educ., Inc.*,
  473 F. Supp. 2d 153 (D. Mass. 2006) ................................................. 39, 45-46

iii

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)...................................................................35

*Foster v. Turley*,
    808 F.2d 38 (10th Cir. 1986).....................................................35

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*,
    512 F.3d 742 (5th Cir. 2008)......................................................33

*Hall v. Eastern Air lines, Inc.*,
    511 F.2d 663 (5th Cir. 1975)......................................................32

*Hooper v. Nat'l Transp. Safety Bd.*,
    841 F.2d 1150 (D.C. Cir. 1988)..................................................30

*Hooters of Am., Inc. v. Phillips*,
    173 F.3d 933 (4th Cir. 1999)......................................................32

*Hoteles Condado Beach v. Union de Tronquistas*,
    763 F.2d 34 (1st Cir. 1985) ................................................. 28, 29

*International Union, UMW v. Marrowbone Dev. Co.*,
    232 F.3d 383 (4th Cir. 2000)..............................28, 29, 31-32

*Jones v. Dancel*,
    792 F.3d 395 (4th Cir. 2015)......................................................28

*Marlboro Corp. v. Ass'n of Indep. Colls. & Sch., Inc.*,
    556 F.2d 78 (1st Cir. 1977) ........................................................46

*Med. Inst. of Minn. v. Nat'l Asso. of Trade & Tech. Sch.*,
    817 F.2d 1310 (8th Cir. 1987)....................................................30

*Pattern v. Signator Ins. Agency, Inc.*,
    441 F.3d 230 (2006)....................................................................28

*Prof'l Massage Training Ctr., Inc. v. Accred. All. of Career Schs. & Colleges*,
    781 F.3d 161 (4th Cir. 2015)........................................... *passim*

*Robertson v. Sea Pines Real Est. Cos.*,
    679 F.3d 278 (4th Cir. 2012)................................................. 27, 28

*Sokaogon Chippewa Community v. Babbitt*,
    961 F. Supp. 1276 (W.D. Wis. 1997)........................................40

*Sweet v. Devos*,
    495 F. Supp. 3d 835 (N.D. Cal. 2020) ........................... 29, 31, 34, 40

*Texas Brine Co., L.L.C., v. American Arbitration Association*,
  955 F.3d 482 (5th Cir. 2020) .......................................................... 34-35

*United States v. Shaffer Equip. Co.*,
  11 F.3d 450 (4th Cir. 1993) ................................................................46

*Ziad Sakr Fakhri v. Marriot Int'l Hotels, Inc.*,
  201 F. Supp. 3d 696 (M.D. Dist. 2016) ...................................... 33, 35

**Statutes and Other Authorities:**

9 U.S.C. § 10(c) .................................................................................29

20 U.S.C. § 1001(a)(5) .........................................................................6

20 U.S.C. § 1099b(a)(6) ....................................................................6, 37

20 U.S.C. § 1099b(e) ...........................................................................7

20 U.S.C. § 1099b(f) ...........................................................................1

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1331 ................................................................................1

28 U.S.C. § 1332(a)(2) .........................................................................1

34 C.F.R. § 602.18(b) .........................................................................21

34 C.F.R. § 602.20(a)(3) ......................................................................11

34 C.F.R. § 602.25 .........................................................................6-7, 37

34 C.F.R. § 602.28(b)(4) ......................................................................39

34 C.F.R. § 668.18(a) ...........................................................................7

34 C.F.R. § 668.18(b)(2) ........................................................................7

34 C.F.R. § 668.18(b)(3) ........................................................................7

34 C.F.R. § 668.25(f) ............................................................................7

Douglas-Gabriel, Danielle, *Education Dept. staff recommends dropping
  embattled for-profit college accreditor backed by DeVos*,
  Washington Post (Jan. 22, 2021),
  https://www.washingtonpost.com/education/2021/01/22/acics-
  education-department-recognition/ (last viewed June 3, 2025) ........................ 44

Fed. R. Civ. P. 12(b)(6) ................................................................. 23, 27

Fed. R. Civ. P. 12(c) ................................................................. *passim*

Federally Recognized Institutional Accrediting Agencies Listing,
    https://www.ed.gov/laws-and-policy/higher-education-laws-and-
    policy/college-accreditation/institutional-accrediting-agencies ........................38

U.S. Dept. of Educ., Press Release, U.S. Department of Education
    Terminates Federal Recognition of ACISC (Aug. 19, 2022) ...........................18

## Jurisdictional Statement

The district court had jurisdiction over this lawsuit under 28 U.S.C. § 1331 because the matters at issues arise under the Constitution, laws, or treaties of the United States and presented questions about whether Defendant-Appellee, Accrediting Alliance of Career Schools and Colleges d/b/a Accrediting Commission of Career Schools and Colleges ("ACCSC") violated Plaintiff-Appellant's, Center for Excellence in Higher Education's ("CEHE's") federal due process rights in the accreditation process.

The district court also had diversity jurisdiction under 28 U.S.C. § 1332(a)(2) because CEHE and ACCSC are citizens of different states. CEHE is incorporated in Delaware and has its principal place of business in Utah. JA16. ACCSC is incorporated and has its principal place of business in Virginia. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. JA16.

Jurisdiction was also appropriate under 20 U.S.C. § 1099b(f), which requires that any civil action brought by an institution of higher education involving the denial, withdrawal, or termination of accreditation shall be brought in an appropriate United States district court. JA16.

This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal of a final decision of a United States district court. CEHE appeals from the district

1

court's final order and judgment, which was entered on March 6, 2025. JA439, JA455. CEHE timely filed its notice of appeal on April 4, 2025. JA456.

## Introduction

At every stage of review, CEHE has been denied an opportunity to challenge ACCSC's bad-faith withdrawal of CEHE's accreditation which was purportedly based on insufficient graduation rates. As a result, approximately 1,500 employees lost their jobs and nearly 10,000 students faced significant interruption in their educational programs. JA15. ACCSC then employed internal appeal and arbitration procedures that created a star chamber in which ACCSC alone decided the evidence and issues that were considered, precluding CEHE from any meaningful review.

Here, ACCSC's purported basis for the withdrawal—*i.e.*, the time it would take CEHE to report compliance with certain graduation benchmark requirements— was merely pretext. In truth, ACCSC withdrew CEHE's accreditation to deflect scrutiny from itself as its recognition by the Department of Education was coming up for renewal. ACCSC's own contemporaneous reports and decisions dispel its proffered basis for withdrawing CEHE's accreditation. Just months earlier, ACCSC found good cause to give CEHE more time to come into compliance based on the myriad of initiatives CEHE implemented to improve graduation rates and the demonstrated improvement those initiatives had on the retention rates of CEHE's more recently enrolled students (who enrolled with the benefit of CEHE's

2

improvements). ACCSC acknowledged that, due to the length of CEHE's programs, it would be years for those students to graduate and become reportable under ACCSC's criteria and thereby become fully compliant with the benchmark requirements at issue. No new information supported ACCSC's decision to cut those efforts short and ACCSC never acknowledged (let alone explained) its about face on the same set of facts.

ACCSC's real reason for the withdrawal was to mitigate negative attention related to a Colorado state court proceeding that implicated ACCSC's oversight of CEHE. Later reversed on appeal, the Colorado state action concerned CEHE advertisements and recruitment practices that ACCSC had contemporaneously reviewed and approved.  Indeed, the Department was then in the process of revoking the recognition of a competitor accreditor based on its oversight of schools that were the subject of similar state enforcement actions. Alert to this event, ACCSC withdrew CEHE's accreditation to bolster its pending application and appease the Department. ACCSC's decision was clearly not based on CEHE's improving benchmark rates, which ACCSC had only recently concluded justified more time to show continued progress.

Fundamentally, this case is about ensuring basic judicial oversight of accrediting actions. ACCSC's rules locked CEHE into an arbitration proceeding that precluded CEHE from raising its bad-faith claims or contesting the evidence the

3

arbitrator was allowed to consider. The district court then ruled that CEHE was barred from judicial review of its bad-faith and related tort claims, quizzically dismissing the claims as "collateral attacks" on the same arbitration proceedings in which CEHE was precluded from raising them.

That cannot be right. This Court has recognized that "[accreditors], like all other bureaucratic entities, can run off the rails" and that meaningful judicial review is necessary to ensure accreditors apply their standards in good faith, subject to fair and impartial procedures. *Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colleges*, 781 F.3d 161, 169 (4th Cir. 2015). By construing CEHE's common law due process and tort claims as collateral attacks on the arbitration award, the district court's decision precluded CEHE from challenging those issues at all—a fundamental denial of due process and fairness. The district court's decision shields accrediting action from review (whether by an arbitrator or court) for bias, bad faith, disparate treatment, or other improper conduct. In short, the decision below immunizes accreditors from liability, even when they "run off the rails" in the most egregious ways. *Id.* at 169.

### Statement of the Issues

1.    Whether the district court erred when it denied CEHE's motion to vacate the arbitration award that was based solely on a closed agency record that

CEHE could not supplement or complete regardless of its showing of bad faith or improper motive?

2. Whether the district court erred in granting ACCSC's motion for judgment on the pleadings under Federal Rule 12(c) (dismissing CEHE's due process and tortious interference claims as a "collateral attack" on an arbitration award) when CEHE's well-pled allegations of bad faith and improper motive do not challenge the conduct or result of the arbitration and involve matters that were expressly excluded from the arbitrator's consideration, thereby effectively blocking CEHE's right to any review of those issues?

## Statement of the Case

### A. Center for Excellence in Higher Education and Independence University

CEHE is a tax-exempt nonprofit organization that owned and operated four colleges. JA15. At the time of ACCSC's withdrawal decision, CEHE was enrolling new students only at its online university, Independence University ("IU"), and was teaching the students that remained at its on-ground campuses. JA15. IU offered degree programs in various areas, including accounting, business, medical assisting, nursing, graphic arts, and respiratory care. JA60-61. Those degree programs were designed to be completed in 20 to 36 months. JA21. At that time, CEHE's colleges enrolled almost 10,000 students and had approximately 1,500 employees. JA15.

## B. Accrediting Commission of Career Schools and Colleges

All of CEHE's colleges participated in student assistance programs authorized under Title IV of the Higher Education Act ("HEA"). JA17. As a requirement to participate in Title IV programs, CEHE's colleges had to be accredited by a federally recognized accrediting agency. *See* 20 U.S.C. § 1001(a)(5). CEHE's colleges were accredited by ACCSC. JA15. ACCSC is recognized by the Department of Education ("Department") to accredit postsecondary institutions in the United States. JA16.

