NO. 25-1372

# United States Court of Appeals

*for the*

# Fourth Circuit

CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC.

*Plaintiff-Appellant,*

– v. –

ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES,
d/b/a Accrediting Commission of Career Schools and Colleges

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

## JOINT APPENDIX

DAVID N. GOLDMAN
LEWIS F. POWELL, III
MICHAEL R. SHEBELSKIE
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 788-8200

*Counsel for Defendant-Appellee*

DAVID OBUCHOWICZ
GOMBOS LEYTON, PC
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
(703) 934-2660

*Counsel for Plaintiff-Appellant*

CP  COUNSEL PRESS    (800) 4-APPEAL • (812711)

# TABLE OF CONTENTS

**VOLUME ONE**

District Court Docket Sheet ......................................................................JA1

Motion to Vacate Arbitration Award and Complaint, with Exhibits
    Filed October 28, 2022 ....................................................................JA12

    1-1    Civil Cover Sheet ........................................................JA44

    1-2    Exhibit A – Decision and Award by Arbitrator
            Dated August 4, 2022......................................JA46

    1-3    Exhibit B – Standard of Accreditation
            Dated July 1, 2018 .........................................JA92

    1-4    Exhibit C – Instructions for Arbitration
            Implemented July 1, 2014................................JA114

    1-5    Exhibit D – Ruling Concerning Arbitration Exhibits
            Dated March 15, 2022.....................................JA120

    1-6    Exhibit E – Letter to Eric Juhlin
            Dated July 21, 2020 .......................................JA130

    1-7    Exhibit F – Letter to Eric Juhlin
            Dated October 28, 2019 ..................................JA167

    1-8    Exhibit G – Independence University Online Graduation and
            Employment Rate Action Plans, Executive Summary
            Undated ........................................................JA198

    1-9    Exhibit H – Letter to Eric Juhlin
            Dated April 22, 2021 ......................................JA204

    1-10  Exhibit I – Letter to Dr. Michale McComis
            Dated May 27, 2021.......................................JA233

i

1-11  Exhibit J – Letter to Eric Juhlin
        Dated October 26, 2020 ......................................................JA273

1-12  Exhibit K – Center for Excellence in Higher Education Memorandum
        Undated ........................................................................JA281

1-13  Exhibit L – Letter to Dr. Michale McComis
        Dated April 30, 2021 ........................................................JA317

1-14  Exhibit M – Letter to Mr. Paul Gardner
        Dated September 17, 2021 ................................................JA321

Defendant's Brief In Opposition to Plaintiff's Motion to Vacate Arbitration Award
        Filed December 22, 2022........................................................JA330

Plaintiff's Reply In Support of Motion to Vacate
        Filed January 26, 2023........................................................JA354

Memorandum Opinion and Order
        Filed September 26, 2023 ....................................................JA360

Defendant's Answer
        Filed October 20, 2023 ......................................................JA380

Memorandum Opinion and Order
        Filed March 6, 2025............................................................JA439

Judgment
        Filed March 6, 2025............................................................JA455

Plaintiff's Notice of Appeal
        Filed April 4, 2025 ..............................................................JA456

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED,JURY

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
### CIVIL DOCKET FOR CASE #: 1:22-cv-01223-RDA-WEF

| | |
|---|---|
| Center for Excellence in Higher Education, Inc. v. Accreditation Alliance of Career Schools and Colleges | Date Filed: 10/28/2022 |
| Assigned to: District Judge Rossie D. Alston, Jr | Date Terminated: 03/06/2025 |
| Referred to: Magistrate Judge William E. Fitzpatrick | Jury Demand: Plaintiff |
| Case in other court: Fourth Circuit, 25-01372 | Nature of Suit: 896 Other Statutes: Arbitration |
| Cause: Motion to vacate an arbitration award | Jurisdiction: Federal Question |

**Plaintiff**

**Center for Excellence in Higher Education, Inc.**

represented by **David Aleksander Obuchowicz**
Gombos Leyton P.C.
11350 Random Hills Rd
Suite 400
Fairfax, VA 22030
703-934-2660
Fax: 703-934-9840
Email: dobuchowicz@glpclaw.com
*ATTORNEY TO BE NOTICED*

**Steven Martin Gombos**
Gombos Leyton P.C.
11350 Random Hills Rd
Suite 400
Fairfax, VA 22030
(703) 934-2660
Email: sgombos@glpclaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Accreditation Alliance of Career Schools and Colleges**
*doing business as*
Accrediting Commission of Career Schools and Colleges

represented by **Lewis Franklin Powell , III**
Hunton Andrews Kurth LLP
951 E Byrd St
Riverfront Plaza
Richmond, VA 23219
(804) 788-8200
Email: lpowell@hunton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur Eric Schmalz**
Hunton Andrews Kurth LLP (DC-Pennsylvania Ave)
2200 Pennsylvania Ave NW
Washington, DC 20037

JA1

202-955-1077
Fax: 202-918-4016
Email: aschmalz@hunton.com
*ATTORNEY TO BE NOTICED*

**David N Goldman**
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
804-788-7283
Email: dgoldman@huntonak.com
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
Hunton Andrews Kurth LLP
951 E Byrd St
Riverfront Plaza
Richmond, VA 23219
(804) 788-8200
Email: mshebelskie@huntonak.com
*ATTORNEY TO BE NOTICED*

**Nathaniel S Shepherd**
Virginia
3101 Kensington Ave.
Apt. 403
Richmond, VA 23221
919-818-4495
Email: nate.shepherd14@gmail.com
*TERMINATED: 12/30/2022*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/28/2022 | 1 | Complaint *and Motion to Vacate Arbitration Award* ( Filing fee $ 402, receipt number AVAEDC-8633966.), filed by Center for Excellence in Higher Education, Inc.. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Exhibit Ex. A, # 3 Exhibit Ex. B, # 4 Exhibit Ex. C, # 5 Exhibit Ex. D, # 6 Exhibit Ex. E, # 7 Exhibit Ex. F, # 8 Exhibit Ex. G, # 9 Exhibit Ex. H, # 10 Exhibit Ex. I, # 11 Exhibit Ex. J, # 12 Exhibit Ex. K, # 13 Exhibit Ex. L, # 14 Exhibit Ex. M)(Gombos, Steven) (Entered: 10/28/2022) |
| 10/28/2022 | 2 | Proposed Summons by Center for Excellence in Higher Education, Inc.. (Gombos, Steven) (Entered: 10/28/2022) |
| 10/28/2022 | 3 | Corporate Disclosure Statement by Center for Excellence in Higher Education, Inc.. (Gombos, Steven) (Entered: 10/28/2022) |
| 10/28/2022 | 4 | NOTICE of Appearance by David Aleksander Obuchowicz on behalf of Center for Excellence in Higher Education, Inc. (Obuchowicz, David) (Entered: 10/28/2022) |
| 10/28/2022 | | Initial Case Assignment to District Judge T. S. Ellis, III and Magistrate Judge William E. Fitzpatrick. (nlop) (Entered: 10/28/2022) |
| 10/28/2022 | 5 | Summons Issued as to Accreditation Alliance of Career Schools and Colleges, NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the |

JA2

| | | |
|---|---|---|
| | | electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Notice to Attorney) (nlop) (Entered: 10/28/2022) |
| 11/07/2022 | 6 | WAIVER OF SERVICE Returned Executed by Center for Excellence in Higher Education, Inc.. Accreditation Alliance of Career Schools and Colleges waiver sent on 11/3/2022, answer due 1/2/2023. (Gombos, Steven) (Entered: 11/07/2022) |
| 11/14/2022 | 7 | NOTICE of Appearance by Lewis Franklin Powell, III on behalf of Accreditation Alliance of Career Schools and Colleges (Powell, Lewis) (Entered: 11/14/2022) |
| 11/14/2022 | 8 | Corporate Disclosure Statement by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 11/14/2022) |
| 11/15/2022 | 9 | Joint MOTION for Entry of Consent Order Scheduling Briefing on Preliminary Motions and Staying Issuance of Rule 16(b) Scheduling Order by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Exhibit A - Proposed Consent Order)(Powell, Lewis) (Entered: 11/15/2022) |
| 11/15/2022 | 10 | Brief in Support to 9 Joint MOTION for Entry of Consent Order Scheduling Briefing on Preliminary Motions and Staying Issuance of Rule 16(b) Scheduling Order filed by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 11/15/2022) |
| 11/16/2022 | | Case Reassigned to District Judge Rossie D. Alston, Jr. District Judge T. S. Ellis, III no longer assigned to the case. (jlan) (Entered: 11/16/2022) |
| 11/29/2022 | 11 | ORDERED that the requested briefing schedule for Plaintiff's pending motion to vacate an arbitration award is GRANTED; it is further ORDERED that the requested briefing schedule with regard to any motion to dismiss or motion for summary judgment that Defendant may file in response to Plaintiff's complaint is DENIED WITHOUT PREJUDICE, with leave to re-petition the Court to set a briefing schedule once a motion to dismiss or motion for summary judgment has been filed; it is further ORDERED that the request to stay issuance of the Rule 16(b) scheduling order is DENIED (see Order for further details). Signed by Magistrate Judge William E. Fitzpatrick on 11/29/2022. (nlop) (Entered: 11/29/2022) |
| 11/30/2022 | 12 | NOTICE of Appearance by Nathaniel S Shepherd on behalf of Accreditation Alliance of Career Schools and Colleges (Shepherd, Nathaniel) (Entered: 11/30/2022) |
| 12/22/2022 | 13 | Opposition to 1 Complaint,, *(Motion to Vacate Arbitration Award)* filed by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 12/22/2022) |
| 12/22/2022 | 14 | MOTION to Dismiss for Failure to State a Claim by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 12/22/2022) |
| 12/22/2022 | 15 | Brief in Support to 14 MOTION to Dismiss for Failure to State a Claim filed by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Exhibit 1) (Powell, Lewis) (Entered: 12/22/2022) |
| 12/30/2022 | 16 | Joint MOTION for Entry of Consent Order Scheduling Briefing on Defendant's Partial Motion to Dismiss and Staying Issuance of Rule 16(b) Scheduling Order by Center for Excellence in Higher Education, Inc.. (Attachments: # 1 Proposed Order Exhibit A - Proposed Consent Order)(Gombos, Steven) (Entered: 12/30/2022) |
| 12/30/2022 | 17 | Brief in Support to 16 Joint MOTION for Entry of Consent Order Scheduling Briefing on Defendant's Partial Motion to Dismiss and Staying Issuance of Rule 16(b) Scheduling |

JA3

| | | Order filed by Center for Excellence in Higher Education, Inc.. (Gombos, Steven) (Entered: 12/30/2022) |
|---|---|---|
| 12/30/2022 | 18 | MOTION to Withdraw as Attorney *(Shepherd, Nathaniel)* by Accreditation Alliance of Career Schools and Colleges. (Shepherd, Nathaniel) (Entered: 12/30/2022) |
| 12/30/2022 | 19 | ORDERED that the Joint Motion (Dkt. 16) is GRANTED, such that Plaintiff shall file its opposition to Defendant's partial motion to dismiss on or before January 26, 2023, and Defendant shall file any reply on or before February 9, 2023; it is further ORDERED that the request to delay issuance of the Rule 16(b) scheduling order is GRANTED, until such time the Court deems appropriate to issue the order; it is further ORDERED that Defendant's Motion to Withdraw Nathaniel Shepherd as Attorney (Dkt. 18) is GRANTED (see Order for further details). Signed by Magistrate Judge William E. Fitzpatrick on 12/30/2022. (nlop) (Entered: 12/30/2022) |
| 01/26/2023 | 20 | Reply to 1 Complaint,, *Motion to Vacate Arbitration Award* filed by Center for Excellence in Higher Education, Inc.. (Gombos, Steven) (Entered: 01/26/2023) |
| 01/26/2023 | 21 | Memorandum in Opposition re 14 MOTION to Dismiss for Failure to State a Claim filed by Center for Excellence in Higher Education, Inc.. (Gombos, Steven) (Entered: 01/26/2023) |
| 02/09/2023 | 22 | Reply to Motion re 14 MOTION to Dismiss for Failure to State a Claim filed by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 02/09/2023) |
| 03/22/2023 | 23 | Notice of Hearing Date *Motion to Vacate Arbitration Award* set for 5/10/2023 re 1 Complaint,, (Obuchowicz, David) (Entered: 03/22/2023) |
| 03/22/2023 | 24 | Notice of Hearing Date set for May 10, 2023 re 14 MOTION to Dismiss for Failure to State a Claim (Powell, Lewis) (Entered: 03/22/2023) |
| 03/23/2023 | | Set Deadline as to 14 MOTION to Dismiss for Failure to State a Claim. Motion Hearing set for 5/10/2023 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston Jr. (wgar, ) (Entered: 03/23/2023) |
| 03/24/2023 | | Set Deadline as to Motion to Vacate Arbitration Award 1 set for 5/10/2023 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston Jr. (wgar, ) (Entered: 03/24/2023) |
| 05/05/2023 | | *** Motion Hearing deadline terminated - Per RDA's chambers motion set for 5/10/2023 will be decided on the papers; no oral argument will be heard (tarm) (Entered: 05/05/2023) |
| 09/26/2023 | 25 | MEMORANDUM OPINION and ORDER that Defendant's Motion (Dkt. 14) is GRANTED-IN-PART and DENIED-IN- PART; and it is FURTHER ORDERED that Count II is DISMISSED WITH PREJUDICE; and it is FURTHER ORDERED that the Motion is DENIED as to Counts III-V (see Order for further details). Signed by District Judge Rossie D. Alston, Jr on 9/26/2023. (swil) (Entered: 09/26/2023) |
| 10/13/2023 | 26 | MOTION for Extension of Time to File Answer *Defendant's Unopposed Motion for Extension of Time to File Answer* by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Proposed Order)(Powell, Lewis) (Entered: 10/13/2023) |
| 10/16/2023 | 27 | ORDERED that the Commission's motion (Dkt. 26) is GRANTED; and it is FURTHER ORDERED that the Commission shall have through October 20, 2023 within which to file its Answer. Signed by Magistrate Judge William E. Fitzpatrick on 10/16/2023. (swil) (Entered: 10/17/2023) |

| 10/20/2023 | 28 | *Defendant's* ANSWER to Complaint *and Response to Plaintiff's Motion to Vacate Arbitration* by Accreditation Alliance of Career Schools and Colleges.(Powell, Lewis) (Entered: 10/20/2023) |
| 04/01/2024 | 29 | SCHEDULING ORDER: Initial Pretrial Conference set for 4/24/2024 at 11:00 AM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. Discovery due by 8/23/2024. Signed by District Judge Rossie D. Alston, Jr on 4/1/24. (Attachments: # 1 Pretrial Notice, # 2 Magistrate Judge Consent Form)(tarm) (Entered: 04/02/2024) |
| 04/17/2024 | | Set/Reset Hearings: Initial Pretrial Conference set for 5/3/2024 at 12:00 PM in Alexandria Telephonically before Magistrate Judge William E. Fitzpatrick. (per WEF chambers) (tfitz, ) (Entered: 04/17/2024) |
| 04/24/2024 | 30 | *Joint Fed. R. Civ. P. 26(f)* Discovery Plan by Center for Excellence in Higher Education, Inc..(Obuchowicz, David) (Entered: 04/24/2024) |
| 04/24/2024 | 31 | MOTION for Discovery *Motion to Suspend Discovery until after Resolution of its Motion for Judgment on the Pleadings* by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 04/24/2024) |
| 04/24/2024 | 32 | Memorandum in Support re 31 MOTION for Discovery *Motion to Suspend Discovery until after Resolution of its Motion for Judgment on the Pleadings* filed by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 04/24/2024) |
| 04/29/2024 | | Notice of Correction: Filing user notified to file a Notice of Hearing or Waiver of Oral Argument re 31 MOTION for Discovery *Motion to Suspend Discovery until after Resolution of its Motion for Judgment on the Pleadings* (Sbro, ) (Entered: 04/29/2024) |
| 05/03/2024 | 33 | Notice of Hearing Date set for 06/05/2024 re 31 MOTION for Discovery *Motion to Suspend Discovery until after Resolution of its Motion for Judgment on the Pleadings* (Powell, Lewis) (Entered: 05/03/2024) |
| 05/03/2024 | 34 | ORDERED that the Motion to Suspend Discovery (Dkt. 31) shall be set for a hearing before the undersigned on Wednesday, June 5, 2024, at 12:00 p.m. Signed by Magistrate Judge William E. Fitzpatrick on 05/03/2024. (wgar, ) (Entered: 05/03/2024) |
| 05/03/2024 | | Set Deadline as to 31 MOTION for Discovery Motion to Suspend Discovery until after Resolution of its Motion for Judgment on the Pleadings. Motion Hearing set for 6/5/2024 at 12:00 PM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. (wgar, ) (Entered: 05/03/2024) |
| 05/03/2024 | | Minute Entry for proceedings held before Magistrate Judge William E. Fitzpatrick: Initial Pretrial Conference held on 5/3/2024. Appearance of counsel via phone. Joint Discovery Plan approved as amended. (per WEF chambers) (tfitz, ) (Entered: 06/06/2024) |
| 05/08/2024 | 35 | Opposition to 32 Memorandum in Support, 31 MOTION for Discovery *Motion to Suspend Discovery until after Resolution of its Motion for Judgment on the Pleadings* filed by Center for Excellence in Higher Education, Inc.. (Obuchowicz, David) (Entered: 05/08/2024) |
| 05/14/2024 | 36 | Reply to Motion re 31 MOTION for Discovery *Motion to Suspend Discovery until after Resolution of its Motion for Judgment on the Pleadings* by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Powell, Lewis) (Entered: 05/14/2024) |
| 05/16/2024 | 37 | MOTION for Judgment on the Pleadings by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 05/16/2024) |

JA5

| | | |
|---|---|---|
| 05/16/2024 | 38 | Memorandum in Support re 37 MOTION for Judgment on the Pleadings filed by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Exhibit Ex.A, # 2 Exhibit Ex.B, # 3 Exhibit Ex.C, # 4 Exhibit Ex.D)(Powell, Lewis) (Entered: 05/16/2024) |
| 05/16/2024 | | Notice of Correction: Filing user notified to file a Notice of Hearing or Waiver of Oral argument re 37 MOTION for Judgment on the Pleadings (Sbro, ) (Entered: 05/16/2024) |
| 05/30/2024 | 39 | RESPONSE in Opposition re 37 MOTION for Judgment on the Pleadings filed by Center for Excellence in Higher Education, Inc.. (Obuchowicz, David) (Entered: 05/30/2024) |
| 06/04/2024 | 40 | Notice of Hearing Date set for 06/26/24 re 37 MOTION for Judgment on the Pleadings (Powell, Lewis) (Entered: 06/04/2024) |
| 06/04/2024 | 41 | MOTION for Electronic Device Application *(Hearing 6/5/24)* by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 06/04/2024) |
| 06/04/2024 | 42 | MOTION for Electronic Device Application by Center for Excellence in Higher Education, Inc.. (Obuchowicz, David) (Entered: 06/04/2024) |
| 06/04/2024 | 43 | MOTION for Electronic Device Application *Hearing 6/5/2024* by Center for Excellence in Higher Education, Inc.. (Gombos, Steven) (Entered: 06/04/2024) |
| 06/04/2024 | 44 | ORDER granting 41 Motion for Electronic Device Application. Signed by Magistrate Judge William E. Fitzpatrick on 6/4/2024. (Sbro, ) (Entered: 06/05/2024) |
| 06/04/2024 | 45 | ORDER granting 42 Motion for Electronic Device Application. Signed by Magistrate Judge William E. Fitzpatrick on 6/4/2024. (Sbro, ) (Entered: 06/05/2024) |
| 06/04/2024 | 46 | ORDER granting 43 Motion for Electronic Device Application. Signed by Magistrate Judge William E. Fitzpatrick on 6/4/2024. (Sbro, ) (Entered: 06/05/2024) |
| 06/05/2024 | | Set Deadline as to 37 MOTION for Judgment on the Pleadings. Motion Hearing set for 6/26/2024 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston, Jr. (triv) (Entered: 06/05/2024) |
| 06/05/2024 | 47 | Reply to Motion re 37 MOTION for Judgment on the Pleadings filed by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 06/05/2024) |
| 06/05/2024 | 48 | Minute Entry for proceedings held before Magistrate Judge William E. Fitzpatrick: Motion Hearing held on 6/5/2024 re 31 MOTION for Discovery *Motion to Suspend Discovery until after Resolution of its Motion for Judgment on the Pleadings* filed by Accreditation Alliance of Career Schools and Colleges. Appearance of counsel. Motion is argued and Denied; 16b Order also to be issued. Order to follow. (Tape #FTR.)(tfitz, ) (Entered: 06/06/2024) |
| 06/05/2024 | 49 | For the reasons set forth from the bench, and in accord with specific rulings and instructions thereto, it is hereby ORDERED that the Defendants Motion to Suspend Discovery 31 is DENIED. Signed by Magistrate Judge William E. Fitzpatrick on 6/5/23. (tfitz, ) (Entered: 06/06/2024) |
| 06/05/2024 | 50 | Rule 16(b) Scheduling Order - Pursuant to the Rule 16(b) Conference it is ordered that: Upon consideration of the representations made by the parties in the Proposed Joint Discovery Plan pursuant to Fed. R. Civ. P. 26(f) (Joint Discovery Plan) (Dkt. 30) and at the initial pretrial conference held on May 3, 2024, and taking note of the Scheduling Order entered in this case (Dkt. 29), and upon the Courts order denying Defendants Motion to Suspend Discovery, the court makes the following rulings: 1. All discovery shall be concluded by August 23, 2024. 2. The Joint Discovery Plan filed by the parties is approved, as amended herein, and shall control discovery to the extent of its application unless further modified by the court.3. All Fed. R. Civ. P. 26(a)(1) disclosures shall be |

| | | |
|---|---|---|
| | | completed by June 14, 2024. 4. Expert disclosures shall be set forth as follows: Plaintiffs and Defendants expert disclosures as required by Fed. R. Civ. P. 26(a)(2), if any, are due by August 2, 2024. Rebuttal disclosures, if any, are due by August 16, 2024. To the extent the parties wish to modify expert deadlines, they must seek leave of court. (see Order for complete details) 5. Pursuant to the Courts scheduling order (Dkt. 29), Motions for Summary Judgment, if any, will be due by August 30, 2024. (see Order for complete details). Signed by Magistrate Judge William E. Fitzpatrick on 6/5/24. (tfitz, ) (Entered: 06/06/2024) |
| 06/17/2024 | | *** Motion Hearing deadline terminated - Per RDA's chambers, motion set for 6/26/2024 will be decided on the papers; no oral argument will be heard (tarm) (Entered: 06/17/2024) |
| 06/25/2024 | 51 | NOTICE of Appearance by David N Goldman on behalf of Accreditation Alliance of Career Schools and Colleges (Goldman, David) (Entered: 06/25/2024) |
| 07/03/2024 | 52 | MOTION to Compel *Plaintiff's Compliance with Rule 26's Required Disclosures Regarding Damages or, in the alternative, to Amend the Pretrial Schedule for Completion of Discovery* by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 07/03/2024) |
| 07/03/2024 | 53 | Memorandum in Support re 52 MOTION to Compel *Plaintiff's Required Disclosures Regarding Damages or, in the alternative, to Amend the Pretrial Schedule for Completion of Discovery* filed by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Powell, Lewis) (Entered: 07/03/2024) |
| 07/03/2024 | 54 | Notice of Hearing Date set for July 12, 2024 re 52 MOTION to Compel *Plaintiff's Compliance with Rule 26's Required Disclosures Regarding Damages or, in the alternative, to Amend the Pretrial Schedule for Completion of Discovery* (Powell, Lewis) (Entered: 07/03/2024) |
| 07/08/2024 | 55 | NOTICE of Appearance by Arthur Eric Schmalz on behalf of Accreditation Alliance of Career Schools and Colleges (Schmalz, Arthur) (Entered: 07/08/2024) |
| 07/08/2024 | | Set Deadline as to 52 MOTION to Compel Plaintiff's Compliance with Rule 26's Required Disclosures Regarding Damages or, in the alternative, to Amend the Pretrial Schedule for Completion of Discovery. Motion Hearing set for 7/12/2024 at 10:00 AM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. (triv) (Entered: 07/08/2024) |
| 07/10/2024 | 56 | ORDERED that the Motion (Dkt. 52) is DENIED-IN-PART and GRANTED-IN-PART (See Order for further details). Signed by Magistrate Judge William E. Fitzpatrick on 7/10/2024. (Sbro, ) (Entered: 07/11/2024) |
| 09/20/2024 | 57 | MOTION for Protective Order by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 09/20/2024) |
| 09/20/2024 | 58 | Memorandum in Support re 57 MOTION for Protective Order filed by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Powell, Lewis) (Entered: 09/20/2024) |
| 09/20/2024 | 59 | Notice of Hearing Date set for 9/27/2024 re 57 MOTION for Protective Order . (Powell, Lewis) (Entered: 09/20/2024) |
| 09/23/2024 | | Set Deadline as to 57 MOTION for Protective Order. Motion Hearing set for 9/27/2024 at 10:00 AM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. (wgar, ) (Entered: 09/23/2024) |

| 09/24/2024 | 60 | MOTION for Electronic Device Application *(Hearing 9/27/2024)* by Accreditation Alliance of Career Schools and Colleges. (Powell, Lewis) (Entered: 09/24/2024) |
|---|---|---|
| 09/25/2024 | 61 | ORDER granting 60 Motion for Electronic Device Application. Signed by Magistrate Judge William E. Fitzpatrick on 09/25/2024. (wgar, ) (Entered: 09/25/2024) |
| 09/25/2024 | 62 | MOTION for Electronic Device Application *Hearing 9/27/2024* by Center for Excellence in Higher Education, Inc.. (Obuchowicz, David) (Entered: 09/25/2024) |
| 09/25/2024 | 63 | RESPONSE in Opposition re 57 MOTION for Protective Order filed by Center for Excellence in Higher Education, Inc.. (Attachments: # 1 Exhibit Ex. 1)(Obuchowicz, David) (Entered: 09/25/2024) |
| 09/26/2024 | 64 | Reply to 57 MOTION for Protective Order *Defendant's Reply in Support of Its Motion for Protective Order* filed by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Powell, Lewis) (Entered: 09/26/2024) |
| 09/26/2024 | 65 | ORDER granting 62 MOTION for Electronic Device Application Hearing 9/27/2024. Signed by Magistrate Judge William E. Fitzpatrick on 9/26/2024. (Dest) (Entered: 09/26/2024) |
| 09/27/2024 | 66 | Minute Entry for proceedings held before Magistrate Judge William E. Fitzpatrick: Motion Hearing held on 9/27/2024 re 57 MOTION for Protective Order filed by Accreditation Alliance of Career Schools and Colleges. Appearance of counsel. Motion 57 argued and Granted. (Order to follow) (Tape #FTR.)(tfitz, ) (Entered: 09/30/2024) |
| 09/27/2024 | 67 | For the reasons stated from the bench, and in accord with specific rulings and instructions thereto it is hereby ORDERED that Defendant ACCSC's Motion 57 is GRANTED. Discovery as propounded by CEHE will not be permitted at this time, except to the extent that CEHE shall be permitted to, as soon as practicable, depose ACCSC (for no longer than a half day) with respect to topics 1, 2, 3, 6, 8, 9 - 11, and 15 - 17 as those topics are set forth in CEHE's draft Rule 30(b)(6) deposition notice, but only as those topics are limited by the ACCSC's objections set forth in its counsel's August 27, 2024 letter to CEHE's counsel (Exhibit 5 appended to ACCSC"s Memorandum in Support of its Motion 58 ); it is further ORDERED that CEHE may move this Court for discovery narrowly and specifically tailored to the issue of potential bad faith or impropriety underlying ACCSC's withdrawal of accreditation as to Independence University. Signed by Magistrate Judge William E. Fitzpatrick on 9/27/24. (tfitz, ) (Entered: 09/30/2024) |
| 10/11/2024 | 68 | Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 67 Order on Motion for Protective Order,,,, by Center for Excellence in Higher Education, Inc.. (Attachments: # 1 Exhibit Ex. 1, # 2 Exhibit Ex. 2, # 3 Exhibit Ex. 3, # 4 Exhibit Ex. 4, # 5 Proposed Order Proposed Order)(Obuchowicz, David) (Entered: 10/11/2024) |
| 10/11/2024 | 69 | Notice of Hearing Date set for 11/13/2024 re 68 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 67 Order on Motion for Protective Order,,,, (Obuchowicz, David) (Entered: 10/11/2024) |
| 10/15/2024 | | Set Deadline as to 68 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation in re 67 Order on Motion for Protective Order. Motion Hearing set for 11/13/2024 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston, Jr. (triv) (Entered: 10/15/2024) |
| 10/23/2024 | 70 | Joint MOTION for Protective Order by Center for Excellence in Higher Education, Inc.. (Attachments: # 1 Exhibit Proposed Protective Order)(Obuchowicz, David) (Entered: 10/23/2024) |

JA8

| 10/23/2024 | 71 | Brief in Support to 70 Joint MOTION for Protective Order filed by Center for Excellence in Higher Education, Inc.. (Obuchowicz, David) (Entered: 10/23/2024) |
|---|---|---|
| 10/23/2024 | 72 | PROTECTIVE ORDER re: the handling and labeling of confidential information (see Order for details). Signed by Magistrate Judge William E. Fitzpatrick on 10/23/2024. (swil) (Entered: 10/24/2024) |
| 10/24/2024 | 73 | TRANSCRIPT of proceedings held on 9/27/2024, before Judge W. Fitzpatrick, Court Reporter/Transcriber Tonia Harris, Telephone number 703-646-1438. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/25/2024. Redacted Transcript Deadline set for 12/24/2024. Release of Transcript Restriction set for 1/22/2025.**(harris, tonia) (Entered: 10/24/2024) |
| 10/25/2024 | 74 | Opposition to 68 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 67 Order on Motion for Protective Order,,,, filed by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Exhibit 10, # 2 Exhibit 11, # 3 Exhibit 12) (Powell, Lewis) (Entered: 10/25/2024) |
| 10/28/2024 | 75 | NOTICE of Appearance by Michael Randolph Shebelskie on behalf of Accreditation Alliance of Career Schools and Colleges (Shebelskie, Michael) (Entered: 10/28/2024) |
| 10/31/2024 | 76 | Reply to 68 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 67 Order on Motion for Protective Order,,,, filed by Center for Excellence in Higher Education, Inc.. (Obuchowicz, David) (Entered: 10/31/2024) |
| 11/05/2024 | | *** Motion Hearing deadline terminated - Per RDA's chambers, motion set for 11/13/2024 will be decided on the papers; no oral argument will be heard (tarm) (Entered: 11/05/2024) |
| 11/19/2024 | 77 | Consent MOTION for Extension *Motion to Modify Certain Deadlines for Expert Disclosures* by Accreditation Alliance of Career Schools and Colleges. (Attachments: # 1 Proposed Order)(Powell, Lewis) (Entered: 11/19/2024) |
| 11/21/2024 | 78 | ORDERED that the deadlines previously imposed by this Court shall be modified as follows: <br> 1. The deadline for Defendant's Rule 26(a)(2)(B) disclosures is December 6, 2024; and <br> 2. The deadline for Plaintiffs rebuttal expert disclosures, if any, is January 10, 2025 re 77 Motion for Extension of Time to File <br> . Signed by Magistrate Judge William E. Fitzpatrick on 11/21/2024. (Sbro, ) (Entered: 11/21/2024) |
| 12/20/2024 | 79 | MOTION for Extension of Time to Complete Discovery by Center for Excellence in Higher Education, Inc.. (Attachments: # 1 Proposed Order Proposed Order)(Obuchowicz, David) (Entered: 12/20/2024) |
| 12/20/2024 | 80 | Memorandum in Support re 79 MOTION for Extension of Time to Complete Discovery filed by Center for Excellence in Higher Education, Inc.. (Attachments: # 1 Proposed Order Proposed Order)(Obuchowicz, David) (Entered: 12/20/2024) |
| 12/20/2024 | 81 | Notice of Hearing Date set for 1/03/2024 re 79 MOTION for Extension of Time to Complete Discovery (Obuchowicz, David) (Entered: 12/20/2024) |

| 12/23/2024 | | Set Deadline as to 79 MOTION for Extension of Time to Complete Discovery. Motion Hearing set for 1/3/2025 at 10:00 AM in Alexandria Courtroom 500 before Magistrate Judge William E. Fitzpatrick. (triv) (Entered: 12/23/2024) |
|---|---|---|
| 12/23/2024 | 82 | NOTICE by Accreditation Alliance of Career Schools and Colleges re 80 Memorandum in Support, 79 MOTION for Extension of Time to Complete Discovery (Powell, Lewis) (Entered: 12/23/2024) |
| 01/02/2025 | | Reset Deadline as to 79 MOTION for Extension of Time to Complete Discovery. Motion Hearing reset for 1/3/2025 at **11:00 AM** in Alexandria Telephonically on the Record before Magistrate Judge William E. Fitzpatrick. (wgar, ) (Entered: 01/02/2025) |
| 01/03/2025 | 83 | Minute Entry for proceedings held before Magistrate Judge William E. Fitzpatrick:Motion Hearing held on 1/3/2025 by phone re 79 MOTION for Extension of Time to Complete Discovery filed by Center for Excellence in Higher Education, Inc. Appearance of counsel by phone for plaintiff and defendant. Motion argued and 79 MOTION for Extension of Time to Complete Discovery - GRANTED IN PART. Order to follow. (Tape #FTR)(wgar, ) (Entered: 01/03/2025) |
| 01/03/2025 | 84 | ORDER, for the reasons stated in open court, granting in part 79 Motion for Extension of Time to Complete Discovery. ORDERED that deadline for the close of discovery is HELD IN ABEYANCE for the sole purpose of preserving the jurisdictional basis for Plaintiff's pending objection to the undersigned's order limiting the scope of discovery dated September 27, 2024 (Dkts. 67, 68). No additional fact discovery that has not already been authorized will be permitted at this time. Signed by Magistrate Judge William E. Fitzpatrick on 01/03/2025. SEE ORDER FOR FURTHER DETAILS. (wgar, ) (Entered: 01/03/2025) |
| 01/23/2025 | 85 | TRANSCRIPT of proceedings held on 1/3/2025, before Judge W. Fitzpatrick, Court Reporter/Transcriber Tonia Harris, Telephone number 703-646-1438. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/24/2025. Redacted Transcript Deadline set for 3/25/2025. Release of Transcript Restriction set for 4/23/2025.(harris, tonia) (Entered: 01/23/2025)** |
| 03/06/2025 | 86 | MEMORANDUM OPINION and ORDER that Defendant's Motion for Judgment on the Pleadings (Dkt. 37) is GRANTED; and it is FURTHER ORDERED that Plaintiff's Motion to Vacate is DENIED; and it is FURTHER ORDERED that Plaintiff's Objection to Magistrate Judge's Order on Defendant's Motion for Protective Order (Dkt. 68) is DISMISSED AS MOOT. Signed by District Judge Rossie D. Alston, Jr on 3/6/2025. (Sbro, ) (Entered: 03/06/2025) |
| 03/06/2025 | 87 | JUDGMENT is hereby entered in favor of Defendant Accreditation Alliance of Career Schools and Colleges and against Plaintiff Center for Excellence in Higher Education, Inc. on Counts I, III, IV, and V Pursuant to the Order of this Court entered on March 6, 2025 and in accordance with Federal Rules of Civil Procedure 58. Signed by Clerk on 3/6/2025. (Sbro, ) (Entered: 03/06/2025) |
| 04/04/2025 | 88 | NOTICE OF APPEAL as to 86 Memorandum Opinion, by Center for Excellence in Higher Education, Inc.. Filing fee $ 605, receipt number AVAEDC-10103257. (Obuchowicz, David) (Entered: 04/04/2025) |

| 04/08/2025 | 89 | Transmission of Notice of Appeal to US Court of Appeals re 88 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Sbro, ) (Entered: 04/08/2025) |
| 04/10/2025 | 90 | USCA Case Number 25-1372 Fourth Circuit, Case Manager Rachel Phillips for 88 Notice of Appeal filed by Center for Excellence in Higher Education, Inc. (Sbro, ) (Entered: 04/10/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/28/2025 17:23:36 | | |
| **PACER Login:** | cplosangeles16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-01223-RDA-WEF |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

JA11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**CENTER FOR EXCELLENCE IN**
**HIGHER EDUCATION, INC.,**
a Delaware Corporation,
P.O. Box 575777,
Salt Lake City, Utah 84157

Case No: 1:22-cv-1223

**MOTION TO VACATE**
**ARBITRATION AWARD AND**
**COMPLAINT**

Injunctive Relief Sought

Jury Trial Demanded

                              Movant/Plaintiff,

v.

**ACCREDITATION ALLIANCE OF**
**CAREER SCHOOLS AND COLLEGES,**
**D/B/A ACCREDITING COMMISSION OF**
**CAREER SCHOOLS AND COLLEGES,**
a Virginia Corporation,
2101 Wilson Boulevard, Suite 302
Arlington, VA 22201

**Registered Agent**:
CT Corporation System
4701 Cox Rd., Ste. 285
Glen Allen, VA 23060

                             Respondent/Defendant.

---

## MOTION TO VACATE ARBITRATION AWARD AND COMPLAINT

Movant/Plaintiff, Center for Excellence in Higher Education ("CEHE"), by counsel,

seeks an order vacating an August 4, 2022 arbitration award ("Award," Ex. A) entered by the

arbitrator in favor of Respondent/Defendant, Accreditation Alliance of Career Schools and

Colleges d/b/a Accrediting Commission of Career Schools and Colleges ("ACCSC"). CEHE

also brings this civil action against ACCSC seeking declaratory relief, injunctive relief, and

damages, alleging as follows:

**Introduction**

1. CEHE brings this action to vacate the Award because the enforcement of that Award would sanction ACCSC's failure to afford CEHE due process and fundamental fairness required under federal law. Additionally, or in the alternative, CEHE brings claims to remedy ACCSC's due process failures and tortious interference with CEHE's contracts and business expectations. Withdrawing accreditation is a death sentence for institutions of higher education. ACCSC's unlawful acts caused CEHE to lose access to critical Title IV funding, to lose the ability to continue enrolling then-current and future students, and ultimately led to the closure of CEHE's schools.

2. The extreme consequences of a withdrawal decision elevate ACCSC's duty to afford due process to CEHE. But ACCSC denied CEHE a fair opportunity to appeal the decision to withdraw accreditation from Independence University ("IU," an institution owned by CEHE), as required by federal law. Instead, ACCSC manipulated its internal appeals process and arbitration rules to shield the arbitrator from considering material evidence of bad faith and disparate treatment. Because ACCSC imposed rules that barred the arbitrator from hearing evidence material to CEHE's claims, this Court must vacate the award under the Federal Arbitration Act, 9 USC 10(a)(3). Additionally, or in the alternative, this Court must remedy ACCSC's deprivation of CEHE's due process rights and its knowing and deliberate acts to close CEHE by preventing CEHE from enrolling students and accessing Title IV funding.

3. The evidence of disparate treatment and pretext is compelling. Yet ACCSC precluded both its own internal Appeals Panel and, later, the arbitrator from meaningfully considering whether CEHE received the due process and fundamental fairness required by federal law. *See Prof'l Massage Training Ctr. v. Accreditation All. of Career Sch. & Colls.*, 781 F.3d 161, 169 (4th Cir. 2015). Prior to the withdrawal decision, ACCSC frequently acknowledged and commended

JA13

CEHE's efforts towards resolving the compliance issues forming the basis of the decision, and in July 2020, it expressly found that CEHE had shown good cause to continue demonstrating the success of those efforts. In CEHE's next submission to ACCSC, it provided verifiable data showing the unequivocal success of CEHE's newly implemented initiatives. But ACCSC nonetheless prematurely and without a rational basis revoked its good cause finding and suddenly withdrew IU's accreditation.

4. The timing and nature of ACCSC's unexplained shift in position indicated that the decision was pretext aimed at self-preservation rather than a fair and uniform application of ACCSC's *Standards of Accreditation* ("*Standards*"). Indeed, publicly available information revealed several instances in which ACCSC continued an institution's accreditation notwithstanding its similar, or even worse, history of compliance with the same *Standards* at issue with respect to IU.

5. Upon information and belief, ACCSC's disparate treatment of CEHE was triggered by an August 21, 2020 Colorado state court ruling against CEHE, which was based on marketing and enrollment practices that ACCSC itself had contemporaneously reviewed and approved. Upon appeal to the Colorado Court of Appeals, the decision was later determined to be erroneous and was reversed. But at the time of the initial ruling—just one month after ACCSC's good cause determination—it was deeply embarrassing to ACCSC. That is because ACCSC's own application for continued federal recognition was up for review by the Department of Education in a matter of mere months. In an attempt to deflect scrutiny and damaging criticism in the wake of the Colorado ruling, ACCSC, to defend itself, precipitously and prematurely withdrew IU's accreditation.

JA14

6. Throughout both ACCSC's internal appeals procedures and subsequent arbitration requirements, CEHE sought to introduce evidence of ACCSC's disparate treatment and bad faith motivations for taking the extreme ultimate sanction against CEHE and its schools. However, ACCSC's Executive Director, Dr. Michale McComis, arbitrarily denied CEHE's reasonable request for crucial records. ACCSC's Appeals Panel was thus denied substantive and vital facts in considering the propriety of the withdrawal decision. When CEHE sought review of the Appeals Panel's decision through arbitration, ACCSC cited its self-promulgated *Instructions for Arbitration* ("*Instructions*"), which precluded the arbitrator from considering any evidence not before the Appeals Panel.  Thus, according to ACCSC's procedures, the unilateral decision of a single ACCSC executive, Dr. McComis, to withhold relevant evidence was unreviewable. That is not the law, and the Award must be vacated and remanded for consideration of the material evidence unlawfully withheld from the arbitrator.

**Parties**

7. Petitioner CEHE is a tax-exempt nonprofit corporation under section 501(c)(3) of the Internal Revenue Code. The corporation exists and operates pursuant to the laws of Delaware. Its principal place of business is in Salt Lake City, Utah.

8. CEHE owned four institutions of higher education: Stevens-Henager College ("SHC"), d/b/a Independence University, CollegeAmerica Denver, CollegeAmerica Arizona, and California College San Diego. Each institution operated multiple campuses. At the time of the withdrawal, CEHE was only enrolling students at its online institution, IU, and was teaching out its remaining students at the other institutions.  At the time of the withdrawal decision, CEHE enrolled almost 10,000 students and had approximately 1,500 employees.

4

9. Respondent ACCSC is a Virginia corporation with its principal place of business in Arlington, Virginia. ACCSC is an accrediting agency officially recognized by the Department of Education ("Department"), pursuant to 20 USC 1099b and 34 CFR part 602.

**Jurisdiction and Venue**

10. This Court has subject matter jurisdiction pursuant to 28 USC 1331, 28 USC 1332(a)(1) and 20 USC 1099b(f).

11. This Court has federal question jurisdiction under 28 USC 1331 because the matters presented in this Petition to Vacate and civil action arise under the Constitution, laws, or treaties of the United States and presents questions about whether ACCSC violated CEHE's federal due process rights in the accreditation process.

12. This Court has diversity jurisdiction under 28 USC 1332(a)(1) because CEHE and ACCSC are citizens of different states.  CEHE is incorporated in Delaware and has its principal place of business in Utah. ACCSC is incorporated and has its principal place of business in Virginia. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13. This Court has jurisdiction under 20 USC 1099b(f), which provides: "Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association recognized by the Secretary [of the Department of Education] for the purposes of this subchapter and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in an appropriate United States district court."

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

5

JA16

**Factual Allegations**

**a.  ACCSC's obligation under federal law to provide due process.**

15. In order to participate in federal student assistance programs authorized under Title IV of the Higher Education Act ("HEA"), an institution must be accredited by a federally recognized accrediting agency, like ACCSC. *See* 20 USC 102. The vast majority of higher education students in the United States use Title IV funds, at least in part, to fund their education. Title IV funds are the lifeblood of nearly every American college and university.

16. Recognizing the quasi-governmental role accreditors fill in determining eligibility to participate in federal programs, courts have held that accreditors are obligated under federal common law to provide due process to the schools they accredit.  *Prof'l Massage.*, 781 F.3d at 169 (4th Cir. 2015).  "They, like all other bureaucratic entities, can run off the rails."  *Id.* "[A]creditors wield enormous power over institutions—life and death power, some might say— which argues against allowing such agencies free rein to pursue personal agendas or go off on some ideological toot." *Id.* at 170.

17. Thus, accreditors are required to adhere to administrative law principles and fundamental notions of fairness. *Id.* at 180-71. Such fairness requires, among other things, that similarly situated institutions be treated similarly by the accreditor. *Med. Inst. of Minn. v. Nat'l Assoc. of Trade & Tech. Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987). And when an accreditor departs from past precedent or practices, it must provide a reasoned explanation for doing so. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

18. In addition to these basic common-law requirements, the HEA and Department further inform the due process accreditors must provide in the accreditation process. *See* 34 CFR 602.25

JA17

(describing additional due process requirements); *Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs.*, 691 F. App'x 737, 741 (4th Cir. 2017).

19. For example, the Department expressly requires an accreditor to "consistently apply and enforce [its] standards," 34 CFR 668.18(a), and have "effective controls against the inconsistent application of [those] standards." 34 CFR 668.18(b)(2). The Department further specifies that accreditation decisions must be based on published standards, rather than political agendas. 34 CFR 668.18(b)(3).

20. The HEA also requires that institutions of higher education must submit any dispute involving the final withdrawal of accreditation to initial arbitration prior to any other legal actions.  20 USC 1099b(e). However, nothing in the HEA or the Department's regulations authorizes accreditors to limit the scope of the arbitrator's review to preclude consideration of evidence related to the accreditor's compliance with federal due process requirements.

      **b.  ACCSC's Appeal and Arbitration procedures fail to provide sufficient due process.**

21. When ACCSC withdraws an institution's accreditation, the only avenue for appeal is through ACCSC's internal appeal process as detailed in Section VIII of the ACCSC *Rules of Process and Procedure* ("*Rules*"). *See* Ex. B at 11-15 (Excerpts from *ACCSC's Rules of Process and Procedure* and *Standards of Accreditation*).[1]

22. Pursuant to those procedures, an institution can appeal a withdrawal decision if it has reason to believe that ACCSC's decision was "arbitrary, capricious, or in substantial disregard of

---

[1] A full version of ACCSC's *Standards of Accreditation* (which contains the *Rules* and ACCSC Bylaws) is available on ACCSC's website:
https://www.accsc.org/UploadedDocuments/1967/ACCSC-Standards-of-Accreditation-and-Bylaws-070118.pdf

the criteria or procedures of the Commission, or not supported by evidence in the record on which the Commission took action." *Rules*, VIII.B.1 (Ex. B at 11).

23. The institution submits its appeal to a three-person Appeals Panel. *Rules*, VIII.D (Ex. B at 13). In considering the institution's Grounds for Appeal (which is the institution's written submission) and hearing arguments, the Appeals Panel may only consider the information that was before ACCSC at the time of the initial withdrawal decision. *Rules*, VIII.B.4 (Ex. B at 11).

24. But institutions have no way of knowing what information was actually before ACCSC when it acted to withdraw accreditation, other than the specific correspondence and submissions between the two parties. Moreover, the *Rules* do not provide any mechanism for institutions to seek supplementation of the record to ensure that the Appeals Panel has all relevant and material information before it when reviewing ACCSC's initial decision.

25. If the Appeals Panel affirms the initial decision, the institution's only recourse is binding arbitration, subject to ACCSC's *Instructions for Arbitration*, which preclude the arbitrator from considering any materials not included in the record before the Appeals Panel. Ex. C at 1 ("*Instructions*," Section I.B.2). Moreover, the arbitrator's review is further limited to consideration only of whether, based solely on ACCSC's curated record, the Appeals Panel's decision was supported by substantial evidence. *Instructions*, Section I.B.1 (Ex. C at 1). The instructions also expressly prohibit any discovery that might allow affected institutions the opportunity to identify material evidence withheld by ACCSC in the proceedings below. *Instructions*, Section I.E (Ex. C at 3). Put another way, ACCSC has unfettered discretion to set the record in however manner it sees fit, without any opportunity for subsequent review of that decision.

26. The proceedings in the instant matter are instructive on that point. At the outset of the arbitration proceedings, CEHE filed a Motion to Supplement the Arbitration Exhibits, seeking an order from the arbitrator requiring ACCSC to produce documentation evidencing its treatment of similarly situated institutions with similar compliance issues. However, the arbitrator confirmed that he was "constrained by the [Instructions] to decline [CEHE's] requests that the Commission be ordered to produce documents that were not in the record before the Appeals Panel or that discovery be permitted in arbitration." Ex. D at 7-8 (Arbitrator's Ruling Concerning Arbitration Exhibits). Thus, ACCSC's exclusion of material evidence has never received any meaningful independent review.

### c. ACCSC arbitrarily and capriciously withdrew IU's accreditation and withheld material evidence from consideration by the arbitrator.

#### i. ACCSC's student achievement Standards.

27. ACCSC's purported basis for its withdrawal decision was that several online IU programs reported graduation and employment rates that fell below ACCSC requirements. However, communications between the parties leading up to the decision show that ACCSC recognized that CEHE had already addressed those findings though an approved corrective action plan. CEHE had demonstrated, through verifiable data, that IU's then-currently enrolled online students tracked to graduate and find employment at acceptable rates.

28. The *Standards* require member institutions to demonstrate that their students graduate and obtain in-field employment at acceptable rates set by the Commission, known as "benchmark" rates. *Standards*, VII.B.1.b (Ex. B at 18-19). When a group of students start an enrollment period for a given program, that group is known as a cohort. ACCSC requires institutions to submit an annual report with graduation and employment rates for each cohort for each program offered. *Standards*, Appendix VI (Ex. B at 21). If an institution fails to

9

JA20

demonstrate that a cohort graduated and found employment at benchmark rates, then it will be deemed out of compliance with student achievement *Standards*. *Id.*

29. When a member school is found to be out of compliance with student achievement *Standards*, ACCSC can initiate adverse action, which may include placing the school on warning or probation status or withdrawing accreditation. *Standards*, VII.B.2.c (Ex. B at 20).

30. ACCSC allows an institution a maximum of three years to remedy noncompliance with any *Standard*, unless good cause exists to extend the time frame. *Rules*, Section VII.M.1 (Ex. B at 9). The *Rules* state that a "school **will be deemed** to have demonstrated good cause if it has shown . . . significant progress has been made toward achieving compliance . . . and when extenuating circumstances exist such that only through the provision of additional time can the school demonstrate compliance." *Rules*, Section VII.M.2 (Ex. B at 9-10) (emphasis added). ACCSC's good cause standard is vital with respect to student achievement *Standards* because new cohorts often do not become reportable for much longer than three years after enrollment.

31. Here, both ACCSC and CEHE understood that it would take more than three years for IU to meet benchmark rates in its annual reports. That is because IU offered primarily 20- to 36-month degree programs. Ex. A at 14-15. A cohort does not become reportable until one-and-a-half times the length of the program. *Id.* at 16-17. Thus, if a cohort started today, IU would not know if that cohort graduated at benchmark rates for 30 to 54 months, depending on the program. *Id.* For reference, most ACCSC member schools offer short-term, in-person degree programs, which can be completed in a matter of months and are often reportable within a year. IU's programs were more substantial, consistent with traditional college programs.

JA21

ii. *CEHE proved that IU successfully resolved its student achievement issues.*

32. In September 2018, ACCSC concluded that IU was out of compliance with student achievement *Standards* due to below-benchmark rates in various programs. The Commission placed IU (and other commonly owned schools) on probation. By that time, IU had already begun substantial efforts to identify the root causes of, and solutions for, its below-benchmark rates.

33. At that time, CEHE had decided to close all but one of its traditional ground-based schools to focus its efforts on IU and its online programs. Due to the lack of in-person interaction and social engagements, fully online programs tend to have significant difficulty retaining students through the completion of their programs. Leading online universities often report graduation rates that are substantially below ACCSC benchmarks. For example, Purdue University Global's eight-year graduation rate is 30%, Maryland Global Campus's is 28%, and Liberty University's is 34%.[2]

34. Nonetheless, CEHE and IU were committed to complying with student achievement *Standards*, notwithstanding the extreme difficulties created by online delivery of education.

35. CEHE devoted roughly $10 million to study and implement effective initiatives to improve student outcomes. Over its roughly two-year probationary period, CEHE consistently updated ACCSC about the status of those initiatives, and ACCSC consistently acknowledged and commended those efforts. In a July 21, 2020 Continued Probation letter—the last review of IU's efforts before ACCSC abruptly withdrew accreditation—ACCSC recognized the breadth of

---

[2] Purdue University Global ([https://collegescorecard.ed.gov/school/?489779-Purdue-University-Global](https://collegescorecard.ed.gov/school/?489779-Purdue-University-Global)); Maryland Global Campus ([https://collegescorecard.ed.gov/school/?163204-University-of-Maryland-Global-Campus](https://collegescorecard.ed.gov/school/?163204-University-of-Maryland-Global-Campus)); Liberty University ([https://collegescorecard.ed.gov/school/?232557-Liberty-University](https://collegescorecard.ed.gov/school/?232557-Liberty-University)).

JA22

CEHE's recently implemented initiatives to improve graduation rates and acknowledged that

IU's distance education programs would not report benchmark graduation rates for several years.

Ex. E at 15 (Arb. Ex. 6, July 21, 2021 Continued Probation Letter).[3] ACCSC found that, based

on IU's demonstrated progress, good cause existed to continue IU's accreditation until at least

May 2021. *Id.* at 31 ("In particular, the Commission recognized the length of time needed to

demonstrate the school's ability to improve student achievement outcomes"). The Commission

was clear that progress would be measured based on the success of the recently enrolled cohorts,

who were the first to receive the benefits of IU's new initiatives—students who would not

become reportable for 30 to 54 months. *Id.* at 15; Ex. F at 18-19 (Arb. Ex. 10, Oct. 28, 2019

Continued Probation Order) (confirming that IU's compliance would be determined based on

"studies of academic progress, retention data and finally student graduation rates for the first

cohorts of students admitted under the new process and procedures").

36. In its subsequent December 20, 2020 response, CEHE provided updated projections for

IU's recently enrolled cohorts, which showed that IU's efforts had succeeded. Ex. G. (Excerpt

from Arb. Ex. 5, December 20, 2020 Probation Response). The recently enrolled cohorts for all

programs were on track to meet or exceed benchmark rates. *Id.* This was an outstanding

achievement for an institution that offered 100% online programs.

> iii. *Without explanation or justification, ACCSC reversed its position and*
> *immediately withdrew IU's accreditation.*

37. But at its February 2021 meeting, ACCSC prematurely withdrew IU's accreditation—

even though it had given CEHE until May 2021 to demonstrate continued progress. Ex. H at 5-6

---

[3] Pursuant to ACCSC's Instructions for Arbitration, the arbitrator was limited to consideration of
the record that was before the Arbitration Panel, which was referred to as "Arbitration Exhibits."
*Instructions for Arbitration*, I.F. Where an exhibit cited in this Motion/Complaint was included
as an Arbitration Exhibit, CEHE has identified the exhibit number used in the arbitration
proceedings as Arb. Ex. [].

JA23

(Arb. Ex. 4, Apr. 22, 2021 Withdrawal Order). Had ACCSC allowed CEHE until May 2021 to show continued improvement (as previously promised), CEHE would have shown that most IU programs would have met benchmarks ahead of the projections set forth in the December 20, 2020 Response. Ex. I at 12-13 (Excerpts from Arb. Ex. 3, May 27, 2021 Grounds for Appeal). The precipitous withdrawal decision, which was published on April 22, 2021, was illogically based entirely on older cohorts, which ACCSC always knew would not, and could not, graduate at benchmark rates. That change in position blatantly contradicted ACCSC's prior acknowledgments that progress would be measured based on the most recently enrolled cohorts. ACCSC's premature decision prevented IU from further demonstrating progress as requested by ACCSC.

38. Given ACCSC's prior acknowledgement of the time it would take for IU's multi-year programs to report above-benchmark rates, the withdrawal decision is capricious. IU subsequently learned from limited, publicly available ACCSC accreditation decisions that other schools were permitted to remain accredited even though they failed to meet student achievement benchmarks in **all** of their programs. Moreover, those decisions noted the institutions' failures to demonstrate any ability to resolve the underlying issues. ACCSC's treatment of those schools stood in stark contrast to treatment of IU, which demonstrated that all of its programs were projected to meet or exceed benchmarks.

39. For example, on October 1, 2020, ACCSC placed Vista College on warning status because "**all** of the school's programs with reportable data" fell below ACCSC's student achievement benchmark rates.  Ex. I at 27 (Excerpts from Arb. Ex. 3) (emphasis in original). Prior to being placed on warning status, Vista had been on outcomes reporting for five years, since May 2015. Describing the basis for moving the school to warning status, the Commission

13

JA24

expressed concerns that the school's program modifications submitted in March 2016 were merely "a means to 'reset' the reporting of student achievement data." *Id.* at 28.  The Commission also noted that the school's "main plan" for resolving these issues appeared to be the continuation of its prior efforts to "revise and re-launch programs," which "did not appear to resolve the school's student achievement issues." *Id.*  Placing an institution on warning status, while serious, falls well short of a full withdrawal of accreditation—an effective death sentence for a college or university.

40. Similarly, Takoda Institute remained accredited at the time of CEHE's withdrawal even though, as of July 2019, all of its programs failed to meet both graduation and employment benchmarks. *Id.* at 34. Moreover, the school had reported below-benchmark graduation and/or employment rates for all of its programs since 2014. *Id.*  The Commission's most recent evaluation of the school as of CEHE's withdrawal date noted that most of the programs were not only failing to show improvement but were actually declining. *Id.* Nonetheless, Takoda remained accredited because the Commission allowed it further time to develop student achievement support strategies and to demonstrate the effectiveness of its strategies. *Id.* at 35.

41. CEHE, on the other hand, demonstrated that its strategies were effective and that then-currently enrolled students would graduate from programs that met or exceeded graduation and employment benchmarks. Still, ACCSC withdrew IU's accreditation. ACCSC's actions did not demonstrate fair and consistent application of the *Standards*.

42. Moreover, Takoda offered diploma programs between only four and nine months in length. *Id.* at 34. In those programs, successful initiatives should have materialized in above-benchmark rates within two years—much sooner than for a school with significantly longer degree programs such as those offered by IU.  As discussed above, new cohorts in IU's degree

14

JA25

programs would not have been able to report for 30 to 54 months. The Commission's willingness to continue accrediting these short programs for years without any indication of improvement stood in stark contrast to its decision to cut short IU's demonstrated progress.

43. Further underscoring ACCSC's disparate treatment of CEHE, around the time of the withdrawal, ACCSC announced that it would offer relief from strict enforcement of student achievement *Standards* in the wake of the COVID-19 pandemic.[4] ACCSC noted that its *Standards* "contemplate [the] very notion" that COVID-19 is an "external or mitigating factor[]" that would be taken into consideration in assessing an institution's compliance with achievement *Standards*. But where ACCSC offered relief to other institutions, it offered none to CEHE. In fact, ACCSC abruptly cut short CEHE's demonstrably successful efforts right in the middle of the pandemic.

44. The limited available evidence demonstrated that ACCSC held IU to a materially different and unreasonably higher standard than other member institutions. And that evidence likely represented just a small sampling of other schools that remained accredited notwithstanding systemic achievement rate issues. CEHE found the above-discussed accreditation decisions on ACCSC's website, which only posts its most recent decisions. In its 20 years of accreditation with ACCSC, CEHE is unaware of any instance where ACCSC withdrew accreditation from an institution that demonstrated all programs were on track to report benchmark achievement rates.

45. Indeed, the decision came as a shock to CEHE because its most recent reporting to ACCSC demonstrated that the recent roll out of its student achievement solutions had proven to be successful. In July 2020, ACCSC concluded that the new initiatives showed promise and

---

[4] The announcement can be found on ACCSC's website at:
https://www.accsc.org/UploadedDocuments/1956/COVID-19-QandA.pdf (Pg. 20 of 22).

asked to see continued evidence of improvement.  Ex. E at 15, 31. CEHE did exactly that in December 2020, but ACCSC nonetheless quickly acted to withdraw accreditation.

46. The only thing that had changed in the interim was that on August 21, 2020, a Colorado state court judge found that the use of Bureau of Labor Statistics ("BLS") salary and job outlook information advertisements for another of CEHE's institutions, CollegeAmerica, violated state consumer protection laws.[5] That decision was reversed by the Colorado Court of Appeals on August 26, 2021.

47. But before the reversal, the Colorado decision was an embarrassment to ACCSC because ACCSC had contemporaneously reviewed and approved the very same advertising practices at issue in that case. In some instances, the Commission actually commended CEHE for the practices found to be problematic by the Colorado court. But instead of publicly defending CEHE's advertising practices (which are prevalent among institutions of higher education across the country) and criticizing the Court's erroneous decision, ACCSC sought to bolster its own image by appearing "tough" against CEHE.

48. ACCSC's perceived image problem was compounded because ACCSC's application for renewal of its federal recognition was set for consideration at the July 2021 meeting of the National Advisory Committee on Institutional Quality and Integrity ("NACIQI"), which is the Department body primarily responsible for advising the Secretary on matters concerning accreditation. The impending NACIQI meeting was especially significant because the Department was in the process of withdrawing its recognition of the Accreditation Council for Independent Colleges and Schools ("ACICS"), based on its allegedly lax oversight over proprietary institutions. *See* Statement from the U.S. Department of Education on the Status of

---

[5] That case, brought in the District Court for the City and County of Denver, was captioned *State of Colorado, et. al v. Center for Excellence in Higher Education, et al.*, Case No. 14CV34530.

JA27

Recognition of Nine Accrediting Agencies and Withdrawal of Recognition of ACICS, available at: https://www.ed.gov/news/press-releases/statement-us-department-education-status-recognition-nine-accrediting-agencies-and-withdrawal-recognition-accrediting-council-independent-colleges-and-schools.

49. In a transparent attempt to deflect criticism in light of the upcoming NACIQI meeting, ACCSC sent a letter to CEHE, dated October 26, 2020, claiming that the Colorado court's findings implicated failures to follow the *Standards* and unethical conduct. Ex. J (Arb. Ex. 8). CEHE's January 22, 2021 response addressed each of ACCSC's concerns and included documentation of each instance where it informed ACCSC of the advertising and recruitment practices at issue and each instance where ACCSC accepted (and often commended) CEHE for those same practices. *See, generally,* Ex. K (Excerpt from Arb. Ex. 7). Unable to use the Colorado decision as a basis to withdraw IU's accreditation, ACCSC apparently dropped the matter.

50. Against this backdrop, ACCSC's disparate treatment of CEHE demonstrates that ACCSC's goal was defense and self-preservation at the expense of the due process and fundamental fairness requirements to which CEHE is entitled.

> iv.  *Dr. McComis deliberately shielded the Appeals Panel from evidence of disparate treatment.*

51. Notwithstanding ACCSC's evident disparate treatment, CEHE has never had the opportunity to meaningfully investigate or present evidence to that point. Immediately following the announcement of the withdrawal decision, CEHE notified ACCSC of its intent to appeal the decision pursuant to section VIII.C.1 of the *Rules*. Ex B at 11. Shortly thereafter, CEHE sent an April 30, 2021 letter to Dr. McComis, noting that the publicly available decisions indicated IU was not treated fairly under the *Standards*. Ex. L. To ensure an opportunity to defend itself

JA28

before the ACCSC appeals panel, CEHE requested records of ACCSC's treatment of other member institutions that failed to report benchmark rates. *Id.* CEHE also requested communications and records related to decisions to grant leniency to any such institutions in light of the COVID-19 pandemic. *Id.* Finally, IU sought records and communications pertaining to decisions to grant leniency to institutions that failed to meet benchmarks while transitioning from ground programs to online programs. *Id.* To alleviate any confidentiality concerns, CEHE offered that all records could be redacted to protect the identity of the implicated institutions. *Id.*

52. ACCSC's *Rules* specify that the Appeals Panel must overturn any decision that is arbitrary and capricious. *Rules*, VIII(B)(1) (Ex. B at 11). CEHE sought to prove that the withdrawal decision was arbitrary and capricious because, among other things, ACCSC failed to consistently apply its *Standards* in furtherance of its own wish to deflect scrutiny into its own oversight capabilities. The requested records were essential for that purpose.

53. But Dr. McComis made sure that no such evidence would get to the Appeals Panel. In his May 7, 2021 response to CEHE's letter, he summarily refused to produce any records of disparate treatment. Ex. I at 24. Even though federal law plainly requires ACCSC to employ effective controls against inconsistent application of the *Standards* (34 CFR 668.18(b)), Dr. McComis conceded in his response that ACCSC did not take any such measures with respect to CEHE. Shockingly, he explained that ACCSC treatment of other schools was not part of its consideration in withdrawing IU's accreditation. Ex. I at 24. That failure, in and of itself, demonstrates that the Decision was arbitrary, capricious, and in substantial disregard of the criteria for fair and impartial treatment and procedures of the Commission.

54. Dr. McComis also claimed that such records were "maintained as confidential." Ex. I at 24. But that is not true. All warning letters, probation orders, and withdrawal decisions are

18

JA29

initially posted to ACCSC's website (although only the most recent decisions are available for review). They are also routinely circulated to numerous other state, federal, and accrediting agencies. They are not confidential. And, as was made clear in its letter requesting the records, the Commission was free to redact any identifying information from the decisions. Ex. L.

55. Upon information and belief, Dr. McComis manipulated ACCSC's rules and processes to prevent CEHE from obtaining documents that would demonstrate ACCSC's bad faith and disparate treatment of CEHE. The decision to withhold this information continued a pattern of misuse of and disregard for ACCSC's rules to inflict harm on CEHE.

56. Years earlier, ACCSC received a series of anonymous smears, denigrating CEHE and its colleges. The smears were submitted to ACCSC in quick succession and bore similarities in format, content, and in other manners, suggestive of common authorship. Rather than specific allegations about actual events, practices, or people, these anonymous smears were filled with insults such as "scummy," "corrupt," "rip-off."

57. Precisely to prevent such harassment and abuse of the accreditation process, ACCSC's *Rules* preclude consideration of anonymous complaints. The Rules state that complaints *must* contain all relevant names, dates, and a release from the complainant, authorizing ACCSC to forward the complaint to the school. Despite this, and the appearance of coordination, ACCSC ordered CEHE to file oppressive responses, initiated its own investigation, and even sent the anonymous smears to certain state attorneys general before CEHE had the opportunity to respond. Ultimately, ACCSC closed each anonymous complaint without any findings or adverse action, but not before forcing CEHE to produce numerous responses totaling thousands of pages of supporting documents and narrative responses.

JA30

> *v. Denied crucial evidence, the Appeals Panel and Arbitrator rubberstamped ACCSC's withdrawal decision.*

58. Because, by Dr. McComis's own admission, consistent treatment of member institutions is not a factor ACCSC considers when taking adverse accreditation actions (Ex. I at 24), the appeals process is the only mechanism through which ACCSC has implemented any control against inconsistent application of the *Standards*. However, Dr. McComis unilaterally blocked the Appeals Panel from considering this evidence.

59. In upholding ACCSC's withdrawal decision, the Appeals Panel concluded that accreditation decisions are made on a case-by-case basis, and ACCSC's so-called "keen sense of the consistency of its decision" was a sufficient control against disproportionate treatment. Ex. M at 7 (Arb. Ex. 1, IU Appeal Decision Letter). Attributing to ACCSC a "keen sense," without any evidentiary support, does not pass muster under the substantial evidence or arbitrary and capricious standards. *W. Va. Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x 214, 228 (4th Cir. 2019) (finding that a decision is not based on substantial evidence, and is therefore arbitrary and capricious, where "the record lacks such relevant evidence as a reasonable mind might accept as adequate to support the agency's conclusion.") (internal quotations omitted).

60. CEHE then initiated arbitration as required by the *Instructions* and ACCSC Bylaws, Section I.A. Ex. C at 1. As contemplated by the *Instructions*, ACCSC designated the Arbitration Exhibits, which consisted solely of the records before the Appeals Panel when it made its decision, the hearing transcript from the hearing before the Appeals Panel, and the Appeals Panel's final decision. Pursuant to the *Instructions*, these were the only materials the arbitrator was permitted to consider. *Instructions*, Section I.F. Ex. C at 3.

61. But, as discussed above, CEHE disputed the completeness of the record, and filed a Motion to Supplement the Arbitration Exhibits.  *See* ¶ 26, *supra*. CEHE argued that, under

JA31

federal law, it was entitled to seek review of the due process it received in the ACCSC proceedings below. Ex. D at 2-3. Accordingly, CEHE sought an order from the arbitrator requiring ACCSC to supplement the Arbitration Exhibits with the same documents requested from Dr. McComis on April 30, 2022 so that CEHE could reasonably challenge whether ACCSC fairly and consistently applied its *Standards*. *Id.* CEHE also sought limited discovery to investigate ACCSC's bad faith. *Id.* at 3.

62. The arbitrator found that he was bound by the *Instructions*, which categorically precluded any discovery or consideration of any information that was not before the Appeals Panel. *Id.* at 7-8. Because Dr. McComis denied the Appeals Panel the documents, the arbitrator found that he could not consider them either. *Id.*

63. Following a hearing, the arbitrator entered the Award in favor of ACCSC on August 4, 2022. Ex. A. With respect to CEHE's contentions of disparate treatment and failure of due process, the arbitrator concluded CEHE did not "sustain[] its burden of proving that the experience of the Commission – or that of the duly constituted appeals panel – failed to provide 'effective controls against the inconsistent application of the agency's standards.'" Ex. A at 35. That result was not surprising given ACCSC's efforts to prevent the arbitrator from consideration of any evidence to contradict that finding.

64. The arbitrator also concluded that the *Instructions* and other federal case law precluded him engaging in a disparate treatment analysis comparing CEHE's withdrawal with decisions concerning other schools. Ex. A at 34. But that eluded the relevant issue before him, which was whether federal due process requirements and binding Department regulations required **ACCSC and the Appeals Panel** to consider such evidence before taking the ultimate sanction of a full withdrawal of accreditation. *See* 34 CFR 668.18(b).

**CEHE Seeks Vacatur of the Award**

65. Paragraphs 1-64 are incorporated by reference herein as if set forth in full.

66. A court may vacate an arbitration award where the arbitrator refused to hear evidence pertinent and material to the controversy or where the arbitrator exceeded its powers.  9 USC 10 (a)(3) and (a)(4).

67. In this case, ACCSC's disparate treatment of CEHE with respect to the withdrawal decision was a central issue in the arbitration.  But the arbitrator nonetheless refused to hear pertinent and material evidence demonstrating that ACCSC's decision to withdraw IU's accreditation was out of line with ACCSC's decisions to take far lesser sanctions with respect to similarly situated schools.

68. Federal law requires ACCSC to treat all member schools consistently in applying the *Standards*. 34 C.F.R. § 602.18(b); *see also Med. Inst. of Minn. v. Nat'l Assoc. of Trade & Tech. Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987) (stating that common law due process requires that accreditors treat similarly situated schools similarly). And CEHE is entitled to meaningful judicial review over ACCSC's adherence to that requirement.  *Prof'l Massage*, 781 F.3d at 169.

69. The HEA required CEHE to initially submit to arbitration for review of the propriety of ACCSC's withdrawal decision. 20 USC 1099b(e). However, ACCSC's binding *Instructions for Arbitration* impermissibly precluded the arbitrator from considering any issue other than whether the Appeals Panel's decision was supported by the evidence in the record when the Appeals Panel rendered its decision.

70. Thus, CEHE was denied an opportunity to be heard on the issues of disparate treatment and agency bad faith. CEHE presented compelling, but limited, evidence that other member institutions were permitted to remain accredited notwithstanding similar, or worse, histories of

JA33

noncompliance with student achievement *Standards*. While that limited evidence was apparently insufficient to sustain a finding of improper disparate treatment, it was sufficient to require ACCSC to produce evidence of its treatment of other institutions with below-benchmark student achievement rates.

71. Arbitrators must "give each of the parties to the dispute an adequate opportunity to present its evidence and argument," *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2nd Cir. 1997) (citations omitted). Arbitral misconduct has occurred, and vacatur is therefore warranted under 9 USC 10(a)(3), where, as here, a party's right to be heard has been "grossly and totally blocked." *Buhannic v. TradingScreen, Inc.*, 2018 U.S. Dist. LEXIS 126477, at *14-15 (S.D.N.Y. July 27, 2018) (citations omitted).

72. CEHE was also denied an opportunity to investigate and present evidence of ACCSC's true motives for the withdrawal decision. Prior to the entry of the later-reversed Colorado state court decision, ACCSC's record statements indicated that it acknowledged and commended CEHE's efforts to return all IU programs to compliance with student achievement *Standards*. But after the Colorado decision—which implicitly criticized ACCSC's own oversight of CEHE's marketing and enrollment practices—ACCSC suddenly and without explanation withdrew CEHE's accreditation, even though CEHE's most recent data demonstrated that current students were progressing through their programs at benchmark rates. Against the backdrop of the Department's recent actions to revoke federal recognition from other accreditors, ACCSC's decision appeared to represent a pretextual attempt at self-preservation, rather than a fair application of the *Standards*.

73. Under such circumstances, limited discovery was necessary to investigate the Commission's true motives for withdrawing IU's accreditation. *See Sokaogon Chippewa Cmty.*

*v. Babbitt*, 961 F. Supp. 1276, 1283-84 (W.D. Wis. 1997) (finding that an agency's sudden change in position at the time it was facing political pressure was sufficient evidence of impropriety to warrant discovery). However, the arbitrator determined that he was bound by the *Instructions*, which categorically precluded any discovery into ACCSC's motives.

**Other Causes of Action**

Count I - Violation of Due Process

74. Paragraphs 1-73 are incorporated by reference herein as if set forth in full.

75. Accreditors are required to afford due process to member institutions under federal common law. *Prof'l Massage.*, 781 F.3d at 170-71.

76. Principles of administrative law inform the federal common law duty of due process. *Id.* at 169.

77. The amount and degree of due process required by an accreditor is determined by the importance of the action being considered. An accreditor's decision to withdraw accreditation severs eligibility to participate in federal funding programs, which are the life blood of nearly every American institution of higher education. Because a withdrawal decision is an institutional death penalty, the "need for due process protection could not be stronger." *Edward Waters Coll., Inc. v. S. Ass'n of Colls. & Sch., Inc.*, 2005 U.S. Dist. LEXIS 39443, at *18 (M.D. Fla. Mar. 11, 2005).

78. When ACCSC withdrew CEHE's accreditation, due process required that CEHE be afforded a meaningful opportunity to challenge whether the decision was made based on a good-faith application of the Standards and was consistent with ACCSC's treatment of similarly situated schools.

79. ACCSC's appeals procedures and *Instructions for Arbitration* do not afford sufficient due process because they fail to provide an institution a reasonable opportunity to acquire and present evidence of bad faith and disparate treatment.

80. ACCSC's decision to withdraw IU's accreditation and the other acts described above violated CEHE's due process rights in at least the following ways:

a. ACCSC's initial withdrawal decision and subsequent Appeal Panel decision were arbitrary, capricious, and not supported by substantial evidence.

b. ACCSC withdrew IU's accreditation without providing a meaningful opportunity to be heard.

c. ACCSC's decision to withdraw IU's accreditation was inconsistent with ACCSC's treatment of other member institutions, who remained accredited notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

d. ACCSC's acted in bad faith by withdrawing IU's accreditation as pretext to avoid federal scrutiny into its own oversight capabilities.

e. ACCSC failed to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

f. ACCSC appeals procedures and *Instructions for Arbitration* prevented CEHE from presenting material evidence of bad faith and inconsistent treatment.

g. ACCSC failed to provide a reasoned explanation for its sudden revocation of its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement *Standards*.

JA36

81. CEHE suffered damages, in an amount to be proved at trial, as a result of ACCSC's denial of due process, including lost profits, loss of business value, and loss of goodwill.

### Count II – Declaratory Judgment

82. Paragraphs 1-81 are incorporated by reference herein as if set forth in full.

83. An actual and justiciable controversy exists between the parties regarding ACCSC's failure to provide due process to CEHE.

84. A judgment declaring that ACCSC's acts violated CEHE's due process rights will serve a useful purpose in clarifying and settling the legal relations at issue and will afford relief from uncertainty, insecurity, and controversy giving rise to the proceedings.

### Count III – Tortious Interference With Contract (Program Participation Agreement)

85. Paragraphs 1-84 are incorporated by reference herein as if set forth in full.

86. By granting accreditation to an educational institution, ACCSC enables that institution to enter a contract with the Department of Education regarding the institution's eligibility for programs authorized by Title IV of the HEA ("Title IV programs"), known as a Program Participation Agreement ("PPA").

87. The PPA sets forth the reciprocal rights and responsibilities of the institution and the Department.

88. ACCSC had actual knowledge that IU was eligible for Title IV programs, and, consequently, knew of IU's PPA with the Department.

89. The vast majority of the students who were enrolled at IU relied on Title IV student assistance funds to pay for their educations and living expenses.

90. ACCSC knew that IU's ability to participate in Title IV programs was contingent on its continued accreditation.

JA37

91. In fact, the Department immediately cut off CEHE's ability to access Title IV funds following ACCSC's initial April 22, 2021 withdrawal decision. Without access to critical Title IV funding, CEHE was unable to continue to fund operations and was forced to close on August 1, 2021.

92. By withdrawing IU's accreditation, ACCSC intentionally and knowingly prevented CEHE from performing under the PPA.

93. ACCSC acted through improper means by, among other things:

a.  Withdrawing IU's accreditation arbitrarily and capriciously, and without substantial evidence;

b.  Withdrawing IU's accreditation without providing a meaningful opportunity to be heard.

c.  Treating CEHE disparately by, among other things, withdrawing IU's accreditation while allowing other member institutions to remain accredited, notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

d.  Withdrawing IU's accreditation in bad faith as pretext to avoid federal scrutiny into its own oversight capabilities.

e.  Failing to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

f.  Manipulating its appeals procedures and *Instructions for Arbitration* to deliberately and unlawfully block CEHE from presenting material evidence of bad faith and inconsistent treatment.

JA38

g. Arbitrarily and capriciously, and without substantial evidence, revoking its

finding that CEHE demonstrated good cause to continue its efforts to return IU's

programs to compliance with student achievement *Standards*.

94. As a direct and proximate cause of this intentional, willful, and tortious interference with

a contractual relationship of which ACCSC knew, CEHE has incurred damages, including,

among other things, a loss of students, a loss of Title IV funding, damage to its reputation, loss of

good will, loss of future profits, and a loss of business value in an amount to be proven at trial.

<u>Count IV – Tortious Interference With Contract (Student Enrollment Agreements)</u>

95. Paragraphs 1-94 are incorporated by reference herein as if set forth in full.

96. By granting accreditation to an educational institution, ACCSC enables the institution to

enter into contracts with students, providing for their enrollment in accredited programs. Those

contracts are known as enrollment agreements.

97. IU entered into an enrollment agreement with each of its students. The enrollment

agreement sets forth reciprocal rights and responsibilities of IU and each student, including the

student's responsibility to pay tuition. Students entered into such enrollment agreements based in

large part on IU's accreditation by a federally recognized accrediting agency, namely, ACCSC.

98. ACCSC had actual knowledge of IU's enrollment agreements with its students.

99. ACCSC knew that IU's ability to maintain its relationships with its students depended on

its ability to remain accredited.

100. By unlawfully withdrawing IU's accreditation, ACCSC knowingly and intentionally

interfered with IU's contractual relationships with its students.

JA39

101. ACCSC acted through improper means by, among other things:

    a.  Withdrawing IU's accreditation arbitrarily and capriciously, and without substantial evidence;

    b.  Withdrawing IU's accreditation without providing a meaningful opportunity to be heard.

    c.  Treating CEHE disparately by, among other things, withdrawing IU's accreditation while allowing other member institutions to remain accredited, notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

    d.  Withdrawing the IU's accreditation in bad faith as pretext to avoid federal scrutiny into its own oversight capabilities.

    e.  Failing to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

    f.  Manipulating its appeals procedures and *Instructions for Arbitration* to deliberately and unlawfully block CEHE from presenting material evidence of bad faith and inconsistent treatment.

    g.  Arbitrarily and capriciously, and without substantial evidence, revoking its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement *Standards*.

102. As a direct and proximate cause of this intentional, willful, and tortious interference with contractual relationships of which ACCSC knew, CEHE has incurred damages, including, among other things, a loss of students with their concomitant tuition payments, damage to its

reputation, loss of good will, loss of future profits, and a loss of business value in an amount to be proven at trial.

<u>Count V – Tortious Interference With Prospective Business or Economic Advantage</u>

103. Paragraphs 1-102 are incorporated by reference herein as if set forth in full.

104. IU entered into enrollment agreements with its students, setting forth the reciprocal rights and responsibilities of the parties, including the students' responsibility to pay tuition.

105. ACCSC knew that IU entered into such contracts with its students.

106. ACCSC's intentional and unlawful termination of IU's accreditation without due process has caused its students to withdraw. Absent ACCSC's unlawful withdrawal decision, IU's students would have continued to perform under their enrollment contracts, including the payment of tuition.

107. ACCSC also knew that IU would have continued to attract new students, who would also enter enrollment contracts with IU and pay tuition under those agreements. ACCSC's intentional and unlawful withdrawal of IU's accreditation caused future students not to enroll.

108. ACCSC acted through improper means by, among other things:

    a. Withdrawing IU's accreditation arbitrarily and capriciously, and without substantial evidence;

    b. Withdrawing IU's accreditation without providing a meaningful opportunity to be heard.

    c. Treating CEHE disparately by, among other things, withdrawing IU's accreditation while allowing other member institutions to remain accredited, notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

JA41

    d.   Withdrawing IU's accreditation in bad faith as pretext to avoid federal scrutiny into its own oversight capabilities.

    e.   Failing to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

    f.   Manipulating its appeals procedures and *Instructions for Arbitration* to deliberately and unlawfully block CEHE from presenting material evidence of bad faith and inconsistent treatment.

    g.   Arbitrarily and capriciously, and without substantial evidence, revoking its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement *Standards*.

109. As a direct and proximate cause of this intentional, willful, and tortious interference with contractual relationships of which ACCSC knew, CEHE has incurred damages, including, among other things, a loss of students with their concomitant tuition payments, damage to its reputation, loss of good will, loss of future profits, and a loss of business value in an amount to be proven at trial.

<div align="center"><strong>Prayer for Relief</strong></div>

WHEREFORE, Petitioner CEHE respectfully requests that the Court:

    (A)    Vacate the Award pursuant to 9 USC 10(a)(3) and remand the matter to the arbitrator for further proceedings;

    (B)    Declare that ACCSC's initial decision to withdraw IU's accreditation and the Appeal Panel's subsequent affirmance thereof was arbitrary and capricious and otherwise violated due process;

(C)      Enter an injunction requiring ACCSC to rescind its withdrawal decision, to provide notice to the Department of Education and all other parties ACCSC has informed regarding the withdrawal decision, in all manners in which ACCSC provided notice of the withdrawal of accreditation, including via publication on ACCSC's website;

(D)      Enter an injunction requiring ACCSC to adhere to due process in all future accreditation proceedings with respect to CEHE or any of its institutions;

(E)      Award CEHE damages, in an amount to be proven at trial, for ACCSC's violation of CEHE's due process rights and tortious interference with CEHE's contracts and prospective business and economic advantages;

(F)      Award pre- and post- judgement interest, attorney's fees, and such other and further relief as this Court may deem just and proper.

**Demand for Trial by Jury**

CEHE hereby demands a trial by jury on all issues so triable.

Date:   October 28, 2022                 /s/ Steven M. Gombos
                                         Steven M. Gombos, VSB No. 30788
                                         David A. Obuchowicz, VSB No. 82483
                                         Gombos Leyton, P.C.
                                         11350 Random Hills Road, Suite 400
                                         Fairfax, VA 22030
                                         Ph: (703) 934-2660/9840 (fax)
                                         Email:  dobuchowicz@glpclaw.com

                                         *Counsel for Plaintiff CEHE.*

JA43

JS 44 (Rev. 04/21)   Case 1:22-cv-01223-RDA-WEF   Document 1-1   Filed 10/28/22   Page 1 of 2 PageID# 33

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Center for Excellence in Higher Education

**(b)** County of Residence of First Listed Plaintiff   Salt Lake County, Utah
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gombos Leyton, PC, 11350 Random Hills Rd., Ste. 400,
Fairfax, VA 22030  703-934-2660

## DEFENDANTS

Accreditation Alliance of Career Schools and Colleges

County of Residence of First Listed Defendant   Arlington, Virginia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Hunton, Andrews, Kurth, LLP, 951 East Byrd St.,
Richmond, VA 23219  804-778-8200

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane  ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument |     Liability  ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | **INTELLECTUAL** | ☐ 410 Antitrust |
|     & Enforcement of Judgment |     Slander     Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |     Liability  ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 460 Deportation |
|     Student Loans | ☐ 340 Marine     Injury Product | | ☐ 835 Patent - Abbreviated | ☐ 470 Racketeer Influenced and |
|     (Excludes Veterans) | ☐ 345 Marine Product     Liability | |     New Drug Application |     Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |     Liability  **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|     of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 370 Other Fraud | | ☐ 880 Defend Trade Secrets |     (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle  ☐ 371 Truth in Lending | |     Act of 2016 | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract |     Product Liability  ☐ 380 Other Personal | | |     Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise |     Injury  ☐ 385 Property Damage | | ☐ 710 Fair Labor Standards | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -     Product Liability | |     Act |     Exchange |
| |     Medical Malpractice | | ☐ 720 Labor/Management | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | |     Relations | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights  **Habeas Corpus:** | | ☐ 740 Railway Labor Act | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting  ☐ 463 Alien Detainee | | ☐ 751 Family and Medical | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment  ☐ 510 Motions to Vacate | |     Leave Act |     Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | | ☐ 790 Other Labor Litigation | ☒ 896 Arbitration |
| ☐ 245 Tort Product Liability |     Accommodations  ☐ 530 General | | ☐ 791 Employee Retirement | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 535 Death Penalty | |     Income Security Act |     Act/Review or Appeal of |
| |     Employment  **Other:** | | **IMMIGRATION** |     Agency Decision |
| | ☐ 446 Amer. w/Disabilities -  ☐ 540 Mandamus & Other | | ☐ 462 Naturalization Application | ☐ 950 Constitutionality of |
| |     Other  ☐ 550 Civil Rights | | ☐ 465 Other Immigration |     State Statutes |
| | ☐ 448 Education  ☐ 555 Prison Condition | |     Actions | |
| | ☐ 560 Civil Detainee - | | **FEDERAL TAX SUITS** | |
| |     Conditions of | | ☐ 870 Taxes (U.S. Plaintiff | |
| |     Confinement | |     or Defendant) | |
| | | | ☐ 871 IRS—Third Party | |
| | | |     26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
9 USC 10

Brief description of cause:
Motion to Vacate Arbitration Award and action for declaratory relief, injunctive relief, and damages for violation of due process.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
To be proven at trial

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   10/25/2022

SIGNATURE OF ATTORNEY OF RECORD   s/ Steven M. Gombos

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JA44

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

JA45

# Exhibit A

AAA Case No. 01-21-0017-0169                                  Page 1 of 36
August  4, 2022

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

_____
                                              )
In the Matter of the Arbitration Between      )
                                              )
INDEPENDENCE UNIVERSITY,                       )
                                              )
        Claimant,                             )
                                              )
        and                                   )      Case No. 01-21-0017-0169
                                              )
ACCREDITING COMMISSION OF CAREER              )
SCHOOLS AND COLLEGES,                         )
                                              )
        Respondent.                           )
_____)


**DECISION AND AWARD BY ARBITRATOR**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the

arbitration agreement entered into by the above-named parties, and having been duly sworn, and

having heard the testimony and reviewed the documentary evidence herein, and Claimant,

Independence University, having been represented by Steven M. Gombos, Esq., and David

Aleksander Obuchowicz, Esq., Gombos Leyton, P.C.; and Respondent, Accrediting Commission

of Career Schools and Colleges, having been represented by Lewis F. Powell, III, Esq., and

Nathaniel S. Sheperd, Esq., Hunton Andrews Kurth, LLP, hereby DECIDE and AWARD as

follows:

**I.**

**INTRODUCTION**

A.    **Commission and Appeals Panel Proceedings**

Claimant, Independence University ("Independence, "IU" or "School"), was an

institution of higher education administering career-oriented degree programs taught online and

**Exhibit A - 1**

JA47

at a campus in West Haven, Utah.  As of June 30, 2020, Independence had 9,335 students.

Independence is owned and was operated by the Center for Excellence in Higher Education

("CEHE").  Formerly known as Stevens-Henegar College-West Haven, Independence for several

years was part of a system of post-secondary, career-oriented schools owned and operated by

CEHE in Arizona, California, Colorado, Utah and Wyoming.

Independence was accredited by Respondent, the Accrediting Commission of Career

Schools and Colleges ("ACCSC" or "Commission").  ACCSC is an accreditation association

recognized by the United States Department of Education ("DOE"), for purposes of the Higher

Education Act of 1965, as amended, 20 U.S.C. §§ 1001, *et seq.* ("HEA"), for the accreditation of

institutions of higher education offering career-oriented programs.  *See generally* 20 U.S.C. §

1099b (requirements for DOE criteria for recognition of private accrediting associations).

Accreditation, among other things, enables institutions of higher education to receive federal

student-aid funding pursuant to Title IV of the HEA, 20 U.S.C. §§ 1070, *et seq.*  Without

accreditation by a DOE-recognized accrediting agency, an educational institution is not qualified

for such funding.

By a Withdrawal Letter issued on April 22, 2021, the Commission withdrew

accreditation of Independence and its branch campuses (Stevens-Henager College in Murray,

Utah, and Stevens-Henager College in Boise, Idaho) for lack of compliance with the ACCSC's

minimum, benchmark graduation and employment rates.  These benchmarks must be met on a

continuing basis by an ACCSC-accredited school in order for the school to demonstrate an

acceptable level of successful student achievement under Section VII of the Substantive

Standards of the ACCSC Standards of Accreditation ("Standards") and Appendix VI of the

**Exhibit A - 2**

JA48

USCA4 Appeal: 25-1372     Doc: 14     Filed: 06/04/2025     Pg: 52 of 461

**AAA Case No. 01-21-0017-0169**                                                    **Page 3 of 36**
**August  4, 2022**

Standards.[1]  The Commission noted in its Withdrawal Letter that Independence had consistently reported below-benchmark performance in 11 of its 17 active programs over the preceding five years, and, based on the School's projections of future compliance and "trend data," found that the School's current efforts would not achieve the minimum benchmarks for at least four years.

The Commission's withdrawal action came after several years of compliance-related actions by the Commission concerning Independence and related schools.  On September 6, 2018, by a System-Wide Probation Order, the Commission placed Independence (then Stevens-Henegar College-West Haven) and several other CEHE-affiliated schools on probation for noncompliance with the ACCSC Standards.  This included, the Commission found, Independence's prolonged noncompliance in several programs with the Standards' minimum graduation and employment benchmarks.  The Commission provided Independence a period of two years, or until September 7, 2020, to remedy the noncompliance and requested a wide range of compliance-related information.  The September 6, 2020 Order provided that failure of the School to demonstrate compliance with the Standards or other accrediting requirements by September 7, 2020 may result in revocation of accreditation.

On December 20, 2018, CEHE submitted an extensive response.

On May 2, 2019, after consideration of the December 20, 2018 response, the Commission issued a System-Wide Continued Probation Order.  The Commission continued the probation of Independence and, among things, requested further information to address what the Commission

---

[1] Section VII(B)(1)(b)(ii) of the Standards provides that "[a] school demonstrates an acceptable level of successful student achievement when graduation and employment rates meet or exceed the established benchmarks."  As discussed below, the "Established Benchmark Graduation Rates" and "Established Benchmark Employment Rate" are set forth in Appendix VI of the Standards.

**Exhibit A - 3**

**AAA Case No. 01-21-0017-0169**                                              **Page 4 of 36**
**August 4, 2022**

regarded as "pervasively low," below benchmark student achievement outcomes at

Independence. On June 28, 2019, CEHE submitted a response.

On October 28, 2019, after consideration of the June 28, 2019 response, the Commission

issued another System-Wide Continued Probation Order and made several findings of continuing

non-compliance with ACCSC Standards, including findings of continuing failure to meet the

ACCSC graduation and employment benchmarks. The Commission found that Independence

remained below benchmark in half its programs. The Commission again requested a broad range

of information concerning student achievement at Independence and other CEHE Schools. On

March 3, 2020, CEHE submitted another extensive response.

On July 21, 2020, after consideration of CEHE's March 3, 2020 response, the

Commission issued yet another System-Wide Continued Probation Order against Independence

and other CEHE schools. During 2019 and 2020, CEHE had begun to propose and implement

new strategies to improve student achievement ratings. Still, the Commission found in its July

21, 2020 Order that Independence remained below benchmark in nine of its fourteen active

programs. After noting that "the evidence appears to show the strategies are starting to take

effect," the Commission requested a wide range of updated data concerning the School's current

student achievement rates and new strategies, with a response date of December 30, 2020, and

extended the timeframe for compliance (or possible loss of accreditation) from September 7,

2020 (as had been required by the September 6, 2018 Order) to May 31, 2021.[2]

---

[2] The record shows that it would have been unrealistic to expect a complete response to the July 21, 2020 information request by September 7, 2020, let alone a response, Commission review and accreditation decision within the then-remaining eight-week period. The Commission's information request of July 21, 2020 was extensive and wide-ranging. It included, among many requests concerning CEHE schools other than IU, requests for graduation and employment charts for each of IU's programs, with detailed information concerning each student in a specified format; updated assessments of factors affecting IU's graduation and

**Exhibit A - 4**

JA50

On December 30, 2020, CEHE submitted a 3,578-page response, which included (among other things) a detailed action plan with estimates of projected future graduation rates for Independence's degree programs.

On April 22, 2021, after consideration of the December 30, 2020 response, the Commission issued its Withdrawal Letter.

Independence then appealed from the withdrawal decision to an AACSC Appeals Panel, pursuant to Section VIII(E) of the ACCSC Standards of Accreditation Rules of Process and Procedure ("Rules").  With its Grounds for Appeal, submitted on May 27, 2021, Independence submitted further projections of estimated future graduation rates for its degree programs, updated as of May 10, 2021.  By a decision issued September 17, 2021, the Appeals Panel affirmed the Commission's April 22, 2021 withdrawal decision ("Appeals Panel Decision"). The ACCSC's withdrawal of the School's accreditation became final, effective as of August 1, 2021.[3]

---

employment rates; descriptions of IU's strategies to target the factors identified in the assessments; descriptions of the strategies' relative effectiveness; detailed student retention charts for each of IU's programs in a specified format; and a list of recent graduates from each IU program for the last six months with each graduate's employment information also to be detailed in a specified format.  It should also be noted that, at time of the July 21, 2020 request, in mid-2020, CEHE was concurrently managing multiple transitions throughout its system of fifteen schools.  These ongoing projects included the early closure of eight campuses and an ongoing "teach-out" of students from five campuses, all on top of the ongoing administration of IU's programs and IU's responses to the Commission.

[3] The School had closed its campuses on August 1, 2021. Accordingly, the Appeals Panel made the withdrawal of accreditation final as of August 1, 2021.

**Exhibit A - 5**

**AAA Case No. 01-21-0017-0169**                                                    **Page 6 of 36**
**August  4, 2022**

B.        <u>**Arbitration Proceedings**</u>

Section 4.06 of the Bylaws of the Accreditation Alliance of Career Schools and Colleges

("AACSC") provides that schools seeking ACCSC accreditation agree to "submit fully and

faithfully to final, binding arbitration proceedings as set forth in the Standards of Accreditation

before filing any suit, claim or proceeding relating to . . . accreditation or accredited status."[4]  As

referenced in Section 4.06 of the AACSC Bylaws, any such arbitration is conducted in

accordance with the ACCSC Instructions for Arbitration ("Arbitration Instructions" or

"Instructions"), which are made a part of Appendix II of the Standards.[5]  Section I(A)(4) of the

Arbitration Instructions provides that the arbitration is "the exclusive remedy for a school which

has received an Adverse Appeal Decision and governs any and all claims arising out of the

Adverse Appeal Decision as well as the underlying or predicate actions of the Commission."

On October 21, 2021, Independence's Demand for Arbitration was filed with the

American Arbitration Association ("AAA"), seeking reversal of the September 17, 2021 Appeals

Panel Decision.  I was appointed through the AAA to serve as arbitrator, and the arbitration

---

[4] The HEA and implementing DOE regulations require arbitration of disputes involving accreditation status of institutions of higher education.  *See* 20 U.S.C. § 1099b(e) ("The Secretary may not recognize the accreditation of any institution of higher education unless the institution of higher education agrees to submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration prior to any other legal action."); 34 C.F.R. §600.4(c) ("The Secretary does not recognize the accreditation or preaccreditation of an institution unless the institution agrees to submit any dispute involving an adverse action, such as the final denial, withdrawal, or termination of accreditation, to arbitration before initiating any other legal action.").

[5] The Accreditation Alliance of Career Schools and Colleges does business as the Accrediting Commission of Career Schools and Colleges.  As provided in the Preamble to the ACCSC Standards of Accreditation, "[a]ccredited schools and schools seeking accreditation agree to . . . adhere to the AACSC Bylaws[ .]"

**Exhibit A - 6**

**AAA Case No. 01-21-0017-0169**                                 **Page 7 of 36**
**August 4, 2022**

proceeded pursuant to the Regular Procedures of the AAA Commercial Arbitration Rules, as augmented by the ACCSC Arbitration Instructions.[6]

On January 17, 2022, ACCSC submitted the documents comprising the Arbitration Exhibits, as provided by Section I(F)(1) of the ACCSC Arbitration Instructions. The Arbitration Exhibits include the entire record that was before the Appeals Panel, Independence's Grounds for Appeal and the transcript of an oral hearing conducted virtually before the Appeals Panel. On March 15, 2022, by a Ruling Concerning Arbitration Exhibits, I denied a Motion by Independence to Supplement the Arbitration Exhibits and determined that the Arbitration Exhibits, as submitted by ACCSC, were complete. A copy of the March 15, 2022 Ruling is attached hereto and made part hereof.

In accordance with Sections G(1) and G(2) of the ACCSC Arbitration Instructions, respectively, Independence submitted an Arbitration Brief, and ACCSC submitted a Response Brief.

On May 26, 2022, an in-person arbitration hearing was then conducted before me in Washington, DC, pursuant to Section I of the Arbitration Instructions. Both Independence and ACCSC appeared at the hearing in-person by counsel and in-person or remotely by their designated representatives.

The matter is now ripe for decision.[7]

---

[6] Section I(C)(1) of the Arbitration Instructions provides for administration of the arbitration by an arbitrator selected from the National Roster of Commercial Arbitrators maintained by the American Arbitration Association.

[7] On June 28, 2022, after the close of the hearing, ACCSC filed a Motion to Amend the Arbitration Hearing Transcript. On July 7, 2022, Independence filed an Objection thereto. The tribunal discerned no good reason to entertain further proceedings in this arbitration beyond those expressly authorized by the Arbitration Instructions, and the case has been fully and ably presented by the submissions and proceedings required by the

**Exhibit A - 7**

AAA Case No. 01-21-0017-0169                                         **Page 8 of 36**
**August  4, 2022**

## II.

### APPLICABLE STANDARDS AND PARTIES' CONTENTIONS

**A.      Standard of Review in Arbitration**

Section I(B) of ACCSC Arbitration Instructions sets forth the "Standard of Review in

Arbitration and Available Remedies."  Section I(B)(1) of the Instructions provides that "[t]he

arbitration proceeding is not a *de novo* review."  As Section I(B)(1) states, "[i]t is a review on the

record and is limited to the question of whether the Appeals Panel's decision is supported by the

evidence that was in the record when the Panel rendered its decision."  Read as a whole, the

Instructions provide that the standard of review in the arbitral tribunal is whether the Appeals

Panel decision is based on "substantial evidence" in the record that was before it.[8]  Section

I(B)(2) provides: "The arbiter may not consider evidence that was not in the record before the

Appeals Panel."  Pursuant to Section I(B)(4), "[t]he arbitrator shall only have authority to affirm

or reverse the decision of the Appeals Panel[.]."  And, as Section I(B)(3) of the Instructions

provides, "[t]he school has the burden of proof in the arbitration proceeding."

In *Professional Massage Training Ctr. v. Accreditation Alliance of Career Schools &*

*Colleges*, 781 F.3d 161 (4th Cir. 2015), the United States Court of Appeals for the Fourth Circuit

---

Instructions.   Accordingly, the matters stated in the Motion have been disregarded in the preparation of this
Decision and Award, and the Motion will be denied as moot.

[8] *See* Instructions, § I(A)(4) ("A school that believes that the decision of an independent Appeals Panel is not
supported by **substantial evidence** in the record on which the Appeals Panel took action may seek review of
that decision through binding arbitration as described in these Instructions.") (emphasis added); *id.*, § I(G)(1)
(school's Arbitration Brief shall "set[] out the reasons why the decision of the Appeals Panel was not
supported by **substantial evidence** in the record on which the Appeals Panel took action" (emphasis added);
*id.*, § I(F)(3) (arbitrator may require submission of additional documents, "but only as necessary to determine
whether **substantial evidence** supported the decision of the Appeals Panel") (emphasis added).

**Exhibit A - 8**

considered in detail the standard of judicial review of an accreditation agency's decision-making. The Fourth Circuit adopted the "familiar standard," often applicable in judicial review of final actions of administrative agencies, of "whether the decision of an accrediting agency such as [ACCSC] is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." 781 F. 3d at 171 (citing *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 712 (6th Cir. 2006)) (brackets in original).  "Under this standard, courts are 'not free to conduct a *de novo* review or to substitute their judgment for the professional judgment of the educators involved in the accreditation process.'"  *Id*. (quoting *Wilfred Acad. of Hair & Beauty Culture v. S. Ass'n of Colls. & Schs*., 957 F.2d 210, 214 (5th Cir. 1992)).  "As with federal administrative agencies, the accreditation agency's expertise and knowledge merits a measure of deference from generalist federal courts."  *Id.* (citing  *Chevron U. S. A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837 (1984)).

As the Fourth Circuit also recognized in *Professional Massage,* even though "[a]ccreditation agencies are private entities, not state actors, and as such are not subject to the strictures of constitutional due process requirements," 781 F. 3d at 169, "there exists a 'common law duty on the part of 'quasi-public' private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members.'"  *Id*. (quoting *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ*., 24 F.3d 519, 534-35 (3d Cir. 1994)).   In applying the "deferential standard ordinarily due to [an] accreditation agency under a common law due process claim," 781 F.3d at 180, "courts should 'focus primarily on whether the accrediting body's internal rules provide[d] a fair and impartial procedure and whether it [followed] its rules in reaching its decision.'"  781 F.3d at 172 (quoting

**Exhibit A - 9**

AAA Case No. 01-21-0017-0169                                      Page 10 of 36
August 4, 2022

*Wilfred*, 957 F.2d at 214)) (brackets in original).  Regulations of the DOE addressing an

accrediting agency's application of its standards similarly require that the agency have "effective

controls against the inconsistent application of the agency's standards[.]"  34 C.F.R. §

602.18(b)(2).[9]

B.    **ACCSC Benchmarks, Standards and Rules**

Section VII(B)(1)(b) of the ACCSC Accreditation Standards requires that accredited

schools "demonstrate successful student achievement by maintaining acceptable rates of student

graduation and employment in the career field for which the school provided education[.]"  As

stated in Section VII(B)(1)(b)(ii) of the Standards, "[t]he Commission establishes and publishes

. . . benchmark graduation and employment rates[.]"  These two benchmarks of student

achievement -- the "Established Benchmark Graduation Rates" and the "Established Benchmark

Employment Rate" -- are are stated in Appendix VI of the Standards, as referenced at footnote 5

to Section VII(B)(1)(b)(ii).[10]

---

[9] In implementation of Section 496(a)(4)(A) of the HEA, 20 U.S.C. § 1099(a)(4)(A), paragraph (a) of 34
C.F.R. § 602.18 provides that an accrediting agency "must consistently apply and enforce standards that
respect the stated mission of the institution, including religious mission, and that ensure that the education or
training offered by an institution or program, including any offered through distance education,
correspondence courses, or direct assessment methods, is of sufficient quality to achieve its stated objective
for the duration of any accreditation or preaccreditation period."  Paragraph (b)(2) of 34 C.F.R. § 602.18
provides that "[t]he agency meets the requirement in paragraph (a) of this section if [among other things] the
agency . . . [h]as effective controls against the inconsistent application of the agency's standards[.]".

[10] The ACCSC Standards of Accreditation and revisions thereto made since July 1, 2015 are available at the
ACCSC web site.  *See* https://www.accsc.org/UploadedDocuments/standards%20and%20alerts/ACCSC-
Standards-of-Accreditation-and-Bylaws-070122.pdf  (Standards of Accreditation, as of July 1, 2022) (last
visited July 26, 2022); https://www.accsc.org/UploadedDocuments/standards%20and%20alerts/ACCSC-
Standards-of-Accreditation-Catalog-of-Revisions-07012022.pdf (ACCSC Standards of Accreditation,
Revision Catalog from July 1, 2015 forward) (last visited July 26, 2022).  The ACCSC Standards of
Accreditation effective at the time of the events at issue are those dated July1, 2018.  Chapter One of Standards
sets forth Rules of Process and Procedure for the accreditation process and Commission decision-making.
Chapter Two contains the Substantive Standards.  Appendices to the Standards specify requirements and
procedures for maintaining compliance with the Substantive Standards.

**Exhibit A - 10**

The benchmark graduation rate requires that a minimum percentage of students graduate each year from each program an accredited school administers.  As set forth in Appendix VI of the Standards, for programs of 19 to 23 months' duration, the benchmark graduation rate is 43%. For programs lasting 24 months or longer, the benchmark graduation rate is 40%.  The benchmark employment rate requires that 70% of each year's graduating students in each of a school's programs attain employment in the career field for which the school provided their education, regardless of program length.

The Rules require continuous compliance with the Standards.  Section I(B)(4) of the Rules provides that "[b]y applying for and receiving accreditation, a school accepts the obligation to demonstrate ***continuous*** compliance with the Standards of Accreditation." (emphasis added).  As provided by Section VII(C)(1) of the Rules, "[t]he Commission monitors schools ***throughout the period of accreditation*** to ensure ***continued compliance*** with accrediting standards and requirements." (emphasis added). *See also* Rules, Section I(G)(2)(a) ("In order for a school to maintain its eligibility for accreditation, it must . . . [c]omply on ***a continuous basis*** with accreditation standards and requirements[.]" (emphasis added).  And Section I(G)(3) of the Rules provides that "[f]ailure by a school to maintain ***continued compliance*** with all ACCSC standards and requirements will lead to the Commission taking appropriate action as described in Section VII [of the] Rules[.]" (emphasis added).  Such actions may include the issuance of warnings, placing a school on probation or withdrawing the school's accreditation.  As provided by Section VII(C)(3) of the Rules, "[t]he Commission's decision relative to a school's application for accreditation (initial or renewal) will be based upon the Commission's review of the school's records[.]"

**Exhibit A - 11**

**AAA Case No. 01-21-0017-0169**                                             Page 12 of 36
**August  4, 2022**

C.    <u>**Contentions in Arbitration**</u>

In accordance with Section G(1) of the ACCSC Arbitration Instructions, in setting out in its Arbitration Brief the reasons why, in IU's view, the decision of the Appeals Panel was not supported by substantial evidence, the School urges in essence as follows:

- The Appeals Panel ignored the Commission's representations that IU's success was to be measured by its recently enrolled cohorts.

- Neither the Commission nor the Appeals Panel offered any explanation for the Commission's sudden reversal of its finding of good cause to extend the time for demonstrating compliance.

- Neither the Commission nor the Appeals Panel identified evidence refuting IU's data demonstrating improvement in student achievement.  In this regard, the School contends that (a) the record shows IU's current students would graduate at benchmark rates; (b) the Commission did not identify any relevant evidence supporting its decision to reverse its prior finding of good cause; (c) the Appeals Panel similarly failed to identify evidence supporting the Commission's failure to consider IU's strong showing of good cause; and (d) the Commission's system-wide withdrawal of accreditation was not supported by substantial evidence.

- The Appeals Panel's refusal to consider the Commission's treatment of other schools violated IU's due process rights, and thus could not be supported by substantial evidence.

ACCSC maintains, in essence, that Independence seeks a *de novo* review of a decision that, ACCSC urges, is plainly supported by substantial evidence.  ASSCS contends that the School misinterprets the efforts of the Commission in encouraging measures that could help students get a better education, while at the same time making clear to the School that its prolonged and continuing failure to achieve the graduation and employment benchmarks specified in the Standards would result in withdrawal of accreditation.  ACCCS contends that the Commission amply protected the due process rights of Independence in accordance with the Rules and Standards, as informed by regulatory and common-law requirements.

**Exhibit A - 12**

### III.

### ARBITRATOR'S REVIEW OF APPEALS PANEL'S DECISION

**A.**    <u>**The School's Benchmark Performance, Based on Annual Reports as Updated**</u>

As an initial matter, a review of the Appeals Panel Decision as a whole provides helpful context for the parties' specific contentions.

The Commission's assessment of an ACCSC-accredited school's performance in achieving and maintaining the required benchmark rates includes ongoing review of percentages of students starting in each year's programs (referred to as an annual "cohort" of students) who graduate and secure field-relevant employment, as reported to the Commission each year by the school in an ACCSC Annual Report.  With respect to Independence University, the Commission's Withdrawal Letter included charts summarizing the School's graduation and employment rates as reported by the School in its 2016, 2017, 2018, 2019 and 2020 ACCSC Annual Reports, with a supplementation as of December 2020.  The charts, which of course were also before the Appeals Panel, show below-benchmark rates of student achievement in multiple programs  -- that is,  graduation rates below 43% for programs of 19 to 23 months and below 40% for programs of 24 months or longer, and employment rates below 70% -- as shown on the charts reproduced on the next two pages of this Decision and Award.  The duration of each program is indicated, with rates falling below benchmark shown in red.


*[Remainder of this page intentionally blank]*


**Exhibit A - 13**

AAA Case No. 01-21-0017-0169
August 4, 2022

Page 14 of 36

Exhibit A - 14

### HISTORICALLY REPORTING BELOW BENCHMARK RATES

| PROGRAM (Credential) | GRADUATION RATES | | | | | | EMPLOYMENT RATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 |
| Accounting-DE (BS) 36 months | No Starts* | No Starts | 17% | 20% | 24% | 26% | No Starts | No Starts | 73% | 79% | 72% | 73% |
| Business – DE (AAS) 20 months | 13% | 16% | 19% | 21% | 18% | 16% | 74% | 53% | 41% | 59% | 72% | 65% |
| Business Administration (BS) 36 months | 42% | 48% | 23% | 42% | 32% | 29% | 53% | 77% | 83% | 90% | 100% | 100% |
| Business Administration-DE (BS) 36 months | 33% | No starts | 18% | 17% | 20% | 22% | 100% | No Starts | 53% | 49% | 70% | 66% |
| Graphic Arts-DE (BS) 36 months | No Starts | No Starts | 19% | 21% | 19% | 23% | No Starts | No Starts | 63% | 55% | 63% | 76% |
| Health Services Management-DE (BS) 38 months | 90% | 65% | 74% | 58% | 78% | 59% | 86% | 83% | 68% | 73% | 77% | 31% |
| Information Systems-DE (MS) 15 months | 50% | 53% | 37% | 58% | 78% | 59% | 67% | 75% | 30% | 73% | 77% | 63% |
| Master of Business Administration-DE (MBA) 15 months | 60% | 59% | 70% | 63% | 74% | 65% | 50% | 53% | 44% | 60% | 64% | 54% |
| Medical Assisting (AOS) 20 months | 47% | 22% | 29% | 43% | 30% | 31% | 72% | 71% | 71% | 75% | 91% | 90% |
| Medical Assisting-DE (AOS) 22 months | 33% | 21% | 13% | 19% | 23% | 22% | 70% | 48% | 27% | 50% | 45% | 42% |
| Web Design and Development – DE (BS) 36 months | No Starts | No Starts | 13% | 12% | 8% | 10% | No Starts | No Starts | 100% | 57% | 80% | 33% |

### PROGRAMS DISCONTINUED BY THE SCHOOL

| PROGRAM (Credential) | GRADUATION RATES | | | | | | EMPLOYMENT RATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 |
| Graphic Arts-DE (AAS) 20 months | 18% | 16% | 18% | 22% | 18% | N/A | 72% | 36% | 34% | 56% | 62% | N/A |
| Accounting (BS) 36 months | 64% | 55% | 33% | 43% | 31% | N/A | 89% | 100% | 100% | 100% | 100% | N/A |
| Respiratory Therapy-DE (AS) 26 months | 44% | 52% | 53% | 47% | 52% | N/A | 56% | 46% | 61% | 59% | 67% | N/A |
| Healthcare Administration (BS) 36 months | 47% | 33% | 20% | 30% | 24% | N/A | 0% | 0% | 100% | 57% | 33% | N/A |

* "No Starts" means that the school reported no students commencing in the program for the reporting period on Graduation and Employment Charts submitted for that Annual Report.

*[Charts Reproduced from ACCSC-IU Withdrawal Letter (Apr. 22,2021) at 7]*

JA60

Case 1:22-cv-01223-RDA-WEF    Document 1-2    Filed 10/28/22    Page 16 of 46 PageID# 50

**AAA Case No. 01-21-0017-0169**
**August 4, 2022**
**Page 15 of 36**

### HISTORICALLY REPORTING ABOVE BENCHMARK

| PROGRAM (Credential) | GRADUATION RATES | | | | | | EMPLOYMENT RATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 |
| Nurse Education-DE (MS) 15 months | 100% | 100% | 100% | 100% | 80% | 40% | 100% | 100% | 100% | 100% | 100% | 100% |
| Nursing Administration-DE (MS) 15 months | 100% | 100% | 50% | 100% | No Starts | 100% | 75% | 100% | 100% | 100% | No Starts | 0% |
| Nursing Education (AD) 25 months | 75% | 77% | 53% | 67% | 79% | 79% | 86% | 84% | 84% | 88% | 91% | 73% |
| Nursing-DE (BS) 24 months | 40% | 67% | 55% | 75% | 75% | 75% | 100% | 100% | 83% | 100% | 100% | 100% |
| Respiratory Care-DE (BS) 20 months | 84% | 82% | 72% | 78% | 76% | 71% | 85% | 86% | 80% | 93% | 97% | 96% |
| Surgical Technologist (AOS) 20 months | 53% | 57% | 48% | 52% | 43% | 24% | 75% | 92% | 91% | 91% | 92% | 100% |

### PROGRAMS THAT HAVE NOT BEEN OPERATIONAL LONG ENOUGH TO BE REPORTABLE

| PROGRAM (Credential) | GRADUATION RATES | | | | | | EMPLOYMENT RATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 |
| Cybersecurity & Networking (BS) 36 months | | | No Starts* | | | N/A | | | No Starts | | | N/A |
| Cybersecurity & Networking-DE (BS) 36 months | | | No Starts | | | N/A | | | No Starts | | | N/A |
| Medical Assisting (Diploma) 8 months | | | No Starts | | | N/A | | | No Starts | | | N/A |
| Medical Billing & Insurance Specialist (Diploma) 8 months | | | No Starts | | | N/A | | | No Starts | | | N/A |
| Software and Mobile Application Development (BS) 36 months | | | No Starts | | | N/A | | | No Starts | | | N/A |
| Software and Mobile Applications-DE (BS) 36 months | Did Not Have a Start at the Previous Branch | | | | | N/A | Did Not Have a Start at the Previous Branch | | | | | N/A |

\* "No Starts" means that the school reported no students as commencing in the program for the reporting period on Graduation and Employment Charts submitted for that Annual Report.

*[Charts Reproduced from ACCSC-IU Withdrawal Letter (Apr. 22,2021) at 8]*

**Exhibit A - 15**

JA61

The Appeals Panel sustained the Commission's finding, based on the data summarized in the charts reproduced above, that "IU reported below benchmark rates of student achievement in 65% (11 of 17) of the active/reportable programs over the last five years."  As further noted by the Appeals Panel:

> The Commission also found that the programs that are performing below acceptable standards for student achievement affect the highest number of students -- 14,327 of 15,377 students were enrolled in programs which reported unacceptable rates of student achievement . . . .  And, notably, only 16% of the 15,377 students available to graduate successfully completed the program and achieved the vocational objectives of the program -- i.e., employment in the field of training.

Independence contests the relevance and significance of this verifiable information concerning the actual educational outcomes of its students reflected in the School's Annual Reports to ACSSC, as discussed further below.  However, the facts and data concerning these demonstrable educational outcomes, based on actual experience of IU students -- the failure of multiple IU programs to attain graduation and employment benchmarks every year from 2018 to 2020 -- are undisputed.  The charts are replete with below-benchmark performance year after year in multiple programs.  Based on the evidence that was before the Appeals Panel, this tribunal concludes that the Appeals Panel's declination to reverse the findings reflected in the charts reproduced above is supported by substantial evidence.

B.    **The School's Benchmark Performance, Based on Current Student Retention Data**

The graduation and employment data reported in a school's Annual Report to ACCSC necessarily focus retrospectively on verifiable, historical information.  These actual, complete graduation and employment data are only available and "reportable" in the school's Annual Report after a student graduates (or not) upon completing his or her studies (or not) and has been

**Exhibit A - 16**

JA62

**AAA Case No. 01-21-0017-0169**                                **Page 17 of 36**
**August  4, 2022**

employed (or not) in a job in his or her field of study.  Thus, for example, a program of 20 to 36

months would not produce graduation or employment outcomes "reportable" in an ACCSC

Annual Report, such as those Annual Reports of IU providing the data for the charts reproduced

above, for 30 to 54 months.

      In order to obtain the most recent data available concerning student achievement at

Independence University, in its July 21, 2020 Continued Probation Order, the Commission

requested that CEHE provide a student retention chart for Independence with a report date of

December 2020 for each of the School's programs, along with a list of recent graduates from

each of its programs for the last six months, and updated information concerning these recent

graduates' employment status.

      On December 30, 2020, CEHE submitted this information to the Commission by an

extensive response to the July 21, 2020 Order.  Based on this most-recently-available data of

actual student retention rates and updated graduation and employment data, the Commission

undertook a program-by-program analysis of the levels of student achievement attained by the

School. The Commission used this recent data in analyzing estimated projections of graduation

rates for existing IU students -- undergraduate cohorts -- whose ultimate educational outcomes

with IU would not be "reportable" in ACCSC Annual Reports until future years.  This analysis is

excerpted below, with quotations of portions of the Commission's Withdrawal Letter as

indicated.  Again, the required benchmark graduation rate is 40% for these longer, degree

programs, and the required benchmark employment rate is 70%.

      This is what the evidence before the Appeals Panel showed:

**<u>Accounting-DE (BS)</u>** -- "projected graduation rate for this cohort, reportable on
the 2024 Annual Report, is already below the graduation rate benchmark of 40%."

**Exhibit A - 17**

**Business-DE (AAS)** -- retention rates of 70% for students with start dates from September 2019 to October 2020; noting, however, that "the school listed 351 graduates in the last six months but only 29% (107) are reported as employed in field."

**Business Administration-DE (BS)** -- "retention rate of 28%. Although the students have between 24% and 55% of the program yet to complete, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, is already below the benchmark of 40%."

**Business Administration (BS)** -- "The first chart shows that the school retained only 6 of 16 students that started between September 2018 and August 2019, for a retention rate of 38%. Therefore, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, will be below the benchmark of 40%."

**Cybersecurity & Networking (BS)** -- retention rate of 63%.

**Cybersecurity & Networking-DE (BS)** -- "The school provided a Retention Chart for the program with the 2020 Annual Report, which shows the school has retained only 101 of 475 students that started between April 2018 and March 2019 for a retention rate of 21%. Therefore, by the time the program is reportable in 2022, the graduation rate will already be unacceptable under ACCSC's standards."

**Health Services Management-DE (BS)** -- "The first Retention Chart, based on starts from the period September 2018 to August 2019, shows the school retained only 581 of the 2024 students available for retention, for a retention rate of 29%. Therefore, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, will be below the benchmark of 40%."

**Information Systems-DE (MS)** -- "Due to the persistent history of low outcomes, the Commission directed the school to cap the program's enrollment at the June 30, 2019 level of enrollment as part of the July 21, 2020 Continued Probation Order.  As of the 2020 Annual Report, IU reported acceptable rates of student graduation and employment; however, the December 2020 report shows an employment rate of 63%."

**Master of Business Administration-DE (MBA)** -- "IU reported unacceptable employment rates over the last five years. Due to the history of low student achievement outcomes, the Commission directed the school to cease enrollment in this program as part of the May 2, 2019 Probation Order.  The school reported that 16 of the 25 graduates (64%) within the last six months have obtained employment in the field of training.  The Commission calculated that an

**Exhibit A - 18**

additional 2 graduates must obtain employment in the field of training in order for the percentage to increase to at least 70%."

**Medical Assisting (AOS) (formerly Medical Specialties)** -- "IU reported unacceptable rates of student graduation from this program in the 2018, 2019, and 2020 Annual Reports, as well as the December 2020 report.  The school provided a Retention Chart for the Medical Assisting (AOS) program.  Based on starts from October 2019 to October 2020, the school retained 9 of 11 students available for retention, for a retention rate of 89%. The school reported that 9 of the 10 graduates (90%) within the last six months have obtained employment in the field of training."

**Medical Assisting-DE (AOS) (formerly Medical Specialties)** -- "The school reported below benchmark rates of graduation for the five most recent Annual Reports (2016-2020) and the December 2020 report.  In addition, the school reported below benchmark employment rates for the four most recent Annual Reports (2017-2020).  Due to the history of low student achievement outcomes, the Commission directed the school to cap the program's enrollment at the June 30, 2019 level of enrollment as part of the July 21, 2020 Continued Probation Order. IU submitted a Retention Chart for the Medical Assisting-DE (AOS) program, based on starts from the period between October 2019 and October 2020.  The Retention Chart shows an overall retention rate of 73%; however, the chart also shows that 80% of the students are primarily in the first half of the program."

**Software and Mobile Application Development (BS)** -- "36-month program will not be reportable until the 2023 Annual Report. The school provided a Retention Chart for the program with the 2020 Annual Report, which shows the school has retained none of the 7 students (0%) that started between April 2018 and March 2019. Therefore, the projected graduation rate for this program already does not meet ACCSC's acceptable minimum."

**Software and Mobile Applications-DE (BS)** -- " 36-month program will not be reportable until the 2023 Annual Report. The school provided a Retention Chart for the program with the 2020 Annual Report, which shows the school has retained only 51 of 353 students that started between April 2018 and March 2019 for a retention rate of 14%. Therefore, the projected graduation rate for this program already does not meet ACCSC's acceptable minimum."

**Web Design and Development – DE (BS)** -- "The school reported below benchmark rates of student graduation for the three most recent Annual Reports (2018-2020) as well as the December 2020 report. . . . [T]he school retained

**Exhibit A - 19**

only 13 of the 107 students available for retention, for a retention rate of 12%.
Therefore, the projected graduation rate for this cohort, reportable on the 2024
Annual Report, will be below the benchmark of 40%."

The Commission, by its July 21, 2020 Order, thus obtained from the School the most up-to-date student achievement data available, including, as shown above, retention data for student start dates as late as October 2020.  Based on this analysis of recent student retention, the Commission found that "the retention rates are so low for nine programs that it appears the school will report unacceptable rates of student graduation minimally over the next two to three Annual Report years."  The Commission also found that "three new programs are predicted to have unacceptable rates of student graduation by the time they are first reportable using the Graduation and Employment Chart formula, adding to the number of programs at the school that are failing to demonstrate successful student achievement."

The Appeals Panel affirmed these findings of the Commission concerning projected graduation rates based on current retention data.  I am constrained to conclude, based on the evidence that was before the Appeals Panel, including the evidence described above in the excerpted program-by-program analysis, that the Appeals Panel's decision not to disturb these findings is supported by substantial evidence.

C.    **The School's Projected, Future Benchmark Performance**

The School maintained before the Commission and the Appeals Panel, as it does in arbitration, that significant and costly initiatives it had taken in 2019 and 2020 toward improving student achievement had placed it well on track for future compliance with the Standards.  In its December 30, 2020 response to the July 21, 2020 Continued Probation Order, the School

**Exhibit A - 20**

**AAA Case No. 01-21-0017-0169**                                              **Page 21 of 36**
**August  4, 2022**

included updated projections of future graduation rates for its associate degree and baccalaureate

programs for each year from 2021 through 2026.  The Commission considered these projected

graduation rates, and included them in a table in its Withdrawal Letter, as follows, with below-

benchmark programs again indicated in red:

| Program (Credential) | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|
| Business-DE (AAS) | 21% | 24% | 33% | 45% | | |
| Medical Assisting (AOS) | 40% | | | | | |
| Medical Assisting-DE (AOS) | 26% | 25% | 34% | 46% | | |
| Accounting-DE (BS) | 22% | 24% | 27% | 27% | 36% | 50% |
| Business Administration (BS) | 47% | | | | | |
| Business Administration-DE (BS) | 27% | 25% | 26% | 26% | 35% | 49% |
| Graphic Arts-DE (BS) | 28% | 28% | 22% | 25% | 34% | 48% |
| Health Services Management-DE (BS) | 18% | 19% | 20% | 22% | 31% | 44% |
| Web Design and Development-DE (BS) | 15% | 10% | 13% | 20% | 29% | 43% |
| Information Systems-DE (MS) | No projections provided | | | | | |
| Master of Business Administration-DE (MBA) | No projections provided | | | | | |

*[Chart Reproduced from ACCSC-IU Withdrawal Letter (Apr. 22,2021) at 7]*

As the Commission found, "IU projected that associate degree programs will take four

years to achieve minimum benchmarks (2024 Annual Report) and baccalaureate programs are

expected to take six years to achieve minimum benchmarks (2026 Annual Report)."  Substantial

evidence in the record before the Appeals Panel supports this finding, and preludes its reversal in

this tribunal.

**D.    Summary of Arbitrator's Review of Appeals Panel Decision**

In sum, the evidence before the Appeals Panel included extensive data concerning rates

of retention, graduation and employment of IU students enrolled in each year of annual cohorts

from 2016 through 2020.  The evidence also included estimates of projected, future student

**Exhibit A - 21**

achievement for each year going forward from 2021 through 2026.  Based on this evidence, the

Appeals Panel affirmed the Commission's findings that Independence was not currently

meeting ACCSC benchmarks in several of its programs, had not met the benchmarks for several

years, and would not be likely to meet them in most of its programs for the next four or five

years.  Given the measure of deference that must be afforded in this tribunal to the Commission

in its assessments and projections of student success in career-oriented college programs, and

considering the allocation of the burden of proof in this proceeding to the School, I must

conclude that the Appeals Panel Decision is supported by substantial evidence in the record that

was before it.

  This conclusion, however, does not address the more specific challenges Independence

raises in the arbitration.  It is to those that the tribunal now turns.

## IV.

## ARBITRATOR'S DISCUSSION OF CONTENTIONS THAT THE DECISION OF THE APPEALS PANEL WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

**A.**    <u>**The Range of Cohorts Considered**</u>

Independence urges that the Appeals Panel ignored the Commission's own

representations to the School in the Commission's Orders requesting information preceding the

Withdrawal Letter, reviewed above. The Commission led the School to believe, it asserts, that

the School's success was to be measured only by its most recently enrolled cohorts of students.

In 2019 and 2020, the School adopted new measures to improve student achievement.  The full

impact of these new measures would not be "reportable" in the School's Annual Reports to

ACCSC for several years -- not until the new students who were first enrolled with the benefit of

**Exhibit A - 22**

AAA Case No. 01-21-0017-0169                                               Page 23 of 36
August  4, 2022

these initiatives graduated (or not) and became employed (or not), as would then be reflected in

future Annual Reports.  Over the interim period, the School maintains, student success would be

measured by its **progress** toward achieving benchmark rates, not by its ***attainment*** of them.   The

School contends that, since its new initiatives to improve student achievement were not

implemented until 2019 or 2020, and the Commission so enthusiastically praised the School's

adoption of those new measures, that the Commission effectively represented that it was the

retention rates of students enrolling after their implementation that should be regarded as

controlling, not the retention rates of students who enrolled in earlier years.

     The record before the Appeals Panel shows that the Commission -- and the Appeals Panel

-- in fact did consider the most recent student achievement information available, including, as

reviewed above, retention data for programs with student start dates in 2019.  As noted above,

the Commission found that "the retention rates are so low for nine programs that it appears the

school will report unacceptable rates of student graduation minimally over the next two to three

Annual Report years."[11]  Thus, it cannot be said that the Commission or the Appeals Panel paid

no attention to the relative success of the School's recently enrolled students.  The Appeals

---

[11] As reviewed above, the Commission in its Withdrawal Letter addressed recent student cohorts in its detailed
program-by-program analysis of student retention as follows:  Accounting-DE (BS) ("projected graduation rate
for this cohort, reportable on the 2024 Annual Report, is already below the graduation rate benchmark of
40%"); Business-DE (AAS) ("the school listed 351 graduates in the last six months but only 29% (107) are
reported as employed in field"); Business Administration (BS) ("school retained only 6 of 16 students that
started between September 2018 and August 2019, for a retention rate of 38%"); Cybersecurity & Networking-
DE (BS) ("2020 Annual Report . . . shows the school has retained only 101 of 475 students that started
between April 2018 and March 2019 for a retention rate of 21%); Health Services Management-DE (BS)
("The first Retention Chart, based on starts from the period September 2018 to August 2019, shows the school
retained only 581 of the 2024 students available for retention, for a retention rate of 29%.");  Software and
Mobile Application Development (BS) ("Retention Chart for the program with the 2020 Annual Report, which
shows the school has retained none of the 7 students (0%) that started between April 2018 and March 2019");
Web Design and Development –  DE (BS) ("below benchmark rates of student graduation for the three most
recent Annual Reports (2018-2020) as well as the December 2020 report. . . . [T]he school retained only 13 of
the 107 students available for retention, for a retention rate of 12%.").  The School does not contest the

**Exhibit A - 23**

Panel's affirmance of the Commission's findings concerning those recent cohorts is supported by substantial evidence in the record before the Appeals Panel.

The approach advocated by the School would require the Commission to disregard the quality of education of IU students who enrolled before 2020.  Reversal of the Appeals Panel Decision on this ground would require the arbitral tribunal to thrust upon the Commission -- and upon these earlier cohorts of students -- standards of educational quality inferior to those expressly stated in ACCSC Standards.  Disturbing the Appeals Panel's determinations as to the stage of IU students whose educational quality is appropriate for protection would be to embark on a *de novo* review.  The Appeals Panel's decision to consider the quality of education of ***all*** IU students, including those persisting in their studies and those who had recently left the School, was consistent with the Commission's federally-recognized mission and its Standards, is supported by substantial evidence in the record before the Appeals Panel, and is not subject to reversal in this tribunal.

The evidence in the record before the Appeals Panel does not support a conclusion that the Appeals Panel, by representations to the School in the review process, abrogated its responsibilities concerning cohorts admitted before 2020.  As Independence points out, the Commission encouraged the School to implement measures to improve student achievement.  In its October 28, 2019 Order, for example, the Commission stated that it would "monitor the implementation of the SmarterMeasure Learning Readiness Indicator in the initial stages, and then monitor the efficacy of the new approach with studies of academic progress, retention data,

---

Commission's reliance upon current student retention rates as a fair and reliable indicator of future graduation rates.

**Exhibit A - 24**

**AAA Case No. 01-21-0017-0169**    **Page 25 of 36**
**August  4, 2022**

and finally student graduation rates for the first cohorts of students admitted under the new

process and procedures." Of course those students' actual graduation rates would not be known

for several years.  That cannot be taken as rendering meaningless the Commission's extensive

requests in July 2020 for *retention* information concerning students short of graduation, or the

School's extensive response in December 2020.

   In its context, the Commission's reference in October 2019 to future cohorts not admitted

until after the implementation of the SmarterMeasure tool cannot reasonably be taken as an

abandonment by the Commission of earlier cohorts.  The SmarterMeasure tool is, as the

quotation indicates, a tool for improving college admissions procedures.  Salutary as improved

admissions criteria are, they do not address the challenges facing the School in retaining students

who had already been admitted to IU prior to 2020 or those students' attainment of in-field

employment.  And it was those on-going challenges of effectively educating students who were

already "in the pipeline" -- keeping them in college until graduation, verifiably preparing them

for employment in the field of their studies -- that the graduation and employment benchmarks

involved in this proceeding address, not the School's initial admissions procedures.  Substantial

evidence in the record before the Appeals Panel -- not to mention the Commission's

responsibilities under the HEA and implementing DOE regulations -- supports the decision of

the Appeals Panel to affirm the Commission's inclusion of IU students enrolled before 2020 in

its analysis of IU's student retention rates, as part of the Commission's consideration of the

School's qualification for accredited status.

**Exhibit A - 25**

AAA Case No. 01-21-0017-0169                                    **Page 26 of 36**
August  4, 2022

B.    <u>**The Timeframe For Compliance - The "Maximum Timeline"**</u>

  In its September 8, 2018 Order, the Commission stated:

> [T]he timeframe to achieve compliance begins as of the date of this
> letter and ends on September 7, 2020.  Please also be advised that
> the Commission is under no obligation to wait for the maximum
> timeframe to expire and may take an adverse action prior to the
> expiration of the maximum allowable timeframe.

In its July 21, 2021 Order, the Commission stated:

> Although the Commission noted that the rates reported using a
> March 2020 Report Date fall below ACCSC benchmarks, the
> evidence appears to show the strategies are starting to take effect.
> Therefore, the Commission is willing to afford the school an
> additional opportunity to demonstrate successful student
> achievement.

As further stated in the July 21, 2020 Order, the Commission "determined that good cause

exist[ed] to extend the timeframe to achieve compliance to May 31, 2021."  The Commission

explained:

> In making this decision [to extend the timeframe to May 31, 2021]
> the Commission took note of the extenuating circumstances,
> including the ongoing teach-out of five campuses, and early
> closure of eight campuses, which leaves only two operational
> campuses.  The Commission found that these circumstances
> warrant affording CEHE additional time to manage the multiple
> transitions and implement strong measures at the two remaining
> schools.  In particular, the Commission recognized the length of
> time needed to demonstrate the school's ability to improve student
> achievement outcomes.

**Exhibit A - 26**

AAA Case No. 01-21-0017-0169                                                    Page 27 of 36
August  4, 2022

        The School posits that the good-cause exception to the compliance timeframe provided in

Section M of the Rules necessarily affords schools with multi-year degree programs, such as IU,

an extended opportunity to come into compliance with ACCSC student achievement standards.[12]

This is so, the School contends, because of the longer duration of degree programs, compared

with those of schools offering short-term diploma programs, and the longer lapse of time before

the degree programs' graduate and employment rates are reportable in the manner required in

ACCSC Annual Reports.  It urges that the only fair reading of the Commission's good-cause

finding is that the Commission was, indeed, accepting the fact that it would take years before the

School would be able to demonstrate compliance.  After all, it urges, the Commission itself had

"recognized the length of time needed to demonstrate the school's ability to improve student

achievement outcomes."  As Independence sees it, the Commission had to know full well, from

the outset of probation in September 2018, and all along, that complete compliance of a three-

year program in the span of only two years would be impossible.

        The substantial evidence in the record before the Appeals Panel, however, does not

support this contention.  The Commission extended the compliance timeframe by less than nine

months, to May 31, 2021.  The projected graduation rates that IU advanced for its associate-

_____

[12] Section M(1)(c)of the Rules addresses "maximum timelines for schools to remedy noncompliance" with the
Standards, and provides in relevant part: "Where the Commission has found an area in which a school is out of
compliance with accreditation standards or requirements, the period allotted to the school to remedy the
noncompliance or cure the deficiency, together with the time for the Commission's final decision, will not
exceed the following time limit[] unless there is good cause to extend the period for achieving compliance: . . .
[t]wo years, if the school's longest program is at least two years in length."  As one basis for a finding of
"good cause," Section M(2) provides: "The school will be deemed to have demonstrated good cause if it has
shown that during the period of review significant progress has been made toward achieving compliance with
the accreditation standard(s) in question and meeting all requirements set forth by the Commission and when
extenuating circumstances exist such that only through the provision of additional time can the school
demonstrate its compliance with the standard(s)[.]"

**Exhibit A - 27**

**AAA Case No. 01-21-0017-0169**                                                **Page 28 of 36**
**August  4, 2022**

degree and baccalaureate programs in its December 2020 submissions to the Commission

predicted benchmark compliance -- not within the timeline as extended -- but by 2024 for two of

its programs, and by 2026 for five of its programs, years after May 31, 2021.  The School offered

no projections for its two other programs.  As the Appeals Panel found:

> There is absolutely nothing in the record of this matter that states
> that the Commission was willing to wait four or six years for the
> school to establish compliance with the critical standards
> governing student achievement.  To do so would be for the
> Commission to concede that programs could be out of compliance
> for multiple years and that all during that time students would be
> matriculating in non-compliant programs, and even that is
> assuming that the school's projections and predictions were all
> correct and accurate. . . . [T]he Commission never informed IU
> that it had a guaranteed four to six years to establish compliance.
>
> The Appeals Panel found no firm basis for concluding that te
> Commission led the school to believe that it had multiple years to
> demonstrate compliance. Indeed, such a position would fly in the
> face of a school's obligation to demonstrate ***continuous
> compliance*** with all accreditation standards and policies.
> [emphasis by the Appeals Panel].  The Introduction, Preamble,
> Standards of Accreditation, clearly states that: 'The burden rests
> with the school to establish that it ***is*** meeting the standards. . . .'
> [emphasis added].

These conclusions by the Appeals Panel are supported by substantial evidence in the

record that was before it.  As the Appeals Panel emphasized, the responsibility to establish

compliance is ***continuous***, as made clear by numerous provisions of the Rules.[13] There was no

evidence before the Appeals Panel to suggest that the Commission condoned the failures of the

---

[13] *See, e.g.*, Rules, § I(B)(4) ("[b]y applying for and receiving accreditation, a school accepts the obligation to
demonstrate ***continuous*** compliance with the Standards of Accreditation."(emphasis added); Rules,
§I(G)(2)(a) ("[i]n order for a school to maintain its eligibility for accreditation, it must . . . [c]omply on ***a
continuous basis*** with accreditation standards and requirements[.]"  (emphasis added).

**Exhibit A - 28**

School to achieve benchmark compliance over the years preceding the Commission's withdrawal decision, or as projected by the School for several years to come.

**C.**    **The Timeframe For Compliance - The Timing of the Commission's Decision**

The School argues that the Commission improperly "reversed" its July 21, 2020 finding of good cause to extend the compliance timeline to May 30, 2021 by issuing the Withdrawal Letter on April 22, 2021 -- about six weeks before the timeline as extended would end.  The School maintains that the Appeals Panel Decision lacks the support of substantial evidence on the ground that neither the Commission nor the Appeals Panel offered any explanation for this "reversal" of the extension of the timeline.

The record before the Appeals Panel, however, provides ample factual support for the Appeals Panel's decision not to set aside the Commission's decision on the ground that it was issued too soon.  On May 27, 2021, with its Application for Appeal to the Appeals Panel, the School provided a chart with further estimated projections of graduation rates for its associate-degree and baccalaureate programs, updated as of May 10, 2021. The chart is reproduced on the next page of this Decision and Award.

*[Remainder of this page intentionally blank]*

**Exhibit A - 29**

**AAA Case No. 01-21-0017-0169**                                    **Page 30 of 36**
**August  4, 2022**

| Graduation Rates by Cohort Year – Weakest Case Scenario – Updated actuals as of 5/10/21 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 | 2021 | 2022 | 2022 updated | 2023 | 2023 updated | 2024 | 2024 updated | 2025 | 2025 updated | 2026 |
| AOS Medical Assisting DE | 26% | | 25% | 39% | 34% | 62% | 46% | 82% | na | | |
| AAS Business DE | 21% | | 24% | 31% | 33% | 61% | 45% | na** | na | | |
| AAS Graphic Arts – in teach out | 18% | na | 20% | na | 29% | na | 43% | na | na | | |
| BS Business Administration DE | 27% | | 25% | 26% | 26% | 26% | 26% | 31% | 35% | 44% | 49% |
| BS Graphic Arts DE | 28% | | 28% | 22% | 22% | 24% | 25% | 22% | 34% | 30% | 48% |
| BS Web Design and Development DE | 15% | | 10% | 13% | 13% | 18% | 20% | 22% | 29% | 44% | 43% |
| BS Health Services Management DE | 18% | | 19% | 19% | 20% | 18% | 22% | 24% | 31% | 34% | 44% |
| MS Nursing Education DE | 40% | | 0% | *0% | na | *100% | na | na | na | na | na |

*There is only 1 student in this cohort.

** ACCSC ceased enrollment in this program. No students to report.

*[Chart Reproduced from IU Application for Appeal (May 27, 2021) at 17-18]*

As the chart above shows, the School in May 2021 projected that associate's programs would report meeting graduation benchmark rates by 2023, and that bachelor's programs would meet benchmark by 2025 or 2026.  The update shows that none of the eight programs listed would meet benchmark in 2022.  Two thirds of programs with more than one student (four of six) would fail to meet benchmark in 2023.  Four of five programs remaining for 2024 would be

**Exhibit A - 30**

AAA Case No. 01-21-0017-0169                                                 Page 31 of 36
August  4, 2022

below benchmark for 2024.  For 2025, two programs of the four remaining then would still be

below benchmark.  Not until 2026 would the four programs then remaining meet benchmark.

Considering the Appeal Panel's well-placed emphasis on the need for continuous

compliance, as repeatedly expressed in the Rules, the updated projections submitted on May 27,

2021 -- two business days before the May 31, 2021 expiration of the extended timeframe -- do

not detract from the substantial evidence supporting the Appeals Panel Decision.  Indeed, the

School's May 27, 2021 submission tended to confirm the merits of the Commission's decision

not to defer its withdrawal action decision any longer, and the Appeals Panel had before it this

nearly up-to-the-very-day update in reviewing the Commission's decision.

Thus, the substantial evidence before the Appeals Panel supports its declination to

reverse the withdrawal decision on the ground that it was too hastily rendered.   The Commission

and Appeals Panel have considerable expertise and experience is assessing the quality of career

schools' educational programs.  As the Fourth Circuit made clear in *Professional Massage*, this

expertise warrants deference in the reviewing tribunal.  The judgments of the Commission and

Appeals Panel required nuanced analyses of predictions of future student success. This tribunal is

not authorized to second-guess those judgments.

In short, the record reflects an extended period of noncompliance based on demonstrated

past performance.  The School submitted projections of improved future performance, and the

Commission found that the projections were insufficient under ACCSC Standards of compliance.

The School would have the arbitral tribunal jettison the verifiable past in favor of future

projections the Commission found wanting.  It was the School's burden before the Appeals Panel

to persuade it that the Commission should have found that the School's new initiatives were

**Exhibit A - 31**

JA77

brought it into compliance with the benchmarks of the Standards.  It failed to do so.  For this tribunal to conclude, based on the same record that was before Appeals Panel, that the School had carried its burden of proof on this issue before the Appeals Panel, or that it has carried its burden here, would be to embark on a *de novo* review of the Appeals Panel Decision.[14]

**D.**     **Appeals Panel's Treatment of School's Projections; Other Evidentiary Contentions**

Independence contends that neither the Commission nor the Appeals Panel identified evidence refuting the School's data demonstrating improvement in student achievement.  In this regard, the School maintains that (a) the record shows its current students would graduate at benchmark rates; (b) the Commission (again) did not identify any relevant evidence supporting its decision to reverse its prior finding of good cause; (c) the Appeals Panel (again) similarly failed to identify evidence supporting the Commission's failure to consider IU's showing of good cause; and (d) the Commission's system-wide withdrawal of accreditation was not supported by substantial evidence.

The School's points (a), (b) and (c) come down largely to an assessment of its projections, estimates and predictions of attaining benchmark graduation and employment rates

---

[14] The School contends that the timing of the Commission's decision, and the Appeals Panel's affirmance of it, was arbitrary and capricious and denied it of due process. It should be borne on mind, though, that the Commission had to strike a balance of competing interests in this matter.  These included the interests of the School.  But they also included the best interests of students in receiving (or timely carrying on) their education at an institution demonstrably qualified for accreditation in accordance with criteria set by DOE in implementation of the HEA, such as accreditation under the ACCSC Standards, rather than at an institution where the statistical prospects of graduating and launching a career in their field of study had been shown, after extensive review, to be too slim for the institution to qualify for accreditation.

**Exhibit A - 32**

in the future, as reviewed above.  The Commission addressed these matters in its Withdrawal

Letter:

> The Commission recognized that these projections are based on
> estimates, but in the context of retention data, IU is estimating that
> it will take years of sustained effort to demonstrate compliance
> with accrediting standards and student achievement benchmarks.
> Based on the length of time the Commission has already afforded
> the school to make improvements or take programmatic actions,
> the Commission cannot continue to defer a decision regarding the
> viability of the school's operations based on projected student
> achievement rates.  Further, IU has not given the Commission, and
> the record does not reflect any reason to extend the maximum time
> any further.

The Appeals Panel sustained this conclusion, and, based on an exhaustive review of the record

before the Appeals Panel, this tribunal cannot conclude that the decision of the Appeals Panel in

doing so is without the support of substantial evidence in that record.

With respect to point (d), review of the record does not show that there was a system-

wide withdrawal of accreditation.  The Withdrawal Letter was directed to Independence

University, and it was the below-benchmark graduation and employment ratings of IU, including

its branch campuses (Stevens-Henager College in Murray, Utah, and Stevens-Henager College in

Boise, Idaho) that resulted in its loss of accreditation.

**D.    <u>Due Process</u>**

Finally, the School maintains that the Appeals Panel's refusal to consider the

Commission's treatment of other schools violated Independence's due process rights, and thus

could not be supported by substantial evidence.

The Appeals Panel addressed IU's contentions regarding other schools.  It stated that the

Commission's "accreditation decisions are predicated on the individual facts and circumstances

**Exhibit A - 33**

**AAA Case No. 01-21-0017-0169**                                              **Page 34 of 36**
**August  4, 2022**

pertaining to the institution as contained in the detailed record of actions and communications

with the institution under review."  This was consistent with Section VII(C)(3) of the Rules,

which provides that "[t]he Commission's decision relative to a school's application for

accreditation (initial or renewal) will be based upon the Commission's review of ***the school's***

records" (emphasis added).  As the Appeals Panel stated: "[T]he specific facts pertaining to one

school's actions would not be determinative in how another institution was treated."

Independence advanced these allegations of disparate treatment in its Motion to

Supplement the Record, which this tribunal denied by the March 15, 2022 Ruling attached to this

Decision and Award.  In addition to the procedural considerations reviewed in the Ruling, for

this tribunal to embark on a comparison of the relative qualifications of different schools would

embroil the tribunal in a *de novo* review of the evaluative decisions of the Appeals Panel in

affirming the Commission's withdrawal of Independence's accreditation.   It would go far

outside the defined role of the reviewing tribunal to attempt to compare the propriety of the

Commission's decisions concerning other schools with the propriety of its decisions concerning

Independence.  *See, e.g., Hampton Univ. v. Accreditation Council for Pharm. Educ.*, No.

4:20cv118 (RCY), 2021 U.S. Dist. LEXIS 140353, at *18 (E.D. Va. Jul. 27, 2021) (noting that

"courts have rejected disparate treatment inquir[i]es in accreditation cases" and citing

authorities).

The record before the Appeals Panel shows that the Commission adhered to its Rules in

considering the School's accreditation and that it afforded the School ample opportunity, over

many years, to show it could bring its programs into compliance with ACCSC Standards.  In

**Exhibit A - 34**

JA80

**AAA Case No. 01-21-0017-0169**                                    **Page 35 of 36**
**August  4, 2022**

applying the "deferential standard ordinarily due to [an] accreditation agency under a common

law due process claim," as articulated in *Professional Massage*, 781 F.3d at 180, the tribunal

concludes that the ACCSC's "internal rules provided a fair and impartial procedure" for the

School, and that the Appeals Panel "followed its rules in reaching its decision.'"  Id. at 172

(quotations and brackets omitted).[15]  Nor is the tribunal persuaded that Independence has

sustained its burden of proving that the expertise and experience of the Commission -- or that of

the duly constituted Appeals Panel -- failed to provide "effective controls against the inconsistent

application of the agency's standards."  34 C.F.R. § 602.18(b)(2).

The tribunal must decline to reverse the Appeals Panel Decision on the ground that it

deprived Independence of due process.

## V.

## DECISION AND AWARD

For the reasons set forth above, it is hereby DECIDED AND AWARDED as follows:

1.      The decision of the Appeals Panel shall be, and the same hereby is, AFFIRMED.

2.      The Motion to Amend the Arbitration Hearing Transcript is DENIED AS MOOT.

3.      The administrative fees of the American Arbitration Association totaling

$6,250.00 and the compensation of the arbitrator totaling $21,375.00 shall be borne as incurred.

---

[15] In this regard, the tribunal concludes, based on the entire record that was before the Appeals Panel, that the issuance of the Withdrawal Letter on April 22, 2021, rather than some time after May 31, 2021, did not violate the ACCSC Rules or deprive Independence of its due process rights.

**Exhibit A - 35**

**AAA Case No. 01-21-0017-0169**                                  **Page 36 of 36**
**August  4, 2022**

This Final Decision and Award is in full settlement of any and all claims and counterclaims

presented to this arbitration.  Any claims or counterclaims not expressly granted in this

arbitration are hereby DENIED.

Dated: August 4, 2022                    _____
                                         Brian S. Harvey
                                         Arbitrator

I, Brian S. Harvey, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument which is my Award.

Dated: August 4, 2022                    _____
                                         Brian S. Harvey

**Exhibit A - 36**

JA82

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

| | |
|---|---|
| In the Matter of the Arbitration Between | ) |
| | ) |
| INDEPENDENCE UNIVERSITY, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| and | )   Case No. 01-21-0017-0169 |
| | ) |
| ACCREDITING COMMISSION OF CAREER | ) |
| SCHOOLS AND COLLEGES, | ) |
| | ) |
| Respondent. | ) |
| | ) |

**RULING CONCERNING ARBITRATION EXHIBITS**

**I.**

The Claimant in this arbitration, Independence University ("IU" or "School"), seeks a

reversal of a September 17, 2021 decision of an Appeals Panel of the Respondent, the

Accrediting Commission of Career Schools and Colleges ("ACCSC" or "Commission"),

affirming an April 22, 2021 decision of the Commission to withdraw the accreditation of IU.

The arbitration is being conducted pursuant to the ACCSC Instructions for Arbitration

("Instructions"), as set forth in Appendix II of the ACCSC Standards of Accreditation.  On

January 17, 2022, pursuant to Section I.F.1 of the Instructions and paragraph 3 of this tribunal's

Scheduling Order of December 29, 2021 ("Scheduling Order"), ACCSC submitted the

documents which, according to ACCSC, comprise all of the documents to be regarded as the

Arbitration Exhibits in this proceeding for purposes of the Instructions.  In accordance with

Section I.F.1 of the Instructions, the documents submitted by ACCSC included the record before

**Exhibit A - 37**

JA83

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 2 of 8**

the Appeals Panel, IU's Grounds for Appeal and the transcript of the hearing before the Appeals

Panel.

On February 7, 2022, pursuant to paragraph 4 of the Scheduling Order, IU filed a Motion

to Supplement the Arbitration Exhibits (the "Motion"). By its Motion, IU requests an order

requiring ACCSC to supplement the materials it submitted on January 17, 2022 by producing

and submitting several categories of documents concerning past treatment by the Commission of

other member institutions of the Accreditation Alliance of Career Schools and Colleges

("AACSC"). IU seeks:

1.  Copies of all probation, warning, or show cause orders issued between 2012 and
    the present which address below benchmark graduation and employment rates.

2.  Any correspondence between ACCSC and any institution placed on probation,
    warning, or show cause status between 2012 and the present for failing to meet
    either graduation or employment benchmark rates.

3.  Any correspondence between ACCSC and any institution subject to an adverse
    action between 2012 and the present based, wholly or in part, on the failure to
    meet either graduation or employment benchmark rates.

4.  Any ACCSC records involving any instances in which ACCSC granted leniency to,
    or did not take an adverse action against, an institution, with below-benchmark
    rates based on the school's transition from on-ground to online programs.

5.  Any ACCSC records of any instances in which ACCSC granted leniency to, or
    did not take an adverse action against, an institution, with below-benchmark rates
    based on circumstances related to the COVID-19 pandemic.

By a letter dated April 30, 2021, prior to the decision of the Appeals Panel, IU had made a

similar request to the Executive Director of ACCSC for documents concerning past treatment of

**Exhibit A - 38**

other institutions. The Executive Director denied this request. The requested materials were not in the record before the Appeals Panel.

IU urges that the supplementary documents requested by its Motion are necessary for the fair determination of its contention that withdrawal of its accreditation was inconsistent with the Commission's treatment of other member institutions of the AACSC. Citing 34 C.F.R. § 602.18, among other authorities, IU maintains that the withdrawal of its accreditation contravened requirements of consistency in decision-making by accrediting agencies, and improperly subjected it to disparate treatment.[1]

By its Motion, IU also requests discovery, in the form of interrogatories, document requests and depositions, in order to investigate what it contends was bad faith on the part of ASCCS. IU contends that the withdrawal of its accreditation, as affirmed by the Appeals Panel, was imposed unfairly on pretextual grounds, in order to deflect scrutiny and criticism of ACCSC.

On February 28, 2022, pursuant to paragraph 5 of the Scheduling Order, ACCSC filed an Opposition to IU's Motion, contending that the supplementation of documents comprising the Arbitration Exhibits and the discovery sought by UI are precluded by several provisions of the Instructions for Arbitration.

---

[1] Title 34 C.F.R. § 602.18 provides at paragraph (a) that an accrediting agency "must consistently apply and enforce standards that respect the stated mission of the institution, including religious mission, and that ensure that the education or training offered by an institution or program, including any offered through distance education, correspondence courses, or direct assessment education is of sufficient quality to achieve its stated objective for the duration of any accreditation or preaccreditation period." *See also* 34 C.F.R. § 602.18(b)(2) ("The agency meets the requirement in paragraph (a) of this section if [among other things] the agency . . . [h]as effective controls against the inconsistent application of the agency's standards[.]".

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 4 of 8**

## II.

As a member of the AACSC seeking accreditation, IU has agreed, among other things, to adhere the AACSC Bylaws.[2]  Pursuant to Section 4.06 of the AACSC Bylaws, IU has agreed, by applying for accreditation with the Commission, to submit any claim against the Commission relating to accreditation to final and binding arbitration as set forth in the ACCSC Standards of Accreditation.  The Standards of Accreditation include the Instructions for Arbitration.  The parties therefore must be deemed to have agreed to the Instructions for Arbitration.[3]

In describing the process for and scope of this arbitral proceeding, the Instructions address with specificity the authority of the arbitral tribunal.  Section I.B of the Instructions sets forth the "Standard of Review in Arbitration and Available Remedies," providing at Section I.B.1 that:

> The arbitration proceeding is not a *de novo* review.  It is a review on the record and is limited to the question of whether the Appeals Panel's decision is supported by the evidence that was in the record when the Panel rendered its decision.

---

[2] The Preamble to the ACCSC Standards of Accreditation provides in relevant part that "[a]ccredited schools and schools seeking accreditation agree to . . . adhere the AACSC Bylaws . . . ."  As stated in a footnote to the Preamble, "[t]he Accreditation Alliance of Career Schools and Colleges ('AACSC') does business as the Accrediting Commission of Career Schools and Colleges ('ACCSC')."  Section 1.01.a of the AACSC Bylaws provides that the Commission (ACCSC, the Respondent in this proceeding) is the Board of Directors of AACSC.

[3] In implementation of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1001, *et seq.*, regulations of the United States Department of Education governing institutions of higher education provide that the Secretary of Education does not recognize the accreditation of an institution unless the institution agrees to submit to arbitration any dispute involving the final denial, withdrawal, or termination of accreditation.  34 C.F.R. §600.4(c).  *See* 20 U.S.C. § 1099b(e) ("The Secretary may not recognize the accreditation of any institution of higher education unless the institution of higher education agrees to submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration prior to any other legal action.").

**Exhibit A - 40**

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 5 of 8**

Section I.B.2 provides: "The arbiter may not consider evidence that was not in the record before

the Appeals Panel."

Under the heading "Discovery Not Available," Section I.H of the Instructions provides

that "[d]epositions, interrogatories, requests for admission, and other forms of adversarial

discovery shall not be used during the arbitration proceeding."

Section I.F of the Instructions details the "Creation of the Record for the Arbitration

Proceeding," in relevant part as follows:

1.  Within 20 days from the date of the appointment of the arbitrator,
    the Commission shall submit to the arbitrator and the school the
    Arbitration Exhibits which shall include the record before the
    Appeals Panel, the school's Grounds for Appeal, and the transcript
    of the hearing before the Appeals Panel if a hearing was held. . . .

2.  Within 10 days of receipt of the Arbitration Exhibits, the school
    shall have the opportunity to file with the arbitrator and the
    Commission for inclusion in the Arbitration Exhibits any material
    relevant to the arbitration proceeding that was not included by the
    Commission.  The school shall not submit for inclusion in the
    Arbitration Exhibits any material that was not submitted to the
    Commission prior to the decision of the Appeals Panel.  Within 10
    days of receipt of any documents proffered by the school for
    inclusion in the Arbitration Exhibits, the arbitrator shall make the
    final decision as to whether such documents or materials shall be
    included in the Arbitration Exhibits. The arbitrator shall also
    decide any disputes over whether specific documents or other
    materials should be included in the Arbitration Exhibits. . . .

3.  The materials in the Arbitration Exhibits shall constitute the
    evidentiary record upon which the arbitrator shall render his/her
    decision.  The arbitrator, at any time during the pendency of the
    proceeding, may require the Commission or the school to submit
    other documents or materials as additional exhibits, but only as
    necessary to determine whether substantial evidence supported the
    decision of the Appeals Panel.

**Exhibit A - 41**

JA87

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 6 of 8**

Section I.J of the Instructions addresses the "Effect of [the arbitration] Decision" and, at

Section I.J.1, provides for the authority of the arbitrator as follows:

> The arbitrator shall have the authority to affirm or reverse the
> decision of the Appeals Panel but shall have no authority to
> remand or amend the Appeals Panel's decision.  The arbitrator
> shall not have the power to order other actions reserved to the
> Commission -- e.g. order an on-site visit, compel the filing of
> reports or materials to the Commission, or other such actions.

Section I.B.4 provides that "[t]he arbitrator shall only have the authority to affirm or reverse the

decision of the Appeals Panel, subject to the limitations below in Section I (J)(3) of these

Instructions." (italics removed).  In turn, Section I.J.3 provides:

> If the arbitrator reverses the decision of the Appeals Panel, the
> Commission shall carry out that decision in a manner consistent
> with the decision, except that the arbitrator shall have no authority
> to grant accreditation to the institution.  Pursuant to the regulations
> of the U.S. Department of Education, that power is reserved
> exclusively to the accreditation agency.

### III.

As set forth above, arbitral review of the decision of the Appeals Panel "is limited to the

question of whether the Appeals Panel's decision is supported by the evidence that was in the

record when the Panel rendered its decision."  Instructions, § I.B.1. The Instructions expressly

provide that "[t]he arbiter may not consider evidence that was not in the record before the

Appeals Panel."  *Id.*, § I.B.2.

In creating the record for the arbitral proceedings, "the school shall have the opportunity

to file with the arbitrator and the Commission for inclusion in the Arbitration Exhibits any

material relevant to the arbitration proceeding that was not included by the Commission" in the

**Exhibit A - 42**

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 7 of 8**

Commission's submission of Arbitration Exhibits.  Instructions, § I.F.2. However, "[t]he school shall not submit for inclusion in the Arbitration Exhibits any material that was not submitted to the Commission prior to the decision of the Appeals Panel."  *Id*.  Further, the "opportunity to file" relevant material already in the possession of the School cannot reasonably be construed as conferring an opportunity to ***obtain*** by discovery in arbitration ***new*** material, not previously submitted to the Commission, whatever its potential relevance.  This is made clear by the express prohibition of discovery in Section I.H: "Depositions, interrogatories, requests for admission, and other forms of adversarial discovery shall not be used during the arbitration proceeding."

        To be sure, the arbitrator is empowered by the Instructions to "decide any disputes over whether specific documents or other materials should be included in the Arbitration Exhibits." Instructions, § I.F.2.  The arbitrator also is authorized "at any time during the pendency of the proceeding" to "require the Commission or the school to submit other documents or materials as additional exhibits," but may do so "only as necessary to determine whether substantial evidence supported the decision of the Appeals Panel."  *Id*. § I.F.3.  And then, as noted above, the arbitration proceeding "is limited to the question of whether the Appeals Panel's decision is supported by the evidence that was in the record when the Panel rendered its decision, " *id*. § I.B.1, and, again, the arbitrator "may not consider evidence that was not in the record before the Appeals Panel."  *Id*., § I.B.2.

        The tribunal is constrained by the parties' arbitration agreement -- as embodied in the Instructions for Arbitration -- to decline IU's requests that the Commission be ordered to produce documents that were not in the record before the Appeals Panel or that discovery be permitted in

**Exhibit A - 43**

**Independence University**
v.
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 8 of 8**

the arbitration.  Even if the tribunal were empowered by the parties' arbitration agreement as

expressed in the Instructions to require such production or discovery (and it is not), the tribunal

is expressly prohibited by that agreement from considering such materials or information in the

arbitral decision.[4]  Under the circumstances, the tribunal declines to require the requested

enlargement of the record in this proceeding, which now comprises some 32,374 pages.

**IV.**

For the foregoing reasons:

1.        The Motion to Supplement the Arbitration Exhibits shall be, and the same hereby

is, DENIED;

2.        The Arbitration Exhibits shall consist of the documents listed in the attached

Document Index dated January 17, 2022; and

3.        The Arbitration Exhibits are now deemed to be complete, subject only to the

authority of the Arbitrator, pursuant to Section I.F.3 of the Instructions for Arbitration, at any

time during the pendency of this proceeding to require the ACCSC or IU to submit other

documents or materials as additional exhibits (but only as necessary to determine whether

substantial evidence supported the decision of the Appeals Panel).

IT IS SO ORDERED.

DATED:  March 15, 2022

Brian S. Harvey
Arbitrator

---

[4] And even if the tribunal were (improperly) to order such production or discovery in this arbitral proceeding,
Section I.J.1 of the Instructions expressly withholds from the arbitral tribunal the power to "compel the filing
of reports or materials to the Commission," including any materials that might be newly (and improperly)
produced or developed in arbitration.

**Exhibit A - 44**

01/17/2022                                      AAA Case No. 01-21-0017-0169

<u>Arbitration Exhibits – Document Index</u>

| Document Number | Document | Document Date |
|---|---|---|
| 1 | IU Appeal Decision Letter | 2021-09-17 |
| 2 | ACCSC – IU Appeal Hearing Transcript | 2021-07-08 |
| | *Appeals Record* | |
| 3 | Independence University Grounds for Appeal | 2021-05-27 |
| 4 | ACCSC Withdrawal of Accreditation | 2021-04-22 |
| 5 | School's SW Continued Probation Response | 2020-12-30 |
| 6 | ACCSC SW Continued Probation Order | 2020-07-21 |
| 7 | School's Response re: COAG Decision | 2021-01-22 |
| 8 | ACCSC Information Request re COAG Decision | 2020-10-26 |
| 9 | School's SW Continued Probation Response | 2020-03-03 |
| 10 | ACCSC SW Continued Probation Order | 2019-10-28 |
| 11 | School's SW Continued Probation Response | 2019-06-28 |
| 11b | School's SW Continued Probation Response – AI | 2019-06-28 |
| 12 | ACCSC SW Continued Probation Order | 2019-05-02 |
| 13 | School's SW Probation Response | 2018-12-20 |
| 14 | ACCSC SW Probation Order | 2018-09-06 |

010042.0000001 EMF_US 88360587v1                                      **Exhibit A - 45**

# Exhibit B

JA92

# The Accrediting Commission of Career Schools and Colleges (ACCSC)

# STANDARDS OF ACCREDITATION

**July 1, 2018**

# ACCSC STANDARDS OF ACCREDITATION
# TABLE OF CONTENTS

**Introduction** ....................................................................................................................1

**Chapter 1 – Rules of Process and Procedure** ...........................................................3

**Section I – Definitions, Accreditation Obligations, Eligibility and Process, & General Instructions** ...4

   A. Definitions .................................................................................................................4

   B. Purpose and Scope .....................................................................................................5

      1. Purpose ...............................................................................................................5

      2. Scope ..................................................................................................................5

      3. Limitations of Scope ..........................................................................................6

      4. Voluntary Process ..............................................................................................6

      5. Accreditation Fees and Obligations ..................................................................6

   C. Educational Objectives ...............................................................................................7

   D. Institutional Eligibility Requirements .......................................................................7

   E. Summary of the Accreditation Process ......................................................................8

   F. Obligations of the Institution in Applying for Accreditation .....................................9

   G. Obligations of the Institution to Maintain Eligibility for Accreditation ..................10

   H. General Instructions – Submission of Documents to the Commission .....................10

   I. Application Withdrawal ..............................................................................................11

   J. Required Reports, Applications, and Fees .................................................................11

   K. Requests for Information ............................................................................................11

**Section II – Application for Accreditation and Self Evaluation** ...........................13

   A. Applications for Accreditation ..................................................................................13

      1. Application for Initial Accreditation .................................................................13

      2. Application for Renewal of Accreditation .........................................................14

   B. Self-Evaluation ..........................................................................................................15

**Section III – The On-Site Evaluation** ......................................................................16

   A. On-site Evaluation Requirements ..............................................................................16

   B. Categories of On-site Evaluation ..............................................................................16

      1. Orientation/Consultative On-site Evaluation ....................................................16

      2. Initial Accreditation or Renewal of Accreditation On-site Evaluation .............16

      3. Substantive Change On-site Evaluation ............................................................16

      4. Special Evaluation or Fact-Finding On-site Evaluation ....................................16

   C. Function of On-site Evaluators ..................................................................................16

# ACCSC STANDARDS OF ACCREDITATION
# TABLE OF CONTENTS

D.  On-site Evaluators .................................................................................. 17

E.  Announced On-site Evaluations: Notice of Team Members to School ................ 17

F.  Observers .............................................................................................. 18

G.  Announced On-site Evaluations: Date and Postponement or Cancellation ........ 18

H.  On-Site Evaluation ................................................................................ 18

I.  Exit Interview ........................................................................................ 19

J.  The Team Summary Report ...................................................................... 19

K.  Response to the Team Summary Report ...................................................... 19

**Section IV – Non-Substantive & Substantive Change Notification & Application Requirements** ... 20

A.  Changes Requiring Notification ................................................................ 20

B.  Non-Substantive Change Provisions .......................................................... 20

  1.  Facility Expansion ............................................................................ 20

  2.  Non-Substantive Program Modifications .............................................. 20

  3.  Continuing Education Courses and Avocational Courses .......................... 21

C.  Substantive Changes .............................................................................. 21

D.  Substantive Change Review and Approval Process ...................................... 22

E.  Specific Substantive Change Provisions ..................................................... 23

  1.  Change of Mission and Educational Objectives ..................................... 23

  2.  Change of Control ............................................................................ 24

  3.  Change of Name .............................................................................. 28

  4.  Change of Location and Relocation ...................................................... 28

  5.  Separate Facilities ............................................................................ 30

    a.  Branch Campus ........................................................................... 30

    b.  Satellite Location ......................................................................... 32

    c.  Distance Education Facility ............................................................ 33

  6.  Program Approval, Additions, and Modifications .................................. 34

  7.  Teach-Out Agreement ....................................................................... 37

F.  Teach-Out Plans .................................................................................... 37

**Section V – Annual Report, Notifications, and Other Reporting** .............................. 39

A.  Reporting ............................................................................................. 39

B.  Annual Report ...................................................................................... 39

C.  Financial Reporting ............................................................................... 40

D.  Progress Reporting ................................................................................ 40

JA95

# ACCSC STANDARDS OF ACCREDITATION
# TABLE OF CONTENTS

E.  Notification Reports ...................................................................................... 41

F.  Review of Reports ........................................................................................ 42

**Section VI – Complaint Procedures** ................................................................ 43

A.  Complaints against Applicant and Accredited Schools ................................. 43

    1.  Purpose of Complaint Procedure ........................................................... 43

    2.  Parties Who May File a Complaint ........................................................ 43

    3.  Filing and Content of a Complaint ......................................................... 43

    4.  Processing a Complaint .......................................................................... 44

    5.  Taking Action on a Complaint ............................................................... 45

    6.  Reporting of Complaint Activity to the Commission ............................. 45

    7.  Information from the U.S. Department of Education or Other Government Entities ........... 45

B.  Complaints against ACCSC Evaluators ...................................................... 45

C.  Complaints against ACCSC, Commissioners, or Staff Members ................. 46

**Section VII – Commission Actions** ................................................................ 47

A.  Authority ..................................................................................................... 47

B.  Effective Date of Commission Decision ...................................................... 47

C.  Basis for Decisions ...................................................................................... 47

D.  Commission Consideration of Third Party Information ............................... 48

E.  Consideration of Applications and Other Matters ....................................... 50

F.  Deferral of Action ....................................................................................... 50

G.  Accreditation ............................................................................................... 50

H.  Stipulations ................................................................................................. 51

I.  Heightened Monitoring ................................................................................ 52

J.  Reporting ..................................................................................................... 52

K.  Warning ....................................................................................................... 52

L.  Probation ..................................................................................................... 53

M.  Timelines to Remedy Noncompliance .......................................................... 54

N.  Denial of Accreditation ............................................................................... 55

O.  Denial of a Substantive Change Application ............................................... 55

P.  Withdrawal of Accreditation ....................................................................... 55

Q.  Voluntary Withdrawal/Closure .................................................................... 56

R.  Other Actions to Monitor Ongoing Compliance ......................................... 57

JA96

# ACCSC STANDARDS OF ACCREDITATION
# TABLE OF CONTENTS

**Section VIII – Appeal of a Commission Decision** .................................................. 58

    A.  Coverage of Appeals ................................................................................. 58

    B.  Grounds for Appeal and Standard of Review ........................................... 58

    C.  Appeal Procedures .................................................................................... 58

    D.  Appeals Panel ........................................................................................... 60

    E.  Sitting Appeals Panel: Scope of Authority .............................................. 61

    F.  Appeal Hearing Procedures ...................................................................... 61

    G.  Appeal Fees and Expenses ....................................................................... 61

**Section IX – Revisions to and Waivers of the *Standards of Accreditation*** ......... 63

    A.  Authority .................................................................................................. 63

    B.  Publication of Proposed Changes to the *Standards of Accreditation* ..... 63

    C.  Opportunity for Comment ........................................................................ 63

    D.  Publication of Final Changes ................................................................... 63

    E.  Waivers .................................................................................................... 64

**Section X – Notification and Information Sharing** ................................................. 65

    A.  Scope of Public Information .................................................................... 65

    B.  Notification of Commission Actions to Schools ..................................... 65

    C.  Notification of Commission Actions to Government Entities & Other Accrediting Agencies .... 66

    D.  Disclosure of Commission Actions to the Public .................................... 66

    E.  Information Sharing with Government Entities & Other Accrediting Agencies .... 67

    F.  Exception in the Event of Appropriate Legal Request ............................ 67

    G.  Authorized Disclosure of Information ..................................................... 67

**Section XI – Pilot Projects** ...................................................................................... 69

    A.  Eligibility ................................................................................................. 69

    B.  Application ............................................................................................... 69

    C.  Evaluation ................................................................................................ 70

    D.  Commission Review ................................................................................ 70

    E.  Progress Report ........................................................................................ 71

    F.  On-site Evaluation ................................................................................... 71

    G.  Final Report ............................................................................................. 71

    H.  Renewal ................................................................................................... 71

    I.  Commission Decision .............................................................................. 71

JA97

# ACCSC STANDARDS OF ACCREDITATION
# TABLE OF CONTENTS

**Chapter 2 – Substantive Standards** ........................................................................72

**Section I – Ownership, Management, and Administration** .........................................73

  A.  Ownership, Management, and Administrative Capacity ........................................73

  B.  Institutional Assessment, Improvement, and Planning ........................................74

  C.  Financial Stability and Responsibility ...................................................................74

  D.  Tuition, Cancellation, and Refund Policies ..........................................................74

  E.  Student Loan Repayment .......................................................................................75

  F.  Institutional Name and Physical Facilities ...........................................................76

**Section II – Program Requirements** ..........................................................................77

  A.  General Program Requirements .............................................................................77

    1.  Approval and Programmatic Accreditation ....................................................77

    2.  Program Design and Development .................................................................77

    3.  Program Organization and Length .................................................................78

    4.  Program Evaluation ........................................................................................80

    5.  Instructional Materials and Equipment ..........................................................80

    6.  Program Advisory Committee ........................................................................80

    7.  Learning Resource System .............................................................................81

    8.  Externships ......................................................................................................82

    9.  Consortium, Partnership, or Contractual Arrangements ................................83

    10. Independent Study ..........................................................................................83

    11. Transfer of Credit ...........................................................................................84

  B.  Non-Degree Programs ...........................................................................................85

  C.  Degree Programs ...................................................................................................85

    1.  General Requirements .....................................................................................85

    2.  Associate Degrees ..........................................................................................85

    3.  Baccalaureate Degrees ...................................................................................86

    4.  Master's Degrees ............................................................................................87

      a.  General Requirements ..............................................................................87

      b.  Program Requirements .............................................................................87

      c.  Graduation Requirements ........................................................................88

  D.  Secondary Educational Objectives ........................................................................88

    1.  Continuing Education Courses and Avocational Courses ...............................88

    2.  English as a Second Language ........................................................................88

JA98

# ACCSC STANDARDS OF ACCREDITATION
# TABLE OF CONTENTS

**Section III – Educational Administration and Faculty Qualifications** ........ 90

   A.  Educational Administration ........ 90

   B.  Faculty Qualifications ........ 91

   Glossary of Terms ........ 92

**Section IV – Student Recruitment, Advertising, and Disclosures** ........ 94

   A.  Recruitment ........ 94

   B.  Advertising, Promotion, Statements, and Claims ........ 95

   C.  Disclosures ........ 96

      1.  Catalog ........ 96

      2.  Enrollment Agreement ........ 96

      3.  Student Achievement Rates ........ 97

      4.  Accreditation and Approval ........ 97

**Section V – Admissions Policies and Practices** ........ 98

   A.  General Requirements ........ 98

   B.  Non-Degree Programs ........ 98

   C.  Degree Programs-Undergraduate ........ 99

   D.  Degree Programs-Graduate ........ 99

   E.  ESL Courses ........ 99

**Section VI – Student Services** ........ 100

   A.  Advising and Counseling ........ 100

   B.  Student Records ........ 100

   C.  Graduate Employment Assistance and Records ........ 101

   D.  Student Complaints ........ 101

**Section VII – Student Learning, Assessment, Progress, and Achievement** ........ 102

   A.  Student Learning, Assessment, and Satisfactory Progress ........ 102

      1.  Student Learning ........ 102

      2.  Student Assessment ........ 102

      3.  Student Satisfactory Progress ........ 103

   B.  Student Achievement ........ 104

      1.  Student Achievement ........ 104

      2.  Student Achievement Outcomes Monitoring and Reporting ........ 105

JA99

# ACCSC STANDARDS OF ACCREDITATION
# TABLE OF CONTENTS

Glossary of Assessment Terms ........................................................................................ 106

**Section VIII – Separate Facilities** ............................................................................... 107

    A.  Classification ......................................................................................................... 107

        1.  Branch Campus ........................................................................................... 107

        2.  Satellite Location ........................................................................................ 107

        3.  Distance Education Facility ........................................................................ 107

    B.  Responsibility ........................................................................................................ 108

    C.  Ownership .............................................................................................................. 108

    D.  Name, Relationship, Disclosure, and Advertising ................................................ 108

    E.  Programs ................................................................................................................ 109

**Section IX – Distance Education** ................................................................................. 110

    A.  General Distance Education Requirements ........................................................... 110

    B.  Management and Administration ........................................................................... 110

    C.  Objectives and Student Achievement ................................................................... 111

    D.  Programs, Curricula, and Resources ..................................................................... 112

    E.  Catalog and Advertising ........................................................................................ 112

    F.  Admissions Requirements and Enrollment ........................................................... 112

    G.  Faculty ................................................................................................................... 113

    H.  Student Services ..................................................................................................... 113

    I.  Distance Education Facility .................................................................................... 114

    Glossary of Distance Education Terms ....................................................................... 114

**Appendices** ..................................................................................................................... 115

    Appendix I – Accreditation Fees ................................................................................ 116

    Appendix II –Applications, Reports, Forms, and Instructions ................................... 119

    Appendix III – Definition of a Credit Hour ............................................................... 120

    Appendix IV – Recruitment and Admissions Personnel Code of Conduct ................. 121

    Appendix V – Admissions Documentation ................................................................ 122

    Appendix VI – Student Achievement Rates ............................................................... 124

    Appendix VII – Guidelines for Employment Classification ...................................... 125

    Appendix VIII – Statement for Working with External Consultants in the Accreditation Process .... 127

**Accreditation Alliance of Career Schools and Colleges**
*Articles of Incorporation* and *Bylaws* ...................................................... Bylaws Tab

JA100

# ACCSC STANDARDS OF ACCREDITATION
# RULES OF PROCESS AND PROCEDURE

    a.  State fully the reasons why the Commission issued the Probation Order;

    b.  Identify the standard and/or other accreditation requirement with which the school may not be in compliance;

    c.  Explain the reasons and cite the evidence indicating that the school may not be in compliance with accreditation requirements; and

    d.  Advise the school of its obligations under the Probation Order and the deadline for response.

5.  Upon expiration of the time limits for submission of the Response to the Probation Order or any progress report or additional requirements placed on a school in relation to the Probation Order, a decision will be made on the school's compliance with the accreditation standard or requirement noted in the order. The Commission may:

    a.  Remove the Probation Order if the school's response gives evidence that such removal is warranted or if the response shows that the school complies with accreditation standards and requirements;

    b.  Continue the Probation Order; or

    c.  Take any other action set forth under *Section VII, Rules of Process and Procedure, Standards of Accreditation*.

6.  The Commission will not consider substantive changes, a change of location/relocation, or additions (i.e., separate facilities, new programs) to a school or its separate facilities while the school is on Probation. However, a school that is subject to Probation may seek the Commission's approval for the transfer of accreditation that would result from a change of ownership as described in *Section IV, Rules of Process and Procedure, Standards of Accreditation*.

7.  A school subject to a Probation Order must inform current and prospective students in writing that the school has been placed on Probation and that additional information regarding that action can be obtained from the Commission's website.

**M. Timelines to Remedy Noncompliance**

The maximum timelines to remedy noncompliance are as follows:

1.  Where the Commission has found an area in which a school is out of compliance with accreditation standards or requirements, the period allotted to the school to remedy the noncompliance or cure the deficiency, together with the time for the Commission's final decision, will not exceed the following time limits unless there is good cause to extend the period for achieving compliance:

    a.  Twelve months, if the school's longest program is less than one year in length.

    b.  Eighteen months, if the school's longest program is at least one year, but less than two years in length; or

    c.  Two years, if the school's longest program is at least two years in length.

2.  The school will be deemed to have demonstrated good cause if it has shown that during the period of review significant progress has been made toward achieving compliance with the accreditation standard(s) in question and meeting all requirements set forth by the Commission and when extenuating circumstances exist such that only through the provision of additional time can the school demonstrate its compliance with the standard(s). Generally, the Commission will

# ACCSC STANDARDS OF ACCREDITATION
# RULES OF PROCESS AND PROCEDURE

limit the duration of the extended timeframe to demonstrate compliance to within the next two regularly scheduled Commission meetings.

3. These time frames will begin on the date that the Commission first informs a school that a finding of noncompliance has been made but will not begin during a period when the Commission is still in a fact-finding process.

4. If the school does not bring itself into compliance within the period specified by the Commission or within the maximum time frame described above, the Commission will take adverse action.

## N. Denial of Accreditation

1. Denial of Accreditation is applicable to schools applying for initial accreditation. Following the due process required by these *Rules*, the Commission may deny a grant of accreditation to an initial applicant when the Commission determines from the record that the school does not meet the requirements specified in the *Standards of Accreditation* and that such an action is warranted.

2. The Commission's decision will be delivered to the school in writing and the school will have an opportunity to appeal the Commission's decision in accordance with *Section VIII, Rules of Process and Procedure, Standards of Accreditation*.

3. The school may reapply no sooner than nine months from the date on which the denial of accreditation became effective.

## O. Denial of a Substantive Change Application

1. Following the due process required by these *Rules*, the Commission may deny a substantive change application when the Commission determines from the record that the school has not demonstrated the sufficient capacity to undertake the change and to meet accrediting standards in all required areas directly or indirectly affected by the change.

2. The Commission's decision will be delivered to the school in writing and the school will have an opportunity to appeal the Commission's decision in accordance with *Section VIII, Rules of Process and Procedure, Standards of Accreditation*.

3. The Commission may, at its discretion, deny a substantive change application without first issuing a Warning or Probation Order.

## P. Withdrawal of Accreditation                                        Revised July 1, 2016 & July 1, 2017

1. Following the due process required by these *Rules*, the Commission may withdraw the accreditation of a school any time a school fails to demonstrate compliance with one or more accreditation standards or other requirements and for any of the reasons, or combination thereof, described below.

   a. Failure to continue to meet the eligibility requirements for accreditation set forth in *Section I, Rules of Process and Procedure, Standards of Accreditation*.

   b. Failure to demonstrate compliance with an accrediting standard or other accreditation requirement set forth in the *Standards of Accreditation*.

   c. Failure to attend an accreditation workshop for reaccreditation or file an Application for Renewal of Accreditation or Self-Evaluation Report.

   d. Failure to file and have approved a substantive change application as set forth in *Section IV, Rules of Process and Procedure, Standards of Accreditation* in advance of the change.

JA102

# ACCSC STANDARDS OF ACCREDITATION
# RULES OF PROCESS AND PROCEDURE

**SECTION VIII – APPEAL OF A COMMISSION DECISION**

**A.  Coverage of Appeals**                                    Revised July 1, 2018

The appeal procedure specified in this section of the *Rules* is the exclusive remedy for a school that believes that an adverse accreditation decision by the Commission is unwarranted pursuant to the terms set forth in this section of the *Rules*.

1.  Only adverse accreditation decisions made by the Commission are subject to appeal. Adverse accreditation decisions are:

    a.  A decision to deny a substantive change application;

    b.  A decision to cease processing an application for initial accreditation as described in these *Rules*;

    c.  A decision to deny an application for initial accreditation; and

    d.  A decision to withdraw of accreditation.

2.  An accredited school remains accredited, operating under a Probation Order, until the final disposition of the appeal. The Commission will follow its public notification requirements in accordance with the provisions set forth in these *Rules*.

3.  The Commission will not consider petitions for reinstatement or petitions for reconsideration.

**B.  Grounds for Appeal and Standard of Review**              Revised July 1, 2018

1.  A school affected by an adverse accreditation action taken by the Commission may appeal that decision if it has reason to believe the Commission's decision was arbitrary, capricious, or in substantial disregard of the criteria or procedures of the Commission, or not supported by evidence in the record on which the Commission took action.

2.  In order for a school subject to an adverse accreditation decision to withdraw accreditation to be eligible to submit its Grounds for Appeal, a school must submit a teach-out plan as directed by the Commission and as required by *Section IV (F), Rules of Process and Procedure, Standards of Accreditation*.

3.  On appeal, the school has the burden of proof.

4.  The Appeals Panel will only consider that information that was before the Commission at the time that the adverse action was taken, except as allowed for under *Section VIII (C)(2)(c), Rules of Process and Procedure, Standards of Accreditation*.

5.  The record on an appeal will include, as applicable, the Letter of Intent to Appeal, Application for Appeal a Commission Decision and the Grounds for Appeal, Team Summary Report(s), Commission action letter(s), school response(s), and other documents relevant to the appeal.

6.  The appeal fee and all other fees due to the Commission must be paid in full in order to have standing to appeal a Commission decision.

**C.  Appeal Procedures**                                     Revised July 1, 2018

1.  Letter of Intent to Appeal: To initiate an appeal process the school must submit a Letter of Intent to Appeal accompanied by the required appeal fee, within 10 days of receipt of the Commission's official notice of the adverse accreditation decision.

JA103

# ACCSC STANDARDS OF ACCREDITATION RULES OF PROCESS AND PROCEDURE

2. Application for Appeal of a Commission Decision and Grounds for Appeal: Within 30 days of receipt of the Commission's official notice of the adverse accreditation decision, the school must submit the Application for Appeal of a Commission Decision and Grounds for Appeal in accordance with the requirements set forth therein.

   a. The school must set forth in the Grounds for Appeal its case relative to its belief that the Commission's decision was arbitrary, capricious, or otherwise in substantial disregard of the criteria or procedures of the Commission, or not supported by substantial evidence in the record on which the Commission took action. The written Grounds for Appeal must respond to each basis included in the letter reporting the Commission's decision and the Grounds for Appeal must be prepared and presented in accordance with the Commission's established process and requirements.

   b. Only evidence previously submitted to the Commission may be included in a submission to the Appeals Panel, except as allowed for under *Section VIII (C)(2)(c), Rules of Process and Procedure, Standards of Accreditation*. The Grounds for Appeal may not include information or documentation that was not in the record at the time that the Commission took the adverse action. The Grounds for Appeal must include a reference to where information and documentation can be found in the record at the time that the Commission took the adverse action.

   c. Financial Information: In instances where the only remaining deficiency cited by the Commission in an adverse accreditation decision is the institution's failure to meet the Commission's standards pertaining to financial soundness, an institution may present new financial information under the following conditions:

      i. The financial information is significant as determined by the Commission;

      ii. The financial information was unavailable prior to the adverse accreditation decision;

      iii. The financial information bears materially on the financial deficiencies identified by the Commission; and

      iv. A school may present new financial information only once and any final determination reached with respect to the new financial information does not provide a new basis for appeal.

3. The school has the option of sending a representative(s) to make a presentation at the hearing. The school must provide to the Commission the names and titles of any representatives from the school who will offer testimony or argument in an appeal hearing before the Appeals Panel, and give the name and title of any outside counsel, if the school intends to be represented by counsel.

4. Record of Appeal Hearing: The school has the right to a transcript of the appeal hearing and may request one by notice to the Executive Director of ACCSC at the time of the filing of the Grounds for Appeal. Videotaping of the appeal hearing is not permitted. The school will be responsible for the cost of its copy of the hearing transcript. Any transcription of the hearing will be arranged by the Executive Director of ACCSC.

5. The appeal will be heard within 60 days of receipt of the school's Letter of Intent to Appeal unless reasonable circumstances prevent the hearing of the appeal in that time frame.

# ACCSC STANDARDS OF ACCREDITATION
# RULES OF PROCESS AND PROCEDURE

**D.  Appeals Panel**                                                    Revised July 1, 2016

1.  The Executive Director of ACCSC will make available the complete record of the accreditation proceeding involving the appealing school to the ACCSC Appeals Panel.

2.  Standing Appeals Panel:

    a.  The Standing Appeals Panel does not include any current member of the Commission.

    b.  Members of the Standing Appeals Panel are subject to the ACCSC Appeals Panel Code of Conduct and other requirements as stated in the Commission's policies and may be removed from the list of Standing Appeals Panel members for failure to comply with these policies.

    c.  At least 10 persons constitute the Commission's Standing Appeals Panel.

    d.  Members of the Standing Appeals Panel are nominated by the Commission Chair, with the advice of the Executive Director of ACCSC, and confirmed by the Commission from a pool of candidates who have knowledge of accrediting policies and procedures, such as school and college administrators and academic personnel; public members with an academic and/or administrative background and individuals from industry, government, or education; or individuals with experience in accreditation.

    e.  Prior to the Appeals Panel hearing, the school is advised of the names and school affiliations, if any, of members of the Standing Appeals Panel.

    f.  Alternates: The Standing Appeals Panel may be supplemented with qualified alternates in the event that there is an insufficient number of members of the Standing Appeals Panel to constitute a Sitting Appeals Panel with the requisite number of persons.

3.  Sitting Appeals Panel: Three persons are nominated by the Executive Director of ACCSC from the Standing Appeals Panel and are confirmed by the Commission Chair to serve as the Sitting Appeals Panel, which will consider a school's appeal. One member will be designated to Chair the Sitting Appeals Panel, one member will be designated as an administrative representative, one member will be designated as an academic representative, and at least one member will be a public member.[1]

4.  Objections:

    a.  If the school has good cause to believe any member of the Standing Appeals Panel should not hear the appeal, it must promptly notify the Executive Director of ACCSC of its belief and the reasons for it in writing.

    b.  Objections to any member of the Standing Appeals Panel hearing the appeal or any other procedural issues concerning the conditions under which the school's appeal is to be heard will be considered and ruled upon by the Executive Committee of the Commission. If it is not feasible to convene the Executive Committee, the Commission Chair may act upon the matter in question.

---

[1] An Appeals Panel Member may hold more than one designation – for example a member may be designated as the Chair of the Sitting Appeals Panel and as an administrative representative or a member may be designated as a public member and as an academic representative – but in no case will a member be designated as both an administrative and academic representative.

---

# ACCSC STANDARDS OF ACCREDITATION
# RULES OF PROCESS AND PROCEDURE

**E. Sitting Appeals Panel: Scope of Authority**

1. The Sitting Appeals Panel can affirm, amend, reverse, or remand the adverse accreditation decision made by the Commission. The action taken must be approved by a majority of the Sitting Appeals Panel.

2. If the Sitting Appeals Panel affirms the decision of the Commission, the Commission's action becomes final. When a decision to deny initial accreditation or to withdraw accreditation is final, the school, if previously accredited, is removed from the Commission's list of accredited schools.

3. If the Sitting Appeals Panel remands the case to the Commission for further consideration, the Sitting Appeals Panel will identify specific issues that the Commission must address and implement in a manner consistent with the appeals panel's findings and decision. If the Commission takes a subsequent adverse action based upon grounds that have not been reviewed by an Appeals Panel, a school may appeal that action based only on those grounds not previously reviewed by an Appeals Panel. If the Commission, acting in a manner consistent with the appeals panel's decision, takes a subsequent adverse action based upon the grounds previously reviewed by an Appeals Panel, the adverse action will be final and the Commission will afford no additional appeal rights.

4. If the Sitting Appeals Panel amends the adverse accreditation decision, the Commission will carry out that action in a manner that is consistent with the Sitting Appeals Panel's decision.

5. If the Sitting Appeals Panel reverses the adverse accreditation decision, the Commission will carry out that action in a manner that is consistent with the Sitting Appeals Panel's decision. The Commission may, however, immediately begin a new investigation into the school's compliance with accreditation standards, which may result in a subsequent adverse accreditation decision. If such is the case, the school may appeal the subsequent adverse accreditation decision in accordance with this section of the *Rules*.

**F. Appeal Hearing Procedures**

1. The appeal hearing will commence with an opening statement by the Appeal Panel Chair, which describes the applicable standard of review and the procedures to be followed during the hearing.

2. The appealing school's representative or counsel may then offer an opening statement summarizing the grounds for appeal. Presentations of all aspects of the appeal are limited to 30 minutes.

3. The Sitting Appeals Panel members may ask questions related to the record on appeal.

4. The appealing school may offer a closing statement and the hearing will adjourn.

5. The Executive Director of ACCSC communicates in writing to the school the Sitting Appeals Panel's decision and the reasons for that decision.

**G. Appeal Fees and Expenses**

1. Each school appealing a Commission decision is required to pay the established appeal fee, in accordance with Commission requirements. This includes:

   a. Any main school that is subject to an adverse action;

   b. Any branch campus that is subject to an adverse action independent of its main school; and

JA106

# ACCSC STANDARDS OF ACCREDITATION
# RULES OF PROCESS AND PROCEDURE

    c.   Any branch campus that elects to be included in the appeal of a main school that is subject to an adverse action.

2.   The expenses incurred in the development and presentation of an appeal, including the fee for the application to appeal, are borne by the school filing the appeal, as indicated in these *Rules*.

JA107

USCA4 Appeal: 25-1372       Doc: 14       Filed: 06/04/2025       Pg: 111 of 461

# ACCSC STANDARDS OF ACCREDITATION
# SUBSTANTIVE STANDARDS

**SECTION VII – STUDENT LEARNING, ASSESSMENT, PROGRESS, AND ACHIEVEMENT**

**STATEMENT OF PURPOSE**

A school must establish processes, policies, and procedures in the areas of student assessment and achievement and demonstrate that a high proportion of its students attend class, successfully progress through and complete their program of study, and obtain employment in the field for which trained. A school must establish and consistently apply criteria that provide an objective evaluation of the student's learning and progress toward attaining the program's specific educational objectives. Assessment of a school's performance in these areas requires a broad consideration of all circumstances that affect student learning, satisfactory progress, and student achievement.

**A. Student Learning, Assessment, and Satisfactory Progress**                Revised July 1, 2017

   1. Student Learning

      a. Student learning outcomes for each program are consistent with the program objectives defined by the institution's program design and development process and meet any relevant academic, occupational, or regulatory requirements.

      b. Student learning outcomes for each program are aligned with the program's objectives, the occupational area of study, and with the level of education intended (e.g., non-degree, degree, degree level).

      c. Student learning outcomes for each program reflect the necessary occupational and academic knowledge, skills, and competencies as applicable.

   2. Student Assessment

      a. The school has a developed and structured process to assess and evaluate the defined student learning outcomes of the education and training and established competencies (e.g., the application of knowledge and skills to the standard of performance articulated in the program objectives and as expected in the workplace). This process may include a variety and combination of methods such as grading, portfolio assessment, and criterion referenced testing based on developed and appropriate rubrics.

      b. Student assessment approaches must be documented for each course or program offered and are designed and implemented in a valid, reliable, fair and, where relevant, flexible[1] manner and included as part of the institution's institutional assessment and improvement planning process (see *Section I (B), Substantive Standards, Standards of Accreditation* for details regarding institutional assessment and improvement requirements).

      c. The school establishes criteria to assess a student's academic progress through the program. At a minimum, the school reports academic progress to students at regular intervals (e.g., phase, module, mid-term, term, quarter, semester, etc.) and evaluates the minimum grade point average that students must attain at those intervals.

      d. The school provides students with learning outcomes for each course and publishes in its catalog a written policy for assessing satisfactory student progress through the program. The school measures grades, projects, portfolios, externships, or other assessments against stated educational objectives that the school explains clearly to students. This policy must address performance standards and grading and be applied consistently.

---

[1] See the Glossary of Assessment Terms at the end of this section for more information related to these terms.

JA108

# ACCSC STANDARDS OF ACCREDITATION
## SUBSTANTIVE STANDARDS

3. Student Satisfactory Progress

   a. The school establishes a policy and process to assess student academic progress throughout the program and to inform students of their academic progress at established and specific intervals.

      i. The school establishes cumulative grade point average requirements at specific intervals through the program and requires that students attain minimally a cumulative grade point average of 2.0 in order to be eligible for graduation. At each interval specified, the school determines the likelihood that the student will be able to attain the minimum cumulative grade point average required for graduation.

      ii. In those instances when the school determines that a student has not met minimum cumulative grade point average requirements, the school places the student on academic probation or terminates the student, based on the school's established policies.

      iii. If the school uses a grading scale other than the traditional 4.0 scale (e.g., letter grades, percentages, pass/fail) the school establishes comparable progress standards and publishes the grade conversion scale in its catalog.

   b. The school publishes in its catalog and enforces a policy of acceptable student attendance. The policy must promote sufficient levels of student attendance such that the required knowledge, skills, and competencies can be reasonably achieved.

   c. Leave of Absence

      i. If the school allows students to take a leave of absence, the school defines and publishes in its catalog the leave of absence policy to include the process to have a leave of absence approved, the reason(s) why a student can request a leave of absence, the allowable leave of absence period, and the consequences of a student's failure to return from an approved leave of absence. The period of the leave of absence may not begin until the student has submitted and the school has approved a written and signed request for an approved leave of absence except in those cases where unforeseen circumstances would prevent a student from submitting a request in advance.[2]

      ii. A leave of absence period may not exceed 180 days within any 12-month period. A school may grant more than one leave of absence in the event that unforeseen circumstances arise, such as medical reasons affecting the student or a member of student's immediate family, military service requirements, or jury duty, provided that the combined leaves of absence do not exceed 180 days within the 12-month period.

      iii. If the student does not return following the leave of absence, the school must terminate the student and apply the school's refund policy in accordance with applicable and published requirements.

   d. The school publishes in its catalog the normal duration of each program based on regular and required course loads and schedules, the maximum timeframe within which a student is expected to complete the program, and the implications when a student does not complete the program within the maximum timeframe (e.g., loss of financial aid eligibility and program

---

[2] In cases where a school grants a leave of absence to a student who could not provide a request prior to the leave of absence period due to unforeseen circumstances, the school must secure at a later date the request and the reason(s) for the leave of absence along with documentation to show that the leave of absence could not have been requested and approved in advance. In these cases, the beginning date of the leave of absence period can be no earlier than the date that the circumstances prevented the student from attending school.

JA109

# ACCSC STANDARDS OF ACCREDITATION
## SUBSTANTIVE STANDARDS

enrollment termination). For a clock hour program, the maximum time frame shall not exceed 1.5 times the normal duration of the program. For a credit hour program, the credit hours attempted cannot exceed 1.5 times the credit hours required to complete the program. The school is not required to terminate the enrollment of a student who is unable to complete the program within the maximum timeframe unless the school has determined that the student has failed to meet school policies that would otherwise warrant termination (e.g., academic progress or attendance policies). For the purposes of reporting student achievement, the school may not classify students who do not complete the program within the maximum timeframe as graduates.

e.  The school has probation and termination policies that are defined and published in its catalog. These policies must include specific warning procedures to notify the student in writing that continued unsatisfactory academic progress or a failure to meet attendance requirements will result in termination. The school shows that the student receives the notification or in the case of absenteeism that the school made an attempt to notify the student that continued failure to attend classes will result in termination. The school maintains documentation of the notification and the terms of the probation or termination in the student's file.

f.  The school terminates any student who does not satisfactorily acquire the minimum knowledge, skills, and competencies required by the program objectives based on the school's assessment criteria and satisfactory progress policy. The school publishes its policies and procedures for a student to request reinstatement after being terminated.

g.  The school publishes policies that define the effect of course incompletion, course withdrawal, course repetitions, and, if offered, policies that define the requirements for non-credit remedial courses.

h.  A student may only earn credits when, based on the school's assessment methods, the student has demonstrated that the required educational objectives have been met at an acceptable level. Successful program completion is based upon satisfactory achievement of the knowledge, skills, and competencies required by the program objectives and is confirmed by an appropriate credential (e.g., certificate, diploma, degree).

i.  The credential document identifies the school's name, location, program of study, and date of graduation in an accurate manner.

**B.  Student Achievement**                                                    Revised July 1, 2016

1.  Student Achievement

    a.  The school demonstrates successful student achievement by documenting through its assessment practices that students are acquiring the knowledge, skills, and competencies intended by the program objectives.

    b.  The school demonstrates successful student achievement by maintaining acceptable rates of student graduation and employment in the career field for which the school provided education as well as acceptable pass rates on licensure/certification exams where required by governmental entities to work in a particular career field. The school supports student achievement rates through student transcripts, the school's verifiable records and

JA110

# ACCSC STANDARDS OF ACCREDITATION
# SUBSTANTIVE STANDARDS

documentation of initial employment of its graduates, and exam pass rate data obtained from the requiring entity.[3]

i.  The Commission will review student achievement for each program offered at an institution and will consider not only the rates at which students graduate from a training program, attain employment in a training related field, and pass licensure/certification exams required for employment,[4] but also other factors that are reasonably related to student achievement as a measure of educational quality and institutional effectiveness.

ii.  The Commission establishes and publishes the benchmark graduation and employment rates from information submitted in the Annual Reports of accredited schools.[5] The Graduation and Employment Chart is the Commission's mechanism for collecting student achievement data and schools must provide this information in accordance with the prescribed requirements and instructions that accompany this chart. A school demonstrates an acceptable level of successful student achievement when graduation and employment rates meet or exceed the established benchmarks.

iii.  For those programs where a governmental entity requires the attainment of a passing score on a licensure/certification exam in order to work in a particular field, the Commission determines a program's licensure/certification exam pass rate to be acceptable when at least 70% of the students that take the exam attain a passing score.[6]

iv.  For any program that has a graduation, employment, or licensure/certification exam pass rate that is lower than the Commission's established benchmark rates, a school may still demonstrate with supporting documentation the successful achievement of its students in that program by providing other reliable indicators of successful student learning and by showing that factors such as economic conditions, state and national trends, location, student population served, length of program, students who withdraw from training but still obtain employment, state requirements, or other external or mitigating factors reasonably related to student achievement are adversely impacting the school's ability to meet the Commission's established benchmark rates.

v.  Upon presentation by a school, the Commission may consider an aggregated institutional rate of graduation or employment attainment in determining whether to take a programmatic or institutional action related to student achievement.

2.  Student Achievement Outcomes Monitoring and Reporting

For any program that has a graduation, employment, or licensure/certification pass rate that falls below the Commission's established benchmark rate, the Commission will require a school to submit to heightened monitoring or reporting of student achievement outcomes as directed or take other action as deemed appropriate unless the school can otherwise demonstrate successful student achievement as described in *Section VII (B)(1)(b)(iii), Substantive Standards* above.

a.  Heightened monitoring will require, at a minimum, detailed annual review of a program's graduation and/or employment rate(s) and may require the submission of additional student

---

[3] See *Appendix VII* for the Commission's Guidelines for Employment Classification.

[4] This includes any exam that is required by a governmental entity for employment in a field, regardless of the exam's title or whether passing the exam results in a license, certification, or any other validation credential.

[5] See *Appendix VI* for the Commission's current established benchmark rates for acceptable student achievement.

[6] If another entity or agency requires a higher examination pass rate, the higher standard shall apply and the Commission will take into consideration any action taken by another entity or agency with regard to a school's failure to meet an examination pass rate requirement (see *Section I (B)(1)(e)(iii), Rules of Process and Procedure, Standards of Accreditation*). See also *Appendix VI.*

*July 1, 2018*          *Section VII – Student Learning, Assessment, Progress, and Achievement*          *Page 105 of 127*
**Exhibit B - 19**

JA111

# ACCSC STANDARDS OF ACCREDITATION
## SUBSTANTIVE STANDARDS

achievement outcomes information as appropriate (e.g., plans for improvement; an updated Graduation and Employment Chart; current program retention, graduation, employment and/or licensure/certification pass rate(s); supporting documentation; etc.).

b.  Reporting will require the submission of student achievement outcomes data (e.g., student program retention, graduation rates, and employment rates); pass rates on licensure/certification examinations and examinations required to be taken as a condition of employment (i.e., local, state, and federal); admissions criteria studies; institutional operations and improvement planning; or any other information that the Commission determines necessary to make a judgment regarding the successful achievement of students.

c.  The Commission at its discretion may take a programmatic action such as to require an on-site evaluation; temporarily require a school to cease enrollment in a program; suspend or revoke program, degree-granting, or distance education approval; or may take an institutional action such as to issue a Warning or Probation Order (see *Section VII, Rules of Process and Procedure, Standards of Accreditation*) when the Commission has determined that the school has not demonstrated acceptable student achievement either through its student learning assessment efforts; graduation, employment attainment, and/or licensure/certification exam pass rate(s); or a combination thereof.

**Glossary of Assessment Terms:**

"Valid" means an assessment process that is sound and assesses that which is claimed (e.g., assessment against the program outcomes that covers the broad range of skills and knowledge that are essential to competent performance in the workplace).

"Reliable" means that evidence presented for assessment is consistently interpreted and results in consistent assessment outcomes.

"Fair" means that assessment processes are equitable, reasonable, consistently applied, and that instructional staff clearly communicate the assessment process to students.

"Flexible" means that, where relevant, assessment reflects the individual student's needs; provides for recognition of skills and program outcomes achieved prior to undertaking the program; and draws on a range of methods appropriate to the context, program outcomes concerned, and the student.

# ACCSC STANDARDS OF ACCREDITATION
# APPENDIX VI – STUDENT ACHIEVEMENT RATES

**STUDENT ACHIEVEMENT RATES – GRADUATION AND EMPLOYMENT**    Revised July 1, 2016

The Commission determines the established benchmark rates of student graduation and graduate employment for its accredited schools from information collected in Annual Report submissions.[1] Schools should set goals to exceed not only the benchmark rates, but also the average rates of graduation and employment.

The following student achievement rates are in effect for all Graduation and Employment Charts that use a Report Date of July 1, 2016 and later. These rates remain in effect until further notice.

| Established Benchmark Graduation Rates | | | |
|---|---|---|---|
| Program Length in Months | Average Rates of Graduation | Standard Deviation | Established Benchmark Graduation Rates* |
| 1-3 | 92% | 8% | 84% |
| 4-6 | 84% | 11% | 73% |
| 7-9 | 72% | 12% | 60% |
| 10-12 | 69% | 14% | 55% |
| 13-15 | 64% | 14% | 50% |
| 16-18 | 62% | 15% | 47% |
| 19-23 | 61% | 18% | 43% |
| 24+ | 53% | 13% | 40% |

* If a school reports a lower graduation rate for a program, that program will be subject to additional monitoring or reporting as deemed appropriate. Prolonged failure to meet a benchmark rate will result in a programmatic or institutional action as deemed appropriate by the Commission (see *Section VII (B)(2)(a-c), Substantive Standards, Standards of Accreditation*).

| Established Benchmark Employment Rate | | | |
|---|---|---|---|
| | Average Rate of Employment | Standard Deviation | Established Benchmark Employment Rate* |
| All Programs | 78% | 8% | 70% |

* If a school reports a lower employment rate for a program, that program will be subject to additional monitoring or reporting as deemed appropriate. Prolonged failure to meet a benchmark rate will result in a programmatic or institutional action as deemed appropriate by the Commission (see *Section VII (B)(2)(a-c), Substantive Standards, Standards of Accreditation*).

**STUDENT ACHIEVEMENT RATE – LICENSURE/CERTIFICATION EXAM PASS RATE**

For those programs where a governmental entity requires the attainment of a passing score on a licensure/certification exam in order to work in a particular field, the Commission determines a program's licensure/certification exam pass rate to be acceptable when at least **70%** of the students that take the exam attain a passing score.[2]

---

[1] Generally, the Commission establishes the benchmark rate at one standard deviation below the average (mean) aggregated graduation and employment rate data collected in the Annual Report.
[2] If another entity or agency requires a higher examination pass rate, the higher standard shall apply and the Commission will take into consideration any action taken by another entity or agency with regard to a school's failure to meet an examination pass rate requirement (see *Section I (D)(3), Rules of Process and Procedure, Standards of Accreditation*).

JA113

# Exhibit C

# INSTRUCTIONS FOR ARBITRATION

## I.  BINDING ARBITRATION OF AN ADVERSE APPEAL DECISION

### A.  Coverage of Binding Arbitration

1. The Department of Education's regulations governing institutions of higher education (34 CFR § 600.4(c)) provide that the Secretary of Education does not recognize the accreditation of an institution unless the institution agrees to submit any dispute involving the final denial, withdrawal, or termination of accreditation to arbitration.

2. The Commission's *Bylaws* provide that by applying for accreditation with the Commission, the school agrees to exhaust all appeal opportunities and to submit fully and faithfully to final, binding arbitration proceedings.

3. For the purposes of binding arbitration pursuant to these *Instructions*, an Adverse Appeal Decision is a decision of an independent Appeals Panel pursuant to *Section VIII (E), Rules of Process and Procedure* which results in the withdrawal of a school's accreditation, the denial of an application for initial accreditation, or any other adverse decision of the Appeals Panel.

4. A school that believes that the decision of an independent Appeals Panel is not supported by substantial evidence in the record on which the Appeals Panel took action may seek review of that decision through binding arbitration as described in these *Instructions*. This is the exclusive remedy for a school which has received an Adverse Appeal Decision and governs any and all claims arising out of the Adverse Appeal Decision as well as the underlying or predicate actions of the Commission. A school which does not participate in binding arbitration will not have exhausted its administrative remedies.

5. An accredited school remains accredited during the pendency of the arbitration proceeding and until the arbitrator renders a final decision. Pursuant to the Commission's *Rules of Process and Procedure*, the school will operate under a Probation Order during this period.

6. The arbitration proceedings shall be conducted in accordance with these *Instructions* and the parties and the arbitrator shall maintain the confidentiality of these proceedings except in the case of a judicial challenge or court order concerning the proceedings, or as otherwise required by law.

7. The school and the Commission may be represented by legal counsel during the arbitration proceeding.

### B.  Standard of Review in Arbitration and Available Remedies

1. The arbitration proceeding is not a *de novo* review. It is a review on the record and is limited to the question of whether the Appeals Panel's decision is supported by the evidence that was in the record when the Panel rendered its decision.

2. The arbiter may not consider evidence that was not in the record before the Appeals Panel.

3. The school has the burden of proof in the arbitration proceeding.

4. The arbitrator shall only have the authority to affirm or reverse the decision of the Appeals Panel, subject to the limitations below in *Section I (J)(3)* of these *Instructions*.

### C.  Administration of the Arbitration

1. The arbitration shall be administered by an arbitrator selected from the National Roster of Commercial Arbitrators maintained by the American Arbitration Association ("AAA").

---

# INSTRUCTIONS FOR ARBITRATION

2. The process for selecting the arbitrator is set out below in *Section I (E)* of these *Instructions*.

**D.   Initiation of Arbitration Proceeding**

1. Within 10 days of receipt of a final adverse Appeal Panel decision, the school may initiate an arbitration proceeding by providing a written Notice of Intent to Arbitrate to the Commission accompanied by the required fees as provided for below in *Section I (K)* of these *Instructions*. The notice shall contain a concise statement of the arguments that the school intends to assert during the arbitration and the remedy which it intends to seek.

2. Within 20 days of the receipt of the Notice of Intent to Arbitrate, the Commission shall file with the AAA:

   a. A copy of the school's Notice of Intent to Arbitrate and the statement of the arguments that the school intends to assert during the arbitration and the remedy which it intends to seek;

   b. A statement of the arguments that the Commission intends to assert during the arbitration;

   c. The names and addresses of all parties;

   d. A copy of these *Instructions* governing the arbitration process; and

   e. The appropriate fees as specified by the AAA and provided for in *Section I (K)* below.

**E.  Appointment of Arbitrator from AAA National Roster**

1. The arbitration shall be heard and determined by one arbitrator who shall be impartial and independent.

2. As soon as practicable after receipt of the materials from the Commission described in *Section I (D)(2) above,* the AAA shall simultaneously submit to the school and the Commission an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed. The list of proposed arbitrators shall be accompanied by biographical descriptions of each arbitrator on the list.

3. The school and the Commission may each strike two names from the list and return it to the AAA within 7 days from the date of receipt of the list of arbitrators from the AAA. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other arbitrators from the National Roster without the submission of additional lists to the school or Commission.

4. The AAA shall promptly provide written notice to the school and the Commission of the appointment of the arbitrator. The decision of the AAA shall be final.

5. If for any reason an arbitrator is unable to perform the duties of his/her appointment, the AAA may, on proof satisfactory to it, declare the office vacant and fill the vacancy with another arbitrator. Such action by the AAA shall be final.

6. Neither the school nor the Commission nor anyone acting on their behalf shall communicate *ex parte* with the arbitrator or anyone a candidate to be the arbitrator.

# INSTRUCTIONS FOR ARBITRATION

**F. Creation of the Record for the Arbitration Proceeding**

1. Within 20 days from the date of the appointment of the arbitrator, the Commission shall submit to the arbitrator and the school the Arbitration Exhibits which shall include the record before the Appeals Panel, the school's Grounds for Appeal, and the transcript of the hearing before the Appeals Panel if a hearing was held. The documents shall be true, legible, and complete copies.

2. Within 10 days of receipt of the Arbitration Exhibits, the school shall have the opportunity to file with the arbitrator and the Commission for inclusion in the Arbitration Exhibits any material relevant to the arbitration proceeding that was not included by the Commission. The school shall not submit for inclusion in the Arbitration Exhibits any material that was not submitted to the Commission prior to the decision of the Appeals Panel. Within 10 days of receipt of any documents proffered by the school for inclusion in the Arbitration Exhibits, the arbitrator shall make the final decision as to whether such documents or materials shall be included in the Arbitration Exhibits. The arbitrator shall also decide any disputes over whether specific documents or other materials should be included in the Arbitration Exhibits. All materials to be included in the Arbitration Exhibits shall be prepared in electronic format in accordance with the Commission's Instructions for Electronic Submission.

3. The materials in the Arbitration Exhibits shall constitute the evidentiary record upon which the arbitrator shall render his/her decision. The arbitrator, at any time during the pendency of the proceeding, may require the Commission or the school to submit other documents or materials as additional exhibits, but only as necessary to determine whether substantial evidence supported the decision of the Appeals Panel.

**G. School's Arbitration Brief, Commission's Response**

1. Within 20 days from the date the arbitrator deems the Arbitration Exhibits to be complete, the school shall submit to the arbitrator and the Commission its written Arbitration Brief which sets out the reasons why the decision of the Appeals Panel was not supported by substantial evidence in the record on which the Appeals Panel took action. The brief shall be no longer than 20 double-spaced pages.

2. Within 20 days of receipt of the school's Arbitration Brief, the Commission shall submit to the arbitrator and the school a Response Brief, which shall be no longer than 20 double-spaced pages.

3. For good cause shown, the arbitrator may extend the length of a brief.

4. References to documents or other materials in the briefs shall include a reference to the documents as they appear in the Arbitration Exhibits.

5. All briefs shall be filed in electronic format in accordance with the Commission's Instructions for Electronic Submission.

**H. Discovery Not Available**

Depositions, interrogatories, requests for admission, and other forms of adversarial discovery shall not be used during the arbitration proceeding.

**I. Arbitration Hearing**

1. The school and the Commission may agree to waive an oral hearing before the arbitrator and proceed to a decision on the documentary record only.

# INSTRUCTIONS FOR ARBITRATION

2. The school and the Commission may also agree to a telephonic or video hearing before the arbitrator.

3. Upon the request of either the school or the Commission, an in-person hearing shall be held. As set out in *Section I (K)* below, the convening of an in-person hearing will entail an additional AAA administrative fee and additional compensation for the arbitrator.

4. All in-person arbitration hearings shall be held in an area proximate to the Commission's office at a location selected by the Commission.

5. Where an in-person hearing has been requested, the arbitrator shall set the date and time for the hearing, to be held within 30 days after receipt of all of the briefs. The school and the Commission shall respond to requests from the arbitrator for hearing dates in a timely manner, be cooperative in scheduling the earliest practical date, and adhere to the established hearing schedule.

6. Within 10 days of the scheduling of an in-person hearing, the school and the Commission shall submit to the arbitrator and one another the names of all individuals who will be representing them at the hearing.

7. The arbitrator will be requested to conduct the hearing expeditiously, determine the order of the hearing, direct the order of proof, and may direct the parties to focus their presentations on issues that could dispose of all or part of the case. Because the school carries the burden of proof in the arbitration, the school would generally make the first presentation to the arbitrator.

8. The hearing shall be private and not open to the public.

9. A stenographic transcript of the hearing shall be made.

10. The arbitrator will be requested to render a decision promptly within 21 days from the date of closing of the telephonic, video, or in-person hearing, or, if there was no hearing, from the date of the submission of all briefs and materials to the arbitrator. The decision shall be in writing, shall be signed by the arbitrator, and shall provide the reasons for the decision.

**J.  Effect of Decision**

1. The arbitrator shall have the authority to affirm or reverse the decision of the Appeals Panel but shall have no authority to remand or amend the Appeals Panel's decision. The arbitrator shall not have the power to order other actions reserved to the Commission – e.g. order an on-site visit, compel the filing of reports or materials to the Commission, or other such actions.

2. If the arbitrator affirms the decision of the Appeals Panel, the Commission's action becomes final immediately. When a decision to withdraw accreditation is final, the school is removed from the Commission's list of accredited schools.

3. If the arbitrator reverses the decision of the Appeals Panel, the Commission shall carry out that decision in a manner consistent with the decision, except that the arbitrator shall have no authority to grant accreditation to the institution. Pursuant to the regulations of the U.S. Department of Education, that power is reserved exclusively to the accreditation agency.

**K.  Fees and Expenses**

1. The AAA charges a fee to compensate it for the cost of providing administrative services in connection with the arbitration. The fee is specified in the current schedule of fees published by the AAA. The school requesting arbitration is fully responsible for payment of this fee.

# INSTRUCTIONS FOR ARBITRATION

2. In addition to fees required by *Section I (K)(1)* of these *Instructions* above, the arbitrator shall be compensated at the rate specified in the current schedule published by the AAA.

3. Other than the AAA's administrative fee, the school and the Commission shall be responsible for sharing the costs and expenses associated with the arbitration. If, however, the Commission prevails in the arbitration, the school shall be responsible for all costs associated with the claim made against the Commission in accordance with *Section 2.09* of the *AACSC Bylaws*.

4. The school's Notice of Intent to Arbitrate shall be accompanied by a non-refundable fee of $5,000 to cover the administrative costs borne by the Commission in preparation of the record by the Commission, securing the facility for the arbitration hearing (if an in-person hearing is held), and other expenses directly related to the administration of arbitration. The AAA's administrative fee, and the school's share of the costs of the arbitrator's fee, and any other AAA arbitration administrative fees must be paid in advance of the arbitration hearing or for fees accrued after the hearing within 10 days of receipt of the billed amount. A failure to pay any required fee will halt the arbitration proceedings.

5. The AAA may require a deposit in advance of any hearing to cover the expense of the arbitration, including the arbitrator's fee. If a deposit is made, the AAA shall be requested to render an accounting to the school and the Commission and return any unexpended balance at the conclusion of the proceeding.

## II.  ARBITRATION OF OTHER CLAIMS AGAINST THE COMMISSION

### A.  Arbitration Process

1. Other than a claim for review of an Appeals Panel decision under these Instructions, any claim or controversy:

   i.  Arising out of or related to the Commission's accreditation processes, including challenges to a Commission decision to deny or withdraw accreditation, provided the school has exhausted that challenge under *Section VIII, Rules of Process and Procedure, Standards of Accreditation* and under *Section I* of these *Instructions* above, or

   ii.  Arising out of the relationship between the Commission and any Member accredited school or applicant for accreditation,

   shall be submitted to arbitration administered by AAA pursuant to the appropriate rules established by AAA.

### B.  Fees and Expenses

1. The payment of fees and expenses incurred under this section shall be governed by *Section I (K)* of these *Instructions*. Schools accredited by the Commission, or seeking accreditation by the Commission, understand and agree that such arbitration is the sole and exclusive remedy available to a school to resolve such claims or controversies.

2. If the Commission prevails in the arbitration, the school shall be responsible for all costs associated with the claim made against the Commission in accordance with *Section 2.09* of the *AACSC Bylaws*.

# Exhibit D

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

| | |
|---|---|
| In the Matter of the Arbitration Between | ) |
| | ) |
| **INDEPENDENCE UNIVERSITY,** | ) |
| | ) |
| Claimant, | ) |
| | ) |
| and | )     **Case No. 01-21-0017-0169** |
| | ) |
| **ACCREDITING COMMISSION OF CAREER** | ) |
| **SCHOOLS AND COLLEGES,** | ) |
| | ) |
| Respondent. | ) |
| | ) |

## <u>RULING CONCERNING ARBITRATION EXHIBITS</u>

### I.

The Claimant in this arbitration, Independence University ("IU" or "School" ), seeks a reversal of a September 17, 2021 decision of an Appeals Panel of the Respondent, the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "Commission"), affirming an April 22, 2021 decision of the Commission to withdraw the accreditation of IU.

The arbitration is being conducted pursuant to the ACCSC Instructions for Arbitration ("Instructions"), as set forth in Appendix II of the ACCSC Standards of Accreditation.  On January 17, 2022, pursuant to Section I.F.1 of the Instructions and paragraph 3 of this tribunal's Scheduling Order of December 29, 2021 ("Scheduling Order"), ACCSC submitted the documents which, according to ACCSC, comprise all of the documents to be regarded as the Arbitration Exhibits in this proceeding for purposes of the Instructions.  In accordance with Section I.F.1 of the Instructions, the documents submitted by ACCSC included the record before

**Exhibit D - 1**

JA121

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 2 of 8**

the Appeals Panel, IU's Grounds for Appeal and the transcript of the hearing before the Appeals

Panel.

On February 7, 2022, pursuant to paragraph 4 of the Scheduling Order, IU filed a Motion

to Supplement the Arbitration Exhibits (the "Motion"). By its Motion, IU requests an order

requiring ACCSC to supplement the materials it submitted on January 17, 2022 by producing

and submitting several categories of documents concerning past treatment by the Commission of

other member institutions of the Accreditation Alliance of Career Schools and Colleges

("AACSC"). IU seeks:

1.  Copies of all probation, warning, or show cause orders issued between 2012 and the present which address below benchmark graduation and employment rates.

2.  Any correspondence between ACCSC and any institution placed on probation, warning, or show cause status between 2012 and the present for failing to meet either graduation or employment benchmark rates.

3.  Any correspondence between ACCSC and any institution subject to an adverse action between 2012 and the present based, wholly or in part, on the failure to meet either graduation or employment benchmark rates.

4.  Any ACCSC records involving any instances in which ACCSC granted leniency to, or did not take an adverse action against, an institution, with below-benchmark rates based on the school's transition from on-ground to online programs.

5.  Any ACCSC records of any instances in which ACCSC granted leniency to, or did not take an adverse action against, an institution, with below-benchmark rates based on circumstances related to the COVID-19 pandemic.

By a letter dated April 30, 2021, prior to the decision of the Appeals Panel, IU had made a

similar request to the Executive Director of ACCSC for documents concerning past treatment of

**Exhibit D - 2**

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 3 of 8**

other institutions.  The Executive Director denied this request.  The requested materials were not in the record before the Appeals Panel.

IU urges that the supplementary documents requested by its Motion are necessary for the fair determination of its contention that withdrawal of its accreditation was inconsistent with the Commission's treatment of other member institutions of the AACSC.  Citing 34 C.F.R. § 602.18, among other authorities, IU maintains that the withdrawal of its accreditation contravened requirements of consistency in decision-making by accrediting agencies, and improperly subjected it to disparate treatment.[1]

By its Motion, IU also requests discovery, in the form of interrogatories, document requests and depositions, in order to investigate what it contends was bad faith on the part of ASCCS.  IU contends that the withdrawal of its accreditation, as affirmed by the Appeals Panel, was imposed unfairly on pretextual grounds, in order to deflect scrutiny and criticism of ACCSC.

On February 28, 2022, pursuant to paragraph 5 of the Scheduling Order, ACCSC filed an Opposition to IU's Motion, contending that the supplementation of documents comprising the Arbitration Exhibits and the discovery sought by UI are precluded by several provisions of the Instructions for Arbitration.

---

[1] Title 34 C.F.R. § 602.18 provides at paragraph (a) that an accrediting agency "must consistently apply and enforce standards that respect the stated mission of the institution, including religious mission, and that ensure that the education or training offered by an institution or program, including any offered through distance education, correspondence courses, or direct assessment education is of sufficient quality to achieve its stated objective for the duration of any accreditation or preaccreditation period."  *See also* 34 C.F.R. § 602.18(b)(2) ("The agency meets the requirement in paragraph (a) of this section if [among other things] the agency . . . [h]as effective controls against the inconsistent application of the agency's standards[.]".

**Exhibit D - 3**

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 4 of 8**

## II.

As a member of the AACSC seeking accreditation, IU has agreed, among other things, to

adhere the AACSC Bylaws.[2]  Pursuant to Section 4.06 of the AACSC Bylaws, IU has agreed, by

applying for accreditation with the Commission, to submit any claim against the Commission

relating to accreditation to final and binding arbitration as set forth in the ACCSC Standards of

Accreditation.  The Standards of Accreditation include the Instructions for Arbitration.  The

parties therefore must be deemed to have agreed to the Instructions for Arbitration.[3]

In describing the process for and scope of this arbitral proceeding, the Instructions

address with specificity the authority of the arbitral tribunal.  Section I.B of the Instructions sets

forth the "Standard of Review in Arbitration and Available Remedies," providing at Section

I.B.1 that:

> The arbitration proceeding is not a *de novo* review.  It is a review on
> the record and is limited to the question of whether the Appeals
> Panel's decision is supported by the evidence that was in the record
> when the Panel rendered its decision.

---

[2] The Preamble to the ACCSC Standards of Accreditation provides in relevant part that "[a]ccredited schools and schools seeking accreditation agree to . . . adhere to the AACSC Bylaws . . . ."   As stated in a footnote to the Preamble, "[t]he Accreditation Alliance of Career Schools and Colleges ('AACSC') does business as the Accrediting Commission of Career Schools and Colleges ('ACCSC')."  Section 1.01.a of the AACSC Bylaws provides that the Commission (ACCSC, the Respondent in this proceeding) is the Board of Directors of AACSC.

[3] In implementation of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1001, *et seq.*, regulations of the United States Department of Education governing institutions of higher education provide that the Secretary of Education does not recognize the accreditation of an institution unless the institution agrees to submit to arbitration any dispute involving the final denial, withdrawal, or termination of accreditation.  34 C.F.R. §600.4(c).  *See* 20 U.S.C. § 1099b(e) ("The Secretary may not recognize the accreditation of any institution of higher education unless the institution of higher education agrees to submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration prior to any other legal action.").

**Exhibit D - 4**

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 5 of 8**

Section I.B.2 provides: "The arbiter may not consider evidence that was not in the record before

the Appeals Panel."

 Under the heading "Discovery Not Available," Section I.H of the Instructions provides

that "[d]epositions, interrogatories, requests for admission, and other forms of adversarial

discovery shall not be used during the arbitration proceeding."

 Section I.F of the Instructions details the "Creation of the Record for the Arbitration

Proceeding," in relevant part as follows:

 1.   Within 20 days from the date of the appointment of the arbitrator,
      the Commission shall submit to the arbitrator and the school the
      Arbitration Exhibits which shall include the record before the
      Appeals Panel, the school's Grounds for Appeal, and the transcript
      of the hearing before the Appeals Panel if a hearing was held. . . .

 2.   Within 10 days of receipt of the Arbitration Exhibits, the school
      shall have the opportunity to file with the arbitrator and the
      Commission for inclusion in the Arbitration Exhibits any material
      relevant to the arbitration proceeding that was not included by the
      Commission.  The school shall not submit for inclusion in the
      Arbitration Exhibits any material that was not submitted to the
      Commission prior to the decision of the Appeals Panel.  Within 10
      days of receipt of any documents proffered by the school for
      inclusion in the Arbitration Exhibits, the arbitrator shall make the
      final decision as to whether such documents or materials shall be
      included in the Arbitration Exhibits. The arbitrator shall also
      decide any disputes over whether specific documents or other
      materials should be included in the Arbitration Exhibits. . . .

 3.   The materials in the Arbitration Exhibits shall constitute the
      evidentiary record upon which the arbitrator shall render his/her
      decision.  The arbitrator, at any time during the pendency of the
      proceeding, may require the Commission or the school to submit
      other documents or materials as additional exhibits, but only as
      necessary to determine whether substantial evidence supported the
      decision of the Appeals Panel.

**Exhibit D - 5**

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 6 of 8**

Section I.J of the Instructions addresses the "Effect of [the arbitration] Decision" and, at

Section I.J.1, provides for the authority of the arbitrator as follows:

> The arbitrator shall have the authority to affirm or reverse the
> decision of the Appeals Panel but shall have no authority to
> remand or amend the Appeals Panel's decision. The arbitrator
> shall not have the power to order other actions reserved to the
> Commission -- e.g. order an on-site visit, compel the filing of
> reports or materials to the Commission, or other such actions.

Section I.B.4 provides that "[t]he arbitrator shall only have the authority to affirm or reverse the

decision of the Appeals Panel, subject to the limitations below in Section I (J)(3) of these

Instructions." (italics removed). In turn, Section I.J.3 provides:

> If the arbitrator reverses the decision of the Appeals Panel, the
> Commission shall carry out that decision in a manner consistent
> with the decision, except that the arbitrator shall have no authority
> to grant accreditation to the institution. Pursuant to the regulations
> of the U.S. Department of Education, that power is reserved
> exclusively to the accreditation agency.

**III.**

As set forth above, arbitral review of the decision of the Appeals Panel "is limited to the

question of whether the Appeals Panel's decision is supported by the evidence that was in the

record when the Panel rendered its decision." Instructions, § I.B.1. The Instructions expressly

provide that "[t]he arbiter may not consider evidence that was not in the record before the

Appeals Panel." *Id.*, § I.B.2.

In creating the record for the arbitral proceedings, "the school shall have the opportunity

to file with the arbitrator and the Commission for inclusion in the Arbitration Exhibits any

material relevant to the arbitration proceeding that was not included by the Commission" in the

**Exhibit D - 6**

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 7 of 8**

Commission's submission of Arbitration Exhibits.  Instructions, § I.F.2. However, "[t]he school shall not submit for inclusion in the Arbitration Exhibits any material that was not submitted to the Commission prior to the decision of the Appeals Panel."  *Id.*  Further, the "opportunity to file" relevant material already in the possession of the School cannot reasonably be construed as conferring an opportunity to ***obtain*** by discovery in arbitration ***new*** material, not previously submitted to the Commission, whatever its potential relevance.  This is made clear by the express prohibition of discovery in Section I.H: "Depositions, interrogatories, requests for admission, and other forms of adversarial discovery shall not be used during the arbitration proceeding."

To be sure, the arbitrator is empowered by the Instructions to "decide any disputes over whether specific documents or other materials should be included in the Arbitration Exhibits." Instructions, § I.F.2.  The arbitrator also is authorized "at any time during the pendency of the proceeding" to "require the Commission or the school to submit other documents or materials as additional exhibits," but may do so "only as necessary to determine whether substantial evidence supported the decision of the Appeals Panel."  *Id.* § I.F.3.  And then, as noted above, the arbitration proceeding "is limited to the question of whether the Appeals Panel's decision is supported by the evidence that was in the record when the Panel rendered its decision, " *id.* § I.B.1, and, again, the arbitrator "may not consider evidence that was not in the record before the Appeals Panel."  *Id.*, § I.B.2.

The tribunal is constrained by the parties' arbitration agreement -- as embodied in the Instructions for Arbitration -- to decline IU's requests that the Commission be ordered to produce documents that were not in the record before the Appeals Panel or that discovery be permitted in

**Exhibit D - 7**

**Independence University**
**v.**
**Accrediting Commission of Career Schools and Colleges**
**AAA Case No. 01-21-0017-0169**
**March 15, 2022**
**Page 8 of 8**

the arbitration.  Even if the tribunal were empowered by the parties' arbitration agreement as expressed in the Instructions to require such production or discovery (and it is not), the tribunal is expressly prohibited by that agreement from considering such materials or information in the arbitral decision.[4]  Under the circumstances, the tribunal declines to require the requested enlargement of the record in this proceeding, which now comprises some 32,374 pages.

**IV.**

For the foregoing reasons:

1.      The Motion to Supplement the Arbitration Exhibits shall be, and the same hereby is, DENIED;

2.      The Arbitration Exhibits shall consist of the documents listed in the attached Document Index dated January 17, 2022; and

3.      The Arbitration Exhibits are now deemed to be complete, subject only to the authority of the Arbitrator, pursuant to Section I.F.3 of the Instructions for Arbitration, at any time during the pendency of this proceeding to require the ACCSC or IU to submit other documents or materials as additional exhibits (but only as necessary to determine whether substantial evidence supported the decision of the Appeals Panel).

IT IS SO ORDERED.

DATED:  March 15, 2022

_____
Brian S. Harvey
Arbitrator

---

[4] And even if the tribunal were (improperly) to order such production or discovery in this arbitral proceeding, Section I.J.1 of the Instructions expressly withholds from the arbitral tribunal the power to "compel the filing of reports or materials to the Commission," including any materials that might be newly (and improperly) produced or developed in arbitration.

**Exhibit D - 8**

01/17/2022                                                AAA Case No. 01-21-0017-0169

Arbitration Exhibits – Document Index

| Document Number | Document | Document Date |
|---|---|---|
| 1 | IU Appeal Decision Letter | 2021-09-17 |
| 2 | ACCSC – IU Appeal Hearing Transcript | 2021-07-08 |
| | *Appeals Record* | |
| 3 | Independence University Grounds for Appeal | 2021-05-27 |
| 4 | ACCSC Withdrawal of Accreditation | 2021-04-22 |
| 5 | School's SW Continued Probation Response | 2020-12-30 |
| 6 | ACCSC SW Continued Probation Order | 2020-07-21 |
| 7 | School's Response re: COAG Decision | 2021-01-22 |
| 8 | ACCSC Information Request re COAG Decision | 2020-10-26 |
| 9 | School's SW Continued Probation Response | 2020-03-03 |
| 10 | ACCSC SW Continued Probation Order | 2019-10-28 |
| 11 | School's SW Continued Probation Response | 2019-06-28 |
| 11b | School's SW Continued Probation Response – AI | 2019-06-28 |
| 12 | ACCSC SW Continued Probation Order | 2019-05-02 |
| 13 | School's SW Probation Response | 2018-12-20 |
| 14 | ACCSC SW Probation Order | 2018-09-06 |

# Exhibit E

# ACCSC

Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

July 21, 2020

**ELECTRONIC DELIVERY**
eric.juhlin@collegeamerica.edu

Eric Juhlin
Chief Executive Officer
Center for Excellence in Higher Education, Inc.
4021 South 700 East, Suite 400
Salt Lake City, Utah 84107

*System-Wide Review*
*Continued Probation Order*

Dear Mr. Juhlin:

At the May 2020 meeting, the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") considered the following:

- The previous decision to place the system of schools in the Center for Excellence in Higher Education ("CEHE") on Probation, along with other matters (see Appendix I included as part of this letter for a list of institutions, actions, and materials considered).

- Teach-out Plans for:
    - California College San Diego ("CCSD") – San Diego, California (#M001073/SL460488-National City, California)
    - California College San Diego ("CCSD-San Marcos")– San Marcos, California (#B072374)
    - CollegeAmerica ("CA-Denver") – Denver, Colorado (#M001507)
    - CollegeAmerica ("CA-Fort Collins") – Fort Collins, Colorado (#B070544)
    - CollegeAmerica ("CA-Colorado Springs") – Colorado Springs, Colorado (#B070623)
    - CollegeAmerica ("CA-Flagstaff") – Flagstaff, Arizona (#M070742)
    - CollegeAmerica ("CA-Phoenix") – Phoenix, Arizona (#B070743)
    - Stevens-Henager College ("SHC-Idaho Falls") – Idaho Falls, Idaho (#B072351)
    - Stevens-Henager College ("SHC-Orem") – Orem, Utah (#B070582)
    - Stevens-Henager College ("SHC-Murray") – Murray, Utah (#B070583)
    - Stevens-Henager College ("SHC-Logan") – Logan, Utah (#B070584)
    - Stevens-Henager College ("SHC-Boise") – Boise, Idaho (#B070764)
    - Stevens-Henager College ("SHC-St. George") – St. George, Utah (#B072360)

- CEHE's response to ACCSC's letter of September 3, 2019 requesting additional information regarding the July 1, 2019 notice which states that Colorado Division of Private Occupational Schools ("DPOS") issued a notice of non-compliance regarding the content of CEHE's ACCSC-mandated probation notice to CollegeAmerica – Denver, Colorado (#M001507); CollegeAmerica ("CA-Fort Collins") – Fort Collins, Colorado (#B070544), and CollegeAmerica – Colorado Springs, Colorado (#B070623);

- CEHE's response to ACCSC's letter of March 17, 2020 requesting additional information with regard to a notice that CEHE had received a Notice and Cease and Desist Order, dated January 28, 2020 from the Colorado Division of Private Occupational Schools ("DPOS");[1] and

---

[1] In a June 1, 2020 letter, CEHE notified ACCSC that the DPOS accepted CEHE's response and did not issue a notice of noncompliance and included a copy of DPOS's May 28, 2020 decision indicating that "… the Cease and Desist Order is moot, the Subpoena Duces Tecum was satisfied, and the response to the Notice of Noncompliance sufficient to persuade the Board that it need not issue a Notice of Charges nor pursue further action regarding the allegations set forth therein." Therefore, ACCSC considers this matter closed.

**Exhibit E - 1**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                   *Probation Order*
*July 21, 2020*
*Page 2 of 32*

- A Media Report received January 13, 2020 regarding Independence University located in Salt Lake City, Utah.

Subsequent to the Commission's May 2020 meeting, in a phone call with ACCSC staff on May 6, 2020 CEHE disclosed the potential closure of certain CEHE-affiliated campuses prior to the anticipated dates of graduation of all students. Based on that call, in a letter dated May 8, 2020 ACCSC requested corresponding updated information with regard to CEHE's teach-out plan. In response, CEHE submitted revised ACCSC Institutional Teach-Out Plan Approval Forms dated May 28, 2020 on behalf of the following eight (8) schools:

- CollegeAmerica ("CA-Denver") – Denver, Colorado (#M001507)
- CollegeAmerica ("CA-Fort Collins") – Fort Collins, Colorado (#B070544)
- CollegeAmerica ("CA-Colorado Springs") – Colorado Springs, Colorado (#B070623)
- CollegeAmerica ("CA-Flagstaff") – Flagstaff, Arizona (#M070742)
- Stevens-Henager College ("SHC-Idaho Falls") – Idaho Falls, Idaho (#B072351)
- Stevens-Henager College ("SHC-Orem") – Orem, Utah (#B070582)
- Stevens-Henager College ("SHC-Logan") – Logan, Utah (#B070584)
- Stevens-Henager College ("SHC-St. George") – St. George, Utah (#B072360)

In addition, at its June 2020 meeting, the Commission considered the following submissions:

- Revised and updated Institutional Teach-out Plans for the above eight (8) schools, and
- A Request for a Waiver of an Accreditation Standard or Policy to permit CCSD to submit an Application for a Branch Re-Alignment while on Probation and to absorb CA-Phoenix as a branch campus for the purpose of completing the teach out of students.

## <u>COMMISSION ACTIONS</u>

Based on its review of the information annotated above, the Commission has taken the following actions:

1. The Commission voted to continue the system of CEHE-affiliated schools on Probation[2] (see the "Commission Findings-Compliance Issues for Independence University and SHC-West Haven" section below).[3]

2. The Commission voted to approve the teach-out plans for all thirteen schools in teach-out effective June 30, 2020, including the revised and updated teach-out plans for the above eight (8) schools which indicate that CEHE now plans to close on September 13, 2020 before the date all students are scheduled to complete their programs. The institutions covered by the Commission's action to approve the

---

[2] Please also refer to the section of this letter titled "Maximum Timeframe to Achieve Compliance."

[3] Please note that the compliance findings in this letter are focused on the only two schools planning to remain open and enrolling students, SHC-West Haven and IU. However, this does not mean that the Commission found that the other 13 schools have demonstrated compliance in all areas cited in previous actions. The entire system of schools remains on Probation. The Commission's decision to not require specific response requirements for the thirteen schools in teach-out is for the sole purpose of focusing on and facilitating the successful teach out of current students. If any school seeks to remain open past the teach-out period, CEHE must inform the Commission as a means to allow the Commission to establish an appropriate application review protocol and process.

**Exhibit E - 2**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                    *Probation Order*
*July 21, 2020*
*Page 3 of 32*

Institutional Teach-out Plans are listed below. **This approval is subject to the provisions set forth in this letter** (see the "Teach-Out Plans" section below):

- California College San Diego ("CCSD") – San Diego, California (#M001073/SL460488-National City, California)
  - California College San Diego ("CCSD-San Marcos") – San Marcos, California (#B072374)
- CollegeAmerica ("CA-Denver") – Denver, Colorado (#M001507)
  - CollegeAmerica ("CA-Fort Collins") – Fort Collins, Colorado (#B070544)
  - CollegeAmerica ("CA-Colorado Springs") – Colorado Springs, Colorado (#B070623)
- CollegeAmerica ("CA-Flagstaff") – Flagstaff, Arizona (#M070742)
  - CollegeAmerica ("CA-Phoenix") – Phoenix, Arizona (#B070743)
  - Stevens-Henager College ("SHC-Idaho Falls") – Idaho Falls, Idaho (#B072351)
  - Stevens-Henager College ("SHC-Orem") – Orem, Utah (#B070582)
  - Stevens-Henager College ("SHC-Murray") – Murray, Utah (#B070583)
  - Stevens-Henager College ("SHC-Logan") – Logan, Utah (#B070584)
  - Stevens-Henager College ("SHC-Boise") – Boise, Idaho (#B070764)
  - Stevens-Henager College ("SHC-St. George") – St. George, Utah (#B072360)

3. The Commission voted to prohibit CEHE from enrolling new students or re-enrolling former students into the 13 schools in teach-out without obtaining the Commission's permission (see also footnote 3 above).

4. The Commission voted to approve the waiver request to allow CCSD to apply for a branch re-alignment in order to add CA-Phoenix as a branch campus for the purpose of completing the teach-out plan.

5. The Commission reconsidered its previous decision to direct IU to cease enrolling new students in the Business-DE (AAS) program and the Master of Business Administration (MBA) program and determined that the programs will continue to be subject to the "cease enrollment" directive.

6. Due to the history of below-benchmark outcomes in the following six programs, the Commission directed IU to cap enrollment at the level of the enrollment in the program as of June 30, 2019, as reported in the 2019 Annual Report:

- Accounting – DE (BS): 256
- Business Administration (BS): 1456
- Health Services Management (BS): 3466
- Information Systems – DE (MS): 43
- Medical Assisting – DE (AOS) [*formerly Medical Specialties*]: 2,524
- Web Design and Development (BS): 194

## SUMMARY OF THE COMMISSION'S REVIEW

Based on the May 2020 and June 2020 reviews, the Commission found that the focus and operational status of the school system has altered drastically since the Commission's review in September 2019. At that time, CEHE represented the transition for 13 campuses as a training out of all residential programs and a shift to online education. According to CEHE's letter of September 11, 2019,

**Exhibit E - 3**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*July 21, 2020*
*Page 4 of 32*

> *CEHE has made a strategic decision to cease recruiting and enrolling new students into most of CEHE's fully-onground campus-based degree programs. Effective September 10, 2019, all of CEHE's onground campuses (Stevens-Henager College, CollegeAmerica, and California College San Diego), except for the Stevens-Henager College main campus in West Haven, UT, will suspend enrolling new students into campus-based onground programs*

The September 2019 letter states CEHE's assertion that the schools would not be closing; rather they would be open to provide training until the last student graduated, as follows:

> *I want to be clear that CEHE is not closing any campuses. All of our onground campuses will continue to provide the education, services, and support to currently enrolled students and every current student will be able to complete their degree programs, without interruption, all the way through to graduation… The only effect of this strategic decision on current students is that if a current student subsequently withdrawals [sic] or is terminated, the campus may not be able to accommodate that student if they want to "re-enroll" sometime in the future. However, in most cases, if one of our current onground students withdrawals in the future and then wants to re-enroll – we will likely be able to accommodate them through Independence University.*

Regardless of CEHE's assertion that the schools are not closing, the Commission directed CEHE to file Teach-Out Approval Forms for the 13 campuses for which CEHE had ceased enrolling. The Commission received those forms on December 12, 2019. The following statement appeared in each Institutional Teach-Out Approval Form:

> *The college's owner, Center for Excellence in Higher Education ("CEHE") wants to make it clear to the Commission that, at this point in time, CEHE has not made a decision to close any of its campuses. The only action taken by the campus has been to cease the acceptance of new enrollments into any of its programs right now. Therefore, at this time, there is technically no "final" date for the cessation of training because the college is not and has not decided to close.*

In a turnabout from these assertions, CEHE now plans the closure of eight schools before students are scheduled to complete their programs. Hence, the Commission's focus has shifted from ensuring a smooth transition between residential and distance education modes of delivery, to ensuring CEHE is meeting its obligations to students while implementing teach-out plans. Therefore, it is imperative for CEHE to show its commitment and capability to implementing detailed, carefully considered, and reliable plans and actions for the discharge of obligations to students in the 13 campuses that are now in various stages of teach-out or closure.

In addition, the Commission considered its previous prohibition on new enrollments that was set forth in the October 28, 2019 Probation letter as follows:

> *In review of CEHE's subsequent announcement that the schools have ceased enrollment in residential programs as of September 11, 2019, the Commission found that the schools' action obviates the need for the cease enrollment or cap enrollment directives. CEHE must request from the Commission permission to enroll any new students in any residential program, which will require reconsideration of the performance of that program in terms of student graduation and graduate employment rates.*

Given the Commission's focus on ensuring that the schools fulfill their obligations to the students currently enrolled in the 13 campuses that are in various stages of teach-out or closure, **the Commission voted to**

**Exhibit E - 4**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                               *Probation Order*
*July 21, 2020*
*Page 5 of 32*

**expand the prohibition on new enrollments regardless of delivery method. Therefore, CEHE is prohibited from enrolling new students or re-enrolling former students into the 13 schools in teach-out without obtaining the Commission's permission.**

Although this Probation Order covers all CEHE schools, this letter will focus on the remaining compliance issues for the two schools[4] that CEHE intends to remain operational.[5] There remain significant questions with regard to student achievement outcomes, accurate reporting of student achievement data, advertising, assessment of prospective students for distance education programs, independent study, and the status of ongoing litigation, state, and federal actions. Of particular concern is that IU continues to report below-benchmark rates of student achievement. Of the 13 active (non-discontinued) programs that have been operational long enough to be reportable, the school has reported above-benchmark rates of student achievement for only four. The rates reported for the other nine will require significant improvements in order to achieve acceptable rates. The lack of significant improvement over the last three years calls into question the depth of assessment the school has conducted, and therefore does not provide assurance that the current plans will have the needed impact on rates of student achievement. The Commission is concerned about the magnitude of improvement required to demonstrate compliance with accrediting standards, in context of the schools' maximum timeframe to remain on Probation. Decisive action is required on the part of the school to demonstrate its students are achieving the outcomes of the programs at an acceptable rate. The gravity of the situation is heightened by CEHE's reporting of student achievement outcomes that is not in full accordance with Commission requirements. The Commission will consider any further student achievement data presented in any fashion not conforming to the instruction to be invalid and a failure to report accurate data to the Commission. If the school does not bring itself into compliance within the period specified (see *Maximum Timeframe to Achieve Compliance* section of this letter), the Commission will be obligated to take adverse action.

## TEACH-OUT PLANS

As stated above, upon review of the revised and updated teach-out plans, which indicate that CEHE now plans to close the above eight (8) schools on September 13, 2020, before the date all students are scheduled to complete their programs, the Commission voted to approve the revised Institutional Teach-Out Plan Approval Forms as well as the original Institutional Teach-Out Plan Approval Forms for the other five schools, effective June 30, 2020, subject to the provisions set forth below. The list of schools covered by the Commission's approval is provided on pages 2-3 above.

The teach-out approvals are divided between the campuses that will remain open through the duration of the teach out and those that intend to close prior to the scheduled completion date of all students. Below is a description of the Commission's review in each instance.

### Schools Scheduled to Cease Operation Prior to Completion of All Students

At the June 2020 meeting, the Commission voted to approve the updated ACCSC Institutional Teach-Out Plan Approval Forms for the following campuses, which CEHE now intends to close prior to completing the delivery of the educational program for all students:

- CollegeAmerica ("CA-Denver") – Denver, Colorado (#M001507);

---

[4] These two campuses are now being merged into a single campus due to a U.S. Department of Education directive. The schools have submitted the necessary applications which are in the process of review by ACCSC.
[5] See also footnote #3 above.

**Exhibit E - 5**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*July 21, 2020*
*Page 6 of 32*

- CollegeAmerica ("CA-Fort Collins") – Fort Collins, Colorado (#B070544);
- CollegeAmerica ("CA-Colorado Springs") – Colorado Springs, Colorado (#B070623);
- CollegeAmerica ("CA-Flagstaff") – Flagstaff, Arizona (#M070742);
- Stevens-Henager College ("SHC-Idaho Falls") – Idaho Falls, Idaho (#B072351);
- Stevens-Henager College ("SHC-Orem") – Orem, Utah (#B070582);
- Stevens-Henager College ("SHC-Logan") – Logan, Utah (#B070584); and
- Stevens-Henager College ("SHC-St. George") – St. George, Utah (#B072360).

The approval forms set forth the following options available to students to complete their programs:

> *Option 1: TRANSFER to Independence University (CEHE's online college) to complete your degree program.*
>
> *We will transfer all of your completed credits to IU and you can complete your degree online at IU without interruption. IU will give you a 30% Tuition Grant (a 30% reduction in your tuition) for any remaining tuition cost to complete your degree program. You will become an IU student and be eligible for all the IU resources including, Student Services, Tutoring, and Career Services job search assistance.*
>
> *Option 2: TRANSFER to the Stevens-Henager College campus in Murray, UT or Ogden [West Haven], UT (this is only available to students at the Logan, UT or Orem, UT campuses).*
>
> *We will transfer all of your completed credits and you can complete your degree program at the Ogden, UT or Murray, UT Stevens-Henager College campus without interruption. The college will give you a 30% Tuition Grant (a 30% reduction in your tuition) for any remaining tuition cost to complete your degree program. You will be eligible for all the campus resources including, Student Services, Tutoring, and Career Services job search assistance.*
>
> *Option 3: DO NOT TRANSFER and receive a full refund of all student loan debt and cash payments made to the college.*
>
> *If you do not want to transfer, CEHE will refund/return all Title IV Student Loan Funds (directly to your lender) that you have received since you began your current enrollment at the college. CEHE will also refund/return to you any cash payments that you have made to the college since you began your current enrollment at the college. CEHE will also write-off or eliminate any loan balance you may have through the college's EduPlan loan program. In other words, you will have $0.00 account balance with the college.*

The Commission noted that the schools are offering a full refund option to students who are unable or unwilling to pursue Options 1 and 2. Given that Option 1 is a fully on-line program that may not be suitable for all students, and Option 2 may involve schools at quite some distance from the closing school, the presence of a third option is necessary to ensure that the school will be able to meet its obligations to students of all circumstances. Option 3 allows students to keep their credits earned and transfer those credits to another school while also being refunded all money and loans back to the source, as opposed to going through the loan discharge process whereby the students would not be able to retain their credits. With this third option, the Commission voted to approve the teach-out plans.

In reviewing the record, the Commission noted that CEHE intends to close CA-Flagstaff (#M070742) on September 13, 2020; however, its branch campus CA-Phoenix (#B070743) plans to remain operational throughout the term of the teach-out, which is projected to extend at least until November 21, 2021. When

**Exhibit E - 6**

CA-Flagstaff ceases training on September 13, 2020, operation as a school will cease and eligibility for ACCSC accreditation will lapse. It appears that the accreditation of the main school will cease prior to the completion of the teach-out of the branch campus. *Section VIII (B)(3), Substantive Standards, Standards of Accreditation*, states that the "[a]ccredited status of the branch campus is dependent upon the continued accreditation of the main school." Therefore, the accreditation of CA-Phoenix would cease when the main school's accreditation ceases at the close of the teach-out. To address the issue of maintaining eligibility throughout the period of the teach-out, CEHE intends to realign CA-Phoenix with CCSD and accordingly submitted waiver requests that would permit the consideration of Application for a Branch Realignment-Parts I and II while the aforementioned schools are on Probation. At its June 2020 meeting, the Commission voted to approve the schools' requests and therefore the schools are proceeding with the application process.

**Schools Scheduled to Remain Open Until Teach-Out is Complete**

At the May 2020 meeting, the Commission voted to approve the Institutional Teach-Out Plans for:

- California College San Diego – San Diego, California (#M001073)
    - SL460488 – National City, California;
- California College San Diego – San Marcos, California (#B072374);
- Stevens-Henager College – Murray, Utah (#B070583); and
- Stevens-Henager College – Boise, Idaho (#B070764).

In doing so, the Commission took note of the accrediting standards which require that in order for a school to maintain its eligibility for accreditation, it must operate as a school providing education and training to students in accordance with its primary objectives and maintain its ability to meet its obligations to students on a continuous basis (*Section I (G)(2)(b), Rules of Process and Procedures, Standards of Accreditation*). Therefore, when each school completes training of all currently enrolled remaining students, that school's eligibility for ACCSC accreditation will cease. As a result, the Commission approved the Institutional Teach-Out Plans through the expected last date of training for each of the five schools listed above, at which point accreditation for these campuses will cease.  In order to allow the closing schools to focus on teaching out current students, there are no response requirements in this letter specifically for those campuses. However, the Commission's approval of the teach-out plans (and concordantly extending each closing school's  term of accreditation and maximum time frame to achieve compliance as necessary), is for the sole purposes of focusing on and facilitating the successful teach-out of current students (see also footnote #3 above).

**Teach-out Resources**

With regard to adequate resourcing of educational delivery at the schools, the Commission has been pursuing the question – first raised in February 2018[6] – of whether CCSD-San Diego provides sufficient equipment for the Computer Technology and Networking; Computer Programming; and Computer Science programs. Despite the school's assertions that equipment for these programs is sufficiently up-to-date, the Commission found that the school has not yet supported those claims with documentation. In the October 28, 2019 Probation letter, the Commission expanded the question to include each of the schools; however, due to the notification that CEHE is prematurely closing eight institutions, the Commission decided to narrow the focus of its questions regarding equipment to the five schools that CEHE intends to remain operational throughout the term of the teach-out.

---

[6] See the February 16, 2018 *Team Summary Report* from the Renewal of Accreditation on-site evaluation.

**Exhibit E - 7**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                                  *Probation Order*
*July 21, 2020*
*Page 8 of 32*

In response, CEHE describes measures taken to ensure equipment is sufficiently comprehensive. The first element consists of an internal assessment that the schools conducted in November 2019. The response includes 55 signed checklists of varying lengths, from seven items for some programs, to over 80 items for the Medical Assisting (AOS) programs. Based on a review of the items included in the checklists, it is not clear that there is a standard checklist for each program or whether the items on the checklist are required. Although CEHE appears to have used this information to conclude that each school is adequately equipped, the Commission is not convinced that simply indicating the presence of the equipment on the checklists demonstrates that the campuses are in fact sufficiently resourced.

The second element of the plan to ensure equipment is sufficient comprehensive is review by the Program Advisory Committee ("PAC"). It appears that PAC members were sent a document that included the results of the internal assessment of the campus' equipment and instructional materials described above and were asked to "…review the school's plan regarding equipment" and provide feedback. In general, the PAC members appear to have found that CEHE's plan for equipping the various programs is sufficient to meet the needs of students. The Commission is aware that PAC members did not conduct an on-site inspection of equipment and discuss the sufficiency of the equipment as a group and understands that an on-site inspection may not be feasible or desirable at this time.

The third element of CEHE's efforts to ensure equipment is sufficiently comprehensive is the formulation of a Transition Task Force that is comprised of corporate directors and vice presidents to "assist the ground campuses with the transition." As stated in the response,

*A member of the Transition Task Force visits each campus once per quarter to conduct a Quarterly Resource Visit During the visit, the task force member conducts a visual inspection of equipment to ensure that needed equipment is being maintained, that copiers, lab equipment, office equipment, and student laptops are in good working order, and that there is no broken equipment. This review is conducted every three months, each time by a different CEHE senior staff member.*

The response also includes under Exhibit 8.b., a blank copy of the "Quarterly Resource Visit Outline" which CEHE indicated is meant to document the quarterly visits. The Commission is interested in reviewing the completed quarterly resource visit outlines and any actions taken by the school based on the results of those visits.

**Teach-out Plan Approval Contingencies**

As stated above, overall the teach-out plans for all thirteen (13) schools are approved, provided that CEHE ensures the following:[7]

1.  The first provision is that in approving the teach-out plans the Commission expects that the schools below will remain open until the final student graduates. The Commission noted that plans for the four schools below contain misaligned information regarding the date the last student is expected to graduate.

| School | Date Last Student is Scheduled to Graduate |
|---|---|
| CCSD (#M001073) | According to the Teach-Out Form: 6/19/2022 |
|  | According to the Student List: 9/11/2022 |
| CCSD Satellite Location (#SL460488) | According to the Teach-Out Form: 8/14/2022 |

---

[7] In order for the teach out plan approval to remain intact, the Commission expects CEHE to adhere to these contingencies. Failure to do so will result in the Commission revising the approval of the teach out plans.

**Exhibit E - 8**

JA138

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*July 21, 2020*
*Page 9 of 32*

| | According to the Student List: 9/11/2022 |
|---|---|
| CCSD – San Marcos, California (#B072374) | 9/11/2022 |
| SHC-Murray (#B070583) | According to the Teach-Out Form: 7/17/2022 |
| | According to the Student List: 6/19/2022 |
| SHC-Boise (#B070764) | According to the Teach-Out Form: 7/17/2022 |
| | According to the Student List: 9/11/2022 |

2. The plans are approved provided that CEHE has any necessary approvals from the state agencies, other accreditors, and the U.S. Department of Education, where applicable.

3. CEHE is prohibited from enrolling new students or re-enrolling former students into the 13 schools in teach-out without obtaining the Commission's permission (see also footnote #3 above).

4. The plans are approved provided that the plans maintain compliance with International Student Visa Requirements.

5. For the schools remaining open until the completion of the teach-out, CEHE must submit biannual reports on the progress of the teach-outs **due on October 1 and April 1** until the completion of the teach-outs. The Commission noted that as part of CEHE's transition and teach-out plan the schools implemented a transition plan that includes incentives for both faculty and staff to stay with the school until all students are graduated or until their position is no longer needed. The schools also implemented a Transition Task Force that meets weekly and will review and analyze the ongoing staffing needs of each campus. Considering the length of time that some of the campuses will be in teach-out the Commission is interested in biannual reports in order to monitor not only the progress of students' education, also the retention of faculty and staff needed to complete the teach-out. The biannual reports must also include completed Quarterly Resource Visit Outlines showing that a member of the Transition Task Force has visited each school and conducted an inspection of equipment and a description of any actions taken by the school based on the results of those visits.

6. For the eight schools closing in September 2020, CEHE must submit a report on the final disposition of students and official closure notice with effective date **due on September 12, 2020**.

## COMMISSION FINDINGS

## COMPLIANCE ISSUES FOR INDEPENDENCE UNIVERSITY AND SHC-WEST HAVEN

1. CEHE must demonstrate successful student achievement, including acceptable rates of student graduation and graduate employment in the career field for which the schools provide education at SHC-West Haven and IU (*Section VII (B)(1)(b), Substantive Standards, Standards of Accreditation*). In the October 28, 2019 Probation letter, the Commission "noted the magnitude of the programs that are failing to demonstrate successful student achievement at some of the schools in CEHE's system, most notably IU, California College-San Diego, and CollegeAmerica in Phoenix." In addition, based on a review of three year's student achievement data the Commission also expressed particular interest in the progress of seven institutions toward demonstrating successful student achievement. These schools reported below-benchmark rates of student achievement for half (or more) of the programs offered. Of those seven, two are now in teach-out mode and three are under consideration for premature closure. The remaining two campuses are the schools that CEHE intends to maintain in operational status: SHC-West Haven and IU.

**Exhibit E - 9**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*            *Probation Order*
*July 21, 2020*
*Page 10 of 32*

At the May 2020 meeting, the Commission reviewed the Graduation and Employment Charts supplied with the response, prepared using a March 2020 Report Date and found that SHC-West Haven now four active programs that have been operational long enough to have reportable outcomes, and the school has reported below-benchmark rates of graduation for two programs. The history of student achievement outcomes reporting for the four active/reportable programs are outlined in the chart below.

| Stevens-Henager College – West Haven (M070581) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Program Title (Credential)** | **Graduation Rate** | | | | **Employment Rate** | | | |
| | **2017** | **2018** | **2019** | **March 2020** | **2017** | **2018** | **2019** | **March 2020** |
| Business Administration (BS) | 48% | **23%** | 42% | **33%** | 77% | 83% | 90% | 100% |
| Medical Assisting (AOS)[†] | **22%** | **29%** | 43% | **32%** | 72% | 71% | 75% | 74% |
| Nursing Education (AD) | 77% | 53% | 67% | 76% | 84% | 84% | 88% | 95% |
| Surgical Technologist (AOS) | 57% | 48% | 52% | 47% | 92% | 91% | 91% | 92% |

[†] Formerly Medical Specialties      Red highlight denotes below benchmark rates.

As noted by CEHE, the rates for all four programs were above benchmark with the 2019 Annual Report; however, two programs show a marked decline for the March 2020 Report Date. The Commission directed SHC-West Haven to provide an updated assessment; however, the response contains an identical description to the one included in the response reviewed at the August 2019 meeting.

With regard to actions taken by SHC-West Haven to address the factors, the response reiterates the previously-described changes to academic management, the implementation of accountability metrics (described in Procedural Directive 363); monthly student surveys; weekly academic progress meetings; creation of a student success center; monitoring of success in the first three weeks; .and increased advising with Medical Assisting (AOS) students about their program selection. The Commission noted that the school consistently reports above-benchmark rates in the Nursing Education (AD) and Surgical Technologist (AOS) programs, and is interested in an analysis of the differences between the programs that might also contribute to the differences in student achievement rates.

With regard to the effectiveness of the school's actions, the response states:

> *In 2018, year-end retention of students is at 75% compared to 88% in 2019. This figure calculates drops and re-entered students and is a declining number starting at 100% on January 1. The improvement is 13%.... The 2021 cohort data suggests that the action plans implemented in the last several years are effective and will allow the College to meet or exceed the graduation rate benchmarks.*

Although the Commission noted that the rates reported using a March 2020 Report Date fall below ACCSC benchmarks, the evidence appears to show the strategies are starting to take effect. Therefore, the Commission is willing to afford the school an additional opportunity to demonstrate successful student achievement. In addition, the Commission is interested in reviewing data that is reported in accordance with the guidance regarding students transferring between programs as outlined in Finding #2 of this letter.

The Commission reviewed the Graduation and Employment Charts supplied with the response, prepared using a March 2020 Report Date and found that IU has fourteen active/reportable programs, and the school has reported below-benchmark rates of student achievement for nine programs. The

**Exhibit E - 10**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                     *Probation Order*
*July 21, 2020*
*Page 11 of 32*

history of student achievement outcomes reporting for the fourteen active/reportable programs are outlined in the chart below.

| Independence University (B072309) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Program Title (Credential)** | **Graduation Rate** | | | | **Employment Rate** | | | |
| | **2017** | **2018** | **2019** | **March 2020** | **2017** | **2018** | **2019** | **March 2020** |
| Accounting-DE (BS) | N/A | 17% | 20% | 22% | N/A | 73% | 79% | 60% |
| Business Administration-DE (BS) | N/A | 18% | 17% | 18% | N/A | 53% | 49% | 51%` |
| Business-DE (AAS) | 16% | 19% | 21% | 20% | 53% | 41% | 59% | 51% |
| Business-DE (Diploma) | N/A | 100% | 65% | 78% | N/A | 100% | 100% | 80% |
| Graphic Arts-DE (BS) | N/A | 19% | 21% | 19% | N/A | 63% | 55% | 41% |
| Health Services Management-DE (BS) | 65% | 74% | 12% | 14% | 83% | 68% | 54% | 29% |
| Information Systems-DE (MS) | 53% | 37% | 58% | 64% | 75% | 30% | 73% | 33% |
| Business Administration-DE (MBA) | N/A | 70% | 63% | 70% | N/A | 44% | 60% | 33% |
| Medical Assisting-DE (AOS)† | 21% | 13% | 19% | 22% | 48% | 27% | 50% | 37% |
| Nurse Education-DE (MS) | 100% | 100% | 100% | 80% | 100% | 100% | 50% | 100% |
| Nursing-DE (BS) | 67% | 55% | 75% | 67% | 100% | 83% | 100% | 100% |
| Nursing Administration-DE (MS) | 100% | 50% | 100% | N/A | 100% | 100% | 100% | N/A |
| Respiratory Care-DE (BS) | 82% | 72% | 78% | 73% | 86% | 80% | 93% | 91% |
| Web Design & Development-DE (BS) | N/A | N/A | 12% | 9% | N/A | N/A | 57% | 67% |

† Formerly Medical Specialties    DE=Distance Education    Red highlight denotes below benchmark rates.

The Commission noted that student graduation rates have gradually improved for the Accounting-DE (BS) and Medical Assisting-DE (AOS) programs, but have remained relatively unchanged for the Business Administration-DE (BS), Business-DE (AAS), and Graphic Arts-DE program. CEHE's response provides a "Summary of the Interim G&E Charts for graduation rates" which shows that on the 13 Graduation and Employment Charts provided with the response, IU reported a total of 4,873 starts, 166 transfers within the campus, 50 unavailable for graduation, and 997 graduates. The institutional graduation rate is 21%. The Commission found that this result highlights the magnitude of improvement that must be achieved in order for IU to demonstrate successful student achievement. The Commission also noted that with the 2019 Annual Report, IU reported 7,912 students as of July 1, 2018 8,607 students as of June 30, 2019, and 8,943 students entered IU between those dates, for a total of 16,855. Of that total, 8,248 students departed the institution between July 1, 2018 and June 30, 2019. Of the students who departed, 1,489 or 18% graduated. The Commission is concerned about the 6,759 students that left IU without achieving the educational objectives of the programs. The data is not reflective of a healthy institution consistently meeting its mission at an acceptable level; however, the Commission noted that IU has consistently reported above-benchmark rates for the Business-DE (Diploma), Nurse Education-DE (MS) Nursing Administration-DE (MS), and Respiratory Care -DE (BS) programs. The Commission is interested in why the policies and procedures that result in student success in these four programs are failing to produce success in the other programs.

With regard to actions taken by SHC-West Haven to address the factors, CEHE reiterated the five factors affecting the rate of graduation in multiple programs as outlined in the previous action plan and provided updates on the effectiveness of actions taken to address each factor, as follows:

**Exhibit E - 11**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                      *Probation Order*
*July 21, 2020*
*Page 12 of 32*

### Factor #1: Course Scheduling

The response defines the issue and the strategy developed to address the issue as follows:

> *One of the challenges Independence University faces in retaining students to graduation is that in order to retain full-time standings, students needed to be scheduled for two courses in the same four-week module on a regular basis. When students were scheduled for two subjects in the same module, the student usually chose to focus on only one of the two courses and subsequently failed the other. To address this issue, the university developed a scheduling model (5 credit courses) that allows students to take only one course at a time.*

According to the November 2019 updates "[t]he five-credit hour course initiative continues to demonstrate improved retention versus the prior 3-4 credit per course model." The response indicates that, in terms of retention in courses, "[t]he overall improvement year-to-date of all Business and related General Education courses is 10.39 percentage points or 15.47%." The response concludes that "[t]he most recent results of the 5-credit model have shown the desired effect for graduation rates. The 2022 cohort, which is the first group of students enrolled in the 5-credit model for the Business AAS is predicted to have a 49% graduation rate. This is a significant jump from the 2021 forecast of 21%."

### Factor #2: Time Management

The response defines the issue and the strategy developed to address the issue as follows:

> *The University conducted research to determine the relationship between grades in the first module to outcomes. The commitment of time and the ability to manage time is identified, in part, by success in the classroom. Research showed that only ten percent of students who earned a C grade or lower in their first time were successfully retained by the end of the first academic year. To improve the success of this segment of the student population the institution organized Study Café.*

The November 2019 update states that that the "Study Café success may have been a false positive tied to another initiative" and that "Study Café has been abandoned as an initiative." However, IU adopted best practices from the Study Café model into a new initiative: Lab Instructors in the Classroom. This term refers to "a second instructor added to a course to focus on student success, individual attention and expanded live session contact and instruction for students in their first academic year." According to the response, IU tested this approach in module six of two programs and found it resulted in an improvement in completion rates. These results led IU to a test of the second instructor model in the first year curriculum. The effectiveness of this stage of implementation is to be measured in December (presumably 2019), with plans to institutionalize the model and procedures in 2020.

### Factor #3: Technology Issues

The response defines the issue and the strategies developed to address the issue as follows:

> *Some students struggle with computer hardware and software issues. The University has put in a number of aids for students including: providing a tablet, a laptop computer, all software for their programs, and IT support to aid students when problems arise. Four strategies to reduce drops related to technology challenges were adopted or expanded in the Fall of 2018. These include: (1) improve the facilitation of equipment distribution, (2) preload software students need for success, (3) improve the turnaround time when replacing or repairing damaged equipment, and (4) improve the level of service by IT support systems.*

**Exhibit E - 12**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*          *Probation Order*
*July 21, 2020*
*Page 13 of 32*

The November 2019 update indicates that IU continues to focus on ensuring that students have tablets in the first week of class, and that students receive laptops in the first week of the fourth module. These devices are preloaded with the requisite software. Graphic Arts students "now receive their MAC computers in week two or three of their third module so that they can receive a mini-course in how to use the MAC and Adobe software prior to their first graphic arts course." In addition, IU is focusing on providing timely service on computers sent in for repairs, with a target of two business days. In cases where repairs will take longer, IU instituted a "loaner" program so students will not experience a protracted disruption to the educational process. Finally, IU has added two student interns to the help desk area, to provide additional resources during high volume call times. Although there are no statistics provided to link the improved technology resourcing with student retention, CEHE concludes that "[i]mprovements in the technology area should result in incremental success in retention of students."

**Factor #4: Student Engagement**

The response describes the eight strategies IU has developed for improving student engagement and retention, as follows:

*Strategy 1 – Enhanced engagement and communication through faculty program advisors*

The November 2019 update indicates that student surveys show a positive response to the faculty program advisors, although the response does not include the date of those surveys. In addition, the response states "[a] new test program is being evaluated, the FPA At-Risk Student Strike Force." It is not clear what this program entails or how it differs from the faculty program advisor program.

*Strategy 2 – Keeping students informed through such resources as SHARC and the IU Student Review*

The November 2019 update indicates that the "IU Student Review has been institutionalized and is issued weekly. Since our last report the open rate has increased to an average of 35%, with a high of 41%." There is no explanation of the "SHARC" resource and whether it is pertinent to the implementation of the strategy at this point.

*Strategy 3 – Open Houses across the country for active students and graduates*

According to the November 2019 update, the last open house occurred in August 2019 with approximately 200 participants. According to the response, IU intends to restructure both graduation ceremonies and open houses in 2020; however, the response does not describe the contemplated changes. The response indicates that IU plans to conduct a combination of open houses and graduation ceremonies in Columbus, Ohio, Salt Lake City, Utah, and Ft Worth, Texas using the same model that was developed in Atlanta, Georgia in 2019.

*Strategy 4 – Invest in, and implement NuroRetention software to provide a better means to track student activity and coordinate communication between departments when working with at-risk students.*

The November 2019 update indicates that the NuroRetention software has been challenging to implement and revisions have been made to the software to make it more compatible to the IU system. IU is planning a "second kick off in January when the final major upgrade is completed as well as moving to the added Insight Platform."

*Strategy 5 – Increase the size and scope of the student services team. The student services team was increase from 28 to 45 employees. Added personnel in this area should improve service and communication, and therefore retention of students.*

**Exhibit E - 13**

The November 2019 update indicates that there are now 55 Student Services Advisors and the plan is to continuing to hire an additional advisor for every 25-student increase in student population. IU has also implemented routine outbound calls to check in with students, in addition to responding to inbound calls from students. According to the update, the Freshman Orientation and Freshman Club Webinar Series continue to show favorable results. Student Services Advisors are continually reaching out to the student population to involve them in the series and are exploring new ways to increase the number of those who attend.

*Strategy 6 – Improvements and activities in the area of tutoring for students.*

According to the response, IU has two distinct groups in the area of tutoring. The Writing Center provides both synchronous and asynchronous assistance in writing and the Student Success Center provides live tutoring in 27 areas. The November 2019 update indicates that those who make use of the Writing Center are more likely to stay in school and the retention rates of those who use the tutoring services shows significant improvement.

*Strategy 7 – Develop and expand extracurricular activities.*

Per the response, IU started a Student Advisory Committee ("SAC") as a support organization to encourage students to participate in activities beyond the classroom. SAC has participated in multiple research and advisory projects that started in 2015. The November 2019 update indicates that students who participate in the student advisory committee activities have a higher retention rate. In addition, the response mentions program-specific extracurricular activities, such as the Business Club. Overall, the results show that participants in those activities are more likely to stay in school.

*Strategy 8 – Badge initiative Roll-out*

According to the response, IU found that students earning certifications in their programs have a higher tendency to complete their programs than those who do not. IU found that many certification programs are not readily available online and so has started "an initiative to show recognition of students who have successfully met the criteria for various badges... [t]he Badge program will include participation badges as well as skills badges that can enhance employability of the University graduates."

It appears, from the response, that some badges are awarded to the recipients of term awards in recognition of academic performance, such as President's list, Dean's list, and Honor roll. There have been under 5,000 students earning these badges, with some students earning more than one. In addition, there have been 690 badges awarded for skills developed in courses. These included badges in Graphic Arts, Business Management, and e-portfolios. IU is in the process of developing a tracking system to record the retention of students earning the different badges.

**Factor #5: Life Issues**

Specifically, as described in the response,

*The University previously conducted research with students who had voluntarily dropped from their programs. In rank order, the four main reasons for dropping included personal medical, money or job, family issues, and work issues. In multiple surveys these four reasons accounted for between 48 and 61 percent of the reported reasons for students dropping. In the fall of 2018 we identified four strategies to reduce the number of drops caused by these life issues*

*Strategy 1 – Have students demonstrate commitment to their education in week 1 of their enrollment, by not only needing to participate in class, but submit their first assignment.*

**Exhibit E - 14**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                    *Probation Order*
*July 21, 2020*
*Page 15 of 32*

The November 2019 update indicates that this approach has resulted in better completion rates in
modules 1-10. The highest drop rates are in modules 2-5; therefore, IU concluded that an increase in
the completion rate in the second course is indicative that IU has done a better job of identifying and
cancelling students who will not proceed and be successful in their programs.

> *Strategy 2 – Investigate the possibility of providing a Leave of Absence (LOA) policy for
> students. Over half of our students who drop report that they would like to return to school
> within six months, but only a fraction of those wanting to come back make it through the reentry
> process.*

The November 2019 update indicates that although the LOA plan was developed, it has been tabled by
CEHE Executive Management due to regulatory concerns. In its place, CEHE intends to adopt "…a
three year test program to determine if additional breaks from school will help reduce burn out and
drops where students only want/need a temporary break. The new program, beginning in 2020 includes
two one-week breaks each year and a two-week break during the Christmas/New Year holiday season.
The current program is only a two-week break during the Christmas/New Year holiday season."

> *Strategy 3 – Expand the reentry team to improve the ability of students wishing to return to
> school after dropping.*

The November 2019 update indicates that the 2020 institutional assessment and improvement plan
includes plans to expand the reentry team with a goal of increasing "reentries from an average of 110
students per module to 180-200 students per module. Based on student surveys of students who drop
nearly two-thirds of students who drop want to return to the university."

The response also includes seven pages of program-specific initiatives to improve student retention,
most a selection of the initiatives described above. The Commission recognized the breadth of
initiatives that IU has implemented in an effort to improve student graduation rates. With regard to the
effectiveness of these initiatives, the response includes a table of "forecasted" graduation rates for the
2020, 2021, 2022, 2023, and 2024 cohort years. IU forecasted that graduation rates will be above-
benchmark for the Business (AAS) and Medical Assisting (AOS) by 2022 and for the Accounting (BS)
and Business Administration (BS) by the 2024 cohort year. The Commission noted that the response
does not include a forecast for the Health Services Management (BS), Graphic Arts (BS) or Web Design
and Development (BS) programs. The Commission expects to see progress toward the reporting of
above-benchmark student graduation rates to provide assurance that CEHE is capable of developing
and implementing successful strategies.

With regard to employment rates at IU, the response states that "[a]lthough the interim G&E charts
show that nine (90 [*sic*] programs are below bench, we are forecasting that only three (3) programs will
be below bench at the time of reporting in October 2020." The response describes the updates to IU's
plans that were implemented in 2017 and 2018. At that time, IU identified four factors affecting the
rates of graduate employment, and two additional factors were identified in 2020. Those factors and
IU's corresponding initiatives are outlined below.

> *Factor 1 - Career Services department being under-staffed*

The response indicates that current staffing includes 47 Career Services Advisors and IU is actively
recruiting for an additional eight. The response includes a chart showing that as the number of Career
Services Advisors rises, the number of placements in all cohorts rises.

> *Factor 2 - Not engaging with students early enough in their programs*

**Exhibit E - 15**

To address this factor, IU has established early and increased interaction between the student and the Career Services Advisor. With the implementation of the Student Success Team in January 2018, all students are assigned a specific member from each of the University's support departments including a Career Services Advisor (CSA). IU views this as an opportunity for students to develop soft skills and increase career readiness while attending school. In addition, IU indicated that this approach will aid in retention by keeping students actively engaged in the end goal, which is to get a better career after graduation. According to the response, IU has already achieved a 20% year over year increase in total placements, and predicts that over time "this will grow exponentially."

*Factor 3 - Not developing sufficient employment opportunities*

In January 2018, IU contracted with "E-hired," a service that provides a job search tool for students and a way to monitor students' job search activity for IU. As described in the response, E-hired is

*...a comprehensive job search tool designed to find job leads based on SOC codes, student's program, and location. A personalized E-Hired student profile is created for every student and graduate contacted by a Career Services Advisor. For active students it is set up during their initial meeting during their 4th module. Each student profile contains the students' resume, portfolio, degree information, certifications obtained and contact information and is open for employer viewing. Jobs leads are then automatically sent via email to the student seven days per week.*

According to IU's analysis of the effectiveness of this approach, currently there are 4,578 students utilizing E-Hired. Since December 1, 2017:

- *9,354,083 in-field, matching students programs/credentials employment opportunities have been identified and delivered to our student body;*

- *1,218,810 jobs have been viewed;*

- *29,157 jobs have been applied for.*

IU has also been working on a network of employer partnerships. According to the response, the school has "connected with" 1,668 employers across the country since January 1, 2020.

*Factor 4 - Students not understanding the need to build professional work experience and skills while attending school*

The school has "implemented an active student development plan to be followed through a set of prescribed contacts." Career Services begins working with active students during their fourth module. Students are contacted at least once per term until the student reaches pre-graduation status at which time the school begins regular weekly contact. In addition, the school changed how students schedule and conduct mock interviews as part of their CSS299 Professional Development course. According to the response, these changes will result in dramatic overall increase in the employment rate from 43% for the 2020 cohort to 83% for the 2021 cohort.

*Factor 5 - Inability to contact students and graduate unresponsiveness*

The school implemented a new scheduling system, Acuity, in May 2018. According to the response, "[t]his system allows students to proactively schedule appointments at a convenient time for them and select the development area they need assistance with." The system also sends a satisfaction survey to the student immediately following the appointment. The response also refers to the implementation of the Student Success Teams and prescribed contact plan that are building a culture of regular voice-to-voice contact to overcome the issue of unresponsiveness. In the school's most recent biannual student

**Exhibit E - 16**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*        *Probation Order*
*July 21, 2020*
*Page 17 of 32*

satisfaction survey, "the greatest improvement in comparison to the 2014 survey results, which are reflective of the opinions affecting the 2019 cohort, was the awareness of the Career Services Department with an increase of 30 percentage points from 67% to 97%."

*Factor 6 - Graduate expectations and levels of preparedness*

The school has implemented an early assessment program, either upon initial reconnection with a graduate, or during an active student's second term, whereby the Career Services Advisor identifies development opportunities and facilitates the creation of a development timeline with the student. According to the response, "[n]ot only does this allow us to identify deficiencies in job experiences, it also provides the opportunity to discuss outcome expectations and recommend internships or skills development to the students while they are in school, if applicable." The school indicates that 96 students and graduates have been matched to internships, and 200 additional opportunities have been identified. It is not clear that the increased number of internships has resulted in additional graduates being employed in field.

The Commission again recognizes the efforts IU has made to analyze factors impacting employment rates and develop a broad range of strategies to address those factors. Although there are some indications that the strategies will be successful mechanisms for improvement, the Commission acknowledges that more time is needed to show whether the improvement will be sufficient to raise rates of student achievement to an acceptable level.

As indicated in the October 28, 2019 Probation letter, the Commission reconsidered its previous decision to direct IU to cease enrolling new students in Business – DE (AAS) and Master of Business Administration (MBA) programs. On charts prepared using a March 2020 Report Date, the school reported below benchmark rates of student achievement for both programs. The Commission found that the graduation and employment rates for the Business – DE (AAS) remained steady; however, there was a noticeable decline in the employment rate for the Master of Business Administration (MBA) program. Therefore, both programs will continue to be subject to the "cease enrollment" directive.

Due to the history of below-benchmark outcomes in the following six programs, the Commission directs IU to cap enrollment at the level of the enrollment in the program as of June 30, 2019, as reported in the 2019 Annual Report:

- Accounting – DE (BS): 256
- Business Administration (BS): 1456
- Health Services Management (BS): 3466
- Information Systems – DE (MS): 43
- Medical Assisting – DE (AOS) [*formerly Medical Specialties*]: 2524
- Web Design and Development (BS): 194

Based on the foregoing, the Commission directs CEHE to submit the following on behalf of SHC-West Haven and IU:

a. A Graduation and Employment Chart using a **December 2020 Report Date**[8] for each program and supporting summary information for each Graduation and Employment Chart submitted, organized according to the corresponding **cohort start date** reported on the chart (line #1), as follows:

---

[8] The Commission will also review the Graduation and Employment Charts submitted with the schools' 2020 Annual Reports.

**Exhibit E - 17**

    i.   For each student reported provide the following information:

| Student ID# | Program | Start Date | Graduation Date | Withdrawal/ Termination Date |
|---|---|---|---|---|
| | | | | |

    ii.  For each student classified as "Unavailable for Graduation" (line #6), provide the following information:

| Student ID# | Program | Start Date | Reason Unavailable | Description of the Documentation on File |
|---|---|---|---|---|
| | | | | |

    iii.  For each graduate reported, provide the following information:

| Graduate ID# | Program | Start Date | Employer, Address, & Phone # | Employer Point of Contact | Date of Initial Employment | Descriptive Job Title | Other Status (Unemployed, Further Ed., Unknown, Etc.) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

    iv.  For each graduate classified as "Graduates-Further Education" (line #11) or "Graduates-Unavailable for Employment" (line #12), provide the following information:

| Graduate ID# | Program | Start Date | Classification on the G&E Chart | Reason | Description of the Documentation on File |
|---|---|---|---|---|---|
| | | | | | |

b.  For each program for which the reported rates of student graduation and graduate employment do not meet the ACCSC benchmark, the school must provide

    i.   An updated assessment of the factors impacting the rates of student graduation (e.g., admissions requirements and student support) and graduate employment (e.g., economic conditions),

    ii.  A description of the strategies implemented by the school and how the strategies are designed to target the factors identified in the assessment described above, and

    iii.  A description of whether the strategies the school is using have been effective.

c.  An ACCSC Retention Chart for each program offered.

d.  A list of recent graduates from each program for the last six months with employment information, in the following format:

| Graduate ID# | Program | Start Date | Employer Contact, Address, & Phone # | Date of Initial Employment | Descriptive Job Title | Other Status (Unemployed, Further Ed., Unknown, Etc.) |
|---|---|---|---|---|---|---|
| | | | | | | |

2.  CEHE must demonstrate that the schools report student achievement data in accordance with the instructions on the Graduation and Employment Chart (*Section VII (B)(1), Substantive Standards, Standards of Accreditation*). With the May 2, 2019 letter, the Commission first raised the question with regard to the use of the "transfers in and out" categories for students that appeared to have withdrawn and re-enrolled. Specifically, according to data reported in the 2018 Annual Report, some students reported as "transfers" between two programs at the same institution entered the second program more than a year after leaving the first program. The Commission observed that the movement of students to a cohort one to three years in the future is more typical of students that drop (or are terminated) and

**Exhibit E - 18**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                     *Probation Order*
*July 21, 2020*
*Page 19 of 32*

subsequently re-enroll in a different program. Therefore, with the October 28, 2019 Probation letter, the Commission directed CEHE to use the following guidance when completing Graduation and Employment Charts in future: **Only if a student withdraws from a program and is able to complete the program into which the student re-enrolled within 150% of the normal duration of the original program, may that student be reported as a transfer.**

In response, CEHE states two points of confusion with the Commission's directive. The first issue has to do with the Commission's directive to implement the definition of transfers with all Graduation and Employment Charts prepared in future:

> *The first point of confusion is that it appears that the Commission is providing CEHE with new or revised guidance (relative to the Commission's interpretation of its Standards) while simultaneously asking CEHE to demonstrate past compliance with this revised guidance. Specifically, the Commission is directing CEHE to use the guidance in its Letter: "...when completing Graduation and Employment Charts in the future." (Emphasis added). But the Commission is simultaneously requesting that CEHE provide evidence of compliance with this new guidance for past reporting of student outcomes (i.e., cohorts of graduates that have already finished school, including student cohorts that were previously reported upon in CEHE's 2019 ACCSC Annual Report.*

The Commission's stance is that the directive to prepare Graduation and Employment Charts in accordance with the instructions does not require "past compliance," rather it requires the current application of the instruction at the time the Graduation and Employment Charts are prepared. The decision to report a student as "withdrawn" or "transferred" is current as of the completion of the chart and the signature attesting to the accuracy of the data therein.

CEHE's response indicates that the schools are interpreting the Commission's guidance as being applied "inconsistently."

> *The second point of confusion relates to how this revised guidance appears to be applied inconsistently. Based upon CEHE's understanding of the Commission's revised guidance, it seems that the guidance is different for students who had withdrawn and then subsequently come back to school and re-enroll into a different program versus students who are active and then decide to transfer into a new program and cease the original program in which they were enrolled.*

The response contains two examples of students "moving" from an associate's degree program to a baccalaureate degree program. The first student "transfers" and the second student "drops out" and "re-enrolls" the very next day. The school's point appears to be that both students experience the same enrollment pattern, and one can be counted as a transfer, while the other is not.

The Commission found that CEHE's interpretation that "the guidance is different" depending on whether students had officially "withdrawn" or whether students were still "active," is inaccurate. The Commission's questions regarding the classification of students moving from one program to another centers on the temporal gaps of enrollment, e.g., up to years between the time enrollment ceased and the time enrollment began again, rather than the student's official status at the time of departure. The issue seems to be how to establish a reasonable timeframe in which a student would be considered to have "transferred," which implies a certain continuity of instruction – as opposed to a withdrawal and re-enroll. To provide CEHE guidance within the framework of the established instructions for preparing

**Exhibit E - 19**

JA149

the Graduation and Employment Charts, as well as connecting to academic progress standards, the Commission used the maximum timeframe paradigm. Granted, the guidance was issued in contemplation of students moving into shorter programs, e.g., baccalaureate degrees into associate degrees. The Commission noted that the guidance is incomplete without the corresponding delimiter established for students transferring into longer programs, and therefore the complete guidance is as follows:

- *When the "transfer in" program is equal to or shorter in duration than the original program:* **Only if a student withdraws from a program and is able to complete the program into which the student re-enrolled within 150% of the normal duration of the original program, may that student be reported as a transfer.**

- *When the "transfer in" program is greater in duration than the original program:* **Only if a student withdraws from a program and is able to complete the program into which the student re-enrolled within 150% of the remaining portion of the program into which the student enrolled, may that student be reported as a transfer.**

In response, CEHE provided lists of the students categorized as "transfers out" on Graduation and Employment Charts submitted with the response. For SHC-West Haven (M070581) there were a total of 20 transfers out on all Graduation and Employment Charts and for IU (B072309), there were a total of 166 students categorized as "transfers out." The Commission noted that CEHE provided the student lists in two categories: "Active Transfers" and "Drop Transfers" as follows:

- **Active transfers** appear to have little to no gap between the end date of one program and the begin date of the next program. For SHC-West Haven, the average is 4 days. For IU the average is 2 days.

- **Drop transfers** appear to have longer periods of non-enrollment between the end date of one program and the begin date of the next program. For SHC-West Haven, the gaps are 33, 41, 184, 349, 466, 1098, and 1245 days. For IU, the average period of non-enrollment for the 73 drop transfers was 255 days, 33 of 73 exceeded 180 days, and 15 exceed a year. The longest period of non-attendance was 3 years.

SHC-West Haven reported 13 active transfers and 7 drop transfers. IU reported 93 active transfers and 73 drop transfers. In reviewing the longer periods of non-enrollment, it appears that CEHE did not apply the guidance provided by the Commission in the October 28, 2019 Probation letter. Therefore, the Commission directs all CEHE-affiliated schools to prepare the Graduation and Employment Charts submitted with the 2020 Annual Report for in accordance with the guidance provided with regard to reporting students as transfers in and out of programs at the same school. The schools will be expected to maintain documentation to support the categorization of students as transfers, including enrollment agreements and transcripts.

Based on the foregoing, the Commission directs CEHE to submit the following for SHC-West Haven and IU:

a.  A list of all students reported as "transfers out" on the Graduation and Employment Charts submitted with Item #1 above in the following format:

| Original Program | Student ID# | Start Date | Date Transferred Out | New Program | Start Date | Status | Completion Date |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

**Exhibit E - 20**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*July 21, 2020*
*Page 21 of 32*

    b.   For each student, provide transcripts documenting the dates of the transfer; and

    c.   Any additional information that the school believes will be useful to the Commission in making a determination regarding the school's compliance with ACCSC's requirements.

3.   CEHE must demonstrate that the SHC-West Haven and IU have established admissions processes for programs and courses delivered via distance education that include:

- An assessment prior to enrollment of the student's technical skills, competencies;

- Access to technology necessary to succeed in a distance education environment;

- An assessment of the student's capability to benefit the distance education program or course; and

- An assessment as to whether the student's learning style is conducive to online learning.

In addition, CEHE must demonstrate the validity and reliability of the assessment tools used to assess a student's readiness for distance education online learning minimally using engagement surveys, academic progress, and student achievement data (*Section IX (F)(2 & 3), Substantive Standards, Standards of Accreditation*).

In August 2019, CEHE presented the results of an internal review that resulted in CEHE's decision to implement the SmarterMeasure Learning Readiness Indicator from SmarterServices, Inc. In the October 28, 2019 Probation letter, the Commission stated its intention to monitor the implementation of the SmarterMeasure Learning Readiness Indicator in the initial stages, and then monitor the efficacy of the new approach with studies of academic progress, retention data, and finally student graduation rates for the first cohorts of students admitted under the new process and procedures. Therefore, as a first stage in the monitoring process, the Commission directed CEHE to provide a copy of the admissions requirements and documentation for the most recent 50 applicants into the distance education programs or courses.

In response, CEHE provided a copy of the admissions requirements for enrollment into programs or course of study delivered via distance education platform as follows:

    *1.  High School Diploma or Equivalency (GED®, TASC, or HiSET). A high school diploma or high school equivalency must be provided on or before 11:59 p.m. (Mountain Time) on the Thursday\* prior to a start date (\*if the Thursday prior to a start is a holiday, the deadline is Wednesday before the start).*

    *2.  SmarterMeasure Online Readiness Assessment. An online assessment must be completed by each new applicant with a passing score of 70% or higher for the technical competency portion of the assessment. All portions of the assessment must be completed no later than 11:59 p.m. (Mountain Time) on the Thursday\* prior to a start date. Applicants who fail to meet the minimum score may take the SmarterMeasure assessment twenty-four hours or later after the first attempt. If the applicant fails to achieve the minimum score (70%) after two attempts, the applicant must wait 30 days before he/she can retake the assessment. If the applicant fails to meet the minimum score for a third time they must wait 120 days (from first attempt) to make another attempt.*

    *3.  Early Enrollment Course ("EAC"). Applicants must submit the seven required components and score 100% on the University and Policy Quiz. The EAC must be taken and passed on or before the start day at 11:59 p.m. (Mountain Time).*

**Exhibit E - 21**

CEHE provided a list of 40 students (of the 50 that applied) that were accepted into the schools. The response includes the admissions documentation in the form of the SmarterMeasure Test, evidence of high school graduation or recognized equivalent, and enrollment agreements for only 25 of the 40 accepted students. Of the 15 students for which there was no documentation, ten were "non starters" and five cancelled after class started. The Commission is interested in all students that were admitted into the school, regardless of the ultimate status of the students. Therefore, if the enrollment agreement was fully executed (e.g., signed by the accepting school official), CEHE must provide admissions documentation to show that those students were admitted in accordance with the stated admissions requirements. In addition, the Commission noted that the schools did not supply evidence that the Early Enrollment Course was taken on or before the start day at 11:59 p.m. (Mountain Time). And with regard to the High School Diploma or Equivalency, documentation for 19 of the students did not include the date of receipt by the school, and therefore the school did not demonstrate that documentation was "provided on or before 11:59 p.m. (Mountain Time) on the Thursday prior to a start date."

In reviewing the results of the SmartMeasure Online Readiness Assessment, the Commission noted that the assessment consists of four separate sections: Technical Competency, Technical Knowledge, Life Factors, and Learning Style. The first three sections are scored, and the learning style section ranks the students' style into one of the following categories: Aural, Logical, Physical, Social, Solitary, Verbal, and Visual. It appears, from the description of admissions criteria, that the prospective student is only required to pass the Technical Competency portion of the assessment in order to be admitted. It is not clear how the schools are adequately assessing the access to technology, student's capability to benefit from enrolling in a distance education course or program; or whether the student's learning style is conducive to online learning when only using a single portion of the test. The Commission noted that 15 students (of the 25 assessments provided in the response) indicated that they do not own computers. The Commission is interested in how this factor is taken into account when determining whether the student has access to the adequate technology. In addition, the Commission noted that although CEHE has not established a passing score for the Technical Knowledge portion of the assessment, the national average is given as 56, and three of the students scored well below that average at 49, 42, and 36 (out of 100). The Commission questioned whether these scores might be indicative that these prospective students might not be capable of benefitting from online learning.

Overall, the Commission is not convinced that CEHE's actual implementation of the SmarterMeasure instrument provides an adequate assessment of the student's technical skills, competencies, and access to technology or of the student's capability to benefit the distance education program or course; or whether the student's learning style is conducive to online learning. And yet, given the previous discussion of student achievement outcomes at SHC-West and IU in particular, it is imperative that CEHE implement the strongest possible measures to ensure that students are capable of benefiting from the hybrid or fully online training.

Based on the foregoing, the Commission directs SHC-West and IU to submit the following:

a.   A description of how CEHE's admissions process includes an assessment of the student's:

  •   Technical skills and competencies,

  •   Access to technology;

  •   Capability to benefit from the distance education program or course; and

  •   Learning style and its alignment to online learning;

**Exhibit E - 22**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                    *Probation Order*
*July 21, 2020*
*Page 23 of 32*

    b.   An explanation of how the results of the assessment, in each area, factors into the admissions decision;

    c.   A description of any other actions that are taken as a result of the assessment; such as enhanced services, or alternative learning methods;

    d.   A list of the 15 accepted students who were categorized as "non starts" or "cancels" and evidence for each of all admissions documentation (including the "EAC"), distance education readiness assessments, and enrollment agreements;

    e.   The list of 25 students who were accepted and began attending class, with the current status of each student (active/dropped/terminated), and current grades to demonstrate satisfactory academic progress; and

    f.   Any additional information that the school believes will be useful to the Commission in making a determination regarding the school's compliance with ACCSC's requirements.

4.   CEHE must demonstrate that the schools advertise in a truthful and accurate manner and that the schools take care to avoid creating any false, misleading, misrepresenting, or exaggerated impressions on prospective students (*Section IV (B), Substantive Standards, Standards of Accreditation*). As part of the October 28, 2019 Probation letter, the Commission stated:

> *Given the history of the Commission's issues and actions regarding CEHE's advertising, the Commission determined that additional monitoring is warranted to ensure that CEHE has established mechanisms which provide assurance that future advertising will comply with accrediting standards.*

Of particular note, CEHE described, in response to the September 8, 2018 System-Wide Probation Order, that "[o]n a cycle of every three years, CEHE engages one of its outside legal advisors to hire an independent third party firm to conduct a system-wide secret shopping review of CEHE's recruitment process and engagement with prospective students." In the October 28, 2019 Probation letter, the Commission expressed interest in how this periodic review might be effective as a self-regulating mechanism and directed CEHE to submit the results of the 2019 independent system-wide review of CEHE's recruitment process and engagement with prospective students. CEHE's response includes a description of the scope of the review conducted in the third quarter of 2019:

> *For the 2019 Q3 independent mystery shopping of CEHE's schools, one of CEHE's legal advisors (Armstrong Teasdale, LLP) contracted with the vendor, Norton Norris, to conduct two (2) engagements at one location from each of CEHE's onground campus brands (CollegeAmerica, California College San Diego, and Stevens-Henager) and twenty (20) engagements with CEHE's online college, Independence University. All of the engagements, except for the Stevens-Henager brand, occurred during the time period of July 1, 2019 to September 30, 2019. Unfortunately, due to vendor problems in securing appropriate staff and scheduling errors, the engagements for CEHE's Stevens-Henager brand were not fully completed. CEHE is working with its legal advisor to re-schedule the completion of engagements for the Stevens-Henager brand.*

CEHE also described the process that each "secret shopper" followed:

> 1.   *Inquire with the college by submitting a "request for information". This was typically done by submitting a request through a "lead form". The lead forms that were submitted came from one of the following: college's website, google search click to a landing page form,*

**Exhibit E - 23**

> *yahoo search click to a landing page form, or 3rd party vendor landing page form submission. In one case (CollegeAmerica Denver), the engagement was simply a "walk-in" to the campus with no previous contact.*

>   2. *Receive contact from the college's Contact Center ("CC") personnel and then schedule an interview appointment with one of the college's Admissions Consultants ("AC").*

>   3. *Visit the college and go through an admissions interview with an AC and a financial planner interview with one of the college's Financial Planners ("FP").*

>   4. *After conclusion of the visit, monitor college's follow-up process and then inform the AC that they were not interested in enrolling.*

> *The above process was slightly different for the engagements with Independence University. In those cases, after the initial contact call, the mystery shopper would request to speak with an IU AC. The interview with the AC and the interview with the FP would occur via the phone/internet.*

> *In each engagement, the mystery shopper ("Prospect") would present a scenario that varied by program of interest, previous education and training, age, family size and components, and high school graduation. Each Prospect had a series of similar questions and evaluation items that they were required to analyze and evaluate as part of the mystery shopping. The required evaluation items were organized into six (6) primary categories: Salary Information, Placement Information, Tuition Information, Financial Aid Information, Accreditation Information, and Transfer Credit Information.*

The Commission noted that CEHE did not provide the actual report issued by the vendor, Norton Norris. However, CEHE described the results in detail, listing each instance of non-compliance and corrective actions taken in each circumstance. The Commission noted that there were "unacceptable" ratings for 10 of 20 contacts at IU. However, each contact was comprised of 6 ratings for a total of 120 data points, of which 12 were rated "unacceptable." CEHE explained each circumstance and the actions taken to address the issues. The Commission noted that the corrective actions described by CEHE were primarily focused on admissions personnel, which were subsequently terminated as part of the teach-out of most of the campuses. The Commission is also interested in oversight of the information supplied by career services personnel, and the actions taken by CEHE to ensure the integrity of those statements.

In an overall assessment of the secret shopper process, CEHE stated:

> *CEHE believes that the results of the system-wide secret shopping were generally good. However, as discussed in the previous section, there were some concerns and corrective action needed. CEHE believes that its policies and procedures are sound and that the bi-weekly training meetings for all ACs provides a regular, reliable, and effective mechanism for ongoing training and improvement. Further, CEHE believes that the QA team and ongoing monitoring/scoring of ACs' interaction with prospective students is an effective tool for continuous improvement and allows CEHE to take corrective action quickly and to also monitor/verify that corrective action has been accepted and implemented by an AC.*

> *With respect to management, CEHE believes that the multiple levels of management and redundant mechanisms for review, monitoring, and verification ensure that advertising and representations will comply with accrediting standards.*

**Exhibit E - 24**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                    *Probation Order*
*July 21, 2020*
*Page 25 of 32*

The Commission noted that CEHE intends to increase the frequency of the secret shopping as an additional mechanism to monitor compliance in advertising and recruitment. The Commission is interested in the completion of a second set of reviews to be focused on the schools continuing in operation – SHC-West Haven and IU. In addition, CEHE is considering engaging with an external law firm to conduct a bi-annual review of all advertising and recruitment scripts, policies, and procedures by an external law firm that is qualified and experienced in accreditation and regulatory compliance. The Commission is interested in the results of these expanded efforts to gain insight into the functioning of the schools' recruitment and advertising processes, and how CEHE is able to use the feedback to formulate effective corrective measures.

To demonstrate that CEHE's oversight mechanisms result in advertising that complies with accrediting standards, CEHE provided copies of current advertising and promotional materials. Based on a review of these materials, the Commission found the following:

- An advertisement for IU titled "Financial Aid Made Simple" lists "6 Smart Reasons to Choose Independence University." The first reason is "[i]n an approval survey, IU scored 95% in student satisfaction, and 96% said they would recommend IU to a friend." The footnote to that statement is as follows: "[s]urvey conducted by IU Student Services, October 2018." While the Commission appreciates that the information is sourced and verifiable, with the various transitions that have occurred over the last two years, the Commission is interested in a demonstration that these approval ratings are reflective of current conditions.

- An advertisement for IU targeted to veterans (page 56 of Exhibit 6.d), contains the claim that appears frequently in all CEHE advertising: "[g]et a new tablet and a new laptop." The footnote to that statement is as follows: "does not apply to master's degree programs." The response contained many advertisements for IU that claim to provide students with a new tablet and new laptop without the disclaimer regarding master's degree students. Therefore, it is not clear that any IU advertising that refers to the receipt of a tablet or laptop without the corresponding disclaimer is accurately representing the school's services.

- An advertisement for IU titled "We're Standing By to Help You" contains the following statement: "unlike some traditional colleges and universities, we help you every step of the way." The Commission found that this statement serves to discredit "traditional colleges and universities" by implying that they do not help students and thus disparaging the character, nature, quality, value, or scope of another school's program of instruction or services (*Section IV (A)(16), Substantive Standards, Standards of Accreditation*).

  - The script for a 30 second radio spot for SHC-West Haven's Medical Assisting (AOS) program states "[w]e're different from other medical assisting programs" and "[w]e'll train you for important certifications." The Commission is interested in an explanation as to what is meant by "different from other medical assisting programs." In addition, given the revisions made to the certification statement in the enrollment agreement (see below), whether the statement "[w]e'll train you for important certifications" can be considered accurate.

In addition to CEHE's response to the October 28, 2019 Probation letter, the Commission considered a Media Report received January 13, 2020 regarding IU. The report includes a letter from an individual who received unsolicited advertising from IU and the four pages of advertising received. The individual raises the question as to whether the student survey referenced in the advertising is representative of current conditions, and whether IU is required to notify students of the school's Probation Status with ACCSC. The Commission had already determined to follow up on the student survey results to ensure

**Exhibit E - 25**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                    *Probation Order*
*July 21, 2020*
*Page 26 of 32*

they are accurately representing the school. As the materials presented in CEHE's response and with the Media Report do not indicate that the school is on Probation with ACCSC, the Commission is interested in how the schools are fulfilling the notification that a school subject to a Probation Order must inform current and prospective students that the school has been placed on Probation and where additional information regarding that action can be obtained from the Commission's website (*Section VII (L)(8), Rules of Process and Procedure, Standards of Accreditation*).

Based on the foregoing, the Commission directs CEHE to submit the following.

a. An explanation as to how CEHE-affiliated schools are informing current and prospective students that the school has been placed on Probation and indicating where additional information regarding that action can be obtained from the Commission's website;

b. An explanation or revision for each of the specific advertising issues listed above;

c. A schedule for all planned independent "secret shopper" reviews to be conducted in 2020 and 2021;

d. The vendor's report of an independent review of recruitment process and engagement with prospective students at SHC-West Haven and a second review at IU;

e. CEHE's assessment of the results of the independent reviews, including:

   i. An assessment as to whether the results indicate that there is adequate management in place to provide assurance that advertising and representations will comply with accrediting standards and

   ii. A description of any improvements that CEHE intends to make in response to the results of the reviews;

f. An update regarding the status of the project to engage with an external law firm to conduct a bi-annual review of all advertising and recruitment scripts, policies, and procedures by an external law firm that is qualified and experienced in accreditation and regulatory compliance (if a review of this nature has been conducted, submit a copy of the external law firm's report and any actions CEHE has taken as a result of this review); and

g. Copies of all advertising and promotional materials in current use by each CEHE-affiliated school, including – but not limited to – Internet advertising, the URL for the school's websites, radio or television (scripts are acceptable), flyers, direct mail, surveys, newsprint, and Yellow Pages.

5. CEHE must demonstrate that the tuition costs and charges, tuition discounts, and all costs incidental to training are disclosed to the prospective student before enrollment (*Section I (D)(1), Substantive Standards, Standards of Accreditation*). In order to demonstrate the use of an enrollment agreement that complies with accrediting standards in all cases, CEHE provided completed enrollment agreements[9] for ten students that enrolled in IU after the implementation of the revised enrollment agreement. The attestation signed by the school's President, Alan Hansen, indicates that the new enrollment agreement was implemented on June 25, 2019. The Commission noted that the agreements,

---

[9] The Commission noted that CEHE did not redact social security numbers from the enrollment agreements. The Commission reminds CEHE to ensure that it does not include personally identifiable information (e.g., social security numbers, dates of birth, addresses, etc.) on any applications, reports, forms or in any response to the Commission. If the school is using student social security numbers as a student identifier, then the Commission strongly discourages the school from doing so and urges the school instead to create and use its own unique student identifier system. The school should evaluate the need for a student's social security number on any form and delete the request for this information if it is not necessary.

**Exhibit E - 26**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*        *Probation Order*
*July 21, 2020*
*Page 27 of 32*

titled "2020 Enrollment Agreement" have a new section on page 2 of the agreement. Section 4: Educational Background provides an area for the student to list previous education. The prospective student is directed to:

> *List only credits which are applicable to the program in which you are enrolling. Be sure to list all university, professional, or corporate courses taken and exams passed for which you have earned credits toward this program, such as CLEP, DANTES, GRE subject exams, or AP.* **Do not attach transcripts.**

The following statement appears at the top of the section: "[p]rior credits and education will be verified at a later date." Thus, it was not clear Commission when in the admissions process the students' previous education is considered for transfer of credit. In addition, there is no information about how successful credit transfer may potentially affect (reduce) the costs associated with training at IU. Therefore, IU has not demonstrated that the student is informed about all tuition costs and charges, tuition discounts, and all costs incidental to training prior to enrollment.

Based on the foregoing, the Commission directs IU to submit the following:

a. An explanation of the timing of the transfer of credit process, including how and when the student is notified of credits accepted in transfer;

b. A description of how IU informs students of the effect of successful credit transfer on tuition costs prior to enrollment; and

c. Any additional information that the school believes will be useful to the Commission in making a determination regarding the school's compliance with ACCSC's requirements.

6. CEHE must demonstrate that the schools have and enforce consistent policies and procedures with regard to independent study at all affiliated institutions (*Section I (A)(1)(d), Substantive Standards, Standards of Accreditation*). Questions regarding the independent study policy were first raised in the October 17, 2018 TSR issued to CCSD-San Marcos and has yet to be resolved with the May 2, 2019 Continued Probation Order. In response, CEHE provided the Directed Study Procedure Directive dated June 18, 2019. With the October 28, 2019 Probation letter, the Commission afforded CEHE an additional opportunity to provide documentation showing that "Directed Study" is delivered in accordance with the stated policy throughout the system of all affiliated schools.

In response, CEHE provided a copy of Procedure Directive 54R revision dated June 18, 2019 that includes the schools' policy relating to directed (independent) study. The response also includes ten executed Directed Study Contracts from the San Marcos campus and ten from all other campuses. The Commission noted the following:

- According to the Directed Study policy, "[s]tudents in their first term with the institution are not eligible for a Directed Study." Despite this statement, it appears that three students J. Delk, G. James, N. Hailey-- from the San Marcos campus appeared to be completing the first module of the program through directed study.

- According to the Directed Study policy, "[s]tudents may only take Directed Study for 10% of the total program." G. James completed three courses concurrently through Directed Study. The Commission expressed concern that by doing so, G. James may have exceeded the 10% threshold,

- According to the Directed Study policy "A specific written syllabus […] is followed and monitored by the instructor." From a review of the executed contracts, it appears that the attached syllabus

**Exhibit E - 27**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                          *Probation Order*
*July 21, 2020*
*Page 28 of 32*

pertain exclusively to the courses as delivered in a classroom setting and the contracts did not outline how the courses or attached syllabi were adjusted to fit the directed study format. Specifically, in numerous cases, when the contract prompted "[i]n class activities are adjusted to accommodate student learning, but still required for student demonstration of competency," the subsequent "Name of Activity" and "New format to accommodate single student learning" fields were completed with "N/A."

- According to the Directed Study policy, "The coursework […] should cause the student to have 20 hours of contact with the curriculum for every credit hour awarded via Directed Study." The response did not include documents that show how the 20 contact hours will be achieved.

- In reviewing scheduled meetings with professors, the Commission noted that. G. James was scheduled to meet with Dr. Mitch Cullins for both NET324 Computer Networking and MCS415Server Administration on Wednesdays from January 6, 2020 to February 2, 2020 at 6:00 – 8:30pm. In addition, N. Hailey was also scheduled to meet with Dr. Cullins at the same time and dates for MCS415 Server Administration. The Commission questioned the quality of instruction during these meetings, as the instructor appears to be teaching two different courses concurrently to two students, one of whom is not enrolled in the second course.

Overall, the Commission determined that CEHE has not demonstrated the consistent application of its formal Directed Study Procedure Directive. As such, the Commission is interested in providing IU and SHC-West Haven (the remaining operational locations) one more opportunity to produce documentation to demonstrate the consistent application of the Directed Study Procedure Directive, such that the Commission can have faith that students participating in Directed Study formats are being served.

Based on the foregoing, the Commission directs CEHE to submit the following:

a.  For reference, a copy of the June 18, 2019 Procedure Directive regarding Directed Study along with any revisions to the policy in light of the school teach-out plans, if applicable;

b.  An explanation of why students in the first term/module were allowed to engage in independent study;

c.  An explanation regarding how G. James can meet with an instructor for two courses simultaneously, while N. Hailey meets with the same instructor at the same time for only one of the two courses;

d.  An explanation of how the school documents that students engage with the curriculum 20 contact hours for every credit hours awarded;

e.  A list of ten students most recently engaged in directed study at SHC-West Haven and IU and copies of the signed Directed Study Contracts that explicitly outline how the course assignments as outlined in the syllabi were adjusted to fit the Directed Study format;

f.  For the ten students noted above, provide documentation that the assignments were completed as required by the Directed Study contract (e.g. the completed assignments); and

g.  Any additional information that the school believes will be useful to the Commission in making a determination regarding the school's compliance with ACCSC's requirements.

7.  CEHE must demonstrate that the schools are in compliance with all applicable federal, state, and local government requirements (*Section I (B)(1)(e)(iii), Rules of Process and Procedure, Standards of*

**Exhibit E - 28**

*Accreditation*). In addition, accrediting standards state that the Commission will take into account actions or investigations by state and federal agencies (*Section VII (D)(5)(a-b), Rules of Process and Procedure, Standards of Accreditation*). At this juncture, there are unresolved actions that raise questions with regard to the schools' compliance with federal and state government requirements. The Commission reviewed those actions and determined the following:

- With regard to the False Claims Act complaint filed against CEHE by the U.S. Department of Justice ("DOJ"), CEHE previously provided an update regarding the status of the complaint filed stating that CEHE filed a motion with the court for sanctions and that oral arguments on this motion were scheduled for July 2, 2019. In response to the October 28, 2019 Probation letter, CEHE stated that "the action is still in the discovery phase" and that "[b]oth parties have until July 31, 2020 to complete their discovery and dispositions." CEHE also stated that the discovery phase was scheduled to close at the end of February 2020; however, the DOJ has delayed in producing the discovery documentation requested by CEHE. Furthermore, CEHE stated, "[f]ollowing the completion of discovery, CEHE will proceed to file multiple Motions of Summary Judgment with the Court. CEHE is confident that all or most of its Summary Judgment Motions will be granted and that this case may potentially be dismissed in late 2020." The Commission is therefore interested in the final status of the discovery phase and dispositions and determined that an update regarding the status with the DOJ is warranted.

- In regards to the complaint filed by the Colorado Attorney General ("COAG"), CEHE previously indicated that the judge had not issued a verdict or decision and stated that there is "no indication of when the judge will issue his decision." In response to the October 28, 2019 Probation letter, CEHE indicated that on January 10, 2020 the judge assigned to the COAG related trial was reassigned to Colorado criminal case from the Colorado civil case. In addition, CEHE expected that the reassignment would assist with encouraging the judge to issue a final decision regarding the complaint filed with the COAG; however, CEHE indicated that the judge has not yet made a decision. Furthermore, CEHE indicated that a confidential request was filed with the Colorado Commission on Judicial Discipline ("CCJD") requesting that the judge's delay in issuing a decision be evaluated. In response to that request, the CCJD submitted the confidential request to the judge in which the judge responded. From the response, the CCJD determined that the judge is making a "good faith effort" to bring the case to a conclusion; however, given the magnitude of the case, the judge requires additional time and assistance from an additional senior judge to manage the case. The Commission noted that CEHE did not provide additional details regarding future timelines for the COAG investigation and therefore the Commission is interested in the status of the COAG complaint.

- On May 20, 2019, CEHE notified ACCSC that CEHE received a Civil Investigative Demand ("CID") from the Consumer Finance Protection Bureau ("CFPB"), a U.S. government agency that provides consumer protection in the financial sector. The October 28, 2019 Probation letter requested that CEHE provide an update regarding the final determination of the CID. In response, CEHE stated,

  *On or about January 2020, CEHE filed its response to the CFPB's motion to enforce its civil investigative demand. The judge in this matter has scheduled oral arguments on the CFPB's motion and CEHE's response for March 25, 2020. Due to a pending case before the United States Supreme Court on the constitutionality of the CFPB, CEHE expects the judge to delay the CFPB's CID until after the Supreme Court issues its decision in the summer of 2020.*

**Exhibit E - 29**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*          *Probation Order*
*July 21, 2020*
*Page 30 of 32*

Given the potential delays of the CFPB's CID and that a final determination of the CID has not been made, the Commission is interested in an update regarding the status.

- There is an outstanding action that involves the three schools that operate in the state of Colorado: CollegeAmerica-Denver, Colorado (School #M001507); CollegeAmerica-Fort Collins, Colorado (School #B070544); and CollegeAmerica-Colorado Springs, Colorado (School #B070623). The July 1, 2019 notice from Colorado Division of Private Occupational Schools ("DPOS") indicates a Notice of Noncompliance regarding the content of CEHE's ACCSC-mandated probation notice. In response, CEHE showed documentation that the school worked with DPOS on a draft stipulation agreement to withdraw the Notice of Noncompliance. The Commission noted; however, that as of CEHE's response to the Commission, DPOS' board has not approved the draft stipulation agreement and has not taken action to withdraw the Notice of Noncompliance. The Commission requested an update regarding the status with DPOS. In response to the December 5, 2019 Commission letter, CEHE stated that while DPOS does not "withdraw" a Notice of Noncompliance, the resolution of the Notice of Noncompliance is the "execution of a Stipulation and Final Agency Order." The Commission noted from CEHE's response that the Stipulation and Final Agency Order was executed by CEHE and DPOS on December 3, 2019." Furthermore, CEHE stated that CollegeAmerica complied with the two final resolution items, as follows:

  1. *Issue a "revised" notice to all active students informing the students that the CollegeAmerica campuses in Colorado were on probation with ACCSC.*

  2. *Utilize a revised "FAQ" website page that provides more information about CollegeAmerica's probation with ACCSC (http://www.capbfaq.com).*

While the Commission acknowledged that CEHE executed the final resolution of the aforementioned stipulations, the Commission is interested in receiving documentation regarding the final status of the Notice of Noncompliance from DPOS through documentation demonstrating that the Notice of Noncompliance is resolved with DPOS.[10]

Based on the review of the foregoing actions, the Commission determined that additional information is required and further monitoring is warranted, as directed below.

a. An update and final determination, if available, regarding the complaint filed by the U.S. Department of Justice;

b. An update and final determination, if available, regarding the complaint filed by the COAG;

c. An update and final determination, if available, regarding the CID filed by CFPB; and

d. Copies of correspondences from the DOJ, COAG, and CFPB regarding the pending litigation items and statuses.

---

[10] DPOS had also issued Notice and Cease and Desist Order dated January 28, 2020 regarding the schools' compliance with § 23-64- 113(1) C.R.S. Subsequent to the May 2020 Commission meeting on June 1, 2020, CEHE provided written notification of the results of the May 26, 2020 review of this matter by the DPOS Board. According to the DPOS letter of May 28, 2020, "…the Board declined to issue a Notice of Noncompliance" and determined that "…CollegeAmerica's responses to the Three Actions were acceptable such that the Board did not maintain an ongoing reasonable belief that there may be violation of Sections 23-64-112(1)(K) and -113(1)(a-c), C.R.S." Therefore, the matter is now considered to be closed.

**Exhibit E - 30**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*          *Probation Order*
*July 21, 2020*
*Page 31 of 32*

## PROBATION REQUIREMENTS

In cases where the Commission has reason to believe that a school is not in compliance with accreditation standards and other requirements, the Commission may, at its discretion, place a school on Probation. A school subject to a Probation Order must demonstrate corrective action and compliance with accrediting standards. **Failure of the school to demonstrate compliance with accrediting standards or other accrediting requirements by the due date set forth herein may result in a revocation of accreditation action**.

The Commission will not consider substantive changes, a change of location/relocation, or additions (i.e., separate facilities, new programs) to a school or its separate facilities while the school is on Probation. However, a school that is subject to Probation may seek the Commission's approval for the transfer of accreditation that would result from a change of ownership as described in *Section IV, Rules of Process and Procedure, Standards of Accreditation.*

In accordance with *Section X, Rules of Process and Procedure, Standards of Accreditation*, the reasons for the Probation Order is made public and provided to the U.S. Department of Education, appropriate State agencies, and appropriate accrediting agencies.

**Notification to Students**

In accordance with *Section VII (L)(7), Rules of Process and Procedure, Standards of Accreditation*, a school subject to a Probation Order must within seven days of receipt inform current and prospective students in writing that the school has been placed on Probation and where information regarding that action can be obtained from the Commission's website.

## MAXIMUM TIMEFRAME TO ACHIEVE COMPLIANCE

According to the October 28, 2019 Probation letter, based on *Section VII (M), Rules of Process and Procedures, Standards of Accreditation* and the schools' longest program of more than two years, the maximum timeframe allowed for the CEHE-affiliated schools, to achieve and demonstrate compliance with the *Standards of Accreditation* is two years. The timeframe to achieve compliance began as of September 6, 2018 and ends on **September 7, 2020**. At the May 2020 meeting, the Commission determined that good cause exists to extend the timeframe to achieve compliance to **May 31, 2021**. In making this decision, the Commission took note of the extenuating circumstances, including the ongoing teach-out of five campuses, and early closure of eight campuses, which leaves only two operational campuses. The Commission found that these circumstances warrant affording CEHE additional time to manage the multiple transitions and implement strong measures at the two remaining schools. In particular, the Commission recognized the length of time needed to demonstrate the school's ability to improve student achievement outcomes.

## RESPONSE REQUIREMENTS

By applying for accreditation, a school accepts the obligation to demonstrate continuous compliance with the *Standards of Accreditation*. While the Commission employs its own methods to determine a school's compliance with accrediting standards, the burden rests with each school to establish that it is meeting the standards. The Commission's deliberations and decisions are made on the basis of the written record and thus each school must supply the Commission with complete documentation of compliance with accrediting standards.

**Exhibit E - 31**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                          *Probation Order*
*July 21, 2020*
*Page 32 of 32*

CEHE must provide a response to the items expressed above that provides the information requested along with any additional information that the school believes supports a demonstration of compliance with accrediting standards.[11] If the response contains documentation that includes personal or confidential student or staff information that is not required for the Commission's review (e.g., social security numbers, dates of birth, etc.), please remove or redact that information.

CEHE must upload the school's electronic response directly to ACCSC's College 360 Database for each campus. The ACCSC College 360 database can be accessed by <u>clicking here.</u> Please note that the password utilized by the institution to access the Annual Report Portal is the same to access the School Submission section of the College 360 database. The Instructions for College 360 DMS Submissions can be found <u>here</u>. A detailed overview on how to upload a school submission can be found <u>here.</u>

Keep in mind, the response must be prepared in accordance with ACCSC's Instructions for Electronic Submission (e.g., prepared as one Portable Document Format ("PDF") file that has been prepared using Adobe Acrobat software (version 8.0 or higher) and which has a .pdf extension as part of the file name).

The response must also include a signed certification attesting to the accuracy of the information and be received in the Commission's office **on or before December 30, 2020**. If a response, the required fee,[12] and the certificate of attesting to the accuracy of the information is not received in the Commission's office **on or before December 30, 2020**, the Commission will consider further appropriate action.

For assistance with the password or for any other questions regarding the electronic submission requirements, please contact Maurice Gatewood at mgatewood@accsc.org. Please note that any password requests to access College 360 must be made by the school director, or designated member of the school's management team, via e-mail.

For assistance or additional information, feel free to contact me directly at mccomis@accsc.org.

Sincerely,

Michale S. McComis, Ed.D.
Executive Director

Encl.:  Appendix I – Accreditation Actions Considered

---

[11] ACCSC has issued two modules of the **Blueprints for Success Series** – <u>Organizing an Effective Electronic Submission</u> and <u>Preparing a Comprehensive Response for Commission Consideration</u> – which provide a framework for submitting a well-documented, organized, electronic response for Commission consideration. ACCSC encourages the school to review these modules when formulating its response to this letter. More information is available in the <u>Resources section</u> at <u>www.accsc.org</u>.
[12] ACCSC assesses a $1,000 processing fee to a school placed on Probation.

**Exhibit E - 32**



2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

**APPENDIX I**
**ACCREDITATION ACTIONS CONSIDERED**

| School | Accreditation Actions Considered | Materials Considered |
|---|---|---|
| California College San Diego (#M001073)<br><br>San Diego, California | • Probation/Renewal of Accreditation /Change of Location<br><br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| College America (#M070742)<br><br>Flagstaff, Arizona | • Probation/Renewal of Accreditation<br><br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| CollegeAmerica (#B070743)<br><br>Phoenix, Arizona | • Probation/Renewal of Accreditation<br><br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| Independence University (#B072309)<br><br>Salt Lake City, Utah | • Probation/Renewal of Accreditation<br><br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |

**Exhibit E - 33**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                *Probation Order-Appendix I*
*July 21, 2020*
*Page 2 of 4*

| School | Accreditation Actions Considered | Materials Considered |
|---|---|---|
| Stevens-Henager College (#B070581) West Haven, Utah | • Probation/Renewal of Accreditation/ Degree Program<br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| Stevens-Henager College (#B070582) Orem, Utah | • Probation/Renewal of Accreditation | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response |
| Stevens-Henager College (#B070583) Murray, Utah | • Probation/Renewal of Accreditation/ Degree Program<br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| Stevens-Henager College (#B070584) Logan, Utah | • Probation/Renewal of Accreditation | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response |
| Stevens-Henager College (#B072351) Idaho Falls, Idaho | • Probation/Renewal of Accreditation | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response |

**Exhibit E - 34**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*     *Probation Order-Appendix I*
*July 21, 2020*
*Page 3 of 4*

| School | Accreditation Actions Considered | Materials Considered |
|---|---|---|
| Stevens-Henager College (School #B070764)<br><br>Boise, Idaho | • Probation/ Renewal of Accreditation<br><br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| Stevens-Henager College (School #B072360)<br><br>St. George, Utah | • Probation<br>• Renewal of Accreditation<br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• October 17, 2018 Team Summary Report and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| California College San Diego (School #B072374)<br><br>San Marcos, California | • Probation<br>• Renewal of Accreditation | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• October 17, 2018 Team Summary Report and the school's response |
| CollegeAmerica (#B070544)<br><br>Fort Collins, Colorado | • Probation<br>• Renewal of Accreditation and Initial Distance Education<br>• Warning | • October 28, 2019 System-wide Probation Order and the school's response<br>• May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• October 17, 2018 Team Summary Report and the school's response<br>• March 26, 2018 Continued Warning Order and the school's response |

**Exhibit E - 35**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*     *Probation Order-Appendix I*
*July 21, 2020*
*Page 4 of 4*

| School | Accreditation Actions Considered | Materials Considered |
|---|---|---|
| CollegeAmerica (#M001507)<br><br>Denver, Colorado | • Probation<br><br>• Renewal of Accreditation and Initial Distance Education | • October 28, 2019 System-wide Probation Order and the school's response<br><br>• May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• October 17, 2018 Team Summary Report and the school's response |
| CollegeAmerica (#B070623)<br><br>Colorado Springs, Colorado | • Probation<br><br>• Warning/Renewal of Accreditation | • October 28, 2019 System-wide Probation Order and the school's response<br><br>• May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• March 26, 2018 Continued Warning Order and the school's response |

**Exhibit E - 36**

# Exhibit F

# ACCSC

Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

October 28, 2019

**ELECTRONIC DELIVERY**
eric.juhlin@collegeamerica.edu

Eric Juhlin
Chief Executive Officer
Center for Excellence in Higher Education, Inc.
4021 South 700 East, Suite 400
Salt Lake City, Utah 84107

*System-Wide Review*
*Continued Probation Order*

Dear Mr. Juhlin:

At the August 2019 meeting, the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") considered the following:

- The previous decision to place the system of schools in the Center for Excellence in Higher Education ("CEHE") on Probation, along with other matters (see Appendix I included as part of this letter for a list of institutions, actions, and materials considered).

- CEHE's response to ACCSC's letter of July 11, 2019, requesting additional information with regard to a notice that CEHE had received a Civil Investigative Demand ("CID") from the Consumer Finance Protection Bureau ("CFPB").

On September 11, 2019, CEHE provided ACCSC with notification that the schools have stopped enrolling students in residential programs at most CEHE campuses. CEHE indicated that the schools will continue to operate and that "onground campuses will continue to provide the education, services, and support to currently enrolled students and every current student will be able to complete their degree programs, without interruption, all the way through to graduation."

At the September 2019 meeting, the Commission reconsidered its decision in context of the September 11, 2019 notification. The Commission voted to continue the system of CEHE-affiliated schools on Probation, with a review of additional material regarding the transition of the schools from residential instruction to distance education delivery scheduled for February 2020 and a review of the Commission's findings scheduled for May 2020.

The Commission's action is effective as of the date of this letter. The institutions covered by the Commission's action are listed below:

- California College San Diego ("CCSD") – San Diego, California (#M001073/SL460488-National City, California)
  - California College San Diego ("CCSD-San Marcos")– San Marcos, California (#B072374)
- CollegeAmerica ("CA-Denver") – Denver, Colorado (#M001507)
  - CollegeAmerica ("CA-Fort Collins") – Fort Collins, Colorado (#B070544)
  - CollegeAmerica ("CA-Colorado Springs") – Colorado Springs, Colorado (#B070623)
- CollegeAmerica ("CA-Flagstaff") – Flagstaff, Arizona (#M070742)
  - CollegeAmerica ("CA-Phoenix") – Phoenix, Arizona (#B070743)
  - Stevens-Henager College ("SHC-Idaho Falls") – Idaho (#B072351)
- Stevens-Henager College ("SHC-West Haven") – West Haven, Utah (#M070581)
  - Stevens-Henager College ("SHC-Orem") – Orem, Utah (#B070582)
  - Stevens-Henager College ("SHC-Murray") – Murray, Utah (#B070583)
  - Stevens-Henager College ("SHC-Logan") – Logan, Utah (#B070584)

**Exhibit F - 1**

JA168

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                                    *Probation Order*
*October 28, 2019*
*Page 2 of 27*

- Stevens-Henager College ("SHC-Boise") – Boise, Idaho (#B070764)
- Independence University ("IU-Salt Lake City") – Salt Lake City, Utah (#B072309)
- Stevens-Henager College ("SHC-St. George") – St. George, Utah (#B072360)

### SUMMARY OF THE COMMISSION'S REVIEW

As a result of the August 2019 review, the Commission found that the schools had made strides in demonstrating compliance with accrediting standards, providing documentation that addressed the Commission's questions in the following areas:

- Employment classifications
- Objectives of the Healthcare Administration (BS) program,
- Transfer of credits policies
- Course prerequisites
- Allowable credit hours attempted per module
- Compliance with BPPE requirements regarding the enrollment agreement; and
- Status with the Commission on Respiratory Therapy Commission

Although the schools were able to address a significant number of the questions raised in the May 2, 2019 Probation Order, there are still a number of issues that remain in question. The Commission determined that the response does not include sufficient information and documentation to address the questions raised with regard to advertising, assessment of prospective students for distance education programs, independent study, international students, the attendance policy, and the way in which CCSD-San Diego is equipped for the Computer Programming (AAS), Computer Technology & Networking (AAS), and Computer Science (BS) program.

Finally, as a result of the August 2019 review, the Commission raised two questions with regard to the school system's compliance with fundamental tenets of ACCSC's accreditation process: student achievement outcomes and the integrity of information provided by the schools. With regard to student achievement, the Commission noted the magnitude of the programs that are failing to demonstrate successful student achievement at some of the schools in CEHE's system, most notably Independence University, California College-San Diego, and CollegeAmerica in Phoenix. In addition, the schools' submissions with regard to enrollment agreements call into question whether CEHE has provided accurate and reliable information to the Commission.

With regard to student success, the Commission noted that 7 of the 15 affiliated schools reported above-benchmark rates for all programs, and that the remaining 8 schools reported below-benchmark rates of student achievement for at least one program. Two of those schools are reporting below benchmark rates for fewer than 50% of the schools' active reportable programs; however, there are six schools reporting below benchmark rates for at least half of the active reportable programs. It is not clear that those six schools have addressed the underlying problem impacting student success.

With regard to the enrollment agreements, the Commission found that documentation included with the response to the May 2, 2019 Probation Order shows that CEHE has not implemented the revisions as claimed in the December 2018 response. A high level of reliance is placed upon information, data, and statements provided to the Commission by a school, and the integrity and honesty of a school are fundamental and critical to the process. If the Commission determines that a school has knowingly provided false or misleading information, the Commission will take any action that it believes is reasonable and

**Exhibit F - 2**

JA169

appropriate including, but not limited to, denying any pending application or taking any accreditation action described in *Section VII, Rules of Process and Procedure, Standards of Accreditation*.

### <u>SEPTEMBER 11, 2019 ANNOUNCEMENT</u>

The Commission reviewed the September 11, 2019 letter from Eric Juhlin, President of CEHE, which states that effective September 10, 2019, all of CEHE's campuses, with the exception of Stevens-Henager College in West Haven, Utah, will suspend enrolling new students into campus-based residential programs. Mr. Juhlin also stated:

> ***I want to be clear that CEHE is not closing any campuses.*** *All of our onground campuses will continue to provide the education, services, and support to currently enrolled students and every current student will be able to complete their degree programs, without interruption, all the way through to graduation. Aside from admissions personnel, we are not laying off any employees at our ground campuses.*

Although the schools will remain open, the shift away from residential programs to distance education delivery represents a significant transition in the fundamental nature of the institutions. The Commission determined that additional information and monitoring is warranted with regard to CEHE's plans for a successful transition and the safeguards provided for currently enrolled students as well as new online students enrolled during the change.

The Commission also noted that the announcement states:

> *The only effect of this strategic decision on current students is that if a current student subsequently withdrawals or is terminated, the campus may not be able to accommodate that student if they want to "re-enroll" sometime in the future. However, in most cases, if one of our current onground students withdrawals in the future and then wants to re-enroll – we will likely be able to accommodate them through Independence University* [via Distance Education].

The letter also includes a copy of the notice provided to students which indicates that the transition of all degree programs to fully online delivery will take place over the next 3-4 years. The notice also states that, "…all current students, including those who have just recently started, will be able to complete their program through the campus as scheduled.\*" The asterisk is linked to the following statement "Current students will still be required to take hybrid courses and, periodically, fully online courses as part of completing their current degree programs."

It appears that current students who enrolled in a residential program may be required to take some courses via distance education in order to complete their programs. While the statement indicates that students will "still" be required to complete distance education courses, the information does not make clear whether students were aware of and agreed to this at the time of enrollment or if this will be new to the students as part of the school's teach-out plan. The Commission notes the potential for a negative impact of this change in delivery methods on the success of students that are not interested in or equipped to learn in an online environment. Also, considering the length of the teach-out/transition period and therefore the amount of education and time that the residential programs will need to operate to complete the teach-out without enrolling new students, CEHE must demonstrate that the schools have the capacity and commitment to complete the education of all currently enrolled students even as the student population and class size becomes significantly smaller but faculty needs remain.

The Commission has been monitoring the school's compliance specifically with regard to the policies and procedures for the admission and education of international students. As established previously, international students may not enroll in programs offered exclusively via distance education methods. Therefore, it appears

**Exhibit F - 3**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                        *Probation Order*
*October 28, 2019*
*Page 4 of 27*

that CEHE-affiliated schools will no longer be eligible to enroll new international students. The Commission is interested, however, in how the teach-out plan will adequately address and fulfill obligations to currently enrolled international students.

In accordance with *Section IV (F)(1)(a) Rules of Process and Procedure, Standards of Accreditation*, the Commission requires a school to submit a complete <u>ACCSC Institutional Teach-Out Plan Approval Form</u> when a school intends to close. The Commission is interested in ensuring that students are fully aware of all options available to them and that the schools proceed with teach-out arrangements that are in the students' best interest.

The Commission directs CEHE to provide an updated ACCSC Institutional Teach-Out Plan Approval Form for each school. Please use the most updated version of the form, dated 2019, of the ACCSC Institutional Teach-Out Plan Approval Form on the Commission's website. Given the Probation status and length of the programs and therefore the teach-out period, <u>as part of and in addition to</u> the requirements in the above teach-out plan form, the Commission directs the schools to submit the following:

a.  The schools must show individualized education plans for all students to demonstrate an equitable pathway for each. Therefore the Commission directs CEHE to submit a list of all students by campus by program and the education plan for each.

b.  A list of all international students, an explanation as to how the cessation of residential instruction will affect those students, and CEHE's plan to address those consequences;

c.  An explanation as to when and what circumstances would require current students to take hybrid courses and, periodically, fully online courses as part of completing their current degree programs.

d.  If taking hybrid or fully online courses is a new component not already agreed to by the student during enrollment, a description of CEHE's policies and procedures for assisting residential students who must utilize a distance education format, including the following:

    i.  The method that CEHE will use to assess the student's technical skills, competencies, and access to technology necessary to succeed in a distance education environment prior to requiring them to complete hybrid/fully online coursework.

    ii.  An assessment of the student's capability to benefit from a distance education program. The school must utilize an assessment tool (e.g., test, preparation/ orientation course, etc.) to determine if the student's learning style is conducive to online learning.

    iii.  The alternate options that will be made available to students that do not demonstrate the technical skills, competencies, and access to technology necessary to succeed, or a learning style that is conducive to online learning.

e.  A detailed plan for retaining sufficient residential staff and faculty through the entire teach-out period for every program and every campus.

<p style="text-align:center">***</p>

Prior to enumerating the findings of non-compliance to which the school must respond, the Commission will address the following question which appears as part of the schools' responses, as follows:

> *Before responding to each of the items in this section, CEHE would like to make a general observation and ask a question of the Commission regarding this item. CEHE is confused and does not understand the Commission's addition of this item to the Commission's System-Wide Probation Order. This item, nor anything similar or related to this item, was included in the 18 items identified as areas of concern in the Commission's September 6, 2018 System-Wide Probation Order.*

**Exhibit F - 4**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                              *Probation Order*
*October 28, 2019*
*Page 5 of 27*

*This item is specific to CEHE's California College San Diego campus in San Marcos. As noted in the Commission's May 2, 2019 Continued System-Wide Probation letter, this item was part of the October 17, 2018 Team Summary Report ("TSR") for the San Marcos campus. The San Marcos campus provided its response to the October 17, 2018 TSR on January 3, 2019 and the campus has never received any response from the Commission. We are confused as to why the Commission is adding an item specific to a single campus, from a specific re-accreditation visit, to a System-Wide Probation Order for CEHE. Could the Commission help us understand why this item was added as part of CEHE's system-wide probation order?*

The purpose of the inclusion of the questioned items in the Commission's system-wide action is three-fold. First, once a system-wide action has been taken, rather than issuing multiple letters with regard to individual schools, it is the Commission's practice to group as many outstanding compliance issues into a single letter for the purposes of streamlining the schools' responses and the Commission's review of the response material. Second, the incorporation of all items of non-compliance is conducive to assessment of the system as a whole. Although the Commission does not accredit corporations, similarities and differences in compliance issues may show whether managerial weaknesses exist at the corporate or campus level. Third, because the policy at one school may apply to all campuses, a question raised at one campus may become a question raised at all campuses.

## COMMISSION FINDINGS

1. CEHE must demonstrate successful student achievement, including acceptable rates of student graduation and graduate employment in the career field for which the schools provide education, in the schools' active programs (*Section VII (B)(1)(b), Substantive Standards, Standards of Accreditation*). With the May 2, 2019 letter, the Commission conveyed the expectation that CEHE's efforts to make fundamental changes to the way in which the campuses are managed should result in improved student achievement outcomes. At that juncture, a review of student achievement data reported in the 2016, 2017, and 2018 Annual Reports, as well as the more recent data provided in CEHE's response indicate that CEHE's strategies have had mixed results in terms of improving student achievement. As a result, the Commission directed the following:

   - Cessation of enrollment in 10 programs offered at four CEHE-affiliated schools that reported three consecutive years of below-benchmark rates of student graduation and/or graduate employment; and

   - Updated student achievement data for 30 programs at eight CEHE-affiliated schools that reported below-benchmark rates of student achievement with the most recent report date.

   In response, CEHE provided a recapitulation of seven key actions taken by the schools over the past "year or two" to address student achievement. The stated actions include:

   - *Implementation of the 5-credit model: CEHE rearranged the course and academic work in a given program so that students only have to take one course per module. According to the response, the initial data for this strategy shows considerable efficacy in improving retention.*

   - *Increased staffing: Based on an analysis of the "headcount" needed to provide the high levels of contact and engagement that CEHE has deemed necessary to improve both graduation rates and employment rates, CEHE implemented a revised staffing-model for its campuses.*

   - *Accountability Metrics: CEHE has developed and implemented an entirely new metrics and accountability system for all academic and career services personnel.*

**Exhibit F - 5**

USCA4 Appeal: 25-1372    Doc: 14    Filed: 06/04/2025    Pg: 176 of 461

- *Elimination of Poor Performing Programs Over the past two years, through its ongoing assessment of programs, outcomes, and viability, CEHE has discontinued over 52 programs throughout its system of colleges.*

- *Program Modifications. CEHE has made numerous revisions, modifications, and restructurings to programs. Over the past two years, CEHE has submitted at least 78 program modifications and 51 non-degree program applications.*

- *Seeking Outside Assistance. To augment the efficacy of analysis and strategies for improving student success, CEHE has launched a phased series of research and solution development projects with an outside research entity, Hanover Research. In March 2019, CEHE and Hanover completed a Phase I project to analyze the predictors of student retention, graduation, and employment after leaving CEHE.*

- *Revised Assessment Plan for Prospective Students. This item is discussed in more detail in our response to Item 7. In short, CEHE's analysis has concluded that we need to revise and significantly upgrade the assessment policies, processes, and tools we leverage with prospective students. After careful examination of various options, CEHE has contracted with SmarterMeasure to implement a new assessment tool and process. This implementation will occur within the next month.*

The Commission recognized the efforts that CEHE and the schools appear to be making in an effort to improve student achievement outcomes. The Commission noted with interest that CEHE enlisted an outside research entity, Hanover Research, to assist CEHE schools in analyzing the factors impacting student success, and to provide external feedback into the process of developing strategies tailored to addressing those factors. CEHE has also implemented new metrics and an accountability system for faculty and career services that establish the expected benchmarks for performance in the support of student success. The Commission recognizes the value of these types of efforts. As such, the Commission is interested in how CEHE has incorporated the information gleaned by the outside research entity into the schools' assessment and improvement mechanisms. The Commission is also interested in how the new metrics support oversight and monitoring of the processes that support student success, and how faculty and career services staff are receiving and adapting to the new metrics and accountability system.

Another of the seven key factors is CEHE's decision to significantly upgrade the assessment policies, processes, and tools for prospective students in the distance education learning environment. The recruitment and admissions processes have a tremendous impact on whether the school admits only those students who are capable of benefiting from the program, which in turn impacts whether the schools are able to adequately support student success given the capability of students and the educational resources available. This will be especially crucial, given the September 11, 2019 announcement that the schools will be transitioning to delivering programs exclusively via distance education. The Commission intends to review documentation of the implementation of the new assessment procedures, and evidence that the new policies, processes, and tools are effectively supporting student success. In addition, the response includes data indicating that the 5-credit model is having a positive impact on student persistence rates, which CEHE posited should result in improved graduation rates.

CEHE also pointed to the "numerous revisions, modifications, and restructurings to programs" as indicia of its improvement efforts and that "over the past two years, CEHE has submitted at least 78 program modifications and 51 non-degree program applications." The Commission affirmed the importance of a systematic and evidence-based process to: evaluate curriculum and course content; assess the appropriateness of that coursework in relation to program objectives; assess program viability; and make curriculum revisions accordingly. Likewise, the response indicates that the schools

**Exhibit F - 6**

have discontinued a total of 52 "poor performing" programs throughout the system.[1] As such, CEHE's response asks the Commission to consider the following:

> *Since virtually all of efforts to improve graduation rates will only impact current and future students (and these initiatives are showing positive results), we encourage the Commission to considering removing the cessation directive on those programs that were placed on cessation due to poor graduation rates. This would allow CEHE to bring new students into those programs and continue to measure and demonstrate the effectiveness of various improvement strategies. However, due to CEHE's past challenges in achieving satisfactory graduation rates in some of its programs, coupled with some ongoing uncertainty around the effectiveness of multiple improvement strategies, CEHE is not advocating for the Commission to remove the cessation directive (for programs with a history of poor graduation rates) in its entirety. CEHE believes that a more prudent, appropriate, and conservative action would be to move the programs on cessation for poor graduation rates to a "capped enrollment" status. Under a "capped" status, CEHE could not grow or expand the population in programs that were previously under cessation until the data for current and future cohorts evidences satisfactory graduation rates.*

The Commission considered CEHE's request in context of the history of reported graduation rates and the more current data provided in the response. Independence University notified ACCSC that the Graphic Arts-DE (AAS), Healthcare Administration (MS), and Respiratory Therapy (AAS) programs are in teach-out. The student achievement rates for programs subject to the cease enroll action in the May 2, 2019 letter are outlined in Table 1.1. CEHE requested consideration of the "cessation directive on those programs that were placed on cessation due to poor graduation rates." The two programs in this category are the Business (AAS) program at CA-Flagstaff (M070742) and the Business Administration (BS) program at SHC-Murray. CA-Flagstaff reported a significant decline in the rates of student graduation and graduate employment for the Business (AAS) program; therefore, the Commission determined to keep the cease enrollment directive in place pending review of updated information.

With regard to the Business Administration (BS) program at SHC-Murray (B070583), the Commission noted that the most recent rates of student graduation and graduate employment are reported to be above benchmarks.

| Stevens-Henager College – Murray (B070583) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Graduation Rates | | | | Employment Rates | | |
| | 2016 | 2017 | 2018 | 2019 | 2016 | 2017 | 2018 | 2019 |
| Business Administration (BS) | 19% | 35% | 32% | 46% | 100% | 71% | 75% | 90% |

At the August 2019 meeting, in recognition of the improved rates, the Commission voted to lift the cease enrollment directive and to impose an enrollment cap to afford the school an opportunity to implement and show the effectiveness of improvement strategies in controlled circumstances, particularly with regards to graduation rates. Therefore, the Commission determined to **cap enrollment** in the Business Administration (BS) program at SHC-Murray at a level not to exceed the program's June 30, 2018 enrollment as reported in the 2018 ACCSC Annual Report[2].

---

[1] The Commission recognizes that a rigorous assessment process may result in a conclusion that a program is no longer viable. it is the Commission's expectation that a school would take appropriate action with regard to such a conclusion, including discontinuing and teaching out non-viable programs.

[2] In the Program Enrollment Summary portion of the 2018 ACCSC Annual Report, SHC-Murray reported 18 students enrolled in the Business Administration (BS) program as of June 30, 2018.

**Exhibit F - 7**

Given that Independence University discontinued three of the programs under the May 2, 2019 cease enrollment directive, and the Commission acted to lift the cease enrollment directive for the Business Administration (BS) program at the SHC-Murray campus, the programs that remain on a cease enrollment directive are outlined in Table 1.1. The Commission determined to reconsider the cease enrollment directives at the next review.

**Table 1.1**

| California College of San Diego (M001073) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Graduation Rates** | | | | **Employment Rates** | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Business Administration (BS) | 36% | 41% | 56% | 56% | 69% | 67% | 50% | 63% |
| Respiratory Therapy (AS) | 52% | 45% | 58% | 52% | 52% | 47% | 59% | 58% |
| Respiratory Therapy (BS) | 62% | 68% | 46% | 52% | 53% | 33% | 33% | 58% |
| CollegeAmerica-Flagstaff (M070742) | | | | | | | |
| | **Graduation Rates** | | | | **Employment Rates** | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Business(AAS) (formerly Business Management & Accounting) | 32% | 20% | 36% | 17% | 100% | 100% | 75% | 50% |
| Independence University (M072309) | | | | | | | |
| | **Graduation Rates** | | | | **Employment Rates** | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Business-DE(AAS) (formerly Business Management & Accounting-DE) | 13% | 16% | 19% | 21% | 74% | 53% | 41% | 51% |
| Master of Business Administration-DE (MBA) | 60% | 59% | 70% | 62% | 50% | 53% | 44% | 52% |

In review of CEHE's subsequent announcement that the schools have ceased enrollment in residential programs as of September 11, 2019, the Commission found that the schools' action obviates the need for the cease enrollment or cap enrollment directives. CEHE must request from the Commission permission to enroll any new students in any residential program, which will require reconsideration of the performance of that program in terms of student graduation and graduate employment rates.

The Commission reviewed the history of outcomes data reported by CEHE-affiliated schools in the 2016, 2017, and 2018 Annual Reports, in addition to the updated data provided in the response, which was prepared using a report date of July 2019. Overall, the Commission noted that CEHE-affiliated schools are reporting on 113 active programs, 81 of which have been operational long enough to be reportable. Of the 81, 6 are already subject to the cease enrollment directive. The schools reported below benchmark rates of student graduation and/or graduate employment in 32% (24 of 75) of the remaining programs. Although this shows a modest improvement from 30 programs reporting below-benchmark rates during the previous review, the Commission found that additional monitoring is warranted as a means to ensure that CEHE's strongest attention and managerial resources remain focused on demonstrating successful student achievement throughout the term of the teach-out of

**Exhibit F - 8**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*October 28, 2019*
*Page 9 of 27*

students. The Commission is particularly interested in the progress of the following schools toward demonstrating successful student achievement through acceptable rates of graduation and employment.

- California College of San Diego reported 4 of 8 (50%) of the school's active/reportable programs below benchmark, three are listed in Table 1.1 above, and the other one is listed in Table 1.2 below.

- College America - Flagstaff reported 1 of 2 (50%) of the school's active/reportable programs below benchmark, which is listed Table 1.1 above.

- College America – Phoenix reported 3 of 4 (75%) of the school's active/reportable programs below benchmark, listed in Table 1.2 below.

- Stevens-Henager College – Idaho Falls reported 2 of 4 (50%) of the school's active/reportable programs below benchmark, listed in Table 1.2 below.

- Stevens-Henager College – West Haven reported 3 of 6 (50%) of the school's active reportable programs below benchmark, listed in Table 1.2 below

- Independence University reported 7 of 13 (69%) of the school's active/reportable programs below benchmark, two are listed in Table 1.1, and the others are listed in Table 1.2 below.

- Stevens-Henager College – St. George reported 2 of 3 (67%) of the school's active/reportable programs below benchmark, listed in Table 1.2 below.

**Table 1.2 – Institutions and Programs with Below-Benchmark Rates:**

| California College of San Diego (M001073) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Program Title (Credential)** | **Graduation Rate** | | | | **Employment Rate** | | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Medical Assisting (AOS) (formerly Medical Specialties) | 48% | 48% | 47% | **43%** | **62%** | 70% | **67%** | **55%** |

| College America-Phoenix (M070743) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Program Title (Credential)** | **Graduation Rate** | | | | **Employment Rate** | | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Business (AAS) (formerly Business Management & Accounting) | 44% | 43% | **32%** | **40%** | 70% | 70% | **44%** | **62%** |
| Computer Technology & Networking (AAS) | 44% | 44% | 49% | 43% | 77% | 77% | **50%** | **20%** |
| Medical Assisting (AOS) (formerly Medical Specialties) | 50% | 51% | 43% | 42% | 70% | 73% | **65%** | **59%** |

| Stevens-Henager College – Idaho Falls (B072351) | | | | | | |
|---|---|---|---|---|---|---|
| **Program Title (Credential)** | **Graduation Rate** | | | **Employment Rate** | | |
| | **2016** | **2017** | **2018** | **2016** | **2017** | **2018** |
| Accounting (BS) | No starts | **0%** | 50% | No starts | N/A | **33%** |
| Business Administration (BS) | **33%** | **33%** | 50% | 100% | 100% | **40%** |

**Exhibit F - 9**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*October 28, 2019*
*Page 10 of 27*

| Stevens-Henager College – West Haven (M070581) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Program Title (Credential) (BS)** | **Graduation Rate** | | | | **Employment Rate** | | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Accounting (BS) | 64% | 55% | 33% | | 89% | 100% | 100% | |
| Business (AAS) (formerly Business Management & Accounting) | 38% | 0% | 13% | | 80% | N/A | 100% | |
| Computer Science (BS) | 42% | 24% | 24% | 39% | 83% | 82% | 100% | 83% |
| Medical Assisting (AOS) (formerly Medical Specialties) | 47% | 22% | 29% | 37% | 72% | 71% | 71% | 74% |
| Stevens-Henager College – Murray (M070583) | | | | | | | | |
| **Program Title (Credential)** | **Graduation Rate** | | | | **Employment Rate** | | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Business (AAS) (formerly Business Management & Accounting) | 41% | 49% | 26% | 28% | 71% | 72% | 80% | 75% |
| Healthcare Administration (MS) | 77% | 86% | 76% | 78% | 80% | 33% | 0% | 33% |
| Medical Assisting (AOS) (formerly Medical Specialties) | 43% | 45% | 43% | 44% | 72% | 76% | 58% | 68% |
| Independence University (B072309) | | | | | | | | |
| **Program Title (Credential)** | **Graduation Rate** | | | | **Employment Rate** | | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Accounting-DE (BS) | N/A | N/A | 17% | 21% | NA | N/A | 73% | 72% |
| Business Administration-DE (BS) | 33% | N/A | 18% | 17% | 100% | N/A | 53% | 33% |
| Graphic Arts-DE (BS) | N/A | 0% | 19% | 21% | N/A | N/A | 63% | 53% |
| Health Services Management-DE (BS) | 90% | 65% | 74% | 12% | 86% | 83% | 68% | 43% |
| Information Systems-DE (MS) | 50% | 53% | 37% | 58% | 70% | 75% | 30% | 64% |
| Medical Assisting-DE (AOS) (formerly Medical Specialties) | 33% | 21% | 13% | 13% | 70% | 48% | 27% | 40% |
| Web Design & Development-DE (BS) | N/A | N/A | 13% | 57% | N/A | N/A | 100% | 25% |

| Stevens-Henager College – St. George (B072360) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Program Title (Credential)** | **Graduation Rate** | | | | **Employment Rate** | | | |
| | **2016** | **2017** | **2018** | **2019** | **2016** | **2017** | **2018** | **2019** |
| Business (AAS) (formerly Business Management & Accounting) | 41% | 53% | 27% | 36% | 71% | 86% | 75% | 100% |
| Medical Assisting (AOS) (formerly Medical Specialties) | 39% | 51% | 47% | 45% | 75% | 52% | 65% | 50% |

If Independence University – the only CEHE-affiliated institution currently offering education exclusively via distance education – is taken as the bellwether of student success rates for distance education programs for the CEHE system, the Commission considered the possibility that there may be further declines in the rates of student success. Of the 13 active programs at Independence University that have been operational long enough to be reportable, 4 programs met ACCSC's student achievement benchmarks. That means 69% of the school's programs reported below-benchmark rates of student achievement, and in addition, the school has already discontinued five programs due to poor performance. Given these indicators, it remains the Commission's primary concern that CEHE vigorously pursue strategies to ensure student success as all programs transition into a distance education delivery format.

**Exhibit F - 10**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*October 28, 2019*
*Page 11 of 27*

Based on the foregoing, the Commission directs CEHE to submit the following for each school:

a.  For programs into which the school has ceased enrollment:

   i.  An **ACCSC Retention Chart**;

   ii. A list of graduates from that program for the last six months and employment information, in the following format:

| Graduate ID# | Program | Start Date | Employer Contact, Address, & Phone # | Date of Initial Employment | Descriptive Job Title | Other Status (Unemployed, Further Ed., Unknown, Etc.) |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

b.  For programs into which the school continues to enroll students, submit a Graduation and Employment Chart using a **March 2020 Report Date** and supporting summary information for each Graduation and Employment Chart submitted, organized according to the corresponding **cohort start date** reported on the chart (line #1), as follows:

   i.  For each student reported provide the following information:

| Student ID# | Program | Start Date | Graduation Date | Withdrawal/ Termination Date |
|---|---|---|---|---|
|  |  |  |  |  |

   ii. For each student classified as "Unavailable for Graduation" (line #6), provide the following information:

| Student ID# | Program | Start Date | Reason Unavailable | Description of the Documentation on File |
|---|---|---|---|---|
|  |  |  |  |  |

   iii. For each graduate reported, provide the following information:

| Graduate ID# | Program | Start Date | Employer, Address, & Phone # | Employer Point of Contact | Date of Initial Employment | Descriptive Job Title | Other Status (Unemployed, Further Ed., Unknown, Etc.) |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

   iv. For each graduate classified as "Graduates-Further Education" (line #11) or "Graduates-Unavailable for Employment" (line #12), provide the following information:

| Graduate ID# | Program | Start Date | Classification on the G&E Chart | Reason | Description of the Documentation on File |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

c.  For each program for which the reported rates of student graduation and graduate employment do not meet the ACCSC benchmark on the Graduation and Employment Charts required above, an updated assessment of the factors impacting the rates of student graduation (e.g., admissions requirements and student support) and graduate employment (e.g., economic conditions), how the strategies implemented by the school are intended to target those factors, and how the school is measuring the effectiveness of those strategies.

2.  CEHE must demonstrate that the schools report student achievement data in accordance with the instructions on the Graduation and Employment ("G&E") Chart (*Section VII (B)(1), Substantive Standards, Standards of Accreditation*). With the May 2, 2019 Probation Order, the Commission raised questions with regard to the reporting of students that withdraw from one CEHE-affiliated school and re-enroll in a different CEHE-affiliated school. In response, CEHE stated:

**Exhibit F - 11**

> *CEHE understands and acknowledges the Commission's requirement that CEHE modify its policies and procedures, with respect to Graduation and Employment Charts, for how to treat, students that leave one CEHE-affiliated school and continue their education and training at another CEHE-affiliated school. CEHE has revised its policies and procedures so that a student who leaves one CEHE-affiliated school and enrolls in another CEHE-affiliated school is reported as a "withdrawal/termination" for the first school and a new start for the CEHE-affiliated school where the student subsequently enrolled.*

The response includes a copy of a Procedure Directive dated June 17, 2019, formalizing the new policy. The Commission intends to review documentation for the Graduation and Employment Charts submitted in response to item (1) above as evidence that the new policy has been implemented and how the process is documented.

The Commission also raised the question with regard to the use of the "transfers in and out" categories for students that appeared to have withdrawn and re-enrolled. Specifically, according to data reported in the 2018 Annual Report, some students reported as "transfers" between two programs at the same institution entered the second program more than a year after leaving the first program. With the May 2, 2019 letter, the Commission noted that the movement of students to a cohort one to three years in the future is more typical of students that drop (or are terminated) and subsequently re-enroll in a different program, and raised the question as to whether the CEHE-affiliated schools are accurately reporting these students as "transfers."

In response, CEHE quotes the definition of a "transfer" published on the Graduation and Employment Chart, and states:

> *It is clear from the verbiage above that the glossary definition is silent with respect to how a college should treat a student who has a "break" or temporal interruption between withdrawing from one program at a school and transferring into another program at the same school. In the absence of specific guidance, CEHE has historically applied the definition in a way that is most beneficial for the student and the school by discounting any temporal breaks that occur between the time a student withdraws from one program and transfers into another program.*

Although CEHE stated that its policy is more beneficial to the student, there is no explanation of how the student benefits when the schools report an extended temporal interruption "transfer" rather than as a "withdrawal and re-enrollment." The response outlines five "types" of temporal interruptions in enrollment that students may encounter, as follows:

> *1. A student decides they want to transfer into a new program at some point during their current module, but some or all of the courses they are presently taking are not included in the new program into which they want to transfer.*

According to the response, "in almost every case," students choose to withdraw from the courses they are in and wait until the next module starts to begin classes in the "transfer in" program. CEHE indicated that "[t]he temporal gap we see in this situation can be as short as a few days or as long as a few weeks." The Commission found that this scenario appears to be typical of students "transferring" from one program to another and would expect the school to be able to document the transfer process (e.g., written request from the student, documentation of credits that will transfer to the new program, enrollment agreement for the new program).

> *2. A student decides they want to transfer into a different degree program. While some of the student's completed courses may transfer into the new program (i.e. GenEd), the student*

**Exhibit F - 12**

USCA4 Appeal: 25-1372     Doc: 14      Filed: 06/04/2025      Pg: 183 of 461

Case 1:22-cv-01223-RDA-WEF     Document 1-7     Filed 10/28/22     Page 14 of 31 PageID# 169

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*October 28, 2019*
*Page 13 of 27*

*now has to complete the courses that make up the new program. Often times, the courses in the new program are sequential and may have prerequisite requirements. A student wishing to transfer into a new program is often "out of sequence" with the standard delivery cycle for courses in the new program (since they did not originally start in a given program). In these cases, the transferring student may have to wait 1-3 modules before there is a course available in the new program that they are eligible (due to sequencing) to take. The temporal gap we see in these situations can last from 4 weeks to 12 weeks.*

This second scenario also appears to be typical of students "transferring" from one program to another and the school would be able to document the transfer process (e.g., written request from the student, notes of advising sessions, documentation of credits that will transfer to the new program, enrollment agreement for the new program).

The Commission noted that CEHE described the remaining scenarios specifically as cases where students "withdraw" and then subsequently "re-enroll" in a different program. In this case, the time of non-attendance is more variable, and the outer parameters (e.g., a few quarters, more than a year) appear more typical of students that drop (or are terminated) and subsequently re-enroll in a different program.

> 3. *A student withdraws from a program because they need to deal with some "external" issue in their life (financial problems, health problems, transportation problems, family issues, etc.) and after they have resolved the issue the student comes back to college but wants to earn their degree in a different program. The temporal gap we see in these situations can last from a few weeks to a few months.*

> 4. *A student decides that they need to take a break from college (this happens for a lot of different reason). To take a break, the student must withdraw from their program because CEHE's schools do not allow approved leave-of-absence. CEHE does not allow approved leave-of-absence because we believe there is simply too great a risk for potential noncompliance with federal Title IV financial aid regulations governing approved leave of absences. Since the college does not allow an approved leave of absence, the student has to withdraw to get the break they want/need. In some cases, when the student decides to come back to college, they have also made a choice to come back into a different program. The temporal gap we see in these situations can last from a few months to a few quarters.*

> 5. *A student is not being successful in their program and decides to drop out because they do not believe they can succeed in the current program. After being out of school for a period of time, the student finds some new motivation or determination and re-commits themselves to being successful, more dedicated, more committed, and more serious about earning their degree. This may have occurred through continued outreach by the college and interaction with the college's academic staff, student support staff, or other advisors. After not being successful in the previous program, the student decides that a different program would be a better fit. The student comes back to college and re-enrolls into a new program. The temporal gap we see in these situations can last from a few months to more than a year.*

CEHE concluded that "[d]ue to the differences in situations, reasons, student intent, student choice, and temporal variations, it is virtually impossible to have a "bright-line" or fixed standard to differentiate between categorizing a student a transfer into a new program versus a dropout who then subsequently starts again in a new program." The response states the following about the method CEHE uses to determine whether a student is a withdrawal or a transfer:

> *The best solution that CEHE has come up with (and which has been our policy) is to use the ACCSC AIR Cohort Reporting deadline as a hard cutoff for differentiation. In summary, if a student left one program and subsequently transferred (or re-enrolled) into a new program*

**Exhibit F - 13**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*               *Probation Order*
*October 28, 2019*
*Page 14 of 27*

> *after the reporting deadline for the original program cohort, CEHE would record that student as a drop for the original program cohort and then record them as a new start in the new program's cohort.*

Based on the scenarios described above, the Commission believes that there are certain documented indicators that occur before the break in enrollment that could be used to differentiate between "transfer" and "withdrawal," such as advising notes, written requests to transfer to another program, evaluation of credits to transfer to the new program, execution of an enrollment agreement for the new program. However, there is also precedent allowing for breaks in enrollment when reporting student outcomes on the Graduation and Employment Chart. Specifically, if a student is able to complete the program within 150% of the reported duration of the program despite any breaks in enrollment, that student may be counted as a graduate. The same logic may be applied to the situation where the student returns to complete a different program. If the student completes the new program within 150% of the normal duration of the program, it would be appropriate to categorize that student is a transfer. In fact, that provides a generous allowance for students that begin a baccalaureate degree program, withdraw, and re-enroll and complete an associate degree program.

CEHE's response also states the following with regard to ACCSC's measurement of student success:

> *ACCSC stated in its May 2, 2019 letter that the Graduation and Employment Chart is intended to evaluate rates of student achievement at each specific campus. CEHE agrees with this statement. Accordingly, the purpose of the "Transfer to Another Program" and "Transfer From Another Program" categories is to account for and track student achievement and ultimately student success of students who switch from one program to another. It should not matter (nor be punitive to the measurement of a school's success) whether a student moves from one program to another immediately, within a few weeks, within a few months, or even after a year.*

The Commission reminds CEHE that ultimate student success is captured when the school reports the re-enrolling student as a start and graduate in the subsequent program. The Graduation and Employment Chart is meant, in part, to measure the success of each ***program*** in fulfilling the promised educational objectives. When students who withdraw from the program are instead removed from the calculation of the graduation rate by being reported as transfers, the resultant data may serve to mask issues with the baccalaureate degree program that might otherwise be used for a healthy assessment.

Therefore, the Commission directs CEHE to use the following guidance when completing Graduation and Employment Charts in future: **Only if a student withdraws from a program and is able to <u>complete</u> the program into which the student re-enrolled within 150% of the normal duration of the original program, may that student be reported as a transfer.**

The schools will be expected to maintain documentation to support the categorization of students as transfers, including enrollment agreements and transcripts.

Based on the foregoing, the Commission directs CEHE to submit the following with regard to students who withdraw and return to the same school in a different program, provide the following:

a.  A list of all students reported as "transfers out" on the Graduation and Employment Charts submitted with Item #1 above;

b.  For each student, provide transcripts showing that the student completed the subsequent program within 150% of the normal duration of the originating program; and

c.  Any additional information that the school believes will be useful to the Commission in making a determination regarding the school's compliance with ACCSC's requirements.

**Exhibit F - 14**

3.  CEHE must demonstrate that the school accurately represents the rights, responsibilities, and obligations of both the student and the school under the enrollment agreement (*Section IV (B)(1)* and *Section IV (C)(2)(c), Substantive Standards, Standards of Accreditation*). The Commission's original concern stemmed from a provision found in the enrollment agreement used by CEHE schools which stated that if a student discovers any misrepresentation upon which s/he relied on to enroll, they may terminate his/her enrollment without any liability and obtain a full refund of all monies paid. The provision also stipulated that once the 90-day "verification period" had expired, the student forfeited the ability to take any further action with regard to any misrepresentation. CEHE's December 20, 2018 response states the following regarding this matter:

> *...CEHE has deleted this language from all of its colleges' enrollment agreements. CEHE has also notified all currently enrolled students, who may have previously signed enrollment agreements that included this language, that this language is no longer in effect or applicable to any student.*

In reviewing updated enrollment agreements also provided in that response, the Commission noted that references to the "verification period" remained in revised enrollment agreements and as such the Commission raised additional questions in the May 2, 2019 Continued System-Wide Probation Order with regard to the accuracy of certain statements and the limitations imposed on rights of students.

At the time of the Commission's August 2019 review, the statements that CEHE purported to have revised or removed from the schools' enrollment agreements are as follows:

- 90 day limitation on students' rights to take action regarding misrepresentation;

- References to non-refundable fees;

- Certification and licensure statements;

- Requirement that students must be paid in full to receive career services;

- Allowance to graduate in any program regardless of the program in which the student originally enrolled;

- Stipulation that student services are offered at the option of the college;

- A section inaccurately titled "Release and Waiver"; and

- Stipulation that refunds are not made in the case the college ceases enrollment.

In response to the May 2, 2019 Continued System-Wide Probation Order, CEHE provided copies of revised enrollment agreements as the following exhibits:

- Exhibit 5.a.1 - Revised Enrollment Agreement for CollegeAmerica Arizona campuses;

- Exhibit 5.a.2 - Revised Enrollment Agreement for CollegeAmerica Colorado campuses;

- Exhibit 5.a.3 - Revised Enrollment Agreement for California College San Diego campuses;

- Exhibit 5.a.4 - Revised Enrollment Agreement for Independence University;

- Exhibit 5.a.5 - Revised Enrollment Agreement for Stevens-Henager College campuses; and

- Exhibit 5.a.6 – Revised Enrollment Agreement for International Students

CEHE also provided a "Highlight/Crosswalk of revisions made to the Enrollment Agreement" for each enrollment agreement as Exhibits 5.a.7 through 5.a.12. These exhibits provide side-by-side comparisons of the previous language and updated language. Additionally, the response includes, as Exhibit 5.a.13, copies of the five current catalogs for College America-Arizona campuses,

**Exhibit F - 15**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*October 28, 2019*
*Page 16 of 27*

CollegeAmerica-Colorado Campuses, California College of San Diego-both campuses, Stevens-Henager Colleges, and Independence University.

The Commission found that the enrollment agreements presented in Exhibits 5.a.1 through 5.a.6 appear to have been revised to address the issues listed above; however, the Commission noted that the response does not indicate when the new forms had been implemented. In the course of reviewing the entirety of the June 28, 2019 response, the Commission considered the following documentation and noted that the schools have not demonstrated use of an enrollment agreement that complies with accrediting standards:

- Exhibit 7.d. Copies of enrollment agreements for the ten most recent applicants to all programs for all schools delivered in a hybrid format or fully distance education format and

- Exhibit 8.c.2. Copies of enrollment agreements for the ten most recent international students who started an academic program at CEHE's SHC campus in Murray, Utah.

The enrollment agreements included in Exhibit 7.d. appear to have been executed between June 3, 2019 and June 10, 2019. The Commission noted that all were executed on forms that – to varying degrees – differ from the documents submitted in Exhibits 5.a.1-5.a.6. As outlined below, five were executed on what is referred to as "previous" in the table: a version of the enrollment agreement that does not appear to have been updated as CEHE indicated in this response. This "previous" version contains the reference to "verification period" and "non-refundable fees" for international students, includes the outdated "Certifications and Licenses" section, and includes the section title "Release and Waiver." The other five were executed on what is referred to as "partially updated" in the table: a version that incorporates some changes, however, includes the outdated "Certifications and Licenses" section. The table also identifies individual differences, such as the one enrollment agreement that refers to the non-refundable fee and the three that are missing the section titled "Understanding of Information."

| Student | Campus[3] | Accepting School Official Signature Date | Version of Enrollment Agreement |
|---------|-----------|------------------------------------------|---------------------------------|
| Santana | CA-Colorado Springs | June 7, 2019 | Partially updated |
| Vargas Guerrero | Independence University | June 3, 2019 | Partially updated– does not include the section "Understanding of Information" |
| Romero | Independence University | June 6, 2019 | Partially updated and does not include the section "Understanding of Information" |
| Edwards | Independence University | June 6, 2019 | Partially updated –does not include the section "Understanding of Information" |
| Loiacono | SHC-Boise | June 6, 2019 | Partially updated |
| Cruz | SHC-Boise | June 6, 2019 | Partially updated |
| Gray | SHC-Boise | June 10, 2019 | Partially updated |
| Wing | SHC-Orem | June 10, 2019 | Previous |
| Johnson | SHC-St. George | June 4, 2019 | Previous |
| Morales | SHC-West Haven | June 10, 2019 | Previous – includes references to $3,500 non-refundable fee |

---

[3] Although all campuses except Independence University and SHC-West Haven are no longer enrolling students, the Commission is interested in ensuring that this letter reports the Commission's full findings regarding schools that are still accredited by ACCSC.

**Exhibit F - 16**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                    *Probation Order*
*October 28, 2019*
*Page 17 of 27*

The enrollment agreements included in Exhibit 8.c.2. were all executed between March 14, 2019 and May 10, 2019 for students at SHC-Murray. The Commission noted that all enrollment agreements were executed on forms that do not reflect the changes that CEHE claimed to have made in the December 20, 2018 response. Of particular concern is the appearance of the "verification period" that attempts to limit students' rights to recourse to a 90-day period following enrollment. The Commission expressly directed CEHE to remove the provision from enrollment agreements with the September 8, 2018 System-Wide Probation Order, and with the December 20, 2018 response, CEHE confirmed to the Commission that the language had been deleted. It appears, based on the signature dates, that CEHE's response did not appear to be a fully accurate representation of the schools' practices.

According to CEHE's December 20, 2018 response, "CEHE completed the revision for of all its colleges' enrollment agreements on or about October 25, 2018." A copy of the revised enrollment agreement for all Stevens-Henager College campuses, including SHC-Murray, is included as in that response Exhibit 1.a.1. That enrollment agreement differs significantly from the executed enrollment agreements contained in Exhibit 8.c.2. of the June 28, 2019 response.

| Student Last Name | Accepting School Office Signature Date |
|---|---|
| Guo | March 14, 2019 |
| Millan | March 14, 2019 |
| Rajanala | March 18, 2019 |
| Mendbyar | March 18, 2019 |
| Kurasova | April 5, 2019 |
| Lan | April 9, 2019 |
| Cruz da Silva | April 12, 2019 |
| Kadu | April 12, 2019 |
| Tao | April 12, 2019 May 10, 2019 |
| Hayes | April 15, 2019 |

Based on the foregoing, the Commission found that CEHE has not demonstrated the use of an enrollment agreement that complies with accrediting standards in all cases. In context of the multiple versions of an enrollment agreement executed within a three-month time period and the failure to implement promised changes, the Commission found the provision of blank forms to be insufficient to demonstrate the required actions have been taken.

Accordingly, the Commission directs CEHE to submit the following:

a.  An explanation as to why SHC-Murray was using enrollment agreements in March, April, and May 2019 that contained the following provision that CEHE claimed to have deleted from enrollment agreements:

> *If you do not bring to our attention any misinformation or misrepresentation in writing by 5:00PM on the last day of the verification period, you forever and completely release and exempt the college from any and all liability as a result of any such representation.*

b.  If there is an updated enrollment agreement in use at SHC-West Haven and Independence University, submit a signed attestation from the director, affirming the date that the enrollment agreement form was implemented;

**Exhibit F - 17**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                        *Probation Order*
*October 28, 2019*
*Page 18 of 27*

    c.  A list of the 10 most recent students at SHC-West Haven and Independence University for whom enrollment agreements were executed after the implementation date of the new enrollment agreement form; and

    d.  Any additional information that the school believes will be useful to the Commission in making a determination regarding the school's compliance with ACCSC's requirements.

4.  CEHE must demonstrate that the schools with approved distance education programs and courses have established admissions processes for those programs and courses that include:

- An assessment prior to enrollment of the student's technical skills, competencies;

- Access to technology necessary to succeed in a distance education environment;

- An assessment of the student's capability to benefit the distance education program or course; and

- An assessment as to whether the student's learning style is conducive to online learning;

In addition, CEHE must demonstrate the validity and reliability of the assessment tools used to assess a student's readiness for distance education online learning minimally using engagement surveys, academic progress, and student achievement data (*Section IX (F)(2 & 3), Substantive Standards, Standards of Accreditation*).

In response to the Commission's questions regarding these matters, CEHE engaged in "a complete internal review of the process, tools, and assessments that CEHE's colleges' use to assess, measure, and analyze an applicant's readiness, suitability, and other factors prior to starting any distance education program delivered by CEHE." As a result, CEHE concluded that although the current process adequately measured certain aspects of readiness, the following areas were not adequately addressed:

- *Only measured applicants' general computer and technology familiarity;*

- *Were NOT consistently used to assess and screen applicants before they were allowed to complete the enrollment process and start school at CEHE's ground campuses (CollegeAmerica, Stevens-Henager, and California College San Diego);*

- *Did NOT adequately assess applicants' readiness for success in a distance education program;*

- *Did NOT adequately assess whether an applicant's learning style is conducive to distance education delivery;*

- *Did NOT adequately assess an applicant's ability to benefit from a distance education program;*

- *While there was some data (from student surveys) to support the efficacy of CEHE's assessment processes and tools, the data was minimal, inconsistent throughout CEHE's campuses, and insufficient to effectively validate current practices or identify areas for improvement.*

After consideration of the findings of its internal review, CEHE decided to implement the SmarterMeasure Learning Readiness Indicator from SmarterServices, Inc. The response includes a copy of the contract, a copy of the invoice, and CEHE's payment for this new tool. According to the response, it is CEHE's plan to implement this new assessment process on or about August 1, 2019.

The Commission recognized the work that appears to have gone into the internal study as well as CEHE's choice to adopt a new assessment approach. The Commission is interested in monitoring this adoption and how these changes take root and grow. As such, the Commission will monitor the

**Exhibit F - 18**

implementation of the SmarterMeasure Learning Readiness Indicator in the initial stages, and then monitor the efficacy of the new approach with studies of academic progress, retention data, and finally student graduation rates for the first cohorts of students admitted under the new process and procedures.

Accordingly, the Commission directs the school to submit, at this time, the following:

a.  The admissions requirements for enrollment into each distance education program or course of study;

b.  A list of the first 50 students that applied to any CEHE-affiliated school into a program delivered in a hybrid format or fully distance education format since the implementation of the SmarterMeasure Learning Readiness Indicator;

c.  Of those 50 students, a list of all students accepted for admission and corresponding copies of admissions documentation, distance education readiness assessments, and enrollment agreements for teach; and

d.  Of those 50 students, a list of all students that were denied admission and highlight those that were denied based on failing to meet CEHE's DE readiness assessment.

5.  CEHE must demonstrate that the schools have and enforce an acceptable policy of student attendance that promotes sufficient levels of student attendance such that the required knowledge, skills, and competencies can be reasonably achieved (*Section VII (A)(3)(b), Substantive Standards, Standards of Accreditation*). The question was first raised in the October 17, 2018 TSR issued to SHC-St. George, as the on-site evaluation team noted that the attendance policy published in the school's catalog did not provide sufficient detail regarding attendance requirements for the on-ground components of the courses. The policy did not define what levels of absence are considered excessive, or what actions will be taken in response to student absences, except for the specific case of automatic dismissal if a student is absent for 14 consecutive days.

In response, although SHC-St. George stated that "the attendance policy has been revised to include levels of attendance and detail regarding attendance requirements and actions taken for the blended delivery courses," the Commission found that the new policy still does not provide sufficient detail regarding required attendance levels.

In response to the May 2, 2019 Probation Order, CEHE included a revised Procedure Directive outlining the revised attendance policy, which appears to apply to all CEHE-affiliated schools. The Commission found the following:

•  The attendance policy with regard to onground students is stated as follows: "[o]nground ("OnG") students attending classes on campus are expected to be on time and maintain a high attendance rate." The policy does not define what is meant by "high attendance rate." The policy for online students is stated as follows: "[s]tudents taking a fully online course are expected to participate, at a minimum, of four (4) days each week in their course." It is not clear that the consequences, outlined below, are tied to the expectation of four days each week, rather it seems to be tied to overall attendance percentages.

•  The consequences for failing to meet the attendance expectations are outlined as follows:

   -  The policy pertaining to "onground" students states, "[i]f a new student does not regularly attend classes during the first five days of their first module, then the student will be reclassified as a No-Show and will be withdrawn from the program." The policy does not define "regular" attendance during the first five days of the module, so it is unclear how the policy can be effectively applied. Given that the schools will no longer be admitting new residential students, the provision does not apply; however, the Commission noted that there is no corresponding

**Exhibit F - 19**

provision for online student attendance in the first week. The Commission is interested in understanding if there is a parallel policy regarding "no shows" for online or hybrid students.

- The policy pertaining to "onground" students indicates that those "who are absent more than 25% of any module will be sent a 25% Absent Notice from the Registrar stating that the student's absences are excessive and that the student is in jeopardy of failing the course." For online students, "[i]f an online student fails to attend/participate in his/her online course for five (5) consecutive days, then the student will be contacted by Student Services about their poor attendance/participation and will be reminded/encouraged to actively attend/participate in his/her course."

- The policy pertaining to "onground" students indicates that "students who are absent more than 50% of any module will be placed on Attendance Warning Status" and "directed to meet with the Dean or Program Advisor in order to discuss issues and identify strategies for improving attendance." For online students, "[i]f an IU student has no attendance/participation for ten (10) days, then he/she will receive an Attendance Warning Letter."

- The only defined consequence for failing to comply with the school's policies occur after 14 consecutive absences: "[i]f a student fails to return to class on or before the expiration of fourteen (14) days, then the student's enrollment must be terminated."

• With regard to students engaged in what CEHE terms "BlendED delivery," a hybrid of residential and online education, there is no definition of acceptable attendance. The policy is stated as follows:

> *Students completing coursework in a BlendED model are strongly encouraged to participate in all live class sessions, whether online or onground. Scheduled onground courses may include in-class activities that may not be made up if a student is not present.*

As justification for using the policies outlined above, CEHE conducted an analysis of attendance percentages, GPAs, grades, and student status (drop or graduate) for a three-year period was conducted for both on-ground and online courses. According to the response,

> *Results suggest that there is a significant difference in the number of "D" grades between the group with 51%-75% attendance and the group with 76%-89% attendance. This data supports the colleges' revised policy to take action when a student is absent more than 25% of a course. There was also a significant difference in the course pass rate between the group with 26%-50% attendance and the group with 51%-75% group. This data supports the colleges' revised policy to place students on attendance warning if they reach 50% for a module. The attendance percentage of graduates versus dropped students suggest that students who fall below 50% attendance in courses are more likely to drop out of school. Overall program attendance percentages suggest that students need to maintain at least 50% attendance in each course to achieve the required 2.0 GPA to graduate.*

The Commission agrees that the analysis shows a relationship between lower rates of attendance and lower rates of program graduation; however, CEHE has not shown that the 50% attendance rate benchmark is sufficient to achieve the educational objectives of the program. In addition, the Commission noted that the 50% threshold is not an established lower limit, rather it is a trigger for the beginning of the attendance warning period. The Commission is unconvinced of the efficacy of the current policy and in light of the transition to distance education found that much more detail is required with regard to the attendance policies for online and hybrid students. In addition, given that the policies described above appear to be effective for all CEHE-affiliated schools, the Commission is interested in a demonstration of compliance for all schools.

**Exhibit F - 20**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*October 28, 2019*
*Page 21 of 27*

Based on the foregoing the Commission directs CEHE to submit the following:

a. A detailed explanation of the attendance policies and procedures for onground students during the teach-out phase, hybrid students during the teach-out phase, and online students. The policies and procedures must clearly define what levels of absence are considered excessive, the actions that the school will take at each level including advisement, warning, probation if applicable, and termination;

b. The school's justification for defining the acceptable level of student attendance, specifically demonstrating that the required knowledge, skills, and competencies can be reasonably achieved at that level;

c. An explanation as to how the progressive steps in the policy (e.g., advisement, warning) are designed to promote sufficient levels of attendance; and

d. A copy of the schools' current catalogs, demonstrating disclosure of the attendance policies as stated above.

6. CEHE must demonstrate that the schools advertise in a truthful and accurate manner and that the schools take care to avoid creating any false, misleading, misrepresenting, or exaggerated impressions on prospective students (*Section IV (B), Substantive Standards, Standards of Accreditation*). CEHE's response to the May 2, 2019 Probation letter includes all advertising and promotional materials used by CEHE-affiliated schools; a description of the actions taken to ensure that each advertisement connected with the finding of the letter complies with accrediting standards; a sample "personal website" created for prospective students; documentation designed to support the claim that the schools award "millions of dollars" annually in grants, scholarships, and other financial aid; graduate testimonials used in advertising.

Given the history of the Commission's issues and actions regarding CEHE's advertising, the Commission determined that additional monitoring is warranted to ensure that CEHE has established mechanisms which provide assurance that future advertising will comply with accrediting standards. The Commission noted, in CEHE's response to the September 8, 2018 System-Wide Probation Order that "[o]n a cycle of every three years, CEHE engages one of its outside legal advisors to hire an independent third party firm to conduct a system-wide secret shopping review of CEHE's recruitment process and engagement with prospective students." Although the response includes documentation that the third party was engaged in 2016, the response does not include the results of that review. Therefore, with the May 2, 2019 System-Wide Probation Order, the Commission directed CEHE to submit the results of the 2019 independent system-wide review of CEHE's recruitment process and engagement with prospective students. According to the response, although CEHE previously indicated the next secret shopping event will be conducted during the spring or summer of 2019,

> *Several months ago, CEHE made the decision to conduct the 2019 secret shopping during the third quarter of 2019. Therefore, as of the date of this response, the 2019 review has not been completed. That being said, CEHE's legal advisor, Armstrong Teasdale, has finalized the 2019 agreement with Norton Norris for the 2019 review and that activity is scheduled for the third quarter of 2019. Attached as Exhibit 6.e is a copy of the executed agreement with Norton Norris and copies of the payment CEHE has already made for this project. CEHE will provide the Commission with the results of the 2019 secret shopping review upon completion of the project.*

In addition, the Commission is interested in viewing advertising in light of the September 11, 2019 announcement that the schools will no longer enroll students in residential programs. Accordingly, the Commission directs CEHE to submit the following:

**Exhibit F - 21**

   a.  The results of the 2019 independent system-wide review of CEHE's recruitment process and engagement with prospective students;

   b.  CEHE's assessment of the results of the system-wide review, including:

      i.  An assessment as to whether the results indicate that there is adequate management in place to provide assurance that advertising and representations will comply with accrediting standards and

      ii.  A description of any improvements that CEHE intends to make in response to the results of the system-wide review;

   c.  A description of any other mechanisms that CEHE intends to employ to ensure advertising and representations are truthful and accurate and avoid leaving any false, misleading, misrepresenting, or exaggerated impressions; and

   d.  Copies of all advertising and promotional materials in current use by each CEHE-affiliated school, including - but not limited to - Internet advertising, the URL for the school's websites, radio or television (scripts are acceptable), flyers, direct mail, surveys, newsprint, and Yellow Pages.

7.  CEHE must demonstrate that the schools have and enforce consistent policies and procedures with regard to independent study at all affiliated institutions (*Section I (A)(1)(d), Substantive Standards, Standards of Accreditation*). Questions regarding the independent study policy were first raised in the October 17, 2018 TSR issued to CCSD-San Marcos. The on-site evaluation team noted that the school's "directed study" policy was described in different ways during the on-site evaluation. In response to the TSR, the Commission found that the school's policy statements were inconsistent regarding the circumstances under which independent study is allowable. Therefore, with the May 2, 2019 Continued Probation Order, the Commission directed CCSD-San Marcos to demonstrate the consistent publication of an independent study policy, as well as documentation that the school is following that policy.

In response, CEHE provided an updated Procedure Directive dated June 18, 2019. According to that policy, a "[d]irected Study contract is signed by the student and by an instructor qualified to teach the subject matter no later than the end of the first day of class." The response includes a single completed Directed Study Contract, which shows that the student and the instructor signed the contract 21 days after the first day of class. The Commission will therefore provide CEHE with an additional opportunity to provide documentation showing that "Directed Study" is delivered in accordance with the stated policy. In addition, the Commission is interested in a sample of documentation from all affiliated schools to ensure that the other schools in the system are implementing the June 18, 2019 directive.

Based on the foregoing, the Commission directs CEHE to submit the following for all campuses:

   a.  For reference, a copy of the June 18, 2019 Procedure Directive regarding Directed Study along with any revisions to the policy in light of the school teach-out plans, if applicable;

   b.  A list of the ten students most recently engaged in directed study at CCSD-San Marcos, and copies of the signed Directed Study Contracts; and

   c.  A list of the ten students most recently engaged in directed study at the other CEHE-affiliated schools and copies of the signed Directed Student Contracts.

**Exhibit F - 22**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                                      *Probation Order*
*October 28, 2019*
*Page 23 of 27*

8.  CCSD-San Diego must demonstrate that instructional materials and equipment are sufficiently comprehensive and reflect current occupational knowledge and practice (*Section II (A)(5)(a), Substantive Standards, Standards of Accreditation*). The question regarding sufficiency of equipment provided by CCSD-San Diego for the Computer Technology and Networking; Computer Programming; and Computer Science programs was first raised in the February 16, 2018 TSR. Despite the school's assertions that equipment for these programs was sufficiently up-to-date, the Commission found that the school had not supported those claims with documentation. With the September 6, 2018 Probation Order, the Commission directed the school to provide a description of the review and commentary by the Program Advisory Committee, as well as CCSD's own assessment of equipment and plan for ongoing improvement. With the May 2, 2019 Continued Probation Order, the Commission asked for assessment and plans specific to the two associate degrees in question, evidence of the school's progression toward becoming a Cisco Network Academy and how this step is improving the Computer Science program through a review by the PAC.

In response, CEHE indicated that the school solicited feedback during a faculty meeting conducted in April 2019:

> *Technology faculty members recommended adding large monitors to create a "Programming Computer Lab" at both the San Diego and National City campuses. Faculty member Steven Holt explained that when he is consulting with his clients, he has a minimum of two monitors to assist in the coding. Associate Dean, Jean-Pierre Muheim, coordinated with the company AutoAnything to have additional monitors donated. Within the week, 30+ monitors were installed. The new set up allows students to connect their laptops and see the code they are writing in large font.*

In addition, the school conducted meetings of the Program Advisory Committees responsible for oversight of the programs and received the following recommendations:

- Provide MAC Pro for student use;
- Add Digital equipment in classrooms;
- Explore alternative Integrated Developer Environments;
- Increase Computer Students' Computers RAM to 16 GB and convert to Solid State Drive HD 256 GB;
- Access resources on cloud like AWS or Azure; and
- Visual Studio/Explore alternative Integrated Developer Environments.

All suggestions were assigned to Jean-Pierre Muheim to be completed by August 1, 2019, which was beyond the timeframe of the response. The Commission was interested in further monitoring of the improvement to the equipment in the program; however, the September 11, 2019 announcement that CEHE-affiliated schools intend to "teach out" students remaining in residential programs changes (and broadens) the nature of the questions the Commission has with regard to the schools' equipment. At this juncture, the Commission determined that it appears germane to review plans for each school, for each program, for ensuring that residential training programs are adequately equipped throughout the term of the teach-out.

Accordingly, the Commission directs CEHE to submit the following for each affiliated school that will continue to offer residential education for the duration of a teach-out:

a.  A description of the schools' most recent assessment of equipment and instructional materials for each program;

**Exhibit F - 23**

USCA4 Appeal: 25-1372     Doc: 14     Filed: 06/04/2025     Pg: 194 of 461

Case 1:22-cv-01223-RDA-WEF     Document 1-7     Filed 10/28/22     Page 25 of 31 PageID# 180

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*     *Probation Order*
*October 28, 2019*
*Page 24 of 27*

b.  A description of the school's plan to ensure that the equipment is sufficiently comprehensive and reflect current occupational knowledge and practice; and

c.  A copy of the Program Advisory Committees' review and comment with regard to the schools' plans to maintain sufficient equipment throughout the term of the teach-out and documentation of the school's efforts to implement any suggestions by the Program Advisory Committee.

9.  CEHE must demonstrate that the schools are in compliance with all applicable federal, state, and local government requirements (*Section I (B)(1)(e)(iii), Rules of Process and Procedure, Standards of Accreditation*). As stated in the May 2, 2019 Commission letter, CEHE's January 23, 2019 letter indicates that with regard to the False Claims Act complaint filed against CEHE by the U.S. Department of Justice ("DOJ"), the district court judge issued a new opinion and that the scope of the claims against CEHE had been "dramatically reduced and narrowed in scope... [a]dditionally, the ability of the Relators to pursue claims beyond the limited claims that the Government intervened upon has been denied." The letter listed the following details:

> *On January 14, 2019, the court ordered the following:*
>
> *1.  CEHE's Motion for Leave to Take Judicial Notice was granted.*
>
> *2.  CEHE's Motion to Dismiss the Government's Amended Complaint in Intervention was granted in part and denied in part. The court dismissed with prejudice the Government's claims under the False Claims Act to the extent they are based upon its G5 certification theory of liability. The court denied the remainder of the motion to dismiss.*
>
> *3.  CEHE's Motion to Dismiss Relators' Fourth Amended Complaint was granted in part and denied in part. The court dismissed with prejudice the Relators' second cause of action based upon G5 certifications and the third cause of action based upon required management assertions in CEHE's annual audits. The court also dismissed portions of the Relators' first cause of action based upon the Colleges' Program Participation Agreements ("PPAs") with the Department of Education.*
>
> *4.  Perhaps most importantly, the court found that the Government's Complaint in Intervention superseded the Relators' amended complaint and that any pleadings subsequently filed by the Relators lacked legal effect. Therefore, the court ordered that Relators' Second Amended Complaint, Third Amended Complaint, and Fourth Amended Complaint be stricken.*

In response to the May 2, 2019 Commission letter, CEHE provided an update regarding the complaint filed by the DOJ. Specifically, CEHE state that "the Government chose **not** to file a motion to amend its complaint any further after the court's January 14th ruling." The court also requested that CEHE and the DOJ's lawyers participate in another mediation, which occurred on May 22, 2019. CEHE indicated that "[t]here was no resolution of the matter following the mediation" [and that] the court extended the discovery period until November 2019."

In regard to the complaint filed by the Colorado Attorney General ("COAG"), CEHE indicated that the judge has not issued a verdict or decision and stated that there is "no indication of when the judge will issue his decision." However, CEHE provides this update:

> *First, a recent ruling by the Colorado Court of Appeals clarified that the COAG must prove there was a "significant public impact" when bringing a Colorado Consumer Protection Act ("CCPA") complaint. On April 19, the COAG filed a motion with the court requesting that the COAG and CEHE be allowed to file revised/supplemental Proposed Findings of Fact and Conclusions of Law in this matter. At the same time, CEHE filed a motion requesting the court "reconsider" its previous rulings (back in 2017) whereby it denied CEHE's motions for*

**Exhibit F - 24**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*October 28, 2019*
*Page 25 of 27*

*summary judgment based upon the court's decision, at that time, that the COAG **did not** have to prove significant public impact. The court granted the COAG's motion and ordered that both sides submit revised Findings of Fact and Conclusions of Law. The court has not yet ruled on CEHE's motion for reconsideration.*

In addition, upon learning that COAG violated the Protective Order in this case, "CEHE filed a motion with the court for sanctions." On May 15, 2019, the court issued four sanctions against COAG. COAG complied with three sanctions and filed a motion for consideration of the fourth sanction to pay CEHE's legal expenses related to this matter. The schools state that oral arguments on this motion were scheduled for July 2, 2019.

On May 20, 2019, CEHE notified ACCSC that CEHE had received a Civil Investigative Demand ("CID") from the Consumer Finance Protection Bureau ("CFPB"), a U.S. government agency that provides consumer protection in the financial sector. By letter dated July 11, 2019, ACCSC requested additional information on this matter. According to CEHE's response,

*CEHE has no knowledge as to the impetus for the CFPB's investigation. According to the April 12, 2019 notice that CEHE received from the CFPB, the Civil Investigative Demand ("CID") was issued pursuant to Section 1052 of the Consumer Financial Protection Act of 2010 and 12 C.F.R Part 1080 to determine whether there is or has been a violation of any laws enforced by the Bureau of Consumer Financial Protection. The CID contained a "Notification of Purpose" pursuant to 12 C.F.R. §1080.5. That notice stated the following:*

*The purpose of this investigation is to determine: (1) whether colleges or associated persons are offering to extend credit, extending credit, or providing financial-advisory services to students; (2) whether these persons, in connection with offering to extend credit, extending credit, or providing financial-advisory services, have misrepresented the true nature of a financing program or enrolled students in a financing program without their knowledge or consent in a manner that is deceptive, unfair, or abusive, in violation of§§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536; and (3) whether Bureau action to obtain legal or equitable relief would be in the public interest.*

With regard to the status of the action, CEHE's response states:

*...on or about June 15, 2019, CEHE submitted a Respondent's Supplement to Petition to Set Aside or Modify Civil Investigative Demand. A copy of the submission is attached as Exhibit b.2. Since the date of that filing, CEHE has not received a decision on its Petition, and neither CEHE nor its counsel have received any further correspondence from CFPB. In accordance with CFPB's Rules Relating to Investigations, CEHE's timely filed Petition stays the time permitted for compliance with the CID until the Petition is adjudicated. (See 12 C.F.R. § 1080.6(f).)*

With three actions remaining open, the Commission determined that further monitoring is warranted. Accordingly, the Commission directs CEHE to submit the following:

a.  An update and final determination, if available, regarding the complaint filed by the U.S. Department of Justice;

b.  An update and final determination, if available, regarding the complaint filed by the COAG;

c.  An update and final determination, if available, regarding the CID filed by CFPB; and

d.  Any other information or documentation regarding any pending or final litigation matters with respect to any CEHE-affiliated school.

**Exhibit F - 25**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*                    *Probation Order*
*October 28, 2019*
*Page 26 of 27*

## PROBATION REQUIREMENTS:

In cases where the Commission has reason to believe that a school is not in compliance with accreditation standards and other requirements, the Commission may, at its discretion, place a school on Probation. A school subject to a Probation Order must demonstrate corrective action and compliance with accrediting standards. **Failure of the school to demonstrate compliance with accrediting standards or other accrediting requirements by the due date set forth herein may result in a revocation of accreditation action**.

The Commission will not consider substantive changes, a change of location/relocation, or additions (i.e., separate facilities, new programs) to a school or its separate facilities while the school is on Probation. However, a school that is subject to Probation may seek the Commission's approval for the transfer of accreditation that would result from a change of ownership as described in *Section IV, Rules of Process and Procedure, Standards of Accreditation.*

In accordance with *Section X, Rules of Process and Procedure, Standards of Accreditation*, a summary of the Probation Order is made public and provided to the U.S. Department of Education, appropriate State agencies, and appropriate accrediting agencies. Moreover, in accordance with *Section X (C)(6), Rules of Process and Procedure, Standards of Accreditation,* the Commission has notified the U.S. Department of Education of this action pertaining to the findings related to the school's federal financial aid responsibilities.

In accordance with *Section VII (L)(8), Rules of Process and Procedure, Standards of Accreditation*, a school subject to a Probation Order must inform current and prospective students that the school has been placed on Probation and that additional information regarding that action can be obtained from the Commission's website.

## MAXIMUM TIMEFRAME TO ACHIEVE COMPLIANCE:

Based on *Section VII (M), Rules of Process and Procedures, Standards of Accreditation* and the schools' longest program of more than two years, the maximum timeframe allowed for the CEHE-affiliated schools, to achieve and demonstrate compliance with the *Standards of Accreditation* is two years. The timeframe to achieve compliance began as of September 6, 2018 and ends on **September 7, 2020**. Please also be advised that the Commission is under no obligation to wait for the maximum timeframe to expire and may take an adverse action prior to the expiration of the maximum allowable timeframe.

## NOTIFICATION TO STUDENTS:

CEHE schools must inform current and prospective students in writing that the school has been placed on Probation and that additional information regarding that action can be obtained from the Commission's website (*Section VII (L)(7) Rules of Process and Procedure, Standards of Accreditation*).

## RESPONSE REQUIREMENTS:

By applying for accreditation, a school accepts the obligation to demonstrate continuous compliance with the *Standards of Accreditation*. While the Commission employs its own methods to determine a school's compliance with accrediting standards, the burden rests with each school to establish that it is meeting the standards. The Commission's deliberations and decisions are made on the basis of the written record and thus each school must supply the Commission with complete documentation of compliance with accrediting standards.

CEHE must provide a response to the items expressed above that provides the information requested along with any additional information that the school believes supports a demonstration of compliance with

**Exhibit F - 26**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*     *Probation Order*
*October 28, 2019*
*Page 27 of 27*

accrediting standards.[4] If the response contains documentation that includes personal or confidential student or staff information that is not required for the Commission's review (e.g., social security numbers, dates of birth, etc.), please remove or redact that information.

CEHE must upload the school's electronic response directly to ACCSC's College 360 Database for each campus. The ACCSC College 360 database can be accessed by clicking here. Please note that the password utilized by the institution to access the Annual Report Portal is the same to access the School Submission section of the College 360 database. The Instructions for College 360 DMS Submissions can be found here. A detailed overview on how to upload a school submission can be found here.

Keep in mind, the response must be prepared in accordance with ACCSC's Instructions for Electronic Submission (e.g., prepared as one Portable Document Format ("PDF") file that has been prepared using Adobe Acrobat software (version 8.0 or higher) and which has a .pdf extension as part of the file name).

The response must also include a signed certification attesting to the accuracy of the information and be received in the Commission's office **on or before December 30, 2019**. If a response, the required fee,[5] and the certificate of attesting to the accuracy of the information is not received in the Commission's office **on or before December 30, 2019**, the Commission will consider further appropriate action.

For assistance with the password or for any other questions regarding the electronic submission requirements, please contact Anne Santalla at asantalla@accsc.org or (703) 247-4532. Please note that any password requests to access College 360 must be made by the school director, or designated member of the school's management team, via e-mail.

For assistance or additional information, feel free to contact me at 703.247.4520 or mccomis@accsc.org.

Sincerely,

Michale S. McComis, Ed.D.
Executive Director

Encl.:  Appendix I – Accreditation Actions Considered

---

[4] ACCSC has issued two modules of the **Blueprints for Success Series** – Organizing an Effective Electronic Submission and Preparing a Comprehensive Response for Commission Consideration – which provide a framework for submitting a well-documented, organized, electronic response for Commission consideration. ACCSC encourages the school to review these modules when formulating its response to this letter. More information is available in the Resources section at www.accsc.org.
[5] ACCSC assesses a $1,000 processing fee to a school placed on Probation.

**Exhibit F - 27**



2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

**APPENDIX I**
**ACCREDITATION ACTIONS CONSIDERED**

| School | Accreditation Actions Considered | Materials Considered |
|---|---|---|
| California College San Diego (#M001073)<br><br>San Diego, California | • Probation/Renewal of Accreditation /Change of Location<br><br>• 2018 Annual Report Rates | • May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• November 20, 2018 ACCSC letter and the school's response |
| College America (#M070742)<br><br>Flagstaff, Arizona | • Probation/Renewal of Accreditation<br><br>• 2018 Annual Report Rates | • May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• November 20, 2018 ACCSC letter and the school's response |
| CollegeAmerica (#B070743)<br><br>Phoenix, Arizona | • Probation/Renewal of Accreditation<br><br>• 2018 Annual Report Rates | • May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• November 20, 2018 ACCSC letter and the school's response |
| Independence University (#B072309)<br><br>Salt Lake City, Utah | • Probation/Renewal of Accreditation<br><br>• 2018 Annual Report Rates | • May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• November 20, 2018 ACCSC letter and the school's response |
| Stevens-Henager College (#B070581)<br><br>West Haven, Utah | • Probation/Renewal of Accreditation/ Degree Program<br><br>• 2018 Annual Report Rates | • May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• November 20, 2018 ACCSC letter and the school's response |

**Exhibit F - 28**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*      *Probation Order-Appendix I*
*October 28, 2019*
*Page 2 of 3*

| School | Accreditation Actions Considered | Materials Considered |
|---|---|---|
| Stevens-Henager College (#B070582)<br><br>Orem, Utah | • Probation/Renewal of Accreditation | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response |
| Stevens-Henager College (#B070583)<br><br>Murray, Utah | • Probation/Renewal of Accreditation/ Degree Program<br>• 2018 Annual Report Rates | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| Stevens-Henager College (#B070584)<br><br>Logan, Utah | • Probation/Renewal of Accreditation | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response |
| Stevens-Henager College (#B072351)<br><br>Idaho Falls, Idaho | • Probation/Renewal of Accreditation | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response |
| Stevens-Henager College (School #B070764)<br><br>Boise, Idaho | • Probation/ Renewal of Accreditation<br>• 2018 Annual Report Rates | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |
| Stevens-Henager College (School #B072360)<br><br>St. George, Utah | • Probation<br>• Renewal of Accreditation<br>• 2018 Annual Report Rates | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• October 17, 2018 Team Summary Report and the school's response<br>• November 20, 2018 ACCSC letter and the school's response |

**Exhibit F - 29**

*Center for Excellence in Higher Education, Inc. – Salt Lake City, Utah*          *Probation Order-Appendix I*
*October 28, 2019*
*Page 2 of 3*

| School | Accreditation Actions Considered | Materials Considered |
|---|---|---|
| California College San Diego (School #B072374)<br><br>San Marcos, California | • Probation<br>• Renewal of Accreditation | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• October 17, 2018 Team Summary Report and the school's response |
| CollegeAmerica (#B070544)<br><br>Fort Collins, Colorado | • Probation<br>• Renewal of Accreditation and Initial Distance Education<br>• Warning | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• October 17, 2018 Team Summary Report and the school's response<br>• March 26, 2018 Continued Warning Order and the school's response |
| CollegeAmerica (#M001507)<br><br>Denver, Colorado | • Probation<br>• Renewal of Accreditation and Initial Distance Education | • May 2, 2019 System-wide Probation Order and the school's response<br>• September 6, 2018 System-wide Probation Order and the school's response<br>• October 17, 2018 Team Summary Report and the school's response |
| CollegeAmerica (#B070623)<br><br>Colorado Springs, Colorado | • Probation<br>• Warning/Renewal of Accreditation | • May 2, 2019 System-wide Probation Order and the school's response<br>• • September 6, 2018 System-wide Probation Order and the school's response<br>• March 26, 2018 Continued Warning Order and the school's response |

**Exhibit F - 30**

# Exhibit G

**Exhibit 1.b.1**

# Independence University Online

## GRADUATION AND EMPLOYMENT RATE ACTION PLANS

## Executive Summary

In its efforts to improve both graduation and employment rates in several programs over the past few three years, the University has committed tremendous resources in time and money to not only meet bench requirements for ACCSC, but to also improve the overall education and outcomes for its student body to meet our mission.

The following Executive Summary highlights changes that the University has made that have, and will continue to have, a significant impact on improved student outcomes. While these are not *the only* actions the University has taken over the past few years, these ten (10) actions are showing the most positive impact on improved outcomes. Each of these actions or changes (and others) are discussed in more detail in the body of this Action Plan.

**Ten Key Initiatives Positively Impacting Graduation Rates
and/or Employment Rates for Independence University.**

The following table identifies ten initiatives that are positively impacting graduation rates, employment rates or both elements of student outcomes. The first three columns in the table identify the initiative, when testing/assessment of the initiative began, and when full-implementation was (or will be) completed. The final two columns indicate the University's assessment of the expected impact on improvement in graduation rates and employment rates.

| Successful Student Outcomes Initiative | | | | |
|---|---|---|---|---|
| Description | Testing | Full Implementation | Expected Graduation rate improvement | Expected Employment rate improvement |
| Student Success Teams | 2017 | 2018 | 3-6% | 3-6% |
| Acuity Scheduling Software | 2018 | 2021 | 1-3% | 1-3% |
| SmarterMeasure Assessments | 2019 | 2020 | 7-9% | 2-4% |
| Expanded Reentry Team | 2018 | 2020 | 7-10% | 0 |
| 5-Credit Hour Model | 2018 | 2020 | 8-11% | 2-4% |
| Lab Instructor Model | 2019 | 2020 | 5-7% | 0 |
| Extensions | 2020 | 2020 | 1-2% | 0 |
| Harmonize Software | 2020 | 2021 | 2-3% | 0 |
| Employment Relations Team | 2020 | 2021 | | 8-12% |
| Vertical Specialization | 2019 | 2021 | 1-3% | 2-4% |
| **Total** | | | **35-54%** | **18-33%** |

The genesis of the **Student Success Team** followed a reorganization of the management team in 2017 which included an identification of the need to expand student services for IU-Online. At that time, the department(s) totaled roughly 38 personnel. As of the fall of 2020, the Student Success Teams encompasses roughly 145 personnel, a 281% expansion. The focus of these staff members has been to

**Exhibit G - 1**

enhance engagement, communication, and support for active students. In 2020, attention was paid to building a stronger bond between academics, student services, and career services by realigning staff by academic/program vertical (School of Business, School of Healthcare, School of Technology and School of Graphic Arts).

One of the tools initially tested and then adopted by the Student Success Team, including student services and career services, was the **Acuity** scheduling software.  This software allowed staff members to proactively communicate hours for face-to-face visits with students and direct scheduling by students. The system also automatically sends out reminders to students about upcoming appointments.  This feature has significantly improved the "show rate" of students to support and service meetings. Additionally, after a meeting, the system automatically sends the student a follow-up survey to review and comment on the meeting and its usefulness in supporting the student.  The system has received over 20,000 student survey responses in the past two years resulting in an exceptionally high average rating of 4.93 on a 5.0 scale for the University's Student Services Advisors.  The final group to be rolled out the Acuity software is the Academics Team which will be completed in Q1 2021.

The **SmarterMeasure Assessment** tool was initially launched in November 2019 as an additional assessment and entry-requirement tool (for Technology Competency).  In 2020, the University further expanded the entry requirements using this tool by adding to specific thresholds for additional assessment components of the SmarterMeasure tool: Learning Styles, and Individual Attributes.  These changes have reduced the successful admissions pool by over 25% and should impact favorably (i.e., reduce) the number of students who withdrawal in their first academic year.  Estimates of beneficial impact are extrapolated from the number of students who are applying but not being matriculated.  This assumes that the SmarterMeasure tool, and the established threshold scores, can be used to identify student success. While the University will be monitoring the data from these changes (and making warranted adjustments if necessary), if the tool lives up to expectations our projections for the impact on outcome improvement will likely be much higher than we've conservatively estimated.

The University has conducted numerous surveys of students who have dropped from school over the years and consistently had results showing that two-thirds of the students who dropout want to return to school to complete their degree; approximately one-third respond that they want to return within six months.  To reduce the barriers to reentry, the **Reentry Team** has been expanded by over 100%, to 19 active employees.  As a result, the average number of reenrollments for modules 5 through 10 in 2020 have more than doubled to 204 reenrollments per module.  Roughly 25% to 30% percent of dropouts are now reentering school through these efforts.  This increase volume should have a significant impact on improving graduation rates.

The **Five-Credit Hour Model** has been very successful in improving both overall completion rates and first year retention rates.  This model expanded the amount of coursework in individual courses and eliminated the need for students to take two separate courses in a given module.  The change was initially rolled out in the Business and Accounting programs in December 2018.  While the effort to expand this initiative to all programs was delayed by external factors, that effort was finally completed for other programs that have struggling with below-benchmark graduation rates in the Spring of 2020.  Even with the combined challenges of a global pandemic and summer enrollment periods, the completion rates for these programs have jumped.

2

**Exhibit G - 2**

JA200

In mid-2019, the University started testing a new **Lab Instructor** model, where a second instructor was placed in a course to focus on: (1) more one-on-one interactions with students, (2) helping students achieve more successful in the course, and (3) enhancing student engagement. The test program was successful and by May of 2020, this initiative became part of the curriculum model for all first-year students. Lab Instructors are now a part of the first eight modules of instruction for all programs that have had challenges with below benchmark outcomes.

A test to determine if expanding **Extensions for Course Completion** could help more students succeed was started in the early spring of 2020. Prior to the start of the test program less than 40 students per module were requesting and receiving extensions each module. In the most recent module, over 300 students requested extensions. Due to the results on the effectiveness of this initiative, it was moved from testing to full implementation in the Summer of 2020. It is estimated that in 2021, over 1,000 more students who, prior to this initiative would have a failed a course, will be able to complete their work and successful pass a given course.

In the summer of 2020, the University began testing the **Harmonize Software** system to impact the discussion boards within online courses. This software and model improves the discussion format to make it more of a social-media type interaction between students and the faculty members. Initial tests have shown double digit improvements in both course engagement and course completion rates. The University intends to begin rolling this out as part of the curricula in 2021.

Also in 2020, the University developed an **Employment Relations Team** to do business-to-business contacting and outreach to develop more employment opportunities for IU graduates. This team developed nearly 200 job leads (with over 100 of those job leads in healthcare professions) during its first week of operation. This initiative went through extensive open planning and development before implementation and has demonstrated significant value in its first full month of operation.

Consideration and planning for **Vertical Integration** of the career services team to the academic verticals (programs) began in late 2019 and began initial rollout in 2020. The goal of this initiative is to enhance communication and coordination between the stakeholders who work to help students stay in school and get a career path job after graduation. A challenge has been getting all the stakeholders on the same page and communicating the same message to students. This initiative has been evolving through most of 2020, however, the impact on being able to reach students on a single issue through multiple channels is showing positive results.

One of the hallmarks of the University is the constant analysis of data and implementation of initiatives to improve results. Several of the successful initiatives mentioned above, began testing as early as 2017 and there have also been other tests, that proved less successful, that were abandoned. However, the University is confident (and the data supports) that its dedication to ongoing improvement, openness to testing new initiatives, ability to assess effectiveness, and commitment to spend millions of dollars on successful initiatives, targeted at improving student achievement and outcomes are (and will continue in) correcting past challenges that some programs have had in meeting ACCSC benchmarks for graduation and employment - while maintaining a high level of student satisfaction.

With these ten initiatives it is reasonable to assume, based upon ongoing assessment of results, that some initiative's results will be cannibalized by other initiative's results. To this end, the University's forecasts of the aggregate success of all initiatives is conservative. However, as a stress-test, or weakest-case

3

**Exhibit G - 3**

scenario, let's assume that: (1) the aggregate impact only ends up being two thirds (66%) of the _minimum range_ forecasted in the table above, and that (2) only a limited part of the impact will affect 2020 new enrollments, and that (3) the bulk of the impact will be on 2021 enrollments. Under this (highly unlikely) weakest-case scenario, the data is still forecasting that all programs would achieve graduation rates benchmarks between 2024 and 2026.

| Graduation Rates by Cohort Year – Weakest Case Scenario | | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
| AOS Medical Assisting | 26% | 25% | 34% | 46% | | |
| AAS Business | 21% | 24% | 33% | 45% | | |
| AAS Graphic Arts | 18% | 20% | 29% | 43% | | |
| BS Business Administration | 27% | 25% | 26% | 26% | 35% | 49% |
| BS Graphic Arts | 28% | 28% | 22% | 25% | 34% | 48% |
| BS Web Design and Development | 15% | 10% | 13% | 20% | 29% | 43% |
| BS Health Services Management | 18% | 19% | 20% | 22% | 31% | 44% |
| MS Nursing Education | 40% | 0% | na | na | na | na |

The impact of several of the aforementioned initiatives have already improved outcomes in placement rates for the University. Between 2018 and 2020 aggregate placement rates have improved from 50% percent in 2018 to 65% percent in 2020, irrespective of the negative impact from COVID-19 pandemic in 2020. Most of the initial impact has come from (and will increase from) four initiatives: Student Success Teams, Acuity Software, SmarterMeasure, and the 5-Credit Hour initiative. In addition, two other initiatives are already beginning to impact the student outcomes for placement: Employment Relations Team and Vertical Specialization.

Current trends indicate that the aggregate graduate employment rates will exceed benchmarks in 2021. Specifically, we are forecasting that 12 of 15 programs will achieve benchmarks in 2021 (and 13 out of 15 is highly probable) and all programs will meet benchmarks in 2020.



| | 2018 | 2019 | 2020 | 2021 (Projected) |
|---|---|---|---|---|
| | 50% | 61% | 65% | 73% |

4

**Exhibit G - 4**

The details supporting these initiatives and their projected outcomes are included in the body of this report.  Actions to improve graduate placement rates has, by its nature, shown more immediate results. All the actions taken to improve graduation rates have a direct or indirect impact on placement rates. However, the movement toward benchmark numbers (and beyond) are indicative of the longer-term impact these actions will have on graduation rates.

Finally, and importantly, while the University estimates that it is spending an additional $10 million per year to support these initiatives, the Board of Directors, senior management, executives, administrators, and all CEHE employees are committed to this effort and all agree that this is money, time, and effort well spent.

### *Legend for this report:*

***Black text indicates original factors and previous strategies***

***Blue text indicates updates to original factors and strategies***

***Green text indicates new factors and or strategies***

**Exhibit G - 5**

JA203

# Exhibit H

# ACCSC

Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
**www.accsc.org**

April 22, 2021

**ELECTRONIC DELIVERY**
eric.juhlin@collegeamerica.edu

Eric Juhlin
Chief Executive Officer
Center for Excellence in Higher Education
4021 South 700 East, Suite 400
Salt Lake City, Utah 84107

***Withdrawal of Accreditation***

Dear Mr. Juhlin:

At the February 2021 meeting, the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") considered the following:

- The previous decision to continue the system of schools in the Center for Excellence in Higher Education ("CEHE") on Probation, and matters related thereto;[1] and

- CEHE's response to ACCSC's letter of October 26, 2020, requesting additional information regarding the ruling by the District Court, City and County of Denver, State of Colorado ("District Court"), in favor of the State of Colorado and against the Defendants, jointly and severally, to include $3,000,000.00 for civil penalties under the Colorado Consumer Protection Act ("CCPA"), and injunctive relief under the CCPA and Uniform Consumer Credit Code ("UCCC").

Upon review of the record, the Commission found that Independence University ("IU"), which as of the date of this letter, remains the only active main school or branch campus in the CEHE system not in a teach-out status, failed to demonstrate successful student achievement by maintaining acceptable rates of student graduation and employment in the career field for which the school provided education over a significant history of reporting and monitoring. In this regard, the history is significant in terms of the length of time afforded IU to come into compliance with standards, significant in terms of the breadth of the failure throughout the school's programmatic offerings, and significant in terms of the number of students the school failed to serve.

Therefore, the Commission voted to withdraw IU's accreditation and to remove the school from the list of ACCSC-accredited institutions.[2] The chronology of the Commission's review and bases for the Commission's decision to withdraw IU's accreditation are set forth below.[3]

## History of the Commission's Review

The history and compliance history of IU is part of the history and compliance history of the oversight of the corporation CEHE and its system of affiliated schools is laid forth in Appendix II. The Commission noted that from 2003 to 2012, the CEHE system of schools underwent a period of growth and acquisition from six schools in November 2002, to 16 schools in 2012. From 2012 to the present, the schools have been

---

[1] See Appendix I included as part of this letter.
[2] Pursuant to *Section VIII (B)(3), Substantive Standards, Standards of Accreditation*, the accredited status of branch campuses are dependent upon the continued accreditation of the main school. Therefore, the Commission's action to withdraw the accreditation of the main campus also withdraws the accreditation of the branch campuses, Stevens-Henager College in Murray, Utah (B070583), Stevens-Henager College in Boise, Idaho (B070764), and the satellite location in Layton, Utah (S460424). Other campuses in the CEHE system remain on Probation for the duration of the approved teach out of students.
[3] Although the Commission's decision to remove IU from the accredited list is based on the school's failure to demonstrate successful student achievement outcomes as required by accrediting standards, this does not mean that the Commission found that the school demonstrated compliance in the other areas outlined in the July 21, 2020 Continued Probation Order.

**Exhibit H - 1**

*Independence University*
*School # M070581*
*April 22, 2021*
*Page 2 of 17*

*Withdrawal of Accreditation*

subject to scrutiny by the Commission due to an inability to demonstrate continuous compliance with accrediting standards, particularly in the areas of acceptable student achievement, advertising and recruitment tactics, rigor of the admissions process, and employment classifications. From 2017 through 2021, the system had closed and consolidated schools so that by March 2021, there is only a single school that is not operating in a teach-out status – IU. The status of operations at CEHE-affiliated schools is described in the table below.

| CAMPUS | NUMBER OF ACTIVE STUDENTS | EXPECTED LAST DATE OF GRAD |
|---|---|---|
| Independence University (M070581) | 9,335 as of June 30, 2020* | N/A |
| Stevens-Henager – Murray (B070583) | 21 as of March 24, 2021 | June 19, 2022 |
| Stevens-Henager College – Boise (B070764) | 38 as of March 24, 2021 | July 17, 2022 |
| Stevens-Henager College – Layton (S460424) | N/A | N/A |
| California College San Diego – National City (M001073)† | 55 as of March 24, 2021 | July 17, 2022 |
| California College San Diego – San Marcos (B072374) † | 68 as of March 24, 2021 | August 28, 2022 |
| CollegeAmerica – Phoenix (B070743) † | 48 as of March 24, 2021 | August 29, 2021 |

\* As of June 30, 2020, enrollment at the main school (070581) was reported as 114 and enrollment at the consolidated branch (072309) was reported as 9,220.

† These campuses remain accredited and on Probation during the period of the approved teach out of students.

As noted in the school's compliance history, the system of CEHE-affiliated schools has been under the Commission's scrutiny for an extended period. During this time, the Commission has given notice to the schools regarding the findings of non-compliance, defined the maximum timeframe in which to demonstrate compliance with standards, provided notice regarding the consequences for failing to make the requisite changes, and provided ample opportunity for the school to achieve and demonstrate compliance. The Commission's findings and communications, particularly in the last four years, reflect a deepening concern regarding the magnitude of the schools' failure to demonstrate compliance with standards and heightened awareness of the expiration of the timeframe available to the school to remedy the areas of non-compliance, as follows:

During the May and September 2018 reviews, the Commission raised serious substantive questions about the failure of the school to demonstrate compliance with accreditation standards over an extended period of time, the apparent lack of engagement in self-assessment, the inability to effect permanent improvements, and ultimately whether the schools voluntarily supported and respected the accreditation process. The Commission expressed these observations in the September 6, 2018 letter as follows:

> *The Commission found that the record shows that the inputs, resources, and processes of CEHE schools are designed and implemented in a manner that is not designed for student success. CEHE's advertising and recruitment tactics coupled with a poorly documented admissions process has fostered the creation of a student population that the schools are ill-prepared to educate. In addition to questions regarding the length and educational objectives of certain programs, the record before ACCSC raises significant questions about the schools' delivery of all of its program offerings. The Commission suspects that the result of the CEHE's focus on recruitment and lack of attention to educational quality is evidenced by the widespread and persistent below-benchmark rates of graduation and employment reported throughout the system of CEHE-affiliated institutions. In addition, the school's practices with regard to transferring students and employment classifications may in fact be preventing the Commission from a more fulsome opportunity to determine whether they are truly an accurate depiction of student success. Overall, the Commission*

**Exhibit H - 2**

> *found CEHE's response to be dismissive of the schools' responsibilities to the students and to the accrediting process. Of particular note is the attempt by CA-Flagstaff to blame low rates of student success on the ethnic culture of its students. The character of that response portrays an institutional disregard of the school's responsibility for addressing the needs of the students admitted by the school from the very community the school has elected to serve, which is a fundamental expectation of ACCSC accreditation.*

> *Overall, it is not clear that CEHE agrees "to support the accreditation process," or to meet or exceed the Standards of Accreditation throughout the application and accreditation period," as required by the Standards of Accreditation. The responses to on-site evaluation team findings routinely consist of attacking the validity of a standard, the application of a standard, and the actions of on-site evaluation team and ACCSC-staff members. The character of the responses portrays an institutional culture of disregard of the school's responsibility to support the accreditation process and to meet the Standards of Accreditation. At this junction, the Commission questions whether the CEHE system of schools is misaligned with ACCSC's mission and purpose to an irremediable extent. Therefore, the Commission voted to place the CEHE system of schools on Probation with a subsequent review scheduled for the February 2019 meeting. The critical focus of that review and the Commission's next decision will be CEHE's ability to demonstrate a commitment to student success and a commitment to supporting ACCSC's mission and purpose (p. 6-7).*

With that letter, the Commission informed CEHE that the timeframe to achieve compliance, pursuant to *Section VII (M)(1) Rules of Process and Procedure, Standards of Accreditation*, began as of the date of the letter. Therefore, the period allotted to the schools to remedy the noncompliance or cure the deficiency would end on September 7, 2020.[4] The Commission also informed the school that the Commission is under no obligation to wait for the maximum timeframe to expire and has the authority to take an adverse action prior to the expiration of the maximum allowable timeframe. In each of the 18 areas of non-compliance, the Commission afforded the CEHE-affiliated schools an opportunity to submit additional information to demonstrate compliance with accrediting standards.

The Commission made the following observation as described in the letter dated May 2, 2019:

> *...the character of the responses under review at the February 2019 meeting portrays a significant shift in tone and toward taking the action required to achieve and demonstrate compliance with the Standards of Accreditation. The record reflects that CEHE has begun the process of candid self-evaluation and is working to develop realistic solutions across the array of compliance issues outlined in this and previous letters. The Commission recognized and appreciates the amount of effort CEHE and its campuses have put into developing new policies and procedures and implementing new practices (p. 2).*

Despite the observation expressed above, the Commission also stated in the May 2, 2019 letter that:

> *...significant questions remain with regard to successful student achievement, reporting practices, admissions practices related to distance education students, and practices with regard to international students among others, which the Commission believes warrant further clarification and monitoring. The Commission expects that CEHE will direct the same conscientious attentiveness to these questions, and supply thorough documentation to successfully address the outstanding issues (p. 2).*

---

[4] At the May 2020 meeting, the Commission determined that good cause exists to extend the timeframe to achieve compliance to May 31, 2021. See additional information in this letter on p. 5.

**Exhibit H - 3**

*Independence University*
*School # M070581*
*April 22, 2021*
*Page 4 of 17*

*Withdrawal of Accreditation*

The Commission also determined that to prolong the outcomes reporting process at that time was not an acceptable course of action for some programs due to the history and trend of below-benchmark rates of student achievement. As such, the Commission directed IU to cease enrollment in five programs: Business-DE (AAS), Graphic Arts-DE (AAS), Healthcare Administration-DE (AAS), Master of Business Administration-DE (MBA), and Respiratory Therapy-DE (AS).

The May 2, 2019 letter reiterated the maximum timeframe that would be allowed for the CEHE-affiliated schools to come into compliance:

> *Based on Section VII (M), Rules of Process and Procedures, Standards of Accreditation and the schools' longest program of more than two years, the maximum timeframe allowed for the CEHE-affiliated schools, to achieve and demonstrate compliance with the Standards of Accreditation is two years. The timeframe to achieve compliance began as of September 6, 2018 and ends on September 7, 2020[5]. Please also be advised that the Commission is under no obligation to wait for the maximum timeframe to expire and may take an adverse action prior to the expiration of the maximum allowable timeframe.*

With the May 2, 2019 letter, the Commission afforded the CEHE-affiliated schools an opportunity to submit additional information to demonstrate compliance with accrediting standards in each of the 17 areas of non-compliance.

During the August 2019 review of the school's response, the Commission made the following observation regarding overall compliance as described in the October 28, 2019 letter:

> *Although the schools were able to address a significant number of the questions raised in the May 2, 2019 Probation Order, there are still a number of issues that remain in question. The Commission determined that the response does not include sufficient information and documentation to address the questions raised with regard to advertising, assessment of prospective students for distance education programs, independent study, international students, the attendance policy, and the way in which CCSD-San Diego is equipped for the Computer Programming (AAS), Computer Technology & Networking (AAS), and Computer Science (BS) program. Finally, as a result of the August 2019 review, the Commission raised two questions with regard to the school system's compliance with fundamental tenets of ACCSC's accreditation process: student achievement outcomes and the integrity of information provided by the schools. With regard to student achievement, the Commission noted the magnitude of the programs that are failing to demonstrate successful student achievement at some of the schools in CEHE's system, most notably Independence University, California College-San Diego, and CollegeAmerica in Phoenix. In addition, the schools' submissions with regard to enrollment agreements call into question whether CEHE has provided accurate and reliable information to the Commission (p.2).*

> *With regard to student success, the Commission noted that 7 of the 15 affiliated schools reported above-benchmark rates for all programs, and that the remaining 8 schools reported below-benchmark rates of student achievement for at least one program. Two of those schools are reporting below benchmark rates for fewer than 50% of the schools' active reportable programs; however, there are six schools reporting below benchmark rates for at least half of the active reportable programs. It is not clear that those six schools have addressed the underlying problem impacting student success (p. 2).*

---

[5] See previous footnote regarding the extension of the maximum timeframe.

**Exhibit H - 4**

> *If Independence University – the only CEHE-affiliated institution currently offering education exclusively via distance education – is taken as the bellwether of student success rates for distance education programs for the CEHE system, the Commission considered the possibility that there may be further declines in the rates of student success. Of the 13 active programs at Independence University that have been operational long enough to be reportable, 4 programs met ACCSC's student achievement benchmarks. That means 69% of the school's programs reported below-benchmark rates of student achievement, and in addition, the school has already discontinued five programs due to poor performance. Given these indicators, it remains the Commission's primary concern that CEHE vigorously pursue strategies to ensure student success as all programs transition into a distance education delivery format* (p. 10).

In addition, the Commission noted that IU discontinued three of the programs under the May 2, 2019 cease-enrollment directive: Graphic Arts-DE (AAS), Healthcare Administration-DE (AAS) and Respiratory Therapy-DE (AS). The Commission decided to continue the cease enrollment directive on the Business-DE (AAS) and Master of Business Administration-DE (MBA) programs. With the October 28, 2019 letter, the Commission afforded the CEHE-affiliated schools an opportunity to submit additional information to demonstrate compliance with accrediting standards in each of the 9 areas of non-compliance. The letter reiterated the maximum timeframe to remedy compliance, and reminded the school that the Commission is under no obligation to wait for the maximum timeframe to expire and that the Commission may take an adverse action prior to the expiration of the maximum allowable timeframe.

During the May 2020 review of the record, the Commission observed the following with regard to the status of compliance at the institutions as excerpted from the July 21, 2020 Commission letter*:*

> *Of particular concern is that IU continues to report below-benchmark rates of student achievement. Of the 13 active (non-discontinued) programs that have been operational long enough to be reportable, the school has reported above-benchmark rates of student achievement for only four. The rates reported for the other nine will require significant improvements in order to achieve acceptable rates. The lack of significant improvement over the last three years calls into question the depth of assessment the school has conducted, and therefore does not provide assurance that the current plans will have the needed impact on rates of student achievement* (p. 5).

The Commission reviewed its previous decision to direct IU to cease enrolling new students in the Business-DE (AAS) program and Master of Business Administration (MBA) programs and determined that the programs will continue to be subject to the "cease enrollment" directive, as the school continued to report unacceptable rates of student achievement. In addition, the Commission directed IU to cap enrollment in an additional six programs because of an ongoing history of unacceptable student achievement: Accounting-DE (BS), Business Administration-DE (BS), Health Services Management-DE (BS), Information Systems-DE (MS), Medical Assisting-DE (AOS), and Web Design and Development-DE (BS).

The Commission also voted to extend the maximum timeframe to achievement compliance as follows:

> *The timeframe to achieve compliance began as of September 6, 2018 and ends on September 7, 2020. At the May 2020 meeting, the Commission determined that good cause exists to extend the timeframe to achieve compliance to May 31, 2021. In making this decision, the Commission took note of the extenuating circumstances, including the ongoing teach-out of five campuses, and early closure of eight campuses, which leaves only two operational campuses. The Commission found that these circumstances warrant affording CEHE additional time to manage the multiple*

**Exhibit H - 5**

> *transitions and implement strong measures at the two remaining schools. In particular, the Commission recognized the length of time needed to demonstrate the school's ability to improve student achievement outcomes* (July 21, 2019 ACCSC letter, p. 31).

Although the Commission voted to extend the maximum timeframe to achieve compliance at the May 2020 meeting, the Commission also noted the amount of improvement required to achieve compliance. Therefore, the Commission expected "decisive action" on the part of the schools, as follows:

> *The Commission is concerned about the magnitude of improvement required to demonstrate compliance with accrediting standards, in context of the schools' maximum timeframe to remain on Probation. Decisive action is required on the part of the school to demonstrate its students are achieving the outcomes of the programs at an acceptable rate. The gravity of the situation is heightened by CEHE's reporting of student achievement outcomes that is not in full accordance with Commission requirements. The Commission will consider any further student achievement data presented in any fashion not conforming to the instruction to be invalid and a failure to report accurate data to the Commission. If the school does not bring itself into compliance within the period specified (see Maximum Timeframe to Achieve Compliance section of this letter), the Commission will be obligated to take adverse action* (July 21, 2019 ACCSC letter, p. 5).

### February 2021 Review

On October 12, 2020, CEHE completed consolidation of the main school and branch into a single entity. All students transferred from the IU branch campus to the newly renamed IU main school (formerly Stevens-Henager College of West Haven, Utah). The programs from the branch were incorporated into ACCSC's approval of the main school in August 2020; however, the student achievement outcomes reported on these programs by the former branch attach to these programs. After the consolidation, IU has:

- 17 active programs that have operational long enough to be reportable via the Graduation and Employment Chart formula;

- 4 programs that have started, but have not been operational long enough to be reportable;

- 2 programs that have not had any enrollments; and

- 4 programs that have been discontinued and are in the process of being taught out.

The Commission reviewed the new data presented in Graduation and Employment Charts prepared using a Report Date of December 2020. The school reported below-benchmark rates of student achievement in 82% (14 of 17) programs that are active and have been operational long enough to be reportable. The Commission also reviewed the history of student achievement outcomes reported by the school in the 2016, 2017, 2018, 2019, and 2020 ACCSC Annual Reports, as presented in the following tables.

**Exhibit H - 6**

*Independence University*
*School # M0705SI*
*April 22, 2021*
*Page 7 of 17*

*Withdrawal of Accreditation*

## HISTORICALLY REPORTING BELOW BENCHMARK RATES

| PROGRAM (Credential) | GRADUATION RATES | | | | | | EMPLOYMENT RATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 |
| Accounting-DE (BS) 36 months | No Starts* | No Starts | 17% | 20% | 24% | 26% | No Starts | No Starts | 73% | 79% | 72% | 73% |
| Business – DE (AAS) 20 months | 13% | 16% | 19% | 21% | 18% | 16% | 74% | 53% | 41% | 59% | 72% | 65% |
| Business Administration (BS) 36 months | 42% | 48% | 23% | 42% | 32% | 29% | 53% | 77% | 83% | 90% | 100% | 100% |
| Business Administration-DE (BS) 36 months | 33% | No starts | 18% | 17% | 20% | 22% | 100% | No Starts | 53% | 49% | 70% | 66% |
| Graphic Arts – DE (BS) 36 months | No Starts | No Starts | 19% | 21% | 19% | 23% | No Starts | No Starts | 63% | 55% | 63% | 76% |
| Health Services Management-DE (BS) 38 months | 90% | 65% | 74% | 58% | 78% | 59% | 86% | 75% | 68% | 73% | 77% | 31% |
| Information Systems-DE (MS) 15 months | 50% | 53% | 37% | 63% | 74% | 65% | 67% | 75% | 30% | 60% | 64% | 63% |
| Master of Business Administration-DE (MBA) 15 months | 60% | 59% | 70% | 43% | 30% | 31% | 50% | 53% | 44% | 60% | 64% | 54% |
| Medical Assisting (AOS) 20 months | 47% | 22% | 29% | 43% | 30% | 31% | 72% | 71% | 71% | 75% | 91% | 90% |
| Medical Assisting-DE (AOS) 22 months | 33% | 21% | 13% | 19% | 23% | 22% | 70% | 48% | 27% | 50% | 45% | 42% |
| Web Design and Development – DE (BS) 36 months | No Starts | No Starts | 13% | 12% | 8% | 10% | No Starts | No Starts | 100% | 57% | 80% | 33% |

## PROGRAMS DISCONTINUED BY THE SCHOOL

| PROGRAM (Credential) | GRADUATION RATES | | | | | | EMPLOYMENT RATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 |
| Graphic Arts – DE (AAS) 20 months | 18% | 16% | 18% | 22% | 18% | N/A | 72% | 36% | 34% | 56% | 62% | N/A |
| Accounting (BS) 36 months | 64% | 55% | 33% | 43% | 31% | N/A | 89% | 100% | 100% | 100% | 100% | N/A |
| Respiratory Therapy-DE (AS) 26 months | 44% | 52% | 53% | 47% | 52% | N/A | 56% | 46% | 61% | 59% | 67% | N/A |
| Healthcare Administration (BS) 36 months | 47% | 33% | 20% | 30% | 24% | N/A | 0% | 0% | 100% | 100% | 33% | N/A |

* "No Starts" means that the school reported no students commencing in the program for the reporting period on Graduation and Employment Charts submitted for that Annual Report.

**Exhibit H - 7**

JA211

*Independence University*
*School # M070SN1*
*April 22, 2021*
*Page 8 of 17*

Case 1:22-cv-01223-RDA-WEF    Document 1-9    Filed 10/28/22    Page 9 of 29 PageID#
201

*Withdrawal of Accreditation*

## HISTORICALLY REPORTING ABOVE BENCHMARK

| PROGRAM (Credential) | GRADUATION RATES | | | | | EMPLOYMENT RATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 |
| Nurse Education-DE (MS) 15 months | 100% | 100% | 100% | 100% | 80% | 40% | 100% | 100% | 100% | 100% | 100% | 100% |
| Nursing Administration-DE (MS) 15 months | 100% | 100% | 50% | 100% | No Starts | 100% | 75% | 100% | 100% | 100% | No Starts | 0% |
| Nursing Education (AD) 25 months | 75% | 77% | 53% | 67% | 79% | 79% | 86% | 84% | 84% | 88% | 91% | 73% |
| Nursing-DE (BS) 24 months | 40% | 67% | 55% | 75% | 75% | 75% | 100% | 100% | 83% | 100% | 100% | 100% |
| Respiratory Care-DE (BS) 20 months | 84% | 82% | 72% | 78% | 76% | 71% | 85% | 86% | 80% | 93% | 97% | 96% |
| Surgical Technologist (AOS) 20 months | 53% | 57% | 48% | 52% | 43% | 24% | 75% | 92% | 91% | 91% | 92% | 100% |

## PROGRAMS THAT HAVE NOT BEEN OPERATIONAL LONG ENOUGH TO BE REPORTABLE

| PROGRAM (Credential) | GRADUATION RATES | | | | | EMPLOYMENT RATES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 | 2016 | 2017 | 2018 | 2019 | 2020 | Dec-20 |
| Cybersecurity & Networking (BS) 36 months | | | No Starts* | | | N/A | | | No Starts | | | N/A |
| Cybersecurity & Networking-DE (BS) 36 months | | | No Starts | | | N/A | | | No Starts | | | N/A |
| Medical Assisting (Diploma) 8 months | | | No Starts | | | N/A | | | No Starts | | | N/A |
| Medical Billing & Insurance Specialist (Diploma) 8 months | | | No Starts | | | N/A | | | No Starts | | | N/A |
| Software and Mobile Application Development (BS) 36 months | | | No Starts | | | N/A | | | No Starts | | | N/A |
| Software and Mobile Applications-DE (BS) 36 months | Did Not Have a Start at the Previous Branch | | | | | N/A | Did Not Have a Start at the Previous Branch | | | | | N/A |

\* "No Starts" means that the school reported no students as commencing in the program for the reporting period on Graduation and Employment Charts submitted for that Annual Report.

**Exhibit H - 8**

JA212

*Independence University*
*School # M070581*
*April 22, 2021*
*Page 9 of 17*

*Withdrawal of Accreditation*

The rates of student achievement presented in the preceding charts shows that unacceptable rates of student achievement have been persistent over a long time and pervasive throughout the institution. In context of the history of student achievement reporting, the Commission noted that the new data does not represent a significant upward trend in the ongoing pattern of unacceptable student achievement rates. According to that history, IU consistently reported below benchmark rates of student achievement in 65% (11 of 17) of the active/reportable programs over the last five years. For 8 of the active/reportable programs, unacceptable rates have persisted for more than three consecutive years. In addition, the Commission noted the programs that are performing below acceptable standards for student achievement affect the highest number of students. Of the students who were reported as students available to graduate in the Graduation and Employment Charts referenced in the tables above, 93% (14,327 of 15,377) were enrolled in programs that are reporting unacceptable student achievement. The Commission further noted that of the 15,377 students that were available to graduate, only 16% (2,518 of 15,377 students) successfully completed the program and achieved the vocational objectives of the program (i.e., employment in the field of training). The Commission found that the low percentage of IU students that achieve success strongly reinforces the conclusion that IU as an institution has failed to demonstrate successful student achievement.

### Projections/Trend Data

Student achievement in the form of graduation rates and employment rates are a primary measure as to whether a school is successful in meeting its mission and program objectives. To date, IU has not demonstrated student achievement to the level required by accrediting standards. Moreover, the Commission found that school's projections and trend data show that the school's current efforts will not achieve minimum student achievement benchmarks for years.

The Commission directed IU to provide "trend data" regarding student achievement in order to formulate an understanding of the school's progress toward reporting acceptable rates of graduation and employment. First, the school was asked to provide an ACCSC Retention Chart for each program offered. The purpose of the Retention Chart is to report how many students who started the program during a defined period (and are available for retention) have remained in school. Because the reporting period draws on more current data than ACCSC's Graduation and Employment Chart, students in the cohort have varying percentages of the program remaining to be completed. The Commission found that the retention rates are so low for nine programs that it appears the school will report unacceptable rates of student graduation minimally over the next two to three Annual Report years. In addition, the Commission noted that three new programs are predicted to have unacceptable rates of student graduation by the time they are first reportable using the Graduation and Employment Chart formula, adding to the number of programs at the school that are failing to demonstrate successful student achievement.

Second, the school was asked to provide a list of graduates in each program over the most recent six months, and report the graduates' employment status. As with the Retention Chart, this provides a snapshot of student success over a defined period; however, it is possible that more graduates in this cohort will yet achieve the employment objectives of the program and increase the employment rate. Although this data can indicate whether employment rates will likely meet ACCSC's minimum acceptable rates, where fewer than 70% have achieved the employment objectives, it is difficult to predict whether the school's efforts are likely to make sufficient improvement by the time the data is reportable via the Graduation and Employment Chart formula.The school has the burden of demonstrating compliance with the Commission's accreditation standards and unverified predictions do not rise to the level of proof.

**Exhibit H - 9**

*Independence University*                                      *Withdrawal of Accreditation*
*School # M070581*
*April 22, 2021*
*Page 10 of 17*

**Accounting-DE (BS)**

The program was approved in March 2013 at the former branch (072309). IU first reported student achievement outcomes for this program with the 2018 Annual Report and has reported below benchmark rates of student graduation in each subsequent Annual Report. Due to the history of low outcomes, the Commission directed the school to cap the program's enrollment at the June 30, 2019 level of enrollment as part of the July 21, 2020 Continued Probation Order.

The reporting period for retention data is September 2018 to July 2020 for this 36-month program and is presented on two Retention Charts. The first chart shows that the school has retained only 64 of 216 students that started between September 2018 and August 2019 for a retention rate of 30%. Although the students have between 24% and 55% of the program yet to complete, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, is already below the graduation rate benchmark of 40%.

**Business-DE (AAS)** (formerly Business Management & Accounting)

This program was approved in March 2013 at the former branch (072309). The school first reported student achievement outcomes for this program with the 2016 Annual Report and has reported below-benchmark rates of student graduation in each subsequent Annual Report. In addition, the school reported below-benchmark rates of graduate employment in the 2017, 2018, and 2019 Annual Reports as well as the December 2020 report. Due to the persistent history of low outcomes, the Commission directed the school to cease enrollment in this program as part of the May 2, 2019 Probation Order.

IU submitted a Retention Chart for the Business-DE (AAS) program, based on starts from the period September 2019 to October 2020. The chart shows the school retained 69 of 99 students that started, for a retention rate of 70%; however, most students have more than half of the program to complete.

With regard to more contemporaneous employment rates, the school listed 351 graduates in the last six months but only 29% (107) are reported as employed in field. The Commission calculated that an additional 123 graduates must obtain employment in the field of training in order for the percentage to increase to at least 70%.

**Business Administration-DE (BS)**

This program has been approved since March 2013 at the former branch (072309). IU first reported student achievement outcomes for this program with the 2016 Annual Report and has reported below benchmark rates of student graduation in each subsequent Annual Report (with the exception of 2017, in which there were no starts for the reporting period). Again, due to the history of low student achievement outcomes, the Commission directed the school to cap the program's enrollment at the June 30, 2019 level of enrollment as part of the July 21, 2020 Continued Probation Order.

The reporting period for retention data is September 2018 to July 2020 for this 36-month program and is presented on two Retention Charts. The first chart shows that the school retained only 233 of 841 students that started between September 2018 and August 2019 for a retention rate of 28%. Although the students have between 24% and 55% of the program yet to complete, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, is already below the benchmark of 40%.

**Exhibit H - 10**

### Business Administration (BS)

This program has been approved at the main school since November 2002. IU reported below benchmark rates of graduation with the 2018 and 2020 Annual Reports, and the December 2020 report. The reporting period for retention data is September 2018 to July 2020 for this 36-month program and is presented on two Retention Charts. The first chart shows that the school retained only 6 of 16 students that started between September 2018 and August 2019, for a retention rate of 38%. Therefore, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, will be below the benchmark of 40%.

### Cybersecurity & Networking (BS) (formerly Networking and Information Systems Security)

This program has been approved at the main school since June 2013. The school reported the first reported enrollments as of the 2018 Annual Report, so the 36-month program will not be reportable until the 2023 Annual Report. The school provided a Retention Chart for the program with the 2020 Annual Report, which shows the school has retained 5 of 8 students that started between April 2018 and March 2019 for a retention rate of 63%.

### Cybersecurity & Networking-DE (BS) (formerly Networking and Information Systems Security)

This program has been approved since June 2013 at the former branch (072309). IU reported the first enrollments as of the 2017 Annual Report, so the 36-month program will not be reportable until the 2022 Annual Report. The school provided a Retention Chart for the program with the 2020 Annual Report, which shows the school has retained only 101 of 475 students that started between April 2018 and March 2019 for a retention rate of 21%. Therefore, by the time the program is reportable in 2022, the graduation rate will already be unacceptable under ACCSC's standards.

### Graphic Arts-DE (BS)

This program has been approved since March 2013 at the former branch (072309). IU first reported student achievement outcomes for this program with the 2018 Annual Report and has reported below benchmark rates of student graduation and employment in each subsequent Annual Report.

The reporting period for retention data is September 2018 to July 2020 for this 36-month program and is presented on two Retention Charts. The first chart shows that the school retained only 153 of the 633 students available for retention, for a retention rate of 24%. Therefore, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, will be below the benchmark of 40%.

### Health Services Management-DE (BS)

This program has been approved since July 2010 at the former branch (072309). IU reported unacceptable graduation rates in the 2019 and 2020 Annual Reports, as well as the December 2020 report. The school also reported unacceptable employment rates in the program with the 2018, 2019, and 2020 Annual Reports, as well as the December 2020 report. Due to the history of low student achievement outcomes, the Commission directed the school to cap the program's enrollment at the June 30, 2019 level of enrollment as part of the July 21, 2020 Continued Probation Order.

The reporting period for retention data is September 2018 to July 2020 for this 36-month program and is presented on two Retention Charts. The first Retention Chart, based on starts from the period September 2018 to August 2019, shows the school retained only 581 of the 2024 students available for retention, for a retention rate of 29%. Therefore, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, will be below the benchmark of 40%.

**Exhibit H - 11**

*Independence University*                                              *Withdrawal of Accreditation*
*School # M070581*
*April 22, 2021*
*Page 12 of 17*

### Information Systems-DE (MS)

This program has been approved since March 2013 at the former branch (072309). Due to the persistent history of low outcomes, the Commission directed the school to cap the program's enrollment at the June 30, 2019 level of enrollment as part of the July 21, 2020 Continued Probation Order. As of the 2020 Annual Report, IU reported acceptable rates of student graduation and employment; however, the December 2020 report shows an employment rate of 63%. The school provided a Retention Chart for the Information Systems-DE (MS) program. Based on starts from January 2020 to October 2020, the school retained 17 of 19 students available for retention, for a retention rate of 89%.

The school reported that only 1 of the 11 graduates (9%) within the last six months have obtained employment in the field of training. The Commission calculated that an additional 7 graduates must obtain employment in the field of training in order for the percentage to increase to at least 70%.

### Master of Business Administration-DE (MBA)

This program has been approved since July 2010 at the former branch (072309). IU reported unacceptable employment rates over the last five years. Due to the history of low student achievement outcomes, the Commission directed the school to cease enrollment in this program as part of the May 2, 2019 Probation Order. The school reported that 16 of the 25 graduates (64%) within the last six months have obtained employment in the field of training. The Commission calculated that an additional 2 graduates must obtain employment in the field of training in order for the percentage to increase to at least 70%.

### Medical Assisting (AOS) (formerly Medical Specialties)

This program has been approved at the main school since November 2002. IU reported unacceptable rates of student graduation from this program in the 2018, 2019, and 2020 Annual Reports, as well as the December 2020 report. The school provided a Retention Chart for the Medical Assisting (AOS) program. Based on starts from October 2019 to October 2020, the school retained 9 of 11 students available for retention, for a retention rate of 89%. The school reported that 9 of the 10 graduates (90%) within the last six months have obtained employment in the field of training.

### Medical Assisting-DE (AOS) (formerly Medical Specialties)

This program has been approved since September 2011 at the former branch (072309). The school reported below benchmark rates of graduation for the five most recent Annual Reports (2016-2020) and the December 2020 report. In addition, the school reported below benchmark employment rates for the four most recent Annual Reports (2017-2020). Due to the history of low student achievement outcomes, the Commission directed the school to cap the program's enrollment at the June 30, 2019 level of enrollment as part of the July 21, 2020 Continued Probation Order.

IU submitted a Retention Chart for the Medical Assisting-DE (AOS) program, based on starts from the period between October 2019 and October 2020. The Retention Chart shows an overall retention rate of 73%; however, the chart also shows that 80% of the students are primarily in the first half of the program.

**Exhibit H - 12**

## Software and Mobile Application Development (BS)

This program has been approved since June 2013 at the main campus. IU first reported enrollments in this program as of July 2018 (on the 2019 Annual Report), so the 36-month program will not be reportable until the 2023 Annual Report. The school provided a Retention Chart for the program with the 2020 Annual Report, which shows the school has retained none of the 7 students (0%) that started between April 2018 and March 2019. Therefore, the projected graduation rate for this program already does not meet ACCSC's acceptable minimum.

## Software and Mobile Applications-DE (BS)

This program was approved June 2013 at the former branch (072309). IU first reported enrollments in this program as of July 2018 (on the 2019 Annual Report), so the 36-month program will not be reportable until the 2023 Annual Report. The school provided a Retention Chart for the program with the 2020 Annual Report, which shows the school has retained only 51 of 353 students that started between April 2018 and March 2019 for a retention rate of 14%. Therefore, the projected graduation rate for this program already does not meet ACCSC's acceptable minimum.

## Web Design and Development – DE (BS)

This program was approved March 2013 at the former branch (072309). The school reported below benchmark rates of student graduation for the three most recent Annual Reports (2018-2020) as well as the December 2020 report. Due to the history of low student achievement outcomes, the Commission directed the school to cap the program's enrollment at the June 30, 2019 level of enrollment as part of the July 21, 2020 Continued Probation Order.

The reporting period for retention data is September 2018 to July 2020 for this 36-month program and is presented on two Retention Charts. The first Retention Chart, based on starts from the period September 2018 to August 2019, shows the school retained only 13 of the 107 students available for retention, for a retention rate of 12%. Therefore, the projected graduation rate for this cohort, reportable on the 2024 Annual Report, will be below the benchmark of 40%.

Overall, the Commission found that the trend data shows that student achievement rates will not improve significantly in the next two years. The Commission's finding in this regard is supported by information provided in the school's response. As part of the *Graduation and Employment Rate Action Plans* (p.4) for the online programs, the school presented a "conservative forecast of the aggregate success of all initiatives" expressed in projected graduation rates by year. As stated in the response,

> *With these ten initiatives it is reasonable to assume, based upon ongoing assessment of results, that some initiative's results will be cannibalized by other initiative's results. To this end, the University's forecasts of the aggregate success of all initiatives is conservative. However, as a stress-test, or weakest-case scenario, let's assume that: (1) the aggregate impact only ends up being two thirds (66%) of the minimum range forecasted in the table above, and that (2) only a limited part of the impact will affect 2020 new enrollments, and that (3) the bulk of the impact will be on 2021 enrollments. Under this (highly unlikely) weakest-case scenario, the data is still forecasting that all programs would achieve graduation rates benchmarks between 2024 and 2026.*

The Commission determined that waiting an additional 3-5 years for the school and its programs to achieve benchmark students achievement rates is simply not acceptable.

**Exhibit H - 13**

The following table represents the projections from the response:

| Program (Credential) | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|
| Business-DE (AAS) | 21% | 24% | 33% | 45% | | |
| Medical Assisting (AOS) | 40% | | | | | |
| Medical Assisting-DE (AOS) | 26% | 25% | 34% | 46% | | |
| Accounting-DE (BS) | 22% | 24% | 27% | 27% | 36% | 50% |
| Business Administration (BS) | 47% | | | | | |
| Business Administration-DE (BS) | 27% | 25% | 26% | 26% | 35% | 49% |
| Graphic Arts-DE (BS) | 28% | 28% | 22% | 25% | 34% | 48% |
| Health Services Management-DE (BS) | 18% | 19% | 20% | 22% | 31% | 44% |
| Web Design and Development-DE (BS) | 15% | 10% | 13% | 20% | 29% | 43% |
| Information Systems-DE (MS) | No projections provided | | | | | |
| Master of Business Administration-DE (MBA) | No projections provided | | | | | |

IU projected that associate degree programs will take four years to achieve minimum benchmarks (2024 Annual Report) and baccalaureate programs are expected to take six years to achieve minimum benchmarks (2026 Annual Report). The Commission noted that the pattern shows only the potential for incremental improvement (single digit percentage points) over the next three to five years and would require a marked increase to an average of 13 percentage point improvement in the year where the program attains benchmark. If IU has underestimated the timeline for improvement, it will take even longer for the programs to demonstrate compliance with acceptable student achievement benchmarks.

The Commission recognized that these projections are based on estimates, but in the context of retention data, IU is estimating that it will take years of sustained effort to demonstrate compliance with accrediting standards and student achievement benchmarks. Based on the length of time the Commission has already afforded the school to make improvements or take programmatic actions, the Commission cannot continue to defer a decision regarding the viability of the school's operations based on projected student achievement rates. Further, IU has not given the Commission, and the record does not reflect any reason to extend the maximum time any further.

**Assessment/Plan**

In recognition of the amount of improvement required for IU to meet even the minimum requirements for acceptable student achievement, the Commission made the following statement in the July 21, 2020 Continued Probation Order:

> *The Commission is concerned about the magnitude of improvement required to demonstrate compliance with accrediting standards, in context of the schools' maximum timeframe to remain on Probation. Decisive action is required on the part of the school to demonstrate its students are achieving the outcomes of the programs at an acceptable rate.*

The Commission directed IU to submit the school's plan for improving student achievement rates and demonstrating compliance with accrediting standards. The school provided a "plan" which consists of a 73-page description of initiatives for the online programs, plus narratives regarding the following programs: Business Administration (BS), Medical Assisting (AOS), and Surgical Technician (AOS). The plan

**Exhibit H - 14**

enumerates the following as factors affecting graduation rates: Life Issues, Course Scheduling, Time Management, Technological Challenges, and Student Engagement. Since the original assessment, the school has also determined that Readiness at Admission is another factor. The plan describes the variety of strategies the school has used or is planning to use to overcome these six factors.

In addition, the plan enumerates the following as factors affecting employment rates: understaffed career services department, lack of early engagement with students, insufficient development of employment opportunities, and failure to emphasize the need to build professional work experience and skills while in school. Since the original assessment, the school has also determined that the inability to contact students and graduate unresponsiveness; graduate expectations and levels of preparedness, and the COVID-19 Global Pandemic are additional factors affecting employment rates. The plan describes the variety of strategies the school has used or is planning to use to overcome these six factors.

The Commission found the plan, although lengthy, does not account for the persistent and pervasive lack of acceptable student achievement and the short timeframe in which to achieve compliance with ACCSC's minimum requirements. The Commission found that the assessment presumes the viability of programs that have failed to serve students over many years, but does not demonstrate that the school has designed and delivered programs that can lead to students' successful attainment of knowledge, skills, and vocational objectives.

The Commission, in consideration of the stark contrast between student achievement rates in the school's programs, as part of the July 21, 2020 Continued Probation Order, asked the fundamental question as to why the policies and procedures that result in student success in four of the school's programs fail to produce success in the other programs? In response, the school provided reasons that the Nursing Education and Surgical Technologist residential programs and the Business-DE (Diploma), Nurse Education-DE (MS) Nursing Administration-DE (MS), and Respiratory Care -DE (BS) programs report higher rates of successful student achievement, as follows:

- The successful programs generally have very specific and well-established career paths.

- Applicants who are interested in successful programs usually have a better understanding of what their career entails and begin the admissions process with a higher degree of passion and commitment to pursuing the well-defined career paths resulting from these programs.

- The successful programs are extremely hands-on, with a large portion of the program conducted in lab settings, which helps to keep the student more engaged and motivated to stay in school.

- The successful programs, due primarily to post-program licensure and/or certification requirements, have additional admissions requirements. The additional, program-specific, admissions requirements likely work to screen out applicants who might have later lacked the commitment to graduate.

- Additionally, both the Nursing and Respiratory Care programs are specifically designed for students who are already working in-field.

- With respect to the Business diploma, the distinguishing factor is the length or the program compared to other degree-level programs. The Business diploma program is a very short program that students can transfer into if they do not want to complete the associate's level Business degree.

**Exhibit H - 15**

*Independence University*
*School # M070581*                                                *Withdrawal of Accreditation*
*April 22, 2021*
*Page 16 of 17*

The school concluded that:

> *...none of these distinguishing program characteristics are applicable or readily transferable to the other programs offered by IU. It is CEHE's assessment that these unique program characteristics, as opposed to system-wide programmatic policies and procedures, are the primary factor contributing to the graduation success in these programs.*

The Commission is not persuaded by the school's claim that there is no application from these assessments. Having clear alignment between educational objectives and specific career paths is part of a healthy design process for every program. Implementing more rigorous admissions criteria that better contribute to an informed judgment as to an applicant's ability to achieve the program's objectives is an option available for any program, and in fact, is being considered by the school at this time. Moreover, the school can choose to design a curriculum with activities in all modalities attuned to the objectives, content, and the delivery method of the program.

Overall, the Commission was not persuaded by the information provided by IU, and found that the school failed to demonstrate that it can achieve minimum levels of acceptable student achievement within the maximum time frame, Indeed, the preponderance of evidence would suggest that IU cannot demonstrate compliance with the standard at all. The Commission found that the strategies outlined in the most recent plan appear to be a continuation or variation of plans that the school has previously implemented, and which have not resulted in sufficient improvement in the area of student achievement. As documented extensively in the record, the Commission has consistently found that IU failed to demonstrate successful student achievement, and to date, school's strategies have not proven to be effective in identifying and implementing the kind of systemic, sustained improvements that are needed to attain and maintain compliance with ACCSC's standards in the area of student achievement.

****

Based on the school's history of non-compliance with ACCSC's student achievement standards, the lack of improvement over an extended period, and the projected length of time that the school will still be out of compliance with standards, the Commission has acted to withdraw the accreditation of IU and to remove the school and its branch campuses from the list of ACCSC-accredited schools.

**Teach-Out Plan**

Pursuant to federal law, an accrediting agency recognized by the U.S. Department of Education must require a teach-out plan from an institution subject to an adverse accreditation decision to withdraw accreditation. Therefore, in accordance with *Section IV (1)(F)(1)(c) Rules of Process and Procedure, Standards of Accreditation* the Commission requires IU to submit a completed ACCSC Institutional Teach-Out Plan Approval Form.[6] The information provided must demonstrate how, in the face of possible consequences of the withdrawal of accreditation, IU will ensure the opportunity for students to complete their program of study either by IU or through an agreement with an/other accredited institution(s) approved to offer a comparable program. The Institutional Teach-Out Plan Approval Form should be submitted **on or before May 24, 2021.**

---

[6] The *ACCSC Institutional Teach-Out Plan Approval Form* is available online at *http://www.accsc.org/Content/FormsAndReports/FormsAndReports.asp*

**Exhibit H - 16**

JA220

*Independence University*
*School # M070581*                                              *Withdrawal of Accreditation*
*April 22, 2021*
*Page 17 of 17*

**Appeal and Reapplication Process and Procedure**

IU may opt to appeal the Commission's decision to withdraw accreditation or may elect to reapply for accreditation. Details regarding the reapplication and appeal procedures are outlined in the ACCSC *Rules of Process and Procedures, Standards of Accreditation.*

- If IU elects to appeal this decision, the school must sign and return the enclosed Letter of Intent to Appeal a Commission Decision, along with the Appeal Expense Fee of $18,000.00, **on or before May 3, 2021**.

- If IU elects to appeal this decision, the school's Application for Appeal of a Commission Decision and Grounds for Appeal must be submitted **on or before May 24, 2021**.

- If IU elects not to appeal this decision, the Commission's decision will become effective **May 3, 2021**. The school may submit comments **on or before May 3, 2021** in accordance with the enclosed Public Comment Disclosure Form. Comments submitted by the school will accompany any public disclosure of a final Commission action pursuant to *Section X (D)(4), Rules of Process and Procedure, Standards of Accreditation*.

- In accordance with *Section VII (N)(3) Rules of Process and Procedure, Standards of Accreditation*, the school may reapply no sooner than nine months from the date on which the denial of accreditation becomes effective.

                                        ***

For additional information regarding the Commission's decision, please contact me directly at mccomis@accsc.org.

Sincerely,

Michale S. McComis, Ed.D.
Executive Director

Encls:    Appendix I
          Appendix II
          Letter of Intent to Appeal a Commission Decision
          ACCSC Standing Appeals Commission Members
          Public Comment Disclosure Form

**Exhibit H - 17**



2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

**APPENDIX I**
**ACCREDITATION ACTIONS CONSIDERED**

| School | Accreditation Actions Considered | Materials Considered |
|---|---|---|
| Independence University (#M070581)<br><br>West Haven, Utah | • Probation/Renewal of Accreditation/ Degree Program<br><br>• 2018 Annual Report Rates | • July 21, 2020 System-wide Probation Order and the school's response<br><br>• October 28, 2019 System-wide Probation Order and the school's response<br><br>• May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• November 20, 2018 ACCSC letter and the school's response |
| Stevens-Henager College (#B070583)<br><br>Murray, Utah | • Probation/Renewal of Accreditation/ Degree Program<br><br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br><br>• May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• November 20, 2018 ACCSC letter and the school's response |
| Stevens-Henager College (#B070764)<br><br>Boise, Idaho | • Probation/ Renewal of Accreditation<br><br>• 2018 Annual Report Rates | • October 28, 2019 System-wide Probation Order and the school's response<br><br>• May 2, 2019 System-wide Probation Order and the school's response<br><br>• September 6, 2018 System-wide Probation Order and the school's response<br><br>• November 20, 2018 ACCSC letter and the school's response |

**Exhibit H - 18**



2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
**www.accsc.org**

**APPENDIX II**
**HISTORY/COMPLIANCE HISTORY**

1891:   The school is founded in Ogden, Utah in September 1891 by Professor J.A. Smith as the Intermountain Business College. It was known over the following 68 years as Smithsonian Business College, Meonch University of Business, and Ogden Business College.

1959:   The name of the school became Stevens-Henager College ("SHC-Ogden).

1978:   SHC-Ogden established a branch in Provo, Utah in June 1978.

1992:   Stevens-Henager College, Inc., a corporation owned 100 percent by Carl B. Barney purchased SHC-Ogden and the branch in Provo, Utah.

1999:   SHC-Ogden established a branch in Murray, Utah in August 1999.

2000:   The branch in Murray established a satellite location in Bountiful, Utah in September 2000.

2001:   SHC-Ogden established a branch in Providence, Utah in October.

2002:   SHC-Ogden and the three branches received an initial grant of accreditation for a period of five years from ACCSC in November 2002. At that time, the Stevens-Henager Colleges were owned by Carl Barney, who also owned CollegeAmerica, Inc. operating schools in Denver, Fort Collins, and Colorado Springs (accredited by ACCSC), and a school in Flagstaff, Arizona (accredited by the Accrediting Bureau for Health Education Schools).

2003:   California College of San Diego ("CCSD") acquired in May 2003.

2005:   CollegeAmerica in Denver, Colorado established a (third) branch in Cheyenne, Wyoming.

2005:   At the November 2005 meeting, ACCSC granted CollegeAmerica in Flagstaff, Arizona (M070742) and it branch in Phoenix (B070743) an initial grant of accreditation

2006:   SHC-Ogden established a (fourth) branch in Boise, Idaho in October

2008:   At the August 2008 meeting, the Commission considered SHC-Ogden's Application for Renewal of Accreditation and deferred final action due to questions regarding appropriate education administration of the graduate level programs, student achievement outcomes for the Medical Specialties (AOS) program, Program Advisory Committees, management of the learning resource system, faculty qualifications, and advertising.

2009:   At the February 2009 meeting, the Commission considered the previous decision to defer final action and granted the school renewal of accreditation for five years going forward from November 2007.

2010:   SHC-Ogden established a satellite in Layton, Utah in February 2010.

2010:   Eric Juhlin becomes CEO of CollegeAmerica Services, Inc. (the corporation responsible for overseeing the CollegeAmerica/Stevens-Henager/California College of San Diego schools) in May (February 16, 2021, copy of the Appellant's Opening Brief).

2010:   SHC-Ogden established a (fifth) branch: Independence University ("IU") located in Salt Lake City, Utah in July 2010.

2011:   At the February meeting, the Commission approved the school's request to submit a second branch application within the same 12-month period.

**Exhibit H - 19**

*Appendix II*
*History/Compliance History*
*Page 2 of 7*

2011: CollegeAmerica in Flagstaff established a (second) branch (Stevens-Henager College) in Boise, Idaho (B072362) in March 2011.

2011: CCSD opened a satellite location in National City in June 2011.

2011: SHC-Ogden established a (sixth) branch in St. George, Utah in July 2011.

2011: CCSD established a branch in San Marcos, California (B072374) in November 2011.

2012: On April 20, 2012, ACCSC acknowledged receipt of a notification from CollegeAmerica Services, Inc. regarding the Good Neighbor Initiative. The letter directed CollegeAmerica Services, Inc. to provide additional information to verify the school is operating in compliance with accrediting standards.

2012: At the June 2012 meeting, the Commission considered CollegeAmerica Services, Inc.'s response regarding the school's "Good Neighbor Initiative," in context of anonymous complaints dated May 2, May 3, May 18, May 20, and May 31, 2012 and voted to process the complaints, directing the schools to provide additional information regarding compliance with accrediting standards in 13 areas..

2012: On August 10, 2012 ACCSC sent a letter to CollegeAmerica-Denver, requesting documentation of compliance with regard to a notice from the Colorado Board of Private Occupational Schools ("CBPOS") disclosing that CBPOS voted to file a "Notice of Charges" and to proceed with an "administrative hearing seeking revocation of the school's certificate of approval to operate in the state of Colorado; as well as four other anonymous complaints with overlapping concerns, dated May 18, 2012; May 24, 2012; June 19, 2012; and July 12, 2012.

2012: At the September 2012 meeting, the Commission considered five complaints against CollegeAmerica Services, Inc. and voted to defer final action for additional information on the school's response to anonymous complaints dated May 2, 2012, May 3, May 18, May 20, and May 31, 2012. Specifically, the Commission directed the CollegeAmerica to provide additional information regarding: 1) the payment of cash or other consideration to any prospective student as an inducement to enroll; 2) the reliability of statements made by CollegeAmerica Services, Inc.; 3) the availability of all required courses (e.g., externships); 4) the awarding and application of scholarship funds; 5) the focus of recruitment efforts; and 6) past records of integrity of the owners, managers, and administrative employees.

2012: At the November 2012 meeting, the Commission considered SHC-Ogden's Application for Renewal of Accreditation and voted to defer final action due to questions regarding student satisfaction and branch oversight.

2012: On December 31, Center for Excellence in Higher Education ("CEHE") merged with California College of San Diego, Inc., CollegeAmerica Denver, Inc., Stevens-Henager College, Inc., and CollegeAmerica Arizona, Inc. CEHE, a non-profit 501 (c)(3) corporation, is the surviving corporation governed by an eleven-member Board of Directors. At this point, CEHE owned and operated 16 schools under four main campuses:

- California College of San Diego (001073) with one branch;

- CollegeAmerica Denver (001507) with three branches;

- Stevens-Henager College in West Haven (070581) with six branches;

- CollegeAmerica in Flagstaff (070243) with two branches

**Exhibit H - 20**

JA224

*Appendix II*
*History/Compliance History*
*Page 3 of 7*

2013:    At the February 2013 meeting, the Commission considered documentation related to the State of Colorado's subpoena that overlaps with the Commission's concerns regarding CollegeAmerica's compliance with ACCSC's standards. In addition, the Commission reviewed the record regarding the Good Neighbor Initiative and externships. The Commission voted to defer action and to direct CollegeAmerica Services, Inc. to submit additional information to demonstrate the schools' compliance with accrediting standards in sixteen specific areas.

2013:    At the May 2013 meeting, the Commission considered to the applications for renewal of accreditation, applications, substantive change applications, complaint notices, and other actions for the ACCSC-accredited schools in the CEHE system of schools. The Commission expressed concern as to whether there are systemic issues with regard to recruitment, admissions, student achievement, advertising, state licensure, and cohort default rates throughout the CEHE schools under consideration and voted to direct the CEHE system of schools to show cause as to why accreditation should not be withdrawn.

2013:    At the November meeting, the Commission vacated the system-wide show cause order, but continued the show cause order for CollegeAmerica-Denver. In addition, the Commission determined that additional review of CEHE's advertising was warranted to ensure that CEHE continued to adhere to accrediting standards. The Commission voted to place the system of schools on Advertising Reporting. The Commission acted to renew SHC-Ogden's accreditation for four years going forward from November 2012 with Stipulations (admissions documentation) and Reporting (student achievement outcomes).

2014:    By letter dated May 2, 2014 ACCSC directed CEHE to provide information regarding a complaint filed by the U.S. Department of Justice under the federal False Claims Act relating to recruiting tactics.

2014:    At the June 2014 meeting, the Commission considered CEHE's response regarding the complaint filed by the U.S. Department of Justice under the federal False Claims Act against CEHE, its affiliated schools, and Chairman Carl Barney and voted to place the system of schools on Litigation Reporting.

2014:    At the December 2014 meeting, the Commission considered the Outcomes Report submitted by SHC-Ogden and voted to continue the school on Outcomes Reporting.

2015:    By letter dated March 25, 2015 ACCSC directed CEHE to provide information regarding a complaint filed by the State of Colorado against CEHE, its affiliated schools, The Carl Barney Living Trust, Carl Barney, Chairman, and Eric Juhlin, Chief Executive Officer.

2015:    At the May 2015 meeting, the Commission voted to continue CEHE on Advertising Reporting given ongoing questions regarding the school's advertising practices.

2015:    At the May 2015 meeting, the Commission voted to continue CEHE on Litigation Reporting given the open status of the complaint filed by the U.S. Department of Justice under the federal False Claims Act and the complaint filed by the State of Colorado.

2015:    At the November 2015 meeting, the Commission considered the Outcomes Report submitted by SHC-Ogden and voted to accept the report with two stipulations regarding how the school determines that employment outcomes align with employment objectives.

2016:    At the February 2016 meeting, the Advertising and Litigation Reporting actions were merged because of the nature of the advertising and the complaints from the U.S. Department of Justice and the State of Colorado. The Commission voted to continue CEHE on Adverting / Litigation

**Exhibit H - 21**

*Appendix II*
*History/Compliance History*
*Page 4 of 7*

Reporting given the open status of the complaint filed by the U.S. Department of Justice under the federal False Claims Act against CEHE, its affiliate schools, and Chairman Carl Barney.

2016:     By letter dated July 14, 2016, ACCSC directed CEHE to provide additional information regarding the May 11, 2016 notice from the U.S. Department of Education ("the Department") to the CEHE located in Salt Lake City, Utah and its affiliated schools. The notice discloses that CEHE's non-profit status application remains pending and as such, CEHE continues to be subject to all federal student aid requirements applicable to proprietary institutions of higher education. The notice also states, "[a] review of the web pages for some of your institutions suggests that CEHE is not providing the required GE disclosures for its programs, and this must be addressed immediately."

2016:     At the November 2016 meeting, the Commission considered two complaints regarding CEHE and its affiliated schools. Upon review of the complaints, the Commission voted to process the complaints in accordance with *Section VI, Rules of Process and Procedure, Standards of Accreditation*. The Commission received two complaints dated September 15, 2016 and October 13, 2016 alleging that CEHE is aggressively recruiting displaced ITT students in an "unethical" manner. Also, the complaints allege that CEHE's recruiters are not fully and accurately disclosing CEHE's accredited status and policies and procedures pertaining to CEHE's transfer of credit practices. In reviewing the complaints, the Commission also reviewed CEHE websites and found that CEHE is in fact actively and explicitly pursuing displaced ITT students as well as other students from schools that have closed precipitously. The Commission determined that while these complaints are being reviewed by ACCSC, CEHE must cease and desist from any direct recruitment of displaced ITT students or from any other school that may have recently closed. In addition, given the specific allegations in the complaints regarding the disclosure of the Warning status for the CollegeAmerica schools in Colorado, each CollegeAmerica campus must immediately inform all current of the schools' Warning status with ACCSC as well as informing on a continuing basis all prospective students.

2016:     At the November 2016 meeting, the Commission voted to continue CEHE on Litigation and Advertising Report given the open status of the legal matters (refer to letter dated January 26, 2017).

2017:     CollegeAmerica in Cheyenne, Wyoming closed on March 19, 2017

2017:     At the August 2017 meeting, considered the response to the April 27, 2017 Warning Order issued to CollegeAmerica located in Denver, Colorado (School M001507) and its branches in Fort Collins (School B070544) and Colorado Springs (B070623). Included as part of the Warning letter, the Commission directed CollegeAmerica in Denver and CollegeAmerica in Fort Collins to undergo a total re-evaluation and directed CollegeAmerica in Denver to cease enrollment and teach out all remaining baccalaureate degree programs. Upon review of the record, the Commission continued the Warning Order due to ongoing non-compliance in the area of student achievement outcomes (refer to letter dated February 12, 2018).

2018:     At the May 2018 and September 2018 meetings, the Commission considered the renewal of accreditation applications, substantive change applications, and supplemental data to the 2017 Annual Report for nine ACCSC-accredited schools in the Center for Excellence in Higher Education ("CEHE") system of schools. At this juncture, the Commission questioned whether the CEHE system of schools is misaligned with ACCSC's mission and purpose to an irremediable extent. Therefore, the Commission voted to place the CEHE system of schools on Probation. The areas in question included in the areas of student achievement, reporting representations to prospective students on the enrollment agreement, advertising in a false/misleading manner, using scholarships and tuition discounts as an inducement to enroll, failure to meet minimums regarding

**Exhibit H - 22**

*Appendix II*
*History/Compliance History*
*Page 5 of 7*

student achievement of acceptable graduation and employment rates, documentation of admissions requirements, cancellation and refund practices, validity of student achievement data reported to the Commission, achievement of objectives of the programs, employment classification, documentation of employment records, transfers of credit, accurate transcripts, number of credit hours attempted per term, objectives and length of the Medical Specialties program, program title misaligned with objectives, instructional materials and equipment at CCSD, Program Advisory Committees, and continuity of management oversight at the CCSD-San Marcos campus.

2019:    At the February 2019 meeting, the Commission considered the schools' responses and voted to continue the Probation Order. The schools had not demonstrated compliance with accrediting standards in the areas of student achievement, reporting student achievement data, employment classification, program titles and objectives, accurate representation to prospective students via the enrollment agreement, truthful advertising, admissions processes for distance education programs, processes and procedures pertaining to international students, transfers of credit, credit hours per term, publication of course sequencing, independent study, student attendance policies, adequate equipment at CCSD-San Diego, enrollment agreements at the CCSD-San Diego and San Marcos campuses, notification of material events, and the matters of litigation.

2019:    ACCSC's letter of July 11, 2019, requesting additional information with regard to a notice that CEHE had received a Civil Investigative Demand ("CID") from the Consumer Finance Protection Bureau ("CFPB").

2019:    CEHE notified ACCSC of the "Strategic Action with CEHE's Ground Campuses" on September 19, 2019. The notification states:

> *Effective September 10, 2019, all of CEHE's onground campuses (Stevens-Henager College, CollegeAmerica, and California College San Diego), except for the Stevens-Henager College main campus in West Haven, UT, will suspend enrolling new students into campus-based onground programs.*

2019:    At the May 2019 meeting, the Commission considered the previous decision to place the system of schools on Probation and the information provided by CEHE about the CID from the CFPB. At the September 2019 meeting, the Commission reconsidered its decision in context of the September 11, 2019 notification regarding the cessation of onground instruction. The Commission voted to continue the system of CEHE-affiliated schools on Probation, with a review of additional material regarding the transition of the schools from residential instruction to distance education delivery. The outstanding compliance issues included unacceptable graduation and employment rates, not reporting student achievement data in accordance with instructions, inaccurate representation to prospective students on enrollment agreements, insufficient admissions processes for distance education programs, unclear attendance policy and procedures, false/misleading advertising, insufficient documentation of independent study practices, inadequate instructional materials and equipment, and the open status of multiple agency/court actions against the school system.

2020:    By letter dated March 17, 2020 ACCSC requested additional information with regard to a notice that CEHE had received a Notice and Cease and Desist Order, dated January 28, 2020 from the Colorado Division of Private Occupational Schools ("DPOS") regarding the content of CEHE's ACCSC-mandated probation notice. In a June 1, 2020 letter, CEHE notified ACCSC that the DPOS accepted CEHE's response and did not issue a notice of noncompliance and included a copy of DPOS's May 28, 2020 decision indicating that "… the Cease and Desist Order is moot, the Subpoena Duces Tecum was satisfied, and the response to the Notice of Noncompliance sufficient to persuade the Board that it need not issue a Notice of Charges nor pursue further action regarding

**Exhibit H - 23**

*Appendix II*
*History/Compliance History*
*Page 6 of 7*

the allegations set forth therein." The additional information was considered at the May 2020 meeting and ACCSC considered the matter closed.

2020:    At the May 2020 Commission meeting, the Commission considered the previous decision to continue the system of schools on Probation and a Media Report received January 13, 2020 regarding IU located in Salt Lake City, Utah. Subsequent to the Commission's May 2020 meeting, in a phone call with ACCSC staff on May 6, 2020 CEHE disclosed the potential closure of certain CEHE-affiliated campuses prior to the anticipated dates of graduation of all students. Based on that call, in a letter dated May 8, 2020 ACCSC requested corresponding updated information with regard to CEHE's teach-out plan. In response, CEHE submitted revised ACCSC Institutional Teach-Out Plan Approval Forms dated May 28, 2020 on behalf of eight schools. In addition, at its June 2020 meeting, the Commission considered revised and updated Institutional Teach-Out Plans for the eight schools, and a Request for a Waiver of an Accreditation Standard or Policy to permit CCSD to submit an Application for a Branch Re-Alignment while on Probation and to absorb CA-Phoenix as a branch campus for the purpose of completing the teach out of students.

Based on its review of the information in the record, the Commission took the following actions:

- Continued the system of CEHE-affiliated schools on Probation;[1]

- Approved the teach-out plans for all thirteen schools in teach-out, subject to provisions outlined in the letter;

- Prohibited CEHE from enrolling new students or re-enrolling former students into the 13 schools in teach-out without obtaining the Commission's permission;

- Approved the waiver request to allow CCSD to apply for a branch re-alignment in order to add CA-Phoenix as a branch campus for the purpose of completing the teach-out plan;

- Determine that the Business-DE (AAS) program and the Master of Business Administration (MBA) program will continue to be subject to the "cease enrollment" directive;

- Directed IU to cap enrollment at the level of the enrollment in the program as of June 30, 2019, as reported in the 2019 Annual Report: Accounting – DE (BS): 256; Business Administration (BS): 1456; Health Services Management (BS): 3466; Information Systems – DE (MS): 43; Medical Assisting – DE (AOS) [*formerly Medical Specialties*]: 2,524; and Web Design and Development (BS): 194.

2020:    On September 13, 2020, the following locations closed:

- Stevens-Henager in Idaho Falls, Idaho

- Stevens-Henager College in Orem, Utah

- Stevens-Henager College in Logan, Utah

- Stevens-Henager College in St. George, Utah

---

[1] Please note that the compliance findings in this letter are focused on the only two schools planning to remain open and enrolling students, SHC-West Haven and IU. However, this does not mean that the Commission found that the other 13 schools have demonstrated compliance in all areas cited in previous actions. The entire system of schools remains on Probation. The Commission's decision to not require specific response requirements for the thirteen schools in teach-out is for the sole purpose of focusing on and facilitating the successful teach out of current students. If any school seeks to remain open past the teach-out period, CEHE must inform the Commission as a means to allow the Commission to establish an appropriate application review protocol and process.

**Exhibit H - 24**

*Appendix II*
*History/Compliance History*
*Page 7 of 7*

- CollegeAmerica in Denver, Colorado

- CollegeAmerica in Fort Collins, Colorado

- CollegeAmerica in Colorado Springs, Colorado

2020: On September 14, 2020 the Commission approved the Applications for a Branch Realignment Part I and Branch Realignment Part II for CollegeAmerica ("CA-Phoenix") located Phoenix, Arizona submitted by California College of San Diego ("CCSD") located in San Diego, California. The applications request permission to realign CA-Phoenix located at 9801 North Metro Parkway East, Phoenix, Arizona 85851 as a branch campus of CCSD.

2020: On October 12, CEHE completed consolidation of the SHC-Ogden and the branch IU into a single entity. All students transferred from the IU branch campus to the newly renamed main school Independence University ("IU-West Haven").

2021: On January 17, 2021, CollegeAmerica in Flagstaff, Arizona closed .

**Exhibit H - 25**



2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
**www.accsc.org**

## <u>LETTER OF INTENT TO APPEAL A COMMISSION DECISION</u>

<u>To Be Submitted No Later Than May 3, 2021</u>

Michale S. McComis, Ed.D.
Executive Director
ACCSC
2101 Wilson Boulevard, Suite #302
Arlington, Virginia 22201

Dear Dr. McComis:

This letter serves to provide notice that Independence University located in West Haven, Utah and its branch campuses Stevens-Henager located in Muray, Utah and Stevens-Henager loated in Boise, Idaho intend to appeal the recent decision of the Commission to withdraw the schools listed above accreditation and remove the schools from the list of ACCSC-accredited institutions. Attached is a check in the amount of $18,000 as required by accreditation procedures. I understand that this fee is non-refundable.

I understand that the ACCSC Appeals Panel will meet to consider the appeal of the school and that I will receive final confirmation of the hearing at a later date. I have reviewed *Section VIII, Rules of Process and Procedure, Standards of Accreditation* pertaining to appeals and noted that I am entitled to a transcript of the proceedings and to have representatives, including legal counsel, present with advance notification to ACCSC.

I understand that it is the right of a school to appeal an adverse action taken by the Commission on the grounds that the decision was arbitrary, capricious, or otherwise in disregard of the criteria or procedures of the Commission, or not supported by substantial evidence in the record on which the Commission took the action (*Section VIII (B), Rules of Process and Procedures, Standards of Accreditation*). I understand that because the appeal must be based on evidence in the record at the time that the Commission took the adverse action, no new evidence may be submitted during the appeal process, other than information related to the financial solvency and condition of the school.

I understand it is the right of a school intending to appeal a Commission decision to indicate whether there is good cause as to why any member of the Commission's Standing Appeal Commission should not hear the appeal. I have reviewed the list of Standing Appeal Commission members and have included with this notice any objections to any member of the Standing Appeal Member with the reasons and cause why I believe a member should not hear the school's appeal. I understand the absence of a submission with this notice indicates my approval to allow any member of the Standing Appeal Commission to sit for the school's appeal.

I understand that the Application for Appeal of Commission Decision with the school's Grounds for Appeal are due to ACCSC **on or before May 24, 2021,** and I agree to submit that material on or before that date. I understand that failure to submit these required documents by the due date could prevent consideration of the school's appeal.

_____          _____
Signature                                              Date

_____
Name/Title

**Exhibit H - 26**



2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

# ACCSC Standing Appeals Commission Members

| PANEL MEMBER | AFFILIATION | TERM ENDING |
|---|---|---|
| Nancy Bradley | **Daytona College**<br>Ormond Beach, Florida<br>*School Member* | 2024 |
| Nicholas Brown | **Spartan College of Aeronautics**<br>Thornton, Colorado<br>*School Member* | 2024 |
| Mary Cano | **Western Technical College**<br>El Paso, Texas<br>*School Member* | 2022 |
| Wanda Corner, Ph.D. | **ACCSC Distance Education Specialist**<br>Atlanta, Georgia<br>*Public Member* | 2024 |
| Christine Cote | **Perry Technical Institute**<br>Yakima, Washington<br>*School Member* | 2022 |
| Paul Fitzgerald | **Erie Institute of Technology**<br>Erie, Pennsylvania<br>*School Member* | 2023 |
| Don Harris | **New England Tractor Trailer Schools**<br>Quincy, Massachusetts<br>*School Member* | 2024 |
| Jenna Langer | **The Los Angeles Film School**<br>Los Angeles, California<br>*School Member* | 2022 |
| Weyland Morse, J.D. | **Southern California Education &**<br>**Legal Services Organization**<br>Los Angeles, California<br>*Public Member* | 2022 |
| Gail J. Robin, Ph.D. | **ACCSC Education Specialist**<br>McLean, Virginia<br>*Public Member* | 2024 |
| Vikram Sethi, Ph.D. | **Wright State University**<br>Dayton, Ohio<br>*Public Member* | 2022 |
| George "Chip" Snyder | **ACCSC Education Specialist**<br>Hagerstown, Maryland<br>*Public Member/Academic* | 2024 |
| Raymond Tuttle, Ph.D. | **University of Mary Washington**<br>Fredericksburg, Virginia<br>*Public Member/Academic* | 2024 |
| Andy Vignone | **WyoTech**<br>Laramie, Wyoming<br>*School Member/Administrative* | 2024 |

**Exhibit H - 27**



Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

# PUBLIC COMMENT DISCLOSURE FORM

**To Be Submitted No Later Than May 3, 2021**

Michale S. McComis, Ed.D.
Executive Director
ACCSC
2101 Wilson Boulevard, Suite #302
Arlington, Virginia 22201

RE:    Independence University (School #M070581)
       1890 South 1350 West
       West Haven, Utah 84401

Dear Dr. McComis:

I understand and agree that the Commission, pursuant to *Section X (D)(4), Rules of Process and Procedure, Standards of Accreditation*, will make public the reasons for the April 22, 2021 adverse accreditation decision together with any comments submitted by the school.

I understand and agree that the school is not obligated to submit public comments and acknowledge that the attached comments are provided voluntarily.

I understand and agree that the attached comments constitute Independenc University's public comments on the adverse accreditation action and will be disseminated with the public notice of the Commission's decision including, but not limited to, posting to the ACCSC website (*Section X (D)(4), Rules of Process and Procedure, Standards of Accreditation*).

I understand and agree that the school's public comments must be in summary format and limited to two type written pages. I acknowledge that any comments which do not meet these requirements will not be disseminated or posted along with the summary of the reasons for the adverse accreditation decision.

I understand and agree that the Commission will release the adverse accreditation decision to the public pursuant to *Section X (D)(3), Rules of Process and Procedure, Standards of Accreditation* and that the school's written comments will not be added to this disclosure if this form and the comments are not submitted in the required format **on or before May 3, 2021**.

I understand and agree that the Commission has no responsibility for how the school's comments may be used once they are put in the public domain.

_____
Signature

_____
Name/Title

_____
Date

**Exhibit H - 28**

JA232

# Exhibit I

*Center for Excellence in Higher Education*





May 27, 2021

Dr. Michale McComis
Executive Director
ACCSC
2101 Wilson Blvd, Suite 302
Arlington, VA 22201

Dear Dr. McComis:

Enclosed, please find the Grounds for Appeal from Center for Excellence in Higher Education, Inc. (CEHE) to the Withdrawal of Accreditation Letter dated April 21, 2021.

I attest to the accuracy of this information.

Sincerely,

*Paul Gardner*

Paul Gardner
Acting CEO
Center for Excellence in Higher Education

4021 South 700 East, Suite 400, Salt Lake City, Utah 84107    (801) 312-0078

**Exhibit I - 1**

JA234

## CEHE's GROUNDS FOR APPEAL

### Issues for Appeal

The ACCSC *Standards* require the Commission to extend the time frame to remedy noncompliance if there is good cause to do so. Good cause exists where an institution has shown significant progress towards achieving compliance and there are extenuating circumstances where only through the provision of additional time can the institution demonstrate compliance. If an institution makes this required showing, the Commission does not have discretion to deny good cause. Section VII.M.2 provides:

> The school **will be deemed** to have demonstrated good cause if it has shown that during the period of review significant progress has been made toward achieving compliance with the accreditation standard(s) in question and meeting all requirements set forth by the Commission and when extenuating circumstances exist such that only through the provision of additional time can the school demonstrate its compliance with the standard(s).

Did CEHE demonstrate significant progress by showing that recently enrolled cohorts are projected to meet benchmarks when they become reportable? Are there extenuating circumstances (*e.g.*, the pandemic, the College's longer-term degree programs, and the nature of 100 percent online programs) that make it impossible to demonstrate compliance now? Can CEHE demonstrate compliance without additional time, considering the length of the College's degree programs and the fact that students receiving the full benefit of CEHE's corrective measures will not show up in annual reports for several years?

Additionally, *Standard* VII.B.1.iv allows the Commission to find an institution in compliance with student achievement *Standards* notwithstanding the inability to demonstrate benchmark rates. This *Standard* encourages the Commission to consider mitigating factors that adversely impact the institution's ability to meet those rates. That *Standard* provides:

> For any program that has a graduation, employment, or licensure/certification exam pass rate that is lower than the Commission's established benchmark rates, a school may still demonstrate with supporting documentation the successful achievement of its students in that program by providing other reliable indicators of successful student learning and by showing that factors such as economic conditions, state and national trends, location, student population served, length of program, students who withdraw from training but still obtain employment, state requirements, or other external or mitigating factors reasonably related to student achievement are adversely impacting the school's ability to meet the Commission's established benchmark rates.

Did the Commission consider the nationwide trend of lower achievement rates at 100 percent online universities? Should the Commission have considered the projected student achievement rates of newly enrolled cohorts, who are all projected to meet benchmark

1

**Exhibit I - 2**

JA235

graduation and employment rates?  Did CEHE demonstrate successful student achievement for these students?

The Department of Education further requires accreditors to have "effective controls against the inconsistent application of the agency's standards."  34 C.F.R. § 602.18(b)

Did the Commission treat CEHE and the College differently that other member schools with similar or worse histories of compliance with student achievement *Standards*?  In deciding to withdraw the College's accreditation, did it take any measures to ensure it decision was a consistent application of its *Standards*?  Did the Commission consider its treatment of other member schools at all?

## Introduction

Center for Excellence in Higher Education ("CEHE") and its colleges[1] ("College") submit the following Grounds for Appeal.  In an April 22, 2021 letter, the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "Commission") arbitrarily and capriciously withdrew the College's accreditation (the "Decision"). The Appeals Panel should vacate the Decision on the following grounds: (1) the Commission disregarded evidence demonstrating that the College's programs are on track to meet student achievement benchmarks; (2) the Commission inconsistently applied student achievement *Standards* to the College, resulting in disparate treatment as compared to other member institutions; and (3) the Commission acted with bias towards CEHE and its executive leadership in withdrawing the College's accreditation.

CEHE demonstrated in its December 2020 Response that the College's programs will meet student achievement outcomes.[2]  In that Response, CEHE provided data and projections showing that recently enrolled cohorts will complete programs that meet all graduation and employment benchmarks.  The Decision does not meaningfully dispute these projections.

Indeed, it was only *after* CEHE demonstrated the success of multiple strategies to improve student outcomes implemented over the past two years that the Commission withdrew the College's accreditation.  Upon seeing that CEHE and the College had met the requirements the Commission imposed in its series of Continued Probation Orders, the Commission moved the goalposts.  And for the first time, the Commission announced an expectation that the College's 20-to-36-month degree programs had to report benchmark graduation rates years *before* students receiving the benefit of these improvement initiatives could complete their programs. That is an

---

[1] As noted in the Decision, Independence University ("IU") is CEHE's only remaining active school.  The main campus, IU-West Haven, offers mostly traditional, ground programs and in 2020 the former fully-online branch of IU was re-consolidated back into the main campus.  IU is a branch of IU-West Haven and is a 100 percent online university.

[2] See CEHE's December 29, 2020 Response to Continued Probation.

2

**Exhibit I - 3**

JA236

unreasonable requirement, and it is in stark contrast to expectations previously set by the
Commission.

CEHE relied on the Commission's stated expectations as it completely restructured its
programs and operations to do what the Commission to meet the Commission's requirements
After a thorough and honest assessment of the root causes of below-benchmark student
achievement rates, CEHE made significant changes to leadership, faculty, course design,
program structure, student support, and career services; eliminated multiple poor-performing
programs; closed and consolidated campuses; and spent millions of dollars to test and implement
measures specifically aimed at improving student retention, student assessment, student support,
student engagement, student learning, and graduate employment.[3]

The vast majority of these initiatives were implemented in direct response to the
Commission's concerns over student outcomes. And the Commission knew that new cohorts of
students would be receiving the benefit of the array of enhancements and student achievement
strategies but would not become reportable for 36 to 54 months following enrollment. The
Commission was well informed of CEHE's plan at every step of the process; it was obvious that,
due to ACCSC cohort reporting time periods, results would necessarily take multiple years for
these new student cohorts to move through the system. The Commission knows this, so it
***expressly acknowledged*** that CEHE's success would be measured by its ability to <u>show progress</u>
prospectively and, ultimately, the improvement in the graduation rates of the cohorts who
enrolled under the new initiatives. *See, e.g.*, Ex. 1 at pages 18-19 (October 28, 2019 Probation
Order).

After CEHE presented evidence demonstrating success, the Commission unfairly moved
to immediately withdraw the College's accreditation. This contradicts the Commission's prior
expectations stated in the Probation Orders. Failure to accept CEHE's demonstrated success is
arbitrary and capricious, and contrary to the *Standards*.

The Commission's criteria and procedures require fair and consistent application of the
*Standards* to member institutions. The Commission's arbitrary change in position contradicts its
representations to CEHE and is inconsistent with its treatment of other member institutions.
Publicly available decisions reveal that the Commission routinely allows schools to remain
accredited when they fail to meet benchmarks in every program offered.[4] In some cases, those
other schools have remained accredited for many years *without demonstrating improved student
outcomes*. That is a stark contrast to how the Commission now treats the College, which <u>has
demonstrated</u> measurable improvements to student success. ACCSC staff have conceded that

---

[3] A more complete discussion and explanation of CEHE's assessments, evaluations, and
implementations of significant improvements is discussed in the multiple CEHE Responses to
Probation dated December 19, 2018, June 28, 2019, March 4, 2020, and December 29, 2020 –
which are all hereby incorporated into this appeal.
[4] This differs from the situation with CEHE's colleges, where multiple programs have
consistently met ACCSC benchmarks.

3

**Exhibit I - 4**

the Commission did not even consider how it applied student achievement *Standards* to other institutions when preparing the Decision. The Commission was asked but refused to disclose any information that would allow the Appeals Panel to review the extent of the Commission's discriminate treatment of CEHE.

From the College's perspective, it seems that the Commission disregards that CEHE solved its achievement issues and that its students are succeeding. The evidence suggests that that was not the Commission's true objective. Indeed, if those were Commission's goals, the Commission should have extended the time for the College's significant efforts to demonstrate compliance. Given the objective improvements and correlated projections in CEHE's December 2020 Response, the Commission should have continued the Probation and monitored the College's retention rates as the recent cohorts (who are the only cohorts able to benefit from the extensive improvements) moved through their programs. If it became apparent that the projections were wrong (although they have proven to be <u>ahead of schedule</u> so far), the Commission could have then withdrawn approval for any programs that were still not meeting benchmark outcomes.

The Commission should not have rejected this approach. Why did it do so when the College was succeeding in its strategy to meet benchmarks? What could explain it? Since 2012, the Commission's oversight of the College has been disproportionate and punitive. (See the details for this below.) Instead of fairly judging the College (as it did with other colleges) based on its efforts to comply with the *Standards*, it seems to have allowed bias or animosity toward the Colleges to influence its decision-making process. Why would the Commission make this Decision in the middle of a devastating health pandemic that has decimated the job market and disrupted the education of millions of students across the country? For any other college, demonstrated progress in retention and graduate employment over the last year would be considered a substantial achievement worthy of praise. But for the College, it was ignored. The Commission has denied CEHE and the College the due process and fundamental fairness required by the accreditation process. We ask the Appeals Panel to vacate this unjust Decision.

## Argument

### 1. The Decision disregards the criteria of the Commission and is not supported by evidence in the record.

The Decision unfairly applies an impossible standard to CEHE and the College that, until now, was never contemplated by the Commission. The Commission has always known that the multiple initiatives CEHE developed and implemented to solve the College's student achievement issues would take several years to materialize in annual reports. The College does not offer short-term certificate programs (as most other member schools do); it offers degree programs. As such, cohorts enrolling now may not report outcomes for 54 months. CEHE has been transparent about this fact, and the Commission acknowledged that the proper measure for success is <u>demonstrated progress</u>. If the Commission expected changes to long-term degree

4

**Exhibit I - 5**

programs to show up in annual reports in just a year or two, there was no reason to even engage in the probation process at all. That was simply never possible given the length of the College's degree programs.

In its December 2020 Response, CEHE reported that it had completed its implementation of numerous initiatives that were previously explained in the series of Probation Orders and Responses. CEHE provided evidence showing that future cohorts were on track to meet student achievement standards. CEHE did everything the Commission asked: it studied and examined how to improve outcomes, developed and implemented effective solutions, and provided evidence that recent cohorts will achieve student achievement benchmarks.

Nonetheless, the Commission withdrew the College's accreditation before the timeframe for compliance had elapsed. To justify its abrupt Decision, the Commission mischaracterized and misstated the College's December 2020 projections and, for the first time, asserted that CEHE is incapable of developing effective solutions. This finding marks a sudden and arbitrary change in the Commission's expectations stated in the prior Continued Probation letters and contradicts the objective data. Until now, the Commission recognized CEHE's efforts and the time it would take to report benchmark rates. *See, e.g.,* Ex. 2 at pages 15 & 31 (July 21, 2020 Probation Order) (acknowledging that graduation rates were not forecasted to meet benchmarks for several years and recognizing "the length of time needed to demonstrate the school's ability to improve student outcomes"). The Decision invokes a new, impossible retroactive standard requiring the College's 20-to-36-month degree programs to report above-benchmark rates in a fraction of that time. Put simply, the Commission arbitrarily and capriciously not only moved the goalposts, but narrowed them to make the goal impossible to achieve.

**CEHE's efforts are working**. The Commission's representations throughout the probation process recognized these efforts and expressed interest in seeing whether they would result in demonstrated improvement in student outcomes over time. Demonstrating conscientious commitment to the *Standards*, CEHE discontinued programs, closed and consolidated campuses, and focused significant attention to developing successful online programs. CEHE relied on the Commission's stated recognition that older cohorts would continue to report below-benchmark rates and that success was to be measured prospectively as newer cohorts, who could benefit from the multiple improvement strategies, moved through the system. Ex. 1 at pages 18-19 (October 28, 2019 Probation Order) ("The Commission will . . . monitor the efficacy of the new approach with studies of academic progress, retention data and finally **student graduation rates for the first cohorts of students admitted under the new process and procedures**.") (emphasis added).

But as soon as CEHE actually demonstrated that the newer cohorts are on track to succeed, the Commission cut the process short, absurdly claiming that CEHE "cannot demonstrate compliance at all." Ex. 3 at page 16 (April 22, 2021 Withdrawal). This statement is contrary to the extensive data and analysis in CEHE's various probation responses, rendering the Decision arbitrary and capricious. CEHE took massive steps to do everything the Commission asked of it, and the Commission may not now ignore the uncontroverted success of those efforts. We ask the Appeals Panel to correct this injustice.

Exhibit I - 6

a. *The Commission commended CEHE's efforts to address the College's student achievement issues with the full understanding that it would take years for the College to report benchmark rates.*

Starting with its consideration of CEHE's first probation response in March 2019, the Commission commended CEHE's efforts to recognize and address the root causes of the College's below-benchmark achievement rates CEHE reported for certain programs in prior years. *See e.g.,* Ex. 4 at page 5 (May 2, 2019 Probation Order); Ex. 1 at pages 6 & 19 (October 28, 2019 Probation Order). Throughout the process, the Commission consistently sought CEHE's analysis of the issues resulting in below-benchmark graduation and employment outcomes as well as CEHE's plans to address those issues.

CEHE devoted immense resources to analyze its outcomes and develop initiatives to meet the Commission's demands. Ex. 5 at page 5 (December 2020 Action Plan) ("the University estimates that it is spending an additional $10 million per year to support these initiatives"). Since 2018, much of that spending was devoted to increasing personnel in student services, career services, IT, faculty advisors, lab instructors, and quality assurance by a combined 108%. Ex. 6 (Institutional Expenditure Changes Since Probation). Meanwhile, the Commission acknowledged the promise CEHE showed as it tested and demonstrated the initiatives' effectiveness.

Each time the Commission continued the College's Probation status—in May 2019, October 2019, and July 2020, it did so with the understanding that online education cohorts already in the pipeline would not meet benchmark graduation rates until they became reportable. *See* Ex. 2 at pages 15 & 31 (July 21, 2020 Probation Order). It knew that for these degree programs, it would be impossible to demonstrate benchmark achievement rates in a short time frame.

The College programs of 20 to 36 do not produce <u>reportable</u> graduation or employment outcomes for 30 to 54 months. Thus, students enrolling in 36-month programs now, with the full benefit of the newly implemented measures, will not show up in the annual reports for 54 months. The Commission recognized that the fair and appropriate measure by which to judge CEHE's commitment to the *Standards* was whether CEHE could develop and implement solutions improving the College's student achievement outcomes in a reasonable time. It did. In each Response, CEHE provided evidence that the College <u>was meeting that standard</u>. *See* Ex. 7 a-e (June 28, 2019 IU Action Plan Update); March 4, 2020 Action Plan Update for IU-West Haven and IU; December 30, 2020 Action Plans for IU and IU-West Haven.

Indeed, in the May 2019 Probation Order, the Commission "recognized CEHE's efforts to determine the root cause of poor student achievement and make some fundamental changes to the way in which the campuses are managed for the purpose of improving student achievement." Ex. 4 at page 5. Far from demanding immediate compliance with the benchmark for graduation rates, the Commission directed CEHE to "use the information derived from this self-assessment and analysis as the accreditation process intends—to create permanent and reliable improvement in student success." *Id.* And that is what CEHE did.

6

**Exhibit I - 7**

Following CEHE's June 2019 Response, CEHE updated the Commission on additional strategies to address achievement rates and provided data showing their effectiveness. CEHE was clear that "virtually all of [the] efforts to improve graduation rates will only impact current and future students (and these initiatives are showing positive results)." Ex. 8 at 3 (June 28, 2019 Narrative Response).

Most notably, CEHE demonstrated the effectiveness of the "Five-Credit Hour Model." Through its self-analysis, CEHE determined that when students were enrolled in two subjects in the same four-week module, they usually chose to focus on only one of the courses and subsequently struggled in the other. So CEHE developed a scheduling model—a single five-credit course per module—allowing students to focus on one course at a time. It initially rolled this initiative, out on a limited basis in three business and accounting programs, offered by the College. Those programs showed between 14.5% and 19.5% increases in course completion rates—a significant improvement to student success. Ex. 8 at 676.

CEHE also explained in its June 2019 Response that it would "revise and significantly upgrade the assessment policies, processes, and tools we leverage with prospective students." Ex. 8 at page 3. As a solution, CEHE contracted with an outside company to implement new assessment tools and processes. *Id.* at pages 2-3. Specifically, CEHE purchased a web-based assessment tool that measured an applicant's readiness for succeeding in an online, technology-rich environment. *Id.* at page 39. This tool allowed CEHE to better screen out individuals who did not possess the attributes, skills, and knowledge necessary to succeed in the College's online programs. *Id.*

In the October 28, 2019 Continued Probation Order, the Commission "noted with interest" that CEHE hired an outside research entity to analyze the factors impacting student success. Ex. 1 at page 6. It further explained that it was "interested in how CEHE has incorporated the information gleaned by the outside research entity into the school's assessment and improvement mechanisms." *Id.* And in recognizing CEHE's plan to transition the College to distance education programs, the Commission expressed interest in CEHE's decision to significantly upgrade the assessment policies, processes, and tools for prospective students in the distance education learning environment," explaining that it "intends to review the documentation of the implementation of the new assessment procedures." *Id.* The Commission was clear that the ultimate efficacy of this new approach would be judged on "studies of academic progress, retention data and finally student graduation rates for the first cohorts of students admitted under the new process and procedures." *Id.* at pages 18-19.

All of these measures, which the Commission recognized and took great interest in, were prospective in nature. CEHE and the Commission knew the measures would have minimal impact on the College's current cohorts, which would be predominantly represented in the annual reporting for several years to come—including the reports on which the Commission based the Decision. Indeed, the fruits of the assessment strategies for new enrollees would not show up in annual reports for 54 months in most cases, and the Commission confirmed that success was to be measured by the graduation rates of these new enrollees. The Commission's

7

Exhibit I - 8

stated interest in these efforts belies its sudden change of position in the Decision, where it claims it expected benchmark graduation rates *now*. That, of course, would be impossible.

In fact, in the most recent July 2020, Continued Probation Order, the Commission confirmed that it did not expect immediate reporting of above-benchmark graduation rates. Rather, it "recognized the breadth of initiatives that Independence University has implemented in an effort to improve student graduation rates" and acknowledged that IU's distance education programs would not report benchmark rates for several years. Ex. 2 at page 15 (July 21, 2020 Continued Probation Order). The Commission did not contend this was an unacceptable time frame. To the contrary, it explained that it in future reports, it "expect[ed] to see *progress* toward the reporting of above-benchmark student graduation rates to provide assurance that CEHE is capable of developing and implementing successful strategies." *Id.* (emphasis added). It also asked for similar forecasts for other programs. *Id.*

In its December 2020 Response, CEHE did exactly that. CEHE provided detailed updates on its efforts to implement its most successful initiatives, and it provided updated projections, supported by verifiable data, showing that the College remained on track to meet or exceed benchmark rates in all programs. Moreover, CEHE showed it was able to maintain progress notwithstanding the devastating effects of the COVID-19 pandemic. CEHE reported institution-wide increases in course completions and decreases in course drops. *See* Ex. 5 (December 2020 Action Plan).

   b. *The Commission ignored the demonstrated success of CEHE's new initiatives and withdraws accreditation based on the performance of older cohorts.*

The Decision abruptly reverses the Commission's prior statements of encouragement to CEHE and states a new position: "waiting an additional 3-5 years for the school and its programs to achieve benchmark students [sic] achievement rates is simply not acceptable." But in the most recent July 2020 Continued Probation Order, it recognized that the College's programs were several years away from reporting benchmark graduation rates. Ex. 2 at page 15 (July 21, 2020 Continued Probation Order). The Commission never explains this abrupt change in position. It was only after it became clear that CEHE was going to succeed that, the Commission suddenly moved the goalposts to withdraw the College's accreditation.

To be sure, the Decision is not based on any meaningful evidence that the College's projections are invalid. Rather, the withdrawal letter focuses almost entirely on the projected below-benchmark reports for cohorts enrolling between September 2018 and August 2019. Ex. 3 at pages 9-14 (April 22, 2021 Withdrawal). But, as the Commission knew, those cohorts did not have the full benefit of the initiatives discussed in the series of probation orders and responses.

The Commission offhandedly claims that "the strategies outlined in the most recent plan appear to be a continuation or variation of plans that the school has previously implemented, and which have not resulted in sufficient improvement in the area of student achievement." Ex. 3 at page 16 (April 22, 2021 Withdrawal). This is not true. This statement is a serious mischaracterization of the Action Plan submitted with the December 2020 Response. It appears

8

**Exhibit I - 9**

the Commission did not read or understand the December 2020 plan because the Commission's finding is significantly inconsistent with the record evidence.

As explained in CEHE's December 2020 Response, the majority of the improvement measures—including the highly successful Five-Credit Hour Model and pre-enrollment assessment tools—were not fully implemented until 2020. The following table is taken directly from the Action Plan. Ex. 5 (December 2020 Action Plan).

| Successful Student Outcomes Initiative | | | | |
|---|---|---|---|---|
| Description | Testing | Full Implementation | Expected Graduation rate improvement | Expected Employment rate improvement |
| Student Success Teams | 2017 | 2018 | 3-6% | 3-6% |
| Acuity Scheduling Software | 2018 | 2021 | 1-3% | 1-3% |
| SmarterMeasure Assessments | 2019 | 2020 | 7-9% | 2-4% |
| Expanded Reentry Team | 2018 | 2020 | 7-10% | 0 |
| 5-Credit Hour Model | 2018 | 2020 | 8-11% | 2-4% |
| Lab Instructor Model | 2019 | 2020 | 5-7% | 0 |
| Extensions | 2020 | 2020 | 1-2% | 0 |
| Harmonize Software | 2020 | 2021 | 2-3% | 0 |
| Employment Relations Team | 2020 | 2021 | | 8-12% |
| Vertical Specialization | 2019 | 2021 | 1-3% | 2-4% |
| **Total** | | | **35-54%** | **18-33%** |

Perhaps the Commission's claim that these initiatives were "previously implemented" refers to the testing phase of some of the programs. As explained throughout its responses, CEHE tested dozens of initiatives to improve retention and employment rates for online students (which is extremely difficult). This evidence-based approach determined which initiatives would be fully implemented and was used to inform the expected rate of improvement in outcomes. Only those that demonstrated tangible results were fully implemented across all programs. As discussed above, the Commission was informed of CEHE's plans to roll out these measures, and, prior to the Decision, the Commission expressed great interest in seeing the results.

Similarly, the Commission cannot claim that the corrective measures failed. Throughout the testing process, the Five-Credit Model alone resulted in substantial improvement to course completion rates and drop rates for the Business and Accounting programs. Ex. 5 at pages 12-23 (December 2020 Action Plan). As the initiative was tested in those programs, the College consistently experienced double-digit improvement to completion rates for the five-credit hour courses versus the earlier three- to four-credit hour courses. *Id.* at 15. The chart above details many of CEHE's other recently implemented initiatives. The expected effect of these measures is also based on testing, and the December 2020 Action Plan provided data and detailed explanations in support of CEHE's projections. The Decision ignored those results, while

9

**Exhibit I - 10**

JA243

mischaracterizing the Action Plan as either ineffective or as consisting of rehashed versions of prior unsuccessful attempts at corrective action.

The Commission could not refute CEHE's projections. Instead, it focused on projected outcomes for cohorts that enrolled **before** CEHE could fully implement its new initiatives. The Commission's program-by-program analysis in the Decision observes that that the September 2018 to August 2019 cohort was not on track to report benchmark graduation rates. Again, the Commission has always known this would be the case, and if it intended to withdraw accreditation based on the graduation outcomes of this cohort, it did not need to issue three Continued Probation Orders or review CEHE's response to each.

The Decision is silent on the success of the College's more recent cohorts. Obviously, it is the success of these students—who enrolled over the past year and a half—that demonstrate whether the College's attempts to address its prior student achievement issues were bearing fruit. The Commission's failure to consider the most relevant evidence of the College's success in addressing its student achievement issues is a significant error.

The Decision does not relate to CEHE's ability to successfully implement solutions to student achievement issues.

> c. *The Commission has no basis for a system-wide withdrawal of accreditation.*

The unnecessarily arbitrary and capricious nature of the Decision is further highlighted by the fact that the College's main campus, IU-West Haven, will report above-benchmark rates for the 2021 reporting period for every program with one exception: the Medical Assisting (AOS) program is predicted to report a 40% graduation rate—just short of the 43% benchmark. Ex. 9 at page 13 (December 30, 2020 Response). The difference is represented by one student who needs to return to finish her externship. The Commission's decision to withdraw the accreditation of a viable campus that is in substantial compliance with the *Standards* is shocking and unprecedented.

Withdrawing IU-West Haven's accreditation shows how the Commission moved the goalposts. In the July 2020 Probation Order, the Commission recognized that "the evidence appears to show the strategies are starting to take effect [at IU-West Haven]" and provided "an additional opportunity to demonstrate successful student achievement." Ex. 2 at page 10 (July 21, 2020 Probation Order). By any measure, CEHE demonstrated successful student achievement for that campus. But the Commission withdrew its accreditation anyway.

> d. *Good cause exists to allow CEHE to continue the success of its initiatives.*

Both the COVID-19 pandemic and the 100% online structure of many of IU's programs present substantial hurdles towards achieving benchmark rates. CEHE, in spite of the two major obstacles, demonstrated, with verifiable data, that the College's currently enrolled students are successfully completing courses and finding employment at increasing rates. CEHE's students are successfully learning. The Commission simply ignored this evidence and concluded without basis: "the record does not reflect any reason to extend the maximum time frame [for compliance]." Ex. 3 (April 22, 2021 Withdrawal).

10

**Exhibit I - 11**

Not only did the Commission refuse to extend the maximum timeframe, but it took away time it had previously granted to CEHE to continue demonstrating progress towards compliance. Recognizing "the length of time needed to demonstrate the school's ability to improve student achievement outcomes," the Commission found that there was good cause to extend the time to demonstrate compliance to May 31, 2021. Ex. 2 at page 31 (July 21, 2020 Probation Order).  The timing considerations the Commission took notice of then are just as relevant now; newly implemented initiatives have not had time to show up in annual achievement reporting.  The December 2020 Response proved that these measures are effective, but the Commission nonetheless terminated the process before CEHE had any further opportunity to demonstrate success.

The Commission's change in position is in opposition to the *Standards*.  The relevant *Standard* provides:

> The school **will be deemed** to have demonstrated good cause if it has shown that during the period of review significant progress has been made toward achieving compliance with the accreditation standard(s) in question and meeting all requirements set forth by the Commission and when extenuating circumstances exist such that only through the provision of additional time can the school demonstrate its compliance with the standard(s).

ACCSC Rules of Process and Procedure, Section VII.M.3 (emphasis added).  Due to the length of its programs, there is no question that "only through the provision of additional time" can CEHE demonstrate that it has solved its College's student achievement issues and come into full compliance with the student achievement *Standards*.

The decision to cut successful efforts short in the midst of a devastating pandemic is truly unreasonable, particularly when the College, despite this, remains on track with projections. Further, the College actually <u>tracks to be ahead</u> of schedule in many programs.  As CEHE noted in the December 2020 Action Plan, its projections were based on a "*worst-case scenario*." Ex. 5 (December 2020 Action Plan).  The chart below represents updated projections for the currently below-benchmark programs based on current trends.

| Graduation Rates by Cohort Year – Weakest Case Scenario – Updated actuals as of 5/10/21 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 | 2021 | 2022 | 2022 updated | 2023 | 2023 updated | 2024 | 2024 updated | 2025 | 2025 updated | 2026 |
| AOS Medical Assisting DE | 26% | | 25% | 39% | 34% | 62% | 46% | 82% | na | | |
| AAS Business DE | 21% | | 24% | 31% | 33% | 61% | 45% | na** | na | | |
| AAS Graphic Arts – in teach out | 18% | na | 20% | na | 29% | na | 43% | na | na | | |

11

Exhibit I - 12

| BS Business Administration DE | 27% | | 25% | 26% | 26% | 26% | 26% | 31% | 35% | 44% | 49% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BS Graphic Arts DE | 28% | | 28% | 22% | 22% | 24% | 25% | 22% | 34% | 30% | 48% |
| BS Web Design and Development DE | 15% | | 10% | 13% | 13% | 18% | 20% | 22% | 29% | 44% | 43% |
| BS Health Services Management DE | 18% | | 19% | 19% | 20% | 18% | 22% | 24% | 31% | 34% | 44% |
| MS Nursing Education DE | 40% | | 0% | *0% | na | *100% | na | na | na | na | na |

*There is only 1 student in this cohort.

** ACCSC ceased enrollment in this program. No students to report.

Even without considering the effects of the pandemic, the College's success is a tremendous achievement for an institution offering 100% online programs. Comparable to leading nonprofit online universities report graduation rates that fall well short of ACCSC benchmarks. According to the College Scorecard, Purdue University Global's *eight-year graduation rate* is 26%,[5] Maryland Global Campus's 27%,[6] and Penn State World Campus's is 39%.[7] CEHE has shown that it is on track to be an industry leader and demonstrates that CEHE's actions were effective despite documented headwinds that online programs experience with student persistence and retention. *See, e.g.*, https://www.westga.edu/~distance/ojdla/summer142/boston_ice142.html.

It is well known that the absence of in-person interaction and social engagements is inherent to distance education programs and increases the likelihood students will leave their programs. Notwithstanding this, the College has shown it can succeed where the majority of distance education universities fail. As recognized by the Commission, CEHE developed numerous strategies to ensure that students remain engaged with their programs and the College. These extraordinary strategies included creating and increasing extracurricular activities; open houses across the country; the use of faculty program advisors; improvement in tutoring; and a "badge program" that motivates students by rewarding them for various achievements. Ex. 2 at pages 13-14 (July 21, 2020 Probation Order). And in the December 2020 Action Plan, CEHE identified a new initiative, the Lab Instructor, where a second instructor was added to courses to focus on student success, individual attention, and expanded session contact for students. Ex. 5 at pages 22-24 (December 2020 Action Plan). The Lab Instructor model tracks to be nearly as

---

[5] https://collegescorecard.ed.gov/school/?489779-Purdue-University-Global
[6] https://collegescorecard.ed.gov/school/?163204-University-of-Maryland-Global-Campus
[7] https://collegescorecard.ed.gov/school/?479956-Pennsylvania-State-University-World-Campus

12

**Exhibit I - 13**

effective as the Five-Credit Model in improving retention rates. Ex. 5. These actions are worthy of commendation not condemnation.

The Commission's decision to prematurely cut these efforts short in the midst of a pandemic is clearly not in the spirit of the *Standards*. Indeed, Student Achievement *Standard* VII(B)(1)(iv) encourages consideration of "external or mitigating factors reasonably related to student achievement." When "factors such as economic conditions, state and national trends, location, student population served, [or] length of program . . . are adversely impacting the school's ability to meet the Commission's established benchmark rates," the school can still nonetheless be in compliance with the *Standards* if it can provide other reliable indicators of successful student learning. *Id.* With respect to fully online degree programs, CEHE has demonstrated that the College's students are succeeding at rates greater than most other universities offering online degree programs.

Following this standard, CEHE has shown that good cause exists to allow the College to continue demonstrating its progress towards benchmark achievement rates. CEHE proved that it is currently retaining the College's students and that they are successfully completing their courses. Because CEHE has provided reliable indicators that the College's students are successfully learning notwithstanding the effects of COVID-19 and the persistence and retention issues inherent to 100 percent online degree programs, the Appeals Panel should allow CEHE to continue its diligent efforts.

**2. The withdrawal of accreditation evades the Commission's requirement to consistently apply its *Standards*.**

The Commission's decision to withdraw the College's accreditation solely on the basis of *Standard* VII (1)(b)(ii) is extraordinary. The Commission has routinely permitted schools with a history of failing to meet benchmark rates in **all** of their programs to remain accredited, even when the Commission recognizes that a school has not yet demonstrated it is on track to achieve compliance. In sharp contrast, the College has many programs that meet benchmark, and its main campus, with only one minor exception, fully meets the *Standard*. And CEHE has taken actions that will result in all of the College's programs meeting benchmarks once recently enrolled cohorts become reportable. To CEHE's knowledge, the Commission has never withdrawn a school's accreditation under these circumstances, and its disparate treatment of the College requires reversal. The Commission must afford the College the same fairness and consideration as it does any other member institution.

*a. The Commission is obligated to be transparent in its decision-making process.*

An accrediting commission must apply its standards consistently to its member institutions. This is a fundamental tenet of accreditation—the U.S. Department of Education requires all federally recognized accreditors to have sufficient controls to prevent disparate treatment. *See*, 34 C.F.R. § 668.18(b) (requiring accreditors to have "effective controls against the inconsistent application of the agency's standards"). The appeals process is the primary mechanism through which ACCSC has implemented any sort of control against the Commission's inconsistent application of the ACCSC *Standards of Accreditation*. In this case,

13

**Exhibit I - 14**

the Commission's departure from how it has treated other similarly situated schools directly violates the ACCSC Rules of Process and Procedure, which authorize this Appeals Panel to vacate a decision of the Commission that is arbitrary, capricious, or in substantial disregard of the criteria or procedures of the Commission, or not supported by evidence in the record on which the Commission issued the Decision.

ACCSC's Executive Director, Dr. Michale McComis, conceded that the Commission did not take any measures to ensure it consistently applied the *Standards*. CEHE requested records from Dr. McComis showing the Commission's application of the *Standards* to other institutions who failed to meet graduation and employment benchmarks. In a letter denying CEHE's request, Dr. McComis explained that information would not properly be reviewable by the Appeals Panel because the Commission **did not consider the appropriateness of its decision in relation the Commission's treatment of other schools when it withdrew the College's accreditation**. Ex. 10 (McComis Letter). That admission is stunning and damning.

In fact, Dr. McComis went so far as to claim that "[t]he information you requested . . . was not before the Commission in [the College's] case." Ex. 10 (McComis Letter). That is not true. Certainly, the Commission remains aware of its recent actions involving other member schools. There can be no doubt that the Commission's treatment of other schools was properly before it when it decided to withdraw the College's accreditation. Every member school expects to be treated consistently with how other member institutions are treated. Both common sense and the federal policy stated in the regulations on accrediting agency recognition prescribe consideration of such matters in order to avoid inconsistent and arbitrary decision making. But, if as Dr. McComis conceded, the Commission gave no consideration to whether the Decision was consistent with its treatment of other schools. That failure, in and of itself, demonstrates that the Decision was arbitrary, capricious, and in substantial disregard of the criteria for fair and impartial treatment and procedures of the Commission.

We ask the Appeals Panel to consider ACCSC staff's refusal to make records available that would allow full review of the Commission's disparate treatment of the College. As a secondary basis for declining to provide information to CEHE about the Commission's past decisions, Dr. McComis claimed such records are "maintained as confidential." But this is not true. All warning letters, probation orders, and withdrawal decisions are initially posted to ACCSC's website (*although only the most recent decisions are available for review*). They are also routinely circulated to numerous other state, federal, and accrediting agencies. They are not confidential. And, as was made clear in its letter requesting the records, the Commission was free to redact any identifying information from the decisions.

   *b.   Recent publicly available ACCSC decisions reveal the Commission's disparate treatment of the College.*

Although Dr. McComis's refusal to provide a complete record makes it impossible to discover the full extent of the Commission's disparate treatment of the College, recent decisions published on ACCSC's website provide ample evidence that the College is being held to an unfair standard. Those decisions reveal that the Commission allows other institutions to remain

<div align="center">14</div>

<div align="right">**Exhibit I - 15**</div>

<div align="center">JA248</div>

accredited notwithstanding program outcomes that are similar, or worse, than those cited in the
Decision.

For example, on October 1, 2020, the Commission placed Vista College on Warning
status because "**all** of the school's programs with reportable data" fell below ACCSC's student
achievement benchmark rates. Ex. 11 at page 3 (Vista College Warning Letter) (emphasis
in original). Prior to being placed on Warning status, Vista had been on outcomes reporting for five
years, since May 2015. Describing the basis for moving the school to Warning status, the
Commission expressed concerns that the school's program modifications submitted in March
2016, were merely "a means to 'reset' the reporting of student achievement data." *Id.* at page 4.
The Commission also noted that the school's "main plan" for resolving these issues appeared to
be the continuation of its prior efforts to "revise and re-launch programs," which "did not appear
to resolve the school's student achievement issues." *Id.*

Vista College has systematically failed to meet benchmark rates since 2015. And, as of
the October 1, 2021 Warning Letter, it had not demonstrated any effective solutions for its
student achievement issues. Yet, as of this Appeal, not only does Vista remain accredited, but it
is not even on probation.

Similarly, Takoda Institute remains accredited even though, as of July 2019, **all** of its
programs failed to meet both graduation and employment benchmarks. Ex. 12 at page 2 (Takoda
Institute Continued Probation Order). Moreover, the school has reported below-benchmark
graduation and/or employment rates for all of its programs since 2014. *Id.* The Commission's
most recent evaluation of the school noted that most of the programs were not only failing to
show improvement but were actually declining.

Nonetheless, Takoda remains on Probation because the Commission allowed it further
time to develop student achievement support strategies and to demonstrate the effectiveness of
its strategies. CEHE, on the other hand, demonstrated that its newly implemented strategies **are**
effective and that students currently enrolled at the College will graduate from programs that
meet or exceed graduation and employment benchmarks. Still, the Commission withdrew the
College's accreditation. This is not a fair and consistent application of the *Standards*.

Construction Training Center provides yet another example of the Commission's
disparate treatment of the College. That school remains accredited despite reporting below-
benchmark rates for **all** of its programs. In fact, since 2018, the school had only one program that
met applicable graduation and/or employment benchmarks in an annual report. Ex. 13 at page
13 (Construction Training Center Continued Probation Order). The Commission placed the
school on Probation status, but did so based in part on several other findings in the Probation
Order, including deficiencies and conflicting information in its backup documentation and a
failure to provide retention charts for some programs. *Id.* Moreover, according to the
Commission, the school failed to provide an adequate assessment of the causes for the low rates
and did not develop a plan for how it would improve the rates. *Id.* at pages 14-15.

Construction Training Center and Takoda offer diploma programs that are between four
and nine months in length. So, successful initiatives should materialize in above-benchmark rates

**Exhibit I - 16**

JA249

within two years—much sooner than for a school with significantly longer degree programs such as those offered by the College. As discussed above, new cohorts in the College's degree programs will not, and cannot, report for 30 to 54 months. The Commission's willingness to continue accrediting these short programs for years without any indication of improvement stands in stark contrast to its decision to cut short the College's demonstrated progress.

The Commission's decision to keep these three schools in accredited status while withdrawing the College's accreditation demonstrates that the College is being held to a materially different standard than other member institutions. And these schools may represent just a small sampling of other schools that remain accredited notwithstanding systematic achievement rate issues. The three schools described above have similar histories of reporting below-benchmark outcomes in the majority of their programs, yet they have been given reasonable time to develop and execute plans to improve those rates, even after their short-term programs. The College, too, was given a limited time frame to demonstrate improvement in its student achievement outcomes, but unlike the three other schools mentioned, the College **has experienced measurable success**. Withdrawing the College's accreditation while all programs are on track to achieve benchmark rates demonstrates significantly different and inconsistent treatment relative to other member schools. Such inequitable treatment justifies vacating the Decision.

### 3. The Decision is a continuation of unnecessarily punitive actions against CEHE.

CEHE's relationship with ACCSC leadership and the Commission has been characterized by disproportionate actions, harsh rhetoric, and a refusal to recognize CEHE's corrective actions and compliance with ACCSC *Standards*. Viewed in its totality, the Commission's conduct toward CEHE exposes an effort to harm CEHE and the College, culminating with its Decision. Beginning in 2012, in retaliation for CEHE exercising its right to challenge the Commission's improper handling of unsubstantiated and unexamined anonymous "complaints", Dr. McComis subjected the College to an intense level of scrutiny that laid a foundation for a series of progressively adverse actions culminating in the withdrawal of accreditation. Ex. 14 (Summary of ACCSC Actions since 2012). An analysis of ACCSC's actions against the College evidences the existence of a punitive stance against the CEHE.

#### a. *ACCSC receives a coordinated series of anonymous "complaints," initiating a disproportionate campaign of oppressive information requests.*

Starting in May 2012, over the course of less than 90 days, ACCSC received nine anonymous complaints that made various allegations regarding the College. In 2013, ACCSC received five more anonymous complaints. None of the complainants identified themselves or provided their consent to ACCSC to forward a copy of the complaint to the school. And in no instance did ACCSC attempt to verify the complaint or contact the anonymous complainant. The anonymous complainants (likely there was only one source) did not meet the criteria for processing a complaint against an institution in the ACCSC Rules of Process and Procedure. Such failure meant that the Commission could decide to process the complaints in the exercise of

**Exhibit I - 17**

its discretion, but it was not required to do so.  See ACCSC Rules of Process and Procedure, *Standard* VI(3)(b)(iv), FN2 (April 15, 2012).

The Commission elected to process the complaints and, eventually, provided them to CEHE for a response. Despite the inherent unreliability of anonymous complaints, the Commission never took any independent efforts to substantiate them.  Ultimately, the Commission closed every complaint <u>without taking any action</u>.  However, ACCSC revealed its bias by providing the entire batch of anonymous complaints to two states Attorneys General, without notifying CEHE, and in some cases, without CEHE's response.  ACCSC provided copies of all anonymous complaints to the two states Attorney General, but never provided copies of CEHE's responses.  For the Attorneys General, these complaints became fodder for state-level investigations which ultimately resulted in a five-year damaging litigation, to the massive detriment of CEHE's and the College's reputation.

Anonymous complaints from disgruntled staff and former students are common and seldom merit serious investigation, and these complaints had all of the hallmarks of unreliability. The fact that all fourteen complaints were anonymous (with indications of being coordinated) should have raised the Commission's suspicion about their legitimacy.  Indeed, almost all of them used the same formatting, the same font, and they all copied similar oversight agencies and media sources.  And just months after ACCSC received the initial five complaints, two former admissions consultants filed a whistleblower lawsuit seeking hundreds of millions of dollars against CEHE. Obviously, those allegations would carry more weight if the College was also under investigation by ACCSC.  Sending out anonymous complaints appears to be a too easy way to manufacture such a result.

  *b. Without any corroborating information, the Commission orders a series of unnecessarily onerous requests for information, culminating in a system-wide Show Cause Order.*

The Commission used the anonymous complaints as a vehicle to subject the College to a series of disproportionate actions, leading to the Decision.  Notwithstanding the obvious coordination of the anonymous complaints, ACCSC required CEHE to respond to multiple requests for information and expend substantial resources in the process.  As detailed below, CEHE comprehensively responded to every complaint allegation and every information request. Over the course of at least three meetings, the Commission met ostensibly to consider CEHE's responses, but continued to defer action and demand numerous reiterative responses from CEHE, consuming the institution's resources and creating great expense in the process. This was the beginning of a pattern of disproportionate unreasonable actions by the Commission targeting the College.

For example, in a July 18, 2012 letter, in which the Commission ordered CEHE to provide detailed responses to 28 individual allegations from the initial five anonymous complaints.  Even though not one allegation was corroborated, the Commission expanded the inquiry to include an additional nine demands for additional documents and information broadly investigating the College's entire operations, including its admissions, recruitment, scholarship,

<div align="center">17</div>

**Exhibit I - 18**

<div align="center">

JA251

</div>

tuition, and standard academic progress processes.  CEHE dutifully submitted a response totaling over 500 pages on August 20, 2012.

But before the Commission could even have reviewed CEHE's response, on August 10, 2012, the Commission demanded comprehensive responses to an additional 25 allegations in four additional anonymous complaints and 11 requests for documents and information. This request asked for similar information about the College's admissions, recruitment, and scholarship practices.  CEHE nonetheless addressed each of the Commission's demands with a 900-page response, submitted on September 3, 2012.

And, again, before having any reasonable opportunity to review CEHE's second comprehensive response, the Commission issued a third demand for information documents just over two weeks later on September 20, 2012.  This letter made fifteen additional requests for information.

In its third response, submitted on October 23, 2012, CEHE explained that the continuous requests for information took an inordinate amount of executive time and resources, especially given the fact that the anonymous complaints provided no information about the employees, programs, or even named which campus was involved with the allegations.  CEHE questioned the Commission's frequent demands for information when other accreditors and regulators had policies of summarily peremptorily dismissing anonymous, unsubstantiated allegations. When CEHE again submitted a full response, totaling nearly 200 pages, the Commission responded with its fourth request for information on March 5, 2013.  On April 3, 2013, CEHE addressed each request in another 200-plus page response.

In the year following its receipt of the first anonymous complaint, the Commission issued four more requests for responses.  Those requests required CEHE to address the anonymous allegations and produce more documents and information corresponding to 44 individual requests for information.  Apparently, lacking any concern regarding the cost or effects on CEHE's and the College's operations, the Commission demanded information faster than it could review it. The repeated series of requests led to the Commission's continuous deferrals. At each successive Commission meeting in which CEHE's complaints were an agenda item, the Commission simply chose to keep the matter open—ostensibly so that it could review CEHE's next response to the information request the Commission had just made prior to the meeting.  As CEHE and the Commission went through this cycle of repeated requests and responses, the Commission never identified any basis to assign legitimacy to any of the anonymous "complaints".  Meanwhile, CEHE asked the Commission for some understanding about the harm these demands were causing, pointing out the lack of any verifiable facts or details to corroborate the complaints.

The Commission could have gotten to the bottom of the complaints during the course of a number of on-site visits to the College's campuses that took place in 2013.  From March 27, 2013 to June 27, 2013, ACCSC conducted site visits at 16 campuses in connection with a change in ownership application.  Yet none of the site visit teams were informed by the Commission about the anonymous complaints or tasked with collecting information regarding the alleged

18

**Exhibit I - 19**

violations of ACCSC *Standards*.  These site visits occurred contemporaneously with the Commission's oppressive documents requests.  At each visit, the College provided the site visit teams access to every aspect of its operations, yet the Commission chose not to avail itself of the easiest, most cost-efficient in-person and on-site means of investigating the anonymous complaints.

CEHE was understandably perplexed when, ultimately, on July 12, 2013, the Commission issued a system-wide Show Cause Order based on the anonymous complaints.  A year-long campaign of requests for voluminous information was oppressive enough.  But a system-wide Show Cause—putting the existence of the College at substantial risk—is an outrageously disproportionate response to unsubstantiated, anonymous allegations.  There can be no question the Show Cause Order was intended to be punitive.  CEHE was forced to provide yet another costly 4,500-page response to the same allegations to which it had already responded.  All this was necessary to respond to complaints the Commission did not deem worthy enough to task 16 site teams—who were on the College's campuses just weeks before issuing the Show Cause Order—to review and evaluate.

Yet this was still not enough.  Before receiving the Show Cause response, on August 1, 2013, the Commission notified CEHE of three more anonymous complaints and an anonymous blog post and demanded that CEHE address every accusation in each with supporting documentation.  This required CEHE to prepare yet another response to a series of obviously coordinated, unsubstantiated allegations.

Moreover, as the Commission continued its oppressive investigation, ACCSC leadership forwarded the anonymous complaints to the Attorneys General of Colorado and Wyoming.  Most concerningly, ACCSC opted not to provide the state investigators with CEHE's responses to the allegations.  ACCSC staff's apparent refusal to provide any of the thousands of pages of exculpatory information legitimized the anonymous complaints, which the Commission ultimately **resolved with no action**.

Worse still, after Colorado used the anonymous complaints to justify a many years-long investigation into the operations of CEHE's Colorado campuses, the Commission used the existence of the Colorado investigation to justify its onerous requests to CEHE.

   *c.  The Commission vacates the Show Cause Order but refuses to accept any accountability for its disproportionate response to unsubstantiated complaints.*

Ultimately, the Show Cause Order was vacated in December 2013, and all complaints were closed **without any action** from the Commission.  But not before CEHE was forced to expend thousands of hours in executive and staff time responding to the Commission's unwarranted requests and over $500,000 in attorney's fees. And that is a drop in the bucket compared to the costs CEHE incurred responding to the Colorado Attorney General's investigation, discovery, and litigation against CEHE's Colorado campuses.  Those costs easily exceeded $10 million dollars.

19

**Exhibit I - 20**

In CEHE's response to the July 12, 2013 Show Cause Order, CEHE pushed back on ACCSC's handling of the anonymous complaints and criticized the Commission for its failure to cheaply and efficiently investigate them during ongoing on-site visits and also for providing the complaints to states Attorneys General without allowing CEHE the opportunity to respond.

CEHE also asked for reimbursement for the substantial costs CEHE incurred in responding to ACCSC's unwarranted demands and dealing with the Attorney General investigations. It requested that ACCSC explain how its *Standards* justify such a heavy-handed response to unattributed (clearly false) complaints lacking corroboration.

It is deeply concerning that a school can be held hostage by the accreditation process based on unsubstantiated anonymous complaints. ACCSC accepted them at face value against a member institution (which to that point had enjoyed a cordial and cooperative relationship including several executives serving ACCSC on site visits), turned them over to the government before the school responded, subjected the school to onerous information requests, and threatened its accreditation through a system-wide show cause order.

Understandably, CEHE's Board of Directors, specifically then-Chairman Carl Barney, did not accept ACCSC's refusal to accept any responsibility for the harm caused by ACCSC's unwarranted actions. Mr. Barney filed a formal complaint against ACCSC (January 14, 2014), its staff, and its Commissioners for their violations of ACCSC *Standards* regarding the handling and processing of complaints and for violating Department of Education regulations requiring fair and equitable review of complaints.

The Commission itself never responded to CEHE's complaints, instead deferring to its lawyers to justify its actions. After the Commission twice deferred a response on January 29, 2014 and March 27, 2014, CEHE received a letter from ACCSC counsel on June 2, 2014, claiming that ACCSC had complete discretion to process and respond to anonymous complaints as it sees fit. ACCSC counsel failed to recognize any obligation of the Commission to consider proportionality or fairness in this process, claiming instead that "[t]he Standards do not include financial or operational burdens as a factor for the Commission to consider when determining whether to take action against a school." Ex. 15 at page 5 (June 2, 2014 Letter from ACCSC Counsel). The Commission took the position that so long as a "complaint was submitted in writing and reasonably suggested accreditation violations," the *Standards* place no limits on the Commission's responsive action against a school. *Id.* at 3 (emphasis added).

But that is not true, and it is a dangerous assertion of unfettered power. Department regulations require accreditors to review complaints in a "timely, fair, and equitable manner." 34 C.F.R. § 602.23(c)(1). A failure to consider massive financial or operations burdens can hardly be said to be fair or equitable.

   d. *The Commission retaliates against CEHE and the College by expanding its disparate treatment.*

After ACCSC's October 26, 2020 request for information, CEHE provided a detailed response explaining how litigation resulting from that investigation did not demonstrate a failure

20

**Exhibit I - 21**

of the College to comply with ACCSC *Standards*. In fact, nearly every aspect of the Colorado
case concerns documented policies and practices that were known to ACCSC when the activity
was ongoing. *See* Ex. 16 at 23-27 (CEHE Response to Oct. 26, 2020 Letter). ACCSC was well
aware of, and accepted, the College's practices. The judge in that case, which decision the
College is appealing, took a different view of those policies and practices than ACCSC did, but
that does not mean the practices violated the *Standards*. Notably, the concerns raised in the
October 26, 2020 letter are not listed as a basis for the withdrawal.

    *e. ACCSC promulgated new Standards for the specific purpose of excluding Mr. Barney
from CEHE's Board of Directors.*

    More egregiously, ACCSC promulgated new *Standards*, specifically designed to force
Mr. Barney to resign from CEHE's Board. In December 2012, CEHE, an IRS 501(c)(3)
organization, acquired the colleges at issue in this appeal. By operation of that merger, the
colleges became nonprofit institutions for ACCSC and Title IV purposes, and the Commission
approved the College's change of ownership without conditions, on January 30, 2013. *See* Ex.
17 (ACCSC January 30, 2013 Approval of Part II of Change of Ownership). However, three
years later, in August 2016, the Department of Education notified CEHE that, while it was
approving CEHE's ownership of the College, it was going to keep the College's classification,
for Title IV purposes, as proprietary institutions (a.k.a., "for-profit").[8]

    The Department publicized its 2016 denial of the College's nonprofit designation, which
explained the basic structuring of the transaction. And just months later, ACCSC issued a
January 13, 2017 Call for Comment seeking to change its *Standards* to prohibit anyone with a
financial interest from serving on a nonprofit institution's board. The example cited in the Call
for Comment specifically mentioned a former owner who held a promissory note to secure the
financing of the sale. This example precisely describes how the former owner of the colleges
that merged with CEHE, the Carl Barney Living Trust, whose trustee was Mr. Barney, financed
the merger. Moreover, this new *Standard* was made to be retroactive, ensuring that it would bar
Mr. Barney's seat on the board. The timing and specificity of the proposed rule change show that
ACCSC sought to specifically target Carl Barney and CEHE.

    Notwithstanding the Commission's history of punitive actions, CEHE has worked
consistently and conscientiously to demonstrate the College's commitment to meeting the
*Standards*. In the September 2018 Probation Order, the Commission made 18 findings against
the College across 15 campuses. Since then, CEHE has devoted millions of dollars to address
every one of the Commission's concerns. In fact, it has fundamentally reorganized the College's
entire system to meet the *Standards*. It has devoted almost all of its resources into building what
had been on pace to be one of the most successful fully online universities in the country.

---

[8] CEHE immediately filed a lawsuit in federal court to challenge that action and in 2018, the
litigation was settled, with the Department reclassifying the College as a nonprofit institution.

**Exhibit I - 22**

**Conclusion**

For the above reasons, CEHE asks the Appeals Panel to remand the Decision and direct the Commission to find that good cause exists to continue the time for CEHE and the College to come into compliance with student achievement standards.

22

**Exhibit I - 23**

Exhibit 10

# ACCSC

Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

May 7, 2021

**ELECTRONIC DELIVERY**
sgombos@glpclaw.com

Steven M. Gombos
Attorney-at-Law
Gombos Leyton, PC
11359 Random Hills Road, Suite 400
Fairfax, VA 22030

Dear Mr. Gombos:

The Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") is in receipt of your letter dated April 30, 2021 relating to your client's the appeal of the Commission's April 22, 2021 decision to withdraw the accreditation of Independence University ("IU") located in West Haven, Utah. Your letter seeks an extensive scope and variety of documents relating to ACCSC member schools other than your client. Contrary to the assertion in your letter, the *Standards of Accreditation* are not silent as to whether institutions may obtain "discovery" from the Commission in connection with their appeals. Nor are they silent as to whether one member may rifle through the Commissions' files pertaining to its fellow members.

The *Rules of Process and Procedure* expressly state that the Appeals Panel will consider only that information that was before the Commission at the time that the adverse action was taken[1] (*Section VIII (B)(4) & (C), Rules of Process and Procedure, Standards of Accreditation*). The information you have requested from the other member institutions was not before the Commission in your client's case. Indeed, the *Rules of Process and Procedure* make clear that the Commission, in making decisions as to any particular school, considers only that school's file (*Section VII (C), Rules of Process and Procedure, Standards of Accreditation*). The April 22, 2021 decision letter is expressly based "upon review of the record" in your client's case, which is defined on page 1 and in Appendix A of that letter, and which clearly does not include documents, information, or actions in other schools' records.

The *Rules of Process and Procedure* also expressly provide that information obtained in the accreditation process and pertaining to the Commission's actions will be maintained as confidential and will not be shared with other members (*Section X (A)(2), Rules of Process and Procedure, Standards of Accreditation*). As you are undoubtedly aware, your client agreed to these *Rules* when it applied for accreditation by the Commission. Having enjoyed the benefits of these confidentiality provisions for many years, your client cannot reasonably ask the Commission to deprive its fellow members of the same. To the extent you seek copies of actions taken by ACCSC that are required by law or regulation to be made public, those are posted and available on ACCSC's website.

ACCSC looks forward to receiving IU's Application for Appeal of a Commission Decision and the school's Grounds for Appeal, which are due no later than May 24, 2021.

Sincerely,

Michale S. McComis, Ed.D.
Executive Director

---

[1] Except in instances where financial soundness is the only deficiency that provides the basis for the adverse accrediting decision, certain financial information may be submitted by the appellant.

**Exhibit I - 24**

# ACCSC

Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
www.accsc.org

Exhibit 11

October 1, 2020

**ELECTRONIC DELIVERY**

███████

Vista College
300 North Coit Road, Suite 300
Richardson, Texas 75080

*School #M055898*
*Warning*

Dear ███████

At the August 2020 meeting, the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") considered its previous decisions to defer final action on the Application for Renewal of Accreditation, Applications for an Academic Associate Degree for the Logistic and Operations Management and Business Administration Leadership programs, and an Outcomes Report submitted by Vista College located in Richardson, Texas. Upon review of the January 28, 2020 Commission letter and the school's response, and in conjunction with its prior reviews of these matters, the Commission voted to place Vista College on **Warning and to direct the school to cap/limit enrollment in all current program offerings** with a subsequent review scheduled for ACCSC's May 2021 meeting. The reasons for the Commission's decision and the Commission's requirements for the school to demonstrate compliance are set forth below.

## History of the Commission's Review

### Outcomes Reporting History

- At the May 2015 Meeting, the Commission granted Vista College Renewal of Accreditation for four years going forward from November 2014 and accepted the school's report for the Business Management (BS) program. At that time, the Commission placed Vista College on Management Retention Reporting, Outcomes Reporting, and Admissions Reporting.

- At the March 2016 meeting, the Commission approved substantive program modifications to 11 of the school's programs: Criminal Justice – DE (AAS), Information Systems and Security Assurance – DE (AAS), Information Technology – DE (AAS), Medical Insurance Billing and Coding – DE (AAS), Paralegal – DE (AAS), Business Administration – DE (AAS), Business Administration – DE (BS), Project Management – DE (BS), Medical Insurance Billing and Coding – DE (Diploma), Information Technology – DE (Diploma), and Business Administration – DE (Diploma). As part of this approval, the school taught out its existing programs and the Commission began tracking student achievement outcomes in the revised program offerings.

- At the June 2016 meeting, the Commission reviewed and accepted the school's Admissions Report and continued Vista College on Management Retention Reporting and Outcomes Reporting.

- At the May 2017 meeting, the Commission deferred final action on its review of the school's student achievement outcomes and management and administrative capacity

- At the February 2018 meeting, the Commission accepted the school's Management Report and deferred action on the Outcomes Report and new non-degree and degree programs and forwarded the matter to the on-site evaluation team for review in conjunction with the school's evaluation for Renewal of Accreditation.

**Exhibit I - 25**

*Vista College – Richardson, Texas*                                                     *Warning*
*School #M055898*
*October 1, 2020*
*Page 2 of 8*

The Commission's continued review of these matters throughout the renewal of accreditation process is detailed in the May 2019, November 2019, and August 2020 meeting information below.

### May 2019 Meeting

At the May 2019 meeting, the Commission reviewed the findings from the November 15-16, 2018 on-site evaluation. The on-site evaluation report includes three findings regarding student achievement rates, admissions requirements, and refunds. Upon review of the information provided by the school in response to that report, the Commission voted to defer action until the November 2019 meeting and requested that Vista College submit additional information about student achievement and admissions in order to demonstrate compliance with accrediting standards.

### November 2019 Meeting

At the November 2019 meeting, the Commission considered its previous decision to defer final action on the Application for Renewal of Accreditation and Applications for an Academic Associate Degree for the Logistic and Operations Management and Business Administration Leadership programs. Upon review of the information provided by the school regarding student achievement and admissions, the Commission found that only one of the school's programs met student achievement benchmarks as of the July 2019 Report Date. In addition, the Commission found that it remained unclear whether or not Vista College was allowing students to start class prior to full execution of the enrollment agreement. Therefore, the Commission again deferred final action on these matters and required Vista College to submit an additional response regarding these student achievement and admissions issues.

### August 2020 Meeting

At the August 2020 meeting, the Commission reviewed Vista College's July 6, 2020 response regarding below-benchmark student achievement rates and the school's process for ensuring that students meet admissions requirements prior to enrollment. Upon review of the information provided by the school, the Commission concerned that Vista College continues to have significant, unresolved items in the areas of student achievement and admissions heightened. The areas of the Commission's continued concerns and the requirements for the school's response to those concerns is detailed below.

1.  Vista College must demonstrate successful student achievement through acceptable rates of student graduation and graduate employment in the career fields for which the school provides education (*Section VII (B)(1)(b), Substantive Standards, Standards of Accreditation*). In response to the Commission's January 28, 2020 deferral letter, Vista College provided detailed retention data for the school's programs along with graduation and employment data as summarized in the chart below. As shown in the chart, Vista College continues to fall short of meeting student achievement benchmarks across its programs.

**Exhibit I - 26**

*Vista College – Richardson, Texas*
*School #M055898*
*October 1, 2020*
*Page 3 of 8*

*Warning*

| Program (Length in Months) | Credential | Grad/ Empl | July 2018 Report Date | July 2019 Report Date | June 2020 Report Date | ACCSC Benchmark Rates | Program Status |
|---|---|---|---|---|---|---|---|
| Business Administration and Leadership-DE (15) | Diploma | G | No Reportable Data | 42% | 37% | 50% | Teaching Out |
| | | E | No Reportable Data | 80% | 75% | 70% | |
| Medical Administrative Assistant-DE (15) | Diploma | G | No Reportable Data | No Reportable Data | 17%* | 50% | Teaching Out |
| | | E | No Reportable Data | No Reportable Data | 0%* | 70% | |
| Medical Administrative Assistant – DE (16) | AAS | G | No Reportable Data | No Reportable Data | No Reportable Data | 47% | |
| | | E | No Reportable Data | No Reportable Data | No Reportable Data | 70% | |
| Medical Insurance Billing and Coding-DE (17) | Diploma | G | No Reportable Data | 43% | 50% | 47% | Teaching Out |
| | | E | No Reportable Data | 14% | 35% | 70% | |
| Business Administration and Leadership-DE (18) | AAS | G | No Reportable Data | No Reportable Data% | No Reportable Data | 47% | |
| | | E | No Reportable Data | No Reportable Data | No Reportable Data | 70% | |
| Criminal Justice-DE (24) | AAS | G | No Reportable Data | 37% | 38% | 47% | Teaching Out |
| | | E | No Reportable Data | 64% | 45% | 70% | |
| Logistic and Operations Management-DE (24) | AAS | G | No Reportable Data | No Reportable Data | No Reportable Data | 47% | |
| | | E | No Reportable Data | No Reportable Data | No Reportable Data | 70% | |
| Medical Insurance Billing and Coding-DE (24) | AAS | G | No Reportable Data | 45% | 55% | 47% | |
| | | E | No Reportable Data | 50% | 33% | 70% | |
| Business Administration – DE | AAS | G | No Reportable Data | 22% | 36% | 47% | Teaching Out |
| | | E | No Reportable Data | 75% | 69% | 70% | |
| Business Administration-DE (48) | BS | G | No Reportable Data | No Reportable Data | No Reportable Data | 40% | |
| | | E | No Reportable Data | No Reportable Data | No Reportable Data | 70% | |
| Business Management – DE (34) | BS | G | No Reportable Data | No Reportable Data | 26% | 40% | |
| | | E | No Reportable Data | No Reportable Data | 87% | 70% | |
| Healthcare Administration-DE (48) | BS | G | No Reportable Data | No Reportable Data | No Reportable Data | 40% | |
| | | E | No Reportable Data | No Reportable Data | No Reportable Data | 70% | |

\* There are discrepancies between the student achievement data listed on the Graduation and Employment ("G&E") Chart and within the school's narrative response. Where there is a discrepancy, the data in this chart matches the G&E Chart submitted by the school.

The Commission found that for **all** of the school's programs with reportable data, Vista College reported graduation and/or employment rates as highlighted above that fall below ACCSC's student achievement benchmark rate(s).[1] In the July 6, 2020 response, Vista College provided information regarding the school's continued efforts to address the issue of below-benchmark student achievement. Specifically, the school is

---

[1] *Section VII (B)(1)(b)(ii), Substantive Standards, Standards of Accreditation* and *Appendix VI - Student Achievement Rates.*

**Exhibit I - 27**

*Vista College – Richardson, Texas*                                                                                      *Warning*
*School #M055898*
*October 1, 2020*
*Page 4 of 8*

implementing leadership changes; conducting a rigorous assessment of programs and credentials to determine how to serve students and employers; redesigning curricula; enhancing student advising; and teaching out diploma programs to focus on associate-level programs. In addition, Vista College provided retention data as directed by the Commission which shows improved retention in some programs and decreased retention in others.

As noted above, Vista College previously discontinued several programs with low student achievement rates and re-launched those programs with revised curricula and class schedules aimed to promote student retention. Although it is clear that Vista College understands the importance of improving its student achievement outcomes, it appears that the school's main plan for doing so is to repeat the past strategy of revising/modifying its program content as a means to "reset" the reporting of student achievement data. As shown by the data in the chart above, Vista College's prior efforts to revise and re-launch programs did not appear to resolve the school's student achievement issues. Despite Vista College's efforts to identify and address the root causes of these below-benchmark student achievement rates, the school has failed to raise the programs' student achievement rates to acceptable levels thereby also failing to show that the school's programs are meeting student needs and adequately preparing students for sustainable employment in the field of study.

Given the school's history of reporting below-benchmark student achievement across its programs, and especially considering the fact that as of the June 2020 Report Date, the graduation and employment rates across the school's programs continue to fall below benchmark, the Commission concluded that Vista College has neither provided sufficient evidence of a cogent solution to this ongoing compliance issue nor demonstrated that the school can operate its programs in compliance with standards in a sustainable manner. The Commission recognized the school's efforts to enhance student achievement; however, the Commission cannot overlook that the school has continually reported below benchmark graduation/employment rates across its programs. The Commission found that despite its formal monitoring of the reported rates of student achievement and concordant institutional actions, and the school's formal reporting on its continual efforts to enhance and support student achievement, Vista College has been unable to demonstrate a level of improvement that would bring the program's rates of student achievement to a minimally acceptable level as required by accrediting standards.

The Commission concluded that it is the school's responsibility to ensure that its programs meet the specific needs of its students in terms of content, delivery methods, support services, and preparation for employment . Vista College must seriously consider whether the school can offer its distance education programs in a manner that will translate to successful student achievement for the student population served by the school.

While the Commission has opted to afford Vista College an additional opportunity to demonstrate improved student achievement outcomes, the Commission has also concluded that Vista College must focus its efforts on its success strategies. Given that many of the school's programs have required continuous outcomes monitoring since May 2015 and that several programs – Business Administration and Leadership-DE (Diploma), Criminal Justice-DE (AAS), and Medical Insurance Billing and Coding-DE (AAS) – have shown a *decrease* in student achievement outcomes with the most recent report, the Commission directs the school to **cap enrollment in all of its active programs effective as of the date of this letter** which will allow the school to focus on the current students and support graduation and employment. As such, the Commission hereby **directs Vista College to immediately limit/cap enrollments for all program offerings to not exceed an enrolled population of 60 students per program at any time, until further notice** (*Section VII (R), Rules of Process and Procedure, Standards of Accreditation*). These program-level actions are meant to allow the school to focus on the strategies and policy changes described in the school's

**Exhibit I - 28**

*Vista College – Richardson, Texas*                                        *Warning*
*School #M055898*
*October 1, 2020*
*Page 5 of 8*

response to improve graduate employment for the current student population. Through these actions, it is the Commission's intention to give Vista College ample opportunity to demonstrate improvement.

In addition, the Commission directs the school to submit the following:

a. The school's student achievement improvement plan for **each** program specifically addressing any enhancements or modifications made in the following areas:

    i.   Admissions requirements and process;

    ii.  Curriculum and/or training equipment;

    iii. Teaching methods and/or materials;

    iv. Learning resources;

    v.  Student services; and

    vi. Career services and employer engagement.

b. An evaluation of current employment trends including an assessment as to when each program's graduation and/or employment rates are expected to meet ACCSC's benchmark rates.

c. An analysis of the impact of the pandemic on the school's reported graduation and employment rates.

d. A three-year trend analysis for student achievement outcomes in each program as submitted in the ACCSC Annual Report. If data for three years is not available, please submit data for as many years as is afforded by the Commission's Graduation and Employment Chart reporting formula using the following format.

| Program Name (Credential) | Length In Months | Graduation / Employment | July 2018 Report Date | July 2019 Report Date | July 2020 Report Date |
|---|---|---|---|---|---|
| | | G | | | |
| | | E | | | |
| | | G | | | |
| | | E | | | |
| | | G | | | |
| | | E | | | |

e. Minutes from all Program Name Program Advisory Committee ("PAC") meetings hosted in 2020 that include:

    i.   The date, time, location, and attendance of each meeting (please denote which attendees represent the employment community);

    ii.  A comprehensive and clear description of the review of and commentary made by each of the school's PAC;

    iii. The PAC review and commentary regarding student achievement outcomes.

f. A Program Viability Study for **each** of the school's programs that specifically includes:

    i.   Both internal and external review and validation of the program content and objectives;

    ii.  An analysis of the school's student support services;

    iii. An analysis as to whether the school's program offerings adequately prepare students for employment; and

**Exhibit I - 29**

*Vista College – Richardson, Texas*                                                      *Warning*
*School #M055898*
*October 1, 2020*
*Page 6 of 8*

    iv.  An analysis of the availability of job opportunities for the school's graduates.

g.  An ACCSC Retention Chart[2] for **each** program offered at the school using a **March 2021** Report Date along with an analysis of the effectiveness of the school's student retention efforts.

h.  A Graduation and Employment Chart for **each** program using a **March 2021 Report Date**.

j.  Summary information for **each** Graduation and Employment Charts organized according to the corresponding **cohort start date** reported on the chart (line #1) as follows:

    i.  For each student start, provide the following information:

| Count | Student ID | Program | Start Date | Graduation Date | Withdrawal/Termination Date |
|---|---|---|---|---|---|
| 1 | 12345 | Cosmetology | 01/10/17 | 06/01/2018 | N/A |
| 2 | 12346 | Cosmetology | 01/10/17 | N/A | 01/10/2018 |

    ii.  For each student classified as "Unavailable for Graduation" (line #6), provide the following information:

| Count | Student ID | Program | Start Date | Reason Unavailable | Description of the Documentation on File |
|---|---|---|---|---|---|
| 1 | | | | | |

    iii.  For each graduate classified as employed in the field[3] (line #14), provide the following information:

| Count | Graduate ID | Program | Start Date | Employer, Contact, Address, & Ph. # | Date of Initial Employment | Descriptive Job Title and Responsibilities | Source of Verification[4] (i.e., graduate or employer) |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |

    iv.  From the list in (iii) above, for each graduate classified as employed in a training related field, that is "self-employed," provide the following:

| Count | Graduate ID | Program | Start Date | Description of the Documentation on File |
|---|---|---|---|---|
| 1 | | | | |

    v.  From the list in (iii.) above, for each graduate classified as employed in a training related field, that is "Career Advancement," provide the following:

| Count | Graduate ID | Program | Start Date | Description of the Documentation on File |
|---|---|---|---|---|
| 1 | | | | |

    vi.  For each graduate classified as "Graduates-Further Education" (line #11) or "Graduates-Unavailable for Employment" (line #12), provide the following information:

| Count | Graduate ID | Program | Start Date | Classification on the G&E Chart | Reason | Description of the Documentation on File |
|---|---|---|---|---|---|---|
| 1 | | | | | | |

k.  Any additional information, to include contemporaneous retention, graduation, or employment data, that the school believes will be useful to the Commission in making a determination regarding the school's compliance with ACCSC's student achievement outcomes requirements.

---

[2] Available for download at http://www.accsc.org/Content/FormsAndReports/FormsAndReports.asp
[3] See *Appendix VII – Guidelines for Employment Classification, Standards of Accreditation.*
[4] *Appendix VII (4) – Guidelines for Employment Classification, Standards of Accreditation* requires the school to verify the employment classification.

**Exhibit I - 30**

*Vista College – Richardson, Texas*                                                                 *Warning*
*School #M055898*
*October 1, 2020*
*Page 7 of 8*

2.  Vista College must demonstrate that, prior to enrollment, the school determines that an applicant meets the school's admissions requirements (*Section V(A)(4)(a), Substantive Standards, Standards of Accreditation*). In response to the Commission's request for documentation to demonstrate that the school is securing all necessary documentation prior to fully executing the enrollment agreement and allowing a student to start class in the Criminal Justice-DE (AAS) program, Vista College provided a list of students enrolled in this program between January 1, 2020 and February 28, 2020 along with the admissions documentation secured by the school prior to enrollment. Upon review of the information provided, the Commission found that it appears that in 4 (four) out of 9 (nine) students, the enrollment agreements were signed prior to securing the background checks for these students. Therefore, the Commission again found, after multiple reviews, that Vista College continues to be inconsistent in following its procedures to ensure that all admissions documentation is secured prior to enrolling and starting students.

Based on the foregoing, Vista College must submit the following:

a.  An explanation as to why, after multiple Commission level reviews that date back several meetings and corresponding guidance, Vista College continues to be inconsistent in following its established admissions procedures for the Criminal Justice-DE (AAS) program;

b.  A list of students enrolled in the Criminal Justice-DE (AAS) program between July 1, 2020 and December 31, 2020 along with copies of the admissions documentation secured by the school prior to fully executing the enrollment agreement and allowing the student to start class;

c.  If applicable, an explanation as to why the school allowed a student to start the program prior to securing all necessary documentation for any student reported in (b.) above; and

d.  Any additional information that the school believes will be useful to the Commission in making a determination regarding the school's compliance with accrediting standards.

Due to the school's history of reporting below-benchmark student achievement outcomes coupled with the outstanding item of concern with regard to the school's admissions procedures, continued failure to demonstrate compliance will likely result in an escalation of action to Probation status. Therefore, it is of utmost importance that Vista College make every effort to demonstrate compliance in these areas in response to this Warning action.

**Warning Restrictions:**

Pursuant to *Section VII (K)(9), Rules of Process and Procedure, Standards of Accreditation*, the Commission will not consider substantive changes, a change of location/relocation, or additions (i.e., separate facilities, new programs) to a school or its separate facilities while the school is under a Warning.

**Notification to Students**

The Commission requires the school to inform current and prospective students in writing that the school has been placed on Warning and to provide a summary of the reasons for the Warning Order (*Section VII (K)(8) Rules of Process and Procedure, Standards of Accreditation*).

**Response Requirements:**

By applying for accreditation, a school accepts the obligation to demonstrate continuous compliance with the *Standards of Accreditation*. While the Commission employs its own methods to determine a school's compliance with accrediting standards, the burden rests with the school to establish that it is meeting the

**Exhibit I - 31**

*Vista College – Richardson, Texas*                                                                          *Warning*
*School #M055898*
*October 1, 2020*
*Page 8 of 8*

standards. The Commission's deliberations and decisions are made on the basis of the written record and thus a school must supply the Commission with complete documentation of the school's compliance with accrediting standards.

Vista College must provide a response to the items expressed above that provides the information requested along with any additional information that the school believes supports a demonstration of compliance with accrediting standards.[5] If the school's response contains documentation that includes personal or confidential student or staff information that is not required for the Commission's review (e.g., social security numbers, dates of birth, etc.), please remove or redact that information.

Vista College must upload the school's electronic response directly to ACCSC's College 360 Database. The ACCSC College 360 database can be accessed by clicking here. Please note that the password utilized by the institution to access the Annual Report Portal is the same to access the School Submission section of the College 360 database. The Instructions for Electronic Submission can be found here. A detailed overview on how to upload a school submission can be found here.

Keep in mind, the school's response must be prepared in accordance with ACCSC's Instructions for Electronic Submission (e.g., prepared as one Portable Document Format ("PDF") file that has been prepared using Adobe Acrobat software (version 8.0 or higher) and which has a .pdf extension as part of the file name). The school will receive an e-mail confirmation that the file has been received within 24 hours of the submission.

The school's response must also include a signed certification attesting to the accuracy of the information and be received in the Commission's office **on or before March 4, 2021**. If a response, the required fee,[6] and the certificate of attesting to the accuracy of the information is not received in the Commission's office **on or before March 4, 2021**, the Commission will consider further appropriate action.

For assistance with the password or for any other questions regarding the electronic submission requirements, please contact ███████████████████. Please note that any password requests to access College 360 must be made by the school director, or designated member of the school's management team, via e-mail.

For further assistance or additional information, please contact ████████████████████ or ██████████████.

Sincerely,

██████████████████████████████
██████████████████████████████
██████████████████████████████
Michale S. McComis, Ed.D.
Executive Director

---

[5] ACCSC has issued two modules of the **Blueprints for Success Series** – Organizing an Effective Electronic Submission and Preparing a Comprehensive Response for Commission Consideration – which provide a framework for submitting a well-documented, organized, electronic response for Commission consideration. ACCSC encourages the school to review these modules when formulating its response to this letter. More information is available in the Resources section at www.accsc.org.
[6] ACCSC assesses a $500 processing fee to a school placed on Warning.

**Exhibit I - 32**

Exhibit 12

# ACCSC

Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
**www.accsc.org**

June 10, 2020                                                    **ELECTRONIC DELIVERY**

████████████

Takoda Institute of Higher Education                            *School #M072435*
1845 East Franklin Avenue
Minneapolis, Minnesota 55404

Dear ████████████

At the May 2020 meeting, the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") considered the response to the Commission's December 5, 2019 Probation letter submitted by Takoda Institute of Higher Education ("TIHE") located in Minneapolis, Minnesota. Upon review of the December 5, 2019 Commission letter and the school's response to that letter, the Commission voted to continue TIHE on **Probation** with a subsequent review scheduled for ACCSC's **November 2020** meeting. The reasons for the Commission's decision and the Commission's requirements for the school to demonstrate compliance are set forth below.

## STUDENT ACHIEVEMENT

TIHE must demonstrate successful student achievement by maintaining acceptable rates of student graduation and employment in the career field for which the school provided education (*Section VII (B)(1)(b), Appendix VI, Substantive Standards, Standards of Accreditation*). TIHE must also be able to support these rates through the school's verifiable records of initial employment of its graduates (*Section VII (B)(1)(b), Substantive Standards, Standards of Accreditation*).

### November 2019 Review

In response to the June 26, 2019 Warning letter, TIHE provided graduation and employment rates with a July 2019 report date as highlighted in the chart on the next page along with additional information regarding TIHE's efforts to address the school's student achievement problem. The Commission noted that as of the July 2019 Report Date on the Graduation and Employment Chart, none of the school's programs was meeting the student achievement benchmarks.

TIHE sought assistance from the school's Program Advisory Committees and received recommendations regarding the expansion of the Student Services Department to provide additional support for students, strengthening admissions procedures to ensure prospective students understand program requirements, and changing the structure of pre-requisites. In addition, TIHE provided occupational outlook information for the Patient Service Specialist (Certificate) and Computer Support Specialist (Certificate) programs in an effort to show program viability. While the Commission acknowledged the initiatives being considered and implemented by TIHE, the Commission remained concerned that the history of TIHE's student achievement rates showed a trend of below-benchmark graduation rates with no evidence of improvement. Accordingly, the Commission placed TIHE on Probation with a subsequent review scheduled for the May 2020 meeting.

**Exhibit I - 33**

*Takoda Institute of Higher Education – Minneapolis, Minnesota*
*School #M072435*
*June 10, 2020*
*Page 2 of 7*

**May 2020 Review and Action**

At the May 2020 meeting, the Commission considered the history of TIHE's below-benchmark student graduation and employment rates from May 2014 to present as recorded in the chart below:

| Program | Length in Month | G/E | May 2014 Report Date | July 2016 Report Date | Feb. 2017 Report Date | March 2018 Report Date | Feb. 2019 Report Date | July 2019 Report Date | Jan. 2020 Report Date | ACCSC Benchmark Rates |
|---|---|---|---|---|---|---|---|---|---|---|
| Administrative Professional* | 9/6 | G | 41% | 40% | 57% | 0% | 17% | 0% | 0% | 55%/60%73% |
| | | E | 86% | 25% | 75% | No rate | 0% | 0% | 0% | 66%/70% |
| Computer Support Specialist | 9 | G | | 52% | 47% | 57% | 40% | 38% | 37% | 60% |
| | | E | | 70% | 75% | 29% | 67% | 55% | 43% | 70% |
| Patient Services Specialist† | 6 | G | 72% | 71% | 65% | 92% | 30% | 45% | 57% | 69%/73% |
| | | E | 62% | 57% | 55% | 55% | 33% | 50% | 50% | 66%/70% |

\* Originally, this was the 9-month Administrative Assistant program. The program became 6 months in length effective with the March 2018 Report Date.
† Formerly the Health Information & Patient Services Specialist program

As shown in the chart above, the graduation and employment rates for the Administrative Professional,[1] Computer Support Specialist, and Patient Services Specialist Certificate programs all continue to fall below the Commission's benchmarks. Although the graduation rate for the Patient Services Specialist program improved by 12 percentage points, the Computer Support Specialist program's graduation and employment rates have further declined by one percentage point and 12 percentage points respectively with the most recent report date of January 2020.

In its response, TIHE identified six underutilized assets that the school could use to improve outcomes:

- Better motivation of staff and faculty;

- Enrollment size;

- The TIHE cohort model;

- The effective use of established cultural competencies reflected by the school's base constituencies;

- More effective engagement with existing programming housed within the American Indian OIC; and

- More effective leveraging of the wide array of external partners as facilitated by the American Indian OIC.

---

[1] TIHE has not enrolled students in the Administrative Professional program since January 2018 and stopped marketing the program in June 2018.

**Exhibit I - 34**

*Takoda Institute of Higher Education – Minneapolis, Minnesota*
*School #M072435*
*June 10, 2020*
*Page 3 of 7*

In addition, the school described a new five-step process for supporting students, including:

- Enhanced enrollment and orientation processes;
- Retention, achievement, and completion processes;
- Completion transitions;
- Post-graduate engagement and mentoring activities; and
- Ongoing institutional learning activities.

TIHE also identified several positive developments from the new Tiospaye Initiative following its implementation in fall 2019, including increased engagement, and the school provided preliminary data showing increased retention of students.

While the Commission acknowledged the initiatives being considered and implemented by TIHE, and took note of the positive trend in retention rates, the Commission remains concerned that the history of TIHE's student achievement rates shows a long-term trend of below-benchmark graduation rates. The Commission considered TIHE's explanations and strategies for supporting and enhancing student graduation and employment for the school's programs. Although TIHE has outlined a comprehensive approach to address student needs, the school has been unable thus far to demonstrate successful student achievement across the school's programs and to bring the school's graduation and employment rates to a minimally acceptable level as required by accrediting standards.

The school's student achievement trends notwithstanding, the Commission determined that it is appropriate to provide the school with an additional opportunity to demonstrate the positive impact of the school's strategies on the reported rate of student achievement. However, the Commission reminds TIHE that if the school cannot demonstrate successful student achievement including graduation and employment rates that meet or exceed the Commission's established benchmarks, then the Commission will take appropriate action as afforded under *Section VII, Rules of Process and Procedure, Standards of Accreditation* to include withdrawing program approval or the school's accreditation. Based on the longstanding nature of its student achievement struggles, TIHE must seriously consider whether the school can offer its programs in a manner that will translate to successful student achievement for the student population served by the school.

Therefore, in order to afford TIHE with an opportunity to further develop its student achievement support strategies in the Computer Support Specialist program and the Patient Services Specialist program and to document the effectiveness of these strategies on the reported rates of student achievement, the Commission determined that further monitoring is warranted. Accordingly, the Commission directs the school to submit the following:

a. The school's student achievement improvement plans for the Computer Support Specialist (Certificate) and Patient Services Specialist (Certificate) programs specifically addressing any modifications or improvements implemented in the following areas:

   i. Admissions requirements and process;

   ii. Curriculum modifications;

   iii. Student Services; and

**Exhibit I - 35**

*Takoda Institute of Higher Education – Minneapolis, Minnesota*
*School #M072435*
*June 10, 2020*
*Page 4 of 7*

    iv.   Career services and employer engagement.

b.   Updated program viability studies for the Computer Support Specialist program and the Patient Services Specialist program to include the school's detailed analysis as to the viability of each program and evidence to support program viability. The school should evaluate current retention trends and employment trends and assess when the programs' student achievement rates are expected to meet ACCSC's benchmark rates.

c.   Written and detailed minutes of all PAC meetings held for all programs in 2020 that include:

    i.   A description of all members in attendance (i.e., titles and affiliations);

    ii.   The date, time, and location of the meeting;

    iii.   A comprehensive and clear description of the review and commentary made by the school representatives and the Program Advisory Committee members in compliance *with Section II (A)(6)(e), Substantive Standards, Standards of Accreditation* (the school is reminded that PAC review and comment activities must include all items outlined in *Section II (A)(6)(d), Substantive Standards, Standards of Accreditation*); and

    iv.   Evidence to demonstrate that the PAC has reviewed the school's new student achievement support strategies along with documentation of the PAC members' assessment as to the effectiveness of those strategies.

d.   Graduation and Employment Charts for the Computer Support Specialist (Certificate) and Patient Services Specialist (Certificate) programs using a **July 2020 Report Date**.

e.   Summary information for **each** Graduation and Employment Chart organized according to the corresponding **cohort start date** reported on the chart (line #1) as follows:

    i.   For each student start, provide the following information:

| Student ID | Program | Start Date | Graduation Date | Withdrawal/Termination Date |
|---|---|---|---|---|
| | | | | |

    ii.   For each student classified as "Unavailable for Graduation" (line #6), provide the following information:

| Student ID | Program | Start Date | Reason Unavailable | Description of the Documentation on File |
|---|---|---|---|---|
| | | | | |

    iii.   For each graduate classified as employed in the field[2] (line #14), provide the following information:

| Graduate ID | Program | Start Date | Employer, Contact, Address, & Ph. # | Date of Initial Employ. | Descriptive Job Title and Responsibilities | Source of Verification[3] (i.e., graduate or employer) |
|---|---|---|---|---|---|---|
| | | | | | | |

---

[2] See *Appendix VII – Guidelines for Employment Classification, Standards of Accreditation*.
[3] *Appendix VII (4) – Guidelines for Employment Classification, Standards of Accreditation* requires the school to verify the employment classification.

**Exhibit I - 36**

*Takoda Institute of Higher Education – Minneapolis, Minnesota*
*School #M072435*
*June 10, 2020*
*Page 5 of 7*

    iv. From the list in (iii.) above, for each graduate classified as employed in a training related field, that is "self-employed," provide the following:

| Graduate ID | Program | Start Date | Description of the Documentation on File |
|---|---|---|---|
| | | | |

    v. From the list in (iv.) above, for each graduate classified as employed in a training related field, that is "Career Advancement," provide the following:

| Graduate ID | Program | Start Date | Description of the Documentation on File |
|---|---|---|---|
| | | | |

    vi. For each graduate classified as "Graduates-Further Education" (line #11) or "Graduates-Unavailable for Employment" (line #12), provide the following information:

| Graduate ID | Program | Start Date | Classification on the G&E Chart | Reason | Description of the Documentation on File |
|---|---|---|---|---|---|
| | | | | | |

d.  Any additional information, **to include contemporaneous retention, graduation, or employment data**, that the school believes will be useful to the Commission in making a determination regarding the school's compliance with ACCSC's student achievement outcomes requirements.

In responding to this letter of Probation, TIHE must demonstrate to the Commission a likelihood that the new strategies implemented by the school will lead to acceptable graduation and employment rates. Additionally, TIHE must demonstrate as part of its response that the school has fully addressed the root causes (internal and external) surrounding the inability to demonstrate successful student achievement as measured via graduation rates and provide evidence of successful student achievement. Pursuant to *Section VII (R), Rules of Process and Procedures, Standards of Accreditation*, if the school fails to demonstrate successful student achievement, the Commission is likely to take a programmatic action to require the school to cease enrollment in a program or to suspend or revoke the approval of a program if that program fails to demonstrate acceptable rates of student achievement. The Commission may also take further institutional action to include continuing the school on probation or a withdrawal of accreditation action.

## ADMINISTRATIVE PROFESSIONAL AND DIGITAL OFFICE PROFESSIONAL PROGRAMS:

The Commission noted that the Administrative Professional and Digital Office Professional programs are in teach-out status and directs TIHE's continued attention toward ensuring that the school continues to support student success through the offering of student, academic, and career services to students enrolled in these programs through the programmatic teach-out process.

## PROBATION REQUIREMENTS:

In cases where the Commission has reason to believe that a school is not in compliance with accreditation standards and other requirements, the Commission may, at its discretion, place a school on Probation. A school subject to a Probation Order must demonstrate corrective action and compliance with accrediting standards. Failure of the school to demonstrate that accrediting requirements have been met by the due date as set forth herein may result in a revocation of program approval or withdrawal of accreditation.

The Commission will not consider substantive changes, a change of location/relocation, or additions (i.e., separate facilities, new programs) to a school or its separate facilities while the school is on Probation. However, a school that is subject to Probation may seek the Commission's approval for the transfer of

**Exhibit I - 37**

*Takoda Institute of Higher Education – Minneapolis, Minnesota*
*School #M072435*
*June 10, 2020*
*Page 6 of 7*

accreditation that would result from a change of ownership as described in *Section IV, Rules of Process and Procedure, Standards of Accreditation.*

In accordance with *Section X, Rules of Process and Procedure, Standards of Accreditation*, a summary of the Probation Order is made public and provided to the U.S. Department of Education, appropriate State agencies, and appropriate accrediting agencies. Moreover, in accordance with *Section X (C)(6), Rules of Process and Procedure, Standards of Accreditation,* the Commission has notified the U.S. Department of Education of this action pertaining to the findings related to the school's federal financial aid responsibilities.

In accordance with *Section VII (L)(8), Rules of Process and Procedure, Standards of Accreditation*, a school subject to a Probation Order must inform current and prospective students that the school has been placed on Probation and that additional information regarding that action can be obtained from the Commission's website.

**MAXIMUM TIMEFRAME TO ACHIEVE COMPLIANCE:**

As stated in *Section VII (M), Rules of Process and Procedures, Standards of Accreditation*, where the Commission has found an area in which a school is out of compliance with accreditation standards or requirements, the period allotted to the school to remedy the noncompliance or cure the deficiency, together with the time for the Commission's final decision, will not exceed eighteen months if the school's longest program is at least one year, but less than two years in length;. Accordingly, the maximum eighteen month timeframe for TIHE to achieve compliance began as of the December 5, 2019 Probation letter. Please also be advised that the Commission is under no obligation to wait for the maximum timeframe to expire and may take an adverse action prior to the expiration of the maximum allowable timeframe if the school's response demonstrates an increasingly deteriorating financial position and lack of financial soundness.

**RESPONSE REQUIREMENTS:**

By applying for accreditation, a school accepts the obligation to demonstrate continuous compliance with the *Standards of Accreditation*. While the Commission employs its own methods to determine a school's compliance with accrediting standards, the burden rests with the school to establish that it is meeting the standards. The Commission's deliberations and decisions are made on the basis of the written record and thus a school must supply the Commission with complete documentation of the school's compliance with accrediting standards.

TIHE must provide a response to the items expressed above that provides the information requested along with any additional information that the school believes supports a demonstration of compliance with accrediting standards.[4] If the school's response contains documentation that includes personal or confidential student or staff information that is not required for the Commission's review (e.g., social security numbers, dates of birth, etc.), please remove or redact that information.

TIHE must upload the school's electronic response directly to ACCSC's College 360 Database. The ACCSC College 360 database can be accessed by <u>clicking here.</u> Please note that the password utilized by

---

[4] ACCSC has issued two modules of the **Blueprints for Success** – Organizing an Effective Electronic Submission and Preparing a Comprehensive Response for Commission Consideration – which provide a framework for submitting a well-documented, organized, electronic response for Commission consideration. ACCSC encourages the school to review these modules when formulating its response to this letter. More information is available in the Resources section at www.accsc.org.

**Exhibit I - 38**

*Takoda Institute of Higher Education – Minneapolis, Minnesota*
*School #M072435*
*June 10, 2020*
*Page 7 of 7*

the institution to access the Annual Report Portal is the same to access the School Submission section of the College 360 database. The Instructions for Electronic Submission can be found here. A detailed overview on how to upload a school submission can be found here.

Keep in mind, the school's response must be prepared in accordance with ACCSC's Instructions for Electronic Submission (e.g., prepared as one Portable Document Format ("PDF") file that has been prepared using Adobe Acrobat software (version 8.0 or higher) and which has a .pdf extension as part of the file name). The school will receive an e-mail confirmation that the file has been received within 24 hours of the submission.

The school's response must also include a signed certification attesting to the accuracy of the information and be received in the Commission's office **on or before September 24, 2020**. If a response, the required fee[5], and the certificate of attesting to the accuracy of the information is not received in the Commission's office **on or before September 24, 2020**, the Commission will consider further appropriate action.

For assistance with the password or for any other questions regarding the electronic submission requirements, please contact ███████████████████████████. Please note that any password requests to access College 360 must be made by the school director, or designated member of the school's management team, via e-mail.

For further assistance or additional information, please contact ████████████████████ or ████████████████.

Sincerely,

███████████████████████

Michale S. McComis, Ed.D.
Executive Director

---

[5] ACCSC assesses a $1,000 processing fee to schools placed on Probation.

**Exhibit I - 39**

# Exhibit J

# ACCSC
Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
**www.accsc.org**

October 26, 2020[1]

**ELECTRONIC DELIVERY**
eric.juhlin@collegeamerica.edu

Eric Juhlin
Chief Executive Office
Center for Excellence in Higher Education
4021 South 700 East, Suite 400
Salt Lake City, Utah 84107

- Center for Excellence in Higher Education
- CollegeAmerica ("CA-Denver") – Denver, Colorado (#M001507)
- CollegeAmerica ("CA-Fort Collins") – Fort Collins, Colorado (#B070544)
- CollegeAmerica ("CA-Colorado Springs") – Colorado Springs, Colorado (#B070623)
- All Other CEHE affiliated ACCSC-Accredited Institutions

Dear Mr. Juhlin:

In August 2017, the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") informed the Center for Excellence in Higher Education and the specific campuses listed above ("CEHE," "CollegeAmerica," or "the Defendants") that the Commission would monitor a complaint filed by the Colorado Attorney General's Office against CEHE. On or about August 22, 2020, ACCSC became aware of a ruling by the District Court, City and County of Denver, State of Colorado ("District Court"), in favor of the state of Colorado and against the Defendants, jointly and severally, to include $3,000,000.00 for civil penalties under the Colorado Consumer Protection Act ("CCPA"), and injunctive relief under the CCPA and Uniform Consumer Credit Code ("UCCC"). As explained more fully below, the District Court's findings raise very serious questions about CEHE's compliance with the Commission's accreditation standards and policies in concert with the concerns set forth in the Probation Order currently in effect for the system of schools owned and operated by CEHE.

ACCSC understands, as stated in the *Findings of Fact, Conclusions of Law, and Judgment*, that the Colorado Attorney General's Office case was not brought pursuant to any federal law or regulation or any accrediting standard, but rather under two of the state of Colorado's consumer protection statutes, the CCPA and the UCCC. There are several issues raised by the District Court's decision that warrant examination by ACCSC as CEHE's designated institutional accrediting body given that a) the District Court found the Defendants to have violated Colorado state law; b) several of the District Court's findings fall directly under accreditation requirements to which CEHE is required to show compliance as ACCSC-accredited institutions; and c) CEHE's schools are currently on Probation with ACCSC.

The following are other areas of concern raised by the District Court's decision that call into question CEHE's compliance with ACCSC's accrediting standards.

## Management

ACCSC-accredited institutions must demonstrate that all owners, members of school management, and administrative employees have past records that demonstrate a commitment to ethical, fair, and honest practice as well as compliance with accrediting standards and applicable federal, state, and local

---

[1] Corrected copy to reflect CEHE's August 31, 2020 notice to ACCSC regarding the District Court's decision.

**Exhibit J - 1**

JA274

*Center for Excellence in Higher Education – Salt Lake City, Utah*
*October 26, 2020*
*Page 2 of 7*

requirements (*Section I (A)(2)(b & c), Substantive Standards, Standards of Accreditation*). In this regard, the following conclusions by the District Court are of particular note:

- "Defendants (Carl) Barney and (Eric) Juhlin are personally liable, jointly and severally, with CEHE for the school's violations of the CCPA and UCCC because they directed and participated in the conduct of CEHE that gave rise to CEHE's violations of the CCPA and UCCC" (#707, pg. 147).

- "Defendant Barney was essentially the architect of CollegeAmerica's advertising and admissions processes and the school's institutional loan – the very core of the state's claims" (#708, pg. 147).

- "Defendant Barney provided specific direction concerning advertisements and sometimes drafted headlines and content of ads that represented wage and employment outcomes" [and b]y reviewing and approving all advertisements, Barney sanctioned the illegal conduct" (#709, pg. 148).

- "At all times, Defendant Barney was aware that graduates of CollegeAmerica were not making the salaries advertised" (#710, pg. 148).

- "After being hired as the CEO in 2010, Defendant Juhlin also reviewed and approved all CollegeAmerica advertisements. At the same time, Juhlin was aware that graduates of CollegeAmerica were not making the salaries advertised. Juhlin also was aware of the admissions process, as he attended and participated in the training of admissions staff. There is no evidence that Juhlin substantially changed any of the advertising or admissions policies established by Barney even though he could have done so as the CEO" (#712, pg. 148).

These specific conclusions by the District Court (as well as others), indicate that CEHE may be out of compliance with *Section I (A)(2)(b & c), Substantive Standards, Standards of Accreditation* as long as Carl Barney and Eric Juhlin are employed in a management capacity or in a position where they would participate in or oversee submissions of information to ACCSC.

**Recruitment/Admissions**

According to *Section IV (A)(1), Substantive Standards, Standards of Accreditation*, a school's recruitment efforts must focus on attracting students who are qualified and likely to complete and benefit from the education and training provided by the school and not simply obtaining enrollments. *Section IV (A)(2), Substantive Standards, Standards of Accreditation* states that a school's recruitment efforts are required to describe the school to prospective students fully and accurately and follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure. ACCSC noted that the state of Colorado contended that CollegeAmerica conducted its "16 Steps" admissions process in a rushed manner, with the objective of enrolling and "packaging" a prospective student with a financial package in a single day. With regard to this allegation, ACCSC noted that the District Court found that a preponderance of the evidence, in both CollegeAmerica's documents and the testimony of its admissions counselors and financial planners, supports this contention. ACCSC also noted that in an example cited by the District Court, the schools' Admissions Manual's section on "closing techniques" urges a closing even over objection by the prospective student:

> *Close even after resistance. When a prospective student says 'no" his or her mind is temporarily closed and off balance, but a close is still possible. By resolving the problem or answering the question, you can close after resistance. Ask: "What's preventing you from enrolling today?" Overcome objections and close again.*

**Exhibit J - 2**

*Center for Excellence in Higher Education – Salt Lake City, Utah*
*October 26, 2020*
*Page 3 of 7*

In regard to recruitment, of importance to ACCSC are the following conclusions, *inter alia*, reached by the District Court that:

- "CollegeAmerica has knowingly taken advantage of the inability of at least some consumers reasonably to protect their interests by reason of physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors" (#690, pg. 143).

- "The admissions process did not appear to be focused on guiding prospective students, at least not in an attempt to protect their best interests, but rather with simply enrolling them, and 'packaging' them with a financial aid package, all within a single day." Admissions consultants were trained extensively on how to deal with a prospective student's 'objections,' and achieving a 'close,' even after a student had expressed doubt about the wisdom of going forward" (#692, pg. 144).

These findings by the District Court are of particular concern given that ACCSC notified CEHE in a September 6, 2018 Probation Order, that:

> *...the record shows that the inputs, resources, and processes of CEHE schools are designed and implemented in a manner that is not designed for student success. CEHE's advertising and recruitment tactics coupled with a poorly documented admissions process has fostered the creation of a student population that the schools are ill-prepared to educate.*

The Commission's standards for student recruitment have long purported that a "school's recruitment efforts must attract students who are qualified and likely to complete and benefit from the education and training provided by the school and not simply to obtain enrollments"[2] and most recently stated as "[t]he recruitment practices of accredited schools should focus not on simply obtaining student enrollment numbers, but on creating a student body of individuals who are qualified and likely to benefit from the education and training objectives and to achieve success.[3] The District Court's findings with respect to CEHE's recruitment practices directly raise questions about CEHE's compliance with ACCSC's student recruitment standards found under *Section IV, Substantive Standards, Standards of Accreditation*.

<u>Accuracy of Information Provided to ACCSC</u>

ACCSC-accredited institutions must supply the Commission with complete, truthful, and accurate information and documentation showing the school's compliance with all accrediting standards. The Commission places a high level of reliance upon information, data, and statements provided by a school and the integrity and honesty of a school are fundamental and critical to the accreditation process. A compromise of integrity is considered to be an extreme offense (*Introduction* to the *Standards of Accreditation*). *Section I (G)(1), Rules of Process and Procedure, Standards of Accreditation* lists the obligations of the school to maintain eligibility for accreditation. Specifically, by applying for and/or receiving accreditation, a school accepts the obligation to demonstrate continuous compliance with the *Standards of Accreditation*. While the Commission employs its own fact-finding methods to determine a school's compliance with accrediting standards, the burden rests with the school to establish that it is meeting the standards. Moreover, the Commission's deliberations and decisions are made on the basis of the written record of an accreditation review. Accordingly, a school must supply the Commission with complete, truthful, and accurate information and documentation showing the school's compliance with all accrediting standards if the school is to maintain accreditation. Based upon a reading of the District Court's decision, it appears that CEHE may have failed to meet these requirements.

---

[2] *Section IV, Statement of Purpose, Substantive Standards, Standards of Accreditation* – language in effect from College America's date of initial application for accreditation through June 30, 2020.
[3] *Section IV, Statement of Purpose, Substantive Standards, Standards of Accreditation* – language in effect as of July 1, 2020.

**Exhibit J - 3**

*Center for Excellence in Higher Education – Salt Lake City, Utah*
*October 26, 2020*
*Page 4 of 7*

 As explained in the District Court's decision, the state of Colorado retained an expert to audit the schools' backup documentation that ostensibly supported the employment rates reported to ACCSC in the years 2009 to 2012 and 2015 to determine whether the schools reported employment rates in accordance with ACCSC's standards. The District Court found the state's expert analysis "credible and helpful to an understanding of the accuracy of CollegeAmerica's reporting of its graduation and employment rates, especially the charts on which his results were depicted relative to CollegeAmerica's calculations and the ACCSC's benchmarks" (#224, pgs. 45-46).

While CEHE disagreed with the state's expert witness' methodology, the witness concluded that CollegeAmerica's applied methodology to report employment rates was "inconsistent with ACCSC's standards and the guidelines set forth in the January 5, 2011 *Accreditation Alert* and that as a result, the Defendants actual employment rates were lower than those reported to ACCSC and ultimately disclosed to consumers" (#226, pg. 46). Moreover, the District Court found it implausible that "CollegeAmerica actually misunderstood its obligation to properly document its employment placement decisions for over five years between January, 2011 and mid-2016" (#229, pg. 47).

In addition, the District Court found that CEHE's Vice President of Academics admitted that while CollegeAmerica was required to follow ACCSC's *Guidelines for Employment Classification*, "she would count self-employed students as employed in the field even when Defendants did not meet the documentation requirements of ACCSC's guidelines for employment classification" (#259, pg. 51). This is contrary to the expectation set forth in the ACCSC's *Guidelines* that "[o]f crucial importance is that the school is responsible for justifying, with documentation, every graduate classified as employed." In this regard, the District Court found that, "Defendants' knowingly violated ACCSC's Standards when they reported these graduates as employed in field" (#278, pg. 54).

Of importance to ACCSC are the following conclusions, *inter alia*, reached by the District Court:

- "Defendants engaged in a series of deceptive trade practice by knowingly inflating employment rates of their degree programs and reporting and disclosing those inflated rates to ACCSC and prospective students in an effort to maintain CollegeAmerica's accreditation and induce students to enroll" (#607, pg.123).

- "Defendants also falsely represented that their employment rates were calculated in accordance with ACCSC Standards" (#609, pg. 124).

- "Defendants knowing failure to follow ACCSC Standards had the effect of substantially increasing their degree programs' employment rates, which were then disclosed to consumers. Defendants then used the inflated employment rates to induce consumers to enroll" (#612, pg. 124).

- "Defendants failed to follow ACCSC's Standards, including the Guidelines for Employment Classification, in numerous ways including failing to obtain proper documentation before reporting graduates as employed in field, reporting graduates as employed in field when they were actually employed in an unrelated occupation, and improperly classifying graduates as exempt/unavailable for employment" (#610, pg. 124).

- "Defendants withheld the material facts that their graduates were not obtaining jobs in their fields of study and that Defendants did not follow ACCSC guidelines in calculating their employment rates" (#614, pgs. 124-125).

**Exhibit J - 4**

*Center for Excellence in Higher Education – Salt Lake City, Utah*
*October 26, 2020*
*Page 5 of 7*

The decision of the District Court and the specific findings of the District Court as recited above coupled with the potential impact this decision on CEHE's ability to maintain accreditation is of great concern to ACCSC. In order to provide CEHE with an opportunity to respond to ACCSC's concerns arising from the District Court's decision, ACCSC directs CEHE to provide the information set forth below. The submission will be reviewed by the Commission in conjunction with the Probation Order currently in force.

Based on the foregoing, the Commission directs CEHE to submit the following:

a. An explanation as to how, in light of the District Court's decision, CEHE and specifically the Board of Directors has determined that Carl Barney and Eric Juhlin have past records that demonstrate a commitment to ethical, fair, and honest practice as well as compliance with accrediting standards and applicable federal, state, and local requirements (*Section I (A)(2)(b & c), Substantive Standards, Standards of Accreditation*);

b. With regard to the CEHE Board of Directors:

   i. A list of the current Board of Directors with a description as to how each member is qualified to fulfill his/her role on the Board;

   ii. A description of the scope of authority that the Board of Directors has with regard to the operations of CEHE and the individual schools; and

   iii. A copy of CEHE's Bylaws and Articles of Incorporation;

c. Copies of Board of Directors meeting minutes that have discussed the schools' compliance with accrediting standards as well as the District Court's findings, conclusions, and actions;

d. A description of any independent investigation undertaken by CEHE or the Board of Directors with regard to ACCSC's Probation Orders or the District Court's findings as well as the results of such investigation(s) as may be available;

e. A description of any changes directed by the Board of Directors with regard to leadership, management, and administrative oversight in light of the District Court's findings, conclusions, and actions in keeping with the Duty of Care, Duty of Loyalty, and Duty of Obedience that each Trustee has to CEHE;

f. An attestation from each member of the Board of Directors indicating that s/he has read and understands the series of Probation letters issued by ACCSC, the District Court's decision, and this letter;

g. An explanation as to how CEHE has determined that each school reports its employment rates in accordance with ACCSC's *Standards of Accreditation* and *Guidelines for Employment Classification*, addressing the District Court's determinations in the following areas:

   i. The "implausibility" that CEHE actually misunderstood its obligation to properly document its employment placement decisions for over five years between January, 2011 and mid-2016;

   ii. CEHE's knowing failure to follow ACCSC *Standards;* and

   iii. The District Court's determination that CEHE's Vice President of Academics admitted that while CEHE was required to follow ACCSC's Guidelines for Employment Classification that she would count self-employed students as employed in field even when CEHE did not meet the documentation requirements in the ACCSC's guidelines for employment classification;

h. An explanation as to how each ACSC-accredited school's admissions process permit prospective students to make informed and considered enrollment decisions without undue pressure given the District Court's finding that CEHE's admissions process did not appear to be focused on guiding

**Exhibit J - 5**

*Center for Excellence in Higher Education – Salt Lake City, Utah*
*October 26, 2020*
*Page 6 of 7*

prospective students, at least not in an attempt to protect their best interests, but rather with simply enrolling them, and "packaging" them with a financial aid package, all within a single day;

i.   An explanation of the schools' practice of counting self-employed students as employed in field even when CEHE does not possess the documentation requirements in the ACCSC's Guidelines for Employment Classification; and

j.   A summary of any changes to personnel or operating policies made as a result of the District Court's decision against CEHE.

**RESPONSE REQUIREMENTS:**

By applying for accreditation, a school accepts the obligation to demonstrate continuous compliance with the *Standards of Accreditation*. While the Commission employs its own methods to determine a school's compliance with accrediting standards, the burden rests with the school to establish that it is meeting the standards. The Commission's deliberations and decisions are made on the basis of the written record and thus CEHE must supply the Commission with complete documentation of the school's compliance with accrediting standards.

CEHE must provide a response to the items expressed above that provides the information requested along with any additional information that the school believes supports a demonstration of compliance with accrediting standards. If the school's response contains documentation that includes personal or confidential student or staff information that is not required for the Commission's review (e.g., social security numbers, dates of birth, etc.), please remove or redact that information.

CEHE must upload the school's electronic response directly to ACCSC's College 360 Database. The ACCSC College 360 database can be accessed by clicking here. Please note that the password utilized by the institution to access the Annual Report Portal is the same to access the School Submission section of the College 360 database. The Instructions for Electronic Submission can be found here. A detailed overview on how to upload a school submission can be found here.

Keep in mind, the school's response must be prepared in accordance with ACCSC's Instructions for Electronic Submission (e.g., prepared as one Portable Document Format ("PDF") file that has been prepared using Adobe Acrobat software (version 8.0 or higher) and which has a .pdf extension as part of the file name). The school will receive an e-mail confirmation that the file has been received within 24 hours of the submission.

The response must also include a certification attesting to the accuracy of the information signed by the CEHE CEO, Chair of the Board of Directors, and each member of the CEHE Board of Directors. The response must be received in the Commission's office **on or before December 30, 2020.** If a response is not received in the Commission's office **on or before December 30, 2020,** the Commission will consider further appropriate action.

For assistance with the password or for any other questions regarding the electronic submission requirements, please contact Maurice Gatewood at mgatewood@accsc.org or 703.247.4525. Please note that any password requests to access College 360 must be made by the school director, or designated member of the school's management team, via e-mail.

**Exhibit J - 6**

*Center for Excellence in Higher Education – Salt Lake City, Utah*
*October 26, 2020*
*Page 7 of 7*

For further assistance or additional information, please contact me directly at mccomis@accsc.org.

Sincerely,

Michale S. McComis, Ed.D.
Executive Director

**Exhibit J - 7**

# Exhibit K

    

## Introduction

The Accrediting Commission of Career Schools and Colleges ("ACCSC" or "Commission") asked Center for Excellence in Higher Education ("CEHE") on October 26, 2020 for information about the decision in *State of Colorado, et al. v. Center for Excellence in Education, et al*. ("Decision," provided as **Resp. Ex. 1**). Specifically, the Commission indicated that some findings called into question CEHE's compliance with ACCSC accrediting *Standards*.

As discussed below, the Decision presents a revisionist history of issues resolved long ago through the accreditation process. All the material facts developed at trial have been known to Commission for some time.[1]  And in many respects, the Decision takes examples of the iterative accreditation process working as evidence of improper intent.  Nothing could be further from the truth. The district court ("Court") has erred and is wrong because it fundamentally misunderstood the relationship between students and accredited schools and the roles both parties play in obtaining learning and workforce outcomes.  Finally, the Court, in its Decision, concluded that CEHE owes a duty to consumers that is highly capacious: that the use of clear and properly cited Bureau of Labor Statistics ("BLS") salary and job outlook information is misleading because BLS data is not based exclusively on the experiences of the college's own graduates.

The Commission rejects this position, both in the language of its *Standards* and in its historical evaluation of member institutions including CollegeAmerica and CEHE's other colleges. For the Commission to alter its position now, on the same advertisements and practices it previously reviewed, would constitute an impermissible and retroactive application of new substantive standards.  Even more concerning, if the Commission altered its well-established position now, as a result of this Decision, it would immediately place a large segment of its member institutions in violation of accreditation *Standards*.  The Commission's October 26th letter suggests that CEHE's accreditation is now at risk based on practices that CEHE no longer follows and which it had every reason to believe complied with ACCSC *Standards* at the time, and more importantly, comply currently with the Commission's *Standards*.

Compounding a misunderstanding of the accreditation process, the judge in the case, Judge Buchanan, has clearly demonstrated that he was neglectful and inattentive to the evidence presented

---

[1] *See, e.g.*, **Resp. Ex. 2** (June 22, 2011 ACCSC Team Summary Report ("TSR") following unannounced visit to SHC-Murray). Although not CollegeAmerica-specific, the Commission set up a special task force to evaluate recruitment, advertising, and admissions practices following release of the Government Accountability Office's 2010 report on for-profit marketing practices. Based on the TSR and CEHE's response, the Commission was aware of, among other things, CEHE's (1) payment of retention bonuses to Admissions Consultants (which ceased as of July 1, 2011); (2) placing Admissions Consultants on Performance Improvement Plans for not meeting minimum performance expectations; (3) use of enrollment goals; (4) admissions consultant manual, which includes sales strategies; and (5) then-current advertising.

at trial. Unlike the Commission, which timely reviewed the same underlying practices and
advertisements, Judge Buchanan began his review years after the fact and did not issue his Decision
until almost three years after the trial in this matter ended[2]. Shockingly, the judge has even admitted
his inattentiveness to the evidence in open court when he recently conceded that as a result of his
extreme delay, he simply used the State's proposed findings of fact and conclusions of law as the
template for his Decision.

Whole sections of the judge's Decision—including nearly every word on personal liability
for Carl Barney and Eric Juhlin—comes verbatim from the State's proposed findings, which
obviously reflect the State's preferred assessment of its own case. As a result, this Decision adopted
tenuous legal theories and ignored critical evidence from those with first-hand knowledge of the
accreditation process.

Additionally, Judge Buchanan's core conclusion that a college's use of national wage data is
misleading imposes staggering liability on colleges across the country that provide BLS data to
consumers—a generally accepted practice among ACCSC-accredited institutions. Judge Buchanan
reached this novel conclusion without the benefit of the Commission's experience reviewing
college advertisements, which confirms the widespread use of national wage data in a fashion
similar to CollegeAmerica. In fact, ACCSC's *Standards expressly* prohibit institutions from using
anything *but* BLS-type statistics in advertisements involving potential salaries. *Section IV(b) of the
Substantive Standards* ("School personnel, advertisements, and promotional materials may only
provide information pertaining to potential salary that accurately portrays the normal range and
starting salaries in the occupation for which training is provided. Salary information must also
include the source of the information, which is valid.")

Finally, considering the level of oversight the Commission has maintained over CEHE's
employment verification practices over the years, there is no basis to say now that those past
practices amounted to "knowing" violations of ACCSC *Standards* when they occurred.  Judge
Buchanan's findings relative to employment verification rest <u>*entirely*</u> on the opinion of the State's
purchased "expert".  This proffered expert opined that CollegeAmerica's verification documents
failed to comply with ACCSC requirements.  However, upon further examination, the purported
expert admitted to having <u>no prior experience interpreting or applying ACCSC *Standards*</u>.

The documentation reviewed by the so-called expert was the same documentation made
available to the Commission in numerous site visits and other responses.  While the Commission's
review of those documents may have periodically raised isolated questions about certain
verification practices, as part of the iterative accreditation process, those issues were resolved by the

---

[2] The trial in this matter ended in November 2017 and the judge's Decision was issued on August
21, 2020.

**Exhibit K - 2**

JA283

institution in collaboration with ACCSC.  Otherwise, the Commission accepted CEHE's verification documents without raising any objections.

Judge Buchanan's ruling that CollegeAmerica "knowingly" failed to properly document graduate employment even goes so far as to call into question the Commission's oversight capabilities.  Whereas Judge Buchanan seems to think that there was misconduct by CollegeAmerica that went undetected by the Commission, CEHE knows that the Commission (and third-party independent auditors) periodically reviewed CEHE's verification documents and did not find widespread failure to properly document graduate employment.  To be absolutely clear, there is no evidence, in this case or otherwise, that CEHE ever "knowingly" presented inaccurate information to the Commission, and CEHE rejects any claims to the contrary.

For these and other reasons developed more fully below, the Commission is obligated to independently assess the evidence and arguments to determine if CEHE is *currently* in compliance with ACCSC *Standards*. Because the Court's Decision does not add to ACCSC's own supervision over the years, the Commission should not engage in a historical inquiry.  And, because this matter has not been fully adjudicated, the Commission should defer any consideration or potential reaction until CollegeAmerica's appeal of this erroneous Decision is exhausted.  By doing so, the Commission can ensure that CEHE's constitutional due process rights are protected and respected.

## <u>Response</u>

### I.    The Commission's duty is to independently assess CEHE's current compliance with the *Standards*.

The Commission must assess only whether CEHE is currently in compliance. Because the Decision addresses past practices, it sheds no light on that inquiry.  Further, CEHE's responses below illustrate the many ways in which the Decision is flawed due to basic misinterpretations of fact and the Court's failure to understand the accreditation process.  While these errors are deeply troubling, Judge Buchanan's own admissions about the failings of his deliberative process make them expected.

ACCSC previously reviewed the conduct alleged in the Colorado litigation through its own processes and procedures, often contemporaneously with when the alleged conduct was occurring. Judge Buchanan did not.  In fact, Judge Buchanan conceded that he had difficulty grasping the issues involved in the case and therefore resorted to copying the State's findings. Indeed, the judge's Decision borrows heavily—on many occasions word for word—from the State's findings. **Resp. Ex. 3** (Comparison of State's Proposed Findings).

This is not mere speculation.  After two-and-a-half years without a decision, the Colorado Commission on Judicial Discipline ("CCJD") admonished Judge Buchanan to enter his decision by April 17, 2020.  He failed to do so.  The CCJD subsequently set a hearing for its August 21, 2020

**Exhibit K - 3**

JA284

meeting to consider the continued delay, but Judge Buchanan submitted his Decision at 4:46 am that morning—almost three years after the conclusion of the trial.

The scope and complexity of the Colorado case overwhelmed Judge Buchanan. He acknowledged difficulty synthesizing the record in a timely fashion and, as a result, adopted the State's findings of fact and conclusions of law as the template for his decision. **Resp. Ex. 4** at 70 (Excerpt from Transcript of December 2, 2020 Hearing on post-trial motions). While borrowing some language from a party's proposed findings is understandable, such heavy copying is heavily disfavored for obvious reasons. First among those reasons is that it calls into question whether the decision actually reflects the Court's independent judgment. For that reason, Colorado appellate courts give little weight to factual findings copied verbatim from parties' filings. So too, the Commission should take a careful look into the evidence and beyond the Court's Decision—especially as it relates to CEHE's compliance with ACCSC *Standards*.

Moreover, the Decision rests solely upon the application of two Colorado statutes and does not claim to be an interpretation of ACCSC *Standards* or the application of ACCSC *Standards* to CollegeAmerica's conduct.  The case is also limited to activities taking place in Colorado.  This highlights important distinctions between the adjudicative process at trial and ACCSC's oversight role in the accreditation process.  The Court specifically noted its limited scope, writing that "*this case is not brought pursuant to any federal law or regulation, or any accrediting standard, but rather under two of Colorado's consumer protection statutes, the CCPA and the UCCC.*"  **Resp. Ex. 1** at 7. Conversely, ACCSC's Executive Director, Michale McComis, testified that ACCSC reviews accredited institutions under its accreditation *Standards*, not under state law. *See* **Resp. Ex. 5** at 318 (Excerpt of Feb. 15, 2017 Deposition of M. McComis) (explaining that site teams evaluate schools under the *Standards of Accreditation*).

As stated previously, the Commission must make an independent assessment of CEHE's current compliance. Past issues that have been resolved through the accreditation process do not gain new life based on the Court's after-the-fact review. The past conclusions ACCSC reached about CEHE's operations and outcomes, based on its own review of the same operative facts, should stand.  If the Commission were to now jettison all of that work and simply adopt the findings from a Colorado court, it would be holding CEHE to a different standard than other member institutions (i.e., those institutions would be given the opportunity to remedy any noncompliance before the Commission took probationary or adverse action).  And by doing so, the Commission would risk running afoul of U.S. Department of Education rules, specifically, 34 C.F.R. 602.18(a) ("The agency must consistently apply and enforce standards…."). CEHE has already changed practices at issue in the Colorado case, but it cannot change the past.  Adverse action now, based on past practices, would be a marked departure from ACCSC's long-established practices.

Lastly, the Commission must take into consideration the fact that CEHE has appealed the judge's Decision to the Colorado Court of Appeals.  As discussed below, Judge Buchanan's opinion

is flawed in many respects, and CEHE is confident in a reversal. If the Commission intends to elevate this Decision over its own documented history with CEHE, it should at least wait until CEHE has had the opportunity to fully vindicate its rights through the appeals process.

## II.    The core of the Court's decision rests on the novel and unsupported theory that the use of national wage data is deceptive.

In large measure, the Court's decision rests on the notion that truthfully advertising national wage data (mostly BLS) is deceptive. Importantly, the Court did not find that CollegeAmerica misstated BLS data, failed to provide a proper citation for BLS data, or that any student was misled by BLS data. Each of the advertisements at question in the trial clearly disclosed the source for the cited national wage data and, in nearly every instance, included links inviting prospective students to investigate for themselves. The Court even went so far as to acknowledge that several claims CollegeAmerica made are used "*frequently by numerous sources within the education industry, including by the [Department of Education].*" Resp. Ex. 1 at 14, ¶ 39 (emphasis added).

The Court's view that the use of BLS data is misleading or deceptive is an extreme outlier. BLS statistics are widely accepted and relied upon by higher education policy makers at the state and federal level, as well as throughout the private sector. The Court failed to appreciate the weight of that consensus or how it affected the college's advertising practices. *See, e.g.,* Tr. Ex. R at 228-32, 235 (Diane Auer Jones) (describing the use of BLS data as a safe zone for colleges); Tr. Ex. I at 104-06 (C. Barney) (explaining that CollegeAmerica used ideas drawn from college advertisements highlighted in industry magazines); Tr. Ex. S at 78 (E. Juhlin) (explaining that the common practice of using BLS data gave CollegeAmerica confidence in its advertisements). Note: in the preceding sentence (and further in this response), CEHE will periodically provide an exhibit that is a segment or portion from the trial transcript in the matter of *State of Colorado v CollegeAmerica*[3]. However, to ensure the completeness of this response, CEHE is also providing Resp. Ex. FULL, which is a copy of the full trial transcript and exhibits. In the interest of transparency, we have withheld limited portions of the trial testimony and three exhibits that are subject to a Protective Order in the case. Out of an abundance of caution, CEHE is withholding these materials from its Response to avoid potential violations of that Order. CEHE does not believe that materials are relevant to the issues raised in the Commission's request. Nonetheless, should the Commission want to discuss this further, we will make outside counsel available.

It is clear from the Court's Decision—though more so from the trial itself—that the Court struggled to make sense of the Department of Education's efforts to design and implement gainful employment regulations. With respect to the Court, it reached for guidance into an area of policymaking—not law. Setting out how to compare programs across schools is a matter of tradeoffs and requires judgment developed from years of experience. That the Department of

---

[3] District Court, City and County of Denver, State of Colorado Case No. 14CV34530.

Education ("Department") initially settled on using school-specific earnings information, rather than BLS data, does not mean that using BLS data is deceptive. So, when the Court questioned the use of BLS data, by reference to the Department's design of the gainful employment regulations, it missed what was relevant to the lawsuit. **Resp. Ex. 1** at 106.

While it is true that the Department thought BLS data failed to provide the specific comparison the Department aimed to achieve through the gainful employment regulations, the Department reiterated that it was reasonable to use BLS data for "consumer information purposes." *See* **Tr. Ex. 974** at 4 (Excerpt from 79 Fed. Reg. 64942 (Oct. 31, 2014)). In fact, the Department, more recently, explained why BLS data, rather than the gainful employment earnings data, might actually prove more helpful to prospective students than the prior gainful employment data. *See* **Resp. Ex. 6** (Excerpt from 84 Fed. Reg. 49788, 49810 (Sept. 23, 2019)) ("BLS data is helpful because a student is generally interested in earnings over the course of a career, and not just a few years after completion of the program.").

The Department's judgment reflects the consensus view long held within the higher education industry. Indeed, even back in 2010, when the Government Accountability Office reported the results of its undercover testing of for-profit college marketing practices, it held out citing BLS data as an example of providing accurate and helpful information by college personnel. **Resp. Ex. 7** (Excerpt from GAO-10-948T).[4]

Consistent with that view, Colorado colleges almost uniformly use BLS data in their advertisements. During the trial, College America demonstrated to the Court that this was true for 4-year public universities, 4-year private universities, public community colleges, and private career colleges. *See* **Tr. Ex. 3517**. And since those colleges, like CEHE, largely rely on BLS data to provide consumers helpful information about career earnings, they likewise advertise national wages exceeding their own 9-year and 10-year median salaries as reported on the College Scorecard. *See* **Tr. Ex. 3519**. More broadly, the trial testimony uniformly confirmed the industry-wide use of BLS data in higher education advertising. *See, e.g.*, **Tr. Ex. C** at 299-302 (L. Goldhammer) (testifying that each of the 6 colleges where she worked in admissions followed the same practice of using BLS data and not disclosing school-specific data through the admissions

---

[4] In direct response to that GAO Report, the Commission "established a special Task Force to evaluate recruiting, advertising, and admissions practices at its accredited institutions." **Resp. Ex. 2** at 7 (June 22, 2011 TSR following unannounced visit to SHC-Murray). That task force conducted an unannounced visit of Stevens-Henager College's Murray campus. *See Id.* In other words, in direct response to federal concerns about deceptive marketing at for-profit colleges, the Commission reviewed Stevens-Henager's admissions, recruiting, and advertising practices. In doing so, the Commission reviewed the same practices that the Colorado court reviewed years later, including the AC Manual, admissions compensation, advertising, and more. *See Id.* at 7-11.

office); **Tr. Ex. R** at 228-32, 235 (D. Auer Jones) (describing BLS data as ubiquitous in higher education advertising).

Evidence from the trial also established that CollegeAmerica's use of BLS data was <u>neither misleading nor deceptive in fact</u>. **No student witness testified to any confusion about the BLS data cited in CollegeAmerica's advertisements**. On the contrary, one of the State's student witnesses testified that he understood that the BLS data represented national averages for the program in which he enrolled, and that it did not represent CollegeAmerica-specific wage data. *See* **Tr. Ex. B** at 114 (Bradley Dean). Further, both current and former CollegeAmerica admissions consultants testified that they did not experience student confusion about the national wage data used in the advertising or admissions process. *See, e.g.*, **Tr. Ex. C** at 307 (L. Goldhammer).

To our knowledge, the Commission has never taken the position that the use of BLS data to provide context into the workforce outcomes of approved programs is either prohibited or even questionable. It is our understanding that many ACCSC-accredited institutions have similar practices to what has been described in the Colorado trial, and that ACCSC, having observed those practices during onsite visits, is well aware that this practice is widely employed among member institutions. To that end, we would note, not to evade criticism, but to reinforce the industry acceptance of BLS data, that nearly every school which employs a non-public ACCSC commissioner uses or has used BLS data (or similar national wage data) in their marketing material.

1. Great Lakes Institute of Technology (Vickie Clements, Commission Chair): has what appears to be a sponsored news item at GoErie.com citing the BLS median annual wage for all occupations with a technical or trade school ($51,440 in 2014) (available at https://www.goerie.com/article/20160501/NEWS/610130648).

2. NASCAR Technical Institute (Jennifer Bergeron, Commission Secretary): cites on its website the BLS annual median salary for automotive service technicians and mechanics ($40,710 in 2018) (available at https://www.uti.edu/programs/automotive/careers).

3. Gemological Institute of America (Susan Johnson, Commission Treasurer): appears to have sponsored new stories in the past citing BLS median annual income for jewelers and precious stone and metal workers (available at https://www.chicagotribune.com/news/ct-xpm-2000-12-17-0012170499-story.html).

There are many more examples below,[5] which further the general point that the use of BLS data has been ubiquitous within the higher education industry. Given that industry practice, and the

---

[5] **Career College of Northern Nevada** (Nathan Clark, School Commissioner) available at https://learn.ccnn.edu/landing_page/welding-fabrication/; **Lincoln Technical Institute** (Susan Naples, School Commissioner) available at https://www.lincolntech.edu/campus/shelton-ct and https://www.lincolntech.edu/campus/shelton-lti-ct/programs/nursing-practical; **Ancora Education**

absence of any evidence at trial putting CollegeAmerica on notice that students mistook BLS wages for CollegeAmerica-specific data, neither CollegeAmerica nor CEHE's other colleges—nor Carl Barney or Eric Juhlin—could have intended to deceive or mislead prospective students by truthfully representing national wage data.

More to the point, unlike the Court's after-the-fact review of the college's advertisements, ACCSC contemporaneously reviewed the advertisements at issue in the Colorado trial. And, again in contrast to the Court, ACCSC raised concerns, not with the use of national wage data, but instead with the need for supporting information. By way of example, in June 2008, ACCSC remarked that CollegeAmerica's website used BLS statistics but did not indicate the year or source, which the college later corrected. *See* Tr. Ex. 2083 at 2 (June 27, 2008 Response to ACCSC System-Wide Advertising Reporting). Or consider ACCSC's past concern with the advertising claim that "You could make over $1,000,000 more in lifetime earnings if you hold the right degree." Whereas the Court found this claim (which is used throughout higher education including by the Department) to be deceptive, ACCSC expressed concern that the statement "[was] not supported with relevant statistics." *See Id.* at 3. In both instances, as well as others, CollegeAmerica addressed ACCSC's concerns by including clear supporting citations and often guiding consumers with links to the supporting information.

No one questions—though the Court failed to fully appreciate—how thoroughly ACCSC enforces its *Standards* in the recruitment, admissions practices, and advertising areas. *See* Resp. Ex. 8 at 2-3 (Written Testimony of M. McComis to the Senate Committee on Health, Education, Labor, and Pensions, "For-Profit Schools: The Student Recruitment Experience" (Aug. 4, 2010)) (describing ACCSC's *Standards* on advertising and recruiting as "amongst the most rigorous in the higher education community"). And those "rigorous" *Standards* ultimately aim to ensure that advertising is truthful and accurate and not misleading or false. *See Id.* at 6 (describing ACCSC's "more than 50 standards that address . . . recruitment, advertising, and admissions directly"). In other words, ACCSC's *Standards* hold advertising to the same standard as does Colorado law.

Naturally, differences in judgment are possible. But this Commission, in contrast with the Colorado Court, has developed expertise over four decades and is informed not only about industry marketing practices but also about how actual students react to those practices. In contrast with that long-developed expertise, Judge Buchanan ruled based solely on his own personal reaction to CollegeAmerica's advertisements. This ruling was in stark contrast to well-established precedent. *See Bell v. Publix Sup. Mkts., Inc.*, 2020 U.S. App. LEXIS 38120 (7th Cir. 2020) ("*It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement*

_____

(Jessica Sanders, School Commissioner) available at https://www.edgetechacademy.edu/heating-ventilation-air-conditioning-and-basic-refrigeration/; **Aviation Institute of Maintenance** (Patricia Thomas, School Commissioner) available at https://aviationmaintenance.edu/2017/09/05/amt-outlook/.

*is deceptive*."). There was **no** evidence presented at trial that consumers reacted to the college's use of BLS data with any confusion about what it represented. However, there **was** testimony from an expert, Mr. Howard Beales, who previously served as the head of the Federal Trade Commission's Bureau of Consumer Protection.  Mr. Beales testified that CollegeAmerica's advertisements were not misleading and consumers generally understand the use of national wage data as it is common in advertising. **Tr. Ex. M** at 95-96 (Howard Beales).

ACCSC should have confidence in its prior consideration of CEHE's advertising. As a baseline matter, the Commission's prior review of the same advertisements at issue in the Colorado case and its decision not to make findings, either initially or after CEHE provided support, constitutes the Commission's conclusion that the advertisements complied with or did not violate the *Standards*, at least as the *Standards* were understood then. *See* **Resp. Ex. 5** at 315-16 (Excerpt from Feb. 15, 2017 Deposition of M. McComis) (stating that when an issue is raised in a letter to a school, ACCSC will not say, "we have now found the school to be in compliance," it will "just move on"); *see* **Resp. Ex. 9** at 21 (Expert Disclosure of Elise Scanlon) ("when ACCSC stops requesting information or stating concerns about a particular matter, it means the school has satisfied all ACCSC questions with respect to a particular compliance issue").

It is true that the Commission's view as to what is potentially misleading may evolve over time. In fact, after the Colorado action was filed, the Commission changed the way it applied the *Standards* to advertising that uses national wage data (at least in its treatment of CEHE). For example, despite having reviewed CollegeAmerica's use of the common "$1 million more over a lifetime" claim on multiple occasions dating back to 2008, the Commission, for the first time after the Colorado case had been initiated, identified a concern that the claim might mislead students because it is not representative of the normal range and starting salaries in the occupation for which training is provided.  **Resp. Ex. 10** at 2 (Oct. 8, 2015 ACCSC letter continuing system-wide Advertising Reporting).  And 14 months later, after CEHE submitted copies of advertising materials developed following its compliance analysis, the Commission acknowledged that it "had questioned [those materials only] in the recent past." **Resp. Ex. 11** at 1) (January 26, 2017 ACCSC letter continuing system-wide Litigation and Advertising Reporting). But what the Commission did not do then—and cannot do now—is apply a newly adopted view about advertisements to penalize a member institution for prior conduct that was known to the Commission at the time it occurred.

Because the Colorado case primarily concerned advertisements the Commission previously reviewed and not new factual information, there is no legal or factual basis supporting any reconsideration of ACCSC's historical conclusions as to CEHE's advertisements and compliance with the *Standards*. The Court's Decision that national wage data is deceptive departs dramatically from ACCSC's *Standards* and its past practices. The Commission cannot adopt the court's findings as to CollegeAmerica's advertisements without functionally reinterpreting its *Standards*, which would result in CEHE being held to a different, more stringent standard than all other ACCSC-

accredited institutions. And, it would be impermissibly retroactive to impose any punishment against CEHE *now* based on past conduct ACCSC previously reviewed.

**III.    Judge Buchanan's decision is based on the false assumption that CEHE's admissions process was unfair to students.**

The Decision rests upon another fallacy: that CEHE's enrollment and financial aid packaging processes were unfair because a student could complete the admissions process and obtain an estimated financial aid award in the same day. The so-called process of "same day enrollment packaging" refers to a sequence of events in which a prospective student could meet with an Admissions Consultant ("AC"), interview, tour the campus, and then meet with a Financial Planner ("FP") to discuss financial aid eligibility. The process could culminate with a student deciding to sign an enrollment agreement and also leaving the campus with an estimated financial aid award letter.

The Decision wrongly infers that this process, either by design or effect, would lead to confusion for prospective students as to the nature of the obligations they were agreeing to, or would deprive them of the opportunity to reflect or consult with others before entering into such a commitment. ==Resp. Ex. 1== at 144, ¶692. Importantly, the Court did not rely on the testimony of any students to support this inference. Instead, Judge Buchanan referenced only hearsay testimony offered by the State's witnesses who were former CollegeAmerica employees. The court failed to consider or understand the many safeguards in place to prevent that imagined scenario.

First, while giving weight to portions of CEHE admissions training materials and procedures that allow an AC to complete a prospective student's enrollment during their first visit, the Court ignored emphatic directives contained in the same materials which mandated ACs to act ethically. Specifically, those materials instructed ACs to deeply engage and actively listen to prospective students during the visit and communicate information about the school in an honest and ethical way, with the expected result that prospective students understand the values and benefits of the institution's programs. ==Tr. Ex. 2001== at 21-22 (2011 Admissions Manual) ("Our Values and Philosophy"); *Id.* at 24-25 ("Code of Ethics"); *Id.* at 67 ("[CEHE Policy Directive] 191R Admissions System the Experience").

Additionally, CEHE's admissions policies and procedures required ACs to make sure that a prospective student was provided with a complete copy of the enrollment agreement. *Id.* at p. 69. They also create a role for ACs as the new student transitions into classes by requiring ACs to follow up with all new students before and during the first four days of classes. *Id.* The high touch customer service principles integrated into CEHE's admissions policies and procedures provide a substantial opportunity for students to continue to ask questions and obtain information after the student enrolls. The significance of this engagement with students, both during their initial campus visit and after they have signed an enrollment agreement, is that the enrollment decision is

reversible in the event a student experiences "buyer's remorse" or in the event the student demonstrates that they are unlikely to succeed in their chosen program.

Further, CEHE's "False Start" policy is intended to mitigate against the possibility that a student enrolls at the institution but withdraws shortly thereafter, having incurred expenses and student loan debt. **Tr. Ex. 2428** (CEHE Policy Directive 236R). This policy allows CEHE to evaluate new students during the first three weeks in their program in an effort to identify obviously unqualified students who are unlikely to benefit from their program.  For example, if a student routinely fails to be punctual for classes, fails to attend classes, or fails to complete and turn in assignments during this time, CEHE may determine that the student has not demonstrated a likelihood of success and will dismiss the student after reversing all tuition charges and refunding all amounts paid on behalf of the student. *Id.* at 3.  This process acts as a guardrail to prevent the possibility that a student would suffer from any misunderstanding about the nature of the enrollment commitment.

Other guardrails exist to protect students who wish to cancel their enrollment or withdraw from their programs.  Consistent with *ACCSC Standards, Substantive Standards I(D)(4) and (5)*, CEHE's enrollment agreement provides a 3-day cancellation period and a "fair and equitable refund policy that complies with state and third-party requirements".  *See e.g.*, **Tr. Ex. 3077** at 2.  During the timeframe relevant to the trial and the pending System-wide Probation Order, ACCSC conducted several site visits to CEHE's campuses, including unannounced site visits focused on recruiting and admissions practices. The site visit reports for these visits confirm that the onsite teams reviewed CEHE's enrollment agreements and made no findings that these required provisions were omitted from the enrollment agreements. From 2007 -2013, the Colorado campuses that were subject to the Colorado litigation were visited 11 times.

Further, CEHE's ACs and FPs are trained and instructed to carefully review all important details with prospective students and to elicit and answer questions from them to ensure they understand the extent of their commitment. The ACCSC site teams also evaluated CEHE's training and procedures during their site visits.  For example, the site visit team dispatched to the CollegeAmerica Denver campus for an unannounced visit observed the following:

> "*All admissions employees follow a detailed training manual. Two weeks of training is mandatory for all new admissions employees. Appropriate and thorough safeguards are built into the admissions process such as the utilization of strict scripts for admissions staff and video surveillance of on-site interviews with prospective applicants. All applicants tour the school and participate in a sixteen-step process that is designed to inform students of the nature and content of the training. The school assesses each applicant's suitability for the desired program in detail. The team observed many instances where the school did not recommend candidates for*

*admission based on a thorough discussion of their skill level and ability to attain meaningful employment*."

**Tr. Ex. 2093** at 5 (June 28, 2012 TSR following CollegeAmerica-Denver site visit).

Here, the site team gave a favorable assessment of the same procedures the Court misunderstood and found to be troubling.  The site visit team determined that CEHE employed "appropriate and thorough safeguards" in the admissions processes, which included requiring the use of pre-approved scripts and reviewing videos of staff interactions with prospective students for quality control purposes.  *Id.*

The site team also commented that they witnessed "many instances in which the school did not recommend candidates for admission based on a thorough discussion for their skill level and ability to attain meaningful employment." *Id.* This provides a stark contrast to the Court's view of the process, which was informed only by a few lines of testimony taken from the State's witnesses, who made generalized statements about their activities as ACs.  Again, the Court did not rely on any statements or testimony from CollegeAmerica students when it imagined the effect CEHE's procedures might have had on students.

Consistent with the ACCSC *Standards*, the Commission found no fault with CEHE's same-day admissions practices after numerous evaluations over the period at issue in the Colorado litigation. There is nothing in the ACCSC *Standards* that prohibits enrolling and packaging a student in a single day.  Further, in addition to the False Start policy, the procedural safeguards embedded in CEHE's 16 step admissions policy, and CEHE's quality control measures, the interests of students who withdraw after the False Start period are further protected by CEHE's pro-rata refund policy and the Department of Education's Return-to-Title IV requirements (to the extent students have borrowed federal student loans).  Those policies ensure that the institution returns any unearned funds to the student or to the Department, respectively, in the event a student withdraws.

Prior to Judge Buchanan's involvement in the case, the Colorado Court agreed with the Commission's findings that CollegeAmerica's admissions process contain substantial safeguards to ensure students have the opportunity make informed decisions.  On July 16, 2015, the Court denied the State's Motion for 21 Preliminary Injunctions, finding:

"*Enrollment in CollegeAmerica is a multi-step process which takes place over several weeks.  It is designed to provide students with accurate information about the considerations most students find material in deciding whether to attend CollegeAmerica. The process is also designed to provide information and disclosures deemed necessary and appropriate by state, federal, and accrediting oversight agencies.  The series of mutually-reinforcing steps provides progressively more information to prospective students as they advance through the enrollment process. No student incurs any financial obligation until after completing the enrollment*

*process and attending the first three weeks of classes, which do not start until at least one week after the student signs the Enrollment Agreement, and several weeks after the student first saw any CollegeAmerica advertisement.*

*The process provides institutional safeguards to ensure that prospective students get the accurate information they need to make an informed decision about whether to enroll.*"

Resp. Ex. 12 at 7 (July 16, 2015 Order Denying State's Motions for Preliminary Injunctions).

Other than Judge Buchanan, every objective decision maker who has reviewed CEHE's admission process found that it is designed to protect student interests. Nonetheless, without any student testimony that "same-day enrollment packaging" deprived them of the opportunity to reflect on their decision, Judge Buchanan found the opposite, notwithstanding the fact that ACCSC, the Department, and CEHE itself have built-in mechanisms to ensure that this is not the case.

**IV.    CEHE has made every effort to provide the Commission with complete, truthful, and accurate information and documentation supporting its employment rates.**

**a.  There is no evidence that CEHE ever intentionally or knowingly misled the Commission or provided inaccurate information.**

The Colorado Attorney General (COAG)'s investigation into CollegeAmerica's advertising practices began in 2012. Over the course of the two-year investigation, CollegeAmerica produced over 46,000 pages of documents, and the COAG took testimony at 20 civil investigative hearings. After CollegeAmerica refused to enter into a settlement agreement, COAG initiated its lawsuit. In discovery, CollegeAmerica produced hundreds of thousands of pages of documents, and the parties took more than fifty depositions. The trial took four weeks and involved 48 witnesses and 366 exhibits.

Over this same time period, the Commission conducted at least four site visits at CEHE's CollegeAmerica Colorado campuses at which CollegeAmerica's employment verification documentation and processes were thoroughly scrutinized. For most of that time, the Commission was fully aware of the COAG's investigation into CollegeAmerica's representations of employment outcomes to students, and, presumably, the Commission took those allegations into account when it reviewed CEHE's verification records. Moreover, CEHE engaged independent auditors on multiple occasions to ensure CEHE's documentation accurately reflected the graduate employment outcomes it reported to the Commission. *See* Tr. Ex. 2256 (September 26, 2011 Shaw Mumford Audit Objectives Letter); Tr. Ex. 2265 (MMI Description of Methodologies for 2015 Audit).

Through all that scrutiny, covering more than a decade of operations, there is no evidence that CEHE intentionally or knowingly provided incomplete, false, or inaccurate information or

documentation to the Commission.  No student or graduate testified that CEHE falsely represented their employment status. Nor did any current or former CollegeAmerica employee testify that CollegeAmerica reported a placement without a good-faith basis for doing so. And at no point has there been even the contention that CEHE fraudulently created a document with false information.

Judge Buchanan's _only_ factual basis for asserting CollegeAmerica's _knowing_ violations of ACCSC _Standards_, was that the State's expert, Greg Regan, "personally" disagreed with how CollegeAmerica verified employment. In Mr. Regan's view, ACCSC guidelines lay out documentation requirements that CollegeAmerica failed to follow to the letter. Therefore, he concluded that CollegeAmerica must have knowingly violated the _Standards_.

This conclusion is absurd.  Mr. Regan's opinion is nothing more than a personal interpretation of CollegeAmerica's complete, truthful, and accurate records.  The fact that Mr. Regan's interpretation differed from CollegeAmerica's—and ACCSC's in many cases—does not show that CEHE _knowingly and intentionally_ violated ACCSC _Standards_.  As discussed below, Mr. Regan's method of making binary yes/no decisions based on stale records does not accurately reflect the Commission's approach. And Judge Buchanan's near total deference to these flawed opinions resulted in a gross mischaracterization of CollegeAmerica's efforts to comply with ACCSC _Standards_.

Even more concerning is that Mr. Regan's interpretation of CollegeAmerica's records conflicts with the Commission's own review of those same documents. The Commission scrutinized CEHE's verification documentation processes for years, and the issues the Commission identified were resolved through the accreditation process.

Judge Buchanan assigned little importance to those efforts.  He wrongly (and casually) discounted years of Commission scrutiny, misunderstanding Dr. McComis's deposition testimony that the site visit process is not an "infallible process" and crediting a former employee's testimony that, on one occasion, she witnessed the site team review only a sample of the verification documents as opposed to 100% of the documents. _See_ **Resp. Ex. 1** at 56-57, ¶¶ 294, 296 (Decision). Judge Buchanan also found, without citing any evidence or testimony, that it was "impractical" to expect site teams to uncover all information relevant to their determinations.  _Id._ at 56, ¶ 295.

Judge Buchanan seems to have a low opinion of the Commission's oversight capabilities. CEHE, on the other hand, is quite familiar with the Commission's commitment to holding its member schools accountable to the _Standards_.  And considering the level of scrutiny CEHE has faced over the years, it strains credulity that the Commission failed to thoroughly review the verification documentation CEHE provided at its many site visits and in other reports.  Further, the

Commission was aware of the State's allegations since at least December 2014[6 and 7] and no doubt subjected CEHE to greater scrutiny upon learning of the State's allegations that CollegeAmerica knowingly inflated employment rates.

Even if Judge Buchanan is correct that the Commission only sampled CollegeAmerica's verification documents, the State's theory that pervasive failures went unnoticed is implausible. Mr. Regan concluded that CollegeAmerica's documentation supported rates that were a mere fraction of what was reported to ACCSC. Unless CEHE is mistaken about ACCSC's capabilities and commitment to oversight, Mr. Regan's conclusions—and Judge Buchanan's blind adoption of those conclusions—clearly do not fairly and accurately portray CollegeAmerica's compliance with ACCSC requirements.

     b.  **The Commission has already scrutinized CEHE's employment verification processes and has never found a knowing or intentional violation of the *Standards*.**

Judge Buchanan found it "implausible" that CollegeAmerica misunderstood its obligation to properly document its employment placement decisions. **Resp. Ex. 1** at 47, ¶ 229. This could not be further from the truth. CEHE has always understood its obligation to properly document its employment placements and has been completely transparent with the Commission with regard to those requirements. The Commission reviewed CEHE's employment verification numerous times since the COAG initiated its investigation—often the same documents Mr. Regan reviewed for his report. Any time the Commission raised concerns with the sufficiency of CEHE's verifications or its classifications of in-field outcomes, CEHE resolved those issues to the Commission's satisfaction through the accreditation process. If the Commission had other concerns about CEHE's compliance with verification requirements, it certainly did not say so.

CEHE knows that the Commission's silence on the sufficiency of its documentation is not a blanket assurance going forward. But it does reflect what concerned the Commission then, and CEHE is entitled to some reliance that the Commission deemed its practices sufficient at the time.

---

[6] CEHE formally notified the Commission that COAG had filed a complaint in a December 3, 2014 Notice. CEHE also provided information to the Commission in a February 23, 2015 Response to Litigation Reporting. Those documents are incorporated by reference.

[7] The Commission was aware of the COAG investigation in 2012. In a July 12, 2013 Order to Show Cause, the Commission informed CEHE that it had responded to a subpoena from the COAG. Upon information and belief, ACCSC's response to the COAG subpoena(s) contained anonymous and unsubstantiated complaints that ACCSC had received against CEHE but which CEHE had not been afforded an opportunity to respond. Ultimately, those anonymous complaints were never substantiated. Nonetheless, CEHE has endured years of litigation and investigations based on their distribution to various agencies. The Commission's handling of those anonymous complaints prompted several complaints from CEHE and its then Chairman.

*See* **Resp. Ex. 9** at 35 (Declaration of Elise Scanlon) ("If the Commission did not raise specific challenges to the employment outcomes detailed by an institution as part of its outcome reporting, then, in my opinion, that means the Commission reviewed the detail and found that the institution's reporting of graduate employment met ACCSC standards"). It would be grossly unfair for the Commission to find now, years after the fact, that those same practices constituted a *knowing* violation of the *Standards*.

It is obvious that Judge Buchanan did not understand how his ruling upends the fairness and due process requirements of the accreditation relationship. Without any evidence that CollegeAmerica misrepresented any information in a verification document, he overruled the Commission's prior acceptance of those documents to find that CollegeAmerica not only violated the *Standards*, but did so knowingly and intentionally. If Judge Buchanan had made any effort to grasp the realities of the accreditation relationship (instead of simply copying the State's findings of fact), he would have understood how the history of the Commission's oversight of CEHE completely undermines his ruling.

For example, Judge Buchanan took issue with CollegeAmerica's classification of CNAs, medical assistants, and other lower-level medical jobs as in-field placements for the Healthcare Administration program. Even though the evidence at trial showed that the Commission reviewed this same issue in 2011 and 2012 and accepted CollegeAmerica's explanation for why those were reasonable program outcomes at that time, Judge Buchanan ruled that counting those outcomes was a knowing violation of the *Standards*. **Tr. Ex. 277** (December 11, 2011 ACCSC Renewal of Accreditation Letter for CollegeAmerica-Colorado Springs); **Tr. Ex. 3513** (February 2012 CollegeAmerica-Colorado Springs Outcomes Report).

The Commission first raised this issue when it granted reaccreditation to CollegeAmerica's Colorado Springs campus on December 7, 2011. In that letter, the Commission placed the Graphic Arts AAS and Healthcare Administration BS programs on employment outcomes reporting. **Tr. Ex. 277** at 5. For the Healthcare Administration program specifically, the Commission questioned whether certain employed in field classifications were appropriate and reasonable based on the program's educational objectives. *Id.* at 5-6. The Commission asked whether positions such as a CNA, Personal Care provider, or office coordinator were properly related to the training program. *Id.* The Commission directed CEHE to justify how those outcomes were directly related to the program and also to provide an updated Graduation and Employment chart with all supporting documentation. *Id.*

As required, CollegeAmerica-Colorado Springs responded to the Commission's request in a February 2012 Outcomes Report. **Tr. Ex. 3513**. The school explained that the questioned outcomes provided experience in a medical setting that would allow graduates to rise to management positions. *Id.* at 10-11. ACCSC appeared to accept this explanation. In a June 8, 2012 letter, the Commission ordered additional outcomes reporting for the Graphic Arts program

only, with no further questions about the Healthcare Administration outcomes.  CEHE reasonably believed that it could continue to count those placements going forward.  *See* **Resp. Ex. 5** at 315-16 (Excerpt from Feb. 15, 2017 Deposition of M. McComis) (stating that when an issue is raised in a letter to a school, ACCSC will not say, "we have now found the school to be in compliance," it will "just move on"); *see* **Resp. Ex. 9** at 21 (Expert Disclosure of Elise Scanlon) ("when ACCSC stops requesting information or stating concerns about a particular matter, it means the school has satisfied all ACCSC questions with respect to a particular compliance issue").

But Judge Buchanan failed to understand the accreditation process and concluded that the December 7, 2011 letter established that these jobs were not in field.  **Resp. Ex. 1** at 53, ¶ 270. Worse, he considered the February 2012 Outcomes Report as conclusive evidence that CollegeAmerica <u>knew</u> those positions should not be classified as in field.  *Id.* at ¶ 271.

This obviously misrepresents what happened.  In reality, the Commission raised a concern about how CEHE was classifying outcomes, CEHE explained its reasoning, and ACCSC accepted that explanation.  At that time, CEHE had no reason to believe that those outcomes could not be appropriately counted as placements.  But Judge Buchanan—copying nearly word for word from the State's findings of fact—reached the opposite conclusion and found that CEHE knowingly violated ACCSC *Standards*.

Judge Buchanan similarly rewrote history in finding CollegeAmerica knowingly miscounted CNAs as in-field placements for its Medical Specialties program.  *See* **Resp. Ex. 1** at 53, ¶¶ 274-78. In April 2017, the Commission notified CollegeAmerica-Colorado Springs that it had been placed on Warning status.  **Tr. Ex. 19** at 1.  One of the Commission's findings questioned whether positions such as Personal Care Providers, CNAs, Caregivers, Personal Living Assistants, and Home Health Clinical assistants were appropriate outcomes for the Medical Specialties program. Specifically, the Commission determined that "*at this juncture*, due to the vague wording of the program objectives and in context of the employment records provided, the Commission found that there is insufficient information to define a successful student outcome for the Medical Specialties (AOS) program."  *Id.* at 8 (emphasis added).  Thus, from CollegeAmerica's perspective, prior to that juncture, it had a good-faith basis to believe those outcomes were valid placements. In fact, these outcomes were transparently included in the Medical Specialties program description, which was approved by ACCSC in 2002.  *Id.* at 5.

Nonetheless, CEHE revised the outcomes after receiving the Warning Letter and certified to the Commission that nurse assistant, personal caregiver, phlebotomist, and home health aides would no longer be counted.  **Resp. Ex. 13** (Excerpt from June 14, 2017 CEHE Response to April 11, 2017 Warning Letter).  Again, the accreditation process worked: The Commission raised questions regarding CEHE's practices, declining to accept CEHE's explanation, and CEHE changed its practices accordingly.  But at no point during that process did the Commission assert that CEHE knowingly violated ACCSC *Standards*—because CEHE did not.

**Exhibit K - 17**

JA298

But that did not sway Judge Buchanan, who again copied, nearly word-for-word, the State's findings of fact to conclude that CollegeAmerica knew *as far back as 2014* that the Commission would not consider a CNA as employed in-field for the Medical Specialties program. **Resp. Ex. 1** at 53, ¶ 275.  His only basis for that contention was the following statement taken from the Career Services' June 27, 2014 meeting minutes: "[i]n the next few years ACCSC may not count CNA positions as placements for the Medical Specialties program." **Tr. Ex. 2220** at 3.  But CollegeAmerica's advanced planning not only fails to support the Judge Buchanan's finding, it actually proves the opposite. Trying to stay ahead of shifts in ACCSC's policy demonstrates a commitment to complying with the *Standards*—not an attempt to skirt them.  At that time, proposed gainful employment requirements were receiving national attention.  As with many nationally accredited schools, CEHE recognized the potential for stricter definitions of in-field placements. It made plans to adapt accordingly. *See* **Tr. Ex. 2200** at 2 (April 23, 2015 Career Services Notes "Right now, CNA placements area acceptable for [Medical Specialties], but that likely will not always be the case").

The Commission had many other opportunities to review the verification documentation at issue in this case.  As former ACCSC Executive Director Elise Scanlon confirmed, CEHE was under intense scrutiny during the period in question.  **Resp. Ex. 9** at 34-38 (Scanlon Declaration). All the CollegeAmerica campuses went through the renewal of accreditation process in 2007-2009 and again in 2012-2014.  *Id.* at 28.  During the period at issue in the litigation, ACCSC made several re-accreditation site visits to the CollegeAmerica campuses.  *See* **Tr. Ex. 2081** (2007 Denver Team Summary Report); **Tr. Ex. 2087** (2008 Fort Collins Team Summary Report); **Tr. Ex. 2093** (2012 Denver Team Summary Report); **Resp. Ex. 16** (2016 Colorado Springs Team Summary Report).  And there have been others since.  **Tr. Ex. Q** at 97 (S. Reed) ("Q. From the time you joined [CEHE] in 2012 to the present, how many site visits have the Colorado Campuses had with ACCSC?  A. There's been seven").  ACCSC reviewed CEHE's employment verification documentation at all those visits.  CEHE's compliance team recalls site-team members reviewing all employment verification documents at those visits. **Tr. Ex. Q** at 166 (S. Reed).

Moreover, that monitoring extended beyond CEHE's three Colorado campuses.  ACCSC applied the same level of scrutiny to CEHE's eleven other campuses as well as its online school. Since 2012, CEHE has undergone dozens of site visits across its schools.  **Tr. Ex. Q** at 97-98 (S. Reed) ("Q. How many [site visits] have all of the CEHE campuses had [since 2012].  A.  Forty-five").  CEHE's verification processes were uniform across those schools, and any systematic compliance issues with the Colorado schools' documentation practices would have shown up in reviews of other campuses as well.

At no point has the Commission questioned whether CEHE provided complete, truthful, and accurate information in the documentation provided to the Commission. It is unclear why now, years after the fact, the Commission would ignore its own review, the opinions of its former

Executive Director, and those of several independent auditors, and instead rely on Judge Buchanan's findings when those findings plainly misapprehend the accreditation process.

**V.    The Court's decision adopts a faulty analysis of CEHE's previously reported Graduate and Employment charts.**

ACCSC leadership acknowledged that the process of documenting and verifying employment placements is complex and nuanced.  Former Executive Director Elise Scanlon confirmed that "[the employment verification] process is not a straight-forward or simple determination in many cases and often individual-specific factors may play into the determination." **Resp. Ex. 9** at 39.  She agreed that "the determination of whether a graduate is employed in field requires expertise and the consideration of a number of factors."  *Id.* Current Associate Executive Director Christopher Lambert also agreed that ". . . this work is challenging.  There are nuances to it . . . " **Tr. Ex. 3511** (October 31, 2017 emails between Lambert to Reed re: Question regarding third party verifiers).

But Judge Buchanan avoided considering any of those nuances.  Instead, his findings consisted of a blanket adoption of Mr. Regan's opinions. Those opinions were based on nothing more than a review of stale documents to make a binary yes-or-no decision on whether CollegeAmerica should have counted that graduate as a placement.  Such methods are hardly nuanced, and, according to ACCSC leadership, they are unlikely to result in a fair and accurate audit of CEHE's verification documentation.  *See* **Resp. Ex. 14** at 5 (Scanlon Rebuttal to Analysis of Greg Regan) ("Just because documentation is not capable of strict verification many years later, does not mean that it was inaccurate when it was created or that the student who is the subject of the documentation was not placed. Regan's analysis is very unforgiving in this regard, and therefore erroneous").

The inherent infirmities in Mr. Regan's process do not come as a surprise, as he lacks any meaningful experience with ACCSC *Standards* and guidance with respect to employment placement reporting.  Mr. Regan's claimed expertise in that regard is based solely upon the analysis he conducted for purposes of litigation, which consisted of reviewing the written standards, listening to past ACCSC webinars, reading site visit documentation prepared by others, and reviewing the testimony and expert reports of others. **Tr. Ex. G** at 11 (G. Regan).  In developing this "expertise," he never once spoke with anyone at ACCSC to verify that his methods aligned with evolving Commission enforcement practices or how the Commission applied its *Standards* to CollegeAmerica and other schools. *See Id.* at 20.

Had he done so, he almost certainly would have learned that his methods are inconsistent with ACCSC's actual review process.  Mr. Regan, whose firm was paid $161,940 in fees for his opinion, sought to present a worst-case scenario to the Court. **Resp. Ex. 15** (Addendum to Expert Report of Greg Regan).  To do so, he merely reviewed the verification documentation

CollegeAmerica maintained in support of the rates reported to the Commission from 2009 to 2012 and for 2015 and made a "yes" or "no" decision based on whether he agreed those documents supported each placement. Mr. Regan then concluded that CollegeAmerica improperly categorized many graduates as employed in field based on what he deemed to be missing or inadequate documentation.

But under ACCSC's usual processes, when an auditor or site team member identifies issues with employment verification documentation, they do not simply end the inquiry and issue a finding. **Resp. Ex. 14** at 4 (Scanlon Rebuttal to Analysis of Greg Regan) ("ACCSC will always give the institution the opportunity to explain and justify its outcomes"). Instead, the auditor contacts the student and/or employers to investigate further, which, as Mr. Regan acknowledged, can result in additional information and documentation justifying the student's placement. **Tr. Ex. G** at 235-36, 240 (G. Regan).

Mr. Regan never called any students or employers to verify employment or job responsibilities. Instead, if he decided the available documentation was not in and of itself sufficient to justify reporting the student as employed in-field, his inquiry ended, and he counted the student as not employed in-field. *Id.* at 234-35, 242-44. His methodology is a marked departure from that employed by ACCSC, in which any identifiable flaw in the underlying documentation initiates a conversation in which the problem is identified, discussed, and remedied if possible.

Elise Scanlon, who has far more knowledge of ACCSC's actual employment verification requirements than Mr. Regan, took issue with Mr. Regan's binary approach. She made clear that "determining whether employment is in field, not unlike dealing with other issues in education, generally does not involve simple, binary choices. Peer reviewers and educators have the qualifications, experience, and training to map required skills and competencies to program content to determine whether a position should be considered an in-field placement." **Resp. Ex. 9** at 39 (Scanlon Declaration). Mr. Regan's experience as a forensic accountant provides no expertise with regard to that undertaking. *See* **Tr. Ex. G** at 10 (G. Regan).

In confirming that "[p]ost hoc reviews/verification of employment data generally do not achieve reliable results," Ms. Scanlon emphasized the importance of reaching out to employers and graduates for information, an action which is greatly hindered by the passage of time. **Resp. Ex. 9** at 38 (Scanlon Declaration). She prepared a response to Mr. Regan's analysis, in which she unequivocally denounced his methods. In her view, Mr. Regan's omission of this critical step is fatal to his analysis. **Resp. Ex. 14** (Scanlon Rebuttal) ("[the] ability of an institution to gather additional information if necessary is a critical stage in ACCSC's process and an attempt to reverse engineer employment classifications without it could not possibly constitute an accurate reflection of whether the institution did or could do to comply with ACCSC's standards") (emphasis added).

ACCSC's Associate Executive Director, Christopher Lambert, has also recognized that a rote review of documents is an ineffective method to verify placements. In an email to Susie Reed during the trial, he explained,

> "while CPAs clearly have experience auditing 'Numbers' this is more about outreach to graduates and employers than looking at accounts receivable, payable, et. al. It is about making phone calls. Sending emails. Third parties often have established scripts, and internal tracking of outreach so when something is categorized as 'unable' or 'incorrect,' they can provide the schools with the specifics in terms of number of attempts, etc. I'm not sure a CPA has that established infrastructure."

**Tr. Ex. 3511** at 2 (October 31, 2017 emails between Lambert to Reed re: Question regarding third party verifiers).

CEHE's independent auditors, who, unlike Mr. Regan, are not mere CPAs with no experience with ACCSC *Standards*, also recognized the importance of reaching out to employers and graduates as part of the process. CEHE engaged Shaw Mumford and MMI in 2011 and 2015, respectively, to independently verify CEHE's placement reporting. As counseled by ACCSC, their process involves actually reaching out to graduates and employers to verify dates of employment, employment status of the graduate, job title, and, if necessary, the job description. *See* **Tr. Ex. 2256** (September 26, 2011 Shaw Mumford Audit Objectives Letter); **Tr. Ex. 2265** (MMI Description of Methodologies for 2015 Audit).

Without speaking to graduates or employers, it strains credulity to believe that Mr. Regan—who has no identifiable experience as a vocational expert—was capable of making fair and accurate in-field determinations based on terse job descriptions. *See* **Resp. Ex. 14** at 2 (Scanlon Rebuttal of Analysis of Greg Regan) ("[t]his analysis cannot be performed properly without extensive experience working with job placement for new graduates. It is not susceptible to a rigid mathematical process like the one Regan tries to apply").

ACCSC leadership, ACCSC's published guidance, and independent auditors with actual experience applying ACCSC *Standards* all agree that a rote review of stale documents is highly unlikely (if not impossible) to yield reliable, fair results. Those with actual expertise in the nuanced process recognize the need for (1) back-and-forth discussions to rectify issues with underlying documentation, (2) the opportunity to reach out to graduates and employers to confirm and resolve questions involving job duties and the skills used, and (3) some expertise in the classification of vocational outcomes. It is also widely understood that the passage of time greatly hinders the ability to verify a placement. *Id.* at 5 (Scanlon Rebuttal) ("it is nearly impossible to replicate ACCSC's process and analysis of records at any time, but much less five to eight years after the fact, as Regan has attempted to do"). When CEHE staff, independent auditors, and ACCSC site

team members adhered to these methods, there were no systematic issues identified with CEHE's verification documents.

Mr. Regan, on the other hand, was hired by the State to be as critical as possible to generate inculpatory results for the purposes of litigation. His method, consisting of a review of years-old documents, failed to include any of the critical elements described above.

**VI.    The Court's findings with respect to Mr. Barney and Mr. Juhlin do not support a conclusion that either Mr. Barney or Mr. Juhlin has a record of failure to demonstrate ethical, fair, or honest conduct in the management of CEHE.**

Unethical managers do not religiously document their dishonest conduct. Every aspect of the Colorado case concerns documented practices and policies widely distributed for all to see. Nothing in the case turned on "hidden meaning" or "paper policies" that covered over illicit motives. And nearly every aspect of CollegeAmerica's operations at issue in the case was made known to the Commission when the activity was ongoing.

The Decision rests, not on new information, but on a difference of opinion. Judge Buchanan found to be misleading conduct that this Commission has approved and which is widely accepted in higher education. ACCSC member institutions, and the Commission, have always considered nation-wide career earnings data, like BLS, a reliable source of information for potential students. And the admissions practices the Court criticized have been known to, and have at times been positively cited by, this Commission. The views of a single judge in Colorado questioning those practices, years after the fact, does not mean CEHE's conduct—which ACCSC reviewed contemporaneously—is unethical, unfair, or dishonest.

The Commission closely monitored CEHE's advertisements and admissions practices when they were in use. Just because Judge Buchanan views those processes differently than the Commission did at the time does not make CEHE's conduct unethical. His opinions diverge from the Commission's on nearly every issue raised in the October 26, 2020 letter. In each of these findings the Commission was informed of the conduct and CEHE's response when it made contemporaneous accreditation decisions.

| Findings | ACCSC's Interpretation | Judge Buchanan's Interpretation |
|---|---|---|
| Sixteen Steps | "Appropriate and thorough safeguards are built into the admissions process. . . Applicants tour the school and participate in a sixteen-step process that is designed to inform students of the nature | "This process, either by design or effect, would lead to confusion for prospective students as to the nature of the obligations they were agreeing to." **Resp. Ex. 1** at 145, ¶ 692. |

| | | |
|---|---|---|
| | and content of the training." **Tr. Ex. 2093** at 9 (June 28, 2012 TSR for CollegeAmerica-Denver) | |
| AC Manual | "All admissions employees follow a detailed training manual.  Two weeks of training is mandatory for all new admissions employees. Appropriate and thorough safeguards are built into the admissions process . . ." **Tr. Ex. 2093** at 9. | "The Company's standardized processes are outlined in written policies and procedures in the admissions manuals, which are central to the admissions process." **Resp. Ex. 1** at 19, ¶ 61. |
| | "The team reviewed the school's [AC Manual] which appeared to be largely sales training and provided goals for interviews, enrollments, and referrals." **Resp. Ex. 2** at 11-12 (June 22, 2011 TSR for SHC-Murray) (making no findings regarding the AC Manual), | "Overcoming prospective student's objections, in particular the money objections, has been part of the admissions manual since at least 2006 and is part of the 2017 manual." **Resp. Ex. 1** at 23 ¶ 90] |
| National Wage Data | ACCSC raised concerns that "Education Pays Off" chart should include source material. CEHE supplied a revised chart including a supporting source with no further comment from the Commission. **Tr. Ex. 2088** at 8, 39 (January 23, 2009 Ft. Collins TSR and March 2, 2009 Response). | "Most frequently, Defendants depict salaries in the form of a bar or block chart with salary figures separated by degree level, an upward-swooping arrow in the background, and occasionally including an hourly wage equivalent, with the heading 'Education Pays Off' or 'the More You Learn the More You Earn.'" **Resp. Ex. 1** at 15, ¶ 43. |

| Cooling Off Period | "The institution observes ethical practices and procedures in the recruitment of its students in areas including the following . . . allowance for a cooling off period and implementation of cancellation policies." **Resp. Ex. 8** at 6 (Written Testimony of M. McComis to the Senate Committee on Health, Education, Labor, and Pensions).<br><br>"Applicants who have not visited the school prior to enrollment will have the opportunity to withdraw without penalty within three business days **following** either the regularly scheduled orientation procedures or following a tour of the school facilities and inspection of equipment where training and service are provided." *ACCSC Standards, Substantive Standards, Section I(D)(4)(a).* | "There was no cooling off period at CollegeAmerica. . . the lack of such a cooling off period [is] extremely rare . . ." **Resp. Ex. 1** at 32, ¶ 144.<br><br>"Defendants shall affirmatively offer a 'cooling off period' of no less than 48 hours to prospective students after their interview with admissions and **before** enrolling and packaging them with financial aid." **Resp. Ex. 1** at 151, ¶ 723a. |
| AC Compensation | "[I]n light of the recent report of the Government Accountability Office (GAO), ACCSC established a Task Force to evaluate the recruiting, advertising, and admissions practices at its accredited institutions. In accordance with the work of | Judge Buchanan implied that ACs had a financial incentive to enroll students based on conduct that clearly falls within Safe Harbor (e) to the Incentive Compensation Ban:<br><br>"Admissions consultants received financial bonuses for each student |

| | | | |
|---|---|---|---|
| | the Task Forces, Stevens-Henager College located in Murray, Utah, was selected to receive an unannounced onsite evaluation team[.]" **Resp. Ex. 2** at 7 (June 22, 2011 TSR for SHC-Murray) | | they enrolled if the student completed 36 credit hours**." Resp. Ex. 1** at 28, ¶ 124. |
| | "All admissions representatives reported that they . . . feel no pressure to enroll students." *Id.* at 9. | | |
| | "ACs receive a retention bonus for students who complete 36 credits . . .. However, the school stated that the retention bonus is being discontinued by July 2011." *Id.* at 10. | | |
| Student Qualifications | "The school assesses each applicant's suitability for the desired program in detail. The team observed many instances where the school did not recommend candidates for admission based on a thorough discussion of their skill level and their ability to attain meaningful employment." **Tr. Ex. 2093** at 9 (June 28, 2012 TSR for CollegeAmerica-Denver) | | "CollegeAmerica has knowingly taken advantage of the inability of at least some consumers reasonably to protect their interests by reason of physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors." **Resp. Ex. 1** at 143, ¶ 690.

"The admissions process did not appear to be focused on guiding prospective students, at least not in an attempt to protect their best |

| | | |
|---|---|---|
| | | interests . . ." **Resp. Ex. 1** at 144, ¶ 692.<br><br>*But see* **Resp. Ex. 1** at 24, ¶ 95.<br><br>"If CollegeAmerica is not the right fit for a prospective student, the Admissions Consultant will tell the student so, and will also try to help the prospective student find another school that would be a better fit." |
| Admissions PowerPoint | ACCSC reviewed the PowerPoint and identified specific issues that were resolved though the accreditation process.  A revised PowerPoint point was submitted for Commission review with no further comment.  *See* **Tr. Ex. 2088** at 37, 47-82 (January 23, 2009 Ft. Collins TSR and March 2, 2009 Response). | The court took issue with the PowerPoint presentation used during admissions interviews:<br><br>"[T]he PowerPoint presentation also discusses the benefits of a CollegeAmerica degree in terms of money. . . Since at least 2006 the PowerPoint has included a slide that depicts national average wage data." **Resp. Ex. 1** at 20; ¶¶ 71-72. |

In addition to advertisements and admissions practices, the Commission raised concerns regarding CEHE's EduPlan loans in the October 26, 2020 letter.  In particular, the Commission asked about Mr. Barney's role as the creator of the EduPlan loan.  The Court's Decision found that the terms and conditions of the EduPlan loan did not violate Colorado state law and commented that the terms and interest rates were more student-friendly than other potentially available options. **Resp. Ex. 1** at 140, ¶ 681; 145, ¶ 697.  The Court only ordered CollegeAmerica to cancel fourteen EduPlan loans on the basis of student-specific findings.  As above, the bases for those findings

consist of Judge Buchanan second guessing information known to the Commission when the conduct was ongoing. The Commission's past acceptance of these policies and practices precludes a finding now that Mr. Juhlin's and Mr. Barney's oversight was unethical or that they are otherwise incapable of managing CEHE's schools per ACCSC *Standards*.

**VII.   CEHE Continues its Efforts to Maintain Compliance with the *Standards*.**

The Commission remarked in its May 2019 Continued Probation Order that it recognized and appreciated the amount of effort CEHE and its campuses have put into developing new policies and procedures and implementing new practices. That process continues consistent with CEHE's approach towards self-assessment and continuous improvement and notwithstanding its legal challenges to the Decision.

The Decision relates to past conduct. As described in detail above, the Colorado litigation presents no accreditation issues previously unknown to the Commission. CEHE's responses over the past decade to unannounced visits, site visits, complaints, Show Cause Orders, and Probation Orders identify how it has changed policies, procedures, and practices relevant to the areas of advertising, recruitment, admissions, and employment reporting.

For example, CEHE and the Commission have been engaged in significant reviews of CEHE's marketing and advertising, as well as its admissions procedures, which include the submission of CEHE's advertising materials for ACCSC's review and the use of third-party review ("secret shoppers") of CEHE's current admissions operations. These items have been addressed in CEHE's past probation responses and in the December 2020 response.

None of the findings currently before the Commission overlap with the findings in the Decision. On December 30, 2020, CEHE responded to the remaining seven findings in the Commission's July 21, 2020 Continued Probation Order.

**Responses to the Commission's Requests for Information**

a. **An explanation as to how, in light of the District Courts decision, CEHE and specifically the Board of Directors has determined that Carl Barney and Eric Juhlin have past records that demonstrate a commitment to ethical, fair, and honest practices as well as compliance with accrediting standards and applicable federal, state, and local requirements (*Section I (A)(2)(b & C), Substantive Standards, Standards of Accreditation*)**

For the reasons detailed above, we do not believe the Court's Decision calls into question Mr. Juhlin's or Mr. Barney's past records or compliance with ACCSC *Standards* because the practices and policies at issue were known to the Commission at the time and were not found to be in violation of the *Standards*.

**b. With regard to the CEHE Board of Directors:**

    **i.    A list of the current Board of Directors with a description as to how each member is qualified to fulfill his/her role on the Board;**

On February 6, 2020, CEHE received a request from the Commission for information about CEHE's then-current Board of Directors and their qualifications. CEHE provided a detailed response to the Commission's request dated February 10, 2020 and was notified via letter dated June 23, 2020 that the Commission, at its March 2020 meeting, voted to accept CEHE's February 6, 2020 response. CEHE incorporates this correspondence as part of its response to this item.

The following Board members, whose name and qualifications were included in CEHE's February 10, 2020 response, remain as current Board members for CEHE:

    Eric Juhlin, Chairman and CEO
    William Dennis, Director
    Roy Hurd, Director
    Ken Konesco, Director

In March 2020, CEHE added a new Director to its Board, Dr. Rajshree Agarwal. With respect to her qualifications as a Director for CEHE, Dr. Agarwal is the Rudolph Lamone Chair and a Professor in Entrepreneurship and Strategy at the University of Maryland. Since 2014, Dr. Agarwal has also been the Director of the Ed Snider Center for Enterprise and Markets at the University of Maryland. Prior to her positions at the University of Maryland, Dr. Agarwal held the following positions at the University of Illinois: BioBEL Faculty Affiliate at the Institute of Genomic Biology, John Georges Professor in Technology Management and Strategy, Director of Innovation and Technology Management Initiatives, Program Director of Certificate in Entrepreneurship and Management, and Scholar-in-Residence with the Academy of Entrepreneurial Leadership.

Dr. Agarwal holds a Ph.D. in Economics from SUNY-Buffalo, an M.A. in Economics from SUNY-Buffalo, an M.A. in Economics from Bombay University, and a B.A. in Economics from Bombay University. Dr. Agarwal has received numerous academic awards and published over 50 research items in peer reviewed journals. Attached as ==**Exhibit b.i.** – **Dr. Agarwal**== is a copy of Dr. Agarwal's Curriculum Vitae.

Additionally, for reasons unrelated to the Probation Order or the Colorado litigation, Carl Barney informed CEHE's CEO on January 21, 2021 that he is resigning from the CEHE Board of Directors. See Mr. Barney's statement at the end of his letter in ==**Exhibit f.1** – **Affidavits**==. CEHE requests that ACCSC and the Commission keep this resignation information confidential until February 19, 2021 (the date of CEHE's next scheduled Board meeting) as Mr. Barney has requested that he be able to inform the other CEHE Directors of his resignation "face-to-face" at CEHE's February 19, 2021 Board Meeting.

ii.    **A description of the scope of authority that the Board of Directors has with regard to the operations of CEHE and the individual schools; and**

CEHE's top management comprises both the Board of Directors and the most senior management team. For purposes of communication and clarity, CEHE will refer to the two parts of top management as the "Board" (oversight) and "top management" (management) — the most senior managers who manage the enterprise. Each needs the other. Without top management, the Board would not have anything to oversee. Without a Board, management would not have a review and guidance function.

The Board gives top management somebody to talk to: a conscience, a counselor, an advisor. Board members do not need to be available for long discussions but should be willing to answer questions and provide brief guidance.  CEHE's Board also functions as an informed and prepared "stand-by" in case there is "power failure" — a failure of the organization's top management or, if the need arises, to find successors to today's top management.

Nominees for Director are selected on the basis of broad experience, judgment, integrity, ability to make independent inquiries, understanding of CEHE's operating environment, and willingness to devote adequate time to Board duties.  The Board chooses its own Chairman annually.  The role of the Chairman and Chief Executive Officer may be separate or combined. Directors are encouraged to limit the number of other boards on which they serve; Directors should advise the Chairman and the Nominating Committee before accepting an invitation to serve on another organization's board.

At each scheduled Board meeting, there is a set time for the non-management Directors of CEHE to meet in executive sessions without any management present. The presiding Director at the executive session meetings are chosen by the non-management Directors.

CEHE's Board regularly conducts self-evaluations to determine whether it and its committees are functioning effectively.  Generally, this is done at the end of each Board meeting as part of a debrief exercise.  During a debrief, the Board discusses "what's working", "what's not working," and considers any refinements or modifications to the Board's processes and procedures.

**Board Functions and Authority**

The Board's purpose is to ensure that top management has the right (and adequate) strategies, to review top management's performance, and to guide and support top management in the accomplishment of strategies. The Board's primary focus is on strategic matters.

The Board thinks through what the top management of CEHE should be and what it should do.  The Board makes sure that objectives are being set and strategies are being developed — it looks critically at the planning of CEHE, its capital-investment policy, its managed-expenditures

**Exhibit K - 29**

JA310

budget, and how successfully it furthers its tax-exempt educational purposes. The Board monitors senior-people decisions and organization problems, and also acts as the "supreme court" for CEHE. The Board watches the organization's spirit to make sure that it succeeds in utilizing the strengths of people, that top management develops tomorrow's managers, that its rewards to managers are strategically focused, and that its management tools and management methods strengthen the organization and direct it toward objectives.

The following is a general list of specific Board authorized activities (in addition to any other authorized activities and responsibilities mentioned in CEHE's Articles and/or Bylaws):

1. Approving the annual budget.
2. Approving strategic plans and strategic initiatives.
3. Approving Top Management compensation, bonus plans, and annual bonus awards.
4. Approving any changes to the college's mission.
5. Approving the opening or closing of any campuses.
6. Approving new Board of Director members.
7. Approving key decisions on legal matters and legal strategy.
8. Approves annual audits.
9. Approving or ratifying major or significant decisions/actions affecting CEHE.

**Role, Responsibilities, and Duties**

The Board's review and guidance function involves six key areas. They are listed below in order of importance.

Strategy: Strategy is all-encompassing and ranges periodically from an overall Future Picture with Measures of Merit to Centers of Gravity and Campaigns. It usually ends with projections and budgets for operations and capital investments. The Board reviews, discusses, and approves the Strategy. The Board reviews phases of the Strategy (if applicable) as it is in progress or is completed. Particular attention is paid to management's managing of innovations, particularly long-term innovations, which are being tested and which may incur significant time or money. The Board reviews strategy for what business it is in, and what business it should be in (also, what business CEHE should not be in). Further, it questions what should be abandoned or played down and what should be sloughed off to keep itself lean and strong. Proposed major strategic decisions and proposed major strategic policy requires discussion and approval from the Board.

Policy: Our policies and procedures contain our lessons learned and best practices. They are our knowledge capital. Our knowledge capital is contained in Information Letters, Procedure Directives and Management Memos. The Board periodically assesses whether CEHE's knowledge capital is growing, being maintained, and being implemented. The Board also periodically considers if CEHE's reporting systems are accurate and timely. The Board considers and discusses CEHE's policies with respect to key outside relationships with government and the public in

general, and whether CEHE has adequate policies with respect to its legal and regulatory responsibilities as a nonprofit, tax-exempt educational organization.

Trouble (and Success): The Board reviews, discusses, and considers if there are any serious troubles or looming troubles in operations with students, staff, accreditation, Department of Education, or legal. And if so, discusses with management what is it, what has been done, and what is planned to be done.

Performance: The Board monitors how top management is doing. The Board wants to know that the organization has competent management – and the right management. It appraises the performance of the organization as it is the duty of the Board to review top-management performance regularly and in-depth, and to remove top executives who do not measure up to very high demands.

Personnel and Organization: The Board may be involved with the appointment and promotion of people to senior management positions. It may make appraisals of senior management. It can review the performance and productivity of top management and other senior managers, plus the productivity of crucial activities, such as admissions and faculty.

Auditing: The Board approves the hiring of auditors and, at least annually, reviews and discuss the results of audits with the auditors.

**Information**

Top management provides the Board with operating information, such as the quarterly key results table and graphs, financial statements, and summary budget reports. Top management also reports to the Board on progress of strategy.  Information and data are distributed in writing to the Board at least seven days before the Board meets and to each committee before such committee meets.

**Executive Sessions**

Some issues before the Board involve the CEO personally, such as his or her compensation, leadership strengths and weakness, or succession strategy. Other sensitive issues might include legal allegations against CEHE, potential mergers or other significant transactions, or dissatisfaction among members of how the Board operates. When the CEO or other management is present, independent Directors may be reluctant to raise concerns about competence or tenure. They may refrain from complaining strenuously about CEHE's handling of important issues. The unwritten rules in many board rooms call for a polite tone, understated language, and indirect criticism.

To solve this problem, as part of each Board meeting, the independent Directors meet in executive session at some point during or before each Board meeting to discuss sensitive matters.

The lead Director or non-executive chair communicates to the CEO the key takeaways from the executive session.

**Meeting Procedures**

Directors are expected to attend Board meetings and meetings of committees on which they serve, and to spend the time needed and meet as frequently as necessary to properly discharge their responsibilities. The Chairman or CEO and the Secretary of CEHE establish and issue the agenda for each meeting of the Board.

     **iii.**     **A copy of CEHE's Bylaws and Articles of Incorporation.**

CEHE's current Bylaws and Articles of Incorporation are attached as **Exhibit b.iii.** – **Bylaws and Articles.**

     **c.**     **Copies of Board of Directors meeting minutes that have discussed the schools' compliance with accrediting standards as well as the District Court's findings, conclusions, and actions;**

Based on the advice of outside counsel, CEHE objects to this request. The substance of communications between Board members is confidential business information and may include information protected by the attorney-client privilege or constitute attorney work product. While the *Standards* provide that the Commission may request information and documentation that the Commission deems pertinent and relevant, CEHE does not believe the Commission has unfettered access to privileged and confidential business information. CEHE's counsel is certainly available to discuss this with representatives of the Commission or its counsel.

Further, the Commission's inquiry here appears directed towards concerns about whether the Board has been kept apprised of the system-wide Probation Orders and the Colorado litigation. However, the scope of the Commission's request exceeds that purpose. While these matters have been a point of discussion at many meetings, other business matters have been discussed.

Nonetheless, without waiving, and subject to, those objections, CEHE is providing excerpts from the Board of Directors meeting minutes showing that the Board was contemporaneously made aware of the system-wide Probation Orders and the Colorado investigation and litigation, which are attached as **Exhibit c.1** – **Board Excerpts**. These excerpts show that these matters were frequent topics of discussion at the Board meetings.

     **d.**     **A description of any independent investigation undertaken by CEHE or the Board of Directors with regard to ACCSC's Probation Orders or the District Court's findings as well as the results of such investigation(s) as may be available;**

Neither CEHE nor its Board of Directors has undertaken any independent investigations with regard to ACCSC's Probation Orders or the Colorado District Court's Decision. As discussed

above, CEHE and the Board of Directors were regularly updated as to the status of the litigation and find serious deficiencies in the Court's Decision. CEHE has initiated an appeal which is currently in process in the Colorado Court of Appeals.

Notwithstanding this, as discussed and reviewed in detail in several of CEHE's Responses to the Probation Order, prior to the 2018 Probation Order, CEHE had periodically conducted independent third-party "secret shopping" reviews of its Admissions Consultant interview process and engagement with prospective students. Since receipt of the Probation Order, CEHE has increased the frequency of these third-party "secret shopping" reviews and has contracted to conduct these reviews on a quarterly basis in 2020 and 2021. For more details on these reviews, see CEHE's March 2, 2020 Response and December 30, 2020 Response.

    **e. A description of any changes directed by the Board of Directors with regard to leadership, management, and administrative oversight in light of the District Court's findings, conclusions, and actions in keeping with the Duty of Care, Duty of Loyalty, and Duty of Obedience that each Trustee has to CEHE;**

As discussed above, the Board is confident in CEHE's current leadership given the years of continued progress demonstrated by CEHE. Other than beginning a search to fill some vacant Director seats, the Board has no immediate plans to make changes to leadership, management, or delegation of duties to the duly appointed officers of CEHE.

    **f. An attestation from each member of the Board of Directors indicating that s/he has read and understands the series of Probation letters issued by ACCSC, the District Court's decision, and this letter;**

See ==Exhibit f.1== – Affidavits.

    **g. An explanation as to how CEHE has determined that each school reports its employment rates in accordance with ACCSC's Standards of Accreditation and Guidelines for Employment Classification, addressing the District Court's determination in the following areas:**

CEHE's policies and procedures for reporting employment rates in accordance with ACCSC *Standards* are contained in Procedure Directive 321R. *See* ==Exhibit g.1== – **PD 321R**.

As stated more fully above, CEHE strongly contests and rejects the Court's findings on this matter. The Court's findings are part of CollegeAmerica's appeal of the entire Decision with the Colorado Court of Appeals. Finally, CEHE has provided extensive information to the Commission regarding its employment rate reporting practices in its Responses to the ACCSC Probation Order. CEHE incorporates and includes its December 18, 2018 Response, June 28, 2019 Response, March 2, 2020 Response, and December 30, 2020 Response as part of the materials for its response to this

item **g**.  For example, see CEHE's response to Item 9 and Item 10 in its December 18, 2018 Response to Probation and CEHE's response to Item 3 in its June 28, 2019 Response to Probation.

> **i.    The "implausibility" that CEHE actually misunderstood its obligation to properly document its employment placement decisions for over five years between January, 2011 and mid-2016;**

> **ii.    CEHE's knowing failure to follow ACCSC Standards; and**

Requests **g(i) and (ii)** ask for explanations addressing the "implausibility" that CEHE misunderstood its obligations to properly document its employment placement decisions and CEHE's "knowing" failure to follow the *Standards*.  This finding mischaracterizes the evidence in the case.  CEHE has *always* taken seriously its obligation to follow accreditation *Standards* and guidance.

Judge Buchanan's findings notwithstanding, CEHE rejects and denies any "knowing failure" to follow the ACCSC *Standards*.  CEHE's position with respect to all graduation and employment data reported to ACCSC is that the data was made truthfully, honestly, reasonably, and always in in a good faith effort to comply with ACCSC *Standards*.  CEHE stands by this statement regardless of whether a third party, compensated, adversarial, and highly questionable "expert," reviewing the results years after-the-fact arrives at different conclusions with respect to CEHE's classification of students as employed in field, self-employed, placed by reason of job advancement, or excluded (*e.g.,* waivers) from CEHE's reported graduation and employment rate data.

> **iii.    The District Court's determination that CEHE's Vice President of Academics admitted that she would count self-employed students as employed in field even when CEHE did not meet the documentation requirements in the ACCSC guidelines for employment classification;**

Ms. Reed ***did not testify*** that she would count self-employed students as employed in field even when CollegeAmerica did not meet documentation requirements.  This is an unfair characterization of her testimony.  On cross examination, Mr. Reed made clear that she instructed career services staff to obtain signed statements from self-employed graduates.  When the State asked whether there was a period of time where CollegeAmerica did not obtain signed statements, she conceded that "sometimes that happens."  <mark>Tr. Ex. R</mark> at 9-11 (S. Reed).

No institution can guarantee perfect documentation, especially in an area as nuanced as verifying employment.  The fact that CEHE career services staff made mistakes does not mean that CEHE had a policy of knowingly violating documentation requirements.  Again, CEHE has been transparent with the Commission about how it was documenting placements.  Where mistakes were identified, they were always corrected.

h. **An explanation as to how each ACCSC-accredited school's admissions process permit prospective students to make informed and considered enrollment decisions without undue pressure given the District Court's finding that CEHE's admissions process did not appear to be focused on guiding prospective students, at least not an attempt to protect their best interests, but rather with simply enrolling them, and "packaging" them with a financial aid package, all within a single day;**

This has been discussed in Section III, above.  Additionally, CEHE has provided several detailed and extensive responses to this item as part of its Responses to the ACCSC Probation Order.  Specifically, CEHE incorporates and includes as part of its response to this item h the following materials:

1. CEHE's response to Item 2 and Item 5 in its December 18, 2018 Response to Probation Order;
2. CEHE's response to Item 6 in its June 28, 2019 Response to Probation;
3. CEHE response to Item 6 in its March 4, 2020 Response to Probation, and;
4. CEHE's response to Item 3 and Item 4 in its December 30, 2020 Response to Probation.

i. **An explanation of the schools' practice of counting self-employed students as employed in field even when CEHE does not possess the documentation requirements in the ACCSC's Guidelines for Employment Classification; and**

CEHE's policies have always prohibited counting placements that were not supported by documentation required by ACCSC *Standards* and guidance. See also our response to item g, above.

j. **A summary of any changes to personnel or operating policies made as a result of the District Court's decision against CEHE.**

See discussion above in Section VII.

# Exhibit L

Steven M. Gombos

703-934-9831 Direct
sgombos@glpclaw.com

## GOMBOS | LEYTON PC

### ATTORNEYS

11350 Random Hills Road | Suite 400 | Fairfax, Virginia 22030
703.934.2660 Main | 703.934.9840 Fax | www.glpclaw.com

April 30, 2021

**By email** (mccomis@accsc.org)
Michale McComis, Ed.D.
Executive Director, ACCSC
2101 Wilson Blvd., Suite 302
Arlington, Virginia 22201

Re:     **CEHE Notice of Accreditation Withdrawal**

Dr. McComis:

On Friday, April 23, you sent me, as CEHE's counsel, a courtesy copy of ACCSC's notice of withdrawal of CEHE's accreditation. I have initially reviewed ACCSC's withdrawal notice and will work with CEHE to prepare its grounds for appeal within the time allotted under ACCSC's Standards.

I am writing to you well in advance of the submission deadline to request critical information from ACCSC. Specifically, I am asking for documents related to ACCSC's past treatment of accredited institutions with below benchmark graduation and employment rates,[1] including the following:

1.  Copies of all notices ACCSC sent to the Department of Education between 2012 and the present in which ACCSC provided notice that it had placed an accredited institution on probation, show cause, or warning, taken an action against the institution that is subject to appeal, or made a final decision to withdraw or deny a school's accreditation.

2.  Copies of all probation, warning, or show cause orders issued between 2012 and the present which address below benchmark graduation and employment rates.

---

[1] For the sake of these requests for documents and correspondence, please read the terms documents, records, and correspondence broadly to include all information, whether in paper form or electronically stored information, as broadly defined under Federal Rule of Civil Procedure 34(a).

**Exhibit L - 1**

JA318

Michale McComis, Ed.D.
April 30, 2021
Page 2

3. Any correspondence between ACCSC and any institution placed on probation, warning, or show cause status between 2012 and the present for failing to meet either graduation or employment benchmark rates.

4. Any correspondence between ACCSC and any institution subject to an adverse action between 2012 and the present based, wholly or in part, on the failure to meet either graduation or employment benchmark rates.

5. Any ACCSC records of any instances in which ACCSC granted leniency to a school, or did not take an adverse action against an institution, with below benchmark rates based on circumstances related to the COVID-19 pandemic.

6. Any ACCSC records involving any instances in which ACCSC granted leniency to a school, or did not take an adverse action against an institution, with below benchmark rates based on the school's transition from on-ground to a fully online program.

While the Standards do not address the availability of discovery into ACCSC's prior treatment of accredited institutions, they do not foreclose it. ACCSC's Standards, however, expressly entitle CEHE to substantial fairness in the manner in which it is treated as an accredited institution. ACCSC's practices must also accord with 34 CFR 602.25's due process requirements. Under any notion of substantial fairness, ACCSC must treat accredited institutions in a consistent manner. Indeed, reasoned decision making is defined by consistent conduct; an agency's inconsistent enforcement of its rules is arbitrary and capricious.

Moreover, ACCSC's Rules of Process and Procedure governing appeals from adverse actions give weight to this request for information. The rules specify that an accredited institution may appeal from any decision it believes was arbitrary and capricious. Section VIII (B)(1). And the rules also clarify that the record before the Appeals Panel includes all information before the Commission at the time the adverse action was taken. Section VIII (B)(4). That certainly includes the information known to the Commission about its own past practices and treatment of other accredited institutions.

Our ability to independently obtain this information is currently limited to the ACCSC actions posted on its website. Based on our limited review of those actions, it appears multiple schools with similar histories of below benchmark outcomes remain accredited by the Commission (*see, e.g.* Takoda Institute of Higher Education, Vista College, and Construction Training Center). Further, while CEHE has



**Exhibit L - 2**

Michale McComis, Ed.D.
April 30, 2021
Page 3

demonstrated that its graduation and employment rates are trending towards compliance, other schools remain accredited despite a history of gradually worsening rates.

To the extent ACCSC is concerned the requested information discloses confidential information about other accredited institutions, any identifying information can be redacted prior to production.

Given the tight deadline for appeals under ACCSC's Standards, I am asking that the Commission respond to our request no later than May 7, 2021, letting us know whether it agrees to provide the requested information.

Please call if you want to discuss the scope of the requested information or the process for producing the requested information.

Respectfully,

Steven M. Gombos

**Exhibit L - 3**

JA320

# Exhibit M

**ACCSC**
Accrediting Commission of Career Schools and Colleges

2101 Wilson Boulevard, Suite 302
Arlington, Virginia 22201
703.247.4212
703.247.4533 fax
**www.accsc.org**

September 17, 2021

**ELECTRONIC DELIVERY**
paul.gardner@independence.edu

Paul Gardner
Interim CEO/Chief Financial Officer
Center for Excellence in Higher Education
4021 South 700 East, Suite 400
Salt Lake City, Utah 84107

*Withdrawal of Accreditation*
*Appeals Panel Decision*

*Re: Independence University – School #M070581*

Dear Mr. Gardner:

The purpose of this letter is to deliver the decision of the independent Appeals Panel on the appeal of the decision by the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") to withdraw the accreditation of Independence University ("IU" or "the school") (M070581) and its branch campuses – Stevens-Henager College in Murray, Utah (B070583), Stevens-Henager College in Boise, Idaho (B070764) – operated by the Center for Excellence in Higher Education ("CEHE").

## APPEALS PANEL DECISION

CEHE brought an appeal from the April 22, 2021 decision of the Accrediting Commission of Career Schools and Colleges ("ACCSC" or "the Commission") to withdraw the accreditation IU" and to remove the school from the list of ACCSC-accredited institutions. The school submitted a timely Letter of Intent to Appeal a Commission Decision on May 3, 2021 and its Grounds for Appeal were duly submitted on May 27, 2021. Pursuant to the Commission's *Rules of Practice and Procedure*, a virtual hearing was held before an independent Appeals Panel on July 8, 2021. For the reasons set out below, the Appeals Panel affirms ACCSC's decision to withdraw the accreditation of Independence University.[1]

### Background: ACCSC's Decision to Withdraw Accreditation

The rationale for ACCSC's decision to withdraw IU's accreditation is succinctly stated in its April 22, 2021 Withdrawal Letter to CEHE: IU "failed to demonstrate successful student achievement by maintaining acceptable rates of student graduation and employment in the career field for which the school provided education over a significant history of reporting and monitoring" (ACCSC April 22, 2021 Withdrawal Letter, pg., 1). The decision letter went to great effort to explicate the lengthy chronology of Commission actions with respect to IU, noting that "the history is significant in terms of the length of time afforded to IU to come into compliance with standards, significant in terms of the breadth of the failure throughout the school's programmatic offerings, and significant in terms of the number of students the school failed to serve" (*Id.*). The "Accreditation Actions Considered" concerning CEHE and related schools and the "History/Compliance History" are described in detail in Appendix I and Appendix II of the April 22, 2021 Withdrawal Letter and are not restated here.

---

[1] Pursuant to *Section VIII (B)(3)*, *Substantive Standards, Standards of Accreditation*, the accredited status of a branch campus is dependent upon the continued accreditation of its main school. Therefore, the Appeals Panel decision to affirm the Commission's action to withdraw the accreditation of the main school also withdraws the accreditation of the branch campuses, Stevens-Henager College in Murray, Utah (B070583) and Stevens-Henager College in Boise, Idaho (B070764).

**Exhibit M - 1**

JA322

*Center for Excellence in Higher Education – Salt Lake City, Utah*                    *Appeals Panel Decision*
*Re: Independence University – West Haven, Utah (#M070581)*
*September 17, 2021*
*Page 2 of 8*

ACCSC's serious concerns with CEHE schools are longstanding. The Commission's decision letter stated that "[f]rom 2012 to the present, the [CEHE system of] schools have been subject to scrutiny by the Commission due to an inability to demonstrate continuous compliance with accrediting standards, particularly in the areas of acceptable student achievement, advertising and recruitment tactics, rigor of the admissions process, and employment classifications" (ACCSC April 22, 2021 Withdrawal Letter, pgs., 1-2). ACCSC's reservations about the compliance of CEHE-affiliated campuses compliance grew considerably over time: "[t]he Commission's findings and communications, particularly in the last four years, reflect a deepening concern regarding the magnitude of the schools' failure to demonstrate compliance with standards and heightened awareness of the expiration of the timeframe available to the school to remedy the areas of non-compliance" (ACCSC April 22, 2021 Withdrawal Letter, pg., 2).

In 2018, the Commission's concerns about the non-compliance of the CEHE system of schools became so grave that in September of that year it placed the institutions on Probation. In its September 6, 2018 Probation Order, ACCSC also warned the school that "the period allotted to the schools to remedy the noncompliance or cure the deficiency would end on September 7, 2020 (ACCSC September 6, 2018 Probation Order, pg., 78). The Commission also informed the school that the Commission is "under no obligation to wait for the maximum timeframe to expire and may take an adverse action prior to the expiration of the maximum allowable timeframe" (*Id.*). The May 2, 2019 letter reiterated that both the maximum timeframe would end on September 7, 2020 and that the Commission could act sooner if warranted (ACCSC May 2, 2019 Probation Order, p., 54). The September 7, 2020 date was later extended by the Commission to May 31, 2021 with the same admonition that the Commission could act sooner if warranted (ACCSC July 21, 2020 Probation Order, pg., 31).

After all but one ground campus  indicated  an intention to cease enrolling new students and to teach-out its current students, ACCSC continued to express concerns about IU's compliance with accreditation standards, especially in the critical area of student success. For example, in the Commission's July 21, 2020 letter to CEHE, ACCSC stated:

> *Of particular concern is that IU continues to report below-benchmark rates of student achievement. Of the 13 active (non-discontinued) programs that have been operational long enough to be reportable, the school has reported above-benchmark rates of student achievement for only four. The rates reported for the other nine will require significant improvements in order to achieve acceptable rates. The lack of significant improvement over the last three years calls into question the depth of assessment the school has conducted, and therefore does not provide assurance that the current plans will have the needed impact on rates of student achievement* (pg. 5).

The Commission's consideration of IU's compliance with accreditation standards came to a head at its February 2021 meeting. At that time, as explained in the April 22, 2021 Withdrawal Letter:

> *The Commission reviewed the new data presented in Graduation and Employment Charts prepared using a Report Date of December 2020. The school reported below-benchmark rates of student achievement in 82% (14 of 17) programs that are active and have been operational long enough to be reportable. The Commission also reviewed the history of student achievement outcomes reported by the school in the 2016, 2017, 2018, 2019, and 2020 ACCSC Annual Reports* (pgs., 6).

The Commission's analysis of this data led it to conclude that "the new data does not represent a significant upward trend in the ongoing pattern of unacceptable student achievement rates. IU consistently

**Exhibit M - 2**

*Center for Excellence in Higher Education – Salt Lake City, Utah*                                    *Appeals Panel Decision*
*Re: Independence University – West Haven, Utah (#M070581)*
*September 17, 2021*
*Page 3 of 8*

reported below benchmark rates of student achievement in 65% (11 of 17) of the active/reportable programs over the last five years" (ACCSC April 22, 2021 Withdrawal Letter, pg., 9). The Commission also found that the programs that are performing below acceptable standards for student achievement affect the highest number of students – 14,327 of 15,377 students were enrolled in programs which reported unacceptable rates of student achievement (*Id.*). And, notably, only 16% of the 15,377 students available to graduate successfully completed the program and achieved the vocational objectives of the program – i.e., employment in the field of training (*Id.*).

The Commission also carefully examined trend data and projections provided by IU to demonstrate progress toward student achievement to the level required by the Commission's standards. ACCSC concluded that "the school's projections and trend data show that the school's current efforts will not achieve minimum student achievement benchmarks for years" (*Id.*). The Commission had requested IU to provide trend data regarding student achievement including a Retention Chart to report how many students who started the program during a defined period (and available for retention) have remained in school. Upon examination of the data supplied by IU, the Commission found that the "retention rates are so low for nine programs that it appears the school will report unacceptable rates of student graduation minimally over the next two to three Annual Report years" (*Id.*). ACCSC also concluded that "three new programs are predicted to have unacceptable rates of student graduation by the time they are first reportable using the Graduation and Employment Chart formula, adding to the number of programs at the school that are failing to demonstrate successful student achievement" (*Id.*).

The Commission also directed IU to furnish a list of graduates in each program over the most recent six months and report the graduates' employment status. Because fewer than 70% have achieved employment objectives, it is, said the Commission, "difficult to predict whether the school's efforts are likely to make sufficient improvement by the time the data is reportable via the Graduation and Employment Chart formula" (*Id.*). For this reason, these "unverified predictions do not rise to the level of proof" (*Id.*). The withdrawal letter laid out the Commission's findings with respect to the retention data provided for fifteen specific programs.

The decision letter also examined the associate degree and baccalaureate degree programs in light of the retention data proffered by IU. The Commission reached the following determination:

> *IU projected that associate degree programs will take four years to achieve minimum benchmarks (2024 Annual Report) and baccalaureate programs are expected to take six years to achieve minimum benchmarks (2026 Annual Report). The Commission noted that the pattern shows only the potential for incremental improvement (single digit percentage points) over the next three to five years and would require a marked increase to an average of 13 percentage point improvement in the year where the program attains benchmark. If IU underestimated the timeline for improvement, it will take even longer for the programs to demonstrate compliance with acceptable student achievement benchmarks* (ACCSC April 22, 2021 Withdrawal Letter, pg., 14).

The Commission also evaluated the school's plan for improving student achievement rates and demonstrating compliance with accrediting standards. The April 22, 2021 Withdrawal Letter recited the shortcomings in the plan:

> *The Commission found the plan, although lengthy, does not account for the persistent and pervasive lack of acceptable student achievement and the short timeframe in which to achieve compliance with ACCSC's minimum requirements. The Commission found that the assessment*

**Exhibit M - 3**

*Center for Excellence in Higher Education – Salt Lake City, Utah*                    *Appeals Panel Decision*
*Re: Independence University – West Haven, Utah (#M070581)*
*September 17, 2021*
*Page 4 of 8*

> *presumes the validity of programs that have failed to serve students over many years, but does not demonstrate that the school designed and delivered programs that can lead to students' successful attainment of knowledge, skills, and vocational objectives (Id.).*

Taking all of the foregoing into account, the Commission made the following decision: "Based on the school's history of non-compliance with ACCSC's student achievement standards, the lack of improvement over an extended period of time, and the projected length of time the school will still be out of compliance with standards, the Commission has acted to withdraw the accreditation of IU and to remove the school and its branch campuses from the list of ACCSC-accredited schools" (ACCSC April 22, 2021 Withdrawal Letter, pg., 16).

**Appeals Panel Consideration of IU's Grounds for Appeal**

The arguments which IU advanced in support of its appeal are set forth in its written Grounds for Appeal as well as in the oral hearing before the Appeals Panel. According to the Grounds for Appeal, IU contends that the "Appeals Panel should vacate the Decision on the following grounds (1) the Commission disregarded evidence demonstrating that the College's programs are on track to meet student achievement benchmarks; (2) the Commission inconsistently applied student achievement *Standards* to the College, resulting in disparate treatment as compared to other member institutions; and (3) the Commission acted with bias towards CEHE and its executive leadership in withdrawing the College's accreditation (IU Grounds for Appeal, pg., 2).

In considering IU's appeal, the Appeals Panel is keenly mindful of *Section VIII (B) of the Commission's Rules of Process and Procedure, Standards of Accreditation*, which provides that on appeal, the school has the burden of proving that the Commission's decision to withdraw accreditation "was arbitrary, capricious, or otherwise in substantial disregard of the criteria or procedures of the Commission, or not supported by substantial evidence in the record on which the Commission took action." This is an evidentiary burden and it rests squarely on the appealing institution. Based upon its assessment of the arguments proffered on appeal, ACCSC's *Rules of Process and Procedure* provide that the Appeals Panel has the authority to affirm, remand, or amend the Commission's decision to withdraw IU's accreditation. The Appeals Panel's findings and conclusions with respect to IU's appeal arguments follow.

As an initial matter, IU contended that the Commission's withdrawal decision disregards its own criteria and is not supported by the evidence in the record. In particular, the Grounds for Appeal posit that the withdrawal decision:

> *unfairly applies an impossible standard to CEHE and the College that, until now, was never contemplated by the Commission. The Commission has always known that the multiple initiatives CEHE developed and implemented to solve the College's student achievement issues would take several years to materialize in annual reports. The College does not offer short-term certificate programs (as most other member schools do); it offers degree programs. As such, cohorts enrolling now may not report outcomes for 54 months* (IU Grounds for Appeal, pg., 4).

The withdrawal decision, IU asserted "invokes a new, impossible retroactive standard requiring the College's 20-to-36 month degree programs to report above-benchmark rates in a fraction of the time" adding that "[p]ut simply, the Commission arbitrarily and capriciously not only moved the goalposts, but narrowed them to make the goal impossible to achieve" (IU Grounds for Appeal, pg., 5).

**Exhibit M - 4**

*Center for Excellence in Higher Education – Salt Lake City, Utah*                              *Appeals Panel Decision*
*Re: Independence University – West Haven, Utah (#M070581)*
*September 17, 2021*
*Page 5 of 8*

IU repeatedly raised the "moving the goalposts" argument in both its written appeal document and during the appeal hearing. However, the Appeals Panel does not agree that ACCSC ever moved the goalposts, let alone narrow them. There is absolutely nothing in the record of this matter that states that the Commission was willing to wait four or six years for the school to establish compliance with the critical standards governing student achievement. To do so would be for the Commission to concede that programs could be out of compliance for multiple years and that all during that time students would be matriculating in non-compliant programs, and even that is assuming that the school's projections and predictions were all correct and accurate. In addition, in its many communications with the school, the Commission always made it manifest that the Commission was under no obligation to wait for the maximum timeframe to expire and that it had the authority to take an adverse action prior to the expiration of the maximum allowable timeframe. In short, the Commission never informed IU that it had a guaranteed four to six years to establish compliance.

The Appeals Panel found no firm basis for concluding that the Commission led the school to believe that it had multiple years to demonstrate compliance. Indeed, such a position would fly in the face of a school's obligation to demonstrate <u>continuous compliance</u> with all accreditation standards and policies. The *Introduction, Preamble, Standards of Accreditation,* clearly states that:

> *The burden rests with the school to establish that it is meeting the standards. A school must supply the Commission with <u>complete, truthful, and accurate information and documentation</u> showing the school's compliance with all accrediting standards if the school is to be granted and maintain accreditation. A high level of reliance is placed upon information, data, and statements provided to the Commission by a school.* (<u>Emphasis added</u>)

The responsibility to establish compliance is continuous – "Participation in the process of accreditation is voluntary on the part of the school. By applying for and receiving accreditation, a school accepts the obligation to demonstrate continuous compliance with the *Standards of Accreditation*" (*Section I (B)(4), Rules of Process and Procedure, Standards of Accreditation*). The inability of a school to demonstrate continuous compliance with accreditation requirements can lead to adverse actions including withdrawal of the school's accreditation (*Section I (G)(3), Rules of Process and Procedures, Standards of Accreditation* states that: "Failure by a school to maintain continued compliance with all ACCSC standards and requirements will lead to the Commission taking appropriate action as described in *Section VII, Rules of Process and Procedure, Standards of Accreditation*."

IU seized on various statements made in Commission correspondence and offered them as admissions that ACCSC was accepting of the fact that it would take years before the school would be able to demonstrate compliance (IU Grounds for Appeal, pg., 6). The Appeals Panel believes that IU misapprehends the meaning and significance of such statements. Again, there is no evidence in the record to prove that the Commission gave the school carte blanche for four or six years to demonstrate that it was in compliance with the student achievement standards. The fact that the Commission understood that college programs of 20 to 36 months would not produce reportable graduation or employment outcomes for 30 to 54 months does not mean that it would accept such an approach. The various statements cited by IU are most appropriately read against the backdrop of its duty to protect students in the programs as well as its continued warnings to the school that it could take adverse action at any time and it did not have to wait for the expiration of an extension for good cause.

IU also characterized the withdrawal of accreditation as an "abrupt change in position" arguing that "[i]t was only after it became clear that CEHE was going to succeed that the Commission suddenly moved the goalposts to withdraw the College's accreditation" (IU Grounds for Appeal, pg., 8). The Appeals Panel

**Exhibit M - 5**

JA326

*Center for Excellence in Higher Education – Salt Lake City, Utah*     *Appeals Panel Decision*
*Re: Independence University – West Haven, Utah (#M070581)*
*September 17, 2021*
*Page 6 of 8*

does not believe that the record supports this assertion. The Commission's decision is explicit that accreditation was withdrawn specifically because it had concluded that IU had failed to prove that it had or could succeed.

Much of the IU's argumentation is contingent upon the validity of its projections and predictions about how well the various new strategies it put in place would perform over time. The Commission took issue with the reliability of the projections and IU's assessment of their likely effectiveness and laid out the reasons for this skepticism in the withdrawal letter. The school, however, asserted that "the Decision is not based on any meaningful evidence that the College's projections are invalid (IU Grounds for Appeal, pg., 8). Numerous times the school reminded the Appeals Panel that "the majority of the improvement measures—including the highly successful Five-Credit Hour Model and pre-enrollment assessment tools—were not fully implemented until 2020 (IU Grounds for Appeal, pg., 9). The school also noted that it had tested dozens of initiatives to improve retention and employment rates for online students but only fully implemented those where there was evidence that they improve outcomes (*Id.*). Additionally, IU argued that "the Commission cannot claim that the corrective measures failed" because "[t]hroughout the testing process, the Five-Credit Model alone resulted in substantial improvement to course completion rates and drop rates for the Business and Accounting programs" (*Id.*).

The Appeals Panel carefully considered this line of argumentation but in the final analysis did not find it persuasive. The Commission clearly had deep-seated reservations about the data, trends, projections, and predictions presented by IU, particularly those in the December 2020 response. ACCSC was also viewing this information through the lens of several years of non-compliance by CEHE schools as well as exceptionally bad data and trends among student cohorts up to those in 2020 who would be subject to the new initiatives. In addition, it appears that the Commission was not convinced about the reliability of school's predictions. The Appeals Panel could not find no proof in the appeal record that ACCSC's misgivings were misplaced. In the absence of reliable, data-driven, and verifiable projections, the Appeals Panel cannot conclude that the Commission had erred in reaching the conclusion it did.

The Grounds for Appeal contend that the Commission had no basis for a system-wide withdrawal of accreditation citing the purported success at on campus – IU-West Haven (IU Grounds for Appeal, pg., 10). In the Appeals Panel's view, the asserted compliance with benchmark in the programs offered there does not offset the long history and systemic deficiencies in IU campuses and their predecessor entities.

The Appeals Panel also examined IU's argument that good cause existed to allow CEHE to continue to establish compliance with benchmark rates (IU Grounds for Appeal, pgs., 10-13). The gravamen of this assertion is that "the College's currently enrolled students are successfully completing courses and finding employment at increasing rates. CEHE's students are successfully learning. The Commission simply ignored this evidence and concluded without basis 'the record does not reflect any reason to extend the maximum time frame [for compliance].'" CEHE also argued that the Commission "took away time that it had previously granted to CEHE to continue demonstrating progress towards compliance" – i.e., the Commission had previously extended the maximum time to May 31, 2021 (IU Grounds for Appeal, pg., 11).

In the face of the long, detailed, and well-documented chronology of the Commission's actions with respect to the CEHE schools, the Appeals Panel is not convinced that the Commission acted in a manner inconsistent with the record in this matter. The Commission took into account the totality of the facts with respect to the CEHE schools and did not focus on one late-in-the-game slice of time as CEHE does in its appeal. The decision as to whether good cause exists to extend the maximum time frame is within the sole

**Exhibit M - 6**

JA327

*Center for Excellence in Higher Education – Salt Lake City, Utah*                              *Appeals Panel Decision*
*Re: Independence University – West Haven, Utah (#M070581)*
*September 17, 2021*
*Page 7 of 8*

discretion of the Commission and the Appeals Panel finds nothing in the record that would lead to the conclusion that ACCSC abused its discretion in finding that IU should not be given additional time. As for the contention that the Commission had taken away time that it had already granted, ACCSC was abundantly clear in numerous letters to the institution that it did not have to wait until the end of the extended time frame to take action. In addition, there is nothing in the Commission's rules or policies which say that once good cause is determined to exist, that determination cannot be changed or the time frame accelerated. Finally, the amount of time that is at issue is simply a month or two given the date of the withdrawal letter and the end of the extended time frame – May 31, 2021. IU offered no showing that additional data introduced in that short time period would be determinative.

CEHE's Grounds for Appeal posit that the decision to withdraw accreditation "evades the Commission's requirement to consistently apply its *Standards*" (IU Grounds for Appeal, pg., 13). Specifically, IU states that "The Commission has routinely permitted schools with a history of failing to meet benchmark rates in all of their programs to remain accredited, even when the Commission recognizes that a school has not yet demonstrated it is on track to achieve compliance" (*Id.*) In support of this allegation, CEHE makes much of ACCSC's refusal to furnish records showing the Commission's application of the Standards to other institutions as well as excerpts from the Commission's Executive Director explaining that such records were not before the Commission when it decided to withdraw IU's accreditation. In the Appeals Panel's opinion, CEHE's argument ignores the simple fact that accreditation decisions are predicated on the individual facts and circumstances pertaining to the institution as contained in the detailed record of actions and communications with the institution under review. Accordingly, the specific facts pertaining to one school's actions would not be determinative in how another institution was treated. That is not to say, however, that the Commission through numerous decisions over many years does not have a keen sense of the consistency of its decisions which it brings to bear on its actions. It is for these reasons that the Appeals Panel finds that CEHE's discussion of other schools – Vista College, Takoda Institute, Construction Training Center – does not establish that the Commission inconsistently applied its standards to IU.

CEHE characterizes ACCSC's decision to withdraw IU's accreditation as a "continuation of unnecessarily punitive actions" and that CEHE's relationship with the Commission has been fraught with "disproportionate actions, harsh rhetoric, and a refusal to recognize CEHE's corrective actions and compliance with ACCSC *Standards*" (IU Grounds for Appeal, pg., 16). CEHE stated that the decision was "an effort to harm CEHE" and was "in retaliation for CEHE exercising its right to challenge the Commission's improper handling of unsubstantiated and unexamined anonymous complaints" (*Id.*). In support of these serious allegations, CEHE points to the manner in which the Commission handled a series of complaints against the College, "unnecessarily onerous requests for information", the system-wide Show Cause Order, and the promulgation of new standards "for the specific purpose of excluding Mr. Barney from CEHE's Board of Directors" (IU Grounds for Appeal, pgs., 16-21).

Allegations impugning the motive for the Commission's actions against CEHE are serious and as such demand a high standard of proof, the burden of which lies squarely and exclusively on the shoulders of CEHE. This burden is not met by simply coloring ACCSC's actions in a harmful light or viewing those actions through CEHE's own prism. The question for the Appeals Panel is whether the Commission's extensive actions concerning CEHE were motivated by a desire to punish or seek retribution or whether the Commission was simply discharging its responsibilities as an accrediting agency in a manner consistent with its rules, policies, and quality standards. The Appeals Panel found no evidence in the Grounds for Appeal or from the appeal hearing that in fact supports or proves CEHE's assertions about the Commission's conduct. Indeed, there was no proof that that ACCSC's decision was punitive,

**Exhibit M - 7**

*Center for Excellence in Higher Education – Salt Lake City, Utah*                          *Appeals Panel Decision*
*Re: Independence University – West Haven, Utah (#M070581)*
*September 17, 2021*
*Page 8 of 8*

retaliatory, or disproportionate – characterizing the rationales for the Commission's actions in a denigrating manner does not constitute proof. To the contrary, the lengthy record in this matter shows that the Commission was responding within its authority and mandate to CEHE's consistent failure to demonstrate compliance with accreditation standards. CEHE may have labored under the impression that it was being unfairly treated and that the Commission's motives were misguided but it clearly did not carry its burden of adducing evidence to prove that point.

## Conclusion

For the foregoing reasons, it is the unanimous opinion of the Appeals Panel that the decision of the Commission to withdraw the accreditation of Independence University and its branch campuses be affirmed.

****

## EFFECTIVE DATE AND DISCLOSURE

The decision of the Appeals Panel to affirm ACCSC's withdrawal of accreditation makes that action final. Normally, the effective date of the final decision to withdraw accreditation would be effective as of the date of this letter (Section *VII (B) & VIII (A)(2) Rules of Process and Procedure, Standards of Accreditation*). However, in the case of Independence University in West Haven, Utah and its branch campuses – Stevens-Henager College, Murray, Utah and Stevens-Henager College, Boise, Idaho, – because the campuses closed on August 1, 2021, the final decision to withdraw the accreditation of these campuses is effective August 1, 2021.

In accordance with *Section X (C)(4) & (D)(4), Rules of Process and Procedure, Standards of Accreditation*, the Commission will make this action public. The school(s) may submit comments using the enclosed Public Comment Disclosure Form **on or before September 27, 2021** to accompany the Commission's disclosure of this final adverse accreditation action.

For additional information pertaining to this matter, please contact me directly at mccomis@accsc.org.

Sincerely,

Michale S. McComis, Ed.D.
Executive Director

**Exhibit M - 8**

**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

CENTER FOR EXCELLENCE IN HIGHER
EDUCATION, INC.,

                *Movant/Plaintiff*,

     v.

ACCREDITATION ALLIANCE OF CAREER
SCHOOLS AND COLLEGES, D/B/A
ACCREDITING COMMISSION OF CAREER
SCHOOLS AND COLLEGES.

                *Respondent/Defendant*.

Civil Action No.
1:22-cv-01223-RDA-WEF

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S**
**<u>MOTION TO VACATE ARBITRATION AWARD</u>**

JA330

**TABLE OF CONTENTS**

I.   Preliminary Statement.................................................................................................1

II.  Factual Background ..................................................................................................3

     A.   The Accreditation Process .................................................................................3

     B.   Adverse Accreditation Actions ..........................................................................4

     C.   Revocation of Independence University's Accreditation ...............................5

III. Argument ..................................................................................................................11

     A.   Legal Standard .................................................................................................11

     B.   The Arbitrator did not exclude any pertinent or material evidence. ...........13

IV.  Conclusion ..............................................................................................................18

i

JA331

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apex Plumbing Supply, Inc. v. U.S. Supply Co.*,
    142 F.3d 188 (4th Cir. 1998) ............................................................................................1, 11

*Beckley Oncology Assocs., Inc. v. Abumasmah*,
    993 F.3d 261 (4th Cir. 2021) ...................................................................................................1

*e.spire Commc'ns, Inc. v. Commc'ns, Inc. v. CNS Commc'ns*,
    39 F. App'x 905 (4th Cir. 2002) ...........................................................................................13

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*,
    244 F.3d 521 (6th Cir. 2001) .................................................................................................17

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008)................................................................................................................2

*Hampton Univ. v. Accreditation Council for Pharmacy Educ.*,
    No. 4:20CV118 (RCY), 2021 WL 3166380 (E.D. Va. July 27, 2021)......................15, 17, 18

*Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co.*,
    232 F.3d 383 (4th Cir. 2000) ...........................................................................................12, 13

*Interactive Brokers LLC v. Saroop*,
    969 F.3d 438 (4th Cir. 2020) ............................................................................................1, 11

*MCI Constructors, LLC v. City Of Greensboro*,
    610 F.3d 849 (4th Cir. 2010) .................................................................................................12

*Mountain State Univ., Inc. v. Higher Learning Comm'n*,
    No. CV 5:14-16682, 2017 WL 963043 (S.D. W.Va. Mar. 10, 2017)....................................17

*Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. & Colleges*,
    781 F.3d 161 (4th Cir. 2015) ........................................................................................ *passim*

*Qorvis Commc'ns, LLC v. Wilson*,
    549 F.3d 303 (4th Cir. 2008) ...................................................................................................1

*Thomas M. Cooley L. Sch. v. Am. Bar Ass'n*,
    459 F.3d 705 (6th Cir. 2006) .................................................................................................14

*Upshur Coals Corp. v. United Mine Workers*,
    933 F.2d 225 (4th Cir. 1991) ...................................................................................................1

JA332

*Wachovia Sec., LLC v. Brand*,
    671 F.3d 472 (4th Cir. 2012) .................................................................12, 13, 19

*Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*,
    290 F. Supp. 3d 463 (E.D. Va. 2018), *aff'd*, 922 F.3d 568 (4th Cir. 2019)............................15

*Wilfred Acad. of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges & Sch.*,
    957 F.2d 210 (5th Cir. 1992) ......................................................................15

*Yuasa, Inc. v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers*,
    224 F.3d 316 (4th Cir. 2000) .......................................................................1

**Statutes**

9 U.S.C. § 10(a)(3)......................................................................................12

9 U.S.C. § 10(a)(4)......................................................................................12

20 U.S.C. §§ 1001 *et seq.*............................................................................3

20 U.S.C. § 1099b.......................................................................................3

20 U.S.C. § 1099b(e)...................................................................................5

20 U.S.C. § 1099b(f)..................................................................................14

**Other Authorities**

34 C.F.R. §§ 602.10–602.29........................................................................3

34 C.F.R. §§ 602.16–602.21........................................................................3

34 C.F.R. § 602.20..................................................................................4, 5

34 C.F.R. § 602.25...............................................................................4, 5, 6

Office of Postsecondary Education, Department of Education, *Final Regulations*
    84 FR 58834-01 (Nov. 1, 2019).................................................................5

JA333

## I.    PRELIMINARY STATEMENT

The Center for Excellence in Higher Education, Inc. ("CEHE") bears a distinctly "heavy burden" in asking this Court to vacate an arbitration award. *Interactive Brokers LLC v. Saroop*, 969 F.3d 438, 443 (4th Cir. 2020) (citation omitted). The Federal Arbitration Act "*mandates* substantial deference to [arbitration] awards." *Id.* (quoting *Qorvis Commc'ns, LLC v. Wilson*, 549 F.3d 303, 310, 312 (4th Cir. 2008)) (emphasis in original). Accordingly, courts' power to review an arbitrator's award is "severely circumscribed." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998). Indeed, "judicial review of an arbitrator's decision 'is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation.'" *Beckley Oncology Assocs., Inc. v. Abumasmah*, 993 F.3d 261, 266 (4th Cir. 2021) (quoting *Apex*, 142 F.3d at 193).

So deferential is the standard of review, "[a]n arbitration award is enforceable 'even if the award resulted from a misinterpretation of law, faulty legal reasoning or erroneous legal conclusion." *Interactive Brokers*, 969 F.3d at 445 (quoting *Upshur Coals Corp. v. United Mine Workers*, 933 F.2d 225, 229 (4th Cir. 1991)). The Fourth Circuit is explicit on this point: "[O]ur province is not to determine the merits of the dispute between the parties 'but rather to determine only whether the arbitrator did his job — not whether he did it well, correctly, or reasonably, but simply whether he did it.'" *Interactive Brokers LLC*, 969 F.3d at 445 (quoting *Yuasa, Inc. v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers*, 224 F.3d 316, 321 (4th Cir. 2000)).

Against these steep odds, CEHE asks this Court to vacate an arbitration award that the Arbitrator supported with a detailed, 36-page written decision (Compl, Ex. A, ECF No. 1-2), with the benefit of 40 pages of briefing by the parties, and based on a record comprising more than 32,000 pages (Compl., Ex. D at D - 8, ECF No. 1-5). CEHE makes this request

notwithstanding that the Arbitrator followed every applicable rule, regulation, and federal law to the letter. If ever there were a case justifying a break with the "national policy favoring arbitration," *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008), this is not it.

Of particular note, CEHE argues that the arbitrator engaged in "misconduct" by declining to order discovery or to hear additional evidence beyond the already voluminous record, despite the fact that the arbitration rules required exactly that result. Missing from CEHE's criticism of the arbitration proceedings is the notable background that the arbitration was akin to an appeal of an appellate proceeding of an accreditation decision made by the Accrediting Commission of Career Schools and Colleges ("ACCSC" or the "Commission") and confirmed by an independent Appeals Panel. In the two and a half years that Independence University ("IU," CEHE's school) was on probation leading up to the final withdrawal of its accreditation, the Commission gave IU repeated written notice of its deficiencies and, on each occasion, an opportunity to respond. IU responded each time with letters and exhibit packages numbering in the thousands of pages. That correspondence from both parties, the Commission's written withdrawal decision, and the briefing and hearing transcript resulting from the school's subsequent appeal formed the record of the arbitration at issue here. In line with the arbitration rules, and as a federal court would have been required to do in the same situation, the Arbitrator limited his review to the evidence in the record. *Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. & Colleges*, 781 F.3d 161, 174–75 (4th Cir. 2015) ("In considering whether the [accreditation] denial was supported by substantial evidence, we confine ourselves to the record that was considered by the accrediting agency at the time of the final decision."). There was no misconduct in these proceedings, and CEHE's motion should be denied.

2

JA335

## II.    FACTUAL BACKGROUND

### A.    The Accreditation Process

To understand the context of these proceedings, it is helpful to consider the framework of the accreditation process for institutions of higher education in the United States.  The U.S. Department of Education (the "Department") is charged with determining the eligibility of institutions of higher education to participate in certain federal programs, including the receipt of student aid funding under Title IV of the Higher Education Act of 1965 ("HEA") (20 U.S.C. §§ 1001 *et seq.*).  *See* 20 U.S.C. § 1099b.  The Department relies in this endeavor on the support of private accrediting agencies or associations, which serve as deputized evaluators of schools' qualifications.  *Id.*  In order to qualify for Title IV funding (generally considered essential to a school's financial viability), a school must be accredited by an authorized accrediting agency. *Id*.  ACCSC is one such agency.  Compl. ¶ 9, ECF No. 1.

Accreditors, in turn, must meet certain criteria in order to obtain recognition by the Department.  *Id.*  Those criteria are outlined by statute, 20 U.S.C. § 1099b, and the Department has issued regulations providing more specific guidance.  *See* 34 C.F.R. §§ 602.10–602.29. Pertinent to this action, one fundamental requirement of accreditors is that they must promulgate accreditation standards to guide institutions of higher educations and they must hold schools to those standards.  Federal regulations provide, broadly, what the standards must include at a substantive level, and also what mechanisms an accreditor must have in place to enforce the standards.  34 C.F.R. §§ 602.16–602.21.

JA336

To that end, ACCSC has promulgated the *ACCSC Standards of Accreditation* (the "*ACCSC Standards*"). *See* Compl. Ex. B.[1]  The *Standards* are split into two parts: *Chapter 1 – Rules of Process and Procedure*, and *Chapter 2 – Substantive Standards*. The *Rules of Process and Procedure* (or "*Rules*") provide the procedural framework for action relating to a school, including the initial accreditation determination, periodic reviews, and any adverse action ACCSC may take, such as putting a school on probation or withdrawing the school's accreditation. The *Substantive Standards* provide the criteria the school must meet in order to obtain and keep accreditation.

### B.    Adverse Accreditation Actions

As required by federal regulation, the *Rules* provide processes for adverse accreditation actions[2] against schools.  *See Rules, Sections VII – Commission Actions*; *Rules, Section VIII – Appeal of a Commission Decision*.  These processes, as with the *Standards* as whole, are designed intentionally to meet the requirements of federal regulations.  *E.g.*, 34 C.F.R. § 602.20 ("Enforcement of standards."); § 602.25 ("Due process.").

A range of options are available to the Commission when it learns that a school is or may be out of compliance with the *Standards*, including stipulations to future actions, heightened monitoring of school compliance with the *Standards*, reporting requirements, a warning, probation, and withdrawal of accreditation.  *See Rules, Sections VII – Commission Actions*.

---

[1] As CEHE notes in its Complaint, a full version of the *ACCSC Standards* is available online:   https://www.accsc.org/UploadedDocuments/1967/ACCSC-Standards-of-Accreditation-and-Bylaws-070118.pdf (last visited Dec. 22, 2022).  The *Standards* that were in effect at the time of the withdrawal are dated July 1, 2018.  Compl. Ex. A at A - 10 n.10.

[2] The *Standards* define "adverse accreditation decision" and "adverse action" as an "action that can be appealed under [ACCSC] *Rules*. Adverse actions are denial of an application for initial accreditation, withdrawal of accreditation, and denial of a substantive change application."  *Rules, Section I (A)(6)*.

4

JA337

Generally, when the Commission considers or takes action against an out-of-compliance school, the *Rules* require that the Commission give the school notice and an opportunity to respond, in accord with 34 C.F.R. § 602.20. The notice informs the school of the violation, provides an opportunity for the school to submit evidence of compliance to the Commission, and establishes a maximum timeframe for the school to achieve compliance with the *Standards*. Federal regulations establish the maximum time frame which the Commission can provide for a school to achieve compliance. 34 C.F.R. § 602.20.[3] Federal regulations establish a maximum, but no minimum time for an accreditor to take adverse action, if a school is in violation of the *Standards*.

In the event of an adverse accreditation action, a school may appeal the Commission's decision to an independent Appeals Panel. *Rules, Section VIII – Appeal of a Commission Decision*. Per the *Rules* and by federal regulation, the Appeals Panel may not include current members of the Commission. 34 C.F.R. § 602.25. Finally, if the school is dissatisfied with the Appeals Panel Decision, it may initiate arbitration to challenge the result. Federal law requires that schools submit disputes regarding adverse accreditation actions to arbitration prior to bringing a legal action in federal court. 20 U.S.C. § 1099b(e). By design, these *Rules* meet and exceed the procedural requirements outlined by federal law and regulations.

### C.    Revocation of Independence University's Accreditation

The Commission placed IU on probation in September 2018 as part of a System-Wide Probation Order against several schools owned and operated by CEHE. *See* Compl. Ex. A at A - 3. As pertaining to this proceeding, the Commission concluded in the September 2018 Order

---

[3] The Department updated its regulations, including 34 C.F.R. § 602.20, effective July 1, 2020. *See* Office of Postsecondary Education, Department of Education, *Final Regulations* 84 FR 58834-01 (Nov. 1, 2019). The Commission's *Standards* effective in 2018 reflected the timeframe provided for by federal regulation in 2018.

that several of IU's educational programs were out of compliance with the Commission's student achievement standards.[4]

Under the *Rules* in effect in 2018, "the period allotted to the school to remedy the noncompliance or cure the deficiency, together with the time for the Commission's final decision" could not exceed two years. *Section VII (M)(1), Rules of Process and Procedure*. Thus, the Commission noted in the Probation Order, IU's "maximum timeframe" to achieve compliance with the student achievement *Standards* would end September 7, 2020. *See* Compl. Ex. A at A - 26. The Commission further advised IU that it was "under no obligation to wait for the maximum time frame to expire and may take an adverse action prior to the expiration of the maximum allowable time frame." *Id.*

The September 2018 Probation Order marked the beginning of an exchange of communications between the Commission and IU lasting more than two years and comprising over 30,000 pages of documents, and which created the record upon which the Commission would ultimately base its withdrawal decision. In accordance with *ACCSC Standards* and federal due process requirements, the Commission gave IU an opportunity submit a written response to the Commission's findings in the Probation Order. *See* Compl. Ex. A at A – 3; *Section VII (L), Rules of Process and Procedure*; 34 C.F.R. § 602.25.

---

[4] *Section VII (B)* requires that a certain minimum percentage of students graduate from each program the school offers, and that a certain minimum percentage of students find employment in the career field for which the school provides education. The "benchmark graduation rate" depends on program length. *See Standards, Appendix VI – Student Achievement Rates*. For programs of 19 to 23 months, the benchmark graduation rate is 43%, and for programs of 24 or more months, the benchmark graduation rate is 40%. The "benchmark rate" for employment is 70%.

6

The school submitted "an extensive response" in December 2018.  *See* Compl. Ex. A at A - 3.  After reviewing this response, the Commission found that student achievement outcomes at IU remained "pervasively low."  *Id.* at A - 3 to A - 4.  The Commission therefore continued its system-wide probation of CEHE schools and requested more information through a System-Wide Continued Probation Order dated May 2, 2019.  *Id.*

CEHE responded again in June 2019, and upon review, the Commission again found IU out of compliance with student graduation and employment benchmark rates.  *Id.* at A - 4.  The Commission therefore issued another System-Wide Continued Probation Order on October 28, 2019.  *Id.*

CEHE responded again in March 2020.  *Id.*  Yet again, the Commission found IU remained out of compliance with student achievement standards.  *Id.*  Noting that IU was below benchmark rates in nine of its fourteen active programs, the Commission issued one more System-Wide Continued Probation Order, dated July 21, 2020.  *Id.*

With the September 2020 deadline looming, the Commission also decided at that time to extend IU's timeframe to achieve compliance to May 31, 2021,[5] and requested that CEHE provide one more package of documents.  *Id.*  CEHE complied with this request, submitting a 3,578-page response on December 30, 2020.  *Id.* at A - 5.

After considering the information in CEHE's December 2020 response, the Commission decided to withdraw IU's accreditation due to the school's prolonged failure to meet

---

[5] The Arbitrator noted, "The record shows that it would have been unrealistic to expect a complete response to the July 21, 2020 information request by September 7, 2020, let alone a response, Commission review, and accreditation decision within the then-remaining eight-week period" in the original timeframe for compliance.  *See Section VII (M)(1), Rules of Process and Procedure* (defining the maximum timeframe to achieve compliance as "the period allotted to the school to remedy the noncompliance or cure the deficiency, ***together with the time for the Commission's final decision***") (emphasis added).

7

Commission *Standards* relating to student achievement. *See id.* at A - 5. Explaining its decision to the school in a detailed, 17-page letter dated April 22, 2021, the Commission stated:

> Upon review of the record, the Commission found that Independence University ("IU") . . . failed to demonstrate successful student achievement by maintaining acceptable rates of student graduation and employment in the career field for which the school provided education over a significant history of reporting and monitoring. In this regard, the history is significant in terms of the length of time afforded IU to come into compliance with standards, significant in terms of the breadth of the failure throughout the school's programmatic offerings, and significant in terms of the number of students the school failed to serve.

Compl. Ex. H at H - 1, ECF No. 1-9 ("April 2021 Withdrawal of Accreditation"). The Commission proceeded to recount in detail IU's long history of noncompliance with the student achievement benchmarks set by the *Standards*, as well as its ongoing failures. *See id.* at H - 6 (noting that in its December 2020 Response, the school reported below-benchmark student achievement rates in 82% (14 of 17) active programs).

Of particular moment, the Commission analyzed the school's plan for improvement and its "projections" for graduation rates in future years. *Id.* at H - 14 to H - 16. Although IU projected an increase in graduation rates, the Commission found that many of the programs would not meet benchmark rates for ***four to six years***, even under IU's own projections. *Id.* at H - 14. "Based on the school's history of non-compliance, the lack of improvement over an extended period, and the projected length of time that the school will still be out of compliance with standards," the Commission concluded it must withdraw IU's accreditation. *Id.* at H - 16.

IU timely submitted a notice of intent to appeal on May 3, 2021, submitted its Grounds for Appeal on May 27, 2021, and a virtual hearing in front of the Appeals Panel was held on July 8, 2021. *See* Compl. Ex. M at M - 1, ECF No. 1-14; *see also* Compl. Ex. I, ECF No. 1-10 (excerpts from Grounds for Appeal). The question on appeal was whether the Commission's decision to withdraw accreditation "was arbitrary, capricious, or otherwise in substantial

8

JA341

disregard of the criteria or procedures of the Commission, or not supported by substantial evidence in the record on which the Commission took action." Ex. M at M - 4. On September 17, 2021, the Appeals Panel issued a letter unanimously affirming the Commission's decision to withdraw IU's accreditation. *See* Compl. Ex. M. The Appeals Panel rejected each of IU's arguments, including that the Commission should have found good cause to grant IU yet another extension of time to achieve compliance. In particular, the Appeals Panel concluded:

> In the face of the long, detailed, and well-documented chronology of the Commission's actions with respect to the CEHE schools, the Appeals Panel is not convinced that the Commission acted in a manner inconsistent with the record in this matter. The Commission took into account the totality of the facts with respect to the CEHE schools and did not focus on one late-in-the-game slice of time as CEHE does in its appeal. The decision as to whether good cause exists to extend the maximum time frame is within the sole discretion of the Commission and the Appeals Panel finds nothing in the record that would lead to the conclusion that ACCSC abused its discretion in finding that IU should not be given additional time.

*Id.* at M - 6 to M - 7.

Soon thereafter, IU exercised its right under the Commission's Bylaws to initiate AAA arbitration for the purpose of determining whether the Appeals Panel's Decision was supported by substantial evidence. *See* Compl. Ex. A - 6. The arbitration was conducted pursuant to the Commission's *Instructions for Arbitration*, which are incorporated into the *ACCSC Standards*. *See* Compl. Ex. D at D - 4, ECF No. 1-5; Compl. Ex. C, ECF No. 1-4 ("*Instructions for Arbitration*"). Review of the Appeals Panel's Decision under the *Instructions* is limited:

> The arbitration proceeding is not a *de novo* review. It is a review on the record and is limited to the question of whether the Appeals Panel's decision is supported by the evidence that was in the record when the Panel rendered its decision.

*Instructions for Arbitration, Section I.B.1.*

9

JA342

As contemplated by the *Instructions for Arbitration*, the Commission "designated the Arbitration Exhibits, which consisted solely of the records before the Appeals Panel when it made its decision, the hearing transcript from the hearing before the Appeals Panel, and the Appeals Panel's final decision."  Compl. ¶ 60; *see id*. Ex. A, A - 7, A - 45.  The arbitrator's record for review (the Arbitration Exhibits) was thus comprised primarily of the tens of thousands of documents that CEHE had submitted over the preceding two years, along with the Commission's probation orders, the documents generated by the school's appeal.  *See id.* at A - 44, A - 55.

Despite the volume of the record, the numerous opportunities IU had to submit evidence to the Commission over the preceding years, and the *Instructions*' specifically prohibiting the Arbitrator from looking beyond the record, IU requested during the proceedings that the Arbitrator supplement the Arbitration Exhibits.  *See* Compl. Ex. D, ECF No. 1-5 ("Ruling Concerning Arbitration Exhibits").  Incredibly, IU sought:

1.  Copies of all probation, warning, or show cause orders issued between 2012 and the present which address below benchmark graduation and employment rates.

2.  Any correspondence between ACCSC and any institution placed on probation, warning, or show cause status between 2012 and the present for failing to meet either graduation or employment benchmark rates.

3.  Any correspondence between ACCSC and any institution subject to an adverse action between 2012 and the present based, wholly or in part, on the failure to meet either graduation or employment benchmark rates.

4.  Any ACCSC records involving any instances in which ACCSC granted leniency to, or did not take an adverse action against, an institution, with below-benchmark rates based on the school's transition from on-ground to online programs.

5.  Any ACCSC records of any instances in which ACCSC granted leniency to, or did not take an adverse action against, an institution, with below-

10

JA343

benchmark rates based on circumstances related to the COVID-19 pandemic.

Compl. Ex. D at D - 2.  In short, IU requested the **entire record** of every adverse accreditation action that the Commission took or even contemplated between 2012 and 2021.  IU also requested extensive discovery.  *Id.* at D - 3.  The Arbitrator denied this request as contrary to the *Instructions for Arbitration*, which specifically define the proper contents of the Arbitration Exhibits, limit the Arbitrator's review to those exhibits, and prohibit discovery in the arbitration. *See* Compl. Ex. D at D - 8 ("Under the circumstances, the tribunal declines to require the requested enlargement of the record in this proceeding, which now comprises some 32,374 pages.").

The case proceeded to merits briefing, and the Arbitrator heard oral argument from the parties on May 26, 2022.  *See* Compl. Ex. A at A - 7.  The Arbitrator issued a Final Decision and Award on August 4, 2022 affirming the Appeals Panel Decision and denying IU's arguments in every respect.  Compl. Ex. A.  CEHE now challenges that Award by motion to this Court.

## III.    ARGUMENT

### A.    Legal Standard

As stated above, it is well-established that courts' power to review an arbitrator's award is "severely circumscribed."  *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998).  The Federal Arbitration Act "*mandates* substantial deference to [arbitration] awards." *Interactive Brokers LLC v. Saroop*, 969 F.3d 438, 443 (4th Cir. 2020) (citation omitted).

In furtherance of this deferential standard, courts are expressly limited to a few discrete grounds when considering whether to vacate an arbitration award.  The reviewing court may vacate an award only if the moving party "sustain[s] the heavy burden of showing one of the

11

JA344

grounds specified in [section 10 of] the Federal Arbitration Act (the 'FAA') or one of certain limited common law grounds." *MCI Constructors, LLC v. City Of Greensboro*, 610 F.3d 849, 857 (4th Cir. 2010); *see also Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 478 (4th Cir. 2012) ("[T]he FAA limits courts' ability to vacate arbitral awards as part of its comprehensive scheme to replace judicial hostility to arbitration with a national policy favoring it. . . . We are, therefore, hesitant to read any of § 10's grounds for vacatur too broadly.").

CEHE seeks vacatur of the award in this case under FAA Section 10(a)(3), which "allows courts to vacate arbitration awards only 'where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.'" *Wachovia*, 671 F.3d at 478–79 (quoting 9 U.S.C. § 10(a)(3)); *see* Compl. ¶¶ 65–73.[6]  In particular, CEHE argues that the Arbitrator engaged in "misconduct" by refusing to order extraneous discovery and to hear evidence that was not in the record before the Appeals Panel. *E.g.*, Compl. ¶ 67.

With respect to Section 10(a)(3), the Fourth Circuit has explained that "[a]n arbitrator typically retains broad discretion over procedural matters and does not have to hear every piece of evidence that the parties wish to present." *Wachovia*, 671 F.3d at 479 (quoting *Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co.*, 232 F.3d 383, 389 (4th Cir. 2000)).

---

[6] CEHE includes a citation to 9 U.S.C. § 10(a)(4)—*see* Compl. ¶ 66—but does not argue for vacatur on the basis of that provision, and, in its Prayer for Relief, requests only that the Court vacate the Award on the basis of 9 U.S.C. § 10(a)(3). *See* Compl. at 31.  The Commission therefore responds only to CEHE's argument pursuant to 9 U.S.C. § 10(a)(3).  As it happens, the Commission's proof that the Arbitrator did not engage in misconduct under section 10(a)(3) also demonstrates that the Arbitrator did not "exceed[] [his] powers, or so imperfectly execute[] them that a mutual, final, and definite award upon the subject matter submitted was not made" under section 10(a)(4).

Furthermore, "an arbitrator's procedural ruling may not be overturned unless it was in bad faith or so gross as to amount to **affirmative misconduct**." *Wachovia*, 671 F.3d at 479 (quoting *Marrowbone*, 232 F.3d at 390) (emphasis added). Thus, "[i]n the context of § 10(a)(3), 'misconduct' and 'misbehavior' are different from 'mistake.'" *Wachovia*, 671 F.3d at 479. While "[t]he former two imply that the arbitrators intentionally contradicted the law. . . [m]istakes lack the requisite intentionality to fall within § 10(a)(3)'s reach." *Id.* (holding that arbitrators' decision not to apply certain state law procedures in arbitration of state law claim was correct, but even had it not been, the arbitrators' mistaken interpretation of the law would not have constituted "misconduct" under § 10(a)(3)).

Finally, "even assuming the exclusion of pertinent and material evidence, not every failure of an arbitrator to receive relevant evidence constitutes misconduct requiring the vacatur of an arbitrator's award." *e.spire Commc'ns, Inc. v. CNS Commc'ns*, 39 F. App'x 905, 910 (4th Cir. 2002). Rather, "a federal court may vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and material evidence deprives a person of a 'fundamentally fair hearing.'" *Id.* (citation omitted).

**B.    The Arbitrator did not exclude any pertinent or material evidence.**

Section 10(a)(3) of the FAA is inapplicable in this case because the Arbitrator did not refuse "to hear evidence pertinent and material to the controversy." The *Instructions for Arbitration* clearly define the scope of the arbitration proceeding:

> The arbitration proceeding is not a *de novo* review. It is a review on the record and is limited to the question of whether the Appeals Panel's decision is supported by the evidence that was in  the record when the Panel rendered its decision.

*Instructions for Arbitration, Section I.B.1*; *see* Compl. Ex. C ("*Instructions*") at C - 1. To that end, the *Instructions* expressly provide that the arbitrator "*may not consider evidence that was*

13

JA346

***not in the record before the Appeals Panel***," *id.*, *Section I.B.2* (emphasis added), and they prohibit the parties from conducting discovery in the arbitration, *id.*, *Section I.H*; *see* Ex. C at C - 3.  The *Instructions* are clear in this respect, and CEHE admits as much.  Compl. ¶¶ 60, 67, 69, 73.  By definition, therefore, the only pertinent and material evidence was that in the record, as defined by the *Instructions*.

In addition to following the express arbitration rules, the Arbitrator's decision also accorded with that which a federal court would take when facing the same issue.  The Fourth Circuit has explained how federal courts should approach challenges to decisions by accrediting agencies.  *Pro. Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. & Colleges*, 781 F.3d 161, 174–75 (4th Cir. 2015).  An institution of higher learning may bring a federal common law due process claim in federal court to challenge "the denial, withdrawal, or termination of accreditation" by an accrediting agency.  20 U.S.C. § 1099b(f); *Pro. Massage*, 781 F.3d at 169– 72.  Courts hearing such claims "have consistently limited the judicial inquiry, drawing on principles of administrative law and judicial deference."  *Pro. Massage*, 781 F.3d at 170 (explaining that although accrediting agencies are private actors to which the Administrative Procedure Act does not specifically apply, administrative law principles "are useful in determining the standard by which we review the agency's decision-making process.") (quoting *Thomas M. Cooley L. Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 712 (6th Cir. 2006)).

Courts hearing a due process challenge to an adverse accrediting decision, therefore, should review whether the decision "is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence."  *Pro. Massage*, 781 F.3d at 171 (4th Cir. 2015).  In conducting this review, courts are "***not free to conduct a de novo review*** or to substitute their judgment for the professional judgment of the educators involved in the

14

JA347

accreditation process." *Id.* (citation omitted) (emphasis added). The Fourth Circuit explained the connection:

> [D]ue process claims dovetail nicely with administrative law concepts of substantial evidence and arbitrary and capricious review because the prominent point of emphasis of due process is one of procedure. When adjudicating common law due process claims against accreditation agencies, courts should "focus primarily on whether the accrediting body's internal rules provided a fair and impartial procedure and whether it followed its rules in reaching its decision."

*Id.* at 172 (quoting *Wilfred Acad. of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges & Sch.*, 957 F.2d 210, 214 (5th Cir. 1992)). The Fourth Circuit concluded: "In considering whether the denial was supported by substantial evidence, **we confine ourselves to the record that was considered by the accrediting agency at the time of the final decision**." *Pro. Massage*, 781 F.3d at 174–75 (emphasis added).

As a court in this district recently stated: "In light of the Fourth Circuit's admonition that a district court confine itself to the record considered by the accrediting agency, the discovery tools typically available to a civil litigant are either unavailable, or greatly circumscribed, in an accreditation action." *Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, 290 F. Supp. 3d 463, 470 (E.D. Va. 2018), *aff'd*, 922 F.3d 568 (4th Cir. 2019) (citing *Pro. Massage*, 781 F.3d at 172).

The lone instance in which a court "may be justified" in looking beyond the record is when a plaintiff makes "a strong showing of bad faith or improper behavior," such as personal bias. *Wards Corner*, 290 F. Supp. 3d at 470 (quoting *Pro. Massage*, 781 F.3d at 177–78). "Examples of a plaintiff attaining this standard are rare*." Hampton Univ. v. Accreditation Council for Pharmacy Educ.*, No. 4:20CV118 (RCY), 2021 WL 3166380, at *7 (E.D. Va. July 27, 2021). First, "[a]n administrative decisionmaker 'is entitled to a 'presumption of honesty and integrity.'" *Pro. Massage*, 781 F.3d at 178 (citation omitted). Moreover, it is insufficient for a

15

JA348

plaintiff to allege bad faith at a general level; courts have recognized impermissible bias only in specific, limited situations. The Fourth Circuit recognized two instances in which the potential for bias may be sufficient: "those cases in which the adjudicator has a pecuniary interest in the outcome" or when "he has been the target of prior personal abuse or criticism from the party before him." *Pro. Massage*, 781 F.3d at 178 (citation omitted).

The Fourth Circuit explicitly rejected the idea that mere allegations about the emotions or opinions of the adjudicator suffice, explaining that "the 'expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women ... sometimes display' are not sufficient to 'establish bias or partiality.'" *Id.* (citation omitted). "An unfavorable impression of an applicant on the part of the accreditation agency is likewise not bias. To find otherwise would render every denial of accreditation subject to a searching inquiry for lack of impartiality." *Id.*

CEHE does not allege that any member of the Commission or the Appeals Panel had a pecuniary interest in the outcome of the accreditation decision, nor does it allege that any member might be biased against IU due to "prior personal abuse or criticism from the party before him." *Pro. Massage*, 781 F.3d at 178. CEHE alleges nothing that comes remotely close to the types of bias the Fourth Circuit recognized in *Professional Massage*. Instead, CEHE attempts to base its argument in the allegation that the Commission's decision "appeared to represent a pretextual attempt at self-preservation, rather than a fair application of the [student achievement] *Standards*." Compl. ¶ 72. But CEHE fails to grapple with the implications of this argument. IU remained out of compliance with student achievement standards at the time its accreditation was withdrawn, as CEHE admits. *Id.* ¶ 37. The question before the Commission was whether to allow IU to remain out of compliance for even longer, or to grant it another

16

extension.  Even by IU's own blatantly self-serving projections, many of its programs would not have met benchmark rates for ***four to six years***.  See Compl. Ex. H at H - 14.  The Commission decided that it could not allow the school to remain out of compliance for so long.  The act of "self-preservation" to which CEHE alludes was in reality a decision by the Commission to revoke IU's accreditation for an undisputed and long-term violation of *ACCSC Standards*.  Where an accreditor has a responsibility to uphold its accreditation standards, and a school is in clear violation of those standards, the accreditor's decision to enforce its standards simply cannot form the basis for a "strong showing of bad faith," especially given that "[a]n administrative decisionmaker 'is entitled to a 'presumption of honesty and integrity.''" *Pro. Massage*, 781 F.3d at 178.

Perhaps recognizing that it cannot sufficiently allege that the Commission was biased, CEHE attempts to justify its request for extra-record discovery through vague and speculative claims of "disparate treatment and agency bad faith." *E.g.*, Compl. ¶ 70.  But courts specifically "reject[] disparate treatment inquires in accreditation cases."  *Hampton Univ.*, 2021 WL 3166380, at *7 (citing *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 528 (6th Cir. 2001)).  "Delving into the comparators and their treatment by the alleged defendant entity really reduces the court's role to conducting de novo review of a defendant's evaluative decisions." *Hampton Univ.*, 2021 WL 3166380, at *7 (quoting *Mountain State Univ., Inc. v. Higher Learning Comm'n*, No. CV 5:14-16682, 2017 WL 963043, at *14 (S.D. W.Va. Mar. 10, 2017)).  Courts are "not free to conduct a de novo review" in accreditation cases, *Pro. Massage*, 781 F.3d at 171, and pursuing a disparate treatment inquiry would require a court to do it twice: "[S]uch a disparate treatment analysis would require the court to put itself into at least two pairs of accreditors' shoes: comparing the propriety of the decision with respect

17

JA350

to the plaintiff against the propriety of the accreditation of the other school or schools." *Hampton Univ.*, 2021 WL 3166380, at *7.

To ask the arbitrator, or a federal court, to engage in such an analysis neither accords with the strict deference the Fourth Circuit commands, nor does it make sense as a practical proposition. As the Arbitrator noted in his decision denying CEHE's request to supplement the arbitration exhibits, the record for IU's case alone comprised more than 32,000 pages. Compl. Ex. D at D - 8. It would not be feasible for a reviewing tribunal to compare the records of multiple accreditation decisions even if it were permitted. *See Hampton Univ.*, 2021 WL 3166380 (rejecting Plaintiff's requested disparate treatment analysis where the administrative record was over 6,000 pages, analysis would "be a complex and time-consuming task for the Court," and the *Pro. Massage* standard prohibited de novo review of accreditation decisions).

"Rather than weighing the relative qualifications of different schools, . . . the judicial inquiry should be focused on the core standard of review: whether the accrediting agency acted in an arbitrary or unreasonable manner, and whether its decision was based on substantial evidence." *Id.*, at *7 (citation omitted). "And even to the extent that standard is modified upon allegations of bias, those allegations cannot countenance the Court stepping into the shoes of the accreditor to make two or more comparative, de novo evaluations of accreditation decisions." *Id.* at 15. As the Arbitrator in this case correctly determined: "It would go far outside the defined role of the reviewing tribunal to attempt to compare the propriety of the Commission's decisions concerning other schools with the propriety of its decisions concerning Independence." Compl. Ex. A at A - 34 ("Decision and Award by Arbitrator").

## IV. CONCLUSION

In sum, there was simply no reasonable basis for the Arbitrator to do anything other than what he did. The question before him was "limited to the question of whether the Appeals

Panel's decision is supported by the evidence that was in the record when the Panel rendered its decision." Compl. Ex. A at A – 8. His review was expressly limited to the evidence in the record by the *Instructions for Arbitration*. The record was the only evidence that was "pertinent and material" to the arbitration. His decision not to allow discovery—especially the unconstrained fishing expedition sought by IU—and not to hear other evidence was required by the *Instructions*, and a federal court would have ruled the same way facing a similar issue.

Finally, and crucially in the context of this motion, even if there were any doubt about whether the Arbitrator's procedural ruling were correct, his decision to follow the express terms of the *Instructions* cannot constitute a "bad faith" error amounting to "affirmative misconduct." *Wachovia*, 671 F.3d at 479 ("In the context of § 10(a)(3), 'misconduct' and 'misbehavior' are different from 'mistake.'" . . . While "[t]he former two imply that the arbitrators intentionally contradicted the law. . . [m]istakes lack the requisite intentionality to fall within § 10(a)(3)'s reach."). But the Court need not rely in this case on the substantial deference to arbitration awards that the Federal Arbitration Act mandates. CEHE had ample opportunities to prove its case, and the Arbitrator clearly made the right decision by limiting his review to the voluminous record. For these reasons, the Court should dismiss CEHE's motion to vacate the arbitration award.

Date:   December 22, 2022          Respectfully submitted,

                                   ACCREDITATION ALLIANCE OF CAREER
                                   SCHOOLS AND COLLEGES, D/B/A
                                   ACCREDITING COMMISSION OF CAREER
                                   SCHOOLS AND COLLEGES

                                     /s/ Lewis F. Powell III
                                   _____
                                   Lewis F. Powell III (VSB No. 18266)
                                   Nathaniel S. Shepherd (VSB No. 94989)
                                   HUNTON ANDREWS KURTH LLP
                                   Riverfront Plaza, East Tower

                                   19

951 East Byrd Street
Richmond, VA 23219-4074
Telephone:    (804) 788-8200
Facsimile:    (804) 788-8218
Email:        lpowell@hunton.com
              nshepherd@huntonak.com

*Counsel for Respondent/Defendant*

20

JA353

**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

CENTER FOR EXCELLENCE IN HIGHER
EDUCATION, INC.,

*Movant/Plaintiff*,

v.

ACCREDITATION ALLIANCE OF CAREER
SCHOOLS AND COLLEGES, D/B/A
ACCREDITING COMMISSION OF CAREER
SCHOOLS AND COLLEGES.

*Respondent/Defendant*.

Civil Action No.
1:22-cv-01223-RDA-WEF

**CENTER FOR EXCELLENCE IN HIGHER EDUCATION'S REPLY IN**
**SUPPORT OF MOTION TO VACATE**

**Introduction**

ACCSC is not disputing that it denied CEHE an opportunity to test the sufficiency or seek expansion of the arbitration record. CEHE sought to supplement the record by raising credible allegations that ACCSC withdrew its accreditation in response to outside pressure and self-preservation rather than through a good-faith application of accreditation standards. But ACCSC made sure that its internal rules would prevent the arbitrator from any consideration of those well-founded allegations. The misconduct at issue here is not that the arbitrator improperly weighed CEHE's arguments, it's that CEHE never had the opportunity to make them.

Accreditors "can run off the rails" "like all other bureaucratic entities." *Prof'l. Massage Training Ctr., Inv. v. Accreditation All. of Career Sch. & Colleges*, 781 F.3d 161, 169 (4th Cir. 2015). And when accreditors improperly give in to political pressure or seek to act based on expediency and self-preservation rather than faithful and consistent application of their standards,

1

JA354

it is naïve to expect them to disclose their improper conduct in the arbitration record. Thus, due process requires looking beyond the record curated by an accreditor "where the integrity of the record is relevant to the inquiry into the propriety of [the accreditor's] decisions or its actions." *S.C. Dep't of Health & Envtl. Control v. Atl. Steel Indus.*, 85 F. Supp. 2d 596, 603 (D.S.C. 1999) (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 460 (4th Cir. 1993).

ACCSC concedes that due process requires expansion of the record upon a sufficient showing of bad faith or improper conduct. Opp. 15-16 (ECF. No. 13); *see also Prof'l Massage*, 781 F.3d at 177. But when CEHE sought to make that showing in the arbitration proceedings, ACCSC nonetheless argued—and the arbitrator agreed—that ACCSC's *Instructions for Arbitration* ("*Instructions*") categorically precluded consideration of any such arguments. Mot. Ex. D at 3, 7 (ECF No. 1-5). In other words, ACCSC seeks enforcement of an arbitration award that deprived CEHE of an important element of due process.

Section 10(c) of the Federal Arbitration Act ("FAA") confirms that arbitration awards must be vacated when the "exclusion of relevant evidence so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Int'l Union, UMW v. Marrowbone Dev. Co.*, 232 F.3d 383, 389-90 (4th Cir. 2000). By categorically excluding all extra-record evidence, the arbitrator failed to consider relevant and pertinent evidence that was essential to CEHE's case. Specifically, the arbitrator denied CEHE an opportunity to demonstrate that ACCSC singled CEHE out to deflect outside pressure and public scrutiny related to the later-overturned findings in the Colorado state court decision. Mot. ¶ 72 (ECF No. 1); Mot. Ex. D at 3.

## Argument

### I.    The arbitrator denied CEHE a fundamentally fair hearing by categorically excluding all extra-record evidence.

In refusing to allow any extra-record evidence or discovery regardless of the strength of CEHE's showing of improper conduct and bad faith, the arbitrator denied CEHE "an adequate opportunity to present its evidence and arguments." *Int'l Union*, 232 F.3d at 389  (quoting *Hoteles Condado Beach v. Union de Tronquistas*, 763 F.2d 34, 39 (1st Cir. 1985)). ACCSC does not dispute that its withdrawal decision must have been based on a good-faith application of the *Standards*.  Nor can ACCSC dispute that the decision must be overturned if it was issued for the improper purpose of self-preservation and appeasing political actors. *Prof' Massage*, 781 F.3d at 177. Indeed, basic due process requires that accreditors follow "articulated standards and reflective findings . . . rather than impermissible whim, improper influence, or misplaced zeal." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851-852 (D.C. Cir. 1970).

Thus, evidence of ACCSC's motives was not only material to the arbitration proceedings, it was potentially dispositive. Nonetheless, ACCSC argues here that such evidence could not be "pertinent and material" simply because the arbitrator could only consider the evidence in the record and that evidence was not in the record. Resp. 13. But that circular logic invites "all manner of mischief." *San Francisco Bay Conservation Dev. Comm'n. v. U.S. Army Corps of Eng'rs*, 2018 U.S. Dist. LEXIS 136659, *23 (N.D. Cal. 2018).  To be sure, ACCSC alone designated the contents of the arbitration record. And at every level of review, ACCSC has used the *Standards* and *Instructions* to block any opportunity for CEHE to question that designation or add to it. As ACCSC would have it, an arbitrator can never hear evidence of bad faith or improper motives unless ACCSC volunteers that information.  That is a fundamentally unfair process.  *See Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004) ("[R]are indeed would be the

3

occasions when evidence of bad faith will be placed in an administrative record, and to insist on this—and thus restrict discovery regarding bad faith to cases involving officials who are both sinister and stupid—makes little sense").

Seeking to deflect from its facially deficient procedures, ACCSC instead focuses on whether CEHE made a strong enough showing of bad faith or improper behavior sufficient to justify looking beyond the record. Opp. 15-17. But that is a red herring because the *Instructions* prohibited the arbitrator from considering **at all** whether CEHE made such a showing. CEHE is not asking this Court to decide whether the arbitrator properly determined whether CEHE made a sufficient showing of bad faith, it is asking the Court to decide whether CEHE was given an opportunity to do so.

Clearly, CEHE was not. When CEHE sought to supplement the arbitration record, the arbitrator concluded that the *Instructions* prevented any consideration of "evidence that was not in the record before the appeals panel." Mot. Ex. D at 7 (quoting *Instructions*, § I.B.) So while ACCSC appears to accept that due process requires expansion of the record upon a sufficient showing of improper conduct, it argued in the arbitration proceedings (and continues to argue now) that CEHE did not have the right to make that showing. By denying CEHE "an adequate opportunity to present its evidence and arguments" regarding the sufficiency of the record, the arbitrator committed misconduct that requires vacation of the award. *Int'l Union*, 232 F.3d at 389; 9 USC 10(c). ACCSC should not be entitled to benefit from such misconduct because its deficient rules arguably compelled it.

## II.    CEHE does not seek *de novo* review of ACCSC's withdrawal decision.

ACCSC miscasts the nature of the dispute. CEHE did not ask the arbitrator, and it does not ask this Court, to undertake a *de novo* review of ACCSC's withdrawal decision. Opp. 22. Rather,

4

JA357

CEHE seeks to hold ACCSC accountable for blocking any meaningful consideration of the true basis for the withdrawal decision. Mot. Ex.  A at 12 (ECF No. 1-2). By unilaterally refusing CEHE the opportunity to review and present meaningful evidence of bad faith and disparate treatment to the Appeals Panel or the arbitrator, ACCSC denied CEHE a fundamentally fair hearing.  *Med. Inst. of Minn. v. Nat'l Asso. of Trade & Tech. Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987) (concluding that due process requires treating similarly situated schools similarly).

Those errors do not involve ACCSC's professional judgement with respect to application of the substantive standards, "but rather []the fairness of the procedures by which the challenged determination was reached." *Marjorie Webster Junior Coll., Inc. v. Middle States Assoc. of Colls. and Sec. Schs.*, 432 F.2d 650, 656 n. 28 (D.C. Cir. 1970). In such instances, deference is not appropriate. *Id.*  Plainly, ACCSC is entitled to deference regarding its application of the *Standards*. "Deference, however, does not mean turning a blind eye to an empty record on a critical aspect of [] evaluation." *United States v. Montrose Chem. Corp.*, 50 F.3d 741, 748 (9th Cir. 1995).  Here, the record is bare of any substantive consideration of CEHE's arguments to expand the record and take discovery. ACCSC and the arbitrator are not entitled to deference for findings they never made. And while accreditation decisions often come to a court "swaddled" in deference, "[s]waddling is not armor" against failures of due process. *See Id.* at 748

### Conclusion

ACCSC acknowledges that due process requires affording CEHE an opportunity to demonstrate bad faith and improper conduct. Nonetheless, it now seeks enforcement of an arbitration award that was issued in contradiction to that basic requirement. That is not "a fair and effective opportunity to be heard." *Int'l Union*, 232 F.3d 389-90 (4th Cir. 2000); 9 USC 10(c).

JA358

For the forgoing reasons the Court should grant CEHE's Motion to Vacate the Arbitration Award.

Date: January 26, 2023

Respectfully submitted,

CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC.

/s/ Steven M. Gombos
Steven M. Gombos (VSB No. 30788)
David A. Obuchowicz (VSB No. 82483)
GOMBOS LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, VA 22030
Telephone:    (703) 934-2660
Fax:          (703) 934-9840
Email:        sgombos@glpclaw.com
              dobuchowicz@glpclaw.com

*Counsel for CEHE*

## Certificate of Service

I certify that on January 26, 2023, I electronically filed the foregoing document using the Court's CM/ECF system.

*/s/ Steven M. Gombos*

6

JA359

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CENTER FOR EXCELLENCE | ) | |
| IN HIGHER EDUCATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-1223 (RDA/WEF) |
| | ) | |
| ACCREDITATION ALLIANCE OF | ) | |
| CAREER SCHOOLS AND COLLEGES, | ) | |
| D/B/A ACCREDITING COMMISSION | ) | |
| OF CAREER SCHOOLS AND | ) | |
| COLLEGES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's Partial Motion to Dismiss. Dkt. 14. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered Defendant's Partial Motion to Dismiss and Supporting Memorandum (Dkt. Nos. 14; 15), together with Plaintiff's Opposition (Dkt. 21) and Defendant's Reply (Dkt. 22), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion for the following reasons.

I. BACKGROUND

A. Factual Background[1]

1. Accreditation Procedures

An institution must be accredited to participate in federal assistance programs authorized under Title IV of the Higher Education Act ("HEA"). Dkt. 1 ¶ 15. The federal government does not directly accredit institutions of higher learning, but rather delegates that authority to various federally approved accrediting agencies for different types of educational institutions. *Id.* ¶ 15; *Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Sch., Inc.*, No. 1:08CV1186 AJT/JFA, 2009 WL 742532, at *1 (E.D. Va. Mar. 18, 2009). Accreditors set the standards for accreditation but must comply with various other standards set forth by the HEA and Department of Education. *Id.* ¶¶ 16-17; *Career Care Inst.,* 2009 WL 742532, at *1. In particular,

> accrediting agencies must afford certain due process protections to each educational institution it accredits which include, among other things, providing written statements of agency requirements and standards, written notice of any "adverse accrediting action or action to place the institution or program on probation or show cause," and an opportunity to appeal any adverse action prior to the action becoming final. 20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25.

*William Loveland Coll. v. Distance Educ. Accreditation Comm'n*, 347 F. Supp. 3d 1, 7 (D.D.C. 2018), *aff'd sub nom.* 788 F. App'x 5 (D.C. Cir. 2019); Dkt. Nos. 1 ¶ 21; 15 at 16. If the accreditor's internal Appeals Panel affirms the initial decision, the decision is final, and the institution's only recourse is binding arbitration. Dkt. 1 ¶ 25.

---

[1] For purposes of considering the instant Motion, the Court accepts as true all facts contained within Plaintiff's Complaint as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

2

JA361

### 2. Withdrawal of Plaintiff's Accreditation

Plaintiff Center for Excellence in Higher Education, Inc. ("CEHE") ("Plaintiff") owns and operates four institutions of higher education. *Id.* ¶ 7. Independence University ("IU"), an online school, was the only one of CEHE's four institutions that was enrolling students at the time of the withdrawal of accreditation. *Id.* ¶ 8. Defendant Accreditation Alliance of Career Schools and Colleges ("Defendant") is a federally recognized accrediting agency, that was responsible for approving IU's accreditation. *Id.* ¶ 15. Defendant's *Standards for Accreditation* ("*Standards*") lay out the requirements that institutions must maintain to receive accreditation. *Id.* ¶ 4.

In September of 2018, Defendant determined that IU was out of compliance with the student achievement *Standards* because of its low graduation and employment rates. *Id.* ¶ 32. Accordingly, Defendant placed IU on probation. *Id.* Defendant allows an institution a maximum of three years to remedy noncompliance with any *Standard*, however, it may extend that maximum if good cause exists. *Id.* ¶ 30.

Plaintiff spent roughly $10 million on initiatives that would improve student achievement. *Id.* ¶ 35. During this two-year probationary period, Plaintiff consistently updated Defendant on its initiatives and Defendant commended those efforts. *Id.*

On July 21, 2020, Defendant issued a continued probation letter that recognized Plaintiff's progress in improving student achievement and announced that good cause existed to extend IU's accreditation until at least May 2021. *Id.* ¶ 35. In this letter, Defendant also acknowledged that IU's programs could not report benchmark graduation rates for several years because the school primarily offers 20- to 36-month degree programs. *Id.* ¶¶ 31, 35. Defendant further stated that it would measure progress on the success of recently enrolled students, since they are the students that would be affected by Plaintiff's new initiatives. *Id.*

JA362

On August 21, 2020, a Colorado state court ruled that Plaintiff's use of Bureau of Labor Statistics ("BLS") salary and job outlook information advertisements for another of CEHE's institutions, CollegeAmerica (which had been approved by Defendant) violated state consumer protection laws. *Id.* ¶ 5. A few months after that ruling, Defendant's own application for continued federal recognition was up for review by the Department of Education. *Id.* According to Plaintiff, the Colorado state court ruling is the event that triggered Defendant's disparate treatment toward IU. *Id.*

On December 20, 2020, Plaintiff sent Defendant a follow-up letter which contained updated projections for IU's recently enrolled students showing that all programs were on track to meet or exceed benchmark rates. *Id.* ¶ 36. During a meeting in February 2021, Defendant withdrew IU's accreditation before IU's probation was set to end in May. *Id.* ¶ 37. The withdrawal caused Plaintiff to lose access to critical Title IV funding and to lose the ability to continue enrolling students, and also led to the closure of Plaintiff's schools. *Id.* ¶ 1. Defendant published the decision to withdraw IU's accreditation on April 22, 2021 and stated that it based the decision on the graduation rates of old students, not new students. *Id.* ¶ 37. This decision was also announced around the time that Defendant stated that it would ease its strict enforcement of the student achievement *Standards* due to the Covid-19 pandemic. *Id.* ¶ 43.

Plaintiff alleges that Defendant treated other member institutions, who were in worse or similar conditions to IU, more leniently. *Id.* ¶ 51. On April 30, 2021, Plaintiff sent a letter to Defendant's Executive Director, Dr. Michale McComis, notifying him that publicly available information alerted them to this unfair treatment. *Id.* Plaintiff then turned to Defendant's internal Appeals Panel, which is required to overturn any decision that is arbitrary and capricious according to Defendant's *Rules of Process and Procedure*. *Id.* ¶ 52. Plaintiff requested the records of

4

JA363

Defendant's treatment of other member institutions, particularly regarding any leniency given to those schools because the schools were online or because of the pandemic. *Id.* ¶ 51.

Dr. McComis denied Plaintiff's record requests, which according to Plaintiff, meant that the evidence of disparate treatment and bad faith were not considered in Defendant's internal appeals process. *Id.* ¶¶ 53, 6. Plaintiff then initiated arbitration, and the arbitrator also concluded that he could not rely on that alleged evidence of disparate treatment and bad faith. The arbitrator stated that he was "constrained by the *Instructions for Arbitration* to decline [Plaintiff's] requests that the Commission be ordered to produce documents that were not in the record before the Appeals Panel or that discovery be permitted in arbitration." *Id.* ¶ 26. Consequently, the arbitrator entered an award in favor of Defendant. *Id.* ¶ 63.

## B. Procedural Background

Plaintiff initiated suit in this Court by filing a Motion to Vacate Arbitration Award and Complaint on October 28, 2022. Dkt. 1. In turn, Defendant filed a Partial Motion to Dismiss along with a Memorandum in Support on December 22, 2022. Dkt. Nos. 14; 15. Plaintiff responded by filing an Opposition on January 26, 2023. Dkt. 21. Thereafter, Defendant filed a Reply on February 9, 2023. Dkt. 22.

## II. Standard of Review

Federal Rules of Civil Procedure 12(b)(6) provides for the dismissal of an action if the Court determines that a complaint did not set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

5

JA364

In considering a motion to dismiss, a court "must accept as true all the factual allegations contained in the complaint," drawing "all reasonable inferences" in favor of a plaintiff. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citation omitted). Moreover, a court must determine whether the factual allegations contained in a complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545. This means that a plaintiff is obligated to provide more than just conclusory allegations that are merely "a formulaic recitation of a cause of action's elements." *Id.* Accordingly, "the [C]ourt 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).

In general, a court may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). However, a court may consider any exhibits attached to a complaint that are incorporated therein by reference. *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991). Where a conflict exists between "the bare allegations of the complaint and any attached exhibit, the exhibit prevails." *Id.*

### III. Analysis

In its Motion to Vacate Arbitration Award and Complaint, Plaintiff seeks an order vacating the August 4, 2022 arbitration award that was entered in favor of Defendant. Plaintiff also brings five claims against Defendant: a violation of due process claim (Count I), a claim for declaratory judgment (Count II), two tortious interference with contract claims (Count III and IV), and a tortious interference with prospective business or economic advantage claim (Count V). Dkt. 1 at

6

24-30.  Defendant now seeks dismissal of Counts II through V for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Defendant asserts that Plaintiff's state law claims are preempted by the HEA, but, in the alternative, asks the Court to conduct a choice-of-law analysis and to determine that Plaintiff has failed to allege sufficient facts for causation under Utah law.  Dkt. 15 at 18, 24-25.  The Court will address each argument in turn.

### A. Declaratory Judgment (Count II)

Defendant argues that the declaratory judgment claim serves no useful purpose and should be dismissed because the issue will be fully decided through the adjudication of Count I.  Dkt. 15 at 6-7.  Dkt. 15 at 7-8; 20 U.S.C. § 1099b(f).  In its Opposition, Plaintiff avers that its declaratory judgment claim should not be dismissed because declaratory judgment would provide Plaintiff protections from potential liabilities that may be imposed by the Department of Education.  Dkt. 21 at 19.  In addition, Plaintiff argues that declaratory judgment may help other institutions of higher education understand their rights regarding accreditation actions.  *Id.*

The Court may dismiss a declaratory judgment claim that "is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action."  *A.Hak Indus. Servs. BV v. TechCorr USA, LLC*, No. 3:11-CV-74, 2014 WL 7243191, at *27 (N.D. W. Va. Dec. 19, 2014) (quoting *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006).  Put simply, declaratory judgment is improper where the legal issues will be resolved through the litigation of a different claim.

Plaintiff requests "a judgment declaring that Defendant's acts violated Plaintiff's *due process rights*."  Dkt. 1 ¶ 84 (emphasis added).  However, this matter will be fully resolved through the litigation of Plaintiff's due process claim.  Accordingly, if Plaintiff were to prevail on both the declaratory judgment and due process claims, Plaintiff's relief would be purely duplicative.

Plaintiff cites *Perdido Sun Ass'n v. Nationwide Mut. Ins. Co.* to argue that the declaratory judgment claim cannot be dismissed if "possible future events" could be settled by the judgment. No. 3:06cv318/MCR, 2007 WL 2565990, at *4 (N.D. Fla. Aug. 30, 2007); Dkt. 21 at 19. Critically, in *Perdido Sun Ass'n*, both claims did not generate the same relief. The court in *Perdido Sun Ass'n* explicitly stated that "the court accepts that the declaratory relief sought in Count II, if granted, would afford Perdido Sun more relief than it would receive by simply prevailing on [Count I]." *Perdido Sun Ass'n*, 2007 WL 2565990, at *4. The plaintiff's claim for declaratory judgment in *Perdido Sun Ass'n* survived because additional relief was available, not due to the existence of possible future events. *Id.* Plaintiff has not explained how the declaratory judgment claim, if granted, would generate different relief than the due process claim.

Plaintiff also relies on *Rosado v. eBay, Inc.* to argue that its declaratory judgment claim should not be dismissed because the claim "may act to remove future uncertainty and controversy as to the rights of other [institutions seeking review of accreditation actions]." 53 F. Supp. 3d 1256, 1268 (N.D. Cal. 2014); Dkt. 21 at 19. Plaintiff cites no cases within the Fourth Circuit that support the *Rosado* Court's decision to deny a motion to dismiss for a duplicated declaratory judgment claim. The Fourth Circuit has been exceedingly clear "that a declaratory judgment action is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). The Court declines to adopt the *Rosado* Court's analysis, in favor of the Fourth Circuit's established precedent. Plaintiff's declaratory judgment claim does not serve a sufficiently useful

purpose to survive a motion to dismiss; accordingly, the motion to dismiss will be granted in this regard and Count II will be dismissed.

### B. State Law Tort Claims

#### 1. Preemption

Next, Defendant asks this Court to "find that Plaintiff's state law tort claims arising from the withdrawal of accreditation are preempted by the HEA under the doctrine of obstacle preemption." Dkt. 15 at 13. Defendant argues that the ability of constituent institutions to add state law claims could needlessly increase the cost of enforcing accreditation standards without benefiting schools. *Id.* at 14. Additionally, Defendant asserts that increased litigation costs are contrary to the Department of Education's stated purpose of the HEA. *Id.* at 13. Plaintiff, in response, argues the following: (1) that the plain text of the HEA acknowledges the right of an institution to bring tort claims (2) that other courts have held that the HEA does not preempt state tort claims, and (3) that tort claims do not conflict with a "clear and manifest" Congressional policy. Dkt. 21 at 9, 10, 12. In support of its position, Plaintiff highlights that the majority of courts have uniformly held that that the HEA does not preempt state law claims. *Id.* at 10.

Defendant has a high burden to establish that the HEA preempts state tort law claims. To begin, the Supremacy Clause requires that federal law and the Constitution take precedence over any conflicting state laws. U.S. Const. art. VI, cl. 2. The "taxonomy of preemption yields four fundamental varieties: express preemption, field preemption, impossibility preemption, and obstacle preemption." *Oakley v. Coast Pro., Inc.*, 570 F. Supp. 3d 365, 372 (S.D. W. Va. 2021) (quoting Gregory M. Dickinson, *Calibrating Chevron for Preemption*, 63 Admin. L. Rev. 667, 672 (2011)). Obstacle preemption applies "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Columbia*

9

*Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829-30 (4th Cir. 2010) (internal quotation marks omitted) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).

When faced with a similar question, the Fourth Circuit and district courts within the Fourth Circuit have declined to analyze preemption when the question may be mooted based on the outcome of the plaintiff's other claims. *See Prof'l Massage v. Accreditation All. Of Career Sch. & Colleges,* 781 F.3d 161, 180, n. 3 (4th Cir. 2015) (declining to address whether the HEA preempted state tort law claims where the state law claims were meritless); *see also Mountain State University, Inc. v. The Higher Learning Commission*, No.5:14-16682, 2016 WL 626563, at *2 (S.D. W.V. Feb. 16, 2016) (finding it unnecessary to address the matter of preemption at the motion-to-dismiss stage where plaintiff's due process claim would resolve the tortious interference claims).  In *Mountain State University*, a plaintiff institution similarly asserted, *inter alia*, a due process and tortious interference claim against a defendant accrediting agency.  *Id.* at *1.  The *Mountain State University* Court reasoned that if the plaintiff failed to prevail on the due process claim, then surely the defendant would have shown that any interference was proper, and the tortious interference claim will likewise fail.  *Id.* at *3.  The same is true in this case.  If Defendant prevails on the due process claim, then Defendant will likewise prevail on the tortious interference claim.  Further, there exists a "fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Mountain State Univ., Inc. v. Higher Learning Comm'n,* No. CV 5:14-16682, 2017 WL 963043, at *16 (S.D. W. Va. Mar. 10, 2017) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (internal citations and quotation marks omitted)).  The Supreme Court has, even through its dissenting opinions, repeatedly reaffirmed the "principle that constitutional

10

issues are too important to be decided save when absolutely necessary, and are to be avoided if there are grounds for decision of lesser dimension." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 509 (1975) (Rehnquist, J., dissenting). Thus, the Court presently declines to address Defendant's preemption argument at the motion-to-dismiss stage.[2] It is possible that after discovery, when the factual record becomes clearer, Defendant may prevail on the due process claim, which would render answering the preemption question unnecessary. *See Estes v. ECMC Grp., Inc.*, 565 F. Supp. 3d 289, 302 (D.N.H. 2021) ("After discovery, the factual record will be clearer, and the parties may raise any remaining preemption issues at summary judgment."). Defendant may, however, renew its preemption argument via a summary judgment motion. Thus, the Motion to Dismiss will be denied in this respect.

### 2. Choice of Law

The parties disagree as to the choice of law analysis and its relevance to the present Motion to Dismiss. Defendant contends that Utah law should apply to all three tortious interference claims because the "last event necessary" to cause legal injury for each claim occurred in Utah. Dkt. 15 at 18. Plaintiff argues that it is premature to decide choice of law issues on Defendant's Motion to Dismiss, because resolving the motion does not "turn on a choice of law analysis" and that this Court "should defer ruling on such matters until the parties have developed the factual evidence in

---

[2] Although the Fourth Circuit declined to answer the preemption question, it did indicate that a "serious question of cognizability exist[ed]" with respect to levying state law claims to challenge an accreditation decision. *Prof'l Massage v. Accreditation All. Of Career Sch. & Colleges*, 781 F.3d at 180. The Court also notes that the Seventh Circuit has held that federal law, not state law should govern accreditation disputes and that one court within the Circuit has held the Seventh Circuit's position has merit. *Mountain State University, Inc. v. The Higher Learning Commission*, No.5:14-16682, 2016 WL 626563, at *2 (S.D. W.Va. Feb. 16, 2016). Therefore, this Court does not foreclose the possibility that the HEA may preempt state law claims.

support of their respective positions." Dkt. 21 at 14 (citing *Redstone Int'l, Inc. v. Liberty Mut. Fire Ins. Co.*, No. 5:18-CV-175, 2020 WL 13580530, at *7-8 (N.D. W. Va. Nov. 2, 2020).

In deciding which substantive law to apply, the state law of the forum state governs. 28 U.S.C. § 1652; *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). As this Court sits in Virginia, Virginia's choice of law rules apply. For tort claims, Virginia's choice of law rules apply *lex loci delicti—i.e.*, the law of the place of the wrong. *Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998). The place of the wrong is "the place where the last event necessary to make an act liable for an alleged tort takes place." *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986). "The last element of a tortious interference claim is damage to the plaintiff; [for] without damages, a defendant may not be held liable." *Palaxar Grp., LLC v. Williams*, No. 3:13-CV-641, 2014 WL 2002214, at *1 (E.D. Va. May 14, 2014) (applying Virginia law under Virginia's choice of law rules to tortious interference of economic relations claim because "Palaxar has alleged that its business expectancies were being negotiated from Virginia"); *cf. Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 856 (E.D. Va. 2013) ("For claims of tortious interference with contract . . . the occurrence of the plaintiff's injury marks the last event necessary to establish liability") (citing *Gen. Gen. Assur. of Am., Inc. v. Overby-Seawell Co.,* 533 F. App'x 200, 202 (4th Cir. 2013)).

Plaintiff and Defendant disagree as to which act was the last act necessary to impose injury, and thus disagree on which state's substantive law should govern. Defendant argues that for Plaintiff's tortious interference with contract claim regarding Plaintiff's Program Participation Agreement "PPA" with the Department of Education (Count III)… the last necessary act to cause legal injury was the Department of Education's decision to terminate IU's Title IV funding. Dkt. 15 at 19-20. Thus, Defendant claims, since those funds would have been directed to Utah, where

12

the campus is located, Utah law should apply. *Id.* Alternatively, Defendant argues that if "IU's breach of the PPA" was the last event necessary, meaning when IU's accreditation was withdrawn, "Utah law would still apply, because IU's breach occurred in Utah, where the campus is located, and where it would be expected to perform its obligation under the PPA to remain accredited." *Id.* at 25. For Plaintiff's claim for tortious interference with contract regarding student enrollment agreements (Count IV), Defendant argues the last event necessary would either be "IU's breach of the student enrollment agreements by failing to maintain its accreditation, or the students' no longer paying," which in either case happened at IU's campus location in Utah. *Id.* at 24. For Plaintiff's claim based on tortious interference with prospective business or economic advantage (Count V), Defendant argues that the same analysis applies to Count IV and Utah law governs. *Id.* at 30. Plaintiff contends that, while the effects of Defendant's tortious interference occurred in multiple jurisdictions,[3] the alleged "wrongful acts" themselves occurred exclusively in Virginia, so Virginia law should apply to each of the three tort claims. Dkt. 21 at 20. The last necessary act, according to Plaintiff, seems to be Defendant's decision to withdraw Plaintiff's accreditation. *See id.* at 15 ("Here, the 'wrongful acts' alleged by [Plaintiff] all occurred exclusively in Virginia and the effects of that conduct—interference with [Plaintiff]'s contracts and economic relationships with the Department of Education and its current and prospective students—occurred in multiple jurisdictions.")

The Court agrees with Plaintiff that resolving the Motion to Dismiss does not "turn on choice of law analysis." *Id.* at 14. Further, courts are generally in a better position to decide a

---

[3] Plaintiff argues that, at the time of Defendant's withdrawal decision, Plaintiff was operating colleges in California, teaching students in California, and IU enrolled online students from all over the country. Dkt. 21 at 15. Thus, Plaintiff argues that the enrollment agreements that Defendant interfered with touched multiple jurisdictions, not just Utah. Dkt. 21 at 15.

choice of law issue after discovery when the factual record is more developed. *See Anderson Gustafsson Advokatbyra, KB v. eSCRUB Sys. Inc.*, No. 1-10-CV-632, 2011 WL 677053, *2 (E.D. Va. Feb. 15, 2011) (finding that "the choice of law for tort and contract based claims should be determined with the benefit of a more complete record pending discovery"); *Arroyo v. Milton Acad.*, No. 5:10-CV-117, 2011 WL 65938, *3 (D. Vt. Jan. 10, 2011) (declining to conduct "choice-of-law analysis" in a tort case because "it would be premature to resolve these questions before the completion of discovery"); *Graboff v. The Collern Firm*, No. CIV.A. 10-1710, 2010 WL 4456923, *8 (E.D. Pa. Nov. 8, 2010) ("[C]onducting a . . . choice of law analysis is fact-intensive and context specific. Due to the complexity of this analysis, when confronted with a choice of law issue at the motion to dismiss stage, courts . . . have concluded that it is more appropriate to address the issue at a later stage in the proceedings."). As such, the Court will not resolve the choice-of-law question at this stage of the proceedings. Nevertheless, for the purposes of deciding the Motion to Dismiss, there does not appear to be any material differences in Utah and Virginia law concerning the elements of the tort of intentional interference with contract or prospective economic relationship. The Court, therefore, can decide the Motion to Dismiss with respect to those claims without definitively deciding whether Utah or Virginia law applies.

### 3. Tortious Interference (Counts III-V)

To state a claim for tortious interference under Utah law, a plaintiff must plausibly allege "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015) (citation omitted). To state a claim for intentional interference under Virginia law, a plaintiff must allege (1) intentional and willful acts; (2) calculated to cause

14

JA373

damage to the plaintiffs' known and valid business relationship or expectancy and (3) actual damage and loss resulting. *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97, 102 (Va. 1985).

Defendant does not contest that Plaintiff plausibly alleged that the withdrawal decision was secured by improper means aimed at intentionally interfering with Plaintiff's contractual relations. Rather, Defendant argues that Plaintiff failed to plausibly allege causation under both Virginia and Utah law. Dkt. Nos. 15 at 20-26; 22 at 10. This Court's analysis will therefore focus solely on the element of causation for each count.

### a. Count III

Plaintiff alleges that Plaintiff had a contractual agreement entitled a PPA with the Department of Education regarding the institution's eligibility for Title IV programs, Dkt. 1 ¶ 86, and Defendant tortiously interfered with that contract with its April 22, 2021 withdrawal decision, *id.* ¶¶ 92-94. Defendant argues that Plaintiff failed to plausibly allege causation on the tortious interference claim with respect to the PPA, because IU voluntarily closed its doors before Defendant's withdrawal decision was final. Dkt. 15 at 20. As accreditation decisions are stayed pending appeal, Defendant argues that Plaintiff remained accredited up until it voluntarily closed its doors, which "undermines the element of causation in its claims for tortious interference." *Id.* at 22. Plaintiff responds that its allegations give rise to a plausible inference that Defendant's April 22, 2021 withdrawal decision caused Plaintiff's harm, even though it was not final, because it "immediately precipitated" the Department of Education's decision to cut Title IV funding. Dkt. 21 at 17. Plaintiff further claims the Department of Education's cessation of funding set off a chain of events that led to the closure of IU and the loss of current and future students. *Id.*

To allege causation, under both Utah and Virginia law, a plaintiff must plead that a defendant's actions "proximately" caused the end result. *Lockheed Info. Mgmt. Sys. Co. v.*

15

*Maximus, Inc.*, 524 S.E.2d 420, 432-33 (Va. 2000); *Francis v. Nat'l DME*, 350 P.3d 615, 628 (Utah Ct. App. 2015); *see also Burrage v. United States*, 571 U.S. 204, 210 (2014) (distinguishing between "actual cause" and "proximate cause"). Proximate cause is defined as "that cause which, in natural and continuous sequence (unbroken by an efficient intervening cause), produces the injury and without which the result would not have occurred.'" *Francis*, 350 P.3d at 628 (internal citation omitted); *Williams v. Joynes*, 677 S.E.2d 261, 264 (Va. 2009) (similar).

For the purposes of surviving a Rule 12(b)(6) motion to dismiss, Plaintiff has sufficiently alleged facts that make plausible each element of the tortious interference with contract claim (Count III). Plaintiff alleges that the PPA with the Department of Education required Plaintiff to "maintain continuous accreditation," Dkt. 1 ¶ 90, and that once the Department of Education received notice of the accreditation withdrawal decision, it immediately stopped IU's Title IV funding, *id.* ¶ 91. Construing these allegations in the light most favorable to Plaintiff, these facts give rise to a plausible inference that Defendant's withdrawal decision was the proximate cause of Plaintiff's harm.[4] The Court finds it plausible that, after learning that Defendant decided to withdraw IU's accreditation, a condition required for funding under the terms of the PPA, that the Department of Education would cease to provide federal funds in response. Defendant counters that its April 22, 2021 withdrawal decision could not be the cause of Plaintiff's harms for two reasons: (1) the April 22, 2021 decision was not final, so it did not become effective until the

---

[4] In its Opposition, Plaintiff alleges that the Department of Education represented in a letter to Plaintiff that it ceased providing Title IV funds to Plaintiff specifically because of Defendant's withdrawal decision. Dkt. 21 at 17 n.5. However, a party cannot amend their complaint through the pleadings, so the Court will not consider this allegation as part of its analysis. *Weakley v. Homeland Security Solutions, Inc.*, 2015 WL 11112158, at *5 (E.D. Va. May 19, 2015) (noting that it is "axiomatic that [a] complaint may not be amended by the briefs in opposition to a motion to dismiss")

16

Appeal's Panel affirmed the decision in September and (2) IU closed its doors in August before the final withdrawal decision was issued. Dkt. 15 at 20.

This Court is not persuaded by Defendant's arguments that its April 22, 2021 withdrawal decision could not be the proximate cause of Plaintiff's harm. First, accreditation decisions do not need to be final to give rise to a plausible claim of tortious interference. *Career Care Inst., Inc.*, 2009 WL 742532, at *8. In *Career Care*, the accreditor argued that the plaintiff institution could not have been harmed by the accreditor's withdrawal decision, because the decision was not final, and therefore there was no actual disruption in accreditation. *Id.* at *8. However, the court determined that "tortious interference with contract claims do not require that [an accreditor] actually enforce its decision to terminate or withdraw [] accreditation or that plaintiff allege an actual disruption of accreditation." *Id.* The court found it sufficient that the school alleged that the withdrawal decision interfered with its contractual and economic relationships with the Department of Education and its students, even though the withdrawal decision had not yet been enforced. *Id.* Similarly, in the instant case, Plaintiff alleges that the withdrawal decision interfered with its contractual relationship under the PPA, Dkt. 1 ¶ 91, and with its contractual and economic relationships with its current students and future students, *id.* ¶¶ 102, 107, 109. Defendant does not cite any case law in this Circuit holding that an accreditation decision must be final to cause harm.

Defendant's reliance on *William Loveland Coll.*, is also unavailing. Although the court in *William Loveland Coll.* found that the accreditor's actions did not cause any of the school's alleged harms, that case is readily distinguishable. 347 F. Supp. 3d at 6. First, the school in *William Loveland Coll.* received a "show cause directive" ordering the school to show cause why accreditation should not be withdrawn. *William Loveland Coll.*, 347 F. Supp. 3d at 8. Rather than

17

JA376

complying with the process to show cause, the school withdrew from the process, causing its accreditation to lapse. *Id.* at 10. Thus, the accreditors never had the opportunity to make any decision with respect to the Show Cause directive and the accreditation lapsed due to the school's inaction. *Id.* at 22. Here, Plaintiff alleges, and Defendant does not dispute, that IU closed only after Defendant issued the initial withdrawal decision on April 22, 2021. Dkt. Nos. 1 ¶ 91; 15 at 20-21. Unlike the plaintiff in *William Loveland Coll.*, Plaintiff, here, has alleged that there was a withdrawal decision by an accreditor and that that decision caused the Department of Education to cut Plaintiff's funding, resulting in substantial harm to Plaintiff. Ultimately in *William Loveland Coll.*, the accreditors never made a decision due to the plaintiff's inaction, so the court found that there was no action on behalf of the accreditors that could have caused harm. *William Loveland Coll.*, 347 F. Supp. 3d. at 22. Here, however, Plaintiff has alleged that its accreditation did not lapse due to its own inaction, but rather because the accreditation was withdrawn by a decision by the Defendant, thus making *William Loveland Coll.,* inapposite. *Id.* Alternatively, Defendant argues that, even if Defendant's April 22, 2021 decision contributed to Plaintiff's harm, the Department of Education's actions to withdraw funding were a premature intervening cause that was not foreseeable as part of the accreditation appeals process. Dkt. 22 at 11. The Court disagrees. It is foreseeable that, even though a withdrawal decision may not be technically final, the Department of Education may withdraw funding from those schools that require accreditation as a condition to receive said funding, even before the appeals process is complete. *Career Care Inst., Inc.*, 2009 WL 742532, at *8; *Hampton Univ. v. Accreditation Council for Pharm. Educ.* 611 F. Supp. 2d 557, 567 (E.D. Va. 2009). Thus, the Court finds that Plaintiff has adequately alleged that Defendant's withdrawal decision was the proximate cause of Plaintiff's harm with regard to Count III. Thus, the Motion to Dismiss will also be denied with respect to Count III.

18

JA377

b. Counts IV-V

Plaintiff has also alleged sufficient facts to survive a motion to dismiss on Counts IV and V. Plaintiff alleges that as a direct cause of Defendant's April 22, 2021 withdrawal decision, Plaintiff lost all current and future enrollments, Dkt. 1 ¶ 1. To support this allegation, Plaintiff contends that, since nearly every college student relies on federal assistance, it is plausible that loss of that funding would dissuade current and potential students from enrollment. Dkt. 21 at 18. Though Defendant argues that Plaintiff's claims that Defendant's April 22, 2021 decision caused existing students to withdraw and prospective students to refrain from matriculating, are "unsupported and speculative," courts have found that even a mere threat of withdrawal can affect current and future enrollment. *See Hampton Univ.,* 611 F. Supp. 2d at 567 (finding the school's probationary accreditation status "undoubtably" had an adverse impact on current and former students likely leading current students to consider transferring to other schools and prospective students choosing other schools); *see also Mountain State Univ., Inc.*, 2017 WL 963043, at *1 (noting "loss of accreditation may end the institution's very existence for all intents and purposes since, . . . 'the vast majority of its students rely upon state and federal financial aid to finance their education.'") (internal citations omitted). Therefore, it would be reasonably foreseeable that Defendant's accreditation withdrawal decision could plausibly lead to IU's closure. The mere existence of an appeals process should not shield Defendant from all potential liability for any harm allegedly caused by an accreditor's initial decision to withdraw accreditation. Thus, the Court finds that Plaintiff has sufficiently pleaded a claim in Counts IV and V of the Complaint and the Motion to Dismiss will be denied with respect to those counts.

JA378

*      *      *

In sum, the declaratory judgment claim in Count II will be dismissed as duplicative of Plaintiff's due process claim in Count I. However, the Court finds that Plaintiff has pleaded sufficient facts to support his tortious interference claims (Counts III-V) based on the April 22, 2021 withdrawal decision. Thus, the Motion to Dismiss will be denied with respect to those counts. Whether the tortious interference claims can actually be proven must await a more complete record either on summary judgment or at trial.

## IV. Conclusion

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion (Dkt. 14) is GRANTED-IN-PART and DENIED-IN- PART; and it is

FURTHER ORDERED that Count II is DISMISSED WITH PREJUDICE; and it is

FURTHER ORDERED that the Motion is DENIED as to Counts III-V.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
September 26, 2023

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge

JA379

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **CENTER FOR EXCELLENCE IN**<br>**HIGHER EDUCATION, INC.,**<br>a Delaware Corporation,<br>P.O. Box 575777,<br>Salt Lake City, Utah 84157<br><br><br><br>                    Movant/Plaintiff,<br>v.<br><br>**ACCREDITATION ALLIANCE OF**<br>**CAREER SCHOOLS AND COLLEGES,**<br>**D/B/A ACCREDITING COMMISSION OF**<br>**CAREER SCHOOLS AND COLLEGES,**<br>a Virginia Corporation,<br>2101 Wilson Boulevard, Suite 302<br>Arlington, VA 22201<br><br>**Registered Agent**:<br>CT Corporation System<br>4701 Cox Rd., Ste. 285<br>Glen Allen, VA 23060<br><br>                    Respondent/Defendant. | Case No: 1:22-cv-1223 |

**<u>DEFENDANT'S ANSWER</u>**

Defendant Accreditation Alliance of Career Schools and Colleges, d/b/a Accrediting

Commission of Career Schools and Colleges (the "Commission"), by counsel, states the

following in response to Movant/Plaintiff's Motion to Vacate Arbitration Award and Complaint

(ECF No. 1).

<u>General Responses</u>

1    The Complaint fails to state claims for which relief can be granted.

2      The Commission denies every allegation of the Complaint that it does not specifically admit.

3      For every allegation as to which the Commission avers that no response is required, if a response were to be required, the Commission denies the allegation.

**Introduction[1]**

1.      CEHE brings this action to vacate the Award because the enforcement of that Award would sanction ACCSC's failure to afford CEHE due process and fundamental fairness required under federal law. Additionally, or in the alternative, CEHE brings claims to remedy ACCSC's due process failures and tortious interference with CEHE's contracts and business expectations. Withdrawing accreditation is a death sentence for institutions of higher education. ACCSC's unlawful acts caused CEHE to lose access to critical Title IV funding, to lose the ability to continue enrolling then-current and future students, and ultimately led to the closure of CEHE's schools.

Answer:  Denied.  The Commission specifically denies that either its withdrawal of accreditation for Independence University ("IU"), or the Commission's and the arbitrator's following the rules governing the Commission's independent appeals process and external arbitrations—rules to which all of its accredited institutions must agree as a condition of accreditation, and to which CEHE and  IU agreed—denied due process to CEHE or IU (together, "CEHE") or otherwise caused any harm to CEHE that would entitle it to any relief under the causes of action asserted herein by CEHE.  As the arbitrator noted:

---

[1] CEHE's motion to vacate the arbitral award has been fully briefed and remains pending. By responding in this Answer to CEHE's allegations in support of its motion to vacate the award, the Commission is not waiving the arguments asserted in its Brief in Opposition (ECF 13) to CEHE's motion to vacate.

JA381

Thus, the substantial evidence before the Appeals Panel supports its declination to reverse the withdrawal decision on the ground that it was too hastily rendered. The Commission and Appeals Panel have considerable expertise and experience is assessing the quality of career schools' educational programs. As the Fourth Circuit made clear in *Professional Massage*, this expertise warrants deference in the reviewing tribunal. The judgments of the Commission and Appeals Panel required nuanced analyses of predictions of future student success. This tribunal is not authorized to second-guess those judgments.

In short, the record reflects an extended period of noncompliance based on demonstrated past performance. The School submitted projections of improved future performance, and the Commission found that the projections were insufficient under ACCSC Standards of compliance. The School would have the arbitral tribunal jettison the verifiable past in favor of future projections the Commission found wanting. It was the School's burden before the Appeals Panel to persuade it that the Commission should have found that the School's new initiatives . . . brought it into compliance with the benchmarks of the Standards. It failed to do so. For this tribunal to conclude, based on the same record that was before Appeals Panel, that the School had carried its burden of proof on this issue before the Appeals Panel, or that it has carried its burden here, would be to embark on a *de novo* review of the Appeals Panel Decision.

August 4, 2022 Decision and Award by Arbitrator at 31 – 32 (Exhibit A to Complaint).

2.      The extreme consequences of a withdrawal decision elevate ACCSC's duty to afford due process to CEHE. But ACCSC denied CEHE a fair opportunity to appeal the decision to withdraw accreditation from Independence University ("IU," an institution owned by CEHE), as required by federal law. Instead, ACCSC manipulated its internal appeals process and arbitration rules to shield the arbitrator from considering material evidence of bad faith and disparate treatment. Because ACCSC imposed rules that barred the arbitrator from hearing evidence material to CEHE's claims, this Court must vacate the award under the Federal Arbitration Act, 9 USC 10(a)(3). Additionally, or in the alternative, this Court must remedy ACCSC's deprivation of CEHE's due process rights and its knowing and deliberate acts to close CEHE by preventing CEHE from enrolling students and accessing Title IV funding.

3

JA382

Answer:  The allegation in the first sentence of this paragraph is a statement of opinion, not of fact, that requires no response by the Commission.  The Commission denies the allegations in the rest of this paragraph.  The Commission specifically denies that either its withdrawal of accreditation for IU, or the Commission's and the arbitrator's following the Commission's rules governing its independent appeals process and external arbitrations—rules to which all of its accredited institutions must agree as a condition of Commission accreditation, and to which IU agreed—denied due process to CEHE or otherwise caused any harm to CEHE that would entitle it to any relief under the causes of action asserted herein by CEHE.  The Commission further denies that it "manipulated its internal appeals process and arbitration rules" or that it "imposed" the established rules to which CEHE and IU voluntarily agreed.

3.      The evidence of disparate treatment and pretext is compelling. Yet ACCSC precluded both its own internal Appeals Panel and, later, the arbitrator from meaningfully considering whether CEHE received the due process and fundamental fairness required by federal law. *See Prof'l Massage Training Ctr. v. Accreditation All. of Career Sch. & Colls.*, 781 F.3d 161, 169 (4th Cir. 2015). Prior to the withdrawal decision, ACCSC frequently acknowledged and commended CEHE's efforts towards resolving the compliance issues forming the basis of the decision, and in July 2020, it expressly found that CEHE had shown good cause to continue demonstrating the success of those efforts. In CEHE's next submission to ACCSC, it provided verifiable data showing the unequivocal success of CEHE's newly implemented initiatives. But ACCSC nonetheless prematurely and without a rational basis revoked its good cause finding and suddenly withdrew IU's accreditation.

4

JA383

Answer:  The Commission denies the allegations in the first, second, fourth, and fifth sentences of this paragraph, but admits that the cited Fourth Circuit decision is an important component of controlling authority for the resolution of this matter.  In response to the allegations in the third sentence, the Commission admits that it was patient with and supportive of CEHE as IU struggled but continuously failed over the course of several years to bring the school  into compliance with the Commission's accreditation standards, but the Commission denies the remaining allegations of the third sentence.

4.      The timing and nature of ACCSC's unexplained shift in position indicated that the decision was pretext aimed at self-preservation rather than a fair and uniform application of ACCSC's *Standards of Accreditation* ("*Standards*"). Indeed, publicly available information revealed several instances in which ACCSC continued an institution's accreditation notwithstanding its similar, or even worse, history of compliance with the same *Standards* at issue with respect to IU.

Answer:  Denied.

5.      Upon information and belief, ACCSC's disparate treatment of CEHE was triggered by an August 21, 2020 Colorado state court ruling against CEHE, which was based on marketing and enrollment practices that ACCSC itself had contemporaneously reviewed and approved. Upon appeal to the Colorado Court of Appeals, the decision was later determined to be erroneous and was reversed. But at the time of the initial ruling—just one month after ACCSC's good cause determination—it was deeply embarrassing to ACCSC. That is because ACCSC's own application for continued federal recognition was up for review by the Department of

JA384

Education in a matter of mere months. In an attempt to deflect scrutiny and damaging criticism in the wake of the Colorado ruling, ACCSC, to defend itself, precipitously and prematurely withdrew IU's accreditation.

    <u>Answer</u>:  Denied.

    6.    Throughout both ACCSC's internal appeals procedures and subsequent arbitration requirements, CEHE sought to introduce evidence of ACCSC's disparate treatment and bad faith motivations for taking the extreme ultimate sanction against CEHE and its schools. However, ACCSC's Executive Director, Dr. Michale McComis, arbitrarily denied CEHE's reasonable request for crucial records. ACCSC's Appeals Panel was thus denied substantive and vital facts in considering the propriety of the withdrawal decision. When CEHE sought review of the Appeals Panel's decision through arbitration, ACCSC cited its self-promulgated *Instructions for Arbitration* ("*Instructions*"), which precluded the arbitrator from considering any evidence not before the Appeals Panel. Thus, according to ACCSC's procedures, the unilateral decision of a single ACCSC executive, Dr. McComis, to withhold relevant evidence was unreviewable. That is not the law, and the Award must be vacated and remanded for consideration of the material evidence unlawfully withheld from the arbitrator.

    <u>Answer</u>:  The Commission denies the allegations in the first, second, third, and fifth sentences of this paragraph.  In response to the allegations in the fourth sentence of this paragraph, the Commission admits that the Instructions, to which CEHE had agreed in its application for accreditation, precluded the arbitrator from considering any evidence that was not before the Appeals Panel, which evidence exceeded 30,000 pages.  The sixth sentence of

6

JA385

paragraph 6 is a conclusion of law, not a statement of fact, that requires no response by the Commission.

## Parties

7.      Petitioner CEHE is a tax-exempt nonprofit corporation under section 501(c)(3) of the Internal Revenue Code. The corporation exists and operates pursuant to the laws of Delaware. Its principal place of business is in Salt Lake City, Utah.

Answer:  The Commission lacks information sufficient to admit or deny the allegations of this paragraph.


8.      CEHE owned four institutions of higher education: Stevens-Henager College ("SHC"), d/b/a Independence University, CollegeAmerica Denver, CollegeAmerica Arizona, and California College San Diego. Each institution operated multiple campuses. At the time of the withdrawal, CEHE was only enrolling students at its online institution, IU, and was teaching out its remaining students at the other institutions. At the time of the withdrawal decision, CEHE enrolled almost 10,000 students and had approximately 1,500 employees.

Answer:  The Commission lacks information sufficient to admit or deny the allegations of this paragraph.


9.      Respondent ACCSC is a Virginia corporation with its principal place of business in Arlington, Virginia. ACCSC is an accrediting agency officially recognized by the Department of Education ("Department"), pursuant to 20 USC 1099b and 34 CFR part 602.

Answer:  Admitted.

JA386

**Jurisdiction and Venue**

10.    This Court has subject matter jurisdiction pursuant to 28 USC 1331, 28 USC

1332(a)(1) and 20 USC 1099b(f).

     Answer:  The allegations in this paragraph are conclusions of law, to which no response

is required.

11.    This Court has federal question jurisdiction under 28 USC 1331 because the

matters presented in this Petition to Vacate and civil action arise under the Constitution, laws, or

treaties of the United States and presents questions about whether ACCSC violated CEHE's

federal due process rights in the accreditation process.

     Answer:  The allegations in this paragraph are conclusions of law, to which no response

is required.

12.    This Court has diversity jurisdiction under 28 USC 1332(a)(1) because CEHE and

ACCSC are citizens of different states. CEHE is incorporated in Delaware and has its principal

place of business in Utah. ACCSC is incorporated and has its principal place of business in

Virginia. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest

and costs.

     Answer:  The allegations in this paragraph are conclusions of law, to which no response

is required.

13.    This Court has jurisdiction under 20 USC 1099b(f), which provides:

"Notwithstanding any other provision of law, any civil action brought by an institution of higher

education seeking accreditation from, or accredited by, an accrediting agency or association

8

JA387

recognized by the Secretary [of the Department of Education] for the purposes of this subchapter and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in an appropriate United States district court."

Answer:  The allegations in this paragraph are conclusions of law, to which no response is required.


14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

Answer:  The allegations in this paragraph are conclusions of law, to which no response is required.

## Factual Allegations

### a.  ACCSC's obligation under federal law to provide due process.

Answer:  The Commission admits that federal common law requires that it afford due process to all of its accredited institutions, but denies that it did not afford due process to CEHE.


15.    In order to participate in federal student assistance programs authorized under Title IV of the Higher Education Act ("HEA"), an institution must be accredited by a federally recognized accrediting agency, like ACCSC. *See* 20 USC 102. The vast majority of higher education students in the United States use Title IV funds, at least in part, to fund their education. Title IV funds are the lifeblood of nearly every American college and university.

Answer:  The Commission admits the allegations in the first sentence of this paragraph. The allegations of the second sentence are statements of opinion, not assertions of fact, that require no response.

JA388

16.     Recognizing the quasi-governmental role accreditors fill in determining eligibility to participate in federal programs, courts have held that accreditors are obligated under federal common law to provide due process to the schools they accredit. *Prof'l Massage.*, 781 F.3d at 169 (4th Cir. 2015). "They, like all other bureaucratic entities, can run off the rails." *Id.* "[A]creditors wield enormous power over institutions—life and death power, some might say— which argues against allowing such agencies free rein to pursue personal agendas or go off on some ideological toot." *Id.* at 170.

Answer:  The allegations in this paragraph are legal arguments, not statements of fact, to which no response is required.

17.     Thus, accreditors are required to adhere to administrative law principles and fundamental notions of fairness. *Id.* at 180-71. Such fairness requires, among other things, that similarly situated institutions be treated similarly by the accreditor. *Med. Inst. of Minn. v. Nat'l Assoc. of Trade & Tech. Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987). And when an accreditor departs from past precedent or practices, it must provide a reasoned explanation for doing so. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

Answer:  The allegations in this paragraph are legal arguments to which no response is required.

18.     In addition to these basic common-law requirements, the HEA and Department further inform the due process accreditors must provide in the accreditation process. *See* 34 CFR

10

JA389

602.25 (describing additional due process requirements); *Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs.*, 691 F. App'x 737, 741 (4th Cir. 2017).

Answer:  The allegations in this paragraph are legal arguments, not statements of fact, to which no response is required.

19.    For example, the Department expressly requires an accreditor to "consistently apply and enforce [its] standards," 34 CFR 668.18(a), and have "effective controls against the inconsistent application of [those] standards." 34 CFR 668.18(b)(2). The Department further specifies that accreditation decisions must be based on published standards, rather than political agendas. 34 CFR 668.18(b)(3).

Answer:  The allegations in this paragraph are legal arguments, not statements of fact, to which no response is required.

20.    The HEA also requires that institutions of higher education must submit any dispute involving the final withdrawal of accreditation to initial arbitration prior to any other legal actions. 20 USC 1099b(e). However, nothing in the HEA or the Department's regulations authorizes accreditors to limit the scope of the arbitrator's review to preclude consideration of evidence related to the accreditor's compliance with federal due process requirements.

Answer:  The allegations in this paragraph are legal arguments, not statements of fact, to which no response is required.

    **b.  ACCSC's Appeal and Arbitration procedures fail to provide sufficient due process.**

Answer:  Denied.

JA390

21.    When ACCSC withdraws an institution's accreditation, the only avenue for appeal is through ACCSC's internal appeal process as detailed in Section VIII of the ACCSC *Rules of Process and Procedure* ("*Rules*"). See Ex. B at 11-15 (Excerpts from *ACCSC's Rules of Process and Procedure and Standards of Accreditation*).[2]

Answer:  The Commission denies that the "only" avenue for appeal of an adverse accreditation decision is through the Commission's "internal appeal process."  But the Commission admits that it has *Standards of Accreditation* (the "*Standards*")*,* a complete copy of which may be found on the Commission's website.  The Commission further admits that Section VIII of the Standards sets forth the Commission's *Rules of Process and Procedure [for] Appeal of a Commission Decision* (the "*Rules*")*.*

22.    Pursuant to those procedures, an institution can appeal a withdrawal decision if it has reason to believe that ACCSC's decision was "arbitrary, capricious, or in substantial disregard of the criteria or procedures of the Commission, or not supported by evidence in the record on which the Commission took action." *Rules*, VIII.B.1 (Ex. B at 11).

Answer:  Admitted.

23.    The institution submits its appeal to a three-person Appeals Panel. *Rules*, VIII.D (Ex. B at 13). In considering the institution's Grounds for Appeal (which is the institution's written submission) and hearing arguments, the Appeals Panel may only consider the information

---

[2] A full version of ACCSC's *Standards of Accreditation* (which contains the *Rules* and ACCSC Bylaws) is available on ACCSC's website: https://www.accsc.org/UploadedDocuments/1967/ACCSC-Standards-of-Accreditation-and-Bylaws-070118.pdf

JA391

that was before ACCSC at the time of the initial withdrawal decision. *Rules*, VIII.B.4 (Ex. B at 11).

  <u>Answer</u>:  Admitted, except that the Appeals Panel may also consider "financial information" as provided by Section VIII.C.2.c.


  24. But institutions have no way of knowing what information was actually before ACCSC when it acted to withdraw accreditation, other than the specific correspondence and submissions between the two parties. Moreover, the *Rules* do not provide any mechanism for institutions to seek supplementation of the record to ensure that the Appeals Panel has all relevant and material information before it when reviewing ACCSC's initial decision.

  <u>Answer</u>:  Denied.  Further, the Commission denies that, when it decided to withdraw IU's accreditation, it considered any information other than the information specified in its April 22, 2021 withdrawal letter, which is Exhibit H to the Complaint.


  25. If the Appeals Panel affirms the initial decision, the institution's only recourse is binding arbitration, subject to ACCSC's *Instructions for Arbitration*, which preclude the arbitrator from considering any materials not included in the record before the Appeals Panel. Ex. C at 1 ("*Instructions*," Section I.B.2). Moreover, the arbitrator's review is further limited to consideration only of whether, based solely on ACCSC's curated record, the Appeals Panel's decision was supported by substantial evidence. *Instructions*, Section I.B.1 (Ex. C at 1). The instructions also expressly prohibit any discovery that might allow affected institutions the opportunity to identify material evidence withheld by ACCSC in the proceedings below. *Instructions*, Section I.E (Ex. C at 3). Put another way, ACCSC has unfettered discretion to set the

JA392

record in however manner it sees fit, without any opportunity for subsequent review of that decision.

   Answer: The Commission admits that, as set forth in Section I.A.2 of its *Instructions for Arbitration* (the "*Instructions*"), its "Bylaws provide that by applying for accreditation with the Commission, the school agrees to exhaust all appeal opportunities and to submit fully and faithfully to final, binding arbitration proceedings." The Commission further admits that its *Instructions* allow "a school that believes that the decision of an independent Appeals Panel is not supported by substantial evidence in the record on which the Appeals Panel took action may seek review of that decision through binding arbitration as described in these *Instructions*." The Commission further admits that the *Instructions* provide that "[i]f the Appeals Panel affirms the [Commission's] initial decision, the institution's only recourse is binding arbitration"; that the arbitrator "may not consider evidence that was not in the record before the Appeals' Panel"; and that "[d]epositions, interrogatories, requests for admission, and other forms of adversary discovery shall not be used during the arbitration proceeding." The Commission denies the remaining allegations of this paragraph.

   26. The proceedings in the instant matter are instructive on that point. At the outset of the arbitration proceedings, CEHE filed a Motion to Supplement the Arbitration Exhibits, seeking an order from the arbitrator requiring ACCSC to produce documentation evidencing its treatment of similarly situated institutions with similar compliance issues. However, the arbitrator confirmed that he was "constrained by the [Instructions] to decline [CEHE's] requests that the Commission be ordered to produce documents that were not in the record before the Appeals Panel or that discovery be permitted in arbitration." Ex. D at 7-8 (Arbitrator's Ruling Concerning

Arbitration Exhibits). Thus, ACCSC's exclusion of material evidence has never received any meaningful independent review.

    <u>Answer</u>:  The first sentence of this paragraph is a statement of opinion, not fact, that requires no response by the Commission.  The Commission admits the allegations in the second and third sentences of this paragraph.  The Commission denies the allegation in the fourth sentence of this paragraph.

      **c.  ACCSC arbitrarily and capriciously withdrew IU's accreditation and withheld material evidence from consideration by the arbitrator.**

  <u>Answer</u>:  Denied.

      *i.  ACCSC's Student Achievement Standards.*

27.    ACCSC's purported basis for its withdrawal decision was that several online IU programs reported graduation and employment rates that fell below ACCSC requirements. However, communications between the parties leading up to the decision show that ACCSC recognized that CEHE had already addressed those findings though an approved corrective action plan. CEHE had demonstrated, through verifiable data, that IU's then-currently enrolled online students tracked to graduate and find employment at acceptable rates.

    <u>Answer</u>:  Denied.

28.    The *Standards* require member institutions to demonstrate that their students graduate and obtain in-field employment at acceptable rates set by the Commission, known as "benchmark" rates. *Standards*, VII.B.1.b (Ex. B at 18-19). When a group of students start an enrollment period for a given program, that group is known as a cohort. ACCSC requires institutions to submit an annual report with graduation and employment rates for each cohort for

15

each program offered. *Standards*, Appendix VI (Ex. B at 21). If an institution fails to demonstrate that a cohort graduated and found employment at benchmark rates, then it will be deemed out of compliance with student achievement *Standards*. *Id.*

  <u>Answer</u>:  The Commission admits the allegations in the first three sentences of this paragraph.  With respect to the fourth sentence of this paragraph, the Commission further admits that Appendix VI of its *Standards* provides that:  "If a school reports a lower employment rate for a program, that program will be subject to additional monitoring or reporting as deemed appropriate.  Prolonged failure to meet a benchmark rate will result in programmatic or institutional action as deemed appropriate by the Commission (see *Section VII (B) (2) (a-c), Substantive Standards, Standards of Accreditation*)."  The Commission denies any remaining allegations of this paragraph.


  29. When a member school is found to be out of compliance with student achievement *Standards*, ACCSC can initiate adverse action, which may include placing the school on warning or probation status or withdrawing accreditation. *Standards*, VII.B.2.c (Ex. B at 20).

  <u>Answer</u>:  Admitted.


  30. ACCSC allows an institution a maximum of three years to remedy noncompliance with any *Standard*, unless good cause exists to extend the time frame. *Rules*, Section VII.M.1 (Ex. B at 9). The *Rules* state that a "school **will be deemed** to have demonstrated good cause if it has shown . . . significant progress has been made toward achieving compliance . . . and when extenuating circumstances exist such that only through the provision of additional time can the

school demonstrate compliance." *Rules*, Section VII.M.2 (Ex. B at 9-10) (emphasis added). ACCSC's good cause standard is vital with respect to student achievement *Standards* because new cohorts often do not become reportable for much longer than three years after enrollment.

    <u>Answer</u>:  The Commission denies the allegations in the first sentence, but admits that, as set forth in Section VII.M.1 of the *Rules*, it allows a maximum of two years "to remedy noncompliance," unless "there exists good cause to extend the period for achieving compliance." With respect to the second sentence of this paragraph, the Commission admits that CEHE's paraphrase of Section VII.M.2 is partially accurate, but the Commission denies that this sentence fully and fairly represents the totality of that section of the *Rules*.  Further, the Commission avers that the onus rests with the institution to demonstrate significant progress, which IU persistently failed to do.  The third sentence of this paragraph contains statements of opinion, not allegations of fact, that require no response by the Commission.

    31.    Here, both ACCSC and CEHE understood that it would take more than three years for IU to meet benchmark rates in its annual reports. That is because IU offered primarily 20- to 36- month degree programs. Ex. A at 14-15. A cohort does not become reportable until one-and-a- half times the length of the program. *Id.* at 16-17. Thus, if a cohort started today, IU would not know if that cohort graduated at benchmark rates for 30 to 54 months, depending on the program. *Id.* For reference, most ACCSC member schools offer short-term, in-person degree programs, which can be completed in a matter of months and are often reportable within a year. IU's programs were more substantial, consistent with traditional college programs.

    <u>Answer</u>:  Denied.  The Commission's *Rules* establish a maximum timeframe for a school to achieve compliance once a determination of non-compliance had been made.  IU failed to

<div align="center">17</div>

<div align="center">JA396</div>

meet the benchmark rates after being given considerable time to do, and failed to demonstrate that significant progress had been made to support a decision to extend that maximum timeframe. Moreover, federal regulations for recognized accrediting agencies require them to establish such maximum timeframes and to take adverse action when a school fails to achieve compliance.

The allegations in the fifth and sixth sentences of this paragraph are statements of opinion, not assertions of fact, that do not require a response by the Commission.

Further, the allegations in this paragraph misleadingly cite to portions pages 14 – 17 of the arbitrator's decision affirming the Appeals Panel's decision. This paragraph omits the arbitrator's conclusion, which may be found at pages 34 – 35 of Exhibit A:

> The record before the Appeals Panel shows that the Commission adhered to its Rules in considering the School's accreditation and that it afforded the School ample opportunity, over many years, to show it could bring its programs into compliance with ACCSC Standards. In applying the "deferential standard ordinarily due to [an] accreditation agency under a common law due process claim," as articulated in *Professional Massage*, 781 F.3d at 180, the tribunal concludes that the ACCSC's "internal rules provided a fair and impartial procedure" for the School, and that the Appeals Panel "followed its rules in reaching its decision.'" Id. at 172 (quotations and brackets omitted). Nor is the tribunal persuaded that Independence has sustained its burden of proving that the expertise and experience of the Commission -- or that of the duly constituted Appeals Panel -- failed to provide "effective controls against the inconsistent application of the agency's standards." 34 C.F.R. § 602.18(b)(2).

> [The footnote following the citation to *Professional Massage* reads as follows: "In this regard, the tribunal concludes, based on the entire record that was before the Appeals Panel, that the issuance of the Withdrawal Letter on April 22, 2021, rather than some time after May 31, 2021, did not violate the ACCSC Rules or deprive Independence of its due process rights."]

> The tribunal must decline to reverse the Appeals Panel Decision on the ground that it deprived Independence of due process.

> *ii.  CEHE proved that IU successfully resolved its student achievement issues.*

<u>Answer</u>:  Denied.


32.    In September 2018, ACCSC concluded that IU was out of compliance with student achievement *Standards* due to below-benchmark rates in various programs. The Commission placed IU (and other commonly owned schools) on probation. By that time, IU had already begun substantial efforts to identify the root causes of, and solutions for, its below-benchmark rates.

<u>Answer</u>:  The Commission admits that as of September 2018 IU was out of compliance with student achievement Standards.  In its letter to IU the Commission noted the following with regard to the scope of the student achievement issues at IU-Salt Lake City:

- The school is currently approved to offer 20 programs, of which 13 have been operational long enough to be reportable via the Graduation and Employment Chart formula. Of those programs, the school reported below-benchmark student achievement outcomes for 61% (8 of 13).

- The programs with the highest enrollments are below benchmark; thereby affecting the largest number of students.

- The Commission reviewed the Program Enrollment Summaries that IU-Salt Lake City provided to ACCSC in Annual Reports for the seven programs that have not been operational long enough to have reportable student achievement data. The number of graduations and withdrawal/terminations reported are indicative of below-benchmark rates of student graduation.

JA398

- In addition to being unable to demonstrate current compliance with student achievement standards in 61% of the active, reportable programs, the Commission noted the following history of poor student achievement rates.

- The school has reported below-benchmark student achievement rates for the entire reporting history of the Business Management and Accounting (AAS), Graphic Arts (AAS), and Medical Specialties (AOS) programs.

- Healthcare Administration-DE (MS) and Master of Business Administration-DE (MBA) programs have reported below-benchmark rates on the two most recent Annual Reports.

The Respiratory Therapy-DE (AS) program has reported below-benchmark rates of employment for four of the last five reporting years.

The Commission further admits that it then placed IU on probation, as well as the other schools owned by CEHE that were also accredited by the Commission at that time. The allegations in the third sentence of this paragraph are statements of opinion, not assertions of fact, that require no response by the Commission.


33.    At that time, CEHE had decided to close all but one of its traditional ground-based schools to focus its efforts on IU and its online programs. Due to the lack of in-person interaction and social engagements, fully online programs tend to have significant difficulty retaining students through the completion of their programs. Leading online universities often report graduation rates that are substantially below ACCSC benchmarks. For example, Purdue

University Global's eight-year graduation rate is 30%, Maryland Global Campus's is 28%, and Liberty University's is 34%.[3]

Answer:  The Commission lacks information sufficient to admit or deny the allegation that by September 2018 CEHE "had decided to close" the referenced schools.  Further, the Commission avers that CEHE had initially informed the Commission that it intended to cease enrollment, but not to close.  The Commission lacks information sufficient to admit or deny the remaining allegations of the first sentence of this paragraph.  The second and third sentences of this paragraph are expressions of opinion, not fact, and therefore require no response by the Commission.  The Commission lacks information sufficient to admit or deny the allegations of the fourth sentence of this paragraph.

34.     Nonetheless, CEHE and IU were committed to complying with student achievement *Standards*, notwithstanding the extreme difficulties created by online delivery of education.

Answer:  The Commission lacks information sufficient to admit or deny whether CEHE and IU "were committed to complying with student achievement *Standards*."  The Commission avers that CEHE and IU never brought IU's programs into full compliance.  The allegation that there are "extreme difficulties created by the online delivery of education" is a statement of opinion, not of fact, that requires no response by the Commission.

35.     CEHE devoted roughly $10 million to study and implement effective initiatives to improve student outcomes. Over its roughly two-year probationary period, CEHE consistently

---

[3] Purdue University Global (https://collegescorecard.ed.gov/school/?489779-Purdue-University- Global); Maryland Global Campus (https://collegescorecard.ed.gov/school/?163204-University- of-Maryland-Global-Campus); Liberty University (https://collegescorecard.ed.gov/school/?232557-Liberty-University).

JA400

updated ACCSC about the status of those initiatives, and ACCSC consistently acknowledged and

commended those efforts. In a July 21, 2020 Continued Probation letter—the last review of IU's

efforts before ACCSC abruptly withdrew accreditation—ACCSC recognized the breadth of

CEHE's recently implemented initiatives to improve graduation rates and acknowledged that IU's

distance education programs would not report benchmark graduation rates for several years. Ex. E

at 15 (Arb. Ex. 6, July 21, 2021 Continued Probation Letter).[4] ACCSC found that, based on IU's

demonstrated progress, good cause existed to continue IU's accreditation until at least May 2021.

*Id.* at 31 ("In particular, the Commission recognized the length of time needed to demonstrate the

school's ability to improve student achievement outcomes"). The Commission was clear that

progress would be measured based on the success of the recently enrolled cohorts, who were the

first to receive the benefits of IU's new initiatives—students who would not become reportable

for 30 to 54 months. *Id.* at 15; Ex. F at 18-19 (Arb. Ex. 10, Oct. 28, 2019 Continued Probation

Order) (confirming that IU's compliance would be determined based on "studies of academic

progress, retention data and finally student graduation rates for the first cohorts of students

admitted under the new process and procedures").

    Answer:  The Commission admits that CEHE has claimed to have "devoted roughly $10

million to study and implement effective initiatives to improve student outcomes," but the

Commission lacks information sufficient to admit or deny how much money, if any, CEHE

actually spent for these purposes.  In support of the balance of this paragraph, CEHE cites to the

Commission's October 28, 2019 and July 21, 2020 letters to CEHE, the authenticity of which the

Commission admits.  But the letters, which are Exhibits E and F to CEHE's Complaint, together

---

[4] Pursuant to ACCSC's Instructions for Arbitration, the arbitrator was limited to consideration of the record that was before the Arbitration Panel, which was referred to as "Arbitration Exhibits." *Instructions for Arbitration*, I.F. Where an exhibit cited in this Motion/Complaint was included as an Arbitration Exhibit, CEHE has identified the exhibit number used in the arbitration proceedings as Arb. Ex. [].

consist of 65 single space pages and two appendices.  While the Commission admits that CEHE accurately quotes a single sentence from the July 21, 2020 letter and a portion of a single sentence from the October 28, 2019 letter, the Commission denies that CEHE has accurately characterized the contents of the letters, which speak for themselves. Further, the Commission denies that it "abruptly" withdrew IU's accreditation.

36.    In its subsequent December 20, 2020 response, CEHE provided updated projections for IU's recently enrolled cohorts, which showed that IU's efforts had succeeded. Ex. G (Excerpt from Arb. Ex. 5, December 20, 2020 Probation Response). The recently enrolled cohorts for all programs were on track to meet or exceed benchmark rates. *Id.* This was an outstanding achievement for an institution that offered 100% online programs.

Answer:  The Commission admits that CEHE provided additional information to the Commission in a December 20, 2020 submission, but denies that this submission "showed that IU's efforts [to meet its required benchmarks] had succeeded."  The Commission denies the allegations in the second sentence of this paragraph.  The third sentence of this paragraph is an expression of opinion, not fact, and therefore requires no response by the Commission.

> *iii.  Without explanation or justification, ACCSC reversed its position and immediately withdrew IU's accreditation.*

Answer:  Denied.

37.    But at its February 2021 meeting, ACCSC prematurely withdrew IU's accreditation— even though it had given CEHE until May 2021 to demonstrate continued progress. Ex. H at 5-6 (Arb. Ex. 4, Apr. 22, 2021 Withdrawal Order). Had ACCSC allowed CEHE until May 2021 to show continued improvement (as previously promised), CEHE would

JA402

have shown that most IU programs would have met benchmarks ahead of the projections set forth in the December 20, 2020 Response. Ex. I at 12-13 (Excerpts from Arb. Ex. 3, May 27, 2021 Grounds for Appeal). The precipitous withdrawal decision, which was published on April 22, 2021, was illogically based entirely on older cohorts, which ACCSC always knew would not, and could not, graduate at benchmark rates. That change in position blatantly contradicted ACCSC's prior acknowledgments that progress would be measured based on the most recently enrolled cohorts. ACCSC's premature decision prevented IU from further demonstrating progress as requested by ACCSC.

　　　　Answer:  The Commission admits that at its meeting in February 2021 it decided to withdraw IU's accreditation, but the Commission denies the remaining allegations of the first sentence of this paragraph.  The second sentence of this paragraph is an expression of opinion, not fact, and therefore requires no response by the Commission.  (In support of this opinion, CEHE cites to Exhibit I to its Complaint.  Exhibit I is CEHE's self-serving Grounds for Appeal, on which it relied when it appealed the Commission's withdrawal decision to the independent Appeals Panel that reviewed, and unanimously upheld, the withdrawal decision.  The Commission denies all of CEHE's assertions in its Grounds for Appeal.)  The Commission admits that its withdrawal decision was published on April 22, 2021, but the Commission denies the remaining allegations of the third sentence of this paragraph.  The Commission denies the allegations of the fourth sentence of this paragraph.  In response to the fifth sentence of this paragraph, the Commission denies that mere "progress" by IU would have protected it from the consequences of its continuous, multi-year failure to meet the required benchmarks.  The Commission denies that its withdrawal decision was "premature" or "precipitous."

38.    Given ACCSC's prior acknowledgement of the time it would take for IU's multi-year programs to report above-benchmark rates, the withdrawal decision is capricious. IU subsequently learned from limited, publicly available ACCSC accreditation decisions that other schools were permitted to remain accredited even though they failed to meet student achievement benchmarks in **all** of their programs. Moreover, those decisions noted the institutions' failures to demonstrate any ability to resolve the underlying issues. ACCSC's treatment of those schools stood in stark contrast to treatment of IU, which demonstrated that all of its programs were projected to meet or exceed benchmarks.

        Answer:  The first sentence of this paragraph is an expression of opinion, not fact, and therefore requires no response by the Commission.  The Commission lacks information sufficient to admit or deny what, if anything, IU "subsequently learned from limited, publicly available ACCSC accreditation decisions that other schools were permitted to remain accredited even though they failed to meet student achievement benchmarks in **all** of their programs." (Emphasis in original.)   The third and fourth sentences of this paragraph are expressions of opinion, not fact, and therefore require no response by the Commission.  Further, the Commission denies that IU ever "demonstrated that all of its programs were projected to meet or exceed benchmarks" within the period of time established by the Commission in compliance with the *Standards*. Further, the Commission avers that over several years IU had "projected" that all of its programs would meet or exceed benchmarks within a specified period of time, but IU consistently failed to meet these projections.


39.    For example, on October 1, 2020, ACCSC placed Vista College on warning status because "**all** of the school's programs with reportable data" fell below ACCSC's student

JA404

achievement benchmark rates. Ex. I at 27 (Excerpts from Arb. Ex. 3) (emphasis in original). Prior to being placed on warning status, Vista had been on outcomes reporting for five years, since May 2015. Describing the basis for moving the school to warning status, the Commission expressed concerns that the school's program modifications submitted in March 2016 were merely "a means to 'reset' the reporting of student achievement data." *Id.* at 28. The Commission also noted that the school's "main plan" for resolving these issues appeared to be the continuation of its prior efforts to "revise and re-launch programs," which "did not appear to resolve the school's student achievement issues." *Id.* Placing an institution on warning status, while serious, falls well short of a full withdrawal of accreditation—an effective death sentence for a college or university.

<u>Answer</u>:  The allegations of this paragraph rely on an exhibit to CEHE's Grounds for Appeal.  The cited exhibit appears to be an October 1, 2020 letter from the Commission to Vista College.  The Commission denies that its actions with respect to other schools have any relevance to the propriety of its actions with respect to IU.  The Commission further denies that the allegations of the first four sentences of paragraph 39 fairly reflect the full content of the letter, which is 8 single space pages and speaks for itself.  For example, the first sentence of paragraph 39 misinterprets the referenced passage from page 3 of the Commission's letter to Vista.  Accordingly, the Commission denies the allegations in the first sentence of this paragraph.  Further, the Commission denies that its October 1, 2020 letter to Vista captures the history of the Commission's accreditation review of Vista.  The fifth sentence of paragraph 39 is an expression of opinion, not fact, and therefore requires no response by the Commission.


40.     Similarly, Takoda Institute remained accredited at the time of CEHE's withdrawal even though, as of July 2019, all of its programs failed to meet both graduation and employment

JA405

benchmarks. *Id.* at 34. Moreover, the school had reported below-benchmark graduation and/or employment rates for all of its programs since 2014. *Id.* The Commission's most recent evaluation of the school as of CEHE's withdrawal date noted that most of the programs were not only failing to show improvement but were actually declining. *Id.* Nonetheless, Takoda remained accredited because the Commission allowed it further time to develop student achievement support strategies and to demonstrate the effectiveness of its strategies. *Id.* at 35.

Answer: The allegations of this paragraph rely on another exhibit to CEHE's Grounds for Appeal. The cited exhibit appears to be a June 10, 2020 letter from the Commission to Takoda Institute for Higher Education. The Commission denies that its actions with respect to other schools have any relevance to the propriety of its actions with respect to IU. The Commission further denies that the allegations of paragraph 40 fairly reflect the full content of the letter, which is 7 single space pages and speaks for itself. Further, the Commission denies that its June 10, 2020 letter to Takoda captures the history of the Commission's accreditation review of Takoda.

41.    CEHE, on the other hand, demonstrated that its strategies were effective and that then- currently enrolled students would graduate from programs that met or exceeded graduation and employment benchmarks. Still, ACCSC withdrew IU's accreditation. ACCSC's actions did not demonstrate fair and consistent application of the *Standards*.

Answer: The first and third sentences of this paragraph are expressions of opinion, not fact, and therefore require no response by the Commission. The Commission admits that it withdrew IU's accreditation, but denies any inference in the second sentence of this paragraph that is rooted in the word "[s]till."

27

JA406

42.      Moreover, Takoda offered diploma programs between only four and nine months in length. *Id.* at 34. In those programs, successful initiatives should have materialized in above-benchmark rates within two years—much sooner than for a school with significantly longer degree programs such as those offered by IU. As discussed above, new cohorts in IU's degree programs would not have been able to report for 30 to 54 months. The Commission's willingness to continue accrediting these short programs for years without any indication of improvement stood in stark contrast to its decision to cut short IU's demonstrated progress.

   Answer:  The allegations of this paragraph also rely on the June 10, 2020 letter from the Commission to Takoda Institute for Higher Education.  The Commission denies that its actions with respect to other schools have any relevance to the propriety of its actions with respect to IU. The Commission further denies that the allegations of paragraph 42 fairly reflect the full content of the letter, which is 7 single space pages and speaks for itself.  For example, the first sentence of paragraph 42 misinterprets the referenced table on  page 2 of the Commission's letter to Takoda.  Accordingly, the Commission denies the allegations in the first sentence of this paragraph.  Further, the Commission denies that its June 10, 2020 letter to Takoda captures the history of the Commission's accreditation review of Dakota.  The second, third, and fourth sentences of this paragraph are expressions of opinion, not fact, and therefore require no response by the Commission.

43.      Further underscoring ACCSC's disparate treatment of CEHE, around the time of the withdrawal, ACCSC announced that it would offer relief from strict enforcement of student

28

JA407

achievement *Standards* in the wake of the COVID-19 pandemic.[5] ACCSC noted that its *Standards* "contemplate [the] very notion" that COVID-19 is an "external or mitigating factor[]" that would be taken into consideration in assessing an institution's compliance with achievement *Standards*. But where ACCSC offered relief to other institutions, it offered none to CEHE. In fact, ACCSC abruptly cut short CEHE's demonstrably successful efforts right in the middle of the pandemic.

Answer:  The Commission admits that it offered guidance to its accredited institutions but denies that it failed to take into account IU's description of its mitigating circumstances throughout its numerous accreditation reviews.  The Commission denies the allegations in the third and fourth sentences of this paragraph.

44.    The limited available evidence demonstrated that ACCSC held IU to a materially different and unreasonably higher standard than other member institutions. And that evidence likely represented just a small sampling of other schools that remained accredited notwithstanding systemic achievement rate issues. CEHE found the above-discussed accreditation decisions on ACCSC's website, which only posts its most recent decisions. In its 20 years of accreditation with ACCSC, CEHE is unaware of any instance where ACCSC withdrew accreditation from an institution that demonstrated all programs were on track to report benchmark achievement rates.

Answer:  The Commission denies that its actions with respect to other schools have any relevance to the propriety of its actions with respect to IU.   The first and second sentences of this paragraph are expressions of opinion, not fact, and therefore require no response by the

---

[5] The announcement can be found on ACCSC's website at:
https://www.accsc.org/UploadedDocuments/1956/COVID-19-QandA.pdf (Pg. 20 of 22).

JA408

Commission.  The Commission lacks information sufficient to admit or to deny the allegations in the third and fourth sentences of this paragraph.

45.     Indeed, the decision came as a shock to CEHE because its most recent reporting to ACCSC demonstrated that the recent roll out of its student achievement solutions had proven to be successful. In July 2020, ACCSC concluded that the new initiatives showed promise and asked to see continued evidence of improvement. Ex. E at 15, 31. CEHE did exactly that in December 2020, but ACCSC nonetheless quickly acted to withdraw accreditation.

Answer:  The first and third sentences of this paragraph are expressions of opinion, not fact, and therefore require no response by the Commission.  The Commission denies that CEHE had "demonstrated that the most recent roll out of its student achievement solutions had proven to be successful."  Exhibit E to the Complaint is the Commission's July 21, 2020 letter to CEHE. It is 32 single space pages long, with a four page appendix, and speaks for itself.  The Commission denies the allegations of the second sentence of paragraph 45 of the Complaint, because it does not fairly reflect the full content of the July 21, 2020 letter.


46.     The only thing that had changed in the interim was that on August 21, 2020, a Colorado state court judge found that the use of Bureau of Labor Statistics ("BLS") salary and job outlook information advertisements for another of CEHE's institutions, CollegeAmerica, violated state consumer protection laws.[6] That decision was reversed by the Colorado Court of Appeals on August 26, 2021.

Answer:  The Commission denies the allegations of the first sentence of this paragraph. The Commission denies the allegation of the second sentence of this paragraph, because the

_____

[6] That case, brought in the District Court for the City and County of Denver, was captioned *State of Colorado, et. al v. Center for Excellence in Higher Education, et al.*, Case No. 14CV34530.

JA409

Colorado Court of Appeals did not "reverse" the referenced trial court decision. Instead, it reversed in part and remanded the case for a new trial. That decision was appealed to the Colorado Supreme Court, which affirmed in part and reversed in part and remanded. *State ex rel. Weiser v. Center for Excellence in Higher Education*, 529 Col. 599 (2023). Further, the Commission avers that this case involves Colorado's consumer protection laws, not the Commission's accreditation standards or CEHE's or IU's compliance with them.

47.    But before the reversal, the Colorado decision was an embarrassment to ACCSC because ACCSC had contemporaneously reviewed and approved the very same advertising practices at issue in that case. In some instances, the Commission actually commended CEHE for the practices found to be problematic by the Colorado court. But instead of publicly defending CEHE's advertising practices (which are prevalent among institutions of higher education across the country) and criticizing the Court's erroneous decision, ACCSC sought to bolster its own image by appearing "tough" against CEHE.

<u>Answer</u>:  The allegations of this paragraph are expressions of opinion, not fact, and therefore require no response by the Commission.

48.    ACCSC's perceived image problem was compounded because ACCSC's application for renewal of its federal recognition was set for consideration at the July 2021 meeting of the National Advisory Committee on Institutional Quality and Integrity ("NACIQI"), which is the Department body primarily responsible for advising the Secretary on matters concerning accreditation. The impending NACIQI meeting was especially significant because the Department was in the process of withdrawing its recognition of the Accreditation Council for

JA410

Independent Colleges and Schools ("ACICS"), based on its allegedly lax oversight over proprietary institutions. *See* Statement from the U.S. Department of Education on the Status of Recognition of Nine Accrediting Agencies and Withdrawal of Recognition of ACICS, available at: https://www.ed.gov/news/press-releases/statement-us-department-education-status-recognition-nine-accrediting-agencies-and-withdrawal-recognition-accrediting-council-independent-colleges-and-schools.

 Answer:  The Commission admits that its application for renewal of its Department of Education recognition was up for consideration in July 2021, but denies the remaining allegations of the first sentence of this paragraph.  The Commission lacks information sufficient to admit or deny the allegations of the second sentence of this paragraph except that the Commission avers that it has no relationship with ACICS.


 49.  In a transparent attempt to deflect criticism in light of the upcoming NACIQI meeting, ACCSC sent a letter to CEHE, dated October 26, 2020, claiming that the Colorado court's findings implicated failures to follow the *Standards* and unethical conduct. Ex. J (Arb. Ex. 8). CEHE's January 22, 2021 response addressed each of ACCSC's concerns and included documentation of each instance where it informed ACCSC of the advertising and recruitment practices at issue and each instance where ACCSC accepted (and often commended) CEHE for those same practices. *See, generally,* Ex. K (Excerpt from Arb. Ex. 7). Unable to use the Colorado decision as a basis to withdraw IU's accreditation, ACCSC apparently dropped the matter.

 Answer:  The Commission admits that Exhibit J to the Complaint is its October 26, 2020 letter to CEHE, and that the letter speaks for itself.  The Commission denies that its letter was an "attempt to deflect criticism" of it.  The Commission admits that on or about January 22, 2021 it

32

JA411

received from CEHE its response to the Commission's October 26, 2020 letter, which response

speaks for itself and a copy of which is Exhibit K to the Complaint.  The last sentence of

paragraph 49 is an expression of opinion, not fact, and therefore requires no response from the

Commission.

50.    Against this backdrop, ACCSC's disparate treatment of CEHE demonstrates that

ACCSC's goal was defense and self-preservation at the expense of the due process and

fundamental fairness requirements to which CEHE is entitled.

<u>Answer</u>:  Denied.

#### iv.  *Dr. McComis deliberately shielded the Appeals Panel from evidence of disparate treatment.*

<u>Answer</u>:  Denied.

51.    Notwithstanding ACCSC's evident disparate treatment, CEHE has never had the

opportunity to meaningfully investigate or present evidence to that point. Immediately following

the announcement of the withdrawal decision, CEHE notified ACCSC of its intent to appeal the

decision pursuant to section VIII.C.1 of the *Rules*. Ex B at 11. Shortly thereafter, CEHE sent an

April 30, 2021 letter to Dr. McComis, noting that the publicly available decisions indicated IU

was not treated fairly under the *Standards*. Ex. L. To ensure an opportunity to defend itself before

the ACCSC appeals panel, CEHE requested records of ACCSC's treatment of other member

institutions that failed to report benchmark rates. *Id.* CEHE also requested communications and

records related to decisions to grant leniency to any such institutions in light of the COVID-19

pandemic. *Id.* Finally, IU sought records and communications pertaining to decisions to grant

leniency to institutions that failed to meet benchmarks while transitioning from ground programs

33

to online programs. *Id.* To alleviate any confidentiality concerns, CEHE offered that all records could be redacted to protect the identity of the implicated institutions. *Id.*

    <u>Answer</u>:  The Commission denies the allegations of the first sentence of this paragraph. The Commission admits the allegations of the second sentence of this paragraph.  In response to the third sentence, the Commission admits that on April 30, 2021 CEHE sent a letter to Dr. Michale McComis, the Commission's Executive Director, which letter speaks for itself and a copy of which is Exhibit L to the Complaint.  In response to the allegations in the fourth, fifth, and sixth sentences of this paragraph, the Commission admits that that CEHE's April 20, 2021 letter requested the Commission to produce a ***massive*** amount of irrelevant material regarding other institutions, much of it ***going back a decade***.  In response to the seventh sentence, the Commission admits that CEHE proposed that the Commission could redact "identifying information" ***about other accrediting institutions***.  Further, the Commission avers that doing merely that would not solve the real problem—the Commission's obligation under the Federal Education Rights and Privacy Act to protect "personally identifiable information."

    52.    ACCSC's *Rules* specify that the Appeals Panel must overturn any decision that is arbitrary and capricious. *Rules*, VIII(B)(1) (Ex. B at 11). CEHE sought to prove that the withdrawal decision was arbitrary and capricious because, among other things, ACCSC failed to consistently apply its *Standards* in furtherance of its own wish to deflect scrutiny into its own oversight capabilities. The requested records were essential for that purpose.

    <u>Answer</u>:  The Commission denies the allegations of the first sentence of this paragraph, because they do not accurately set forth the standard of review for an appeal of an adverse

accreditation decision.  The allegations of the second and third sentence of this paragraph are

statements of opinion, not fact, and therefore require no response by the Commission.


53.    But Dr. McComis made sure that no such evidence would get to the Appeals

Panel. In his May 7, 2021 response to CEHE's letter, he summarily refused to produce any

records of disparate treatment. Ex. I at 24. Even though federal law plainly requires ACCSC to

employ effective controls against inconsistent application of the *Standards* (34 CFR 668.18(b)),

Dr. McComis conceded in his response that ACCSC did not take any such measures with respect

to CEHE. Shockingly, he explained that ACCSC treatment of other schools was not part of its

consideration in withdrawing IU's accreditation. Ex. I at 24. That failure, in and of itself,

demonstrates that the Decision was arbitrary, capricious, and in substantial disregard of the

criteria for fair and impartial treatment and procedures of the Commission.

<u>Answer</u>:  The allegation of the first sentence of this paragraph is a statement of opinion,

not fact, and therefore requires no response by the Commission.  The Commission admits that on

May 7, 2021 it sent to CEHE a letter responding to CEHE's April 30, 2021 letter, and that page

24 of Exhibit I to the Complaint is a copy of the Commission's letter to CEHE, which letter

speaks for itself.  The third sentence of paragraph 53 is a conclusion of law, not an allegation of

fact, and therefore no response is required by the Commission.  The Commission denies that

CEHE's argumentative paraphrases of  the Commission's May 7, 2021 letter fairly represent

what the letter actually says.  The allegations in the final sentence of this paragraph are

statements of opinion, not fact, and therefore require no response by the Commission.

JA414

54.     Dr. McComis also claimed that such records were "maintained as confidential." Ex. I at 24. But that is not true. All warning letters, probation orders, and withdrawal decisions are initially posted to ACCSC's website (although only the most recent decisions are available for review). They are also routinely circulated to numerous other state, federal, and accrediting agencies. They are not confidential. And, as was made clear in its letter requesting the records, the Commission was free to redact any identifying information from the decisions. Ex. L.

<u>Answer</u>:   The Commission denies that CEHE's argumentative paraphrases of the Commission's May 7, 2021 letter fairly represent what the letter actually says. In particular, while the Commission noted in its letter that its "*Rules of Process and Procedure* expressly provide that information obtained in the accreditation process and pertaining to the Commission's actions will be maintained as confidential and will not be shared with other members," the Commission reminded CEHE that it "agreed to these *Rules* when it applied for accreditation by the Commission." The Commission also noted that "copies of actions taken by [the Commission] that are required by law or regulation to be made public . . . are posted and available on [the Commission's] website." Complaint Exh. I at 24. The Commission admits that in CEHE's April 30, 2021 letter requesting a massive amount of material regarding the Commission's treatment of other schools, mostly covering the decade from 2012 to 2021, CEHE blithely advised the Commission that if it were to be "concerned that the requested information discloses confidential information ***about other accredited institutions***, any identifying information can be redacted prior to production." *Id.* (Emphasis supplied.) The Commission denies that CEHE had any entitlement to any confidential information regarding other accredited institutions.

55.    Upon information and belief, Dr. McComis manipulated ACCSC's rules and processes to prevent CEHE from obtaining documents that would demonstrate ACCSC's bad faith and disparate treatment of CEHE. The decision to withhold this information continued a pattern of misuse of and disregard for ACCSC's rules to inflict harm on CEHE.

    Answer:  Denied.


56.    Years earlier, ACCSC received a series of anonymous smears, denigrating CEHE and its colleges. The smears were submitted to ACCSC in quick succession and bore similarities in format, content, and in other manners, suggestive of common authorship. Rather than specific allegations about actual events, practices, or people, these anonymous smears were filled with insults such as "scummy," "corrupt," "rip-off."

    Answer:  The Commission admits that it has received anonymous complaints regarding CEHE.


57.    Precisely to prevent such harassment and abuse of the accreditation process, ACCSC's *Rules* preclude consideration of anonymous complaints. The Rules state that complaints *must* contain all relevant names, dates, and a release from the complainant, authorizing ACCSC to forward the complaint to the school. Despite this, and the appearance of coordination, ACCSC ordered CEHE to file oppressive responses, initiated its own investigation, and even sent the anonymous smears to certain state attorneys general before CEHE had the opportunity to respond. Ultimately, ACCSC closed each anonymous complaint without any findings or adverse action, but not before forcing CEHE to produce numerous responses totaling thousands of pages of supporting documents and narrative responses.

37

JA416

Answer:  The Commission admits that it processed anonymous complaints against CEHE, in compliance with the Commission's Rules and US Department of Education Regulations. The Commission admits that it responded to information requests and subpoenas from the Colorado Attorney General as required by law and the Commission's *Rules*. The Commission admits that it did not take an adverse action against any CEHE school on the basis of the anonymous complaints.  The Commission denies the remaining allegations of this paragraph.

> v.  *Denied crucial evidence, the Appeals Panel and Arbitrator rubberstamped ACCSC's withdrawal decision.*

Answer:  Denied.

58.     Because, by Dr. McComis's own admission, consistent treatment of member institutions is not a factor ACCSC considers when taking adverse accreditation actions (Ex. I at 24), the appeals process is the only mechanism through which ACCSC has implemented any control against inconsistent application of the *Standards*. However, Dr. McComis unilaterally blocked the Appeals Panel from considering this evidence.

Answer:  Denied.


59.     In upholding ACCSC's withdrawal decision, the Appeals Panel concluded that accreditation decisions are made on a case-by-case basis, and ACCSC's so-called "keen sense of the consistency of its decision" was a sufficient control against disproportionate treatment. Ex. M at 7 (Arb. Ex. 1, IU Appeal Decision Letter). Attributing to ACCSC a "keen sense," without any evidentiary support, does not pass muster under the substantial evidence or arbitrary and capricious standards. *W. Va. Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x 214, 228 (4th Cir. 2019) (finding that a decision is not based on substantial evidence, and is therefore

JA417

arbitrary and capricious, where "the record lacks such relevant evidence as a reasonable mind
might accept as adequate to support the agency's conclusion.") (internal quotations omitted).

    Answer:  The Commission admits that Exhibit M to the Complaint is the Appeals Panel's
September 17, 2021 decision affirming, unanimously, the Commission's April 22, 2021
withdrawal of IU's accreditation.  The first sentence of paragraph 59 does not fairly reflect the
totality of the Appeals Panel's decision, which is comprised of 8 single space pages and speaks
for itself.  The second sentence of this paragraph is a legal argument, not an allegation of fact,
that requires no response by the Commission.


    60.    CEHE then initiated arbitration as required by the *Instructions* and ACCSC
Bylaws, Section I.A. Ex. C at 1. As contemplated by the *Instructions*, ACCSC designated the
Arbitration Exhibits, which consisted solely of the records before the Appeals Panel when it made
its decision, the hearing transcript from the hearing before the Appeals Panel, and the Appeals
Panel's final decision. Pursuant to the *Instructions*, these were the only materials the arbitrator
was permitted to consider. *Instructions*, Section I.F. Ex. C at 3.

    Answer:  The Commission denies that CEHE was "required" to initiate arbitration in
order to challenge the Appeals Panel's decision.  The Commission admits that CEHE initiated
arbitration, as allowed by the Commission's Bylaws and its *Instructions for Arbitration,* to which
CEHE had agreed when it applied for accreditation.  The Commission admits the allegations in
the second and third sentences of this paragraph.


    61.    But, as discussed above, CEHE disputed the completeness of the record, and filed
a Motion to Supplement the Arbitration Exhibits. *See* ¶ 26, *supra*. CEHE argued that, under

federal law, it was entitled to seek review of the due process it received in the ACCSC

proceedings below. Ex. D at 2-3. Accordingly, CEHE sought an order from the arbitrator

requiring ACCSC to supplement the Arbitration Exhibits with the same documents requested

from Dr. McComis on April 30, 2022 so that CEHE could reasonably challenge whether ACCSC

fairly and consistently applied its *Standards*. *Id.* CEHE also sought limited discovery to

investigate ACCSC's bad faith. *Id.* at 3.

      <u>Answer</u>:  The Commission admits that CEHE filed a Motion to Supplement the

Arbitration Exhibits.  The allegations in second sentence is a conclusion of law, not a statement

of fact, that requires no response by the Commission. The allegation in the third sentence is a

statemen of opinion, not fact, to which the Commission is not required to respond.  The

Commission denies that CEHE sought only "limited" discovery; in fact it explicitly sought

permission to serve interrogatories and requests for the production of documents and to take

depositions.

      62.     The arbitrator found that he was bound by the *Instructions*, which categorically

precluded any discovery or consideration of any information that was not before the Appeals

Panel. *Id.* at 7-8. Because Dr. McComis denied the Appeals Panel the documents, the arbitrator

found that he could not consider them either. *Id.*

      <u>Answer</u>:  The Commission admits that at pages 7 – 8 of the arbitrator's denial of CEHE's

Motion to Supplement the Arbitration Exhibits, he wrote:  "The tribunal is constrained by ***the***

***parties' arbitration agreement—as embodied in the Instructions for Arbitration***—to decline

IU's requests that the Commission be ordered to produce documents that were not in the record

before the Appeals Panel or that discovery be permitted in the arbitration. . . .  Under the

JA419

circumstances, the tribunal declines to require the requested enlargement of the record in this

proceeding, ***which now comprises some 32,374 pages***."  (Emphasis supplied.)  The Commission

denies the remaining allegations of paragraph 62.


     63.     Following a hearing, the arbitrator entered the Award in favor of ACCSC on

August 4, 2022. Ex. A. With respect to CEHE's contentions of disparate treatment and failure of

due process, the arbitrator concluded CEHE did not "sustain[] its burden of proving that the

experience of the Commission – or that of the duly constituted appeals panel – failed to provide

'effective controls against the inconsistent application of the agency's standards.'" Ex. A at 35.

That result was not surprising given ACCSC's efforts to prevent the arbitrator from consideration

of any evidence to contradict that finding.

     <u>Answer</u>:  The Commission admits that after considering the parties written submissions

and the arguments of counsel, the arbitrator entered his Award in favor of the Commission on

August 4, 2022.  The Commission further admits that Exhibit A to the Complaint is the

arbitrator's Award, which speaks for itself.  The allegation in the final sentence of this paragraph

is a statement of opinion, not fact, that does not require a response by the Commission.


     64.     The arbitrator also concluded that the *Instructions* and other federal case law

precluded him engaging in a disparate treatment analysis comparing CEHE's withdrawal with

decisions concerning other schools. Ex. A at 34. But that eluded the relevant issue before him,

which was whether federal due process requirements and binding Department regulations

required **ACCSC and the Appeals Panel** to consider such evidence before taking the ultimate

sanction of a full withdrawal of accreditation. *See* 34 CFR 668.18(b).

JA420

Answer:  In response to first sentence of this paragraph, the Commission admits that the arbitrator noted in his August 4, 2022 decision:  "[F]or this tribunal to embark on a comparison of the relative qualifications of different schools would embroil the tribunal in a *de novo* review of the evaluative decisions of the Appeals Panel in affirming the Commission's withdrawal of Independence's accreditation.  It would go far outside the defined role of the reviewing tribunal to attempt to compare the propriety of the Commission's decisions concerning other schools with the propriety of its decisions concerning Independence."  The allegations in the second sentence are assertions of law, not fact, and therefore do not require a response by the Commission.

## CEHE Seeks Vacatur of the Award

65.      Paragraphs 1-64 are incorporated by reference herein as if set forth in full.

Answer:  The Commission incorporates by reference here its responses to paragraphs 1 - 64 of the Complaint and to those headings and subheadings to which the Commission responded.

66.      A court may vacate an arbitration award where the arbitrator refused to hear evidence pertinent and material to the controversy or where the arbitrator exceeded its powers. 9 USC 10 (a)(3) and (a)(4).

Answer:  These allegations are assertions of law, not fact, and therefore do not require a response by the Commission.  Further, the Commission avers that CEHE has abandoned its argument based on 9 U.S.C. § 10(a)(4).

67.      In this case, ACCSC's disparate treatment of CEHE with respect to the withdrawal decision was a central issue in the arbitration. But the arbitrator nonetheless refused to hear pertinent and material evidence demonstrating that ACCSC's decision to withdraw IU's

42

JA421

accreditation was out of line with ACCSC's decisions to take far lesser sanctions with respect to similarly situated schools.

 Answer: Denied.


68.    Federal law requires ACCSC to treat all member schools consistently in applying the *Standards*. 34 C.F.R. § 602.18(b); *see also Med. Inst. of Minn. v. Nat'l Assoc. of Trade & Tech. Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987) (stating that common law due process requires that accreditors treat similarly situated schools similarly). And CEHE is entitled to meaningful judicial review over ACCSC's adherence to that requirement. *Prof'l Massage*, 781 F.3d at 169.

 Answer: These allegations are assertions of law, not fact, and therefore do not require a response by the Commission.


69.    The HEA required CEHE to initially submit to arbitration for review of the propriety of ACCSC's withdrawal decision. 20 USC 1099b(e). However, ACCSC's binding *Instructions for Arbitration* impermissibly precluded the arbitrator from considering any issue other than whether the Appeals Panel's decision was supported by the evidence in the record when the Appeals Panel rendered its decision.

 Answer: These allegations are assertions of law, not fact, and therefore do not require a response by the Commission.


70.    Thus, CEHE was denied an opportunity to be heard on the issues of disparate treatment and agency bad faith. CEHE presented compelling, but limited, evidence that other member institutions were permitted to remain accredited notwithstanding similar, or worse,

histories of noncompliance with student achievement *Standards*. While that limited evidence was apparently insufficient to sustain a finding of improper disparate treatment, it was sufficient to require ACCSC to produce evidence of its treatment of other institutions with below-benchmark student achievement rates.

    <u>Answer</u>:  These allegations are assertions of law and statements of opinion, not allegations of fact, and therefore do not require a response by the Commission.


    71.    Arbitrators must "give each of the parties to the dispute an adequate opportunity to present its evidence and argument," *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2nd Cir. 1997) (citations omitted). Arbitral misconduct has occurred, and vacatur is therefore warranted under 9 USC 10(a)(3), where, as here, a party's right to be heard has been "grossly and totally blocked." *Buhannic v. TradingScreen, Inc.*, 2018 U.S. Dist. LEXIS 126477, at *14-15 (S.D.N.Y. July 27, 2018) (citations omitted).

    <u>Answer</u>:  These allegations are assertions of law, not fact, and therefore do not require a response by the Commission.


    72.    CEHE was also denied an opportunity to investigate and present evidence of ACCSC's true motives for the withdrawal decision. Prior to the entry of the later-reversed Colorado state court decision, ACCSC's record statements indicated that it acknowledged and commended CEHE's efforts to return all IU programs to compliance with student achievement *Standards*. But after the Colorado decision—which implicitly criticized ACCSC's own oversight of CEHE's marketing and enrollment practices—ACCSC suddenly and without explanation withdrew CEHE's accreditation, even though CEHE's most recent data demonstrated that current

students were progressing through their programs at benchmark rates. Against the backdrop of the

Department's recent actions to revoke federal recognition from other accreditors, ACCSC's

decision appeared to represent a pretextual attempt at self-preservation, rather than a fair

application of the *Standards*.

Answer:  These allegations are statements of opinion, not assertions of fact, that require

no response by the Commission.

73.    Under such circumstances, limited discovery was necessary to investigate the

Commission's true motives for withdrawing IU's accreditation. *See Sokaogon Chippewa Cmty. v.

Babbitt*, 961 F. Supp. 1276, 1283-84 (W.D. Wis. 1997) (finding that an agency's sudden change

in position at the time it was facing political pressure was sufficient evidence of impropriety to

warrant discovery). However, the arbitrator determined that he was bound by the *Instructions*,

which categorically precluded any discovery into ACCSC's motives.

Answer:  The allegation in the first sentence of this paragraph is a conclusion of law, not

a statement of fact, and therefore does not require a response by the Commission.  The

Commission denies that CEHE sought only "limited discovery."  The Commission admits that

the arbitrator determined that he was bound by the *Instruction*s, to which CEHE and IU had

agreed, and which precluded any discovery at the arbitration stage.

**Other Causes of Action**

Count I - Violation of Due Process

74.    Paragraphs 1-73 are incorporated by reference herein as if set forth in full.

Answer:  The Commission incorporates by reference here its responses to paragraphs 1 -

73 of the Complaint and to those headings and subheadings to which the Commission responded.

JA424

75.    Accreditors are required to afford due process to member institutions under federal common law. *Prof'l Massage.*, 781 F.3d at 170-71.

   Answer:  This allegation is a conclusion of law, not an assertion of fact, that requires no response by the Commission.


76.    Principles of administrative law inform the federal common law duty of due process. *Id.* at 169.

   Answer:  This allegation is a conclusion of law, not an assertion of fact, that requires no response by the Commission.


77.    The amount and degree of due process required by an accreditor is determined by the importance of the action being considered. An accreditor's decision to withdraw accreditation severs eligibility to participate in federal funding programs, which are the life blood of nearly every American institution of higher education. Because a withdrawal decision is an institutional death penalty, the "need for due process protection could not be stronger." *Edward Waters Coll., Inc. v. S. Ass'n of Colls. & Sch., Inc.*, 2005 U.S. Dist. LEXIS 39443, at *18 (M.D. Fla. Mar. 11, 2005).

   Answer:  The allegations in this paragraph are conclusions of law and of opinion, not assertions of fact, that require no  response by the Commission.


78.    When ACCSC withdrew CEHE's accreditation, due process required that CEHE be afforded a meaningful opportunity to challenge whether the decision was made based on a

JA425

good- faith application of the Standards and was consistent with ACCSC's treatment of similarly situated schools.

Answer:  This allegation is a conclusion of law, not an assertion of fact, that requires response by the Commission.

79.    ACCSC's appeals procedures and *Instructions for Arbitration* do not afford sufficient due process because they fail to provide an institution a reasonable opportunity to acquire and present evidence of bad faith and disparate treatment.

Answer:  This allegation is a conclusion of law, not an assertion of fact, and therefore does not require a response by the Commission.  The Commission reiterates that CEHE and IU agreed to the Commission's "appeals procedures and *Instructions for Arbitration*" as a condition of seeking the Commission's accreditation.

80.    ACCSC's decision to withdraw IU's accreditation and the other acts described above violated CEHE's due process rights in at least the following ways:

a.  ACCSC's initial withdrawal decision and subsequent Appeal Panel decision were arbitrary, capricious, and not supported by substantial evidence.

b.  ACCSC withdrew IU's accreditation without providing a meaningful opportunity to be heard.

c.  ACCSC's decision to withdraw IU's accreditation was inconsistent with ACCSC's treatment of other member institutions, who remained accredited notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

JA426

d.  ACCSC's acted in bad faith by withdrawing IU's accreditation as pretext to avoid federal scrutiny into its own oversight capabilities.

e.  ACCSC failed to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

f.  ACCSC appeals procedures and *Instructions for Arbitration* prevented CEHE from presenting material evidence of bad faith and inconsistent treatment.

g.  ACCSC failed to provide a reasoned explanation for its sudden revocation of its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement *Standards*.

<u>Answer</u>:  These allegations are conclusions of law and statements of opinion, not assertions of fact, that require no response by the Commission.

81.  CEHE suffered damages, in an amount to be proved at trial, as a result of ACCSC's denial of due process, including lost profits, loss of business value, and loss of goodwill.

<u>Answer</u>:  Denied.

<u>Count II – Declaratory Judgment</u>

<u>Response</u>:  This Count has been dismissed with prejudice.  Accordingly, the Commission is not required to respond to the allegations in paragraphs 82 – 84.

82.  Paragraphs 1-81 are incorporated by reference herein as if set forth in full.

83.  An actual and justiciable controversy exists between the parties regarding ACCSC's failure to provide due process to CEHE.

JA427

84.     A judgment declaring that ACCSC's acts violated CEHE's due process rights will serve a useful purpose in clarifying and settling the legal relations at issue and will afford relief from uncertainty, insecurity, and controversy giving rise to the proceedings.

<u>Count III – Tortious Interference With Contract (Program Participation Agreement)</u>

85.     Paragraphs 1-84 are incorporated by reference herein as if set forth in full.

<u>Answer</u>:  The Commission incorporates by reference here its responses to paragraphs 1 - 81 of the Complaint and to those headings and subheadings to which the Commission responded.

86.     By granting accreditation to an educational institution, ACCSC enables that institution to enter a contract with the Department of Education regarding the institution's eligibility for programs authorized by Title IV of the HEA ("Title IV programs"), known as a Program Participation Agreement ("PPA").

<u>Answer</u>:  The Commission admits that accreditation is one of several eligibility criteria for an institution to participate in Title IV programs.

87.     The PPA sets forth the reciprocal rights and responsibilities of the institution and the Department.

<u>Answer</u>:  The Commission lacks information sufficient to enable it to admit or deny this allegation.

88.     ACCSC had actual knowledge that IU was eligible for Title IV programs, and, consequently, knew of IU's PPA with the Department.

<u>Answer</u>:  Admitted.

49

JA428

89.      The vast majority of the students who were enrolled at IU relied on Title IV student assistance funds to pay for their educations and living expenses.

<u>Answer</u>:  The Commission lacks information sufficient to admit or deny this allegation.

90.      ACCSC knew that IU's ability to participate in Title IV programs was contingent on its continued accreditation.

<u>Answer</u>:  Admitted.

91.      In fact, the Department immediately cut off CEHE's ability to access Title IV funds following ACCSC's initial April 22, 2021 withdrawal decision. Without access to critical Title IV funding, CEHE was unable to continue to fund operations and was forced to close on August 1, 2021.

<u>Answer</u>:  The Commission admits that soon after its April 22, 2021 withdrawal decision, the Department took action to place CEHE-affiliated schools participating in Title IV programs on the Department's "Heightened Cash Monitoring Method of Repayment."  The allegations of the second sentence of this paragraph are statements of opinion, not fact, that require no response by the Commission.  Responding further, the Commission notes that, pursuant to Section VIII.A.3 of its *Standards,* IU "remain[ed] accredited, operating under a Probation Order, until the final disposition of the appeal."  Responding further, the Commission avers that IU voluntarily closed effective August 1, 2021, even though the Appeals Panel had not yet decided IU's appeal.

JA429

92.     By withdrawing IU's accreditation, ACCSC intentionally and knowingly prevented CEHE from performing under the PPA.

_Answer_:  Denied.


93.     ACCSC acted through improper means by, among other things:

a.  Withdrawing IU's accreditation arbitrarily and capriciously, and without substantial evidence;

b.  Withdrawing IU's accreditation without providing a meaningful opportunity to be heard.

c.  Treating CEHE disparately by, among other things, withdrawing IU's accreditation while allowing other member institutions to remain accredited, notwithstanding similar or worse histories of noncompliance with student achievement _Standards_.

d.  Withdrawing IU's accreditation in bad faith as pretext to avoid federal scrutiny into its own oversight capabilities.

e.  Failing to follow federal requirements to maintain effective controls against the inconsistent application of the _Standards_.

f.  Manipulating its appeals procedures and _Instructions for Arbitration_ to deliberately and unlawfully block CEHE from presenting material evidence of bad faith and inconsistent treatment.

g.  Arbitrarily and capriciously, and without substantial evidence, revoking its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement _Standards_.

JA430

Answer:  Denied.


94.    As a direct and proximate cause of this intentional, willful, and tortious interference with a contractual relationship of which ACCSC knew, CEHE has incurred damages, including, among other things, a loss of students, a loss of Title IV funding, damage to its reputation, loss of good will, loss of future profits, and a loss of business value in an amount to be proven at trial.

Answer:  Denied.


Count IV – Tortious Interference With Contract (Student Enrollment Agreements)

95.    Paragraphs 1-94 are incorporated by reference herein as if set forth in full.

Answer:  The Commission incorporates by reference here its responses to paragraphs 1 - 81 and 85 – 94 of the Complaint and to those headings and subheadings to which the Commission responded.


96.    By granting accreditation to an educational institution, ACCSC enables the institution to enter into contracts with students, providing for their enrollment in accredited programs. Those contracts are known as enrollment agreements.

Answer:  Admitted.


97.    IU entered into an enrollment agreement with each of its students. The enrollment agreement sets forth reciprocal rights and responsibilities of IU and each student, including the student's responsibility to pay tuition. Students entered into such enrollment agreements based in large part on IU's accreditation by a federally recognized accrediting agency, namely, ACCSC.

52

JA431

<u>Answer</u>:  The Commission admits the allegations in the first two sentences of this paragraph.  The Commission lacks information sufficient to enable it to admit or to deny the allegations in the third sentence of this paragraph.

98.    ACCSC had actual knowledge of IU's enrollment agreements with its students.

<u>Answer</u>:  Admitted.

99.    ACCSC knew that IU's ability to maintain its relationships with its students depended on its ability to remain accredited.

<u>Answer</u>:  Admitted.

100.    By unlawfully withdrawing IU's accreditation, ACCSC knowingly and intentionally interfered with IU's contractual relationships with its students.

<u>Answer</u>:  Denied.

101.    ACCSC acted through improper means by, among other things:

a.  Withdrawing IU's accreditation arbitrarily and capriciously, and without substantial evidence;

b.  Withdrawing IU's accreditation without providing a meaningful opportunity to be heard.

c.  Treating CEHE disparately by, among other things, withdrawing IU's accreditation while allowing other member institutions to remain accredited,

53

JA432

notwithstanding similar or worse histories of noncompliance with student

achievement *Standards*.

d.  Withdrawing the IU's accreditation in bad faith as pretext to avoid federal

scrutiny into its own oversight capabilities.

e.  Failing to follow federal requirements to maintain effective controls against

the inconsistent application of the *Standards*.

f.  Manipulating its appeals procedures and *Instructions for Arbitration* to

deliberately and unlawfully block CEHE from presenting material evidence of

bad faith and inconsistent treatment.

g.  Arbitrarily and capriciously, and without substantial evidence, revoking its

finding that CEHE demonstrated good cause to continue its efforts to return

IU's programs to compliance with student achievement *Standards*.

Answer:  Denied.


102.    As a direct and proximate cause of this intentional, willful, and tortious

interference with contractual relationships of which ACCSC knew, CEHE has incurred damages,

including, among other things, a loss of students with their concomitant tuition payments, damage

to its reputation, loss of good will, loss of future profits, and a loss of business value in an amount

to be proven at trial.

Answer:  Denied.


Count V – Tortious Interference With Prospective Business or Economic Advantage

103.    Paragraphs 1-102 are incorporated by reference herein as if set forth in full.

JA433

Answer:  The Commission incorporates by reference here its responses to paragraphs 1 - 81 and  85 – 102  of the Complaint and to those headings and subheadings to which the Commission responded.

104.    IU entered into enrollment agreements with its students, setting forth the reciprocal rights and responsibilities of the parties, including the students' responsibility to pay tuition.

Answer:  Admitted.

105.    ACCSC knew that IU entered into such contracts with its students.

Answer:  Admitted.

106.    ACCSC's intentional and unlawful termination of IU's accreditation without due process has caused its students to withdraw. Absent ACCSC's unlawful withdrawal decision, IU's students would have continued to perform under their enrollment contracts, including the payment of tuition.

Answer:  These allegations are statements of opinion, not fact, and therefore do nor require a response by the Commission.  The Commission denies that its withdrawal of IU's accreditation was "unlawful" and "without due process."

107.    ACCSC also knew that IU would have continued to attract new students, who would also enter enrollment contracts with IU and pay tuition under those agreements. ACCSC's intentional and unlawful withdrawal of IU's accreditation caused future students not to enroll.

JA434

Answer:  Denied.


108.    ACCSC acted through improper means by, among other things:

a.    Withdrawing IU's accreditation arbitrarily and capriciously, and without

substantial evidence;

b.    Withdrawing IU's accreditation without providing a meaningful opportunity

to be heard.

c.    Treating CEHE disparately by, among other things, withdrawing IU's

accreditation while allowing other member institutions to remain accredited,

notwithstanding similar or worse histories of noncompliance with student

achievement *Standards*.

d.    Withdrawing IU's accreditation in bad faith as pretext to avoid federal

scrutiny into its own oversight capabilities.

e.    Failing to follow federal requirements to maintain effective controls against

the inconsistent application of the *Standards*.

f.    Manipulating its appeals procedures and *Instructions for Arbitration* to

deliberately and unlawfully block CEHE from presenting material evidence of

bad faith and inconsistent treatment.

g.    Arbitrarily and capriciously, and without substantial evidence, revoking its

finding that CEHE demonstrated good cause to continue its efforts to return

IU's programs to compliance with student achievement *Standards*.

Answer:  Denied.

JA435

109.    As a direct and proximate cause of this intentional, willful, and tortious interference with contractual relationships of which ACCSC knew, CEHE has incurred damages, including, among other things, a loss of students with their concomitant tuition payments, damage to its reputation, loss of good will, loss of future profits, and a loss of business value in an amount to be proven at trial.

<u>Answer</u>:  Denied.

**Prayer for Relief**

**WHEREFORE**, Petitioner CEHE respectfully requests that the Court:

(A)    Vacate the Award pursuant to 9 USC 10(a)(3) and remand the matter to the arbitrator for further proceedings;

(B)    Declare that ACCSC's initial decision to withdraw IU's accreditation and the Appeal Panel's subsequent affirmance thereof was arbitrary and capricious and otherwise violated due process;

(C)    Enter an injunction requiring ACCSC to rescind its withdrawal decision, to provide notice to the Department of Education and all other parties ACCSC has informed regarding the withdrawal decision, in all manners in which ACCSC provided notice of the withdrawal of accreditation, including via publication on ACCSC's website;

(D)    Enter an injunction requiring ACCSC to adhere to due process in all future accreditation proceedings with respect to CEHE or any of its institutions;

(E)    Award CEHE damages, in an amount to be proven at trial, for ACCSC's violation of CEHE's due process rights and tortious interference with CEHE's contracts and prospective business and economic advantages;

JA436

(F)     Award pre- and post- judgement interest, attorney's fees, and such other and further relief as this Court may deem just and proper.

Answer:  The Commission denies that CEHE is entitled to any of the relief it seeks in this action.

**Demand for Trial by Jury**

CEHE hereby demands a trial by jury on all issues so triable.

Answer:  This demand does not require a response by the Commission.

**Affirmative Defenses**

1.      The Commission's *Standards for Accreditation*, including its *Rules of Process and Procedure for Appeal of a Commission Decision* and its *Instructions for Arbitration* (collectively, the "*Commission's Standards*") comply with the Higher Education Act and its implementing regulations.  CEHE and IU agreed to the *Commission's Standards* when they applied for accreditation.  CEHE and IU never challenged the *Commission's Standards* or otherwise asserted that they do not comply with the Higher Education Act or its implementing regulations.  CEHE and IU are therefore estopped from alleging here that they were denied due process when the Commission, the Appeals Panel, and the arbitrator followed the *Commission's Standards*.

2.      The Commission had no duty to CEHE or IU beyond compliance with the *Commission's Standards*.

3.      When it withdrew IU's accreditation, the Commission was acting as an "accrediting agency officially recognized by the Department of Education," as the Commission has admitted in response to paragraph 9 above.  Accordingly, the Commission's decision was justified and privileged, and was made in the exercise of the Commission's lawful right.

58

JA437

Accordingly, the Commission cannot be found to have tortiously interfered with the contracts that are the subject of Counts III and IV or the prospective business or economic advantage alleged in Count V.

4.    CEHE and IU were in exclusive control of their unsuccessful efforts to achieve compliance with the accreditation standards, which persisted for several years.  By failing to achieve compliance, CEHE and IU failed to mitigate whatever damages they seek to recover here.

Date:  October 20, 2023                    Respectfully submitted,

                                           ACCREDITATION ALLIANCE OF CAREER
                                           SCHOOLS AND COLLEGES, D/B/A
                                           ACCREDITING COMMISSION OF CAREER
                                           SCHOOLS AND COLLEGES

                                               /s/ Lewis F. Powell III
                                           _____
                                           Lewis F. Powell III (VSB No. 18266)
                                           David N. Goldman (VSB No. 98922)
                                           HUNTON ANDREWS KURTH LLP
                                           Riverfront Plaza, East Tower
                                           951 East Byrd Street
                                           Richmond, VA 23219-4074
                                           Telephone:    (804) 788-8200
                                           Facsimile:    (804) 788-8218
                                           Email:  lpowell@huntonak.com
                                                     dgoldman@huntonak.com

                                           *Counsel for Defendant*

                              Certificate of Service

I certify that on October 20, 2023, I caused the foregoing document to be electronically filed using the Court's CM/ECF system.

                                               /s/ Lewis F. Powell III
                                           _____
                                           Lewis F. Powell III

59

JA438

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 1:22-cv-1223 (RDA/WEF) |
| ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES, D/B/A ACCREDITING COMMISSION OF CAREER SCHOOLS AND COLLEGES, ) ) ) ) ) ) | |
| Defendant. ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Defendant Accrediting Commission of Career Schools and Colleges' ("ACCSC" or "Defendant") Motion for Judgment on the Pleadings ("Motion"). Dkt. 37. This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Complaint (Dkt. 1), Defendant's Answer (Dkt. 28), Defendant's Memorandum in Support of its Motion (Dkt. 38), Plaintiff Center for Excellence in Higher Education, Inc.'s ("CEHE" or "Plaintiff") Response in Opposition (Dkt. 39), and Defendant's Reply (Dkt. 47), the Court will GRANT the Motion for the reasons that follow.[1]

---

[1] Plaintiff's Objection to Magistrate Judge's Order on Defendant's Motion for Protective Order is also pending. Dkt. 68. Given that the Court will grant Defendant's Motion for Judgment on the Pleadings, Plaintiff's Objection will be dismissed as moot.

JA439

## I. BACKGROUND

### A. Factual Background

Given the issues raised by the pending Motion, a review of the statutory framework in addition to the facts alleged in the Complaint is helpful here.

#### 1. Accreditation Procedures

An institution must be accredited to participate in federal assistance programs authorized under Title IV of the Higher Education Act ("HEA"). Dkt. 1 ¶ 15. The federal government does not directly accredit institutions of higher learning but rather delegates that authority to various federally approved accrediting agencies for different types of educational institutions. *Id.* ¶ 15; *Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Sch., Inc.*, 2009 WL 742532, at *1 (E.D. Va. Mar. 18, 2009). Accreditors set standards for accreditation but must comply with various other standards set forth by the HEA and the Department of Education. *Id.* ¶¶ 16-17; *Career Care Inst.,* 2009 WL 742532, at *1. In particular,

> accrediting agencies must afford certain due process protections to each educational institution it accredits which include, among other things, providing written statements of agency requirements and standards, written notice of any "adverse accrediting action or action to place the institution or program on probation or show cause," and an opportunity to appeal any adverse action prior to the action becoming final. 20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25.

*William Loveland Coll. v. Distance Educ. Accreditation Comm'n*, 347 F. Supp. 3d 1, 7 (D.D.C. 2018), *aff'd sub nom.* 788 F. App'x 5 (D.C. Cir. 2019); Dkt. Nos. 1 ¶ 21; 15 at 16. If the accreditor's internal Appeals Panel affirms the initial decision, the decision is final, and the institution's only recourse is binding arbitration. Dkt. 1 ¶ 25.

#### 2. Withdrawal of Plaintiff's Accreditation

Plaintiff CEHE owns and operates four institutions of higher education. *Id.* ¶ 7. Independence University ("IU"), an online school, was the only one of Plaintiff's four institutions

2

JA440

that was enrolling students at the time of the withdrawal of accreditation. *Id.* ¶ 8. Defendant ACCSC is a federally recognized accrediting agency that was responsible for approving IU's accreditation. *Id.* ¶ 15. Defendant's *Standards for Accreditation* (the "*Standards*") lay out the requirements that institutions must maintain to receive accreditation. *Id.* ¶ 4.

In September of 2018, Defendant determined that IU was out of compliance with the student achievement *Standards* because of its low graduation and post-graduate employment rates. *Id.* ¶ 32. Accordingly, Defendant placed IU on probation. *Id.* Defendant allows an institution a maximum of three years to remedy noncompliance with any *Standard*; however, Defendant may extend that maximum timeframe if good cause exists. *Id.* ¶ 30.

Following IU's placement on probation status, Plaintiff spent roughly $10 million on initiatives that it anticipated would improve student achievement. *Id.* ¶ 35. During this two-year probationary period, Plaintiff consistently updated Defendant on its initiatives and Defendant commended those efforts. *Id.*

On July 21, 2020, Defendant issued a continued probation letter that recognized Plaintiff's progress in improving student achievement and announced that good cause existed to extend IU's accreditation until at least May 2021. *Id.* ¶ 35. In this letter, Defendant also acknowledged that IU's programs could not report benchmark graduation rates for several years because the school primarily offers 20- to 36-month degree programs. *Id.* ¶¶ 31, 35. Defendant further stated that it would measure progress on the success of recently enrolled students, since they are the students that would be affected by Plaintiff's new initiatives. *Id.*

On August 21, 2020, a Colorado state court ruled that Plaintiff's use of Bureau of Labor Statistics ("BLS") salary and job outlook information advertisements for another of Plaintiff's institutions, CollegeAmerica (which had been approved by Defendant), violated state consumer

3

protection laws. *Id.* ¶ 5. A few months after that ruling, Defendant's own application seeking continued federal recognition was up for review by the Department of Education. *Id.* According to Plaintiff, "[u]pon information and belief," the Colorado state court ruling is the event that triggered a change in Defendant's treatment of IU because the ruling was allegedly "deeply embarrassing" to Defendant and Defendant needed to "deflect scrutiny and damaging criticism." *Id.*

On December 20, 2020, Plaintiff sent Defendant a follow-up letter which contained updated projections for IU's recently enrolled students showing that all programs were on track to meet or exceed benchmark rates. *Id.* ¶ 36. During a meeting in February 2021, Defendant withdrew IU's accreditation before IU's probation was set to end in May. *Id.* ¶ 37. The withdrawal caused: (i) Plaintiff to lose access to critical Title IV funding; (ii) Plaintiff to lose the ability to continue enrolling students; (iii) the closure of Plaintiff's schools. *Id.* ¶ 1. Defendant published the decision to withdraw IU's accreditation on April 22, 2021, and stated that Defendant based the decision on the graduation rates of old students, not new students. *Id.* ¶ 37. This decision was also announced around the time that Defendant stated that it would ease its strict enforcement of the student achievement *Standards* due to the Covid-19 pandemic. *Id.* ¶ 43.

On April 30, 2021, Plaintiff sent a letter to Defendant's Executive Director, Dr. Michale McComis, notifying him that publicly available information alerted them to Defendant's alleged unfair treatment of IU in comparison to other member institutions. *Id.* ¶ 51. Plaintiff then turned to Defendant's internal Appeals Panel, which is required to overturn any decision that is arbitrary and capricious according to Defendant's *Rules of Process and Procedure*. *Id.* ¶ 52. Plaintiff requested the records of Defendant's treatment of other member institutions, particularly regarding any leniency given to those schools because the schools were online or because of the pandemic.

4

*Id.* ¶ 51. Dr. McComis denied Plaintiff's record requests, which, according to Plaintiff, meant that the evidence of disparate treatment and bad faith were not considered in Defendant's internal appeals process. *Id.* ¶¶ 53, 6. The Appeals Panel ultimately upheld Defendant's accreditation withdrawal decision with respect to IU. *Id.* ¶ 59.

Plaintiff then initiated arbitration, which was conducted pursuant to Defendant's *Instructions for Arbitration*. *Id.* ¶¶ 25-26, 60; Dkt. 1-5 at 1, 5; Dkt. 1-4. In applying for accreditation with Defendant, applicant schools, including IU, agree "to submit fully and faithfully to final, binding arbitration proceedings" that are governed by Defendant's *Instructions for Arbitration*. Dkt. 1-4 at 2; Dkt. 1-5 at 5 (explaining that, [a]s a member of the AACSC seeking accreditation, IU has agreed . . . to adhere [to] the AACSC Bylaws. Pursuant to Section 4.06 of the AACSC Bylaws, IU has agreed, by applying for accreditation . . . to submit any claim against the Commission relating to accreditation to final and binding arbitration as set forth in" Defendant's *Standards*, which include the *Instructions for Arbitration* in an appendix); Dkt. 28 at 14. The *Instructions for Arbitration* provide that

> (1) The arbitration proceeding is not a *de novo* review. It is a review on the record and is limited to the question of whether the Appeals Panel's decision is supported by the evidence that was in the record when the Panel rendered its decision.
>
> (2) The arbiter may not consider evidence that was not in the record before the Appeals Panel.

Dkt. 1-4 at 2. The *Instructions for Arbitration* further provide that discovery is not available during the arbitration process. *Id.* at 4 ("Depositions, interrogatories, requests for admission, and other forms of adversarial discovery shall not be used during the arbitration proceeding.").

At the outset of arbitration proceedings, Defendant provided the arbitrator with Arbitration Exhibits, which consisted solely of the record before the Appeals Panel. Dkt. 1 ¶ 60. Plaintiff subsequently filed a Motion to Supplement the Arbitration Exhibits, seeking to have the arbitrator

order Defendant to produce documents and records related to Defendant's treatment of other similarly situated schools. *Id.* ¶¶ 26; 61. Plaintiff also sought discovery, "in the form of interrogatories, document requests and depositions, in order to investigate what it contends was bad faith on the part of ASCCS." Dkt. 1-5 at 4; Dkt. 1 ¶ 61. The arbitrator concluded that he was "constrained by the parties' arbitration agreement – as embodied in the Instructions for Arbitration – to decline [Plaintiff's] requests that [Defendant] be ordered to produce documents that were not in the record before the Appeals Panel or that discovery be permitted in arbitration." Dkt. 1-5 at 7-8; Dkt. 1 ¶ 26. Consequently, based on a review of the record before the Appeals Panel, the arbitrator entered an award in favor of Defendant. *Id.* ¶ 63.

### B. Procedural Background

Plaintiff initiated suit in this Court by filing a Motion to Vacate Arbitration Award and Complaint on October 28, 2022. Dkt. 1. In turn, Defendant filed a Partial Motion to Dismiss along with a Memorandum in Support on December 22, 2022. Dkts. 14; 15. In the Memorandum in Support, Defendant asserted that Count II's request for declaratory relief was duplicative of Count I's due-process claim. Dkt. 15 at 6-7. As to Plaintiff's state-law claims (Counts III-V), Defendant argued that (1) they were preempted by the HEA, *id.* at 7, and (2) that Plaintiff failed to allege facts sufficient to establish causation for each claim, *id.* at 18-26. Plaintiff filed an Opposition on January 26, 2023. Dkt. 21. Thereafter, Defendant filed a Reply on February 9, 2023. Dkt. 22. On September 26, 2023, this Court granted-in-part and denied-in-part the partial motion to dismiss, dismissing Count II for duplicity but denying the motion in all other respects. Dkt. 25 at 20.

After receiving an extension from Magistrate Judge William E. Fitzpatrick on October 16, 2023, Dkt. 27, Defendant filed its Answer and Response to Plaintiff's Motion to Vacate Arbitration on October 20, 2023, Dkt. 28. On April 1, 2024, a scheduling order issued setting the close of

JA444

discovery for August 23, 2024.  Dkt. 29 at 1.  On April 24, 2024, Defendant moved to suspend

discovery until after the resolution of its forthcoming motion for judgment on the pleadings.  Dkt.

31.  Plaintiff filed an Opposition to Defendant's Motion to Suspend Discovery on May 8, 2024,

Dkt. 35, and Defendant filed a Reply on May 14, 2024, Dkt. 36.  On May 16, 2024, Defendant

filed its Motion for Judgment on the Pleadings.  Dkt. 37.  Plaintiff filed an Opposition to the Motion

for Judgment on the Pleadings on May 30, 2024.  Dkt. 39.  On June 5, 2025, Defendant filed its

Reply, Dkt. 47, and Judge Fitzpatrick denied Defendant's Motion to Suspend Discovery, Dkts. 48;

49.

On September 20, 2024, Defendant filed a Motion for Protective Order requesting that the

Court limit the scope of discovery.  Dkt. 58 at 15-16.  Plaintiff filed an Opposition on September

25, 2024, Dkt. 63, and Defendant filed a Reply on September 26, 2024, Dkt. 64.  After a hearing,

Judge Fitzpatrick granted Defendant's Motion for Protective Order on September 27, 2024.  Dkts.

66; 67.  On October 11, 2024, Plaintiff filed an Objection to Magistrate Judge Fitzpatrick's ruling

on Defendant's Motion for Protective Order.  Dkt. 68.  Defendant filed an Opposition on October

25, 2024, Dkt. 74, and Plaintiff filed a Reply on October 31, 2024, Dkt. 76.

This Court now considers Defendant's Motion for Judgment on the Pleadings, along with

the parties' additional briefing on the issues raised therein.

## II. Standard of Review

From the outset, it is important to note that the disposition of this Motion implicates Rule

12(c) of the Federal Rules of Civil Procedure, and not Rule 12(b)(6).  Rule 12(c) provides that

"[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for

judgment on the pleadings."  Nonetheless, the standard of review for Rule 12(c) motions is the

same "plausibility standard" that governs Rule 12(b)(6) motions.  *Drager v. PLIVA USA, Inc.*, 741

JA445

F.3d 470, 474 (4th Cir. 2014); *Travelers Indem. Co. of Connecticut v. Lessard Design, Inc.*, 321
F. Supp. 3d 631, 635 (E.D. Va. 2018).  "A Rule 12(c) motion for judgment on the pleadings is
appropriate when all material allegations of fact are admitted in the pleadings and only questions
of law remain." *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 805 F. Supp. 2d
213, 216 (E.D. Va. 2011) (quoting *Republic Ins. Co. v. Culbertson,* 717 F. Supp. 415, 418 (E.D.
Va. 1989)), *aff'd,* 494 F. App'x 394 (4th Cir. 2012).  A motion for judgment on the pleadings
challenges a claim's sufficiency; "it does not resolve disputes over factual issues, the merits of a
claim, or the applicability of a defense." *SunTrust Mortg., Inc. v. Simmons First Nat'l Bank*, 861
F. Supp. 2d 733, 735 (E.D. Va. 2012) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943,
952 (4th Cir. 1992)).  Thus, "judgment should be entered when the pleadings, construing the facts
in the light most favorable to the non-moving party, fail to state any cognizable claim for relief[.]"
*O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).

<div align="center">III. Analysis</div>

In its Motion to Vacate Arbitration Award and Complaint, Plaintiff seeks an order vacating
the August 4, 2022 arbitration award that was entered in favor of Defendant.  Plaintiff also brings
four claims against Defendant: a violation of due process claim (Count I), two tortious interference
with contract claims (Count III and IV), and a tortious interference with prospective business or
economic advantage claim (Count V).  Dkt. 1 at 24-30.  In its Motion for Judgment on the
Pleadings, Defendant seeks denial of the Motion to Vacate and dismissal of the remaining counts.
Dkt. 38 at 15, 22.  In Opposition, Plaintiff asserts that the remaining counts survive regardless of
the outcome of the Motion to Vacate and that Defendant's Motion is untimely.  Dkt. 39 at 11; 17.
The Court will first address the timeliness of Defendant's Motion before addressing each of
Defendant's arguments in turn.

<div align="center">JA446</div>

A. Defendant's Motion for Judgment on the Pleadings is Timely

As a threshold matter, Defendant's Motion is timely. Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Plaintiff argues that Defendant's Motion is not timely, noting that Defendant filed its Answer on October 23, 2023, but did not file its Motion for Judgment on the Pleadings until May 16, 2024, "without any explanation for the nearly seven-month delay." Dkt. 39 at 17. In response, Defendant asserts that a motion for judgment on the pleadings can be filed at any time after pleadings close, as long as the motion does not delay trial. Dkt. 47 at 2. Defendant further argues that, since no trial has been scheduled yet, its Motion is timely. *Id.*

The Court finds that the Motion is timely. Defendant filed its Motion on May 16, 2024, Dkt. 37, which is approximately three months before the scheduled close of discovery on August 23, 2024, Dkts. 29 at 1; 50 at 1. Additionally, as Defendant notes, no trial had been scheduled when it filed its Motion. Therefore, Defendant filed its Motion within the acceptable time frame— after pleadings closed, but early enough not to delay trial. *C.F. Biniaris v. Hansel Union Consulting, PLLC*, 382 F. Supp. 3d 467, 471 (E.D. Va. 2019) (questioning timeliness of defendant's motion for judgment on the pleadings that was filed on April 17, 2019, when trial was scheduled to begin on August 20, 2019, but nevertheless reaching the merits of the motion). Defendant's Motion for Judgment on the Pleadings is thus timely.

B. Plaintiff's Motion to Vacate Will be Denied

In its Motion for Judgment on the Pleadings, Defendant first argues that Plaintiff's Motion to Vacate should be denied. Dkt. 38 at 15-22. Plaintiff initiated this action to vacate the August 4, 2022 arbitration award entered in favor of Defendant. Dkt. 1 at 1. Plaintiff asserts that the Court

9

JA447

must vacate the award under Section 10(a)(3) of the Federal Arbitration Act ("FAA"). *Id.* ¶ 2.; *id.* at 31. Under the FAA, federal courts may vacate an arbitration award only upon a showing of one of the specified grounds:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing . . . or in refusing to hear evidence pertinent and material to the controversy . . .; or (4) where the arbitrators exceeded their powers . . . .

9 U.S.C. § 10(a); *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 193 (4th Cir. 1998). Relying primarily on the third ground, Plaintiff states that the Award should be vacated because the arbitrator "refused to hear pertinent and material evidence."[2] Dkt. 1 ¶ 66. Specifically, Plaintiff claims that the arbitrator engaged in misconduct by denying Plaintiff's Motion to Supplement Arbitration Exhibits and by declining to review evidence related to Defendant's more favorable treatment of similarly situated schools or to allow limited discovery to investigate Defendant's true motives for withdrawing IU's accreditation. *Id.* ¶¶ 67, 70, 73. Plaintiff contends that in "refusing to allow any extra-record evidence or discovery regardless of the strength of CEHE's showing of improper conduct and bad faith, the arbitrator denied CEHE 'an adequate opportunity to present its evidence and arguments.'" Dkt. at 3 (quoting *Int'l Union, UMW v. Marrowbone Dev. Co.*, 232 F.3d 383, 389 (4th Cir. 2000)). Conversely, Defendant argues that the Motion to Vacate should be denied because the scope of the arbitration proceedings, as defined by the *Instructions for Arbitration*, limited the arbitrator's authority to considering only evidence in the record before the Appeals Panel. Dkt. 38 at 17.

---

[2] Although Plaintiff also alleges that the arbitrator "exceeded its powers," Plaintiff fails to provide specific details to support this claim. Dkt. 1 ¶ 66. It therefore appears that Plaintiff's Motion to Vacate is based solely on the third ground—that the arbitrator refused to hear pertinent and material evidence.

JA448

As courts recognize, "[a]rbitration is fundamentally a creature of contract," where the "arbitration will be governed by procedures specifically tailored to the context from which the agreement to arbitrate arises." *Pearce v. E.F. Hutton Grp., Inc.*, 828 F.2d 826, 829 (D.C. Cir. 1987). "[T]he scope of judicial review for an arbitrator's decision 'is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation.'" *Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007) (quoting *Apex Plumbing Supply*, 142 F.3d at 193). When reviewing arbitration awards, "a district or appellate court is limited to determining whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 146 (4th Cir. 1994) (internal quotation marks omitted). The party seeking to vacate an arbitration award carries a "heavy burden" in demonstrating that one of the grounds specified in the FAA has been met. *DataQuick*, 492 F.3d at 527.

Plaintiff has failed to meet this burden because the arbitrator did not commit misconduct in declining to consider evidence of Defendant's treatment of similarly situated schools or in declining to order limited discovery. Rather, the arbitrator acted within the scope of his authority prescribed by the arbitration agreement between the parties. The arbitration was governed by Defendant's *Instructions for Arbitration*, which Plaintiff agreed to abide by when it applied for accreditation with Defendant. Dkt. 1-5 at 1, 5. The *Instructions for Arbitration* specifically provide that arbitration "is *not* a *de novo* review" and, importantly, that the arbitrator "*may not* consider evidence that was not in the record before the Appeals Panel." Dkt. 1-4 at 2. Even more particularly, the *Instructions for Arbitration* provide that "[d]epositions, interrogatories, requests

11

JA449

for admission, and other forms of adversarial discovery shall not be used during the arbitration proceeding." *Id.* at 4. Arbitration is a creature of contract and, here, the contract bound the arbitrator to review only the evidence that was part of the record before the Appeals Panel. As such, the arbitrator properly denied Plaintiff's requests to require Defendant to produce additional documents and records related to other schools or to permit discovery beyond the existing record. As Defendant notes, given the clear and binding *Instructions for Arbitration*, "the only pertinent and material evidence was that in the record." Dkt. 38 at 17. Upon review of that record, the arbitrator determined that the Appeals Panel's decision was supported by the evidence.

Plaintiff does not dispute that these are the provisions by which Plaintiff, in applying for accreditation, agreed to be governed. Dkt. 39 at 13 (conceding "as a technical matter, the arbitrator followed ACCSC's procedurally deficient Instructions"). Rather, Plaintiff argues that the *Instructions* "denied CEHE the required full and fair opportunity for review of the withdrawal decision." *Id.* at 1. Accordingly, based on Plaintiff's own allegations and argument, Plaintiff has failed to provide a sufficient basis to vacate the arbitration award under Section 10 of the FAA because the arbitrator did not commit misconduct by denying Plaintiff's Motion to Supplement Arbitration Exhibits. As a result, Defendant's Motion for Judgment on the Pleadings will be granted as to Plaintiff's Motion to Vacate, and the Motion to Vacate will be denied.

### B. Remaining Counts

Next, Defendant asks this Court to dismiss the remaining Counts of the Complaint because "they represent an impermissible collateral attack on the final arbitration award and because they rely on a violation of due process that [Plaintiff] cannot establish." Dkt. 38 at 22. In Opposition, Plaintiff asserts that it can bring claims that it did not assert in arbitration "if a withdrawal decision was based on agency bias or bad faith." Dkt. 39 at 13-14 (citing *Pro. Massage Training Ctr., Inc.*

12

JA450

*v. Accreditation All. of Career Sch. & Colleges*, 781 F.3d 161, 181-82 (4th Cir. 2015) ("*Professional Massage*")). Plaintiff alleges that Defendant treated other member institutions, who were in worse or similar conditions to IU, more leniently. Dkt. 1 ¶ 51. Plaintiff further argues that Defendant withdrew Plaintiff's accreditation in bad faith because it singled out Plaintiff to deflect unrelated public scrutiny; that this claim was not litigated before the arbitrator; and that Plaintiff is therefore entitled to its day in court regarding the remaining claims based on the alleged bad faith. Dkt. 39 at 11-14. The Court will first address Defendant's collateral attack argument.

Under Section 9 of the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in Sections 10 and 11. Section 10 lists grounds for vacating an award, while Section 11 names those for modifying or correcting one." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, at 583 (2008); 9 U.S.C. §§ 9-11. An arbitration award is therefore binding unless the parties challenge the validity of the underlying arbitration agreement under Section 2 of the FAA or seek review of the arbitration award to "address egregious departures from the parties' agreed-upon arbitration" under Sections 10 and 11. *Hall St.*, 552 U.S. at 586; *Corey v. N.Y. Stock Exch.*, 691 F.2d 1205, 1212 (6th Cir. 1982) ("Once an arbitrator has rendered a decision the award is binding on the parties unless they challenge the underlying contract to arbitrate pursuant to section 2 or avail themselves of the review provisions of sections 10 and 11."). As such, courts have ruled that claims that require a court to review an arbitration award outside of the framework prescribed in Sections 10 and 11 of the FAA are generally impermissible, as they constitute collateral attacks on the award. *See Texas Brine Co. v. Am. Arbitration Ass'n, Inc.*, 955 F.3d 482, 487 (5th Cir. 2020) ("The Supreme Court has held that the statutory bases for vacating an arbitrator's award are the only grounds on which a court may vacate an award . . . purportedly independent claims are not a basis for a challenge if they are disguised

13

JA451

collateral attacks on the arbitration award"); *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906 (6th Cir. 2000) (explaining that "where a party files a complaint in federal court seeking damages for an alleged wrongdoing that compromised an arbitration award and caused the party injury, it 'is no more, in substance, than an impermissible collateral attack on the award itself'"); *Corey*, 691 F.2d at 1211-12; *Foster v. Turley*, 808 F.2d 38, 42 (10th Cir. 1986); *Fakhri v. Marriot Int'l Hotels, Inc.*, 201 F. Supp. 3d 696, 712 (D. Md. 2016).

Plaintiff's claims here are an impermissible collateral attack against the arbitration award. In addition to the Motion to Vacate based on Section 10 of the FAA that this Court found insufficient in the previous section, Plaintiff asserts four remaining claims: a violation of due process claim (Count I), two tortious interference with contract claims (Count III and IV), and a tortious interference with prospective business or economic advantage claim (Count V). Dkt. 1 at 24-30. Although Plaintiff challenges the *Instructions for Arbitration*, Plaintiff does not argue that the underlying agreement between the parties, including the agreement to arbitrate, is void or invalid. Instead, Plaintiff's challenge appears to be buyer's remorse regarding the restrictions in arbitration to which it agreed to abide when it applied for accreditation.[3] Plaintiff has therefore

---

[3] In applying for accreditation with Defendant, applicant schools, including IU, agree "to submit fully and faithfully to final, binding arbitration proceedings" that are governed by Defendant's *Instructions for Arbitration*. Dkt. 1-4 at 2; Dkt. 1-5 at 5 (explaining that, "[a]s a member of the AACSC seeking accreditation, IU has agreed, among other things, to adhere [to] the AACSC Bylaws. Pursuant to Section 4.06 of the AACSC Bylaws, IU has agreed, by applying for accreditation . . . to submit any claim against the Commission relating to accreditation to final and binding arbitration as set forth in" Defendant's *Standards*, which include the *Instructions for Arbitration* in an appendix); Dkt. 28 at 14. Moreover, the HEA requires initial arbitration of disputes involving accreditation status of institutions of higher education. *See* 20 U.S.C. § 1099b(e) ("The Secretary may not recognize the accreditation of any institution of higher education unless the institution of higher education agrees to submit any dispute involving the final denial, withdrawal, or termination of accreditation to initial arbitration prior to any other legal action."). As such, in applying for accreditation with Defendant, Plaintiff agreed to submit disputes involving the withdrawal of accreditation to arbitration and agreed to adhere to Defendant's *Instructions for Arbitration*.

14

not sought to challenge the underlying arbitration agreement under Section 2 of the FAA. Nor has Plaintiff sought relief under Section 11 or, as discussed in the previous section, provided sufficient basis to vacate the arbitration award under Section 10 of the FAA. "Barring these . . . situations, the [FAA] provides no other avenue by which an arbitration award may be challenged." *Corey*, 691 F.2d at 1212-13 (explaining that a defendant "may not transform what would ordinarily constitute an impermissible collateral attack into a proper independent direct action by . . . altering the relief sought"); *see also Hall St.*, 552 U.S. at 584 ("hold[ing] that [Sections] 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification"). As Defendant notes, a dispositive issue in each of Plaintiff's claims is whether Defendant afforded Plaintiff due process in withdrawing its accreditation and in the appeal and arbitration process. Dkt. 38 at 24. Ruling in Plaintiff's favor on these claims would effectively nullify the arbitration award in a manner that is unsupported by the FAA and thwart "the strong federal policy in favor of enforcing arbitration agreements."[4] *Decker*, 205 F.3d at 910. Because Plaintiff has not adequately pursued any of the pathways provided by the FAA to challenge the arbitration award,

---

[4] Plaintiff argues that *Professional Massage* allows it to bring its claims regarding Defendant's alleged bad faith, which it was unable to raise during arbitration due to the binding *Instructions for Arbitration* that limited the arbitrator's review of Defendant's withdrawal decision. While the *Professional Massage* Court briefly acknowledges that "[a] federal court may be justified in conducting a more searching inquiry into the motivations of administrative decisionmakers in the case of 'a strong showing of bad faith or improper behavior,'" 781 F.3d at 177-78, it ultimately reversed the district court, which "greatly expanded the administrative record, held a full multi-day bench trial, received depositions and live testimony in a way that sought to make itself the primary investigator and finder of fact," *id.* at 172. Moreover, *Professional Massage* did not involve a challenge to an arbitration award. As discussed, arbitration awards can only be challenged through the pathways prescribed by the FAA, none of which Plaintiff has adequately pursued here.

JA453

its remaining claims constitute an impermissible collateral attack on the award and will be dismissed.[5]

## IV. Conclusion

In sum, Plaintiff has failed to provide a sufficient basis to vacate the arbitration award under Section 10 of the FAA, and Counts I, III, IV, and V constitute an impermissible collateral attack on the arbitration award.  Accordingly, for the foregoing reasons, it is hereby

ORDERED that Defendant's Motion for Judgment on the Pleadings (Dkt. 37) is GRANTED; and it is

FURTHER ORDERED that Plaintiff's Motion to Vacate is DENIED; and it is

FURTHER ORDERED that Plaintiff's Objection to Magistrate Judge's Order on Defendant's Motion for Protective Order (Dkt. 68) is DISMISSED AS MOOT.

The Clerk is directed to enter final judgment in favor of Defendant and against Plaintiff on Counts I, III, IV, and V; to forward copies of this Memorandum Opinion and Order to counsel of record; and to close this civil action.

It is SO ORDERED.

Alexandria, Virginia
March 6, 2025

_____ /s/
Rossie D. Alston, Jr.
United States District Judge

---

[5] Given that the Court finds that Counts I and III-V represent a collateral attack on the arbitration award, the Court need not assess Defendant's Due Process argument which addresses the merits of Plaintiff's claims.

16

JA454

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |  |
|---|---|---|
| Center for Excellence in Higher Education, Inc. | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No.    1:22-cv-01223-RDA-WEF |
| Accreditation Alliance of Career Schools and Colleges | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |

**<u>JUDGMENT</u>**

Pursuant to the Order of this Court entered on March 6, 2025 and in accordance with Federal

Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of Defendant Accreditation

Alliance of Career Schools and Colleges and against Plaintiff Center for Excellence in Higher

Education, Inc. on Counts I, III, IV, and V.

FERNANDO GALINDO, CLERK OF COURT

By: _____/s/_____
                S. Brown
                Deputy Clerk

Dated: 3/6/2025
Alexandria, Virginia

JA455

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |
|---|---|
| CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES, D/B/A ACCREDITING COMMISSION OF CAREER SCHOOLS AND COLLEGES. <br><br> *Defendant*. | Civil Action No. <br> 1:22-cv-01223-RDA-WEF |

**Plaintiff's Notice of Appeal**

Notice is hereby given that Plaintiff Center for Excellence in Higher Education appeals to the United States Court of Appeals for the Fourth Circuit from this Court's March 6, 2025 Order (Dkt. 86) granting Defendant's Motion for Judgment on the Pleadings, denying Plaintiff's Motion to Vacate Arbitration Award, and dismissing as moot Plaintiff's Objection to Magistrate Judge's Order of Defendant's Motion for Protective Order.

Dated this April 4, 2025

Respectfully submitted,

CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC.

/s/ David A. Obuchowicz

Steven M. Gombos (VSB No. 30788)
David A. Obuchowicz (VSB No. 82483)
GOMBOS LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, VA 22030

1

JA456

Telephone:    (703) 934-2660
Fax:          (703) 934-9840
Email:        sgombos@glpclaw.com
              dobuchowicz@glpclaw.com
*Attorney for CEHE*

2

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned counsel certifies that, on April 4, 2025, I also caused a copy of the foregoing to be electronically filed using the Court's CM/ECF system, which will send notification of such filing to counsel of record by operation of the Court's electronic system.

Lewis F. Powell III
David N. Goldman
Arthur Eric Schmalz
Michael Randolph Shebelskie
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street Richmond, VA 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Email: lpowell@hunton.com
       dgoldman@huntonak.com
       aschmalz@hunton.com
       mshebelskie@huntonak.com


*Counsel for ACCSC*


                                    */s/ David A. Obuchowicz*_____

3

JA458