Title IV funds are the lifeblood of most American colleges and universities. As gatekeepers to those funds, "accreditors wield . . . life and death power" over their member schools. *Prof'l Massage*, 781 F.3d at 170. Because accreditors play a quasi-governmental role in determining eligibility to participate in federal programs, accreditors must provide their member schools with due process. *Id.* at 169. They are thus required to adhere to fundamental notions of fairness embodied in administrative law principles. *Id.* at 170-71. Most fundamental to those principles is that accreditors must "play it straight" and base their decisions on a good-faith application of accreditation standards. *Id.* at 170. And critically here, accreditors must employ internal rules that ensure their decisions are made and reviewed using fair and impartial procedures. *Id.* at 172

Indeed, both the HEA and the Department further inform the due process accreditors must provide to accredited institutions. *See* 20 U.S.C. § 1099b(a)(6); 34

6

C.F.R. § 602.25 (describing additional due process requirements); *Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs.*, 691 F. App'x 737, 741 (4th Cir. 2017) (unpublished) (stating that accreditors are subject to the HEA's and Department's due process requirements). For example, the Department expressly requires accreditors to "consistently apply and enforce [their] standards," 34 CFR 668.18(a), and have "effective controls against the inconsistent application of [those] standards." 34 C.F.R. § 668.18(b)(2). The Department further specifies that accreditors must base their decisions on published standards, rather than political interests, bias, or whim. 34 C.F.R. § 668.18(b)(3).

Accreditors must also provide a full and fair opportunity to appeal an adverse action prior to the action becoming final. 34 C.F.R. § 668.25(f). The HEA also requires that institutions of higher education submit any dispute involving the final withdrawal of accreditation to initial arbitration prior to taking any other legal actions. 20 U.S.C. § 1099b(e). However, nothing in the HEA or the Department's regulations authorize accreditors to limit the scope of the arbitrator's review to preclude consideration of evidence related to the accreditor's compliance with federal due process requirements.

ACCSC's internal appeals and arbitration procedures fell short of those standards. An institution's only avenue to challenge an adverse accreditation decision is found in ACCSC's *Rules of Process and Procedure* ("*Rules*").  JA18,

JA103-107. First, the institution must submit its appeal to a three-person Appeals Panel which may consider only the information that was before ACCSC at the time of the initial withdrawal decision. JA104-105. But institutions have no way of knowing what information ACCSC actually considered when it acted to withdraw accreditation, other than the specific correspondence and submissions between the two parties. JA19, JA104. With one limited exception related to "financial soundness" standards (which is not relevant here), the *Rules* do not provide a mechanism for institutions to supplement or complete the record after ACCSC's initial decision to ensure that the Appeals Panel has all relevant and material information before it. JA104.

If the Appeals Panel affirms the initial decision, the institution's only recourse is binding arbitration. ACCSC's *Instructions for Arbitration* ("*Instructions*") in turn, preclude the arbitrator from considering any materials not included in the record before the Appeals Panel. JA115, JA117. The arbitrator is thus bound by ACCSC's curated record, which the institution cannot seek to supplement or complete. And the arbitrator's review is limited to whether substantial evidence supports the Appeals Panel's decision based solely on that record. JA115. The *Instructions* also expressly precluded any opportunity for discovery to identify material evidence withheld by ACCSC in the proceedings below. JA117. Put another way, ACCSC has total

discretion to set the record, without any opportunity for subsequent review of that decision.

### C. ACCSC's Student Achievement Standards

ACCSC's *Standards of Accreditation* ("*Standards*") require member institutions to demonstrate that their students graduate and obtain in-field employment. JA20; JA110-111. One such way is by reporting graduation and employment rates that meet or exceed ACCSC's published "benchmark rates." JA111, JA113. That is done through mandated annual reporting. JA113.

A group of students starting an enrollment period in a given program is called a cohort. JA20. ACCSC requires institutions to submit an annual report of graduation and employment rates for each cohort in each program offered. JA21, JA113. A cohort's outcomes do not become reportable to ACCSC until after one-and-a-half times (150%) the length of the program. JA21, JA113. So a cohort starting a 36-month program today would not report graduation rates to ACCSC for at least 54 months.

When an institution reports below-benchmark graduation and employment rates for any cohort, ACCSC may initiate an adverse action, which can include interim reporting, warning, probation, or, as an ultimate sanction, it may withdraw accreditation. JA21, JA112. The wide range of actions available are intended to bring schools back into compliance. ACCSC rarely, if ever, withdraws a school's

9

accreditation (an effective death sentence) when an institution has demonstrated commitment to, and significant progress toward, compliance with the *Standards*, as occurred here. *See* JA24-26 (detailing instances where other institutions were given significant time to demonstrate the ability to develop strategies to solve student achievement issues).

In fact, ACCSC's *Rules* are designed to avoid such unnecessarily punitive measures. The *Rules* set a generally applicable maximum time to remedy noncompliance (which was two years as of July 1, 2018), which can be extended for good cause. JA21, JA101. The *Rules* state that a "school will be deemed to have demonstrated good cause if it has shown during the period of review significant progress has been made toward achieving compliance with the accreditation standard(s) in question and meeting all requirements set forth by the Commission and when extenuating circumstances exist such that only through the provision of additional time can the school demonstrate compliance." JA101. The good-cause provision is especially critical with respect to student achievement *Standards* because, for schools with longer degree programs (like IU), successful efforts to resolve retention concerns will take far longer than two years (54 months, in the case of IU's 36-month programs) to appear in annual reports. JA10.

But that does not mean that ACCSC must wait 54 months to see if a cohort in a 36-month program will graduate at benchmark rates. ACCSC monitors interim

retention rates of new cohorts as students progress through their programs. JA111-112; *see also* JA213 (noting that ACCSC directed CEHE to provide "trend data" in the form of retention charts for each program, which provides more current retention data than annual reporting); JA199-203 (showing IU Graduation and Employment Rate Action Plans providing updated trend data for newly enrolled cohorts). Interim monitoring gives ACCSC visibility into whether an institution's student retention efforts are actually working. If at any point it becomes clear they are not, ACCSC can respond. But it would be inequitable and irreparably damaging to students, faculty, and other stakeholders if ACCSC cut programs short when the students in them were on track to graduate and find employment at benchmark rates. In fact, the Department explicitly requires accreditors to follow their good-cause standard to prevent such unnecessarily harsh results. 34 C.F.R.§ 602.20(a)(3).

**D. ACCSC monitored CEHE's efforts to improve student retention and concluded that CEHE demonstrated good cause**.

In September 2018, ACCSC concluded that IU's annual reports for some of its programs fell short of ACCSC's benchmarks and placed IU on probation. JA22. By that time, CEHE had already begun substantial efforts to identify and solve the root causes of those below-benchmark rates. JA22. CEHE invested nearly $10 million in resources to study and implement robust initiatives to improve IU's student outcomes. JA22. CEHE discontinued certain underperforming programs, closed and consolidated campuses, and focused significant attention on developing

successful online programs. JA22, JA173-174; JA239. CEHE also updated its admissions assessment tools, increased student outreach, added faculty to facilitate student engagement, and changed program course progressions to allow students to take one course at a time. JA199-201. In making these changes, CEHE relied on ACCSC's recognition that older cohorts would continue to report below-benchmark rates and that future success would be measured based on the performance of newer cohorts that enrolled with the full benefit of the new strategies.

Over the roughly two-year probationary period, ACCSC requested, and CEHE provided, periodic updates about the status of CEHE's initiatives and their impact on student retention. In response to CEHE's updates, ACCSC repeatedly recognized the demonstrated success of CEHE's initiatives, and it confirmed that CEHE was meeting the requirements set forth in the probation letters. *See, e.g.*, JA173 (recognizing "the efforts that CEHE and the schools appear to be making in an effort to improve student achievement outcomes"); JA145 (again "recogniz[ing] the breadth of initiatives that IU has implemented in an effort to improve student graduation rates" and acknowledging the apparent success of those efforts in IU's forecasted graduation rates for certain programs).

Critically, ACCSC understood that the success of CEHE's initiatives would not be reflected in annual reports for several years. ACCSC recognized that CEHE's initiatives had not yet been fully implemented and that the first cohorts to enroll

under the initiatives would not become reportable until years later. For example, in an October 2019, ACCSC acknowledged CEHE's September 11, 2019 announcement that CEHE was transitioning to an exclusively distance education (*i.e.*, online) model. JA173. In light of CEHE's announcement, ACCSC took particular interest in updates to IU's "assessment policies, processes, and tools for **prospective** students." JA173 (emphasis added). It told CEHE that it would monitor the success of those initiatives "with studies of academic progress, retention data, and finally student graduation rates **for the first cohorts of students admitted under the new process and procedures**." JA185-186 (emphasis added).

Moreover, CEHE's subsequent reports to ACCSC included forecasted projections showing that certain IU programs were years away from reporting above-benchmark graduation rates—but were nonetheless on track to meet benchmarks. JA145. In July 2020—ACCSC's last review of IU's efforts before deciding to withdraw its accreditation—ACCSC again recognized the breadth of CEHE's efforts. JA145. ACCSC did so despite acknowledging again that IU's online programs would not report benchmark graduation rates for years. JA145. In fact, ACCSC specifically cited retention data for students who entered IU between July 1, 2018 and June 30, 2019 (who had not received the full benefit of CEHE's initiatives), recognizing that those students would not graduate at benchmark rates. JA141.

13

Fully aware that IU's older cohorts would not graduate at benchmark rates, ACCSC still found good cause to continue IU's accreditation through May 2021 based on the demonstrated success of CEHE's new initiatives. JA 161 ("In particular, the Commission recognized the length of time needed to demonstrate the school's ability to improve student achievement outcomes"). Furthermore, ACCSC was clear that it intended going forward to monitor the retention rates of IU's **recently enrolled cohorts**, who were the first to benefit from IU's new initiatives. JA145; JA185-186.

Up until that point, ACCSC's consideration of IU's efforts was in line with how ACCSC treated other similarly situated institutions. Limited publicly available information showed that ACCSC gave other schools several years to simply prove that they were **capable** of resolving consistently low student achievement rates. JA24-26. For example, ACCSC member school Takoda Institute had reported below benchmark student achievement rates for six years prior to being placed on probation. JA267. And that institution's most recent interim report showed that none of its programs were meeting benchmarks. JA266. But ACCSC nonetheless determined that "it [was] appropriate to provide the school with an additional opportunity to demonstrate the positive impact of the school's strategies on the reported rate of student achievement," subject to continued monitoring. JA268. In another example, ACCSC highlighted that Vista College had required "continuous

14

outcome monitoring" for five years before being placed on warning status. JA261. But even though Vista's most recent report showed a **decrease** in student achievement outcomes, ACCSC confirmed that "it is the Commission's intention to give Vista College ample opportunity to demonstrate improvement." JA261-262.

In contrast, IU proved in its December 20, 2020 update that its initiatives had succeeded. JA23, JA199-203. IU provided updated projections, supported by verifiable data, showing that IU's recently enrolled students (who received the benefit of the improvement strategies) were completing courses and persisting through their programs at increased rates compared to older cohorts at the same point in their programs. JA23, JA199-203. Based on CEHE's projections, recently enrolled cohorts were on track to meet or exceed benchmark rates when they became reportable. JA23, JA199-203.

In sum, CEHE did everything ACCSC asked of it during the probation process. CEHE studied and examined how to improve outcomes, developed and implemented effective solutions at great cost, and provided evidence that new cohorts were on track to achieve student achievement benchmarks.

### E. ACCSC withdrew IU's accreditation despite its recognizing CEHE's success in resolving student achievement concerns.

ACCSC had given IU until May 2021 to demonstrate continued progress. JA161. Well before then, IU had already demonstrated significant and verifiable progress by its December 2020 update. JA23, JA199-203. But ACCSC reversed

15

course and suddenly withdrew IU's accreditation in February 2021 meeting, months before the good cause deadline. JA23-24, JA205.

In its subsequent written decision, ACCSC cited IU's purported failure to demonstrate the ability to comply with student achievement *Standards* as the basis for its action. JA205. That reasoning, however, directly contradicted ACCSC's prior express recognition that IU had, in fact, demonstrated the ability to comply with student-achievement *Standards*. JA161. Moreover, had ACCSC granted IU until May 2021 to show continued improvement (as previously promised), IU would have shown that its programs were on track to meet benchmarks ahead of CEHE's earlier projections. JA24, JA 245-246.

Without acknowledging (let alone explaining) its decision to reverse its prior good cause finding, ACCSC withdrew IU's accreditation based entirely on older, non-relevant cohorts. JA24, JA213-217. In other words, these were cohorts ACCSC already knew would not graduate at benchmark rates when it found good cause to grant IU additional time. JA24, JA141 (evaluating the retention data of students who started at IU between July 1, 2018 and June 30, 2019). ACCSC's arbitrary and unexplained change in position violated its prior assurances to CEHE that progress would be measured based on IU's most recently enrolled cohorts—those that had received the full benefit of CEHE's new initiatives.

16

Nowhere in the April 22, 2021 decision did ACCSC acknowledge—let alone explain—its sudden change in position. Nor did ACCSC explain the basis for IU's disparate treatment. Where ACCSC gave other institutions "ample opportunity to demonstrate improvement," ACCSC withdrew IU's accreditation **after** it had shown success. To CEHE's knowledge, no other member institution was held to such a standard.

ACCSC's unexplained change in position and disparate treatment of CEHE indicates that the withdrawal decision was not based upon a good-faith application of the *Standards*. Instead, the timing of, and circumstances surrounding, the decision strongly suggests that ACCSC withdrew IU's accreditation to avoid scrutiny and embarrassment following an erroneous Colorado state court ruling against CEHE's Colorado colleges. JA27-28. That decision (which was later reversed on appeal) involved prior advertising, enrollment, and outcomes reporting practices in Colorado that ACCSC had contemporaneously reviewed and approved. JA27. The state court's findings necessarily implicated ACCSC's own oversight capabilities, and the withdrawal came just months before the Department was scheduled to reconsider ACCSC's federal recognition. JA27; *see also* JA303-307 (comparing ACCSC's contemporaneous approvals of CEHE's practices with the Colorado courts findings).

ACCSC had a significant pecuniary interest to take swift action against CEHE. Because ACCSC's member schools largely participate in Title IV programs,

17

ACCSC's continued federal recognition is critical to its membership and its viability as an accreditor. ACCSC would lose members and their corresponding membership dues were its recognition impaired. When the Department revoked its recognition of the Accrediting Council for Independent Colleges and Schools ("ACICS") in 2022, ACICS's membership dropped from 237 to 27 schools. *See* U.S. Dept. of Educ., Press Release, U.S. Department of Education Terminates Federal Recognition of ACISC (Aug. 19, 2022).[1]

ACCSC was alert to this risk when it precipitously withdrew IU's accreditation. JA27-28. Less than a month before ACCSC's February 2021 meeting, the Department publicized that its staff recommended terminating ACICS's federal recognition. JA27-28. This was the culmination of a long and highly publicized process that began in 2016, when the Department sought to terminate ACICS based largely on ACICS's purportedly lax oversight of a handful of proprietary schools that were the subject of investigations and lawsuits from state attorneys general and other federal agencies. *See Accrediting Council for Indep. Colls. & Sch. v. Devos*, 303 F. Supp. 3d 77, 89 (D.D.C. 2018).

In light of the Department's consideration of ACICS, CEHE's continued accreditation became a liability for ACCSC. JA27-28. ACCSC undoubtably knew

---

[1] The Department of Education's press release is available from the Internet Wayback Machine at: https://shorturl.at/Fcwge (last visited June 3, 2025)

that its oversight and approval of the practices at issue in the Colorado litigation would be a central focus of the Department's consideration of ACCSC's continued recognition. JA27-28. Protecting its own short-term self-interest, ACCSC ignored its prior acknowledgement that CEHE had demonstrated the ability to comply with student achievement standards and instead sought to bolster its image by pretextually withdrawing CEHE's accreditation. JA28.

The withdrawal decision was catastrophic for CEHE. Within days of the decision, the Department cut off CEHE's ability to access Title IV funds. JA38. CEHE tried to stay open throughout ACCSC's appeal process. JA38. But without access to critical funding, CEHE was forced to close its doors on August 1, 2021, while its appeal before ACCSC's Appeals Panel was pending and before the withdrawal decision became effective. JA28, JA194 ("An accredited school remains accredited . . . until the final disposition of the appeal").

### F. ACCSC blocked CEHE's due process right to challenge the legitimacy of the withdrawal decision.

Notwithstanding strong evidence of pretext, bad faith, and disparate treatment, CEHE has never had the opportunity to meaningfully investigate or present evidence of those issues. Shortly after notifying ACCSC of its intent to appeal the decision, CEHE sent a letter to ACCSC's Executive Director, Dr. Michale McComis, seeking evidence that would allow CEHE a full and fair opportunity to show that IU was not treated fairly under the *Standards*. JA318-320. CEHE

identified the few publicly available decisions in which ACCSC considered other institutions' below benchmark student achievement rates and noted that ACCSC applied materially different review procedures in those cases. JA319-320. CEHE also requested communications and records related to decisions to grant leniency to any such institutions in light of the COVID-19 pandemic. JA319. Finally, IU sought records and communications pertaining to decisions to grant leniency to institutions that failed to meet benchmarks while transitioning from ground to online programs. JA319. All of these documents were critical to CEHE's ability to meaningfully challenge the legitimacy of the withdrawal decision. To alleviate any confidentiality concerns, CEHE offered that all records could be redacted to protect the identity of the implicated institutions. JA320.

But Dr. McComis categorically refused to allow CEHE to supplement the record, even conceding that ACCSC did not take any measures to ensure the withdrawal decision was consistent with ACCSC's prior precedent. JA257. His refusal prevented the Appeals Panel from considering evidence that would demonstrate ACCSC's bad faith and disparate treatment. Further, Dr. McComis summarily refused to produce any of the records CEHE requested. JA257. Although, all warning letters, probation orders, and withdrawal decisions are **initially** posted to ACCSC's website (but only the most recent decisions are available for review), Dr. McComis claimed the records were "maintained as confidential." JA29-30,

JA257. ACCSC also routinely circulated to numerous other state, federal, and accrediting agencies. JA30. The requested records are not confidential. And in any event, CEHE made clear in its request that the Commission was free to redact any identifying information from the decisions. JA320.

As a result, the record ACCSC presented to the Appeals Panel consisted solely of correspondence between ACCSC and CEHE. JA19. CEHE was thus deprived of any meaningful opportunity to present evidence of disparate treatment or bad faith to the Appeals Panel. Without such evidence, the Appeals Panel affirmed the April 22, 2021 withdrawal decision. JA31, JA322. Critically, when presented with Dr. McComis's concession that ACCSC did not consider prior precedent, the Appeals Panel deflected, trusting that ACCSC's "keen sense of the consistency of its decision" to satisfy the requirement that accreditors have effective controls against inconsistent application of their *Standards* (34 C.F.R. ¶ 602.18(b)). JA328.

The next required step in ACCSC's internal processes was arbitration, subject to the *Instructions*. JA19, JA115. Because ACCSC alone had the right to designate the Arbitration Exhibits, the arbitrator could consider only the record before the Appeals Panel, the transcript from the hearing before the Appeals Panel, and the Appeals Panel's final decision. JA117. CEHE nonetheless filed a Motion to Supplement the Arbitration Exhibits and take limited discovery, seeking to exercise

21

its due process right to test the sufficiency of the record and to make an evidentiary showing of bad faith. JA31-32, JA122-123.

ACCSC blocked CEHE's request, arguing that the *Instructions* precluded the arbitrator from expanding the record. JA31-32, JA127-128. The arbitrator agreed that the *Instructions* prevented him from considering anything beyond the record or hearing any issue beyond whether the Appeals Panel's decision was supported by evidence, regardless of the strength of CEHE's showing of bad faith. JA127-128. Confined to consideration of ACCSC's curated record, the arbitrator affirmed the Appeals Panel's decision on August 4, 2022. JA32, JA81.

### G. The district court's decisions also barred CEHE from raising its due process and bad faith claims.

Having been unable to raise its allegations of bad faith and improper conduct in the appeal or arbitration process, CEHE filed its Motion to Vacate Arbitration Award and Complaint on October 28, 2022. JA12. In its Complaint, CEHE brought five claims against ACCSC: a violation of due process claim (Count I), a claim for declaratory judgment (Count II), two tortious interference with contract claims (Counts III and IV), and a tortious interference with prospective business or economic advantage claim (Count V). JA35-42.

CEHE's core allegations were that ACCSC violated CEHE's common law due process rights by withdrawing IU's accreditation in response to outside pressure and out of self-preservation, rather than based on a good-faith application of the

22

*Standards*. JA27-28. ACCSC then manipulated its internal rules and procedures to prevent CEHE from raising those arguments during the internal appeal and arbitration process. JA28-32. CEHE also moved to vacate the arbitration award under sections 10(c)(3) and (4) of the Federal Arbitration Act ("FAA") because the arbitrator refused to consider pertinent and material evidence regarding CEHE's allegations of bad faith and disparate treatment. JA33-34. CEHE also argued that the award must be vacated because the *Instructions* violated the law, which required ACCSC to CEHE provide the opportunity to challenge the record provided to the arbitrator. JA15.

ACCSC initially moved to dismiss under Federal Rule 12(b)(6), the declaratory judgment claim (Count II) as duplicative of CEHE's due process claim (Count I). JA365-366. ACCSC also moved to dismiss (Count I) CEHE's tort claims (Counts III through V) on federal preemption grounds and on the basis that CEHE did not sufficiently allege that ACCSC's withdrawal decision caused CEHE harm. JA365-366. On September 26, 2023, the district court granted ACCSC's motion with respect to the declaratory judgment claim only, and denied the motion with respect to the other claims, concluding that "[t]he mere existence of an appeals process should not shield an accreditor's liability for any harm allegedly caused by an accreditor's initial decision to withdraw accreditation." JA378-379.

Nearly seven months later, on May 16, 2024, ACCSC filed a motion for judgment on the pleadings under Federal Rule 12(c). JA445. ACCSC opposed CEHE's motion to vacate, arguing that CEHE received all of the due process to which it was entitled as defined by the *Instructions*, which limited the arbitrator to considering only the evidence in the record before the Appeals Panel. JA448. It also argued that CEHE's other claims must be dismissed as "collateral attacks" on an arbitration award. JA450. In a March 6, 2025 order, the district court denied CEHE's motion to vacate and granted ACCSC's motion for judgment, concluding that the arbitration award conformed to the *Instructions*. JA449, JA454. And, without disputing that CEHE was denied an opportunity to raise its bad faith and disparate treatment claims, the district court also granted ACCSC's motion for judgment on CEHE's remaining claims as "collateral attacks" on the arbitration decision. JA452. CEHE timely filed its notice of appeal on April 4, 2025. JA456-458.

## Summary of Argument

The Court should reverse the district court's order on two grounds. (1) The district court erred by denying CEHE's motion to vacate the arbitration award because it was decided on a curated record that CEHE had no opportunity to challenge and the arbitration precluded review of ACCSC's bad faith and improper conduct. (2) The district court further erred in dismissing—as collateral attacks on an arbitration award—CEHE's common law due process and tortious interference

24

claims because the harm CEHE suffered is unrelated to the conduct or the outcome of the arbitration and the claims involve allegations of bad faith and improper conduct that were expressly excluded from the scope of the arbitration. Moreover, while not considered by the district court below, CEHE alleged sufficient facts in support of its claims, defeating ACCSC's motion for judgment on the pleadings under Federal Rule 12(c).

First, the district court erred in denying CEHE's motion to vacate the arbitration award. Due process required ACCSC to provide CEHE a full and fair opportunity to present its evidence—something CEHE was denied in the arbitration. Despite strong evidence of bad faith, and notwithstanding ACCSC's failure to explain why it reversed its good cause finding, CEHE had no opportunity to test the sufficiency or completeness of the record. Under this Court's precedent and administrative principals, due process required providing CEHE an opportunity to challenge the sufficiency of the record. By construing ACCSC's *Instructions* to categorically preclude CEHE from doing so, the arbitrator denied CEHE's right to a full and fair hearing.

Second, the district court erred in dismissing CEHE's independent common law due process and tortious interference claims as "collateral" attacks on the arbitrator's decision. Collateral attacks involve claims that arise from issues related to the arbitration proceedings themselves and effectively seek to undo the arbitration

award. That is not the case here. CEHE's claims arise from ACCSC's bad faith and the unjustified destruction of a viable online university, not the arbitration proceedings. Nor do CEHE's claims concern actions that had an effect on the arbitration award, as the arbitration considered only whether substantial evidence supported the Appeals Panel's decision. Regardless of the arbitration award, ACCSC would be liable to CEHE if its written basis for withdrawing IU's accreditation was merely a pretextual screen for an improper, bad faith motive—challenges that were not addressed during the arbitration.

Lastly, CEHE sufficiently pled its common-law due process and tortious interference claims under Federal Rule 12(c). CEHE alleged facts establishing that ACCSC's stated reasons for IU's withdrawal were pretextual. ACCSC's decision simply cannot be squared with ACCSC's express and repeated approvals of CEHE's efforts to improve student retention and its findings that CEHE had made significant improvement in those efforts. Contrary to ACCSC's failure to explain itself, CEHE credibly established that ACCSC withdrew IU's accreditation in bad faith to appease the Department of Education and to deflect scrutiny stemming from the Colorado state court decision. In other words, ACCSC acted out of self-interest—not based on a fair application of accreditation standards. CEHE's Complaint also establishes that ACCSC's *Rules* and *Instructions*—CEHE's only avenue for review of the withdrawal—barred CEHE from introducing evidence or arguments of bad faith and

26

improper conduct, denying CEHE's due process right to a fair and impartial review procedures. Acting in bad faith and employing unfair procedures are quintessential due process violations.

## Argument

### I.    Standard of Review

"[The Court] review[s] *de novo* the district court's ruling on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and in doing so, appl[ies] the standard for a Rule 12(b)(6) motion." *Butler v. United States*, 702 F.3d 749, 751-52 (4th Cir. 2012) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). Thus, "a Rule 12(c) motion should only be granted if, accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Benitez v. Charlotte-Mecklenburg Hosp. Auth.*, 992 F.3d 229, 235 n. 5 (4th Cir. 2021) (cleaned up). Put simply, a Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact. *Butler*, 702 F.3d at 752.

A plaintiff is not required to prove his case in the complaint. *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 291 (4th Cir. 2012). The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that

a plaintiff may only have so much information at his disposal at the outset. *Id.* A "complaint need not 'make a case' against a defendant or 'forecast evidence sufficient to prove an element' of the claim. It need only 'allege facts sufficient to state elements' of the claim." *Id.* (quoting *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir. 2005)) (emphases in original).

A district court's denial of a motion to vacate an arbitration award is also reviewed *de novo*. *Jones v. Dancel*, 792 F.3d 395, 401 (4th Cir. 2015). "As a general proposition, a federal court may vacate an arbitration award only upon a showing of one of the grounds specified in the Federal Arbitration Act." *Pattern v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (2006).  While the scope of the Court's review is narrow, "courts owe no deference to an arbitrator who has failed to provide the parties with a full and fair hearing." *International Union, UMW v. Marrowbone Dev. Co.*, 232 F.3d 383, 388 (4th Cir. 2000).

## II.    The District Court erred in denying CEHE's Motion to Vacate because CEHE was denied a full and fair hearing.

The district court should have vacated the arbitrator's decision because the arbitrator refused to allow CEHE "an adequate opportunity to present its evidence and arguments" of bad faith and disparate treatment. *Int'l Union, UMW v. Marrowbone Dev. Co.*, 232 F.3d 383, 390 (4th Cir. 2000) (quoting *Hoteles Condado Beach v. Union de Tronquistas*, 763 F.2d 34, 39 (1st Cir. 1985). While arbitration awards are afforded deference, a court "cannot sanction the decision of an arbitrator

28

who failed to provide [] a full and fair hearing." *Int'l Union*, 232 F.3d at 390. At a minimum, a full and fair hearing means the parties are allowed an opportunity to present evidence that is "pertinent and material to the controversy." *Hoteles Condado*, 763 F.2d at 40 (quoting 9 U.S.C. § 10(c)).

The arbitrator denied CEHE an opportunity to present pertinent and material evidence based on ACCSC's *Instructions*, which categorically limited the evidence to only ACCSC's curated record. But ACCSC's record was incomplete on its face as it did not address why ACCSC revoked its prior good-cause determination based on the performance of cohorts that ACCSC already knew would not graduate at benchmark rates. The evidence of ACCSC's recent consideration of those same cohorts "tells a story that does not match the explanation [ACCSC] gave for its decision." *Sweet v. Devos*, 495 F. Supp. 3d, 835, 846 (N.D. Cal. 2020) (internal quotation omitted). When the explanation does not match the facts, effective judicial review requires completion or supplementation of the record or limited discovery. *Id.* (finding that record supplementation or discovery is appropriate where "the evidence tells a story that does not match the explanation the [agency] gave for [its] decision").

Nor did ACCSC's record address the Appeals Panel's failure to justify ACCSC's departure from its established procedures. CEHE, through limited publicly available evidence, demonstrated a substantial likelihood that ACCSC

deviated from its established student achievement enforcement procedures with respect to IU, which would render the withdrawal decision arbitrary and capricious. *Hooper v. Nat'l Transp. Safety Bd.*, 841 F.2d 1150, 1151 (D.C. Cir. 1988) (holding that the failure to enforce a procedural rule uniformly is arbitrary and capricious).

The few available decisions revealed that schools with pervasively low outcomes continued to receive opportunities to show just that they were **capable** of coming up with effective solutions, even after years without any sign of improvement. JA24-26. That was not the same procedure afforded to IU, who showed significant improvement according to ACCSC's own reviews. And when confronted, ACCSC's Executive Director conceded that ACCSC did not consider prior precedent with withdrawing IU's accreditation. The record was thus devoid of evidence from which the arbitrator could effectively review the fairness of the student achievement review procedures afforded to CEHE. *Med. Inst. of Minn. v. Nat'l Asso. of Trade & Tech. Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987) (confirming that fairness requires that similarly situated schools be treated similarly).

But as the arbitrator made clear, ACCSC's rules prevent member institutions from challenging the sufficiency of the record regardless of the strength of their showing that ACCSC acted based on improper motives or unfair procedures. That is a fundamentally unfair process because it precludes challenging entities from ever raising bad faith claims unless ACCSC volunteers that information. *See Beta*

30

*Analytics Int'l v. United States*, 61 Fed. Cl. 223, 266 (2004) ("[R]are indeed would be the occasions when evidence of bad faith will be placed in an administrative record, and to insist on this—and thus restrict discovery regarding bad faith to cases involving officials who are both sinister and stupid—makes little sense").

There is no question that ACCSC's withdrawal decision must be overturned if it was based on improper motives. *Prof'l Massage*, 781 F.3d at 177; *Sweet*, 495 F. Supp. 3d at 846. And when an institution makes a sufficient showing of bad faith or improper behavior, effective review requires looking beyond the record into the motivations of the decisionmakers. *Id.* at 177-78. Here, CEHE has raised compelling facts showing that ACCSC's stated reasons for the withdrawal cannot be reconciled with its prior good-cause determination. ACCSC knew in July 2020 that the September 2018/August 2019 cohorts would not report benchmark graduation rates when they became reportable years later, but ACCSC found good cause anyway, expressly acknowledging the time it would take for IU to report rates that met benchmarks. JA141, JA145, JA161. But just months later, without any notice or explanation, ACCSC withdrew IU's accreditation based solely on the performance of those same cohorts. JA213-217. CEHE also demonstrated compelling reasons that ACCSC's true motive was self-preservation and deflecting outside pressure. Evidence showing ACCSC acted for those improper purposes was not only "pertinent and material" to the proceedings, it was potentially dispositive. *Int'l*

31

*Union*, 232 F.3d at 390. Consequently, the district court should have vacated the arbitration award.

Finally, to the extent an accreditor's internal review and arbitration procedures categorically block schools from challenging the sufficiency of the record, they are contrary to the law because they violate due process. "The presentation of one's defense is a basic due process right." *Hall v. Eastern Air lines, Inc.*, 511 F.2d 663, 663 (5th Cir. 1975). And this Court has recognized that due process requires judicial review of whether an accreditor denied an institution a fundamentally fair hearing. *Prof'l Massage*, 781 F.3d at 177 (confirming that due process requires making sure accreditors to employ fair procedures). Arbitration rules that violate these due process requirements are thus contrary to the law and unenforceable. *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999) (finding that an arbitration agreement with egregiously unfair rules was invalid). Contrary to the district court's opinion (JA451), CEHE did argue in its Motion to Vacate Arbitration Award and Complaint that the *Instructions'* "[exclusion of relevant evidence] is not the law, and the Arbitration award must be vacated and remanded for consideration of the material evidence unlawfully withheld from the arbitrator." JA15, *see also* JA17-20, JA32, JA35-36 (alleging that the *Instructions* violate due process because they deny the right to a fair hearing)

32

### III. The District Court erred in dismissing CEHE's well-pled common-law due process and tort claims as "collateral attacks" on an arbitration award.

The district court dismissed CEHE's common-law due process and independent tort claims solely based on its conclusion that they were collateral attacks on the arbitration award. JA452. That was error. CEHE's claims are not "collateral attacks" on the arbitrator's decision because they involve wrongdoing and harm that is unrelated to the arbitration. A claim is considered a "collateral attack" if it concerns "only . . . 'the effect [the allegedly improper conduct] had on an arbitration award.'" *Ziad Sakr Fakhri v. Marriot Int'l Hotels, Inc.*, 201 F. Supp. 3d 696, 712-13 (M.D. Dist. 2016) (quoting *Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 750 (5th Cir. 2008)). Conversely, a claim is not a collateral attack if the "harm was caused by the alleged acts of wrongdoing in and of themselves," irrespective of the outcome of the arbitration. *Id.* (quoting *Gulf Petro*, 512 F.3d at 750).

The district court erred then because CEHE's common law due process and independent tort claims do not concern how ACCSC's unlawful withdrawal decision affected the outcome of the arbitration decision. The outcome of the arbitration decision has no bearing on CEHE's right to relief. Even if the arbitrator were right that ACCSC's stated reasons for the withdrawal are nominally supported by evidence (which is all the arbitrator was authorized to consider), ACCSC would still

33

be liable to CEHE if those stated reasons were pretextual and ACCSC withdrew CEHE's accreditation based on impermissible factors. *See D.C. Federation of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971) (concluding that an agency decision would be invalid if based even "in part" on political pressure rather than "strictly on the merits"); *Sweet*, 495 F. Supp. 3d at 844 ("Pretext is the paradigm of bad faith.") In other words, ACCSC's conduct "in and of itself" harmed CEHE.

On review, the circuit court precedent the district court relied on actually illustrate why CEHE's claims are **not** collateral attacks on the arbitration decision. Those cases all involved allegations that clearly and directly arose from issues pertaining to the arbitration itself. *See* JA13-14. For example, in *Corey v. N.Y. Stock Exch.*, the plaintiff sued the New York Stock Exchange claiming losses attributed to the arbitration panel's selection and its procedural decisions. 691 F.2d 1205, 1211-12 (6th Cir. 1982), The court concluded that those claims constituted a collateral attack because the alleged harm was not caused by the selection of arbitrators and procedural rulings "in and of themselves. . . . Rather, [the plaintiff] was harmed by the impact these acts had on the award." *Id.* at 1213.

Similarly, in *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the plaintiff's challenged the selection of the arbitrator. 205 F.3d 906, 908 (6th Cir. 2000). So to with *Texas Brine Co., L.L.C., v. American Arbitration Association*, where the court summarized the alleged harm as "(1) the strategic disadvantage in

34

the arbitration process due to arbitrator bias; (2) a 'tainted' arbitration; and (3) wasted money spent on the arbitration." 955 F.3d 482, 489 (5th Cir. 2020). And in *Foster v. Turley*, the claims involved allegations that a party committed fraud by failing to disclose material facts to the arbitrator during the proceedings with respect to the matter under consideration. 808 F.2d 38, 41-42 (10th Cir. 1986).

In each those cases, the courts were presented with claims that challenged the legitimacy of the arbitration proceedings themselves and where the harm was the effect of the wrongdoing on the award. Such claims clearly "comprise" the arbitration award. In contrast, CEHE's common law due process and tort claims are viable irrespective of the legitimacy or outcome of the arbitration. As discussed above, the arbitrator's ruling could stand as written and CEHE would still be entitled to relief if it proves its claims. ACCSC's illegal withdrawal decision and the resulting harm occurred completely outside and separate from the arbitration. *Ziad*, 201 F. Supp. 3d at 712-13.

CEHE's claims are also not properly characterized as "collateral attacks" because ACCSC's bad faith and improper conduct were expressly excluded from consideration in the arbitration proceedings. Those were independent issues the district court should have considered. "[A]ny other questions that the parties did not submit to arbitration" should be decided "independently" by the court. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

The scope of the arbitration was limited to whether the Appeals Panel's endorsement of the withdrawal decision was supported by substantial evidence. JA68, JA115. And the arbitrator determined that "[g]iven the measure of deference that must be afforded [to ACCSC] in its assessment of and projections [of student achievement] . . . I must conclude that Appeals Panel's decision was supported by substantial evidence in the record that was before it." JA66, JA68.  In short, the arbitrator decided only that ACCSC mustered enough evidence in its curated record to support its stated basis for the withdrawal—an exceedingly low bar under the substantial evidence standard. But the Arbitrator did not consider—and was expressly precluded from considering—whether ACCSC's stated basis was pretext for improper motives. CEHE's bad faith claims are thus separate and independent from the issues the arbitrator was authorized to review. Contrary to the district court's opinion, a ruling on CEHE's due process and tort claims would not necessarily "nullify" the arbitrator's decision. At bottom, CEHE's claims that ACCSC acted in bad faith and violated CEHE's due process rights were not part of the arbitration. Therefore, they are not "collateral" attacks.

Nonetheless, without considering the sufficiency of CEHE's allegations, the district court dismissed CEHE's due process claims as "buyer's remorse" for being accredited by ACCSC. JA452. That is a dangerous proposition. Accreditors possess "life and death" power over their member schools, and those schools rely on the due

36

process protections afforded by federal law and this Court's precedent in the instances where accreditors "run off the rails." *Prof'l Massage*, 781 F.3d at 169-70; 20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25. Accreditors cannot craft procedural rules that absolve them of those requirements.

Nor can courts presume an institution's acquiescence in the loss of those protections merely because it remained accredited at the time the defective procedures were adopted. *See D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185-86 (1972). Waivers of due process rights must be "voluntary, knowing, and intelligently made." *Id.* Here, the *Instructions* say nothing about waiving the right to judicial review of an accreditor's bad-faith, bias, disparate treatment, other improper conduct, or tort claims. JA115. The scope of the arbitration is limited to only whether the Appeals Panel decision was supported by substantial evidence.

Nor can the court say that CEHE waived its due process rights when it applied for accreditation. CEHE's colleges were accredited long before ACCSC adopted the *Instructions* in July 2014. JA115, bottom margin (noting that the *Instructions* were "Implemented July 1, 2014"); JA223 (confirming Stevens Henager College received an initial grant of accreditation in November 2002 and its branch campus, IU, was established in July 2010). And the mere fact that CEHE remained accredited when ACCSC adopted the *Instructions* in 2014 cannot reasonably be construed as a knowing and voluntary waiver of its due process rights. Initially, accreditors can

adopt and change their rules unilaterally without approval or acknowledgment from member schools. *Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. Of Career Schs. & Colls.*, 44 F.3d 447, 449 (7th Cir. 1994). Beyond that, the *Instructions'* expressly limit the issues submitted to the arbitration, so CEHE could not reasonably expect at that time that ACCSC would use them to block its right to a fair hearing to challenge ACCSC's bad faith.

The district court's decision also fails to appreciate the realities of accreditation. A review of the Department's listing of federally recognized institutional accreditors shows that most only accredit institutions with programs in specific disciplines, like nursing, theological studies, or funeral services or institutions that offer specific credentials, like associate degrees, certificates, or postsecondary diplomas.[2] Career colleges with degree programs in multiple disciplines, like CEHE, have few choices for institutional accreditation, which means most career colleges will not be able to shop around for favorable arbitration provisions. In fact, the Department was in the process of withdrawing the recognition of the largest institutional accreditor of career colleges (ACICS) at the time CEHE was on probation, further limiting those choices. Also, Department regulations

---

[2] The listing of federally recognized institutional accrediting agencies is available on the Department of Education's website, here: https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/college-accreditation/institutional-accrediting-agencies

significantly restrict an institution's ability to change accreditors if it is on probationary (or equivalent status). 34 C.F.R. § 602.28(b)(4). So in CEHE's case, once it was placed on probation in September 2018, it was effectively locked into ACCSC's dispute resolution process.

In short, it would be grossly unfair if ACCSC can force member schools to submit to fundamentally unfair proceedings and then rely on the outcome of those proceedings as an absolute bar to meaningful judicial review for any and all claims. That would effectively grant accreditors "free rein to pursue personal agendas or go off on some ideological toot," eviscerating the due process required by this Court. *See Prof'l Massage*, 781 F.3d at 170 (recognized that courts must review whether an accreditor employs fair procedures).

## IV. CEHE's Complaint raises factual allegations that plausibly establish its common law due process and tortious interference claims.

CEHE's Complaint alleged credible facts which, if proven, establish that ACCSC did not fairly and impartially apply its *Standards*. That is sufficient to avoid dismissal under Rule 12(c). *See Butler*, 702 F.3d at 752; *see also Fine Mortuary*, 473 F. Supp. 2d at 159 (finding that allegations of bias presented a "factual dispute [] as to whether [the institution] was afforded an impartial re-accreditation evaluation.")

### a. CEHE plausibly alleged that ACCSC withdrew IU's accreditation in bad faith.

Taking all reasonable inferences in CEHE's favor, it is plausible—likely, even—that ACCSC's stated reasons for withdrawing CEHE's accreditation were pretextual. ACCSC provided no basis to revoke the good cause finding it had made just months earlier based on the same facts it later cited to withdraw IU's accreditation. That failure of explanation coupled with the timing of the decision strongly suggests that ACCSC withdrew IU's accreditation for the improper purpose of appeasing the Department.

It is a "basic requirement of due process" that accreditors apply their *Standards* in good faith and free from bias or improper motivation. *Prof'l Massage*, 781 F.3d at 177. Where an accreditor's true objective is self-preservation and to deflect outside criticism (rather than faithfully apply its standards), due process has been denied. *See D.C. Federation of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971) (concluding that an agency decision would be invalid if based even "in part" on political pressure rather than "strictly on the merits"); *see also Sokaogon Chippewa Community v. Babbitt*, 961 F. Supp. 1276, 1280 (W.D. Wis. 1997) ("If there are adequate grounds to suspect that an [accreditation] decision was tainted by improper political pressure, courts have a responsibility to bring out the truth of the matter.") "Pretext is the paradigm of bad faith." *Sweet*, 495 F. Supp. 3d at 844.

40

CEHE's complaint provides ample facts establishing that ACCSC's decision is based on impermissible self-interest and outside pressure. Specifically, ACCSC disregarded CEHE's demonstrated and acknowledged success bringing IU back into compliance with student achievement *Standards* and withdrew IU's accreditation anyway to appease the Department and deflect scrutiny stemming from the Colorado state court decision.

First, ACCSC knew and expressly acknowledged that IU would not report above-benchmark rates for some time when it made its good cause finding in July 2020. JA141, JA145, JA161. CEHE's Complaint outlines a detailed history in which ACCSC closely monitored IU's efforts to demonstrate compliance with student achievement *Standards* and knew in July 2020 that it would be several years before IU's progress would be reflected in the annual reports. JA22-23. Yet despite that, ACCSC still concluded that IU was not only capable of coming into compliance but was making significant progress toward doing so. JA161 (finding good cause to extend the timeframe to achieve compliance). ACCSC could not have concluded IU demonstrated good cause if that were not the case. JA101 ("The school will be deemed to have demonstrated good cause if it has shown . . . significant progress has been made toward achieving compliance with the accreditation standard(s) in question and meeting all requirements set forth by the Commission"). To that end, ACCSC extended the maximum time frame for IU to show progress to May 31, 2021

and set forth its expectations for IU's continued accreditation as it continued to monitor the effect of CEHE's efforts. It told CEHE that it "expect[ed] to see **progress toward** the reporting of above-benchmark student graduation rates to provide assurance that CEHE is **capable** of developing and implementing successful strategies." JA146 (emphasis added).

Second, CEHE pled facts showing that this course of action was representative of ACCSC's treatment of other institutions with below benchmark rates. Based on the limited publicly available accreditation actions, schools were given years to prove they were capable of turning the ship around. JA24-26. ACCSC thus understood that technical compliance with student achievement *Standards* (*i.e.*, reporting benchmark rates in annual reports) takes time given the lag between front-end initiatives and back-end reports—especially for institutions with longer degree programs. JA21-23. Because ACCSC can closely monitor whether retention rates are holding steady as new student cohorts move through their programs (as it was doing with IU), ACCSC does not cut programs short (as it did with IU), upending the education of ten thousand students. *See* JA24-26.

Third, CEHE's Complaint outlined ACCSC's clear and direct assurances that CEHE's success would be measured based on the success of IU's most recently enrolled cohorts, as those are the only students who received the full benefit of CEHE's new initiatives. In late 2019 and 2020, ACCSC repeatedly referenced IU's

updates to its "assessment policies, processes, and tools for **prospective** students," which ACCSC considered "especially crucial given CEHE's September 11, 2019 announcement that the schools will be transitioning to delivering programs exclusively via distance education." JA173 (emphasis added). And in July 2020, ACCSC directed IU to provided updated assessments of its "admissions requirements." JA147. And to the extent there was any doubt about the cohorts ACCSC would monitor, it told CEHE that the IU's success would be determined by "student graduation rates for the first cohorts of students admitted under the new processes and procedures." JA186. Those cohorts, as demonstrated by IU's December 2020 projections, were on track to graduate at above benchmark rates. JA218.

Finally, CEHE demonstrated that ACCSC's April 22, 2021 decision does not reflect ACCSC's true reasons for the withdrawal. ACCSC's written decision cannot be reconciled with its prior recognition that IU was meeting ACCSC's good cause requirements based on the success of new strategies that applied to new cohorts. But (contrary to prior assurances) ACCSC completely disregarded the success of the new cohorts, focusing on the retention rates of students who enrolled between September 2018 and August 2019—before CEHE had implemented the robust initiatives ACCSC reviewed and approved. JA213-217. In short, ACCSC moved the goal posts

to manufacture a basis to withdraw IU's accreditation, and it has failed to provide a credible justification for doing so.

CEHE's complaint sets forth a plausible explanation. ACCSC withdrew CEHE's accreditation to deflect scrutiny away from ACCSC related to the Colorado state court decision before the Department next considered ACCSC's federal recognition. JA27-28. Indeed, the only thing that changed with respect to CEHE after July 2020 (when ACCSC determined good cause to extend the time for compliance) and February 2021 (when ACCSC abruptly withdrew IU) was Colorado state court ruling that implicitly criticized ACCSC's oversight. JA27.

Additional facts support ACCSC's ulterior motives. At the time of ACCSC's withdrawal decision, the Department had publicly announced its intention to terminate ACICS's recognition in response to its oversight of career schools that had also been involved in state enforcement actions. [3]  JA27-28; *see also Accrediting Council for Indep. Colls.*, 303 F. Supp. 3d at 89.  With ACCSC's own renewal coming up in mere months, and the Colorado state court ruling having just been issued, ACCSC had strong incentive to withdraw IU's accreditation in an effort to appease the Department and avoid ACICS's fate. JA27-28. ACCSC's precipitous

---

[3] *See, e.g.*, Douglas-Gabriel, Danielle, *Education Dept. staff recommends dropping embattled for-profit college accreditor backed by DeVos*, Washington Post (Jan. 22, 2021)    https://www.washingtonpost.com/education/2021/01/22/acics-education-department-recognition/ (last viewed June 3, 2025).

withdrawal of IU before then would help insulate ACCSC from Department scrutiny. JA28

Simply put, CEHE's allegations set forth a detailed factual predicate supporting its claims that ACCSC withdrew IU's accreditation to bolster its application for continued recognition with the Department. That reason—which had nothing to do with CEHE's ability to meet student achievement *Standards*—is improper and unlawful. *See Volpe*, 459 F.2d at 1246; *See also ATX, Inc. v. United States Dep't of Transp.*, 41 F.3d 1522, 1529 (D.C. Cir. 1994) ("If the decision maker were suddenly to reverse course or reach a weakly-supported determination, [] we might infer that pressure did influence the final decision.")

### b. CEHE alleged that ACCSC's internal appeals and arbitration procedures failed to provide due process.

CEHE's allegations further demonstrate that ACCSC denied CEHE due process by manipulating its internal rules and arbitration procedures to shield meaningful review of the withdrawal decision. A "fair trial in a fair tribunal" is a "basic requirement of due process." *Prof'l Massage*, 781 F.3d at 177. Indeed, "whether the accrediting body's internal rules provided a fair and impartial procedure" is the primary focus of a common law due process claim. *Prof'l Massage*, 781 F.3d at 172 (cleaned up and internal quotation omitted).

Whether the decision was rendered by an "impartial decision maker is an essential element" of that inquiry. *Id.* at 177-78; *see also Fine Mortuary College,*

*LLC v. Am. Bd. of Funeral Serv. Educ., Inc.*, 473 F. Supp. 2d 153, 159-160 (D. Mass. 2006) ("[A] [d]ecision by an impartial tribunal is a fundamental element of due process under any standard.") (citing *Marlboro Corp. v. Ass'n of Indep. Colls. & Sch., Inc.*, 556 F.2d 78, 82 (1st Cir. 1977)). But that "essential element" of due process is meaningless if an accreditor can block judicial review into issues of bias, bad-faith, and improper motives by limiting the scope of review exclusively to the record it chooses, which will rarely (if ever) include evidence of such conduct. *Beta Analytics*, 61 Fed. Cl. at 226. An accreditor's review procedures must allow for some opportunity to show the need supplementing or completing the record. *See Prof'l Massage*, 781 F.3d at 177-78 (recognizing the need for a more searching inquiry into the motivations of decision makers upon a sufficient showing of bad faith or improper behavior); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 460 (4th Cir. 1993) (evidence of bad faith or improper behavior "justifies looking beyond the record compiled").

Neither ACCSC nor the district court dispute that CEHE was categorically blocked in both ACCSC's internal appeal proceeding and the arbitration from challenging the sufficiency of the accreditation record or meaningfully disputing whether ACCSC acted in bad faith.

That is not a "fair and impartial procedure." *Prof'l Massage*, 781 F.3d at 172. Indeed, if the district court's order stands, accreditation decisions will become

effectively unreviewable on bad-faith or bias grounds. Without an opportunity for schools to seek supplementation of the record (whether during the appeals process, arbitration, or through judicial proceedings), accreditors will be free to exclude any and all evidence that might call their motives into question. Such a ruling cannot be reconciled with this Court's directive that reviewing courts make sure that accreditors "play it straight" and that their rules provide "a fair and impartial procedure." *Professional Massage*, 781 F.3d at 169, 172.

## Conclusion

For the forgoing reasons the Court should REVERSE the district court's order granting ACCSC's Motion for Judgment on the Pleadings and REVERSE the district court's order denying CEHE's Motion to Vacate Arbitration Award.

## Request for Oral Argument

This case raises important questions about the due process requirements applicable to federally recognized accreditors and their ability to adopt rules and procedures that critically limit those requirements. CEHE believes the Panel would benefit from discussion of those issues and therefore requests oral argument.

Date: June 4, 2025.

Respectfully submitted,

CENTER FOR EXCELLENCE IN HIGHER
EDUCATION, INC.

/s/ David A. Obuchowicz
David A. Obuchowicz (VSB No. 82483)
GOMBOS LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, VA 22030
Telephone:    (703) 934-2660
Fax:              (703) 934-9840
Email:          dobuchowicz@glpclaw.com

*Counsel for CEHE*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __25-1372__    **Caption:** __Center for Excellence v. Accreditation Alliance__

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

     [✓]   this brief or other document contains __10,539__ [*state number of*] words

     [ ]   this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

     [✓]   this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word _____ [*identify word processing program*] in 14 point Times New Roman _____ [*identify font size and type style*]; **or**

     [ ]   this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) __David A. Obuchowicz__

Party Name __Appellant__

Dated: __06/04/2025__

**Addendum of Statutory and Regulatory Authorities**

# Table of Contents

9 U.S.C. § 10 ............................................................................ A-1

20 U.S.C. § 1001(a) ............................................................... A-3

20 U.S.C. § 1099b(a)(6), (e)-(f) ........................................... A-5

34 C.F.R. § 602.18 ................................................................ A-14

34 C.F.R. § 602.25 ................................................................ A-19

34 C.F.R. § 602.20(a) ........................................................... A-23

# 9 U.S.C. § 10

**§ 10. Same; vacation; grounds; rehearing**

**(a)** In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

> **(1)** where the award was procured by corruption, fraud, or undue means;

> **(2)** where there was evident partiality or corruption in the arbitrators, or either of them;

> **(3)** where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> **(4)** where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

**(b)** If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

**(c)** The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award

upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.

# 20 U.S.C. § 1001(a)

**§ 1001. General definition of institution of higher education**

**(a) Institution of higher education.** For purposes of this Act, other than title IV [20 USCS §§ 1070 et seq.], the term "institution of higher education" means an educational institution in any State that—

**(1)** admits as regular students only persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such a certificate, or persons who meet the requirements of section 484(d) [20 USCS § 1091(d)];

**(2)** is legally authorized within such State to provide a program of education beyond secondary education;

**(3)** provides an educational program for which the institution awards a bachelor's degree or provides not less than a 2-year program that is acceptable for full credit toward such a degree, or awards a degree that is acceptable for admission to a graduate or professional degree program, subject to review and approval by the Secretary;

**(4)** is a public or other nonprofit institution; and

**(5)** is accredited by a nationally recognized accrediting agency or association, or if not so accredited, is an institution that has been granted preaccreditation status by such an agency or association that has been recognized by the Secretary for

the granting of preaccreditation status, and the Secretary has determined that there is satisfactory assurance that the institution will meet the accreditation standards of such an agency or association within a reasonable time.

**(b) Additional institutions included.** For purposes of this Act, other than title IV [20 USCS §§ 1070 et seq.], the term "institution of higher education" also includes—

**(1)** any school that provides not less than a 1-year program of training to prepare students for gainful employment in a recognized occupation and that meets the provision of paragraphs (1), (2), (4), and (5) of subsection (a); and

**(2)** a public or nonprofit private educational institution in any State that, in lieu of the requirement in subsection (a)(1), admits as regular students individuals—

**(A)** who are beyond the age of compulsory school attendance in the State in which the institution is located; or

**(B)** who will be dually or concurrently enrolled in the institution and a secondary school.

**(c) List of accrediting agencies.** For purposes of this section and section 102 [20 USCS § 1002], the Secretary shall publish a list of nationally recognized accrediting agencies or associations that the Secretary determines, pursuant to subpart 2 of part H of title IV [20 USCS § 1099b], to be reliable authority as to the quality of the education or training offered.

A-4

# 20 U.S.C. § 1099b(a)(6), (e)-(f)

**§ 1099b. Recognition of accrediting agency or association**

**(a) Criteria required.** No accrediting agency or association may be determined by the Secretary to be a reliable authority as to the quality of education or training offered for the purposes of this Act or for other Federal purposes, unless the agency or association meets criteria established by the Secretary pursuant to this section. The Secretary shall, after notice and opportunity for a hearing, establish criteria for such determinations. Such criteria shall include an appropriate measure or measures of student achievement. Such criteria shall require that—

**(1)** the accrediting agency or association shall be a State, regional, or national agency or association and shall demonstrate the ability and the experience to operate as an accrediting agency or association within the State, region, or nationally, as appropriate;

**(2)** such agency or association—

**(A)**

**(i)** for the purpose of participation in programs under this Act, has a voluntary membership of institutions of higher education and has as a principal purpose the accrediting of institutions of higher education; or

**(ii)** for the purpose of participation in other programs administered by the Department of Education or other Federal agencies, has a voluntary

A-5

membership and has as its principal purpose the accrediting of institutions of higher education or programs;

**(B)** is a State agency approved by the Secretary for the purpose described in subparagraph (A); or

**(C)** is an agency or association that, for the purpose of determining eligibility for student assistance under this title, conducts accreditation through (i) a voluntary membership organization of individuals participating in a profession, or (ii) an agency or association which has as its principal purpose the accreditation of programs within institutions, which institutions are accredited by another agency or association recognized by the Secretary;

**(3)** if such agency or association is an agency or association described in—

**(A)** subparagraph (A)(i) of paragraph (2), then such agency or association is separate and independent, both administratively and financially of any related, associated, or affiliated trade association or membership organization;

**(B)** subparagraph (B) of paragraph (2), then such agency or association has been recognized by the Secretary on or before October 1, 1991; or

**(C)** subparagraph (C) of paragraph (2) and such agency or association has been recognized by the Secretary on or before October 1, 1991, then the Secretary may waive the requirement that such agency or association is

separate and independent, both administratively and financially of any related, associated, or affiliated trade association or membership organization upon a demonstration that the existing relationship has not served to compromise the independence of its accreditation process;

**(4)**

**(A)** such agency or association consistently applies and enforces standards that respect the stated mission of the institution of higher education, including religious missions, and that ensure that the courses or programs of instruction, training, or study offered by the institution of higher education, including distance education or correspondence courses or programs, are of sufficient quality to achieve, for the duration of the accreditation period, the stated objective for which the courses or the programs are offered; and

**(B)** if such agency or association has or seeks to include within its scope of recognition the evaluation of the quality of institutions or programs offering distance education or correspondence education, such agency or association shall, in addition to meeting the other requirements of this subpart, demonstrate to the Secretary that—

**(i)** the agency or association's standards effectively address the quality of an institution's distance education or correspondence education in the areas identified in paragraph (5), except that—

**(I)** the agency or association shall not be required to have separate standards, procedures, or policies for the evaluation of distance education or correspondence education institutions or programs in order to meet the requirements of this subparagraph; and

**(II)** in the case that the agency or association is recognized by the Secretary, the agency or association shall not be required to obtain the approval of the Secretary to expand its scope of accreditation to include distance education or correspondence education, provided that the agency or association notifies the Secretary in writing of the change in scope; and

**(ii)** the agency or association requires an institution that offers distance education or correspondence education to have processes through which the institution establishes that the student who registers in a distance education or correspondence education course or program is the same student who participates in and completes the program and receives the academic credit;

**(5)** the standards for accreditation of the agency or association assess the institution's—

**(A)** success with respect to student achievement in relation to the institution's mission, which may include different standards for different institutions or

programs, as established by the institution, including, as appropriate, consideration of State licensing examinations, consideration of course completion, and job placement rates;

**(B)** curricula;

**(C)** faculty;

**(D)** facilities, equipment, and supplies;

**(E)** fiscal and administrative capacity as appropriate to the specified scale of operations;

**(F)** student support services;

**(G)** recruiting and admissions practices, academic calendars, catalogs, publications, grading and advertising;

**(H)** measures of program length and the objectives of the degrees or credentials offered;

**(I)** record of student complaints received by, or available to, the agency or association; and

**(J)** record of compliance with its program responsibilities under title IV of this Act based on the most recent student loan default rate data provided by the Secretary, the results of financial or compliance audits, program reviews, and any such other information as the Secretary may provide to the agency or association;

except that subparagraphs (A), (H), and (J) shall not apply to agencies or associations described in paragraph (2)(A)(ii) of this subsection;

**(6)** such an agency or association shall establish and apply review procedures throughout the accrediting process, including evaluation and withdrawal proceedings, which comply with due process procedures that provide—

**(A)** for adequate written specification of—

**(i)** requirements, including clear standards for an institution of higher education or program to be accredited; and

**(ii)** identified deficiencies at the institution or program examined;

**(B)** for sufficient opportunity for a written response, by an institution or program, regarding any deficiencies identified by the agency or association to be considered by the agency or association—

**(i)** within a timeframe determined by the agency or association; and

**(ii)** prior to final action in the evaluation and withdrawal proceedings;

**(C)** upon the written request of an institution or program, for an opportunity for the institution or program to appeal any adverse action under this section, including denial, withdrawal, suspension, or termination of accreditation, taken against the institution or program, prior to such action becoming final at a hearing before an appeals panel that—

A-10

**(i)** shall not include current members of the agency's or association's underlying decisionmaking body that made the adverse decision; and

**(ii)** is subject to a conflict of interest policy;

**(D)** for the right to representation and participation by counsel for an institution or program during an appeal of the adverse action;

**(E)** for a process, in accordance with written procedures developed by the agency or association, through which an institution or program, before a final adverse action based solely upon a failure to meet a standard or criterion pertaining to finances, may on one occasion seek review of significant financial information that was unavailable to the institution or program prior to the determination of the adverse action, and that bears materially on the financial deficiencies identified by the agency or association;

**(F)** in the case that the agency or association determines that the new financial information submitted by the institution or program under subparagraph (E) meets the criteria of significance and materiality described in such subparagraph, for consideration by the agency or association of the new financial information prior to the adverse action described in such subparagraph becoming final; and

**(G)** that any determination by the agency or association made with respect to the new financial information described in subparagraph (E) shall not be separately appealable by the institution or program;

**(7)** such agency or association shall notify the Secretary and the appropriate State licensing or authorizing agency within 30 days of the accreditation of an institution or any final denial, withdrawal, suspension, or termination of accreditation or placement on probation of an institution, together with any other adverse action taken with respect to an institution; and

**(8)** such agency or association shall make available to the public, upon request, and to the Secretary, and the State licensing or authorizing agency a summary of any review resulting in a final accrediting decision involving denial, termination, or suspension of accreditation, together with the comments of the affected institution.

\*      \*      \*

**(e) Initial arbitration rule.** The Secretary may not recognize the accreditation of any institution of higher education unless the institution of higher education agrees to submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration prior to any other legal action.

**(f) Jurisdiction.** Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or

accredited by, an accrediting agency or association recognized by the Secretary for the purpose of this title and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in the appropriate United States district court.

\*    \*    \*

# 34 C.F.R. § 602.18

**§ 602.18 Ensuring consistency in decision-making.**

**(a)** The agency must consistently apply and enforce standards that respect the stated mission of the institution, including religious mission, and that ensure that the education or training offered by an institution or program, including any offered through distance education, correspondence courses, or direct assessment education is of sufficient quality to achieve its stated objective for the duration of any accreditation or preaccreditation period.

**(b)** The agency meets the requirement in paragraph (a) of this section if the agency—

    **(1)** Has written specification of the requirements for accreditation and preaccreditation that include clear standards for an institution or program to be accredited or preaccredited;

    **(2)** Has effective controls against the inconsistent application of the agency's standards;

    **(3)** Bases decisions regarding accreditation and preaccreditation on the agency's published standards and does not use as a negative factor the institution's religious mission-based policies, decisions, and practices in the areas covered by § 602.16(a)(1)(ii), (iii), (iv), (vi), and (vii) provided, however, that the agency may require that the institution's or program's curricula include all core components required by the agency;

A-14

**(4)** Has a reasonable basis for determining that the information the agency relies on for making accrediting decisions is accurate;

**(5)** Provides the institution or program with a detailed written report that clearly identifies any deficiencies in the institution's or program's compliance with the agency's standards; and

**(6)** Publishes any policies for retroactive application of an accreditation decision, which must not provide for an effective date that predates either—

    **(i)** An earlier denial by the agency of accreditation or preaccreditation to the institution or program; or

    **(ii)** The agency's formal approval of the institution or program for consideration in the agency's accreditation or preaccreditation process.

**(c)** Nothing in this part prohibits an agency, when special circumstances exist, to include innovative program delivery approaches or, when an undue hardship on students occurs, from applying equivalent written standards, policies, and procedures that provide alternative means of satisfying one or more of the requirements set forth in 34 CFR 602.16, 602.17, 602.19, 602.20, 602.22, and 602.24, as compared with written standards, policies, and procedures the agency ordinarily applies, if—

    **(1)** The alternative standards, policies, and procedures, and the selection of institutions or programs to which they will be applied, are approved by the

agency's decision-making body and otherwise meet the intent of the agency's expectations and requirements;

**(2)** The agency sets and applies equivalent goals and metrics for assessing the performance of institutions or programs;

**(3)** The agency's process for establishing and applying the alternative standards, policies, and procedures is set forth in its published accreditation manuals; and

**(4)** The agency requires institutions or programs seeking the application of alternative standards to demonstrate the need for an alternative assessment approach, that students will receive equivalent benefit, and that students will not be harmed through such application.

**(d)** Nothing in this part prohibits an agency from permitting the institution or program to be out of compliance with one or more of its standards, policies, and procedures adopted in satisfaction of §§ 602.16, 602.17, 602.19, 602.20, 602.22, and 602.24 for a period of time, as determined by the agency annually, not to exceed three years unless the agency determines there is good cause to extend the period of time, and if—

**(1)** The agency and the institution or program can show that the circumstances requiring the period of noncompliance are beyond the institution's or program's control, such as—

**(i)** A natural disaster or other catastrophic event significantly impacting an institution's or program's operations;

**(ii)** Accepting students from another institution that is implementing a teach-out or closing;

**(iii)** Significant and documented local or national economic changes, such as an economic recession or closure of a large local employer;

**(iv)** Changes relating to State licensure requirements;

**(v)** The normal application of the agency's standards creates an undue hardship on students; or

**(vi)** Instructors who do not meet the agency's typical faculty standards, but who are otherwise qualified by education or work experience, to teach courses within a dual or concurrent enrollment program, as defined in 20 U.S.C. 7801, or career and technical education courses;

**(2)** The grant of the period of noncompliance is approved by the agency's decision-making body;

**(3)** The agency projects that the institution or program has the resources necessary to achieve compliance with the standard, policy, or procedure postponed within the time allotted; and

**(4)** The institution or program demonstrates to the satisfaction of the agency that the period of noncompliance will not—

A-17

**(i)** Contribute to the cost of the program to the student without the student's consent;

**(ii)** Create any undue hardship on, or harm to, students; or

**(iii)** Compromise the program's academic quality.

# 34 C.F.R. § 602.25

**§ 602.25 Due process.**

The agency must demonstrate that the procedures it uses throughout the accrediting process satisfy due process. The agency meets this requirement if the agency does the following:

**(a)** Provides adequate written specification of its requirements, including clear standards, for an institution or program to be accredited or preaccredited.

**(b)** Uses procedures that afford an institution or program a reasonable period of time to comply with the agency's requests for information and documents.

**(c)** Provides written specification of any deficiencies identified at the institution or program examined.

**(d)** Provides sufficient opportunity for a written response by an institution or program regarding any deficiencies identified by the agency, to be considered by the agency within a timeframe determined by the agency, and before any adverse action is taken.

**(e)** Notifies the institution or program in writing of any adverse accrediting action or an action to place the institution or program on probation or show cause. The notice describes the basis for the action.

**(f)** Provides an opportunity, upon written request of an institution or program, for the institution or program to appeal any adverse action prior to the action becoming final.

**(1)** The appeal must take place at a hearing before an appeals panel that—

**(i)** May not include current members of the agency's decision-making body that took the initial adverse action;

**(ii)** Is subject to a conflict of interest policy;

**(iii)** Does not serve only an advisory or procedural role, and has and uses the authority to make the following decisions: To affirm, amend, or remand adverse actions of the original decision-making body; and

**(iv)** Affirms, amends, reverses, or remands the adverse action. A decision to affirm, amend, or reverse the adverse action is implemented by the appeals panel or by the original decision-making body, at the agency's option; however, in the event of a decision by the appeals panel to remand the adverse action to the original decision-making body for further consideration, the appeals panel must explain the basis for a decision that differs from that of the original decision-making body and the original decision-making body in a remand must act in a manner consistent with the appeals panel's decisions or instructions.

A-20

**(2)** The agency must recognize the right of the institution or program to employ counsel to represent the institution or program during its appeal, including to make any presentation that the agency permits the institution or program to make on its own during the appeal.

**(g)** The agency notifies the institution or program in writing of the result of its appeal and the basis for that result.

**(h)**

**(1)** The agency must provide for a process, in accordance with written procedures, through which an institution or program may, before the agency reaches a final adverse action decision, seek review of new financial information if all of the following conditions are met:

**(i)** The financial information was unavailable to the institution or program until after the decision subject to appeal was made.

**(ii)** The financial information is significant and bears materially on the financial deficiencies identified by the agency. The criteria of significance and materiality are determined by the agency.

**(iii)** The only remaining deficiency cited by the agency in support of a final adverse action decision is the institution's or program's failure to meet an agency standard pertaining to finances.

A-21

**(2)** An institution or program may seek the review of new financial information described in paragraph (h)(1) of this section only once and any determination by the agency made with respect to that review does not provide a basis for an appeal.

# 34 C.F.R. § 602.20(a)

**§ 602.20 Enforcement of standards.**

**(a)** If the agency's review of an institution or program under any standard indicates that the institution or program is not in compliance with that standard, the agency must—

    **(1)** Follow its written policy for notifying the institution or program of the finding of noncompliance;

    **(2)** Provide the institution or program with a written timeline for coming into compliance that is reasonable, as determined by the agency's decision-making body, based on the nature of the finding, the stated mission, and educational objectives of the institution or program. The timeline may include intermediate checkpoints on the way to full compliance and must not exceed the lesser of four years or 150 percent of the—

        **(i)** Length of the program in the case of a programmatic accrediting agency; or

        **(ii)** Length of the longest program at the institution in the case of an institutional accrediting agency;

    **(3)** Follow its written policies and procedures for granting a good cause extension that may exceed the standard timeframe described in paragraph (a)(2)

of this section when such an extension is determined by the agency to be warranted; and

**(4)** Have a written policy to evaluate and approve or disapprove monitoring or compliance reports it requires, provide ongoing monitoring, if warranted, and evaluate an institution's or program's progress in resolving the finding of noncompliance.

**(b)** Notwithstanding paragraph (a) of this section, the agency must have a policy for taking an immediate adverse action, and take such action, when the agency has determined that such action is warranted.

**(c)** If the institution or program does not bring itself into compliance within the period specified in paragraph (a) of this section, the agency must take adverse action against the institution or program, but may maintain the institution's or program's accreditation or preaccreditation until the institution or program has had reasonable time to complete the activities in its teach-out plan or to fulfill the obligations of any teach-out agreement to assist students in transferring or completing their programs.

**(d)** An agency that accredits institutions may limit the adverse or other action to particular programs that are offered by the institution or to particular additional locations of an institution, without necessarily taking action against the entire institution and all of its programs, provided the noncompliance was limited to that particular program or location.

**(e)** All adverse actions taken under this subpart are subject to the arbitration requirements in 20 U.S.C. 1099b(e).

**(f)** An agency is not responsible for enforcing requirements in 34 CFR 668.14, 668.15, 668.16, 668.41, or 668.46, but if, in the course of an agency's work, it identifies instances or potential instances of noncompliance with any of these requirements, it must notify the Department.

**(g)** The Secretary may not require an agency to take action against an institution or program that does not participate in any title IV, HEA or other Federal program as a result of a requirement specified in this part.